Susan Walker (130748)
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
susan.walker@dentons.com

Karl M. Tilleman (*Admitted Pro Hac Vice*)
Douglas D. Janicik (*Admitted Pro Hac Vice*)
DENTONS US LLP
2398 East Camelback Road, Suite 850
Phoenix, Arizona 85016-9007
Telephone: (602) 308-3900
Facsimile:  (602) 308-3914
karl.tilleman@dentons.com
doug.janicik@dentons.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| The Icon at Panorama, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>Southwest Regional Council of Carpenters; Laborers International Union of North America Local 300; Daniel Langford, an individual; Alexis Olbrei, an individual; Ron Diament, an individual; Pete Rodriguez, an individual; Ernesto Pantoja, an individual; Sergio Rascon, an individual; Angel Olvera, an individual; SWAPE, LLC, a California limited liability company; Smith Engineering & Management, a California corporation; unnamed spouses of all named individual Defendants, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.: 2:19-CV-00181<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**1. ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT**<br><br>**2. CONSPIRACY TO MONOPOLIZE IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT**<br><br>**3. DIRECTING A "GROUP BOYCOTT" IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**<br><br>**4. CONSPIRACY AND ATTEMPT TO ENTER INTO EXCLUSIVE DEALING ARRANGEMENT IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT AND SECTION 1 OF THE SHERMAN ACT**<br><br>**5. VIOLATION OF LABOR MANAGEMENT RELATIONS ACT, 29 U.S.C. § 187** |

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**6. RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962 (C)**

**7. UNFAIR COMPETITION, CAL. BUS. & PROF. CODE § 17200, AGAINST ALL DEFENDANTS**

**AND DEMAND FOR JURY TRIAL**

Plaintiff, The Icon at Panorama, LLC ("Icon") alleges as follows:

**Jurisdiction and Venue**

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 1337. This action arises under the Clayton Act, 15 U.S.C. §§ 15, 26, to obtain injunctive relief, damages and costs, including reasonable attorneys' fees for violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, section 303 of the Labor Management Relations Act, 29 U.S.C. § 187, and the federal Racketeer Influenced and Corrupt Organizations statute, 18 U.S.C. § 1961 *et seq.*

2.     This Court has jurisdiction pursuant to 28 U.S.C. § 1367 over the state law causes of action because those causes of action are related to the federal law causes of action and form part of the same case and controversy under Article III of the United States Constitution.

3.     The conduct alleged in this First Amended Complaint occurred in interstate commerce and has affected and will continue to substantially and directly affect interstate commerce.

4.     The Court has personal jurisdiction over the Defendants and venue is proper in the Central District of California because (a) all Defendants reside in the State of California and at least one of the Defendants resides in this District, and (b) substantial parts of the events or omissions giving rise to the claims occurred in this District.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

**Introduction**

5.     The Southwest Regional Council of Carpenters ("SWRCC") and the Laborers International Union of North America Local 300 ("LIUNA") have conspired to dominate, monopolize, and control the sale of labor services to developers of large real estate projects within Los Angeles County, California by engaging in anti-competitive conduct and racketeering activities, including fraud and attempted extortion, by means of, *inter alia*, their pattern and practice of filing repeated sham litigation under the guise of the California Environmental Quality Act ("CEQA"). This fraudulent, extortionist, and anti-competitive conduct is commonly referred to as "greenmail."

6.     Throughout this First Amended Complaint the term "Union Defendants" will mean SWRCC and LIUNA, whether acting directly as a labor organization or through any of its officers, directors, employees, or agents authorized to act on behalf of one or both organizations.

7.     For nearly two decades, the former Montgomery Ward building at 14665 Roscoe Boulevard in Panorama City has sat abandoned, attracting homeless encampments, gangs, graffiti, and various other criminal activities. Once a popular shopping destination, the department store shut its doors in 2001 after struggling to compete with other retailers.

8.     Icon purchased the vacant site in January of 2016 and based on feedback from the City and numerous community stakeholders, Icon submitted an application to the Los Angeles Department of City Planning ("Department of City Planning"), proposing to transform the vacant and dilapidated property that encompasses an approximate nine-acre site, into a mixed-use complex, including numerous residential units and commercial space – known as The Icon Panorama Project ("Project").

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

9.      The Department of City Planning, the area's City Council Office, neighboring property and business owners, Panorama City residents, business leaders, the Panorama City Neighborhood Council, the Panorama City Chamber of Commerce, law enforcement (LAPD), a local hospital (Mission Community Hospital), Galpin Motors (a prominent employer in the area), PATH (People Assisting The Homeless) (an advocacy group focused on housing the homeless), among others (collectively the "Community"), enthusiastically support the Project. The Community overwhelmingly supports Icon's plan for the property and have expressly stated that it would strongly satisfy the area's critical housing needs with a contemporary and diverse mix of apartments, bring needed jobs and desirable retail businesses, beautify and safeguard the community, and provide the overall redevelopment desperately needed in the currently blighted area.

10.     Despite the overwhelming and vocal Community support, from March 2017 through August 2018, the Union Defendants have, at every step of the Project approval process, tried to induce the area's City Council Office, Department of City Planning, Los Angeles City Planning Commission ("Planning Commission"), and the Los Angeles City Council ("City Council") to deny approval of the Project on false grounds that it does not comply with CEQA. The Union Defendants' sole purpose in filing CEQA challenges was to delay the Project and coerce, intimidate, and pressure Icon to agree to use exclusively union labor, otherwise Icon would suffer significant cost increases to the Project. The Unions also sought to pad their own coffers. By forcing Icon and other developers to use only union contractors on development projects (like Panorama), the Unions sought to ensure ongoing work for existing unionized contractors, boost the Unions' membership rolls (i.e., the number of employees working for unionized contractors), and eliminate the availability of nonunion labor in the market. Through their extortionate tactics, the Unions maintain and grow the

- 4 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

number of individuals paying dues to the Unions. Membership dues are the Unions' primary source of revenue.

11.    The Union Defendants were the only individuals or entities to continuously challenge the Project's compliance with CEQA and to publicly oppose the Project.

12.    During its sham CEQA challenges, the Union Defendants essentially bribed the Icon Project developers promising that they would withdraw their CEQA challenges and actively support the Project if Icon would agree to use exclusively union labor on the Project. The Union Defendants made these promises to Icon even if Icon took no steps whatsoever to address the purported environmental concerns raised in the Union Defendants' CEQA challenges. The Union Defendants' CEQA challenges were an absolute sham, through and through, and had nothing whatsoever to do with protecting the environment.

13.    Icon continuously made good faith efforts to engage with the Union Defendants to involve them in the Project in ways that were financially feasible. Icon was consistent in its message that given the Project's location and the area's low rents, it could not support the high cost of using exclusively union labor but that finding certain areas on the Project to use union trades was a possibility once Icon began working on the construction plans and pricing the Project.

14.    Icon informed the Union Defendants that the Project's financial constraints were further demonstrated by the fact that the Project site sat vacant for almost two decades and experienced a number of failed attempts by other developers to redevelop it.

15.    Not once was the environment raised as a legitimate concern by the Union Defendants to Icon during any discussions or written communications among the parties about the Project. In fact, early on, during discussions with the Union Defendants, Icon attempted to address any environmental concerns that the

- 5 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Union Defendants had. The Union Defendants summarily refused to engage in discussions about environmental concerns as the Union Defendants were solely interested in compelling Icon to use exclusively union labor on the Project. Otherwise stated, the Union Defendants are exploiting the CEQA process itself, not for any reason related to the environment but for their own financial gain and as a weapon to coerce Icon, and other developers like Icon, to use nothing but union labor on major developments in Los Angeles County.

16.     The irony and hypocrisy of the Union Defendants' sham claims are noteworthy as a considerable part of what they challenged and objected to are alleged unsafe conditions on the site that would adversely impact the health and well-being of those working on the Project, yet while they were publicly opposing the Project with these bogus environmental and health concerns, privately, they were pressuring Icon to use exclusively union labor that would guarantee that no one other than a their own union members would be working on the Project thus ensuring that their members would be exposed to these alleged "health risks."

17.     SWRCC refused to negotiate with Icon to find feasible ways to include their trades and demanded that Icon use exclusively union contractors on the Project. LIUNA refused to negotiate with Icon over an alternative labor arrangement, in part, because LIUNA disclosed to ICON that they previously entered a "most favored nation" agreement with a competing developer whereby LIUNA agreed with the competing developer not to enter more favorable agreements with other developers, such as Icon.

18.     The Union Defendants' challenges so lacked in merit that, in rejecting one of their numerous challenges to the Project, at the conclusion of the Planning Commission hearing, Los Angeles Planning Commission President David Ambroz stated that the Union Defendants "weaponized" CEQA and made objections that were "just patently false." That blunt public rebuke of the Union

- 6 -

Defendants is exactly what they are doing, which is why Icon has filed this litigation—to stop the Union Defendants from weaponizing CEQA and filing frivolous CEQA challenges as a threat to any developer who does not succumb to the Union Defendants' threats.

19.     The Union Defendants failed on their appeals in every administrative level and, on August 29, 2018, the City Council denied the Union Defendants' appeal and unanimously approved the Project, exhausting the administrative approvals process.

20.     Failing to force Icon to use exclusively union contractors on the Project via their spurious administrative challenges, the Union Defendants nevertheless continued their sham efforts on October 1, 2018 by filing a Petition for Writ of Mandate based on CEQA in the Superior Court of the State of California, County of Los Angeles. As they did during the administrative process before the Planning Commission and City Council, the Union Defendants again made false statements regarding the Project. And again, the Union Defendants have only one goal in mind—to delay the Project further, to drive up costs, and to force Icon to cede to their continued improper and anticompetitive demands or suffer significant cost overruns, potential termination of contracts with interested retailers, and the loss of relationships with potential nonunion contractors who have expressed an interest in working on the Project.

21.     This is not the first time that the Union Defendants filed sham oppositions and appeals to the Los Angeles Planning Department, Planning Commission, and City Council based on false CEQA claims to delay development of large projects within Los Angeles County for the purpose of coercing, intimidating, and pressuring developers to surrender to their demands.

22.     In fact, the Union Defendants' practice of challenging projects under the guise of CEQA is rampant and has become the status quo in Los Angeles

- 7 -

County on projects that are of substantial enough scale to attract their attention. The Union Defendants' practice is well known by developers, the community, the City's council offices, the Department of City Planning, the Planning Commission, and the City Council. In fact, there is a website called www.phonyuniontreehuggers.com that tracks and documents the unions opposition to countless public and private sector projects throughout California "on environmental grounds.… with the ulterior motive of extracting something of economic value from the public or private owner." As stated in an email from a planner at the Department of City Planning, Major Projects/Environmental Analysis unit: "From the experience in the Major Projects unit, the law firm Lozeau Drury, the Southwest Carpenters union, and/or the LIUNA union submit comment letters (electronically and written comments) on nearly every single recent EIR that our unit processes."

23.     In fact, the Union Defendants utilize virtually the same "template" arguments and claims in their comment letters and appeals on every project they challenge and appeal.

24.     The Union Defendants regularly conspire with SWAPE, LLC and Smith Engineering & Management, Inc., two consulting firms that provide misleading analyses on environmental impacts such as air quality and traffic to distort the facts and assist the Union Defendants in asserting frivolous challenges to projects' Environmental Impact Reports ("EIR").

25.     The Union Defendants have a consistent pattern and practice of filing sham challenges administratively and litigation in the Superior Court of the State of California against other developers within Los Angeles County in which they assert similar false claims under CEQA in an effort to delay their projects and drive up project costs to control the labor market.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

26.     Most developers buckle under the pressure and settle with the Union Defendants, resulting in disproportionally more developments in higher rent areas that can support these increased costs to the detriment and at the expense of underserved and lower income areas such as Panorama City (where the Project site is located) where developers cannot sustain the higher costs and thus abandon their projects as they are no longer financially feasible. Unfortunately, the ultimate losers are the lower income communities that see little in the way of quality community-enhancing development and more blight from boarded-up and dilapidated abandoned sites.

27.     Icon brings this action to assert and defend its right to manage, control, and operate its business affairs free from the Union Defendants' conspiracy to dominate, monopolize, and control the sale of labor services to developers of large real estate projects within Los Angeles County thorough its blatant use of sham litigation to achieve its goals.

28.     The Union Defendants' anti-competitive and abusive conduct has not only harmed Icon and other developers, nonunion contractors, the Panorama City community, and businesses and residents, it has also wasted the time and resources of public agencies, and now the courts.

29.     Without intervention from this Court, the Union Defendants will stop at nothing to prevent the development of the Project and other similar large projects within Los Angeles County and to eliminate competing nonunion contractors from the labor market. By engaging in the anti-competitive activities described in this First Amended Complaint, the Union Defendants have violated the Sherman Act, the Clayton Act, the Labor Management Relations Act, the Racketeer Influenced and Corrupt Organizations Act, and the California unfair competition laws.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

**The Parties**

30.    Plaintiff Icon is a limited liability company organized in 2015 and authorized to do business in Los Angeles County. Icon is a real estate planning, investment, and development company currently developing the Icon at Panorama Project. William Ruvelson and Eran Fields are co-founders and principals of Icon.

31.    Defendant SWRCC is a labor organization within the meaning of the Labor Act (29 U.S.C. § 151 *et seq.*). SWRCC represents over 50,000 members in Southern California, Nevada, Arizona, Utah, New Mexico, and Colorado.

32.    Alexis Olbrei is the Chief of Staff of the SWRCC.

33.    Pete Rodriguez is the President/COO of the SWRCC.

34.    Dan Langford is the Executive Secretary – Treasurer/CEO of the SWRCC.

35.    Ron Diament is a Special Representative of the SWRCC.

36.    SWRCC, Olbrei, Rodriguez, Langford, and Diament transact business in this jurisdiction with their principal place of business at 533 S. Fremont Ave, Los Angeles, California 90071.

37.    At all relevant times, Olbrei, Rodriguez, Langford, and Diament have been agents of SWRCC and are authorized to act for and on behalf of SWRCC.

38.    Defendant LIUNA is a labor organization within the meaning of the Labor Act (29 U.S.C. § 151 *et seq.*).

39.    Angel Olvera is an organizer with LIUNA.

40.    Sergio Rascon is the Business Manager of LIUNA.

41.    Ernesto Pantoja is a Special Projects Field Agent of LIUNA.

42.    LIUNA, Olvera, Rascon, and Pantoja transact business in this jurisdiction with their principal place of business at 2005 W. Pico Blvd, 2nd Floor, Los Angeles, California 90006.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

43.   At all relevant times, Olvera, Rascon, and Pantoja have been agents of LIUNA and are authorized to act for and on behalf of LIUNA.

44.   The Union Defendants were at all relevant times the agents, principals, partners, co-conspirators, and/or co-venturers of each other, and each of them acted within the course, scope, and authority of those relationships. As a result, the Union Defendants are jointly and severally liable for the acts alleged in this First Amended Complaint.

45.   Upon information and belief, SWAPE, LLC is a California limited liability company with an office and place of business located at 2656 29th Street, Suite 201, Santa Monica, CA 90405.

46.   SWAPE is an environmental consulting firm that conducts business within Los Angeles County, California. SWAPE provides consulting services to the Union Defendants directly or through its legal counsel.

47.   The Union Defendants engaged the services of SWAPE in connection with their efforts to monopolize the labor market as described herein.

48.   Upon information and belief, Smith Engineering & Management, Inc. ("SEM") is a California corporation with an office and place of business located at 5311 Lowry Rd, Union City, CA 94587.

49.   SEM is a traffic and civil consulting firm that conducts business within Los Angeles County, California.

50.   SEM provides consulting services to the Union Defendants directly or through its legal counsel.

51.   The Union Defendants engaged the services of SEM in connection with their efforts to monopolize the labor market as described herein.

52.   Plaintiff is unaware of the true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as DOES 1 through 10, inclusive, and therefore sue these Defendants by such fictitious

- 11 -

110615465

names. Plaintiff will seek leave of the Court to amend this pleading to set forth the true names and capacities of said Doe Defendants when the same are ascertained. Plaintiff is informed and believes, and on that basis allege, that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, or was acting in concert with, and with the permission, approval, and authorization of, the specifically named Defendants.

<u>**Factual Allegations**</u>

**I.     Icon proposes a transformative redevelopment project that the local community overwhelmingly supports.**

53.     Retail company Montgomery Ward previously owned and operated a large store at 14665 Roscoe Boulevard in Panorama City, California. Montgomery Ward closed its business in 2001. The building at Roscoe Boulevard has sat vacant since 2001, and the area has experienced homeless encampments, gang activity, graffiti, and other criminal activities.

54.     In 2016, Icon paid $18 million for the nearly nine-acre parcel on Roscoe Boulevard as the first step in its plan to transform the lot previously occupied by Montgomery Ward.

55.     On the abandoned site, Icon plans to construct 623 residential apartments, a 17,000 square foot public park, and 60,000 square feet of commercial space to potentially include pedestrian active retail at an estimated cost of $150 million to Icon.

56.     The proposed development is named the "The Icon Panorama" and has been enthusiastically greeted by the City and the Community.

57.     Neighborhood residents and groups have described the Project as a job-creator; "provid[ing] much needed housing"; "exactly what we need"; and "a critical element for the area's renewal."

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

58.     For example, Jack Waizenegger, a 30 year resident of Panorama City, wrote in a letter of support for the Project: "Development of the project, The ICON at Panorama City, will be the catalyst to begin restoration of our community. In addition, it will clean up the blight left from the defunct Montgomery Ward ruins, create good jobs during and after construction, provide much needed housing, add new desirable shopping and entertainment, complement the future Metro line along Van Nuys Boulevard, attract more redevelopment, and become a centerpiece which all of our community can be proud of. I do not know of a single neighbor or business owner who objects, instead they are all eager and excited to see this project arrive."

59.     Stephanie Cervantes, a 20 year resident of Panorama City wrote in her letter of support: "As you know, we have the densest residential population of any community in the valley, yet our housing is generally older and run down. We need new and beautiful apartments so that instead of moving out of Panorama City to other nicer neighborhoods, we stay here in the same community where we were born and where our parents and grandparents live. The residents here are good hard-working folks who want to give our children a better quality of life than we had. Moving into another community has been the answer for so many, but as long-time Panorama City residents move out, the community loses its soul. If there was a better housing alternative here in the neighborhood, more of us would stay. All of us go elsewhere to shop because our only shopping center (the Panorama Mall) is old and lacks any of the new and interesting elements that everyone else takes for granted when they shop at the gorgeous newer centers in Burbank, Woodland Hills or Universal City. Icon Panorama will give us a high-quality shopping experience with a beautiful open park with plenty of parking. We need this development to happen. Los Angeles needs for this development to happen."

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

60.     Local business owners have "applaud[ed] the developers and their efforts to transform the Panorama City neighborhood." Jeff Skobin, VP of Business Operations for Galpin Motors, one of the area's largest employers, wrote in Galpin's letter of support: "While the rest of Los Angeles has enjoyed tremendous development and economic boom, Panorama City has continued to languish. There have been two failed attempts in the past to revitalize the site, both of which were headed by out of state developers. This development is absolutely critical for the revitalization of Panorama City and the surrounding communities. We desperately need this dynamic mixed-use project with its proposed community park that will become the social hub of our community. We deserve such a quality project."

61.     Saul Mejia, President of the Panorama City Chamber of Commerce wrote in the Chamber's letter of support: "After driving around other parts of Los Angeles such as North Hollywood and Koreatown and seeing their beautiful new developments, it is disappointing to return to Panorama City and not see the same. Our community was once known as the heart of the San Fernando Valley. With this new project and those that will follow it, we will be beating strong once again. We applaud The Icon Company for coming into an area that was considered unworthy of development until recently."

62.     Gregory Wilkinson, Chair of the Panorama City Neighborhood Council wrote in the Council's letter of support: "Further, the lost economic activities for having such a large part of our business district has been a real loss to our residences and other local businesses. We are tired of seeing the Site being left to waste away and our community suffer as a result."

63.     Michel Moore, Chief of Police for the Los Angeles Police Department noted that the vacant site "has been occupied by the homeless/transients" and "has fallen victim to vandalism and has been

- 14 -

burglarized." Chief Moore emphasized, "This location would be ideal as a redevelopment project. A new development would create jobs and benefit the local economy. It is a densely populated area and in desperate need of redevelopment. The developer, ICON, has taken on this challenge and proposed a project which we feel not only fits the community but benefits the city as well."

64.     Tescia Uribe, Chief Program Officer for PATH Housing Partnerships Program, whose mission is to end homelessness for individuals, families, and communities, applauded "[t]he fact that they are building desperately needed housing in a community that has been largely ignored by development."

65.     James K. Theiring, Chief Executive Officer of Mission Community Hospital located in Panorama City that employs over 700 workers wrote: "As active participants in our community, we have not seen any significant business growth in recent years and struggle to find close partnerships. In this regard, we believe that the development of Icon Panorama will bring needed jobs, businesses and contemporary housing into the community, as well as modern attractions for residents of Panorama City and neighboring towns."

## II.     The Union Defendants raised sham challenges to the Icon Project at every step of the CEQA administrative process.

66.     CEQA sets forth a process for evaluating and publicly disclosing the environmental impacts of a proposed project.

67.     For projects subject to CEQA, the agency prepares an initial study of the project's impact on the environment.

68.     If necessary, the lead agency then sends a Notice of Preparation to inform the public that it will prepare an EIR for a project. The lead agency provides at least 30 days to comment on the Notice of Preparation. The lead agency may also hold meetings with experts and the public during this period.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

69.     The lead agency then prepares a draft EIR ("DEIR") and provides the public an opportunity to comment on the draft. The lead agency can also issue revised DEIRs. The lead agency then prepares a final EIR ("FEIR") and responds to the comments on the DEIR. The agency then holds public hearings and makes a decision on the project.

70.     In Los Angeles, the Los Angeles Advisory Agency initially approves the project. An interested party can appeal that decision to the Los Angeles Planning Commission, then to the Planning and Land Use Management Committee. If the Planning and Land Use Committee approves the project, an interested party can appeal the decision to the City Council. Once an interested party has exhausted all administrative remedies, it can appeal the approval of the project by filing a Petition for a Writ of Mandate in California Superior Court.

71.     On April 6, 2017, the Department of City Planning unanimously approved Icon's DEIR for the Panorama Project.

72.     On May 22, 2017, the Union Defendants sent to the Department of City Planning, via e-mail and U.S. mail, comments challenging the DEIR for the Project.

73.     The May 22, 2017 letter falsely stated that the DEIR failed to analyze the soil for hazardous chemicals at the Project site. In fact, the Union Defendants had a copy of the DEIR and knew that it analyzed the soil for hazardous chemicals at the Project site.

74.     On August 31, 2017, the Department of City Planning recirculated a revised DEIR that addressed comment letters from City of Los Angeles's Building Departments, neighborhood stakeholders, and the Union Defendants.

75.     On February 23, 2018, the Department of City Planning issued the FEIR for the Project.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

76.     On March 19, 2018, the day before the first public hearing on the Project, the Union Defendants sent another letter via e-mail challenging the FEIR. The letter urged the Department of City Planning to deny environmental certification of the Project.

77.     The March 19, 2018 letter falsely stated that the City of Los Angeles Fire Department ("LAFD") found that fire protection for the Project would be inadequate. The Union Defendants knew that the LAFD found that the fire protection for the Project would be adequate if the Project made certain changes that are standard practice.

78.     The March 19, 2018 letter also falsely stated that the FEIR refused to analyze the impact the project would have on fire protection. In fact, the Union Defendants knew that the FEIR analyzed the impact the Project would have on fire protection.

79.     On March 20, 2018, at the first public hearing on the Project before the Los Angeles Advisory Agency, the Union Defendants opposed the Project and repeated the false statements about the Project contained in the March 19, 2018 letter. The Advisory Agency unanimously approved the Project the same day.

80.     The Union Defendants appealed the Advisory Agency's decision to the Los Angeles Planning Commission.

81.     On April 23, 2018, the Union Defendants sent another letter via e-mail and overnight mail to the Planning Commission challenging the Project.

82.     The Union Defendants continued with their sham challenges by falsely claiming that the revised Project "has never been analyzed in any CEQA document," and "will dramatically increase almost all of the Project's environmental impacts," and that, because the revised Project has 48% more residential units than the original Project, it will have 48% greater impacts, conveniently ignoring that the overall scope of the revised Project was actually

- 17 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

reduced by decreasing the commercial floor area proposed under the original Project from 200,000 to 60,000 square feet, a reduction of 70% which significantly reduced the Project's overall environmental impacts. In fact, the FEIR undertakes a thorough analysis to conclude that such impacts would be reduced from those of the original Project.

83.     The Union Defendants, which purport to be advocating on behalf of environmental protection, seek to indict the Department of City Planning for advancing the purposes of CEQA by developing a less impactful project in response to comments on the DEIR and analyzing that project as a new alternative in the FEIR.

84.     The Union Defendants also falsely claimed that the Department of City Planning is required to adopt a different reduced project, which the EIR identified as the environmentally superior alternative. In certifying the EIR, the Advisory Agency correctly found this alternative to be infeasible, as it would not satisfy the Project's underlying purpose and key objectives to the same degree. In particular, it would not support regional housing goals and transit-oriented development or provide the critical mass and mix of uses necessary to successfully activate the area.

85.     Inexplicably, the April 23, 2018 letter also falsely stated that the DEIR "states clearly that the Project proposal is for a ***maximum*** of 422 residential units." (Emphasis added.) In fact, the Union Defendants had a copy of the DEIR and knew or should have known that it did not state that the Project proposal is for a maximum of 422 residential units.

86.     On April 26, 2018, the Planning Commission unanimously approved the Project over the Union Defendants' objections.

- 18 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

87.     At the April 26, 2018 hearing, Planning Commission President David Ambroz chided the Union Defendants' abuse of process and sham litigation tactics, stating:

> I would like to say a few things. I feel as though **the [Union Defendants'] appeal was specious at best** and in my lawyer days I would say I would deny it with prejudice. I think **CEQA has been weaponized** and it's a shame that it is so. Things and assertions like "soil wasn't studied and would harm people" **is just patently false**. And the staff provided information to this commission that Phase 1 and Phase 2 studies were done and **that is in the record and available to the appellant and I am just unclear why someone would make an assertion that is just patently false**. I am dismayed that I have rarely seen CEQA used to actually protect the environment. It seems here and I would be curious to know, and I am not asking, that this seems to be a labor question, are you going to use union labor or not. And while that is not our decision to make it is a shame that we are now seeing CEQA used as a tool to both delay community redevelopment and potentially not harm by not improving the environment so dismaying and a trend that I do not see stopping anytime soon without significant reform.

88.     On May 25, 2018, the Union Defendants again appealed the decision to the Planning and Land Use Management Committee.

89.     On August 21, 2018, the Planning and Land Use Management Committee unanimously approved the Project.

90.     The Union Defendants again appealed the decision to the Los Angeles City Council.

91.     Before the City Council hearing on the Project, the SWRCC met with the City Council's office to further pressure them to oppose the Project.

92.     On August 29, 2018, the City Council unanimously approved the Project.

93.     On September 28, 2018, following the approval of the Project, SWRCC Chief of Staff Olbrei met with Jim Dantona, Chief of Staff of the area's City Council Office to try to discuss a labor agreement on the Project. According

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

to Ackley Padilla, the area's City Council Office's Deputy Chief of Staff, Olbrei left the meeting amenable to the idea of providing SWRCC the right to match Icon's other subcontractors' pricing. On October 1, 2018, the final day to appeal the City Council's decision, the Union Defendants filed their suit as they were unable to coerce and force Icon to pledge in advance that it would use exclusively union contractors on the Project.

94.    Throughout the entire administrative process, the Union Defendants were the *only* individuals or entities to continuously challenge the Project's compliance with CEQA and publicly oppose the Project. In fact, as detailed herein, the Project received overwhelming support from the City and Community.

95.    Icon spent significant time and money responding to the Union Defendants' sham CEQA challenges at the administrative stage.

**III.   At the same time the Union Defendants pursued their sham CEQA challenges, the Union Defendants demanded that Icon agree to use exclusively union labor on its Project.**

96.    To facilitate their attempt to assert monopolistic control of the sale of labor services to developers of large projects in Los Angeles County, the Union Defendants have coerced or attempted to coerce developers like Icon to use exclusively union contractors.

97.    In mid-April 2017, after the Department of City Planning released the DEIR but before the Unions Defendants filed their first opposition, Ron Diament, Special Representative for SWRCC, contacted Icon Principal Ruvelson and told him that he had learned about the Project and wanted to talk with him about having Icon use exclusively union contractors on the Project.

98.    Ruvelson explained that Icon was willing to use both union and nonunion contractors on the Project, and that Icon would implement a competitive bidding process to select contractors for the Project to ensure that it met its budgets.

- 20 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

99.    Unbeknownst to Icon, at the same time that Diament sought to discuss Icon's labor needs, the Union Defendants were preparing their sham CEQA challenges as described above.

100.    After Icon received the Union Defendants' May 22, 2017 challenge to the Project, Ruvelson emailed Diament to express confusion about the Union Defendants' tactics, stating: "Ron, Please be in touch about this. I'm confused."

101.    Diament told Ruvelson that if Icon agreed to use exclusively union contractors on the Project, the Union Defendants would drop their CEQA challenge to the Project. At no time did Diament ever tell Ruvelson that Icon also needed to address any of the purported environmental issues contained in the Unions' CEQA challenge.

102.    On June 8, 2017, Ruvelson met with Diament and Olbrei at SWRCC's training facility in Sylmar, CA.

103.    At the June 8 meeting, Diament and Olbrei continued to pressure Ruvelson to use exclusively union contractors for the Project.

104.    The next day, Diament emailed Ruvelson a list of four "Union General Contractors" that Icon should use for the Project: Morley Builders, Inc., W.M. Klorman Construction Corporation, Charles Pankow Builders, Ltd., and Bomel Construction Company. Diament stated that "There's more. . . . I started with these 4 and I will send out the complete list later."

105.    Over the next few months, the administrative process and the Union Defendants' sham CEQA challenges continued.

106.    On October 16, 2017, Icon principal Eran Fields contacted Diament to express his frustration with the Union Defendants' continuing challenges to the Project in an effort to force Icon to use exclusively union contractors. Fields reiterated that Icon was willing to use union contractors, as well as nonunion contractors, through a competitive bidding process. Fields stressed to Diament

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

that due to the Project's location and projected rents, that it was infeasible for Icon to pledge in advance to use exclusively union contractors because of the higher labor costs but that Icon would work with the Union Defendants in good faith to include them in certain areas of the Project that Icon could afford.

107.    That same day, Diament emailed Fields and stated, "I have some influence with these folks, [*i.e.*, the Unions]," and that they could work out a deal.

108.    On March 14, 2018, one week before the first public hearing on the Project, Diament sent a text message to Fields asking to meet before the hearing and implying that the Union Defendants would drop their CEQA challenges only if Icon agreed to use exclusively union contractors. In response to Fields questioning why he wanted to meet, Diament stated: "I know the road you need to be on the get the job to move forward," and in response to Fields' response of "Sorry, no idea what that means. You mean opposition from union if we don't?" Diament responded: "I know that there's been some of that from a few, including the carpenters."

109.    In response, Fields texted the following: "As I mentioned to you in the past, we won't be coerced into using union labor due to threats of opposition but are willing to explore ways to include union labor on this job if feasible. Meeting before our hearing should have no bearing on that."

110.    Diament immediately responded: "I'm just making suggestions on how to navigate through the woods. If you hire good contractors that participate in apprenticeship programs are tikkun olamins, it makes everyone smile."[1]

111.    Fields responded: "Thanks Ron but it's very simple for us. We do our best and always act honorably and honestly. If we can find a way to work together that would be great. If we can't then it won't be for lack of trying."

---

[1] Tikkun Olam is a concept in Judaism interpreted as an aspiration to behave and act constructively and beneficially.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

**IV.    LIUNA agreed to give "Favored Nation" status to another Los Angeles County apartment developer.**

112.   G.H. Palmer, Inc. ("G.H. Palmer") is a real estate developer with apartment projects in Los Angeles County. G.H. Palmer claims to own more than 11,000 apartment units in Southern California.

113.   Upon information and belief, LIUNA agreed with G.H. Palmer to grant G.H. Palmer "Favored Nation" status in its project labor agreements, ensuring that no other developer could obtain a more competitive agreement than the Union Defendants had with G.H. Palmer.

114.   Upon information and belief, LIUNA agreed with G.H. Palmer that they would never agree to allow a developer to use nonunion labor on a project. Per the Favored Nation agreement with G.H. Palmer, LIUNA agreed to demand use of exclusively union labor on all projects.

**V.    The Union Defendants offered to drop their sham CEQA litigation and allow the Project to timely proceed in exchange for exclusivity.**

115.   Despite the Union Defendants' sham CEQ challenges (as described above), Icon attempted to discuss possible ways to work together with the Union Defendants on the Project that did not require Icon to pledge in advance to use exclusively union labor, but met Icon's labor budget needs.

116.   On May 2, 2018, Olbrei and Rodriguez from SWRCC and Pantoja and Rascon from LIUNA had a breakfast meeting with Ruvelson and Fields to discuss the Project and how to possibly work together. During the approximately two-hour meeting, Icon again explained that given the Project's location and the area's low rents, it could not support the higher cost of using exclusively union contractors, but that it would work with the Union Defendants to try to find areas in the Project to include their trades. Not once was the environment raised as a legitimate concern by the Union Defendants during the meeting. Icon left the meeting cautiously optimistic as the Union Defendants represented that it would

- 23 -

be amenable to entering into a letter of intent between the parties that would require Icon to make good faith efforts to find ways to include the Union Defendants on the Project.

117.   On May 24, 2018, one day before the Union Defendants filed yet another appeal of the Project's approval, Olbrei of SWRCC emailed Fields, stating that if Icon would sign a Letter of Understanding ("LOU") promising to use exclusively union contractors, in exchange the Union Defendants would withdraw its CEQA challenges without Icon doing anything to address the purported environmental issues. Specifically, the LOU promised that:

> the Carpenters' Union **will promptly express its support for the Project before governmental bodies and/or community organizations in connection with any and all required government approvals**. Such expression of support may include, among other things, sending letters of support to appropriate entities; appearing in support at public hearings and/or community hearings; contacting the mayor and/or other elected or appointed officials to express support; and generally working together with the Owner/Construction Manager to obtain full entitlements and approvals for the Project to proceed. (Emphasis added.)

118.   Fields responded to Olbrei's email: "Thanks for the LOU. As I'm sure you're aware, your proposed language is a far cry from what we discussed at breakfast a few weeks ago. As we mentioned to you, this project can only support a certain budget given its location and the project's projected rents. As a result, we cannot commit to anyone unless the numbers work. Nothing will change that. What we're willing to do is make a good faith effort to try to find ways to work with the Carpenters Union and for that matter, anyone, that can help us build this project at a feasible budget. That being said, please find attached redlined LOU that reflects our discussion and consistent position."

119.   The next day, on May 25, Pantoja of LIUNA wrote to Fields that contrary to what they discussed at their breakfast meeting, they could not agree to

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

anything other than the exclusivity arrangement in the proposed Letter of Commitment ["LOC"] because "of the Favored Nation Clause as it relates to our agreement with G.H. Palmer." Pantoja wrote that LIUNA "couldn't enter into anything different then [*sic*] we have with G.H. Palmer." Like SWRCC's LOU, in exchange to agreeing to use exclusive union under the LOC, LIUNA promised via its LOC:

> 17.    The Union on its own behalf and/or through their participating individuals, members, labor organizations, unions, officers, representatives, business managers, agents, consultants, independent contractors (including any agents, persons or entities who assisted with preparation of comment letters and related appendices) or attorneys (or any other person action on their behalf or otherwise under the direction or control), or any of them (collectively 'Affiliated Parties') **will not participate in any meetings or hearings to challenge, oppose, contest, take adverse actions or bring suit or file any claim, complaint or opposition in any forum or before any agency, body, court or other tribunal, whether administratively, quasi-judicially, judicially or otherwise regarding a Residential/Commercial Podium Project covered by this Agreement.** (Emphasis Added.)

> a.    Furthermore, on behalf of itself and its Affiliated Parties, **Union agrees that it will not assist, support, encourage or cooperate with any Affiliated Parties, or any other person or entity of any kind who challenges, opposes, contests, intervenes, takes adverse action or bring suit or files any claim, complaint or opposition in any forum or before any agency, body, court or other tribunal, whether administratively, quasi-judicially, judicially or otherwise, regarding a Residential/Commercial Podium Project and will take all lawful and good faith steps it deems necessary to ensure that all of its Affiliated Parties abide by the terms in the preceding paragraph and this Agreement.** (Emphasis added.)

## VI.    When Icon did not cede to the Union Defendants' exclusivity demands, the Union Defendants brought their sham litigation to state court.

120.    Having failed in their efforts to coerce, intimidate, extort and pressure Icon to use exclusively union contractors on the Project through its abuse of the administrative process from May 2017 through August 2018, the Union Defendants continued to press their sham CEQA challenges to delay the Project

- 25 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

and drive up its costs by filing a Petition for Writ of Mandate in the Superior Court of the State of California County of Los Angeles. The Petition again asserted violations of CEQA and requested that the Court set aside the Project approvals.

121.   The same day, SWRCC Senior Field Representative Dan Langford told Fields during a phone conversation that the Union Defendants had specifically budgeted money for their CEQA litigation scheme. Langford made it clear that the Union Defendants did not truly believe in the substance of their CEQA claims by telling Fields that if the Union Defendants did not challenge Icon's Project they would simply challenge another developer's project. Langford further made clear that the Union Defendants' true goal was to delay the Project and drive up costs.

122.   Immediately following Fields' discussion with Langford, Fields texted Ron Diament from SWRCC the following: "I spoke with Dan and he emphatically said that you want the full labor agreement or you'll sue. He suggested that we'd be better off paying for it now by hiring you versus getting the project delayed and the impacts it would cause. He boasted that they have the budget for it so it won't affect you but will significantly affect us."

123.   Icon has continued to discuss with the SWRCC and the LIUNA the importance of the Project to the community and its willingness to use union contractors as well as nonunion contractors through a competitive bidding process, but the Union Defendants continue to abuse the CEQA process to force Icon to cede to their demands.

**VII.   The Union Defendants have a pattern and practice of filing sham CEQA litigation to delay large development projects within Los Angeles County (as well other California counties).**

124.   Upon information and belief, the Union Defendants maintain databases that track general contractors, subcontractors, permit applications, as

- 26 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

well as when cities release draft Mitigated Negative Declarations (environmental reports that are less comprehensive than EIRs) and EIRs for major construction projects. The Union Defendants use the databases to decide which contractors to target for CEQA litigation based on the size and scope of the project, without regard to the merits of the CEQA claims.

125.   Upon information and belief, the Union Defendants used those databases to identify the Icon Panorama Project as a target for its scheme.

126.   This is not the first time that the Union Defendants filed sham oppositions and appeals based on false CEQA claims to delay development projects within Los Angeles County, California for the sole purpose of coercing, intimidating, extorting, and pressuring developers to surrender to their demands. The Union Defendants use the CEQA process as a means to secure control of the labor market and dictate the cost of labor for all construction projects in the County.

127.   As an example, upon information and belief, LIUNA and/or SWRCC are currently utilizing the same sham challenges under the guise of alleging CEQA-based claims on the following large mixed use projects in Los Angeles County representing millions of square feet of residential and commercial space that include thousands of units and billions of dollars of development at a time when Los Angeles is experiencing a significant housing shortage that has resulted in a homeless crisis:

-   6901 West Santa Monica Boulevard, Los Angeles, CA

-   222 West Second Street, Los Angeles, CA

-   129-135 West College Street, Los Angeles, CA

-   1240-1260 South Figueroa Street, Los Angeles, CA

-   1107-1121 North Mansfield Avenue, and 1106-1126 North Orange Drive, Los Angeles, CA

- 27 -

110615465

- 520-532 South Mateo Street, Los Angeles, CA
- 676 South Mateo Street, Los Angeles, CA
- 1001 Olympic Blvd., Los Angeles, CA
- 1033-1057 South Olive Street, Los Angeles, CA
- 1375 St. Andrews Place, Los Angeles, CA
- 1030-1380 North Broadway and 1251 North Spring Street, Los Angeles, CA
- 1000-1022 South Hill Street, Los Angeles, CA and 220 and 226 West Olympic Blvd., Los Angeles, CA
- 1000 West Temple Street, Los Angeles, CA

## FIRST CAUSE OF ACTION
### Attempted Monopolization in Violation of
### Section 2 of the Sherman Act

128.    Paragraphs 1 through 127 are re-alleged and reincorporated herein.

129.    The sham and baseless oppositions to construction permit applications on environmental or regulatory grounds is a strategy that labor organizations like the Union Defendants in this case use to eliminate competing nonunion contractors from the labor market. Developers who cannot pledge to use exclusively union labor find their projects blocked entirely or their costs increased significantly if their permits are challenged. Thus, developers like Icon suffer injury no matter which option they choose—higher labor costs if they pledge to use only union labor on their projects, or higher costs in delays of their projects if they do not succumb to the Union Defendants' tactics and defend against the sham litigation and proceedings that the Union Defendants pursue both administratively and in the courts.

130.    Through such illegal conduct, the Union Defendants seek to obtain monopoly power over the sale of labor services to developers (like Icon) of large

- 28 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

real estate projects within Los Angeles County, California (the "Relevant Market"). Such large real estate projects are generally those that fall within the purview of the Department of City Planning's "Major Projects Unit," which enables the Department to conduct a more thorough and focused analysis of large, complex projects that have the potential to generate the most significant effects on the City's infrastructure, local economy, and environment.

131. Unions, Icon, other project owners/construction contractors which use nonunion labor, other project owners/construction contractors which use union labor only, and the community at large recognize the existence of the Relevant Market as an area of effective competition for labor services due to the high demand and desirability of project development and construction such as Icon's Panorama Project.

132. The Union Defendants compete against nonunion contractors in the Relevant Market.

133. The Union Defendants have sought to exercise control and monopoly power over the Relevant Market by engaging in predatory, unlawful, fraudulent and/or other anti-competitive business practices, including but not limited to initiating or threatening to initiate sham and objectively baseless CEQA-based protests and litigation that will prevent or delay the development of construction (including the Project) within the Relevant Market. Such baseless protests and lawsuits, which the Union Defendants file over and over again, are the means by which they conceal their attempts to control/lower the supply of labor and drive up the cost of using nonunion labor such that nonunion contractors are excluded from the Relevant Market, interfering directly with Icon's relationships with, and right to open competitive bidding to, construction contractors that use nonunion labor.

- 29 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

134.   The Union Defendants' lawsuits and threats of lawsuits represent a significant barrier to entry to the Relevant Market for any price-competitive nonunion contractor that seeks to obtain work from developers like Icon. By raising the aggregate wage rate, the Union Defendants' anti-competitive activities also drive up the cost of projects because only union labor can be used, allowing the Union Defendants to maintain their market power in such downstream markets. As a result of the Unions' illegal actions, market labor prices will rise to the level set by the Union Defendants when nonunion contractors are driven out of the market.

135.   The Union Defendants' acts have prevented or suppressed competition, and continue to prevent or suppress competition, and these acts have permitted the Union Defendants to seek a dominant and monopolistic market position and wage control in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

136.   The Union Defendants have made clear their intent to prevent development of any additional project in the Relevant Market on which union labor is not used. Their objective is to obtain a monopoly by increasing and controlling wage rates and/or destroying competition in the Relevant Market and to obtain and maintain a dominant market position.

137.   Competition in the Relevant Market has suffered, and will continue to suffer, regardless of whether monopoly power is attained because through their anti-competitive activities, the Union Defendants will obtain the unilateral power to set wage rates in the Relevant Market.

138.   The Union Defendants have willfully sought to acquire and maintain a monopoly in the Relevant Market through predatory, unlawful, fraudulent and/or other anti-competitive business practices. The Union Defendants' intent to monopolize can be inferred from the nature of their illegal conduct.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

139.   The Union Defendants' intent, power, and resources create a dangerous probability that they will succeed in monopolizing the Relevant Market, causing the significant anticompetitive consequences described above.

140.   The Union Defendants' illegal conduct is not exempted from the Sherman Act or any other anti-trust law because they have sought to act in concert with project-owners like Icon, construction contractors, and consulting companies (SWAPE and SEM) – all non-labor groups – to achieve a monopoly in the Relevant Market and have sought to obtain that monopoly through illegitimate means and for illegitimate purposes. In particular, if developers (like Icon) or their contractors/designated agents do not succumb to the Union Defendants' demands that they use exclusively union labor on their construction projects, the Union Defendants continue to assert their sham and objectively baseless protests and litigation, which have nothing to do with the legitimate goals of a union or the purpose of labor law protections.

141.   Icon is a "person" entitled to sue under 15 U.S.C. § 15 because it has been injured as a direct result of the Union Defendants' antitrust violations described herein. Icon's injury was caused by a substantial reduction in the available supply of labor in the Relevant Market as a result of the Union Defendants' illegal conduct, which was intended to, and did in fact, have an anticompetitive effect beyond the costly delays in Icon's Project and the other damages it has suffered. Specifically, the Union Defendants' illegal conduct has removed nonunion labor from the Relevant Market: either developers (i) succumb and pledge to use exclusively union labor, substantially driving up their labor costs, or (ii) decline such a pledge, suffer delays to their projects caused by the Union Defendants' sham and baseless CEQA litigation, and incur substantial litigation costs in defending against that litigation.

- 31 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

142.   As a direct and proximate result of the Union Defendants' above-described anti-competitive activities, Icon has suffered business injuries and/or loss of property by, among other things, threats to their project, loss of goodwill, significant lost profits, increase in interest rates, costs increases due to increases in the minimum wage, possible retail lease losses, costs of suit and attorneys' fees, a loss of revenue that will impact prices paid by consumers of the Project and other projects that project-owners seek, or will seek, to develop, and significant cost overruns due to delays in construction and carrying costs of those projects.

143.   As a proximate result of the wrongful acts herein alleged, Icon has been damaged in an amount to be determined at trial.

144.   Icon has suffered, and will continue to suffer, irreparable harm, entitling Icon to injunctive relief, if the Union Defendants are not enjoined from engaging in their anti-competitive conduct.

**SECOND CAUSE OF ACTION**

**Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act**

145.   Paragraphs 1 through 144 are re-alleged and reincorporated herein.

146.   The Union Defendants knowingly and willfully conspired among themselves and others, including the non-labor groups described above, to monopolize the Relevant Market.

147.   The Union Defendants' specific intent to monopolize the Relevant Market is apparent from the character of the Unions' conduct and their actions as alleged in this First Amended Complaint.

148.   The Union Defendants committed overt acts and engaged in other conduct pursuant to, and in furtherance of, the conspiracy. The Union Defendants have engaged in predatory, unlawful, fraudulent and/or other anti-competitive business practices directed toward achieving the objective of controlling labor costs and destroying competition in the Relevant Market as described above.

- 32 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

149.   The Union Defendants did the acts and things alleged in this First Amended Complaint pursuant to, and in furtherance of, the conspiracy. By virtue of the Union Defendants' statements, behavior, conduct, overt acts, and omissions to prevent or substantially delay Icon from proceeding with the Project and other construction projects, the Union Defendants have the specific intent to monopolize the Relevant Market by controlling wage rates and excluding nonunion contractors and owner-developers which choose to work with nonunion contractors (like Icon) from the construction industry.

150.   Icon is a "person" entitled to sue under 15 U.S.C. § 15, because it has been injured as a direct result of the Union Defendants' antitrust violations described herein. Icon's injury was caused by a substantial reduction in the available supply of labor in the Relevant Market as a result of the Union Defendants' illegal conduct, which was intended to, and did in fact, have an anticompetitive effect beyond the costly delays in Icon's Project and the other damages it has suffered. Specifically, the Union Defendants' illegal conduct has removed nonunion labor from the Relevant Market: either developers (i) succumb and pledge to use exclusively union labor, substantially driving up their labor costs, or (ii) decline such a pledge, suffer delays to their projects caused by the Union Defendants' sham and baseless CEQA litigation, and incur substantial litigation costs in defending against that litigation.

151.   As a direct and proximate result of the Union Defendants conspiracy to engage in anti-competitive activities in violation of the Sherman Act, Icon has suffered business injuries and/or loss of property by, among other things, threats to their projects, loss of goodwill, significant lost profits, costs of suit and attorneys' fees, a loss of revenue that will impact prices paid by consumers for the Project and other projects Icon and other owners seek to develop, and significant cost overruns due to delays in construction of those projects.

- 33 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

152.   As a proximate result of the wrongful acts herein alleged, Icon has been damaged in an amount to be determined at trial.

153.   Icon has suffered, and will continue to suffer, irreparable harm, entitling Icon to injunctive relief, if the Union Defendants are not enjoined from engaging in their anti-competitive conduct.

**THIRD CAUSE OF ACTION**

**Directing a "Group Boycott" in Violation of Section 1 of the Sherman Act**

154.   Paragraphs 1 through 153 are re-alleged and reincorporated herein.

155.   The Union Defendants have sought to control/lower the supply of labor and drive up the cost of using nonunion labor such that nonunion contractors are excluded from the Relevant Market by organizing and leading an unlawful group boycott in violation of Section 1 of the Sherman Act.

156.   The Union Defendants have directed and orchestrated concerted efforts between and among various union contractors in the Relevant Market to enter into tacit and/or express agreements with the Union Defendants and each other to offer developers only union labor on any projects within the Relevant Market and refuse to work with developers who do not accede to their demands to use only union labor.

157.   For example, as explained above in Paragraphs 112-114, 116-119, Defendant LIUNA refused to negotiate with Icon over an alternative labor arrangement, in part, because LIUNA entered a "most favored nation" agreement with a competing developer whereby LIUNA agreed with the competing developer not to enter more favorable agreements with other developers, such as Icon. Given the lower costs of nonunion labor, this type of agreement ensures that LIUNA, and the union contractors which participate in the unlawful group boycott with LIUNA described above, will never agree to allow a developer to

- 34 -

110615465

use any nonunion labor on any project, effectively foreclosing nonunion contractors from entering the Relevant Market.

158. On information and belief, union contractors who have agreed to participate in the unlawful group boycott described above have refused to work with developers like Icon, and/or bid on any development projects, where the developer does not pledge to use only union labor.

159. As part of this unlawful group boycott, the Union Defendants have made clear their intent to prevent development of medium to large scaled projects that require environmental review in the Relevant Market on which union labor is not used. Their objective is to obtain a monopoly by increasing and controlling wage rates and/or destroying competition in the Relevant Market and to obtain and maintain a dominant market position.

160. The Union Defendants have willfully sought to acquire and maintain a monopoly in the Relevant Market through predatory, unlawful, fraudulent and/or other anti-competitive business practices such as directing the above-described group boycott. The Union Defendants' intent to monopolize can be inferred from the nature of their illegal conduct.

161. The Union Defendants' illegal conduct is not exempted from the Sherman Act or any other anti-trust law because they have sought to act in concert with construction contractors and consulting companies like SWAPE and SEM – all non-labor groups – to achieve a monopoly in the Relevant Market and have sought to obtain that monopoly through illegitimate means and for illegitimate purposes, including an unlawful group boycott as described above.

162. The Union Defendants-led unlawful group boycott is a per se violation of section 1 of the Sherman Act. Alternatively, the Union Defendants-led unlawful group boycott violates the Rule of Reason because it harmed not

- 35 -

110615465

only Icon's business, but also competition in the Relevant Market among suppliers of labor for development projects as described herein.

163.    Icon is a "person" entitled to sue under 15 U.S.C. § 15, because it has been injured as a direct result of the Union Defendants' antitrust violations described herein. Icon's injury was caused by a substantial reduction in the available supply of labor in the Relevant Market as a result of the Union Defendants' illegal conduct, which was intended to, and did in fact, have an anticompetitive effect beyond the costly delays in Icon's Project and the other damages it has suffered. Specifically, the Union Defendants' illegal conduct has removed nonunion labor from the Relevant Market: either developers (i) succumb and pledge to use exclusively union labor, substantially driving up their labor costs, or (ii) decline such a pledge, suffer delays to their projects caused by the Union Defendants' sham and baseless CEQA litigation, and incur substantial litigation costs in defending against that litigation.

164.    As a direct and proximate result of the Unions' above-described anti-competitive activities, Icon has suffered business injuries and/or loss of property by, among other things, threats to their projects, loss of goodwill, significant lost profits, costs of suit and attorneys' fees, a loss of revenue that will impact prices paid by consumers of the Project and other projects that project-owners seek, or will seek, to develop, and significant cost overruns due to delays in construction of those projects.

165.    As a proximate result of the wrongful acts herein alleged, Icon has been damaged in an amount to be determined at trial.

166.    Icon has suffered, and will continue to suffer, irreparable harm, entitling Icon to injunctive relief, if the Union Defendants are not enjoined from engaging in their anti-competitive conduct.

- 36 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**FOURTH CAUSE OF ACTION**

**Conspiracy and Attempt to Enter Into Exclusive Dealing Arrangement in Violation of Section 3 of the Clayton Act and Section 1 of the Sherman Act**

167.   Paragraphs 1 through 166 are re-alleged and reincorporated herein.

168.   By engaging in predatory, unlawful, fraudulent and/or other anti-competitive business practices, including but not limited to initiating or threatening to initiate sham and objectively baseless CEQA-based protests and litigation that will prevent or delay the development of construction (including the Project) within the Relevant Market, the Union Defendants seek to create an unlawful exclusive dealing arrangement between themselves and contractors which work on development projects like Icon's Project, all of which is prohibited by section 3 of the Clayton Act, 15 U.S.C. § 14. Under this exclusive dealing arrangement, whereby contractors pledge to the Union Defendants in advance of any bids the contractors may submit on construction projects in the Relevant Market that they will use exclusively union labor on such projects, union contractors become the exclusive source of labor services available for purchase by developers like Icon.

169.   The Union Defendants knowingly and willfully conspired among themselves and others, including the non-labor groups described above, to obtain an exclusive dealing arrangement in violation of section 3 of the Clayton Act.

170.   The Union Defendants' specific intent to monopolize the Relevant Market through an unlawful exclusive dealing arrangement is apparent from the character of the Union Defendants' conduct and their actions as alleged in this First Amended Complaint.

171.   The Union Defendants committed overt acts and engaged in other conduct pursuant to, and in furtherance of, the above-described conspiracy. The Union Defendants have engaged in predatory, unlawful, fraudulent and/or other

- 37 -

anti-competitive business practices directed toward achieving the objective of controlling labor costs, eliminating or foreclosing a substantial share of the nonunion labor supply that exists or previously existed in the Relevant Market, and destroying competition in the Relevant Market.

172.   The Union Defendants did the acts and things alleged in this First Amended Complaint pursuant to, and in furtherance of, the conspiracy. By virtue of the Union Defendants' statements, behavior, conduct, overt acts, and omissions to prevent or substantially delay Icon from proceeding with the Project and other construction projects, the Union Defendants have the specific intent to enter into an exclusive dealing arrangement in violation of Section 3 of the Clayton Act.

173.   The Union Defendants' illegal conduct is not exempted from the Clayton Act or any other anti-trust law because they have sought to act in concert with construction contractors and certain consulting companies (SWAPE and SEM) – all non-labor groups – to achieve a monopoly in the Relevant Market and have sought to obtain that monopoly through illegitimate means and for illegitimate purposes. In particular, if owners (like Icon) or their contractors/designated agents do not succumb to the Union Defendants' demands that they use only union labor on their construction projects, the Union Defendants continue to assert their sham and objectively baseless protests and litigation, which have nothing to do with the legitimate goals of a union or the purpose of labor law protections.

174.   The exclusive dealing arrangement described above violates the Rule of Reason because it harmed not only Icon's business, but also competition in the Relevant Market among suppliers of labor for development projects as described herein.

175.   Icon is a "person" entitled to sue under 15 U.S.C. § 15, because it has been injured as a direct result of the Union Defendants' antitrust violations

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

described herein. Icon's injury was caused by a substantial reduction in the available supply of labor in the Relevant Market as a result of the Union Defendants' illegal conduct, which was intended to, and did in fact, have an anticompetitive effect beyond the costly delays in Icon's Project and the other damages it has suffered. Specifically, the Union Defendants' illegal conduct has removed nonunion labor from the Relevant Market: either developers (i) succumb and pledge to use exclusively union labor, substantially driving up their labor costs, or (ii) decline such a pledge, suffer delays to their projects caused by the Union Defendants' sham and baseless CEQA litigation, and incur substantial litigation costs in defending against that litigation.

176.   As a direct and proximate result of the Union Defendants conspiracy to enter into an exclusive dealing arrangement and engage in anti-competitive activities in violation of the Clayton Act, Icon has suffered business injuries and/or loss of property by, among other things, threats to their projects, loss of goodwill, significant lost profits, costs of suit and attorneys' fees, a loss of revenue that will impact prices paid by consumers for the Project and other projects Icon and other owners seek to develop, and significant cost overruns due to delays in construction of those projects.

177.   As a proximate result of the wrongful acts herein alleged, Icon has been damaged in an amount to be determined at trial.

178.   Icon has suffered, and will continue to suffer, irreparable harm, entitling Icon to injunctive relief, if the Union Defendants are not enjoined from engaging in their anti-competitive conduct.

## FIFTH CAUSE OF ACTION

### Violation of Labor Management Relations Act, 29 U.S.C. § 187

179.   Paragraphs 1 through 178 are re-alleged and reincorporated herein.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

180.   Section 303(a) of the Labor Management Relations Act makes it unlawful for a labor organization, like the Union Defendants, to engage in conduct defined as an unfair labor practice under section 8(b)(4) of the National Labor Relations Act, 29 U.S.C. 158(b)(4).

181.   Under section 8(b)(4) of the NLRA, it is an unfair labor practice for a union to threaten, coerce, or restrain an employer with the object of forcing the employer to enter into any agreement prohibited by section 8(e) of the NLRA or forcing or requiring any employer to cease doing business with any other employer.

182.   Under section 8(e) of the NLRA, labor organizations and employers are prohibited from entering into any agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from doing business or otherwise dealing with the products of any other employer.

183.   The Union Defendants used, and are using, the sham litigation tactics described herein to coerce Icon to sign project labor agreements in which Icon pledges to use exclusively union labor on the Panorama Project. Thus, the object of the Union Defendants' unlawful conduct is to force Icon not to purchase the labor services offered by nonunion contractors (i.e., "other employers") or otherwise work with nonunion contractors on the Project. Specifically, the Union Defendants' unlawful conduct coerces Icon into either (i) succumbing and signing the project labor agreements, eliminating competitive bidding and substantially driving up Icon's labor costs, or (ii) declining such a pledge, suffering delays to their projects caused by the Union Defendants' sham and baseless CEQA litigation, and incurring substantial litigation costs in defending against that litigation.

184.   The project labor agreements are unlawful under section 8(e) of the NLRA because the Union Defendants do not have a collective bargaining relationship with Icon, and because the project labor agreements are not directed

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

towards the "reduction of friction" that may be caused when union and nonunion employees of different employers are required to work together at the same jobsite. To the contrary, the Union Defendants' sole motivation in coercing Icon to sign the unlawful project labor agreements is to monopolize the supply of construction labor for projects within the Relevant Market, as described herein.

185.   Under section 303(b) of the LMRA, an employer "injured in his business or property by reason of any violation" of section 303(a) of the Act may sue for and recover damages and the cost of suit.

186.   Icon has standing to bring suit under section 303(b) because it was the specific target of the Union Defendants' illegal conduct in attempting to coerce Icon to enter into the project labor agreements. As a direct and proximate result of the Union Defendants' illegal conduct, Icon has suffered business injuries and/or loss of property by, among other things, threats to their projects, loss of goodwill, significant lost profits, costs of suit and attorneys' fees, a loss of revenue that will impact prices paid by consumers for the Project and other projects Icon and other owners seek to develop, and significant cost overruns due to delays in construction of those projects.

187.   As a proximate result of the wrongful acts herein alleged, Icon has been damaged in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION

### Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)

188.   Paragraphs 1 through 187 are re-alleged and reincorporated herein.

189.   Icon is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

190.   The Union Defendants constitute an "enterprise" engaged in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962 (the "Enterprise"). The Enterprise exists separate and apart

- 41 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

from the pattern of racketeering activity alleged and the Union Defendants themselves.

191. Defendants Alexis Olbrei, Pete Rodriguez, Dan Langford, Ron Diament, Angel Olvera, Sergio Rascon, and Ernesto Pantoja are each "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who are employed by and/or associated with the Enterprise.

192. From April 2017 until the present, the "persons" identified in Paragraph 191 conducted, participated in, engaged in, conspired to engage in, or aided and abetted the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c). The predicate acts constituting the pattern of unlawful activity engaged in by the "persons" identified in Paragraph 191 constitute:

a.   Attempted extortion/extortion, as defined in 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1951, including but not limited to:

i.   The sham and objectively baseless litigation and related conduct described above beginning in April 2017 and continuing to the present, in which one or more of the "persons" identified in Paragraph 191 threatened to stop and/or delay the Project through unfounded CEQA and/or related challenges and litigation if Icon continued its efforts to develop the Project or other projects in the Relevant Market without agreeing to use exclusively union labor on those projects. By its extortionate acts described herein, the Unions attempted to "obtain property" for purposes of 18 U.S.C. § 1951(b)(2) through the collection of dues from their members who work for union general contractors and subcontractors which charge higher labor rates than nonunion contractors and which Icon would be forced to use on the Project (or other projects in the Relevant Market) if Icon succumbed to the Unions' threats. Additionally, by conspiring with those unionized contractors to extort Icon as described herein, the Unions attempted to

- 42 -

divert significant labor revenue away from nonunion contractors that Icon may have hired (absent the Union's extortionate threats) to the union contractors. Icon's fear of economic loss from the extortion is reasonable. This extortion obstructed interstate commerce;

ii.   Upon information and belief, additional acts of extortion were engaged in by one or more of the "persons" identified in Paragraph 191 beginning on or after April 2017. The information regarding each of those separate acts of extortion is within the custody and control of the Union Defendants and/or their agents.

b.   Mail fraud, as defined in 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1341, including but not limited to, one or more of the "persons" identified in Paragraph 191 used the U.S. mails in around April 2017 through August 2018 to submit to the Planning Committee correspondence, petitions, "written comments," and/or other documents that made false and misleading factual representations about the size, scope and environmental impact of the Project. Upon information and belief, one or more of the "persons" identified in Paragraph 191 made additional uses of the U.S. mails to circulate materially false and misleading information and/or documents about the Project. The information regarding those additional separate mail fraud violations is entirely within the custody and control of the Union Defendants and/or their agents.

193.   These acts all occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

194.   All of the predicate acts described herein were continuous so as to form a pattern of racketeering activity in that the "persons" identified in Paragraph 191 engaged in the predicate acts over a substantial period of time and such predicate acts have become their regular way of conducting business, and these business practices will continue indefinitely into the future unless restrained

- 43 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465

by this Court. Specifically, the "persons" identified in Paragraph 191 knowingly violated the extortion, mail fraud statutes and other statutes discussed in the preceding paragraphs in connection with their illegal schemes. Each of these acts constitutes a separate and distinct racketeering activity, as defined in 18 U.S.C. § 1961(a).

195.   The "persons" identified in Paragraph 191 have engaged in numerous illegal acts in connection with their fraudulent schemes, as described in the preceding paragraphs. Those illegal acts constitute predicate acts of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and were perpetrated for the same or similar purpose, and had similar results, participants, victims, and methods of communication.

196.   As a direct and proximate result of, and by reason of the activities of the "persons" identified in Paragraph 191, and their conduct in violation of 18 U.S.C. § 1962(c), Icon has been injured in its business or property within the meaning of 18 U.S.C. § 1964(c). The above-described actions were taken, among other purposes described herein, with the specific intent and for the purpose of carrying out the Union Defendants' scheme and artifice to defraud and to conduct or participate in the affairs of the Enterprise. These acts are capable of repetition. Furthermore, the extortionate conduct aimed at Icon was done specifically to prevent construction of the Project and any other project which would utilize non-union labor.

197.   As a result of these actions, Icon has been injured in its business or property, having suffered, among other things, threats to their projects, significant lost profits, lost goodwill, costs of suit and attorneys' fees, and significant cost overruns due to delays in construction of the Project.

198.   Icon is entitled to recover treble the damages it has sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

- 44 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

199.  Icon has suffered, and will continue to suffer, irreparable harm, entitling Icon to injunctive relief, if the Union Defendants are not enjoined from engaging in their anti-competitive conduct.

## SEVENTH CAUSE OF ACTION

**Unfair Competition, Cal. Bus. & Prof. Code § 17200, Against All Defendants**

200.  Paragraphs 1 through 199 are re-alleged and reincorporated herein.

201.  Icon brings this action on its own behalf as an entity that has suffered injury in fact and lost money or property as a result of the Union Defendants' unfair competition within Los Angeles County, California.

202.  The Union Defendants have engaged in unfair competition by committing acts that are unlawful, unfair, and fraudulent business practices or acts as defined by the California Business and Professions Code sections 17200, *et seq.* by, among other things, engaging in the acts described above, including but not limited to:

a.  Conduct that constitutes or threatens incipient violation of the Sherman and Clayton Acts, 15 U.S.C. § 2, *et seq.*, and/or violates the policy and spirit of these laws by significantly threatening or actually harming lawful competition, including but not limited to the conduct described in the first, second, third, and fourth causes of action;

b.  Conduct that violates the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1960, *et seq.*, including but not limited to the predicate acts described in Paragraphs 192-196 above; and

c.  Initiating and maintaining frivolous sham inquiries or objections to the Project, with the sole purpose of halting or delaying completion of the Project.

203.  The acts described in this First Amended Complaint constitute numerous individuals and combined unfair, unlawful, and/or fraudulent acts or

- 45 -

practices within the meaning of Business and Professions Code sections 17200, *et seq*. The totality of the Union Defendants' conduct has enabled the Union Defendants, among other things, to dominate and control competition, including the sale of labor services to construction contractors and project developers, including but not limited to Icon, within the Relevant Market. The Union Defendants' conduct as detailed above represents a significant barrier to entry to the Relevant Market for any developer-owner, like Icon, which seeks or may seek to use a price-competitive nonunion contractor. By raising the aggregate wage rate, the Unions' anti-competitive activities raise barriers to entry in both project-owner and construction contractor markets because projects will become cost-prohibitive or more costly to complete, allowing the Union Defendants to maintain their market power in such downstream markets. As a result of the Union Defendants' illegal actions, market labor prices will rise to the level set by the Union Defendants when nonunion contractors are driven out of the market.

204.   The Union Defendants actively and directly participated in or provided substantial assistance to others who committed the unfair, unlawful and/or fraudulent acts or practices described herein.

205.   The gravity of the harm of the Union Defendants' conduct on Icon as well as on nonunion contractors and labor within the Relevant Market outweighs any potential benefits of such conduct. The Union Defendants' conduct described herein offends established public policies, is immoral, unethical, oppressive, unscrupulous, and is substantially injurious to consumers.

206.   The Union Defendants' unfair and unlawful business practices are likely to continue to harm Icon, nonunion contractors and labor, and consumers, and present a continuing threat to the public.

207.   As a result of these actions, Icon has been injured in its business or property, having suffered, among other things, threats to their projects, significant

- 46 -

110615465

lost profits, lost goodwill, costs of suit and attorneys' fees, and significant cost impacts and overruns due to delays in construction of the Project.

208.   Icon seeks a permanent injunction pursuant to Business and Professions Code section 17203, restraining and enjoining the Union Defendants from continuing the acts of unfair competition set forth above;

209.   Icon requests during this action a preliminary injunction pursuant to Business and Professions Code section 17203 to enjoin and restrain the Union Defendants from the acts of unfair competition set forth above;

210.   Icon is entitled to recover restitutionary disgorgement of profits and other economic benefits unjustly obtained by the Union Defendants from the Icon as a result of the Union Defendants' acts of unfair competition;

211.   Icon requests all costs, expenses and attorneys' fees of suit pursuant to 17 U.S.C. §§ 503-05; and

212.   Any other and further relief as the court deems just and equitable.

**WHEREFORE,** Plaintiffs request judgment against Defendants, and each of them, for the following:

**ON THE FIRST, SECOND, THIRD, FOURTH AND FIFTH CAUSES OF ACTION**

213.   The Union Defendants and their agents be enjoined during this litigation, and permanently thereafter, from ongoing and future acts constituting violations of Federal antitrust laws to maintain or secure a monopoly, as provided for by 15 U.S.C. § 26;

214.   Treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, arising from harm Icon has sustained as a result of the Union Defendants' violation of section 2 of the Sherman Act, 15 U.S.C. § 2;

215.   Damages under 29 U.S.C. § 187(b);

216.   Prejudgment interest;

- 47 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

217.   Costs of suit incurred;

218.   All costs, expenses and attorneys' fees; and

219.   Such other and further relief as the court deems just and proper.

**ON THE SIXTH CAUSE OF ACTION**

220.   Issue a permanent injunction restraining the Union Defendants, their officers, employees, agents, affiliates, parents, subsidiaries and all other persons who act in concert with them from making false, misleading or deceptive statements or representations about the Project;

221.   Issue a permanent injunction restraining the Union Defendants, their officers, employees, agents, affiliates, parents, subsidiaries and all other persons who act in concert with them from extorting Icon;

222.   Award damages against the Union Defendants, jointly and severally, for a sum of money equal to the amount of damages Icon has sustained or will sustain, said amount to be trebled pursuant to 18 U.S.C. § 1964(c);

223.   Award prejudgment interest on the amount of damages Icon has sustained;

224.   Award all costs of litigation incurred by Icon, including its reasonable attorneys' fees and expert witness fees, pursuant to 18 U.S.C. § 1964(c);

225.   Award punitive damages; and

226.   Award such other further relief as the Court deems just and equitable.

**ON THE SEVENTH CAUSE OF ACTION**

227.   A permanent injunction pursuant to Business and Professions Code section 17203, restraining and the Union Defendants from continuing the acts of unfair competition set forth above;

- 48 -

228.   During this action, a preliminary injunction pursuant to Business and Professions Code section 17203 to enjoin and restrain the Union Defendants from the acts of unfair competition set forth above;

229.   The Union Defendants be ordered to restore all funds acquired by the acts of unfair competition set forth above pursuant to Business and Professions Code section 17203;

230.   For all costs, expenses and attorney's fees of suit pursuant to 17 U.S.C. §§ 503-05; and

231.   Any other and further relief as the court deems just and equitable.

DATED: April 3, 2019.

DENTONS US LLP

 s/ Susan Walker
Susan Walker
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704

Karl M. Tilleman (*Admitted Pro Hac Vice*)
Douglas Janicik (*Admitted Pro Hac Vice*)
2398 East Camelback Road, Suite 850
Phoenix, Arizona 85016-9007

Attorneys for Plaintiff

- 49 -

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

110615465