EXHIBIT 2



**DEPARTMENT OF**
**CITY PLANNING**

CITY PLANNING COMMISSION

DAVID H. J. AMBROZ
PRESIDENT

RENEE DAKE WILSON
VICE-PRESIDENT

CAROLINE CHOE
VAHID KHORSAND
SAMANTHA MILLMAN
MARC MITCHELL
VERONICA PADILLA-CAMPOS
DANA M. PERLMAN
VACANT

ROCKY WILES
COMMISSION OFFICE MANAGER
(213) 978-1300

# CITY OF LOS ANGELES
CALIFORNIA

ERIC GARCETTI
MAYOR

**EXECUTIVE OFFICES**
200 N. SPRING STREET, ROOM 525
LOS ANGELES, CA 90012-4801

VINCENT P. BERTONI, AICP
DIRECTOR
(213) 978-1271

KEVIN J. KELLER, AICP
EXECUTIVE OFFICER
(213) 978-1272

LISA M. WEBBER, AICP
DEPUTY DIRECTOR
(213) 978-1274

http://planning.lacity.org

---

Mailing Date: March 27, 2018

Appeal Period Ends: April 6, 2018

The ICON at Panorama, LLC (Owner)
Eran Fields
807 E. 12th Street, Suite 401
Los Angeles, CA 90021

PSOMAS (Representative)
Carol Zagaria
555 S. Flower Street, 43rd Floor
Los Angeles, CA 90071

**Vesting Tentative Tract Map No. 74315**
Address: 14665 Roscoe Boulevard
    (14665-14697 Roscoe Blvd., 8300-8406
    Cedros Ave. and 8321-8413 Tobias Ave.)
Council District: 6 – Martinez
Existing Zone: [Q]C2-1-CDO and [Q]P-1-CDO
Proposed Zone: (T)(Q)C2-1-CDO
Community Plan: Mission Hills-Panorama City-
    North Hills
Related Case: CPC-2016-2118-VZC-MCUP-CU-SPR-
    CDO-DD
Environmental Case: ENV-2016-1061-EIR
    (SCH No. 2016081031)

Pursuant to Sections 21082.1(c) and 21081.6 of the Public Resources Code, the Advisory Agency has reviewed and considered the information contained in the Environmental Impact Report prepared for this project, which includes the Draft EIR and Revised Draft EIR, No. ENV-2016-1061-EIR (SCH No. 2016081031), the Final EIR, dated February 2018 (ICON at Panorama EIR), and Errata, dated March 2018, as well as the whole of the administrative record, and

**CERTIFIED** the following:

1) The ICON at Panorama EIR has been completed in compliance with the California Environmental Quality Act (CEQA);
2) The ICON at Panorama EIR was presented to the Advisory Agency as a decision-making body of the lead agency; and
3) The ICON at Panorama EIR reflects the independent judgment and analysis of the lead agency.

**ADOPTED** the following:

1) The related and prepared ICON at Panorama Environmental Findings;
2) The Statement of Overriding Considerations; and
3) The Mitigation Monitoring Program prepared for the ICON at Panorama EIR (Exhibit B).

CPC-2016-2118-VZC-0226

000013
ICON0000013

VESTING TENTATIVE TRACT MAP NO. 74315                                          PAGE   2

Pursuant to Section 17.15 of the Los Angeles Municipal Code (LAMC), the Advisory Agency **APPROVED:**

**Vesting Tentative Tract Map No. 74315**, located at 14665 Roscoe Boulevard (14665-14697 W. Roscoe Blvd., 8300-8406 N. Cedros Ave. and 8321-8413 N. Tobias Ave.), for the merger and resubdivision of a 8.9-acre (388,647-square-foot) site into **6 lots (1 master ground lots and 5 airspace lots)** for a mixed-use development, as shown on map stamp-dated February 2, 2018 (Exhibit A). The lots are based on the proposed C2 Zone.

The subdivider is hereby advised that the LAMC may not permit this maximum approved density. Therefore, verification should be obtained from the Department of Building and Safety, which will legally interpret the Zoning code as it applies to this particular property. For an appointment with the Development Services Center call (213) 482-7077, (818) 374-5050, or (310) 231-2901.

The Advisory Agency's approval is subject to the following conditions:

The final map must record within 36 months of this approval, unless a time extension is granted before the end of such period.

**NOTE** on clearing conditions: When two or more **agencies** must clear a condition, subdivider should follow the sequence indicated in the condition. For the benefit of the applicant, subdivider shall maintain record of all conditions cleared, including all material supporting clearances and be prepared to present copies of the clearances to each reviewing agency as may be required by its staff at the time of its review.

### BUREAU OF ENGINEERING - SPECIFIC CONDITIONS
*(Additional BOE Improvement Conditions are listed in "Standard Condition" section on page 12)*

1. That a 5-foot wide strip of land be dedicated along Roscoe Boulevard adjoining the tract to complete a 55-foot wide half right-of-way in accordance with Boulevard II Standards of LA Mobility Plans. In addition, dedicate 20-foot radius property line returns or 15-foot by 15-foot cut corners at intersections with Cedros Avenue and with Tobias Avenue.

2. That a 3-foot wide strip of land be dedicated along Cedros Avenue adjoining the tract to complete a 33-foot wide half right-of-way in accordance with Collector Street Standards of LA Mobility Plans.

3. That the City Department of Transportation in a letter to City Engineer shall determine that the alley merger area is not necessary for current and future Public Street.

4. That Department of the City Planning in a letter to the City Engineer shall also determine that the proposed alley merger area is consistent with all applicable General Plan Elements of Highway and Circulation Elements for LA Mobility Plan.

5. In the event that Department of Transportation and Department of City Planning have no objections to the alley merger then the portion of the alley as shown on the tentative map dated September 15, 2016, except that partial portion of the alley less than 20-foot wide (no half alley merger is allowed), be permitted to be merged with the remainder of the tract map pursuant to Section 66499.20.2 of the State Government Code, and in addition, the following conditions be executed by the applicant and administered by the City Engineer:

   a. That consents to the alley being merged and waivers of any damages that may accrue as a result of such mergers be obtained from all property owners who might have certain rights in the area being merged.

CPC-2016-2118-VZC-0227

VESTING TENTATIVE TRACT MAP NO. 74315                                   PAGE   3

   b.  That satisfactory arrangements be made with all public utility agencies maintaining existing facilities within the area being merged.

6.  That any surcharge fee in conjunction with the street merger requests be paid.

7.  That a new public alley right-of-way be dedicated from the terminus of the proposed alley merger to Tobias Avenue within the tract boundary. The new alley shall be dedicated 29 feet wide from the intersection with the remaining north-south alley to approximately 60 feet easterly thereof, and 20 feet wide from approximately 60 feet easterly of the intersection with the remaining north-south alley to Tobias Avenue.

8.  That the subdivider make a request to the Valley District Office of the Bureau of Engineering to determine the capacity of existing sewers in this area.

9.  That a set of drawings for airspace lots be submitted to the City Engineer showing the following:

   a.  Plan view at different elevations.
   b.  Isometric views.
   c.  Elevation views.
   d.  Section cuts at all locations where air space lot boundaries change.

10. That the owners of the property record an agreement satisfactory to the City Engineer stating that they will grant the necessary private easements for ingress and egress purposes to serve proposed airspace lots to use upon the sale of the respective lots and they will maintain the private easements   free and clear of obstructions and in safe conditions for use at all times.

## DEPARTMENT OF BUILDING AND SAFETY, GRADING DIVISION

11. Comply with any requirements with the Department of Building and Safety, Grading Division for recordation of the final map and issuance of any permit.

12. The Tract Map recorded with the County Recorder shall contain the following statement; "The approval of this Tract Map shall not be construed as having been based upon geological investigation such as will authorize the issuance of building permits on the subject property. Such permits will be issued only at such time as the Department of Building and Safety has received such topographic maps and geological reports as it deems necessary to justify the issuance of such building permits."

## DEPARTMENT OF BUILDING AND SAFETY, ZONING DIVISION

13. Prior to recordation of the final map, the Department of Building and Safety, Zoning Division shall certify that no Building or Zoning Code violations exist on the subject site. In addition, the following items shall be satisfied:

   a.  Obtain permits for the demolition or removal of all existing structures on the site. Accessory structures and uses are not permitted to remain on lots without a main structure or use. Provide copies of the demolition permits and signed inspection cards to show completion of the demolition work.

   b.  Provide a copy of [Q] condition(s). Show compliance with the above condition(s) as applicable or Department of City Planning approval is required.

CPC-2016-2118-VZC-0228

VESTING TENTATIVE TRACT MAP NO. 74315                                                PAGE    4

c.  Provide a copy of affidavit AFF-3567 and AFF-27612. Show compliance with all the conditions/requirements of the above affidavit(s) as applicable. Termination of above affidavit(s) may be required after the Map has been recorded. Obtain approval from the Department, on the termination form, prior to recording.

d.  Provide a copy of CPC case CPC-2016-2118-VZC-MCUP-CU-ZAA-SPR-CDO-DD. Show compliance with all the conditions/requirements of the CPC case(s) as applicable.

e.  Zone Change to **[Q]C2-1-CDO** must be recorded prior to obtaining Zoning clearance.

f.  Obtain Bureau of Engineering approval for the proposed alley merger.

g.  Show all street/alley dedication(s) as required by Bureau of Engineering and provide net lot area after all dedication. "Area" requirements shall be re-checked as per net lot area after street/alley dedication. Front and side yard requirements shall be required to comply with current code as measured from new property lines after dedication(s).

h.  Record a Covenant and Agreement to treat the buildings and structures located in an Air Space Subdivision as if they were within a single lot.

Notes:

Each Air Space lot shall have access to a street by one or more easements or other entitlements to use in a form satisfactory to the Advisory Agency and the City Engineer.

The submitted Map may not comply with the number of parking spaces required by Section 12.21 A.4(a) based on number of habitable rooms in each unit. If there are insufficient numbers of parking spaces, obtain approval from the Department of City Planning.

The existing or proposed building plans have not been checked for and shall comply with Building and Zoning Code requirements. With the exception of revised health or safety standards, the subdivider shall have a vested right to proceed with the proposed development in substantial compliance with the ordinances, policies, and standards in effect at the time the subdivision application was deemed complete. Plan check will be required before any construction, occupancy or change of use.

If the proposed development does not comply with the current Zoning Code, all zoning violations shall be indicated on the Map.

An appointment is required for the issuance of a clearance letter from the Department of Building and Safety. The applicant is asked to contact Eric Wong at (213) 482-6876 to schedule an appointment.

## DEPARTMENT OF TRANSPORTATION

14. Prior to recordation of the final map, satisfactory arrangements shall be made with the Department of Transportation to assure:

a.  All the requirements and conditions listed in the DOT traffic assessment letter dated December 20, 2016, and all subsequent revisions to this traffic assessment, be applied to the tract map. Project

CPC-2016-2118-VZC-0229

000016

ICON0000016

requirements include the following summarized below:

- Intersection Improvements. Physical traffic mitigation improvements at the following intersections:
  o Tobias Avenue and Roscoe Boulevard; and
  o Tobias Avenue Project Access Improvements.
- Upgrade to the existing traffic signal at Roscoe Boulevard and Tobias Avenue.
- New Traffic Signal at the intersection of Chase Street and Tobias Avenue.
- Transportation Demand Management (TDM) Program.
- Highway Dedication and Street Widening Requirements in accordance with Mobility Plan 2035 and BOE requirements.
- Construction Work Site Traffic Control Plan.
- Parking Requirements per LAMC.
- Final DOT Review of Driveway Access and Circulation.

b. A minimum of 60-foot reservoir space be provided between any security gate(s) and the property line, to the satisfaction of DOT. Backing out onto Roscoe Boulevard shall be prohibited.

c. Driveway apron width of W=30 feet is required, to the satisfaction of DOT.

d. A parking area and driveway plan be submitted to the Citywide Planning Coordination Section of the Department of Transportation for approval prior to submittal of building permit plans for plan check by the Department of Building and Safety. Transportation approvals are conducted at 6262 Van Nuys Boulevard, Room 320, Van Nuys, CA 91401.

e. That the subdivision report fee and condition clearance fee be paid to the Department of Transportation as required per Ordinance No. 183270 and LAMC Section 19.15 prior to recordation of the final map. Note: the applicant may be required to comply with any other applicable fees per this new ordinance.

**FIRE DEPARTMENT**

15. <u>Prior to the recordation of the final map</u>, a suitable arrangement shall be made satisfactory to the Fire Department, binding the subdivider and all successors to the following:

a. Access for Fire Department apparatus and personnel to and into all structures shall be required.

b. The entrance to a Residence lobby must be within 50 feet of the desired street address curb face.

c. Where above ground floors are used for residential purposes, the access requirement shall be interpreted as being the horizontal travel distance from the street, driveway, alley, or designated fire lane to the main entrance of individual units.

d. The entrance or exit of all ground dwelling units shall not be more than 150 feet from the edge of a roadway of an improved street, access road, or designated fire lane.

e. No building or portion of a building shall be constructed more than 150 feet from the edge of a roadway of an improved street, access road, or designated fire lane.

CPC-2016-2118-VZC-0230

f.  The Fire Department may require additional vehicular access where buildings exceed 28 feet in height.

g.  **L.A.M.C. 57.09.03.B Exception:**

  - When this exception is applied to a fully fire sprinklered residential building equipped with a wet standpipe outlet inside an exit stairway with at least a 2 hour rating the distance from the wet standpipe outlet in the stairway to the entry door of any dwelling unit or guest room shall not exceed 150 feet of horizontal travel AND the distance from the edge of the roadway of an improved street or approved fire lane to the door into the same exit stairway directly from outside the building shall not exceed 150 feet of horizontal travel.

  - It is the intent of this policy that in no case will the maximum travel distance exceed 150 feet inside the structure and 150 feet outside the structure. The term "horizontal travel" refers to the actual path of travel to be taken by a person responding to an emergency in the building.

  - This policy does not apply to single-family dwellings or to non-residential buildings.

h.  Building designs for multi-storied residential buildings shall incorporate at least one access stairwell off the main lobby of the building; But, in no case greater than 150ft horizontal travel distance from the edge of the public street, private street or Fire Lane. This stairwell shall extend unto the roof.

i.  Entrance to the main lobby shall be located off the address side of the building.

j.  Any required Fire Annunciator panel or Fire Control Room shall be located within 50ft visual line of site of the main entrance stairwell or to the satisfaction of the Fire Department.

k.  Fire lane width shall not be less than 20 feet. When a fire lane must accommodate the operation of Fire Department aerial ladder apparatus or where fire hydrants are installed, those portions shall not be less than 28 feet in width.

l.  The width of private roadways for general access use and fire lanes shall not be less than 20 feet, and the fire lane must be clear to the sky.

m.  Fire lanes, where required and dead ending streets shall terminate in a cul-de-sac or other approved turning area. No dead ending street or fire lane shall be greater than 700 feet in length or secondary access shall be required.

n.  Submit plot plans indicating access road and turning area for Fire Department approval.

o.  Adequate off-site public and on-site private fire hydrants may be required. Their number and location to be determined after the Fire Department's review of the plot plan.

p.  Standard cut-corners will be used on all turns.

q.  The Fire Department may require additional roof access via parapet access roof ladders where buildings exceed 28 feet in height, and when overhead wires or other obstructions block aerial ladder access.

r.  All parking restrictions for fire lanes shall be posted and/or painted prior to any Temporary Certificate

CPC-2016-2118-VZC-0231

of Occupancy being issued.

s.  Plans showing areas to be posted and/or painted, "FIRE LANE NO PARKING" shall be submitted and approved by the Fire Department prior to building permit application sign-off.

t.  Electric Gates approved by the Fire Department shall be tested by the Fire Department prior to Building and Safety granting a Certificate of Occupancy.

u.  **Section 510, Emergency Responder Radio Coverage.** 5101.1 Emergency responder radio coverage in new buildings. All new buildings shall have approved radio coverage for emergency responders within the building based upon the existing coverage levels of the public safety communication systems of the jurisdiction at the exterior of the building. This section shall not require improvement of the existing public safety communications systems.

v.  During demolition, the Fire Department access will remain clear and unobstructed.

w.  That in order to provide assurance that the proposed common fire lane and fire protection facilities, for the project, not maintained by the City, are properly and adequately maintained, the sub-divider shall record with the County Recorder, prior to the recordation of the final map, a covenant and agreement (Planning Department General Form CP-6770) to assure the following:

   i.   The establishment of a property owners association, which shall cause a yearly inspection to be, made by a registered civil engineer of all common fire lanes and fire protection facilities. The association will undertake any necessary maintenance and corrective measures. Each future property owner shall automatically become a member of the association or organization required above and is automatically subject to a proportionate share of the cost.

   ii.  The future owners of affected lots with common fire lanes and fire protection facilities shall be informed or their responsibility for the maintenance of the devices on their lots. The future owner and all successors will be presented with a copy of the maintenance program for their lot. Any amendment or modification that would defeat the obligation of said association as the Advisory Agency must approve required hereinabove in writing after consultation with the Fire Department.

   iii. In the event that the property owners association fails to maintain the common property and easements as required by the CC and R's, the individual property owners shall be responsible for their proportional share of the maintenance.

   iv.  Prior to any building permits being issued, the applicant shall improve, to the satisfaction of the Fire Department, all common fire lanes and install all private fire hydrants to be required.

   v.   That the Common Fire Lanes and Fire Protection facilities be shown on the Final Map.

x.  Those plot plans be approved by the Fire Department showing fire hydrants and access for each phase of the project prior to the recording of the final map for that phase. Each phase shall comply independently with code requirements.

y.  Any roof elevation changes in excess of 3 feet may require the installation of ships ladders.

z.  During demolition, the Fire Department access will remain clear and unobstructed

aa. Any roof elevation changes in excess of 3 feet may require the installation of ships ladders.

Note: The applicant is further advised that all subsequent contact regarding these conditions must be with the Hydrant and Access Unit. This would include clarification, verification of condition compliance

CPC-2016-2118-VZC-0232

VESTING TENTATIVE TRACT MAP NO. 74315                                    PAGE    8

and plans or building permit applications, etc., and shall be accomplished BY APPOINTMENT ONLY, in order to assure that you receive service with a minimum amount of waiting please call (818) 374-4351. You should advise any consultant representing you of this requirement as well.

## DEPARTMENT OF WATER AND POWER

16. Satisfactory arrangements shall be made with the Los Angeles Department of Water and Power (LADWP) for compliance with LADWP's Water System Rules and requirements. Upon compliance with these conditions and requirements, LADWP's Water Services Organization will forward the necessary clearances to the Bureau of Engineering. (This condition shall be deemed cleared at the time the City Engineer clears Condition No. S-1(c).)

## BUREAU OF STREET LIGHTING

17. See Condition S-3(c) for Street Lighting Improvement conditions.

## BUREAU OF SANITATION

18. There are easements contained within the property. Any proposed development in close proximity to the easements must secure Department of Public Works approval. Satisfactory arrangements shall be made with the Bureau of Sanitation, Wastewater Collection Systems Division for compliance with its sewer system review and requirements. Upon compliance with its conditions and requirements, the Bureau of Sanitation, Wastewater Collection Systems Division will forward the necessary clearances to the Bureau of Engineering. (This condition shall be deemed cleared at the time the City Engineer clears Condition No. S-1.(d).)

## INFORMATION TECHNOLOGY AGENCY

19. That satisfactory arrangements be made in accordance with the requirements of the Information Technology Agency to assure that cable television facilities will be installed in the same manner as other required improvements. Refer to the LAMC Section 17.05-N. Written evidence of such arrangements must be submitted to the Information Technology Agency, 200 North Main Street, 12th Floor, Los Angeles, CA 90012, (213) 922-8363.

## DEPARTMENT OF RECREATION AND PARKS

20. That the Quimby Fee be based on the C2 Zone. The application was filed on June 15, 2016, prior to the effective date of Ordinance No. 184,505.

## URBAN FORESTRY DIVISION AND THE DEPARTMENT OF CITY PLANNING

21. Prior to the issuance of a grading permit, a plot plan prepared by a reputable tree expert, indicating the location, size, type, and condition of all existing trees on the site shall be submitted for approval by the Department of City Planning. All trees in the public right-of-way shall be provided per the current Urban Forestry Division standards, and the Panorama City Center Streetscape Plan, as applicable.

Replacement by a minimum of 24-inch box trees in the parkway and on the site of to be removed, shall be required for the unavoidable loss of desirable trees on the site, and to the satisfaction of the Advisory Agency. **Note**: Removal of all trees in the public right-of-way shall require approval of the Board of Public Works. Contact: Urban Forestry Division at: (213) 485-5675. Failure to comply with this condition as written shall require the filing of a modification to this tract map in order to clear the condition.

CPC-2016-2118-VZC-0233

VESTING TENTATIVE TRACT MAP NO. 74315

## DEPARTMENT OF CITY PLANNING-SITE SPECIFIC CONDITIONS

22. Prior to the recordation of the final map, the subdivider shall prepare and execute a Covenant and Agreement (Planning Department General Form CP-6770) in a manner satisfactory to the Planning Department, binding the subdivider and all successors to the following:

 a. Limit the proposed development to a maximum of 623 dwelling units and a maximum of 60,000 square feet of commercial uses, totaling up to 571,146 square feet of floor area.

 b. That a solar access report shall be submitted to the satisfaction of the Advisory Agency prior to obtaining a grading permit.

23. Prior to the issuance of the building permit or the recordation of the final map, a copy of the decision letter for CPC-2016-2118-ZC-MCUP-CU-SPR-CDO-DD shall be submitted to the satisfaction of the Advisory Agency. In the event CPC-2016-2118-ZC-MCUP-CU-SPR-CDO-DD is not approved, the subdivider shall submit a tract modification.

24. Prior to the issuance of a grading permit, the subdivider shall record and execute a Covenant and Agreement (Planning Department General Form CP-6770), binding the subdivider to the following haul route conditions:

*General Conditions*

 a. The owner or contractor shall keep the construction area sufficiently dampened to control dust caused by grading and hauling, and at all times shall provide reasonable control of dust caused by wind, at the sole discretion of the grading inspector.
 b. Hauling and grading equipment shall be kept in good operating condition and muffled as required by law.
 c. The Emergency Operations Division, Specialized Enforcement Section of the Los Angeles Police Department shall be notified at least 24 hours prior to the start of hauling, (213) 486-0777.
 d. Loads shall be secured by trimming or watering or may be covered to prevent the spilling or blowing of the earth material. If the load, where it contacts the sides, front, and back of the truck cargo container area, remains six inches from the upper edge of the container area, and if the load does not extend, at its peak, above any part of the upper edge of the cargo container area, the load is not required to be covered, pursuant to California Vehicle Code Section 23114 (e) (4).
 e. Trucks and loads are to be watered at the import site to prevent blowing dirt and are to be cleaned of loose earth at the import site to prevent spilling.
 f. Streets shall be cleaned of spilled materials during grading and hauling, and at the termination of each workday.
 g. The owner/contractor shall be in conformance with the State of California, Department of Transportation policy regarding movements of reducible loads.
 h. The owner/contractor shall comply with all regulations set forth by the State of California Department of Motor Vehicles pertaining to the hauling of earth.
 i. A copy of the approval letter from the City, the approved haul route and the approved grading plans shall be available on the job site at all times.
 j. The owner/contractor shall notify the Street Services Investigation and Enforcement Division, (213) 847-6000, at least 72 hours prior to the beginning of hauling operations and shall also notify the Division immediately upon completion of hauling operations. Any change to the prescribed routes, staging and/or hours of operation must be approved by the concerned governmental agencies. Contact the Street Services Investigation and Enforcement Division prior to effecting any change.
 k. Hauling vehicles shall not stage on any streets adjacent to the project, unless specifically approved

CPC-2016-2118-VZC-0234

000021

ICON0000021

VESTING TENTATIVE TRACT MAP NO. 74315                                          PAGE   10

as a special condition in this report.

l.   Hauling vehicles shall be spaced so as to discourage a convoy affect.
m.   This approval pertains only to the City of Los Angeles streets. Those segments of the haul route outside the jurisdiction of the City of Los Angeles may be subject to permit requirements and to the approval of other municipal or governmental agencies and appropriate clearances or permits is the responsibility of the contractor.

*Specific Conditions*

n.   The hauling operations are restricted to the hours between 9:00 a.m. and 4:00 p.m. on Monday through Friday. No hauling is permitted on Saturday, Sundays, or City holidays. Haul vehicles may not arrive at the site before the designated start time.
o.   Hauling of earth shall be completed within the maximum time limit of 30 hauling days.
p.   Loaded haul vehicles travelling from the Project Site shall turn right (south) onto Tobias Avenue, turn right (west) on to Roscoe Boulevard, turn onto I-405, continue to arrive at the Manning Pit facility at 5121 Vincent Blvd., Irwindale, CA 91706.
q.   Empty haul vehicles traveling to the Project Site facility shall utilize the same travel path in reverse.
r.   The approved haul vehicles are 14.0 cubic yard capacity semi-trailer trucks or smaller.
s.   There shall be no staging or parking of construction vehicles, including vehicles to transport workers on any of the adjacent residential streets.
t.   The total amount of dirt to be hauled shall not exceed 14,000 cubic yards.
u.   "Truck Crossing" warning signs shall be placed 300 feet in advance of the exit in each direction
v.   A minimum of two flag attendants, each with two-way radios, will be required during hauling hours to assist with staging and getting trucks in and out of the project area. Additional flag attendants may be required by the LADBS Inspector, LADOT, or BOSS to mitigate a hazardous situation (e.g. blind curves, uncontrolled intersections, narrow portions of roads or where obstacles are present). Flag attendants and warning signs shall be in compliance with Part II of the latest Edition of "Work Area Traffic Control Handbook."

25.  <u>Tribal Cultural Resource Inadvertent Discovery</u>. In the event that objects or artifacts that may be tribal cultural resources are encountered during the course of any ground disturbance activities (including the following: excavating, digging, trenching, plowing, drilling, tunneling, quarrying, grading, leveling, removing peat, clearing, pounding posts, augering, backfilling, blasting, stripping topsoil or a similar activity), all such activities shall temporarily cease on the project site until the potential tribal cultural resources are properly assessed and addressed pursuant to the process set forth below:

-   Upon a discovery of a potential tribal cultural resource, the project Permittee shall immediately stop all ground disturbance activities and contact the following: (1) all California Native American tribes that have informed the City they are traditionally and culturally affiliated with the geographic area of the proposed project; (2) and the Department of City Planning at (213) 978-1454.
-   If the City determines, pursuant to Public Resources Code Section 21074 (a)(2), that the object or artifact appears to be tribal cultural resource, the City shall provide any effected tribe a reasonable period of time, not less than 14 days, to conduct a site visit and make recommendations to the Project permittee and the City regarding the monitoring of future ground disturbance activities, as well as the treatment and disposition of any discovered tribal cultural resources.
-   The project Permittee shall implement the tribe's recommendations if a qualified archaeologist, retained by the City and paid for by the project Permittee, reasonably concludes that the tribe's recommendations are reasonable and feasible.
-   The project Permittee shall submit a tribal cultural resource monitoring plan to the City that includes all recommendations from the City and any effected tribes that have been reviewed and determined by the qualified archaeologist to be reasonable and feasible. The project Permittee shall not be allowed to recommence ground disturbance activities until this plan is approved by the City.

CPC-2016-2118-VZC-0235

ICON0000022

- If the project Permittee does not accept a particular recommendation determined to be reasonable and feasible by the qualified archaeologist, the project Permittee may request mediation by a mediator agreed to by the Permittee and the City who has the requisite professional qualifications and experience to mediate such a dispute. The project Permittee shall pay any costs associated with the mediation.
- The project Permittee may recommence ground disturbance activities outside of a specified radius of the discovery site, so long as this radius has been reviewed by the qualified archaeologist and determined to be reasonable and appropriate.
- Copies of any subsequent prehistoric archaeological study, tribal cultural resources study or report, detailing the nature of any significant tribal cultural resources, remedial actions taken, and disposition of any significant tribal cultural resources shall be submitted to the South Central Coastal Information Center (SCCIC) at California State University, Fullerton.
- Notwithstanding the above, any information determined to be confidential in nature, by the City Attorney's office, shall be excluded from submission to the SCCIC or the general public under the applicable provisions of the California Public Records Act, California Public Resources Code, and shall comply with the City's AB 52 Confidentiality Protocols.

## 26. Indemnification and Reimbursement of Litigation Costs.

Applicant shall do all of the following:

(i)  Defend, indemnify and hold harmless the City from any and all actions against the City relating to or arising out of, in whole or in part, the City's processing and approval of this entitlement, including but not limited to, an action to attack, challenge, set aside, void, or otherwise modify or annul the approval of the entitlement, the environmental review of the entitlement, or the approval of subsequent permit decisions, or to claim personal property damage, including from inverse condemnation or any other constitutional claim.

(ii)  Reimburse the City for any and all costs incurred in defense of an action related to or arising out of, in whole or in part, the City's processing and approval of the entitlement, including but not limited to payment of all court costs and attorney's fees, costs of any judgments or awards against the City (including an award of attorney's fees), damages, and/or settlement costs.

(iii)  Submit an initial deposit for the City's litigation costs to the City within 10 days' notice of the City tendering defense to the applicant and requesting a deposit. The initial deposit shall be in an amount set by the City Attorney's Office, in its sole discretion, based on the nature and scope of action, but in no event shall the initial deposit be less than $50,000. The City's failure to notice or collect the deposit does not relieve the applicant from responsibility to reimburse the City pursuant to the requirement in paragraph (ii).

(iv)  Submit supplemental deposits upon notice by the City. Supplemental deposits may be required in an increased amount from the initial deposit if found necessary by the City to protect the City's interests. The City's failure to notice or collect the deposit does not relieve the applicant from responsibility to reimburse the City pursuant to the requirement in paragraph (ii).

(v)  If the City determines it necessary to protect the City's interest, execute an indemnity and reimbursement agreement with the City under terms consistent with the requirements of this condition.

The City shall notify the applicant within a reasonable period of time of its receipt of any action and the City shall cooperate in the defense. If the City fails to notify the applicant of any claim, action, or

CPC-2016-2118-VZC-0236

000023

ICON0000023

proceeding in a reasonable time, or if the City fails to reasonably cooperate in the defense, the applicant shall not thereafter be responsible to defend, indemnify or hold harmless the City.

The City shall have the sole right to choose its counsel, including the City Attorney's office or outside counsel. At its sole discretion, the City may participate at its own expense in the defense of any action, but such participation shall not relieve the applicant of any obligation imposed by this condition. In the event the applicant fails to comply with this condition, in whole or in part, the City may withdraw its defense of the action, void its approval of the entitlement, or take any other action. The City retains the right to make all decisions with respect to its representations in any legal proceeding, including its inherent right to abandon or settle litigation.

For purposes of this condition, the following definitions apply:

"City" shall be defined to include the City, its agents, officers, boards, commissions, committees, employees, and volunteers.

"Action" shall be defined to include suits, proceedings (including those held under alternative dispute resolution procedures), claims, or lawsuits. Actions includes actions, as defined herein, alleging failure to comply with any federal, state or local law.

Nothing in the definitions included in this paragraph are intended to limit the rights of the City or the obligations of the applicant otherwise created by this condition.

## DEPARTMENT OF CITY PLANNING - ENVIRONMENTAL MITIGATION MEASURES

27. The project shall be in substantial conformance with the mitigation measures in the attached MMP and stamped "Exhibit B" and attached to the subject case file. The implementing and enforcing agencies may determine substantial conformance with mitigation measures in the MMP. If substantial conformance results in effectively deleting or modifying the mitigation measure, the Director of Planning shall provide a written justification supported by substantial evidence as to why the mitigation measure, in whole or in part, is no longer needed and its effective deletion or modification will not result in a new significant impact or a more severe impact to a previously identified significant impact.

If the Project is not in substantial conformance to the adopted mitigation measures or MMP, a modification or deletion shall be treated as a new discretionary action under CEQA Guidelines, Section 15162(c) and will require preparation of an addendum or subsequent CEQA clearance. Under this process, the modification or deletion of a mitigation measure shall not require a Tract Map Modification unless the Director of Planning also finds that the change to the mitigation measures results in a substantial change to the Project or the non-environmental conditions of approval.

## BUREAU OF ENGINEERING - STANDARD CONDITIONS

S-1.   (a) That the sewerage facilities charge be deposited prior to recordation of the final map over all of the tract in conformance with Section 64.11.2 of the LAMC.

(b) That survey boundary monuments be established in the field in a manner satisfactory to the City Engineer and located within the California Coordinate System prior to recordation of the final map. Any alternative measure approved by the City Engineer would require prior submission of complete field notes in support of the boundary survey.

(c) That satisfactory arrangements be made with both the Water System and the Power System of

CPC-2016-2118-VZC-0237

VESTING TENTATIVE TRACT MAP NO. 74315

PAGE  13

the Department of Water and Power with respect to water mains, fire hydrants, service connections and public utility easements.

(d) That any necessary sewer, street, drainage and street lighting easements be dedicated. In the event it is necessary to obtain off-site easements by separate instruments, records of the Bureau of Right-of-Way and Land shall verify that such easements have been obtained. The above requirements do not apply to easements of off-site sewers to be provided by the City.

(e) That drainage matters be taken care of satisfactory to the City Engineer.

(f) That satisfactory street, sewer and drainage plans and profiles as required, together with a lot grading plan of the tract and any necessary topography of adjoining areas be submitted to the City Engineer.

(g) That any required slope easements be dedicated by the final map.

(h) That each lot in the tract complies with the width and area requirements of the Zoning Ordinance.

(i) That 1-foot future streets and/or alleys be shown along the outside of incomplete public dedications and across the termini of all dedications abutting unsubdivided property. The 1-foot dedications on the map shall include a restriction against their use of access purposes until such time as they are accepted for public use.

(j) That any 1-foot future street and/or alley adjoining the tract be dedicated for public use by the tract, or that a suitable resolution of acceptance be transmitted to the City Council with the final map.

(k) That no public street grade exceeds 15%.

(l) That any necessary additional street dedications be provided to comply with the Americans with Disabilities Act (ADA) of 1990.

S-2.   That the following provisions be accomplished in conformity with the improvements constructed herein:

(a) Survey monuments shall be placed and permanently referenced to the satisfaction of the City Engineer. A set of approved field notes shall be furnished, or such work shall be suitably guaranteed, except where the setting of boundary monuments requires that other procedures be followed.

(b) Make satisfactory arrangements with the Department of Transportation with respect to street name, warning, regulatory and guide signs.

(c) All grading done on private property outside the tract boundaries in connection with public improvements shall be performed within dedicated slope easements or by grants of satisfactory rights of entry by the affected property owners.

(d) All improvements within public streets, private street, alleys and easements shall be constructed under permit in conformity with plans and specifications approved by the Bureau of Engineering.

CPC-2016-2118-VZC-0238

301

**000025**

VESTING TENTATIVE TRACT MAP NO. 74315                                       PAGE   14

(e) Any required bonded sewer fees shall be paid <u>prior to recordation of the final map</u>.

S-3.   That the following improvements be either constructed <u>prior to recordation of the final map</u> or that
the construction be suitably guaranteed:

(a) Construct on-site sewers to serve the tract as determined by the City Engineer.

(b) Construct any necessary drainage facilities.

(c) Install street lighting facilities to serve the tract as required by the Bureau of Street Lighting.

IMPROVEMENT CONDITION:

If street widening per BOE improvement conditions, relocate and upgrade street lights,
(consistent with the Panorama City Center Streetscape Plan, as applicable):

- four (4) on Cedros Aveenue
- five (5) on Roscoe Boulevard
- five (5) on Tobias Avenue.

Notes: The quantity of street lights identified may be modified slightly during the plan check
process based on illumination calculations and equipment selection.

Conditions set: 1) in compliance with a Specific Plan, 2) by LADOT, or 3) by other legal
instrument excluding the Bureau of Engineering conditions, requiring an improvement that will
change the geometrics of the public roadway or driveway apron may require additional or the
reconstruction of street lighting improvements as part of that condition.

(d) Plant street trees and remove any existing trees within dedicated streets or proposed dedicated
streets as required by the Street Tree Division of the Bureau of Street Maintenance. All street
tree plantings shall be brought up to current standards. When the City has previously been paid
for tree planting, the subdivider or contractor shall notify the Street Tree Division (213-485-5675)
upon completion of construction to expedite tree planting.

(e) Repair or replace any off-grade or broken curb, gutter and sidewalk satisfactory to the City
Engineer.

(f) Construct access ramps for the handicapped as required by the City Engineer.

(g) Close any unused driveways satisfactory to the City Engineer.

(h) Construct any necessary additional street improvements to comply with the Americans with
Disabilities Act (ADA) of 1990.

(i) That the following improvements be either constructed prior to recordation of the final map or
that the construction be suitably guaranteed (consistent with the Panorama City Center
Streetscape Plan, as applicable):

a. After submittal of hydrology and hydraulic calculations and drainage plans for review by the
Valley District Engineering Office prior to recordation of the final map, construction of public
drainage facilities or any other drainage systems will be required to drain the remainder of

CPC-2016-2118-VZC-0239

**000026**

ICON0000026

the alley not being merged and new dedicated alley to outlets satisfactory to the City Engineer.

b.   Improve Roscoe Boulevard being dedicated and adjoining the subdivision by the construction of a new 15-foot wide concrete sidewalk with tree wells, including any necessary removal and reconstruction of existing improvements.

c.   Improve Cedros Avenue being dedicated and adjoining the subdivision by the construction of a new 15-foot wide concrete sidewalk with tree wells, or a 5-foot concrete sidewalk and landscaping of the parkway, including any necessary removal and reconstruction of existing improvements.

d.   Improve Tobias Avenue adjoining the subdivision by the removal the existing sidewalk and reconstruction a new 12-foot wide full-width concrete sidewalk with tree wells, including any necessary removal and reconstruction of existing

e.   Improve all newly dedicated cut corners with additional concrete sidewalks.

f.   Close the alley intersection with Roscoe Boulevard being merged, by the construction of new concrete integral curb and gutter and concrete sidewalk joining the Roscoe Boulevard new improvement.

g.   Improve the newly dedicated alley by the construction of suitable surfacing to provide a 29-foot wide alley from the intersection with the remaining north-south alley to approximately 60 feet easterly thereof, and a 20-foot wide alley from approximately 60 feet easterly of the intersection with the remaining north-south alley to Tobias Avenue, including a 2-foot longitudinal center gutter through both sections, and including construction of an alley intersection with Tobias Avenue, together with any necessary removal and reconstruction of existing improvements.

NOTES:

The Advisory Agency approval is the maximum number of units permitted under the tract action. However the existing or proposed zoning may not permit this number of units.

Approval from Board of Public Works may be necessary before removal of any street trees in conjunction with the improvements in this tract map through Bureau of Street Services Urban Forestry Division.

Satisfactory arrangements shall be made with the Los Angeles Department of Water and Power, Power System, to pay for removal, relocation, replacement or adjustment of power facilities due to this development. The subdivider must make arrangements for the underground installation of all new utility lines in conformance with LAMC Section 17.05-N.

The Advisory Agency hereby finds that this tract conforms to the California Water Code, as required by the Subdivision Map Act.

The subdivider should consult the Department of Water and Power to obtain energy saving design features which can be incorporated into the final building plans for the subject development. As part of the Total Energy Management Program of the Department of Water and Power, this no-cost consultation service will be provided to the subdivider upon his request.

CPC-2016-2118-VZC-0240

000027

ICON0000027

**FINDINGS OF FACT (CEQA)**

**1.          INTRODUCTION**

**1.1          BACKGROUND**

The City of Los Angeles (the "City") has evaluated the environmental impacts of implementation of the ICON at Panorama project by preparing an environmental impact report ("EIR") (Case Number ENV-2016-1061-EIR/State Clearinghouse No. 2016081031). The EIR was prepared in compliance with the California Environmental Quality Act of 1970, Public Resources Code Section 21000 et seq. (CEQA) and the California Code of Regulations Title 15, Chapter 6 (the "CEQA Guidelines"). The findings discussed in this document are made relative to the conclusions of the EIR.

The EIR analyzed the project as originally proposed by the project applicant (referred to here as the "Original Project"), as well as a series of alternatives to the Project.  A comment letter was submitted in response to the public circulation of the Draft EIR, which contended that the cumulative traffic analysis of the Original Project was deficient and did not address the 266,000 square-foot commercial expansion of the adjacent Panorama City Mall, located at 8401 N. Van Nuys Boulevard, as a related project. An application for the Panorama Mall expansion was received by the City on February 13, 2017, six months after the issuance of the Notice of Preparation for the ICON Project. The Draft EIR adequately analyzed cumulative impacts based on assumptions of ambient growth rates and all other closely related past, present, and reasonably foreseeable probable future projects known at the time of the issuance of the NOP, the established baseline condition and environmental setting. The Panorama Mall expansion project had not yet been proposed at that time and was not reasonably foreseeable, and was therefore not included in the analysis. Moreover, a Lead Agency has the ability to set a reasonable cut-off date to determine baseline conditions and is not required to continuously update these conditions or a list of related projects.

The City, in its discretion, decided it reasonable to update the baseline to include the Panorama Mall expansion as a related project based on the size, scope, and location of that project. The City prepared a revised traffic analysis that included the additional related project, which identified a new additional significant traffic impact that would result from the Original Project.  Accordingly, the City recirculated the Draft EIR for an additional public review period, as required by CEQA. The Project Applicant and City also identified an additional project alternative, a reduced project labeled Alternative 5, which would have less commercial floor area and more residences than the Original Project, and would avoid the additional significant traffic impact of the Original Project.  The City has selected a further reduced project that is a similar but reduced version of Alternative 5 (referred to as the "Revised Project"). The approved project is referred to in these Findings as "Revised Project." The term "Project" is used in these Findings for statements that are equally applicable to the Original Project, Alternative 5, and the Revised Project; where a statement applies specifically only to the Original Project, Alternative 5, or the Revised Project, the more specific terminology is used.

CEQA Section 21002 provides that "public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects[.]" The procedures required by CEQA "are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects." CEQA Section 21002 goes on to state that "in the event [that] specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof."

CPC-2016-2118-VZC-0241

000028

ICON0000028

VESTING TENTATIVE TRACT MAP NO. 74315                                          PAGE  17

The mandate and principles announced in CEQA Section 21002 are implemented, in part, through the requirement that agencies must adopt findings before approving projects for which EIRs are required. (See CEQA Section 21081[a]; CEQA Guidelines Section 15091[a].) For each significant environmental impact identified in an EIR for a proposed project, the approving agency must issue a written finding, based on substantial evidence in light of the whole record, reaching one or more of the three possible findings, as follows:

1)   Changes or alterations have been required in, or incorporated into, the project that avoid or substantially lessen the significant impacts as identified in the EIR.

2)   Such changes or alterations are within the responsibility and jurisdiction of another public agency and not the agency making the finding. Such changes have been, or can or should be, adopted by that other agency.

3)   Specific economic, legal, social, technological, other considerations, including considerations for the provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or alternatives identified in the EIR.

The findings reported in the following pages incorporate the facts and discussions of the environmental impacts that are found to be significant in the Final Environmental Impact Report for the project as fully set forth therein. Although Section 15091 of the CEQA Guidelines does not require findings to address environmental impacts that an EIR identifies as merely "potentially significant", these findings nevertheless fully account for all such effects identified in the Final EIR for the purpose of better understanding the full environmental scope of the Project. For each environmental issue analyzed in the EIR, the following information is provided:

The findings provided below include the following:

- Description of Significant Effects - A description of the environmental effects identified in the EIR.
- Project Design Features - A list of the project design features or actions that are included as part of the Project.
- Mitigation Measures - A list of the mitigation measures that are required as part of the Project to reduce identified significant impacts.
- Finding - One or more of the three possible findings set forth above for each of the significant impacts.
- Rationale for Finding - A summary of the rationale for the finding(s).
- Reference - A reference of the specific section of the EIR which includes the evidence and discussion of the identified impact.

With respect to a project for which significant impacts are not avoided or substantially lessened either through the adoption of feasible mitigation measures or feasible environmentally superior alternatives, a public agency, after adopting proper findings based on substantial evidence, may nevertheless approve the project if the agency first adopts a statement of overriding considerations setting forth the specific reasons why the agency found that the project's benefits rendered acceptable its unavoidable adverse environmental effects. (CEQA Guidelines §15093, 15043[b]; see also CEQA § 21081[b].)

Pursuant to CEQA Section 21081.6(a)(2) and CEQA Guidelines Section 15091(e), the documents and other materials that constitute the record of proceedings upon which the City has based its decision are located in

CPC-2016-2118-VZC-0242

**000029**

ICON0000029

VESTING TENTATIVE TRACT MAP NO. 74315                     PAGE  18

and may be obtained from the Department of City Planning, as the custodian of such documents and other materials that constitute the record of proceedings, located at City Hall, 200 North Spring Street, Room 750, Los Angeles, CA 90012.

### 1.2        RECORD OF PROCEEDINGS

For purposes of CEQA and these Findings, the Record of Proceedings for the Project includes (but is not limited to) the following documents and other materials that constitute the administrative record upon which the City approved the Revised Project.  The following information is incorporated by reference and made part of the record supporting these Findings of Fact:

- All Project plans and application materials including supportive technical reports;

- The Draft EIR and Appendices (April 2017), Revised Draft EIR (August 2017), and Final EIR and Appendices (February 2018), and all documents relied upon or incorporated therein by reference;

- The Mitigation Monitoring Program (MMP) prepared for the Project;

- The City of Los Angeles General Plan and related EIR;

- The Southern California Association of Governments (SCAG)'s 2016-2040 Regional Transportation Plan/Sustainable Communities Strategy (RTP/SCS) and related EIR (SCH No. 2015031035);

- Municipal Code of the City of Los Angeles, including but not limited to the Zoning Ordinance and Subdivision Ordinance;

- All records of decision, resolutions, staff reports, memoranda, maps, exhibits, letters, minutes of meetings, summaries, and other documents approved, reviewed, relied upon, or prepared by any City commissions, boards, officials, consultants, or staff relating to the Project;

- Any documents expressly cited in these Findings of Fact, in addition to those cited above; and

- Any and all other materials required for the record of proceedings by Public Resources Code Section 21167.6(e).

Pursuant to CEQA Section 21081.6(a)(2) and CEQA Guidelines Section 15091(e), the documents and other materials that constitute the record of proceedings upon which the City has based its decision are located in and may be obtained from the Department of City Planning, as the custodian of such documents and other materials that constitute the record of proceedings, located at City Hall, 200 North Spring Street, Room 750, Los Angeles, CA 90012.

### 2.         PROJECT DESCRIPTION

### 2.1        ENVIRONMENTAL SETTING

The Project is located in the Panorama City area of the central San Fernando Valley in the City of Los Angeles.  Regional access to the Project Site is provided via Roscoe Boulevard, Van Nuys Boulevard, State Route 170 (SR-170), and the San Diego Freeway (I-405).  The nearest freeway access is the San Diego Freeway via Roscoe Boulevard, approximately 1.1 miles west from the Project Site.  Local access to the Project Site is provided via Roscoe Boulevard, Tobias Avenue, and Cedros Avenue.  The addresses for the

CPC-2016-2118-VZC-0243

VESTING TENTATIVE TRACT MAP NO. 74315                                          PAGE   19

Project Site are 14651-14697 W. Roscoe Boulevard, 8300-8406 N. Cedros Avenue, and 8313-8413 N. Tobias Avenue. The Project Site is approximately 8.9 acres and is bound by Roscoe Boulevard to the south, Tobias Avenue to the east, Cedros Avenue to the west, and existing multi-family residences to the north. Existing land uses within the Project Site include three commercial structures totaling approximately 172,500 square feet of floor area and a surface parking area. All of the existing structures have been unoccupied since 2003, and a chain-link fence surrounds the Project Site. A Montgomery Ward store, an automobile repair shop, and a restaurant formerly occupied the buildings. An existing public alley runs from Chase Street southward through the Project Site.

## 2.2        PROJECT CHARACTERISTICS

The Project includes the demolition of the existing structures and surface parking lot, and the development of a mixed-use project with multi-family residences, commercial space, and associated parking facilities. The Project includes commercial land uses in one- and two-story buildings, residential buildings, and a parking structure for the commercial land uses.

The Original Project analyzed in the Draft EIR included the demolition of the existing structures and surface parking lot, and the development of a mixed-use project with 422 multi-family residences totaling approximately 384,000 square feet of residential floor area, approximately 200,000 square feet of commercial space, and associated parking facilities. The Original Project also included commercial land uses in five separate one- and two-story buildings, two separate seven-story residential buildings (five stories of residential over two levels of aboveground residential parking), and a six-level parking structure for the commercial land uses. Open space amenities would be provided for the Original Project residents at the residential buildings.

In response to comments on the Draft EIR, and in order to include consideration of a proposed expansion at the adjacent Panorama Mall as a related project, the City prepared a revised traffic analysis that included the additional related project. The revised traffic analysis identified a new additional significant traffic impact that would result from the Original Project at the intersection of Roscoe Boulevard and the I-405 Freeway southbound ramps. The Project Applicant and City also identified an additional project alternative, a reduced project labeled Alternative 5, which would have less commercial floor area and more residences than the Original Project, and would avoid the additional significant traffic impact of the Original Project.

Partly in response to comments received on the Draft EIR, and the subsequent traffic analysis of the Revised Draft EIR, the City requested that the Project Applicant consider a revised project alternative to reduce the significant and unavoidable cumulative traffic impacts identified in the Revised Draft EIR. This alternative was labelled "Alternative 5" and included in Section 3, Revisions, Clarifications, and Corrections, of the Final EIR. Alternative 5 is a reduced commercial use project, which includes less commercial space and more residential units than the Original Project.

Alternative 5 would result in the construction of a mixed-use project with 675 multi-family residences totaling approximately 615,000 square feet of residential floor area, approximately 60,000 square feet of commercial space, and associated parking facilities. The residential units would be developed along Cedros Avenue in the western, central, and northern portions of the Project Site. The commercial land uses would be developed in the southern (Roscoe Boulevard) and eastern (Tobias Avenue) portions of the Project Site. An approximately 16,895-square-foot public plaza would be located along Tobias Avenue, which would function as a passive landscaped and hardscaped area for visitors and residents.

CPC-2016-2118-VZC-0244

VESTING TENTATIVE TRACT MAP NO. 74315                                    PAGE   20

The Revised Project approved by the City is a slightly reduced version of Alternative 5 that would eliminate some significant unavoidable impacts and reduce several other impacts compared to the Original Project, and would have substantially similar impacts compared to Alternative 5. The Revised Project includes 623 multi-family residences totaling approximately 515,571 square feet of residential floor area, approximately 60,000 square feet of commercial space, and associated parking facilities. As compared to Alternative 5, the Revised Project has 52 less residential units, approximately 99,430 square feet less residential floor area, and the same commercial floor area.

## 2.3        PROJECT OBJECTIVES

The objectives of the Project are as follows:

1) Provide for the efficient and functional development of an underutilized site, which is designated to allow for regional commercial development, through the replacement of vacant buildings and surface parking lots with new housing and commercial uses to meet community and regional demands;

   a. Develop new housing to meet the needs of existing residents and projected population growth within the Mission Hills – Panorama City – North Hills Community Plan area.

   b. Provide for safe pedestrian and bicycle connectivity between the Project's residential and commercial areas, adjacent commercial uses, and nearby transit facilities.

   c. Promote pedestrian activity in the area by removing paved surface parking lots and vacant buildings, and activating the street frontage with ground level retail and commercial uses, sidewalks, street trees, and landscaping.

2) Foster local economic development and job creation in the Mission Hills – Panorama City – North Hills Community Plan Area and the San Fernando Valley; and

   a. Develop a project with a balanced mix of uses to act as a catalyst and encourage investment in the commercial district.

   b. Provide permanent job opportunities and temporary construction jobs.

   c. Meet the demand from the immediate and surrounding community for a destination commercial center that includes diverse commercial uses and services, and pedestrian amenities.

3) Eliminate blight and enhance the visual quality of Panorama City by providing a new and attractive development in Panorama City.

   a. Support infill development in an existing urban area with adequate infrastructure and public transit access to support the planned density of the Mission Hills – Panorama City – North Hills Community Plan area.

   b. Enhance the identity and appearance of the district by designing an integrated and architecturally-unified mixed-use development.

CPC-2016-2118-VZC-0245

000032
ICON0000032

VESTING TENTATIVE TRACT MAP NO. 74315

PAGE  21

## 2.4        ACTIONS REQUIRED

The approvals requested by the Project Applicant include the following:

1) Vesting Tentative Tract Map to vacate the existing alley and for the subdivision of an approximately 8.9-acre (393,571 square foot) site into 6 lots (1 master lots and 5 airspace lots) for a mixed-use development, and a Haul Route for the import of 14,000 cubic yards of soil;

2) Vesting Zone Change pursuant to Section 12.32-F from the [Q]C2-1-CDO and [Q]P-1-CDO zones to the (T)(Q)C2-1-CDO zone over the entire site and request to modify [Q] Condition related to signage;

3) Master Conditional Use Permit for on-site and off-site alcoholic beverage sales;

4) Conditional Use Permit for Commercial Corner Development to permit restaurants with extended hours of operation past 11:00 pm, and a maximum building height of 85 feet in lieu of a maximum height of 45 feet;

5) Site Plan Review for a development project which creates over 50,000 square feet of non-residential floor area and over 50 dwelling units;

6) Design Review Plan Approval for a mixed-use development within the Panorama City Community Design Overlay;

7) Director's Decision for a 10 percent reduction in the required open space;

8) Demolition, grading, excavation, and building permits; and

9) Other permits, ministerial or discretionary, may be necessary in order to execute and implement the Project. Such approvals may include, but are not limited to: landscaping approvals, exterior approvals, permits for driveway curb cuts, storm water discharge permits, and installation and hookup approvals for public utilities and related permits.

## 3.     CEQA REVIEW AND PUBLIC PARTICIPATION

For purposes of CEQA and these Findings, the Record of Proceedings for the Project described in Section 1.2 above includes (but is not limited to) the following documents:

**Notice of Preparation.** In compliance with CEQA Guidelines §15375 and §15082, the City published the Notice of Preparation (the "NOP"), which was sent to responsible agencies and members of the public for a 30-day review period starting on August 9, 2016 and ending on September 9, 2016, identifying the scope of the environmental issues. The NOP and responses to the NOP from agencies and interested parties are included in Appendix A to the Draft EIR.

**Public Scoping Meeting.** In compliance with CEQA Guidelines §15206 and §15082(c)(1), as a project of regional significance, a Public Scoping Meeting was held on August 17, 2016, at Panorama High School (8015 Van Nuys Boulevard, Panorama City, CA 91402) to give the public the opportunity to provide comments as related to the Project and the scope and focus of the EIR.

CPC-2016-2118-VZC-0246

**000033**

ICON0000033

VESTING TENTATIVE TRACT MAP NO. 74315                                    PAGE   22

**Draft EIR.** The Draft EIR for the Project, which is incorporated herein by reference in full, was prepared pursuant to CEQA and State, Agency, and City of Los Angeles (City) CEQA Guidelines (Public Resources Code Section 21000, et seq., 14 California Code of Regulations Section 15000, et seq., City of Los Angeles Environmental Quality Act Guidelines). The Draft EIR evaluated in detail the potential environmental effects of the Project. The Draft EIR also analyzed the effects of four alternatives to the Project, as described below. These included a No Project Alternative, Reduced Project, All Commercial Project, and By-Right Project.

The Draft EIR was distributed for public review (including the State Clearinghouse) on April 6, 2017 for a 47-day review period with the comment period expiring on May 22, 2017. A Notice of Availability (NOA) was distributed to all property owners within 500 feet of the Project Site and to interested parties, which informed them of where they could view the document and how to comment. The Draft EIR was available to the public at City Hall, Department of City Planning, and the following local libraries: Los Angeles Central Library, Mid-Valley Regional Library, and Panorama City Branch Library. A copy of the document was also posted online at https://planning.lacity.org/eir/IconAtPanorama/IconAtPanoramaCoverPg.html. Notices were filed with the County Clerk on April 6, 2017.

**Revised Draft EIR.** Pursuant to CEQA Guidelines §15088.5, a Revised Draft EIR was prepared to provide the public an opportunity to review and comment on the changes to the Original Project's traffic analysis based on the addition of the Panorama City Mall expansion. The revision was limited to the addition of the Panorama Mall expansion project to the related projects list in Draft EIR Section III (Environmental Setting) and an update to the entire Draft EIR Section IV.K (Transportation/Traffic).

The Revised Draft EIR was distributed for public review (including the State Clearinghouse) on August 31, 2017 for a 47-day review period with the comment period expiring on October 16, 2017.  A Notice of Availability (NOA) was distributed to all property owners within 500 feet of the Project Site and to interested parties, which informed them of where they could view the document and how to comment. The Draft EIR was available to the public at City Hall, Department of City Planning, and the following local libraries: Los Angeles Central Library, Mid-Valley Regional Library, and Panorama City Branch Library. A copy of the document was also posted online at https://planning.lacity.org/eir/IconAtPanorama/IconAtPanoramaCoverPg.html. Notices were filed with the County Clerk on August 31, 2017.

**Notice of Completion.** A Notice of Completion was sent with the Draft EIR to the Governor's Office of Planning and Research State Clearinghouse on April 6, 2017, and notice was provided in newspapers of general and/or regional circulation.  A Notice of Completion was sent with the Revised Draft EIR to the Governor's Office of Planning and Research State Clearinghouse on August 31, 2017, and notice was provided in newspapers of general and/or regional circulation.

**Final EIR.** A total of 13 comment letters were received by the close of the Draft EIR and Revised Draft EIR public comment periods. The specific and general responses to comments are in Section 2 (Responses to Comments) of the Final EIR.  Responses to public agency comments were distributed to those public agencies on February 23, 2018.

The Final EIR was distributed on February 23, 2018. The Final EIR has been prepared by the City in accordance with CEQA and the CEQA Guidelines. The City has relied on Section 15084(d)(2) of the CEQA Guidelines that allows contracting with another entity, public or private, to prepare the EIR. The City has reviewed drafts of all portions of the EIR and subjected them to its own review and analysis. The Final EIR that was released for public review reflected the independent judgment of the City.

CPC-2016-2118-VZC-0247

**Errata.** An errata was prepared on March 23, 2018 to correct the number of significant unavoidable traffic impacts for Alternative 3, and to correct language in the Final EIR regarding the Environmentally Superior Alternative.

## 4.    NO IMPACT OR LESS THAN SIGNIFICANT IMPACTS WITHOUT MITIGATION

Impacts of the Original Project that were determined to have no impact or be less than significant in the EIR (including as a result of implementation of project design features and regulatory compliance measures) and that require no mitigation are identified below. The impact area and the appropriate section number follow the impact titling and follow the numbering conventions used in the EIR. The City has reviewed the record and agrees with the conclusion that the following environmental issues would not be significantly affected by Alternative 5 or the Revised Project and, therefore, no additional findings are needed.

These findings do not repeat the full discussions of environmental impacts contained in the EIR. The City ratifies, adopts, and incorporates the analysis, explanation, findings, responses to comments, and conclusions of the EIR. The City adopts the reasoning of the EIR, City staff reports, and presentations regarding the Project.

### AESTHETICS

The EIR discussed the impacts related to aesthetics in Section VII of the Draft EIR.

### SB 743

Senate Bill (SB) 743, effective January 1, 2014, made several changes to CEQA for projects located in areas served by transit. Among other changes, SB 743 eliminates the need to evaluate aesthetic and parking impacts of a project in some circumstances. Specifically, aesthetic and parking impacts of a residential, mixed-use residential, or employment center project on an infill site within a Transit Priority Area (TPA) shall not be considered to have a significant impact on the environment.

On February 10, 2016, the City circulated Zoning Information File No. 2452 to clarify the locations of TPAs within the City, and to reaffirm that aesthetic impacts shall not be considered a significant impact on the environment when the provisions of SB 743 apply. The Project Site is within a TPA, and therefore, the Project's impacts on visual resources, aesthetic character, shade and shadow, light and glare, scenic vistas, State- and City-designated scenic highways, and parking are not considered to be significant per SB 743 and Zoning Information File No. 2452. Notwithstanding the mandate imposed by SB 743, the following aesthetic analysis for the Project is provided for informational purposes only.

### Scenic Vistas

Implementation of the Project would not substantially affect any scenic vistas, since scenic vistas available from the Project area are largely obscured by existing development. Pursuant to SB 743, the Project would not result in impacts related to scenic vistas.

### Scenic Resources

The Project Site is not located within a State-designated scenic highway or associated view corridor. Consequently, the Project Site does not contain any trees, rock outcroppings, or historic buildings that are

CPC-2016-2118-VZC-0248

000035

ICON0000035

VESTING TENTATIVE TRACT MAP NO. 74315                                    PAGE   24

within a state scenic highway or associated corridor. Pursuant to SB 743, the Project would result in no impact to scenic resources within a state scenic highway. .

**Visual Character**

While the Project would introduce taller buildings than what exist in the surrounding uses, the Project would be consistent with the urban viewshed of the surrounding area and with the type of development that can be developed at a regional commercial site.  In addition to the increased height, the Project's proposed buildings would increase the building mass on the Project Site.  The resulting buildings would be visually prominent in the immediately surrounding area compared to the existing uses at the Project Site.  This increased visibility would occur on nearby roadways and adjoining sidewalks bordering the site, and the greater height and mass would increase the visibility of the Project Site from nearby residential and commercial properties. Even with increased prominence, however, the Project would be consistent with the urban viewshed of the surrounding area and with the type of development that can be developed at a regional commercial site, and as such, would be visually integrated with the character of the area in a general sense.

The Project would be an urban-scale development that would be reflective of the expected visual character of the area as it develops as part of the Panorama City revitalization efforts and in accordance with adopted land use plans.  The Project has been designed to create a vibrant community and pedestrian-oriented streetscape and circulation.  The Project complements the scale and grain of the regional commercial area along the Van Nuys Boulevard corridor while contributing an architecturally unique Project as part of the revitalization of the area.  The façade of the Project is designed with varying materials and treatments to create a unique street frontage while maintaining the pedestrian experience at street level with high ground-floor façade transparency.  The Project's architectural material selection and color palette would contribute toward aesthetic appeal in the area.   The design alternates different textures, colors, materials, and distinctive architectural treatments to add visual interest while avoiding dull and repetitive facades.

As part of the Project, landscaping and material improvements to the public right-of-way along adjoining streets is integrated into the design, facilitating pedestrian activity.  Overall, the Project is designed and oriented to connect the site as regional commercial use with the Van Nuys Boulevard commercial corridor.

As a result of the proposed building's architectural style and urban design on the Project Site, the proposed Project would be effectively integrated into the aesthetics of the urban viewshed by means of its location within a TPA and its design, architecture, size, massing, and location as well as with future developments that would serve to revitalize this area.  Pursuant to SB 743, the visual character impact associated with architectural style and urban design would result in no impacts.

**Nighttime Light**

It is anticipated that the amount of light emanating from the Project would represent an increase over current light levels. Even so, compliance with City's regulatory compliance measures would require outdoor lighting to be designed and installed with shielding so that the light source cannot be seen from adjacent residential properties, the public right-of-way, nor from above.  Pursuant to SB 743, no significant lighting impacts would occur.

CPC-2016-2118-VZC-0249

000036

ICON0000036

### Daytime Glare

The Project would incorporate both solid and glass surfaces. Exterior portions of the proposed building would use various non-reflective material designed to minimize the transmission of glare from buildings. The Project's residential and commercial parking would be primarily located within parking structures screened from the street, and some surface parking areas interior to the site, minimizing potential glare from vehicles. Compliance with the City's regulatory compliance measure would require the exterior of the proposed building to be constructed of high-performance, non-reflective materials to minimize glare and reflected heat. Moreover, the Project would not use polished metals in its design. Pursuant to SB 743, impacts would not be significant.

### Cumulative Impacts

The development of cumulative projects is expected to occur in accordance with adopted plans and regulations, which would result in individual review of the visual character of each project to ensure consistency and that design standards are compatible with existing land uses. In addition, similar to the Project, the cumulative projects would be required to submit a landscape plan to the City for review and approval.

### FINDINGS

As the Revised Project would be of a compatible design as the Original Project, impacts with respect to aesthetics would remain unchanged. Based on SB 743 and the EIR analysis and the whole of the record, the City finds that Revised Project impacts and cumulative impacts related to scenic vistas, scenic resources, visual character, nighttime light, and daytime glare would not result in any significant impacts.

### AGRICULTURAL AND FOREST RESOURCES

The EIR discussed the impacts related to agricultural and forest resources in Section VII of the Draft EIR. The Project Site is developed with vacant commercial structures and associated surface parking lot areas, and is located in a developed area of the City. Neither the Project site nor the surrounding area are designated as Prime Farmland, Unique Farmland, or Farmland of Statewide Importance. Neither the Project Site nor the surrounding area are under a Williamson Act contract. The Project Site is not zoned for forest land, timberland, or timberland production land uses. No forest land exists on or in the vicinity of the Project Site, and Project implementation would not result in the loss or conversion of forest land. Therefore, no impacts to agricultural and forest resources will occur. Therefore, no impact would occur.

### Cumulative Impacts

Development of the Project in combination with the related projects would not result in the conversion of State-designated agricultural land from agricultural to a non-agricultural use nor result in the loss of forest land or conversion of forest land to non-forest use. Neither the Project Site nor surrounding area are currently used and/or is designated for use as agriculture or forest land, or zoned for agricultural uses or forest land, timberland, or timberland production. Thus, neither the Project nor the related projects would result in the conversion of existing agricultural uses or zoning to a non-agricultural use, nor result in the loss of forest land, timberland, timberland production or zoning, or the conversion of forest land to non-forest use.

CPC-2016-2118-VZC-0250

000037

ICON0000037

VESTING TENTATIVE TRACT MAP NO. 74315            PAGE 26

## FINDINGS

The Revised Project would be constructed on the same site as the Original Project and, therefore, would also result in no impact with respect to agricultural and forest resources. Based on the EIR analysis and the whole of the record, the City finds that the Revised Project would cause no impact and no cumulative impact related to agricultural and forest resources.

## AIR QUALITY

The EIR discussed the impacts related to air quality in Section IV.A of the Draft EIR and Section III of the Final EIR. The following discussion addresses impacts with respect to air quality plan consistency, mass daily construction emissions, localized construction and operational emissions, toxic air contaminants, and odors, which have no impact or are less than significant and do not require mitigation. Mass daily operational air quality emissions are addressed in Section 6, further below.

### Air Quality Plan Consistency

The Project would comply with all South Coast Air Quality Management District (SCAQMD) rules and regulations that are in effect at the time of development. The Project would not exceed the growth projections of the Air Quality Management Plan (AQMP), and, as such, would not conflict with the 2012 AQMP or jeopardize attainment of State and national ambient air quality standards in the area under the jurisdiction of the SCAQMD. Impacts would be less than significant with respect to consistency with the AQMP.

The Project would be consistent with goals, objectives, and policies set forth in the City's General Plan Air Quality Element, as it would be generally consistent with the applicable air quality policies discussed above. Therefore, no impact would occur with respect to consistency with the applicable air quality policies in the General Plan.

### Mass Daily Construction Emissions

The mass daily regional construction-related emissions generated during the Project construction phase would not exceed the thresholds of significance recommended by SCAQMD. Therefore, this impact would be less than significant.

### Localized Construction and Operational Emissions

Emissions during the remaining construction phases would not exceed SCAQMD's Localized Significance Thresholds for the specified pollutants. Therefore, impacts related to localized pollutant concentrations during construction would be less than significant.

On-site operational emissions generated by the proposed uses would not approach the established SCAQMD localized thresholds. Therefore, this impact would be less than significant.

### Toxic Air Contaminants (TACs)

Construction activities associated with the Project would be short-term in nature. Estimation of the cancer risk from diesel particulate matter assumes long-term exposure to the pollutant of 70 years. Therefore, the health risk from air pollutants generated during Project construction would be less than significant.

CPC-2016-2118-VZC-0251

Typical sources of acutely and chronically hazardous TACs include industrial truck stops and warehouse distribution facilities, neither of which would be included as part of the Project. The proposed commercial uses are not sensitive receptors for TACs. Additionally, the proposed use would not be a significant TAC source. Therefore, the impact of the Project operation would be less than significant.

### Odors

Potential sources that may emit odors during construction activities include equipment exhaust. Odors from these sources would be localized and generally confined to the immediate area surrounding the Project Site. The Project would use typical construction techniques, and the odors would be typical of most construction sites and temporary and intermittent in nature. Therefore, construction of the Project would result in less-than-significant impacts related to odors.

The Project operation involves no elements related to industrial or other odor-generating land uses, no objectionable odors are anticipated. Therefore, the potential impacts associated with objectionable odors would be less than significant.

### Cumulative Impacts

Construction emissions associated with the Project would not exceed the SCAQMD's thresholds of significance. Therefore, the cumulative impact of the Project's construction emissions would be considered less than significant.

With respect to TACs, the construction activities associated with the Project and related projects would be similar to other development projects in the City, and would be subject to the regulations and laws relating to toxic air pollutants at the regional, State, and federal level that would protect sensitive receptors from substantial concentrations of these emissions. In addition, and similar to the Project, related projects construction activity would not result in long-term substantial sources of TAC emissions and would not combine with the Project to generate ongoing TAC emissions. Therefore, cumulative TAC emissions from the Project and related projects would be less than significant.

With respect to cumulative odor impacts, SCAQMD Rules 1108 and 1113 limit the amount of VOC from cutback asphalt and architectural coatings and solvents, respectively. Based on mandatory compliance with SCAQMD Rules, it is reasonably anticipated that construction activities and materials used in the construction of the Project and related projects would not combine to create objectionable odors. Therefore, cumulative odor impacts would be less than significant.

### FINDINGS

The Revised Project would result in the same scope of construction as the Original Project, and would generate fewer daily vehicle trips than the Original Project. (See Section 6, below, regarding mass daily operational emissions, which would be significant and unavoidable.) Therefore, based on the EIR analysis and the whole of the record, the City finds that the Revised Project impacts and cumulative impacts related to air quality plan consistency, mass daily construction emissions, localized construction and operational emissions, toxic air contaminants, and odors would be less than significant.

CPC-2016-2118-VZC-0252

VESTING TENTATIVE TRACT MAP NO. 74315                                        PAGE   28

## BIOLOGICAL RESOURCES

The EIR discussed the impacts related to biological resources in Section VII of the Draft EIR. The following discussion addresses impacts with respect to special status species, riparian habitat/wetlands, migratory wildlife corridors, the City's tree preservation ordinance, and habitat conservation plans, which are less than significant and do not require mitigation.

### Candidate, Sensitive, or Special Status Species

The Project Site does not contain any habitat capable of sustaining any species identified as a candidate, sensitive, or special status species in local or regional plans, policies, or regulations, or by the California Department of Fish and Wildlife or U.S. Fish and Wildlife Service. Additionally, there are no known locally designated natural communities at the Project Site or in the immediate vicinity, nor is the Project Site located immediately adjacent to undeveloped natural open space or a natural water source that may otherwise serve as habitat for State- or federally-listed species. Therefore, no impact would occur.

### Riparian Habitat and Wetlands

The Project Site does not support any riparian or wetland habitat or other sensitive habitat areas. Implementation of the Project would not result in any adverse impacts to riparian habitat, wetlands, or other sensitive natural communities. Therefore, no impact would occur.

### Migratory Fish or Wildlife

There are no wildlife corridors or native wildlife nursery sites in the Project vicinity. However, existing on-site trees would be removed (and replaced) during construction of the Project, and these trees, along with the street trees, may provide temporary suitable habitat for nesting migratory birds, which are protected under the federal Migratory Bird Treaty Act (MBTA). The MBTA, which is an international treaty ratified in 1918, protects migratory nongame native bird species (as listed in 50 C.F.R. Section 10.13) and their nests. Additionally, Section 3503, 3503.5, and 3513 of the California Fish and Game Code prohibit take of all birds and their active nests, including raptors and other migratory nongame birds (as listed under the MBTA). The Project would be required to comply with these existing federal and State laws (i.e., MBTA and California Fish and Game Code, respectively). Therefore, impacts would be less than significant.

### Tree Preservation Ordinance

An arborist concluded that no protected trees exist on the Project Site. The tree assessment also inspected adjacent properties and determined that there are no protected trees present. Therefore, construction of the Project would not affect any protected trees and impacts would be less than significant.

### Conservation Plans

The Project Site and its vicinity are not part of any draft or adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or State habitat conservation plan. Therefore, no impact would occur.

### Cumulative Impacts

Since the Project would cause no impact to biological resources, it would not contribute to any significant cumulative impact to biological resources.

CPC-2016-2118-VZC-0253

000040

ICON0000040

VESTING TENTATIVE TRACT MAP NO. 74315

PAGE 29

## FINDINGS

The Revised Project would be constructed on the same site as the Original Project and, therefore, would also result in no impact with respect to biological resources. Based on the EIR analysis and the whole of the record, the City finds that the Revised Project would cause no impact and no cumulative impact related to biological resources.

## CULTURAL RESOURCES

The EIR discussed the impacts related to cultural resources in Section IV.B and Section VII of the Draft EIR. The following discussion addresses impacts with respect to historic resources, paleontological resources, and human remains, which are less than significant and do not require mitigation. Project impacts with respect to archaeological resources are addressed in Section 5, further below.

### Historic Resources

The technical report prepared for this Project (Appendix C to the Draft EIR) fully evaluated the significance of the two buildings associated with the Montgomery Ward store on the Project Site. The evaluation considered three historic contexts: (1) Suburban Planning and Development, (2) Neighborhood and Regional Shopping Centers, and (3) Stand Alone Department Stores. The evaluation concluded that the Montgomery Ward store on the Project Site at 14665 Roscoe Boulevard is not a historical resource under CEQA because it is not associated with the significant Panorama City master planning effort described in the Suburban Planning and Development context; is not associated with a good example of any of the shopping center or regional mall forms discussed in the Neighborhood and Regional Shopping Centers context, nor is it a good example of a well-designed stand-alone Department Store. For these reasons, the Montgomery Ward store is not significant under any of these criteria, and as such, no impact would occur with removal of the Montgomery Ward building.

### Paleontological Resources and Geologic Features

No unique geologic features are located on the Project site, which is developed with three vacant commercial buildings and surface parking lot areas. The Project Site and immediate surrounding area do not contain any known vertebrate paleontological resources. Nonetheless, should paleontological resources be discovered during grading or construction, existing regulatory requirements would require the City of Los Angeles Department of Building and Safety to be notified immediately, and all work to cease in the area of the find until a qualified paleontologist evaluates the find. The required compliance would ensure that the found deposits would be treated in accordance with federal, State, and local guidelines, including those set forth in PRC Section 21083.2. Therefore, impacts would be less than significant.

### Human Remains

It is unknown whether human remains are located at the Project Site. Any human remains that may have existed near the site surface are likely to have been disturbed or previously removed. Even so, should human remains be encountered unexpectedly during grading or construction activities, State Health and Safety Code Section 7050.5 requires that no further disturbance shall occur until the County Coroner has made the necessary findings as to origin and disposition pursuant to PRC Section 5097.98. If human remains of Native American origin are discovered during Project construction, compliance with State laws, which fall within the jurisdiction of the Native American Heritage Commission, relating to the disposition of Native American burials would be required. Therefore, impacts would be less than significant.

CPC-2016-2118-VZC-0254

### Cumulative Impacts

Since the Project would cause no impact to historic resources and a less-than-significant impact to paleontological resources and human remains, it would not contribute to any significant cumulative impact to cultural resources.

### FINDINGS

The Revised Project would be constructed on the same site as the Original Project and, therefore, would also result in no impact with respect to historic resources and a less-than-significant impact with respect to paleontological resources and human remains. Based on the EIR analysis and the whole of the record, the City finds that the Revised Project would cause no impact and no cumulative impact related to historic resources and a less-than-significant impact to paleontological resources and human remains.

### GEOLOGY AND SOILS

The EIR discussed the impacts related to geology and soils in Section IV.C and Section VII of the Draft EIR. The following discussion addresses all potential geology and soils impacts, which are less than significant and do not require mitigation.

### Fault Rupture

The Project Site is not located within a designated Alquist-Priolo Earthquake Fault Zone. The nearest active fault is the Northridge Fault, approximately three miles from the Project Site. Thus, the potential for future surface rupture on site is very low. Moreover, the Project Site is not within a Preliminary Fault Rupture Study Area. Additionally, the City of Los Angeles Building Code, with which the proposed Project would be required to comply, contains construction requirements to ensure habitable structures are built to a level such that they can withstand acceptable seismic risk. Therefore, impacts related to ground rupture from known earthquake faults would be less than significant.

### Seismic Ground Shaking

The Project Site is within the seismically active Southern California region and is, therefore, susceptible to ground shaking during a seismic event, and it is likely the Project would be affected by future earthquakes. However, Project construction would be consistent with all applicable provisions of the Los Angeles Building Code, the recommendations of the Project's Geotechnical Report (see Appendix D to the Draft EIR), and conditions of approval from City of Los Angeles Department of Building and Safety's (LADBS) Grading Division. Conformance with current Los Angeles Building Code requirements would minimize the potential for structures on the Project Site to sustain substantial damage during an earthquake as modern buildings are designed to resist ground shaking through the use of shear panels, moment frames, and reinforcement. Furthermore, although the Project Site is located approximately three miles from the nearest "active" faults (Northridge and Verdugo Faults), and other faults on a regional level, the potential seismic hazard to the Project Site would not be higher than in most areas of the City or elsewhere in the region. Therefore, risks related to strong seismic ground shaking would be less than significant.

### Liquefaction

The Project Site is not located within a State- or City-designated area identified as susceptible to liquefaction. In addition, the Geotechnical Report determined that the potential for liquefaction is considered extremely low as the current and historic groundwater levels are more than 50 feet below existing grade.

CPC-2016-2118-VZC-0255

The Project, nonetheless, would be required to comply with the current Los Angeles Building Code, which incorporates (with local amendments) the latest editions of the International Building Code and California Building Code. Compliance with the Los Angeles Building Code includes incorporation of seismic standards appropriate to the Project Site and its seismic design category, which takes into consideration seismic-related ground failure. Additionally, the Project would be required to comply with the design recommendations enumerated in the Geotechnical Report for the Project, which includes seismic design considerations, and the conditions of approval from LADBS Grading Division. Thus, the required compliance with the Los Angeles Building Code and the Geotechnical Report for the Project would ensure the proposed development is built to a level such that it can withstand acceptable seismic risk. Therefore, impacts related to seismic-related ground failure, including liquefaction, would be less than significant.

## Landslides

The Project Site is not located within an area identified by the City as having a potential for landslides, or of a known landslide. The Project Site and surrounding area consist of relatively flat topography. The Project Site is not in the path of any known or potential landslides. Therefore, no impact would occur.

## Substantial Erosion/Loss of Topsoil

The Project would not cause geologic hazards related to instability from soil erosion with compliance with the regulatory requirements, site-specific recommendations in the Geotechnical Report, and conditions from the Grading Division of the City of Los Angeles Department of Building and Safety that address potential soil erosion hazards during Project construction and operation. Therefore, construction and operation impacts associated with sedimentation or soil erosion would be less than significant.

## Soil Stability

With compliance with the regulatory requirements of the California Building Code, City of Los Angeles Building Code, site-specific recommendations in the Geotechnical Report, and conditions from the Grading Division of the City of Los Angeles Department of Building and Safety, impacts associated with on- or off-site landside, lateral spreading, subsidence, liquefaction or collapse would be less than significant.

## Expansive Soils

The on-site soil materials have a very low potential to be expansive. Even so, construction of the Project would be required to comply with the California Building Code and Los Angeles Building Code, which include building foundation requirements appropriate to site-specific conditions, the recommendations enumerated in the Geotechnical Report for the Project, and the conditions of approval from LADBS Grading Division. Therefore, impacts associated with expansive soils would be less than significant.

## Septic Tanks

The Project Site is located in a developed area of the City, which is served by a wastewater collection, conveyance, and treatment system operated by the City. The Project would connect to the existing wastewater system. No septic tanks or alternative disposal systems are necessary, nor are they proposed. Therefore, no impact would occur.

## Cumulative Impacts

Geologic, soils, and seismicity impacts are typically confined to contiguous properties or a localized area (generally within a 500-foot radius) in which concurrent construction projects in close proximity could be

CPC-2016-2118-VZC-0256

000043

ICON0000043

subject to the same fault rupture system or other geologic hazards or exacerbate erosion impacts.  The Project Site is not located within an Alquist-Priolo Earthquake Fault Zone.  In addition, City regulations and building codes require the consideration of seismic loads in structural design.  For these reasons, Project implementation is not expected to result in a considerable contribution to cumulatively significant impacts related to substantial damage from fault rupture or seismic ground shaking to structures, infrastructure, or human safety, when considered together with the related projects.

## FINDINGS

The Revised Project would be constructed on the same site and subject to the same Building Code requirements as the Original Project. Therefore, based on the EIR analysis and the whole of the record, the City finds that the Revised Project's impacts and cumulative impacts related to fault rupture, seismic ground shaking, liquefaction, landslides, substantial erosion/loss of topsoil, soil stability, expansive soils, and septic tanks would be less than significant.

## GREENHOUSE GAS EMISSIONS

The EIR discussed the impacts related to greenhouse gas (GHG) emissions in Section IV.D of the Draft EIR. The following discussion addresses all potential GHG emission impacts; these cumulative impacts are less than significant and do not require mitigation.

### GHG Emissions Generation

Project operation would result in annual emissions of 15,467 $MTCO_2e$.  The breakdown of emissions by source category shows approximately less than 1 percent from area sources, 24 percent from energy consumption, 72 percent from mobile sources, 1 percent from solid waste generation, 1 percent from water supply, treatment, and distribution, and less than 1 percent from construction activities. Alternative 5 would generate less vehicle trips than the Project, resulting in fewer GHG emissions during operations at the Project Site. Compliance with a GHG emissions reduction plan renders a less-than-significant impact, since compliance with the plans indicates that the project would not generate greenhouse gas emissions that may have a significant impact on the environment.  The Project's design features comply with or exceed performance-based standards included in the regulations outlined in the state Climate Change Scoping Plan (AB32 Scoping Plan), SCAG's 2016 RTC/SCS, and the City's LA Green Plan. The Project would be consistent with the applicable GHG reduction plans and policies. Therefore, the impact of the Project would be less than significant.

### Consistency with Applicable Plans and Policies

The Project's design features comply with or exceed the regulations and reduction actions/strategies outlined in the Climate Change Scoping Plan, 2016 RTP/SCS, and the LA Green Plan.  These strategies and measures have been implemented on the State level through the 2016 Title 24 CalGreen Code and on the local level by the City of Los Angeles Green Building Code.  Therefore, the Project would not conflict with an applicable plan, policy or regulation for the purpose of reducing the emissions of GHGs. The impact of the Project would be less than significant.

### Cumulative Impacts

All projects in the state and City, which include the related projects, are subject to policies and regulations which work to achieve the state's GHG reduction goals, and include state and local green building standards, along with other statewide programs designed to reduce GHG emissions, such as mobile source

CPC-2016-2118-VZC-0257

emissions reductions, fuel standards, and conversion of electricity generation from carbon fuel sources to renewable sources. For these reasons, and since the Project is consistent with GHG reduction goals and policies, the contribution of the Project to the cumulative effect of global climate change is not considered to be cumulatively considerable.

## FINDINGS

The Revised Project would have fewer associated GHG emissions compared to the Original Project. The Revised Project would be required to comply with the same regulations as identified for the Original Project. The Revised Project would have a less-than-significant impact with respect to GHG emissions and consistency with plans and policies. Based on the EIR analysis and the whole of the record, the City finds that the Revised Project's cumulative impacts related to GHG emissions and consistency with applicable plans and policies would be less than significant.

## HAZARDS AND HAZARDOUS MATERIALS

The EIR discussed the impacts related to hazards and hazardous materials in Section IV.E of the Draft EIR. The following discussion addresses all potential hazards and hazardous materials impacts, which are less than significant and do not require mitigation.

### Transport of Hazardous Materials

All potentially hazardous materials would be contained, stored, and used in accordance with manufacturers' instructions and handled in compliance with applicable federal, State, and local regulations. Any associated risk would be adequately reduced to a less-than-significant level through compliance with these standards and regulations. Therefore, the Project would not create a significant hazard to the public or the environment through the routine transport, use, or disposal of hazardous materials. A less-than-significant impact would occur.

### Release of Hazardous Materials

During construction, all asbestos-, lead-, and PCB-containing materials would be removed in accordance with applicable regulatory requirements. Specifically, in accordance with SCAQMD Rule 1403, Asbestos Emissions from Demolition/Renovation Activities, prior to demolition activities associated with the Project, the Project Applicant would implement remediation or abatement before any disturbance occurs. Lead-contaminated debris and other wastes must also be managed and disposed of in accordance with applicable provisions of the California Health and Safety Code. Furthermore, any materials found to contain PCBs must be removed and disposed in accordance with all applicable local, State and federal regulations including, but not limited to California Code of Regulations, Title 22, and EPA 40 CFR. Compliance with these regulatory requirements would minimize risks associated with the presence of ACMs, LBPs, and PCBs, which would result in a less-than-significant impact.

There is no evidence of hazardous materials present in Project Site soils that would pose a possible health risk during construction or operation of future buildings. A Phase II investigation (Partner Engineering and Science, Inc. *Phase II Subsurface Investigation Report, Former Montgomery Ward, 14665 Roscoe Boulevard, Panorama City, California 91402*, March 3, 2014) concluded that the former automotive repair facility, gasoline dispensing operation, interior lifts, clarifiers, and floor drains, and former presences of Underground Storage Tanks (USTs) were no longer considered Recognized Environmental Conditions (RECs). Soil borings indicated no evidence of a release and no evidence of hazardous levels of soil contamination from these former uses.

CPC-2016-2118-VZC-0258

ICON0000045

Routine cleaning supplies used on the Project Site during operations could contain hazardous materials. However, usage of these supplies is subject to County, State, and Federal requirements to minimize exposure to people and to ensure safe use, storage, and disposal of any chemicals, including common cleaning and maintenance materials. Compliance with existing regulations would ensure that routine cleaning solvents would not pose a risk from hazardous materials. Therefore, this impact would be less than significant.

## Hazards within One-Quarter Mile of a School

Although schools are within 0.25 miles of the Project, construction of Project would not emit hazardous emissions or handle hazardous or acutely hazardous materials, substances or waste. All significant impacts associated with foreseeable and accident conditions involving the release of hazardous materials into the environment would be less than significant with compliance with applicable Federal and State standards and procedures for removal and handling of ACMs, LBP, and PCBs. Therefore, the impact during construction would be less than significant.

Operation of the Project would not emit hazardous emissions or handle hazardous or acutely hazardous materials, substances or waste. Therefore, the Project would not emit hazardous substances within one-quarter mile of a school. The operational impact would be less than significant.

## Listed Hazardous Materials Sites

None of the database listings that include the Project Site are considered to be an environmental concern because no violations were noted and the databases on which the Project Site appears are for permitting/documentation purposes rather than for a noted hazardous release. Therefore, there is no hazardous material site pursuant to Government Code Section 65962.5 located on the Project Site, and the Project would not have the potential to exacerbate the current environmental condition to create a significant hazard to the public or the environment. As such, the impact during construction and operation would be less than significant.

## Airport Land Use Plan or Private Air Strip

The Project Site is not located within an airport's influence area or in the vicinity of a private airstrip. Therefore, no impact would occur.

## Emergency Response or Evacuation Plan

Roscoe Boulevard is designated as a Secondary Disaster Route. No road closures along Roscoe Boulevard during construction or operation are anticipated. A project-specific emergency response plan would be submitted to the LAFD during review of plans as part of the building permit process. Furthermore, access for emergency service providers and evacuation routes would be maintained during construction and operation. Moreover, the Project would not cause permanent alterations to vehicle circulation routes and patterns, or impede public access or travel upon public rights-of-way. Therefore, the construction and operation of the Project would result in a less-than-significant impact on emergency response and emergency evacuation plans.

## Wildland Fires

The Project Site is located within a highly developed area of the City and does not include wildlands or high fire hazard terrain or vegetation. The Project Site is not within a Very High Fire Hazard Severity Zone, nor is the Project Site or surrounding area within a wildland fire hazard area. Therefore, no impact would occur

CPC-2016-2118-VZC-0259

000046

ICON0000046

**Cumulative Impacts**

The potential presence of hazardous substances would require evaluation on a case-by-case basis, in combination with the development proposals for each of the related projects. Further, all projects in the City are required to follow local, State, and federal laws regarding hazardous materials. The Project, together with the related projects, would not create an impact that is cumulatively considerable, as each project would have to comply with site-specific development standards and state hazardous materials handling and transporting regulations. Therefore, cumulative impacts would be less than significant.

**FINDINGS**

The Revised Project would require approximately the same amount of demolition as the Original Project and would not introduce new uses in addition to those described for the Original Project. The Revised Project would also be required to comply with the same regulations as identified for the Original Project. Therefore, based on the EIR analysis and the whole of the record, the City finds that the Revised Project's impacts and cumulative impacts related to transport of hazardous materials, release of hazardous materials, hazards within one-quarter mile of a school, listed hazardous materials sites, airport land use plan or hazard, emergency response or evacuation plan, and wildland fires would be less than significant.

**HYDROLOGY AND WATER QUALITY**

The EIR discussed the impacts related to hydrology and water quality in Section IV.F of the Draft EIR. The following discussion addresses all potential hydrology and water quality impacts, which are less than significant and do not require mitigation.

**Water Quality**

With respect to construction, all hazardous materials are to be stored, labeled and used in accordance with the U.S. Occupational Safety and Health Administration (OSHA) regulations. These regulations for routine handling and storing of hazardous materials effectively control the potential stormwater pollution caused by these materials. The Project will comply with the requirements of the General Construction Activity Stormwater Permit, including implementation of a SWPPP, and the MS4 Permit. The Project SWPPP will identify potential pollutant sources that may affect the quality of discharge associated with construction activity, identify non-storm water discharges, and provide design features to effectively prohibit the entry of pollutants into the public storm drain system during construction. These best management practices would ensure that short-term construction-related water quality impacts are less than significant.

With respect to operation, the Project would be required to comply with the MS4 Permit, SUSMP, and City of Los Angeles LID Ordinance to retain and treat stormwater and prevent additional flows to City's Storm Water Drainage System. The Project will provide a gravel infiltration system located under the Project's private access roads between the new structures. With compliance with the MS4 Permit, SUSMP, and LID Ordinance, the operational water quality impacts would be less than significant.

In addition, the Project does not involve the extraction of groundwater, nor are there wells at the Project Site. The closest known water well to the Project Site is Well No. 4847, located approximately 2000 feet west of the site. The Project will not introduce contaminants to groundwater, and would have no potential to cause regulatory standards to be violated at an existing production well. Therefore, impacts would be less than significant.

CPC-2016-2118-VZC-0260

VESTING TENTATIVE TRACT MAP NO. 74315                                    PAGE   36

**Groundwater**

The Project would not involve subterranean construction and would involve grading to accommodate building pads and footings and such construction would be surface grading. Therefore, the grading would not encounter the groundwater table. As such, the Project would not result in significant impacts related to the availability of groundwater and would not result in the alteration of groundwater flows. Therefore, construction impacts to groundwater would be less than significant.

As part of its design, the Project would capture stormwater within an on-site drainage system and direct it to a series of gravel trenches that would be constructed within the private access roadway system that would be 10 feet from any structures or property lines. These trenches would infiltrate stormwater into the ground within 72 hours of capture. While the Project would decrease the amount of impermeable surfaces at the Project Site, no adverse change in groundwater recharge capacity is expected with Project operation because such change would be comparatively negligible from the existing condition to the Project condition due to the urbanized setting of the Project Site and limited recharge potential of the site in its existing condition. Accordingly, operational impacts to groundwater would be less than significant.

**Drainage**

During Project construction, a temporary alteration of the existing on-site drainage pattern may occur. However, these changes would not result in substantial erosion or siltation due to stringent controls imposed under the General Construction Activity Stormwater Permit, including implementation of a SWPPP, and the MS4 Permit. With implementation of the required BMPs, drainage impacts during construction would be less than significant.

The Project is unlikely to alter the drainage pattern in a manner that would result in substantial erosion or siltation because the Project Site slopes gently to the south and would be required to comply with the requirements of the SUSMP, MS4 permit and LID Ordinance, which would reduce the volume of runoff from the Project Site after the Project is constructed. In addition, the Project would not modify the surrounding streets with respect to the manner in which they convey storm runoff to the City storm drain system. Similar to existing conditions, runoff from the Project would drain via sheetflow in a southerly direction toward the city streets. Therefore, the operational impact on drainage patterns with respect to the potential for erosion or siltation would be less than significant.

**Runoff**

The Project would prepare a SWPPP to prevent runoff and water quality impacts during construction as well as comply with the SUSMP and MS4 Permit. Moreover, the Project would comply with the LID Ordinance, which, as noted above, would limit or reduce flows to the City storm drain system. Therefore, stormwater runoff from the Project Site would not exceed the capacity of the existing or planned stormwater drainage systems. However, should the City determine improvements to the stormwater drainage system are necessary during the permit review process, the Applicant would be responsible for the improvements, and such improvements would be conducted as part of the Project either on-site or off-site within the right-of-way. The stormwater drainage infrastructure construction activities would be temporary and of short duration, and would not result in significant environmental impacts. Furthermore, as the Project would manage, capture, and treat runoff, as required by regulatory compliance, implementation of the Project would represent an improvement in water quality as compared to the existing condition where runoff sheetflows untreated to the drainage system. Thus, a less-than-significant impact would occur with respect to surface runoff volume during operation. With compliance with existing regulations, the construction and operation of the Project would not introduce substantial sources of polluted runoff. Therefore, this impact would be less than significant.

CPC-2016-2118-VZC-0261

**000048**

ICON0000048

VESTING TENTATIVE TRACT MAP NO. 74315

**100-Year Flood**

According to the Federal Emergency Management Agency's Flood Insurance Rate Map, the Project Site is within Zone X – Other Areas, which is a designation for areas determined to be outside the 100-year flood hazard area. Therefore, no impact would occur

**Flooding from Levee or Dam**

The Project Site is within the inundation boundaries of the Hansen Dam Reservoir, Pacoima Dam Reservoir, and Lopez Dam and Reservoir. However, according to the Federal Emergency Management Agency Flood Insurance Rate map program, the Project Site is located in Zone X (unshaded). Zone X (unshaded) refers to areas outside of the flood zone. These dams are continuously monitored by various agencies (such as the State of California Division of Safety of Dams and the U.S. Army Corps of Engineers) to guard against the threat of dam failure. Based on the continuous scrutiny by California Division of Safety of Dams and the U.S. Army Corps of Engineers, the potential for failure of the dam that could result in inundation of the downstream area is low. As such, impacts related to potential inundation from the failure of a levee or dam would be less than significant.

**Inundation by Seiche, Tsunami, or Mudflow**

The Project Site is not within an area potentially impacted by a tsunami. There are also no major water bodies in the vicinity of the Project Site that would put the site at risk of inundation by seiche. Furthermore, the Project Site is located within a heavily developed area of the City where little open space exists. The Project Site is relatively flat and is not located adjacent to a hillside area and, thus, the potential for mudflows to impact the Project Site would be highly unlikely. Therefore, no impact would occur.

**Cumulative Impacts**

Future development of the related projects and other development within the Tujunga Wash watershed could affect the amount, the rate, the velocity, and the quality of runoff within their respective local drainage areas. Similar to the Project, each of the related projects and other development would be required to prepare and implement a SWPPP during construction, and a SUSMP during operations. In addition, each project would undergo reviews by the City to ensure compliance with the MS4 permit and the LID Ordinance, and determine what, if any, drainage improvements and BMPs would be required to ensure that the storm drain capacity of the system serving each of the related projects is adequate, that no downstream flooding would occur as a result of exceedance of stormdrain capacity, and that no significant water quality issues would result. With compliance with applicable regulatory requirements, the Project would not result in any significant hydrology and water quality impacts, and would not contribute to a cumulatively considerable effect. Therefore, cumulative impacts related to hydrology and water quality would be less than significant.

**FINDINGS**

The Revised Project would be constructed on the same site as the Original Project and would comply with all regulations identified for the Original Project. Therefore, based on the EIR analysis and the whole of the record, the City finds that the Revised Project's impacts and cumulative impacts related to water quality, groundwater, drainage, runoff, 100-year flood, flooding from levee or dam, and inundation by seiche, tsunami, or mudflow would be less than significant.

CPC-2016-2118-VZC-0262

## LAND USE AND PLANNING

The EIR discussed the impacts related to land use and planning in Section IV.G of the Draft EIR. The following discussion addresses all potential land use and planning impacts, which are less than significant and do not require mitigation.

### Physically Divide an Established Community

The Project would be consistent with surrounding land uses. The Project would be designed to provide connectivity to the surrounding community through the provision of pedestrian and bicycle amenities. Accordingly, the Project would not serve to divide the existing community. Therefore, impacts would be less than significant.

### Consistency Analysis

The Project would be substantially consistent with all of the applicable plans, policies, and regulations associated with development of the Project Site. Therefore, impacts related to consistency with applicable plans, policies, and regulations would be less than significant.

### Zoning

With approval of the requested approvals, the Project would conform to the Zoning Code provisions applicable to the Project. Therefore, impacts related to zoning would be less than significant.

### Conservation Plan

The Project Site is not subject to any applicable habitat conservation plan or natural community conservation plan. No impacts related to this issue would occur.

### Cumulative Impacts

Development of the Project, in combination with the related projects, would result in an intensification of existing prevailing land uses in the Project vicinity. The related projects would be subject to specific findings and conditions, which are based on maintaining general conformance with the land use plans applicable to the area. As such, development of the Project and related projects is not anticipated to substantially conflict with the intent of the City's General Plan regarding the future development of the Panorama City community, or with other land use regulations required to be consistent with the General Plan, such as the Planning and Zoning Code. Development of the Project, in combination with the related projects, would not be expected to result in cumulatively considerable effects with respect to land use regulations or conservation plans.

### FINDINGS

The Revised Project would require the same approvals as the Original Project and would comply with the same regulations as identified for the Original Project. Therefore, based on the EIR analysis and the whole of the record, the City finds that the Revised Project's impacts and cumulative impacts related to physical division of an established community, consistency with existing land use plans, zoning, and conservation plans would be less than significant.

## MINERAL RESOURCES

### Regional and State Mineral Resources

CPC-2016-2118-VZC-0263

ICON0000050

The Project Site is fully developed and no oil wells are present.  Additionally, the Project Site is not located within an oil field or oil drilling area, nor within a surface mining district or MRZ-2 zone. The Project would not affect any extraction activities and there would be no impact on existing or future regionally important mineral extraction sites.  The Project would not involve mineral extraction activities, nor are any such activities presently occurring on the Project Site.  Therefore, no impact would occur

**Local Mineral Resources**

There are no oil extraction operations and drilling or mining of mineral resources at the Project Site, nor is the Project Site within an area identified for such uses.  Therefore, development of the Project would not result in the loss of availability of a mineral resource that would be of value to the residents of the State or a locally-important mineral resource, or mineral resource recovery site, as delineated on a local general plan, specific plan, or land use plan.  Therefore, no impact would occur.

**Cumulative Impacts**

It is not known if any related projects would result in the loss of availability of known mineral resources. Regardless, the Project would have no incremental contribution to a potential cumulative impact on mineral resources, and the Project would have no cumulative impact on such resources.

**FINDINGS**

The Revised Project would be constructed on the same site as the Original Project and, therefore, would also result in no impact with respect to mineral resources.  Based on the EIR analysis and the whole of the record, the City finds that the Revised Project would cause no impact and no cumulative impact related to mineral resources.

**NOISE**

The EIR discussed the impacts related to noise in Section IV.H of the Draft EIR.  The following discussion addresses potential impacts with respect to operational noise, vibration (from construction and operation), and distance from an airport, which are less than significant and do not require mitigation.  Potential impacts with respect to construction noise are addressed in Section 5, further below.

**Operational Noise**

Future noise levels at the Project Site would continue to be dominated by vehicular traffic on Roscoe Boulevard, Tobias Avenue, and Cedros Avenue.  However, there are no exterior activity areas of the residential units that would be exposed to this noise level.  In addition, the exterior-to-interior reduction of newer residential buildings is generally more than 30 dBA.  Assuming a 30 dBA exterior-to-interior noise reduction for new residential buildings would provide an interior noise level of less than 45 dBA CNEL, which is the State's interior standard for new multi-family residential uses.

The traffic generated by the Project would increase local noise levels by a maximum of 1.3 dBA $L_{eq}$ during the AM peak traffic hour and 1.3 dBA $L_{eq}$ during the PM peak traffic hour.  These maximum increases would occur along Tobias Avenue south of Chase Street.  The maximum increase at any other residential use would be 0.5 dbA $L_{eq}$ along Tobias Avenue north of Chase Street.  The increases in noise levels would not be perceptible to most people and would not exceed the applicable thresholds of significance for the affected existing land uses.  Therefore, increased roadway noise impacts would be less than significant.

CPC-2016-2118-VZC-0264

000051

ICON0000051

The mechanical equipment and activities at the Project Site would be subject to the City's Noise Ordinance standards. Therefore, operation of the Project would not expose persons to or generate noise levels in excess of standards established by the City and the impact of the Project would be less than significant.

### Construction Vibration

Vibration levels during construction could reach as high as approximately 0.076 inches per second PPV within 25 feet of an operating loaded truck. The maximum vibration level of 0.076 inches per second PPV would be below the thresholds of significance for both potential building damage and human annoyance. Therefore, the potential impacts associated with construction vibration would be less than significant.

### Operational Vibration

The greatest regular source of Project-related ground-borne vibration would be from trucks making deliveries to the Project Site and garbage trucks picking-up Project-related refuse material. The vibration levels associated with these trucks would be less than the levels associated with large construction equipment. Therefore, the operational impacts associated with ground-borne vibration would be less than significant at nearby sensitive uses.

### Within Two Miles of Airport

Although the Project Site is subject to occasional over flights from jet and propeller aircraft, the Project Site is approximately 2.1 miles from the nearest airport (Van Nuys Airport), and is not within that airport's influence area. Moreover, the Project Site is not located within an existing or projected noise contour associated with Van Nuys Airport. In addition, the Project Site is not located in the vicinity of a private airstrip. Therefore, no impact would occur.

### Cumulative Impacts

The traffic generated by the Project and cumulative development would increase local noise levels by a maximum of 1.6 dBA $L_{eq}$, which would not be perceptible to most people and would not exceed the City's thresholds of significance. On-site equipment at the Project Site would have no noise effect on any sensitive uses. Therefore, the Project would not contribute to cumulative noise impact.

### FINDINGS

The Revised Project would result in similar vibration-inducing construction activity as the Original Project. The Revised Project would generate similar operational stationary source noise on the Project Site as the Original Project. The Revised Project would generate substantially fewer daily vehicle trips than the Original Project. Therefore, based on the EIR analysis and the whole of the record, the City finds that the Revised Project's impacts and cumulative impacts related to construction vibration, operational noise, operational vibration, and being located within two miles of an airport would be less than significant.


## POPULATION AND HOUSING

The EIR discussed the impacts related to population and housing in Section IV.I of the Draft EIR and Section III of the Final EIR. The following discussion addresses all potential population and housing impacts, which are less than significant and do not require mitigation.

### Substantial Population Growth

CPC-2016-2118-VZC-0265

ICON0000052

VESTING TENTATIVE TRACT MAP NO. 74315

PAGE   41

With respect to construction, it is likely that the skilled workers anticipated to work on the Project already reside within the Los Angeles region and would not need to relocate as a result of employment.

The Alternative 5's new residential units would have approximately 1,701 residents, which is an increase compared to the Original Project's 422 residential units with approximately 1,063 residents. According to SCAG, the citywide population is expected to increase by 221,200 between 2008 and 2020 with additional growth of 328,900 persons between 2020 and 2035. Since the population growth associated with the Alternative would be within the projected growth for the citywide SCAG projections, similar to the Original Project, impacts related to population growth would be less than significant.

The Revised Project would generate more residents than the Original Project and fewer residents than Alternative 5. The Revised Project would generate fewer employees than the Original Project and the same number of employees as Alternative 4B. Therefore, the Revised Project would not cause substantial, unplanned growth.

### Population and Housing Displacement

The Project Site currently consists of three vacant commercial buildings and surface parking lot areas and, thus, the Project would not displace existing housing or people. Therefore, no impact would occur.

### Cumulative Impacts

The Project, in combination with the related projects with residential components, would be part of SCAG's adopted 2012 growth forecast. Furthermore, SCAG periodically updates its population projections for the various subregions that comprise the SCAG region, which allows these projections to be revised to reflect land use and planning changes that have occurred since previous updates. Accordingly, the effects of cumulative population growth associated with the Project and other development within the City of Los Angeles subregion would not contribute to a cumulatively considerable effect with respect to population growth (i.e., would not result in population growth at a rate not already anticipated at the regional and local level). Therefore, cumulative impacts would be less than significant.

### FINDINGS

The Revised Project would cause increased growth in residents and employment compared to the Original Project and reduced growth in residents compared to Alternative 4B, both of which were identified to have less than significant impacts. Based on the EIR analysis and the whole of the record, the City finds that the Revised Project's impacts and cumulative impacts related to substantial population growth and displacement of housing or persons would be less than significant.

### PUBLIC SERVICES

The EIR discussed the impacts related to public services in Section IV.K of the Draft EIR and Section III of the Final EIR. The following discussion addresses potential impacts with respect to fire protection, police protection, schools, parks, and libraries, which are less than significant and do not require mitigation.

### Fire Protection - Construction

Construction impacts will be less than significant for the following reasons: Emergency access would be maintained to the Project Site during construction through marked emergency access points approved by the LAFD (see PDF PS-1); Construction impacts are temporary in nature and do not cause lasting effects to

CPC-2016-2118-VZC-0266

000053

ICON0000053

impact LAFD fire protection services; Partial lane closures, if determined to be necessary, would not greatly affect emergency vehicles, the drivers of which normally have a variety of options for avoiding traffic, such as using their sirens to clear a path of travel or driving in the lanes of opposing traffic. Additionally, if there are partial closures to streets surrounding the project site, flagmen would be used to facilitate the traffic flow until construction is complete (see PDF PS-1); and the Project would be required to prepare a Construction Staging and Traffic Management Plan (CSTMP) (see PDF PS-1) that would address traffic and access control during construction. Therefore, the Project's construction-related impacts on fire protection services would be less than significant.

### *Project Design Feature*

**PDF PS-1**    The Project shall implement a Construction Staging and Traffic Management Plan that would outline provisions for on-site security during construction, which could include, but are not limited to, temporary security fencing, lighting, and providing security personnel to patrol the site. Additionally, the Construction Staging and Traffic Management Plan shall ensure emergency access to the Project Site is maintained at all times during construction through well-marked entrances.

### Fire Protection - Operation

The Project would be within the current fire response distance, provides adequate fire flow and access, and meets building fire safety regulations. Although the Project would increase overall housing, population, and employment in the Project area, and therefore would increase demand on fire protection services, compliance with existing regulations would ensure that growth associated with the Project would not result in substantially increased demand for fire protection services that would foreseeably require the addition of a new fire station or the expansion, consolidation, or relocation of an existing facility. Therefore, impacts to fire protection services would be less than significant during operation.

### Police Protection – Construction

The Project would provide security fencing and at least one guard to the site during the construction process. Traffic generated by construction workers and trucks would occur primarily during off-peak hours. Emergency access would be maintained to the Project Site during construction through marked emergency access points approved by the LAPD, and the project would implement a CSTMP. Therefore, impacts to police services during construction of the Project would be less than significant.

### Police Protection – Operation

The Project would not result in a substantial incremental contribution to the demand for police protection services, taking into account the population increase and demand generated by the Project, including security and/or design features (PDFs PS-2, PS-3, and PS-4) that would reduce demand. Therefore, the Project would not result in a need for new or physically altered police station the construction of which could cause significant environmental impacts as the Project's impacts on police protection services during operation would be less than significant.

### *Project Design Features*

**PDF PS-2**    The Project shall comply with the design guidelines outlined in the LAPD Design Out Crime Guidelines, which recommend using natural surveillance to maximize visibility, natural access control that restricts or encourages appropriate site and building access, and

CPC-2016-2118-VZC-0267

ICON0000054

territorial reinforcement to define ownership and separate public and private space. Specifically, the Project would:

- o  Provide on-site security personnel whose duties shall include but not be limited to the following:

   - ▪  Monitoring entrances and exits;

   - ▪  Managing and monitoring fire/life/safety systems; and

   - ▪  Controlling and monitoring activities in the parking facilities.

- o  Install security industry standard security lighting at recommended locations including parking structures, pathway options, and curbside queuing areas;

- o  Install closed-circuit television at select locations including (but not limited to) entry and exit points, loading docks, public plazas and parking areas;

- o  Provide adequate lighting of parking structures, elevators, and lobbies to reduce areas of concealment;

- o  Provide lighting of building entries, pedestrian walkways, and public open spaces to provide pedestrian orientation and to clearly identify a secure route between the underground parking area and hotel access points;

- o  Design public spaces to be easily patrolled and accessed by safety personnel;

- o  Design entrances to, and exits from the buildings, to be open and in view of surrounding sites; and

- o  Limit visually obstructed and infrequently accessed "dead zones."

**PDF PS-3**  Prior to the issuance of a certificate of occupancy for each construction phase and ongoing during operations, the Applicant or its successor shall develop an Emergency Procedures Plan to address emergency concerns and practices. The plan shall be subject to review by LAPD.

**PDF PS-4**  The Project shall include space on-site for a police substation (i.e., "drop-in office") for use by the LAPD. The precise location and amount of space shall be determined in consultation with the LAPD prior to Project occupancy.

### Schools

The Alternative 5 Project would generate an increase of approximately 510 students over existing conditions, which is more than the 417 students that would be generated by the Original Project over existing conditions. Similar to the Project, the new students would contribute to the projected seating shortage or overcrowding at all three schools serving the Project Site. However, pursuant to SB50, payment of the school fees established by the LAUSD in accordance with existing rules and regulations regarding the calculation and payment of such fees, would, by law, mitigate this alternative's direct and indirect impacts on schools.

CPC-2016-2118-VZC-0268

VESTING TENTATIVE TRACT MAP NO. 74315                    PAGE   44

**Parks**

There would be an approximately 48 percent increase in the number of residential units under the Alternative 5 Project as compared to the Original Project. Similar to the Original Project, the Alternative 5 Project would be required to provide open space and landscaping and would provide sufficient open space to meet the City's requirements. Furthermore, the Alternative 5 Project would also include an additional 16,895-square-foot public plaza for passive use in the commercial portion of the site, resulting in a greater amount of open space throughout the site per resident than the Original Project. The Alternative 5 Project would also be subject to the same payment of recreation and parks fees under the Quimby Act and/or Dwelling Unit Construction Tax as the Original Project. Therefore, there would be no need to construct new or physically alter existing recreational facilities, or the need for new or physically altered parks, the construction of which could cause significant environmental impacts, and impacts to recreation and parks would be less than significant.

**Libraries**

Implementation of the Project would not result in the need to construct new or physically alter existing library facilities, the construction of which could cause significant environmental impacts, in order to maintain acceptable service ratios or other performance objectives. Implementation of the Project would not result in a significant population increase and would not increase the demand for libraries beyond the expected level of service. Therefore, Project impacts to library service would be less than significant.

**Cumulative Impacts**

As stated in the EIR, cumulative development combined with the Project would not cause the LAFD, LAPD, Department of Recreation and Parks, or LAPL to construct new or expanded facilities; cumulative school impacts would be mitigated by the payment of Government Code section 65995 school facility development fees. Therefore, the cumulative impact would be less than significant.

**FINDINGS**

The Revised Project would result in increased impacts compared to the Original Project, and slightly less impacts compared to Alternative 5, with respect to fire protection services, police protection services, parks, and libraries, and would include all of the Project Design Features identified for the Original Project and Alternative 5. Therefore, based on the EIR analysis and the whole of the record, the City finds that the Revised Project's impacts and cumulative impacts related to fire protection services, police protection services, schools, parks, and libraries would be less than significant.

**TRANSPORTATION/TRAFFIC**

The EIR discussed the impacts related to transportation/traffic in Section IV.K of the Draft EIR and Revised Draft EIR, Section III of the Final EIR, and the Errata. The following discussion summarizes the Project's impacts with respect to construction traffic, Congestion Management Plan Consistency, air traffic hazards, hazardous design features, emergency access, and alternative modes of transportation. The Project's operational traffic impacts are addressed in Section 6, further below.

**Construction Traffic**

The City generally considers construction-related impacts adverse but not significant because of the temporary effects with prohibitions during peak hour travel. While not considered a significant impact, the

CPC-2016-2118-VZC-0269

ICON0000056

Project would implement Project Design Features that include a Work Area Traffic Control Plan (PDF TR-1) and Construction Staging and Traffic Management Plan (PDF TR-2) to ensure that construction related impacts are reduced to the extent feasible and remain less than significant.

### Project Design Features

**PDF TR-1.** A Work Area Traffic Control Plan shall be developed by the Applicant and approved by the Los Angeles Department of Transportation.  The Work Area Traffic Control Plan shall identify all traffic control measures, signs, delineators, and work instructions to be implemented by the construction contractor through the duration of demolition and construction activity.  The plan shall minimize the potential conflicts between construction activities, street traffic, bicyclists and pedestrians, and shall include the following:

- o A flagman shall be placed at the truck entry and exit from the Project Site to control the flow of exiting trucks.

- o Deliveries and pick-ups of construction materials shall be scheduled during non-peak travel periods to the extent feasible and coordinated to reduce the potential of trucks waiting to load or unload for protracted periods of time.

- o The Project shall not obstruct access to adjacent land uses during Project construction.

- o Applicant shall plan construction and construction staging as to maintain pedestrian access on adjacent sidewalks throughout all construction phases. This measure requires the applicant to maintain adequate and safe pedestrian protection, including physical separation from work space and vehicular traffic and overhead protection, due to sidewalk closure or blockage, at all times.

- o Temporary pedestrian facilities shall be adjacent to the Project Site and provide safe, accessible routes that replicate as nearly as practical the most desirable characteristics of the existing facility.

- o Covered walkways shall be provided where pedestrians are exposed to potential injury from falling objects.

- o Applicant shall keep sidewalks open during construction until only when it is absolutely required to close or block sidewalks for construction staging. Sidewalks shall be reopened as soon as reasonably feasible taking construction and construction staging into account.

- o In the event of a lane or sidewalk closure, traffic and/or pedestrians shall be routed around any such lane or sidewalk closures.

**PDF TR-2.** A Construction Staging and Traffic Management Plan shall be developed by the contractor and approved by the City of Los Angeles Department of Transportation. In addition to the measures identified above, a Construction Management Plan shall include the following:

- o Construction equipment and worker cars shall generally be contained on-site. At times when on-site staging and parking is not available, a secondary staging area shall be required.  Off-site truck staging shall be identified, as

CPC-2016-2118-VZC-0270

o   needed, which shall be in a legal area, and shall detail measures to ensure that trucks use the specified haul route, and do not travel through residential neighborhoods.

o   Schedule vehicle movements to ensure that there are no vehicles waiting off-site and impeding public traffic flow on the surrounding streets.

o   Establish requirements for the loading, unloading, and storage of materials on the Project Site.

o   Establish requirements for the temporary removal of parking spaces, time limits for the reduction of travel lanes, and closing or diversion of pedestrian facilities to ensure the safety of pedestrian and access to local businesses. Any travel lane closures shall be limited to between non-peak commute hours of 9:00 AM and 3:00 PM.

o   Coordinate with the City and emergency service providers to ensure adequate access is maintained to the Project Site and neighboring land uses.

o   Construction Worker Parking Plan shall be prepared which prohibits construction workers from parking on adjacent streets and that directs construction workers to on-site parking; or if unavailable, to off-site locations. If off-site, parking location(s) shall be identified for construction workers and the method of transportation to and from the Project Site (if beyond walking distance) for approval by the City.

**CMP Facilities and Caltrans Facilities**

To determine the geographic scope of the study area for regional traffic impact analyses, the Project would need to meet the criteria for CMP arterial monitoring intersections and for freeway monitoring locations, determined by the number of trips added by the project during peak traffic hours. The Project's traffic volume is below the CMP thresholds, and no further CMP analysis is required. In addition, the estimated additional transit trips would not result in regional transit impacts as Roscoe Boulevard and Van Nuys Boulevard provide sufficient transit capacity and connections for the proposed added Project transit trips. For Caltrans facilities, Freeway Impact Procedures with screening criteria have been developed by LADOT and Caltrans, and if any of these criteria regarding the project's peak hour trip impacts on mainline capacity of freeway segments and off-ramp operations are satisfied, then additional regional traffic impact analysis is required. Results of the analyses pursuant to the screening criteria show that the freeway mainlines and off-ramps do not exceed the screening criteria as set forth in the LADOT/Caltrans agreement. Therefore, Project impacts related to CMP facilities and Caltrans facilities would be less than significant.

**Air Traffic Patterns**

The Project does not include any aviation-related use and would have no impact on any airport. The Project would also not require any modification of flight paths for the existing airports in the Los Angeles Basin. Therefore, no impact would occur.

**Hazardous Design Features**

No hazardous design features or incompatible land uses would be introduced with the Project that would create significant hazards to the surrounding roadways. Therefore, no impact would occur.

CPC-2016-2118-VZC-0271

ICON0000058

VESTING TENTATIVE TRACT MAP NO. 74315                                          PAGE   47

**Emergency Access**

While not considered a significant impact, the Project would implement Project Design Features that include a Work Area Traffic Control Plan (PDF TR-1) and Construction Staging and Traffic Management Plan (PDF TR-2), which is intended to minimize disruptions to through-traffic flow and maintain emergency vehicle access to the Project Site and neighboring land uses. Construction related impacts are reduced to the extent feasible and were determined to be less than significant.

With respect to Project operations, while the Project is anticipated to affect the LOS of roadways in the Project vicinity, the Project Site is bordered by major streets and would provide an internal fire lane and several points of access from the adjacent roadways. The final design of emergency access features would be subject to the review and approval of the LAFD for compliance with emergency access requirements, prior to the issuance of building permits. Therefore, adequate emergency access would be provided. Operational impacts on emergency access would be adequate and impacts would be less than significant.

**Alternative Transportation Modes**

The Project would be consistent with policies, plans, and programs that support alternative transportation, including the Mobility Plan and 2010 Bicycle Plan, and Community Plan. Bicycle parking would be provided on the Project Site in accordance with the Bicycle Parking Ordinance. Operation of the Project would not modify the existing roadway configurations or otherwise introduce a design feature or physical configuration that inhibits safe visibility of pedestrians, bicyclists, and drivers to and from the Project Site. The driveways would be designed in accordance with LADOT standards and approvals. The Project would not conflict with alternative transportation plans, and would support policies for incentivizing transit usage, increasing pedestrian safety, and providing bicycle facilities.

**FINDINGS**

The Revised Project's impacts with respect to construction traffic, Congestion Management Plan Consistency, air traffic hazards, hazardous design features, emergency access, and alternative modes of transportation would be similar to those of the Original Project. Therefore, based on the EIR analysis and the whole of the record, the City finds that the Revised Project's impacts and cumulative impacts related to construction traffic, Congestion Management Plan Consistency, air traffic hazards, hazardous design features, emergency access, and alternative modes of transportation would be less than significant.

**TRIBAL CULTURAL RESROUCES**

**Substantial Adverse Change in the Significance of a Tribal Cultural Resource Defined in Public Resources Code Section 21074 and Listed in Public Resources Code Section 5024.1(k).**

The City sent notification letters on August 31, 2016 to the California Native American Tribes that requested inclusion on the City's AB 52 notification list. On September 20, 2017, the City, after acting in good faith and with reasonable effort, concluded consultation for the Project. The City determined that the record did not contain substantial evidence that the Project may cause a significant impact on a tribal cultural resource. The City also determined that no mitigation measures relating to tribal cultural resources were required, the City stated that it will add a condition of approval under its police powers to protect the inadvertent discovery of tribal cultural resources. In addition, for archeological resources, MM CUL-1 was included, which would require that a qualified professional archeologist and a certified Native American Monitor be present to monitor all initial phases of ground-disturbing activities associated with the Project.

CPC-2016-2118-VZC-0272

VESTING TENTATIVE TRACT MAP NO. 74315                                    PAGE   48

Finally, none of the potential tribal resources disclosed during the consultation process, or after the City had concluded consultation, are either listed or eligible for listing in the California Register or in a local register of historical resources as defined in PRC Section 5020.1(k). Therefore, the Project would not cause a substantial adverse change in the significance of a tribal cultural resource as defined in PRC Section 21074. Impacts would be less than significant and no mitigation measures are required.

### Substantial Adverse Change in the Significance of a Tribal Cultural Resource Defined in Public Resources Code Section 21074 and Determined by the Lead Agency to be Significant under Public Resources Code Section 5024.1(c)

In compliance with AB 52, the City sent notification letters on August 31, 2016 to the California Native American Tribes that requested inclusion on the City's AB 52 notification list. On September 20, 2017, the City, after acting in good faith and with reasonable effort, concluded consultation for the Project. Accordingly, the City determined, in its discretion based on the evidence in the record, that the Project would not cause a substantial adverse change in the significance of a tribal cultural resource pursuant to the criteria in subdivision (c) of PRC Section 5024.1. Therefore, impacts would be less than significant and no mitigation measures are required.

### Cumulative

As demonstrated above, the Project does not result in a significant impact to a tribal cultural resource. Specifically, there are no resources listed or determined eligible for listing, on the national, state, or local register of historical resources and the Lead Agency determined that resources identified during AB 52 tribal consultation are not eligible for listing under the criteria in subsection (c) of the Public Resources Code Section 5024.1. Therefore, the Project itself does not make a contribution to a cumulative impact on tribal cultural resources. Accordingly, the impact to tribal cultural resources cannot be characterized as a cumulative impact of the Project.

Further, in compliance with CEQA review, AB 52 consultation was completed for the Project. Similarly, consultations would be required for the related projects with California Native American Tribes in order to identify potential impacts to tribal cultural resources. There are no other ongoing or foreseeable contiguous excavations adjacent to the Project Site that could, when viewed together with the Project, cause a substantial adverse change in the significance of a tribal cultural resource. Therefore, the Project would not independently contribute to a cumulative impact, and when considered together with the related projects, would not create a cumulative impact. Therefore, impacts are less than cumulatively considerable and there are no cumulatively significant impacts on tribal cultural resources.

### UTILITIES AND SERVICE SYSTEMS

The EIR discussed the impacts related to utilities and service systems in Section IV.L of the Draft EIR and Section III of the Final EIR. The following discussion addresses all potential utilities and service systems impacts, which are less than significant and do not require mitigation.

### Water Supply and Treatment

A Water Supply Assessment was prepared for the Project in compliance with State Water Code Sections 10910-10915, which was approved by the Board of Water and Power Commissioners on March 7, 2017. The Project would generate an increase in water consumption from the Project Site. The estimated daily water consumption for Alternative 5 is estimated to be approximately 4.7 percent greater than the estimated daily water consumption for the Original Project. Current water supply and infrastructure can accommodate

CPC-2016-2118-VZC-0273

VESTING TENTATIVE TRACT MAP NO. 74315

PAGE 49

the increase.  Implementation of the Project would not result in the need for new or additional water infrastructure (facilities).  Therefore, impacts with respect to water would be less than significant.

### Project Design Feature

**PDF WA-1.** The following measures shall be included in the Project, which are in addition to those required by codes and ordinances:

- High Efficiency Toilets with flush volume of 0.8 gallons of water per flush;
- Waterless Urinals;
- Showerheads with flow rate of 1.5 gallons per minute;
- ENERGY STAR Residential Dishwashers – Standard size, 3.4 gallons/cycle or less;
- Central Domestic Water Heating System divided into approximately 3 zones with roof top mounted equipment that is located in close proximity to points of use, is equipped with a re-circulating system and metered hot water;
- Individual Metering and billing of hot and cold water for every residential dwelling unit and commercial unit;
- Water-Saving Pool Filter;
- Pool/Spa recirculating filtration equipment;
- Leak Detection System for swimming pools and Jacuzzi;
- Drip Irrigation (Micro-Irrigation);
- Proper Hydro-zoning/zoned irrigation (group plants with similar water requirements together).
- Artificial Turf used exclusively instead of grass.
- Drought tolerant plants-100% of total landscaping

## Wastewater

The Project would generate wastewater from the Project Site. However, the wastewater treatment facilities can accommodate additional sewage flow.  As a result, Project implementation would not result in the need for new or additional wastewater treatment facilities.  Therefore, Project impacts to wastewater treatment capacity would be less than significant.

## Stormwater

The Project would neither create, nor contribute, runoff water that would result in the need for any additional storm water drainage facilities. Low Impact Development (LID) is a storm water management strategy that seeks to prevent impacts of runoff and storm water pollution as close to its source as possible. Therefore, Project impacts related to stormwater would be less than significant.

## Solid Waste

The Project would generate a net solid waste stream. The landfill serving the Project Site has sufficient permitted capacity to accommodate the Project's solid waste disposal needs.  The Project would comply with federal, State, and local statutes and regulations related to solid waste.  Therefore, impacts would be less than significant.

CPC-2016-2118-VZC-0274

**FINDINGS**

The Revised Project would result not result in significant impacts and would include the same Project Design Feature identified for the Original Project. Therefore, based on the EIR analysis and the whole of the record, the City finds that the Revised Project's impacts related to wastewater, water, and solid waste would be less than significant.

**Energy Conservation**

The EIR discussed the impacts related to energy conservation in Section IV.M of the Draft EIR.  The following discussion addresses energy conservation impacts, which are less than significant and do not require mitigation.

The Project would include energy conservation and efficiency features to reduce energy consumption. The Project would be served by the existing energy supply and infrastructure.  There would be no impact during construction, and the impacts during operation would be less than significant.

**FINDINGS**

The Revised Project would not result in significant impacts and would include the same Project Design Feature (PDF WA-1) identified for the Original Project. Therefore, based on the EIR analysis and the whole of the record, the City finds that the Revised Project's impacts related to wastewater, water, and solid waste would be less than significant.

**5.     LESS THAN SIGNIFICANT IMPACTS WITH MITIGATION**

The EIR determined that the Project has potentially significant environmental impacts in the areas discussed below. The EIR identified feasible mitigation measures to avoid or substantially reduce the environmental impacts in these areas to a level of less than significant.  Based on the information and analysis set forth in the EIR, the Revised Project would not have any significant environmental impacts in these areas, as long as all identified feasible mitigation measures are incorporated into the Revised Project. The City again ratifies, adopts, and incorporates the full analysis, explanation, findings, responses to comments, and conclusions of the EIR.

**CULTURAL RESOURCES**

The EIR discussed the impacts related to cultural resources in Section IV.B of the Draft EIR. The following discussion addresses potential impacts with respect to archaeological resources, which would not result in significant impacts with implementation of the identified mitigation measures.

**Archaeological Resources**

The Project Site is located in a developed urban environment on a previously disturbed site, as such, the potential to encounter either prehistoric or historic archaeological resources is considered to be low. However, due to the depth of the foundation needed to accommodate the Project's height, a possibility exists for encountering archaeological materials during excavation. To mitigate any potential impacts resulting from unexpected discoveries, it is recommended that a qualified archaeologist monitor all ground-disturbing project-related activities and that protocols be established in case previously unidentified archaeological resources are discovered through the course of construction. In addition, it has also been requested that a Certified Native American Monitor be present to observe all ground-disturbing activities.

CPC-2016-2118-VZC-0275

VESTING TENTATIVE TRACT MAP NO. 74315                                    PAGE  51

Implementation of Mitigation Measure MM CUL-1 would ensure that Project impacts related to archaeological resources would be less than significant.

**Mitigation Measure**

MM CUL-1      A qualified professional archaeologist and a Certified Native American Monitor shall monitor all initial phase of ground disturbing activities of the project.  If buried cultural resources— such as flaked or ground stone, historic debris, building foundations, or non-human bone— are discovered during ground-disturbing activities, work shall stop in that area and within 50 feet of the find until a qualified archaeologist can assess the significance of the find and, if necessary, develop appropriate treatment measures.  Treatment measures typically include development of avoidance strategies, capping with fill material, or mitigation of impacts through data recovery programs such as excavation or detailed documentation.  A report of findings shall be prepared, and recovered materials curated, if needed, in an approved facility.  If, during cultural resources monitoring, the qualified archaeologist determines that the sediments being excavated are previously disturbed by previous construction or are unlikely to contain significant cultural materials, the qualified archaeologist can specify that monitoring be reduced or eliminated.

## FINDINGS

The Revised Project would have the same potential impacts to archaeological resources as the Original Project.  Therefore, based on the EIR analysis and the whole of the record, the City finds that the Revised Project's impacts would be significant absent mitigation, but that changes or alterations have been required in, or incorporated into, the project that avoid or substantially lessen the significant impacts as identified in the EIR.  Mitigation Measure MM CUL-1 is hereby incorporated into the Revised Project and would avoid or substantially lessen the significant impact related to archaeological resources to less than significant.

## RATIONALE

The Project Site is located in a developed urban environment on a previously disturbed site, as such, the potential to encounter either prehistoric or historic archaeological resources is considered to be low. However, due to the depth of the foundation needed to accommodate the Project's height, a possibility exists for encountering archaeological materials during excavation. To mitigate any potential impacts resulting from unexpected discoveries, a qualified archaeologist shall monitor all ground-disturbing project-related activities and protocols shall be established in case previously unidentified archaeological resources are discovered through the course of construction.  In addition, a Certified Native American Monitor shall be present to observe all ground-disturbing activities.  Implementation of Mitigation Measure MM CUL-1 would ensure that Project impacts related to archaeological resources would be less than significant.

## REFERENCE

For a complete discussion of Project impacts related to archaeological resources, please see Section VII of the Draft EIR.  See Section 2.2 above for the Project Characteristics of the Revised Project.

## NOISE

The EIR discussed the impacts related to noise in Section IV.H of the Draft EIR.  The following discussion addresses potential impacts with respect to construction noise, which would not result in significant impacts with implementation of the identified mitigation measures.

CPC-2016-2118-VZC-0276

**000063**

ICON0000063

**Construction Noise (Exposure of Excessive Noise and Temporary Increase in Ambien Noise)**

Construction activities associated with the Project would require the use of heavy equipment for demolition and building construction. Noise from smaller power tools, generators, and other sources of noise would also be associated with construction of the Project. During each stage of development, there would be a different mix of equipment operating and noise levels would vary based on the type and amount of equipment in operation and the location of the activity. As such, the sensitive receptors in the vicinity of the Project Site that would be affected by construction activities would be the multi-family residences to the immediate north of the Project Site and the multi-family residences to the west of Cedros Avenue and south of Roscoe Boulevard. The closest of these receptors would be the multi-family residences to the immediate north of the Project Site (i.e., within 50 feet of the Project Site). Accordingly, these receptors could experience construction noise levels of up to 90 dBA. Since the measured ambient noise level at this location is approximately 55 dBA, the Project would increase noise levels by more than 10 dBA, which would be a potentially significant impact in terms of excessive noise and a temporary increase in ambient noise levels.

Construction activities associated with the Project would comply with LAMC Section 41.40. Specifically, LAMC Section 41.40 regulates noise from demolition and construction activities by prohibiting construction activity (including demolition) and repair work, where the use of any power tool, device, or equipment would disturb persons occupying sleeping quarters in any dwelling hotel, apartment, or other place of residence, between the hours of 9:00 PM and 7:00 AM Monday through Friday, and between 6:00 PM and 8:00 AM on Saturday. All such activities are also prohibited on Sundays and all federal holidays. In addition, pursuant to the provisions of LAMC Section 112.05, implementation of technically feasible noise limitation measures, including the use of mufflers, shields, sound barriers and/or any other noise reduction device or techniques during the operation of the equipment, would be required for the Project. As such, the Project would be required to comply with mitigation measures MM NOI-1 through MM NOI-6, which represent the technically feasible noise limitation measures for reducing construction noise levels that could be associated with the Project. Compliance with these LAMC requirements in addition to mitigation measures MM NOI-1 through MM NOI-6 would reduce noise levels associated with construction of the Project to the extent feasible, and therefore, to a less-than-significant level.

*Mitigation Measures*

**MM NOI-1**   All construction equipment engines shall be properly tuned and muffled according to manufacturers' specifications. The Project contractor shall use power construction equipment with noise shielding and muffling devices.

**MM NOI-2**   Construction activities whose specific location on the Project Site may be flexible (e.g., operation of compressors and generators, cement mixing, general truck idling) shall be conducted as far as possible from the nearest noise-sensitive land uses, and manmade barriers (e.g., intervening building walls) shall be used to screen such activities from these land uses.

**MM NOI-3**   Demolition and construction activities shall be scheduled so as to avoid operating several pieces of equipment simultaneously, which causes high noise levels. Examples include the use of concrete saws and jackhammers.

**MM NOI-4**   Equipment warm-up areas, water tanks, and equipment storage areas shall be located as far as possible from the surrounding residential uses.

**MM NOI-5**   The Project developer shall install temporary sound curtains of sufficient height to block the lines-of-sight of the construction activities at the Project Site from the residential properties to the north and west. The sound curtains shall be in place until the exterior of the building is constructed and doors are installed and loud construction activities (activities capable of

CPC-2016-2118-VZC-0277

generating noise levels in excess of 75 dBA L$_{max}$ at the existing residential properties) have ceased.

**MM NOI-6**     Two weeks prior to the commencement of demolition and construction at the Project Site, notification shall be provided to the residential properties to the immediate north of the Project Site and to the west of the Project Site along Cedros Avenue disclosing the construction schedule, including the various types of activities and equipment that would be occurring throughout the duration of the construction period.

**FINDINGS**

The Revised Project would generate a similar amount of construction noise as the Original Project. Therefore, based on the EIR analysis and the whole of the record, the City finds that the Revised Project's impacts would be significant absent mitigation, but that changes or alterations have been required in, or incorporated into, the project that avoid or substantially lessen the significant impacts as identified in the EIR. Mitigation Measures MM NOI-1 through MM NOI-6 are hereby incorporated into the Revised Project and avoid or substantially lessen the significant noise-related land use compatibility impact to less than significant.

**RATIONALE**

Construction activities associated with the Project would require the use of heavy equipment for demolition and building construction. Noise from smaller power tools, generators, and other sources of noise would also be associated with construction of the Project. During each stage of development, there would be a different mix of equipment operating and noise levels would vary based on the type and amount of equipment in operation and the location of the activity. As such, the sensitive receptors in the vicinity of the Project Site that would be affected by construction activities would be the multi-family residences to the immediate north of the Project Site and the multi-family residences to the west of Cedros Avenue and south of Roscoe Boulevard. The closest of these receptors would be the multi-family residences to the immediate north of the Project Site (i.e., within 50 feet of the Project Site). Accordingly, these receptors could experience construction noise levels of up to 90 dBA. Since the measured ambient noise level at this location is approximately 55 dBA, the Project would increase noise levels by more than 10 dBA, which would be a potentially significant impact, in terms of excessive noise and a temporary increase in ambient noise levels.

Construction activities associated with the Project would comply with LAMC Section 41.40. Specifically, LAMC Section 41.40 regulates noise from demolition and construction activities by prohibiting construction activity (including demolition) and repair work, where the use of any power tool, device, or equipment would disturb persons occupying sleeping quarters in any dwelling hotel, apartment, or other place of residence, between the hours of 9:00 PM and 7:00 AM Monday through Friday, and between 6:00 PM and 8:00 AM on Saturday. All such activities are also prohibited on Sundays and all federal holidays. In addition, pursuant to the provisions of LAMC Section 112.05, implementation of technically feasible noise limitation measures, including the use of mufflers, shields, sound barriers and/or any other noise reduction device or techniques during the operation of the equipment, would be required for the Project. As such, the Project would be required to comply with mitigation measures MM NOI-1 through MM NOI-6, which represent the technically feasible noise limitation measures for reducing construction noise levels that could be associated with the Project. Compliance with these LAMC requirements in addition to mitigation measures MM NOI-1 through MM NOI-6 would reduce noise levels associated with construction of the Project to the extent feasible, and therefore, to a less-than-significant level.

**REFERENCE**

CPC-2016-2118-VZC-0278

000065

ICON0000065

VESTING TENTATIVE TRACT MAP NO. 74315                                          PAGE   54

For a complete discussion of noise impacts, please see Section IV.H, Noise, of the Draft EIR. See Section 2.2 above for the Project Characteristics of the Revised Project.

### 6.    SIGNIFICANT UNAVOIDABLE IMPACTS

The EIR determined that the Project would result in potentially significant environmental impacts related to operational air quality and transportation/traffic. The EIR identified all feasible mitigation measures to reduce these impacts, but even with implementation of feasible mitigation measures, impacts would remain significant and unavoidable for the following impacts:

- Air Quality – VOC and NOx Emissions

- Transportation/Traffic – Intersection LOS

The City again ratifies, adopts, and incorporates the full analysis, explanation, findings, responses to comments, and conclusions of the EIR.

### AIR QUALITY

The EIR discussed the impacts related to air quality in Section IV.A of the Draft EIR. The following discussion addresses potential impacts with respect to mass daily operational emissions (VOC and NOx), which cannot be fully mitigated even with the implementation of all feasible mitigation measures, and would result in significant and unavoidable impacts.

### Mass Daily Operational Emissions

The Project would generate mass daily emissions of VOC and $NO_X$ that exceed the thresholds of significance recommended by SCAQMD, violating an air quality standards and resulting in a cumulatively considerable net increase of criteria pollutants. As such, the impact of the Project would be significant. The bulk of Project-related VOC emissions would be from area sources and mobile sources. Most of the area source emissions would be generated by consumer products, including cleaning supplies, kitchen aerosols, cosmetics, and toiletries. It would not be possible to restrict and monitor the types of consumer products used by Project residents. Accordingly, no feasible mitigation is available to address these emissions. The other primary source of the significant VOC emissions and the primary source of the significant $NO_X$ emissions would be motor vehicles. Mitigation Measures MM-TR-5 for the implementation of a Transportation Demand Management Program, and the design and location of the Project in an area served by transit, with facilities intended to encourage bicycle and pedestrian activity, would serve to reduce Project-related automobile trips to the maximum extent feasible. No other mitigation measures are available to the Project to reduce emissions, as the authority to regulate emissions from motor vehicles rests solely in the state and federal governments. The mass daily emissions of the other criteria pollutants would not exceed the SCAQMD's thresholds of significance.

### *Mitigation Measures*

Most of VOC emissions would be generated by consumer products used at the Project Site. These consumer products include cleaning supplies, kitchen aerosols, cosmetics, and toiletries. It would not be possible to restrict and monitor the types of consumer products used by Project residents, which would be the primary source of such emissions at the Project Site.

The other primary source of the significant VOC emissions and the primary source of the significant $NO_X$ emissions would be motor vehicles. Several public transit services run along Roscoe Boulevard and Van

CPC-2016-2118-VZC-0279

ICON0000066

Nuys Boulevard, including several bus routes operated by Los Angeles County Metropolitan Transportation Authority and City of Los Angeles Department of Transportation. The traffic numbers identified in the Traffic Study prepared for the Project and used in the CalEEMod analysis already assume a 15 percent reduction in vehicle trips due to transit use by Project residents, employees, and guests. They also assume a reduction in vehicle trips due to the internal capture of trips by the mix of uses within the Project Site. Furthermore, a mitigation measure (MM-TR-5) has already been included to require the Project to implement a Transportation Demand Management Program (TDM) with a performance standard of reducing Project traffic by 15 percent though bike and carpool-like programs, transit incentives, and other elements for both residents and employees. The Project also proposes an urban-scale development with pedestrian-oriented streetscape and circulation. The Project has been designed to draw in pedestrian activity from the surrounding community and provide adequate bicycle facilities in an effort to reduce vehicle trips.

The Project is designed to have a minimum capability of five percent electrical vehicle charging in the commercial parking and residential parking garages.  Use of electric vehicles by Project residents, employees, and guests would result in lower mobile source emissions than what is estimated. However, the number of electric vehicles that would be expected to travel to and from the Project Site is not known at this time and CalEEMod does not provide a module to reduce the motor source emissions due to electrical vehicle charging stations.

Based on this information, the total operational emissions that would be generated by the Project would be slightly lower than what is estimated, although the actual reduction by the proposed features of the Project is not known. As such, no additional mitigation measures are known to be feasible to reduce the operational emissions associated with the Project to levels that do not exceed the thresholds of significance recommended by SCAQMD.

*Impacts After Mitigation*

Operational impacts would be significant and unavoidable due to the exceedance of SCAQMD's threshold for daily VOC and $NO_x$ emissions.

## Alternative 5

Under the Alternative 5, trip generation would be reduced by approximately 44%. Since mobile source emissions are roughly proportional to trip generation, mobile source emissions would be reduced by approximately 44% with Alternative 5.  However, due to the nearly 60% increase in the number of residences, area source emissions for VOCs and NOx would increase, and the total emissions would remain above the SCAQMD threshold. Similar to the Project, impacts would still be significant and unavoidable. It would not be possible to restrict and monitor the types of consumer products used by Project residents, which would be the primary source of VOC emissions at the Project Site. In addition, project features and mitigation measures have already been incorporated into the Project to reduce mobile emissions, VOC, and NOx to the extent feasible.

*Mitigation Measures*

Most of VOC emissions would be generated by consumer products used at the Project Site.  These consumer products include cleaning supplies, kitchen aerosols, cosmetics, and toiletries. It would not be possible to restrict and monitor the types of consumer products used by Project residents, which would be the primary source of such emissions at the Project Site. As discussed above, no additional measures are known to be feasible to reduce the operational emissions associated with the Project to levels that do not exceed the thresholds of significance recommended by SCAQMD.

*Impacts After Mitigation*

CPC-2016-2118-VZC-0280

000067

ICON0000067

Operational impacts would be significant and unavoidable due to the exceedance of SCAQMD's threshold for daily VOC and NO$_X$ emissions.

**FINDINGS**

Under the Alternative 5, trip generation would be reduced by approximately 44%. Since mobile source emissions are roughly proportional to trip generation, mobile source emissions would be reduced by approximately 44% with Alternative 5. However, due to the nearly 60% increase in the number of residences, area sources for VOC emissions and NOx emissions would increase, and the total emissions would remain above the SCAQMD threshold and, similar to the Project, impacts would still be significant and unavoidable.

The Revised Project would result in similar mobile source emissions from commercial uses as Alternative 5, and reduced mobile source emission from residential uses from Alternative 5. Therefore, the Revised Project's operational emissions would be similar, but less than those of Alternative 5, and impacts would remain significant and unavoidable.

**RATIONALE**

Most of VOC emissions would be generated by consumer products used at the Project Site.  These consumer products include cleaning supplies, kitchen aerosols, cosmetics, and toiletries. It would not be possible to restrict and monitor the types of consumer products by Project residents, which would be the primary source of such emissions at the Project Site.

The other primary source of the significant VOC emissions and the primary source of the significant NO$_X$ emissions would be motor vehicles. Several public transport services run along Roscoe Boulevard and Van Nuys Boulevard, including several bus routes operated by Los Angeles County Metropolitan Transportation Authority and City of Los Angeles Department of Transportation. The traffic numbers identified in the Traffic Study prepared for the Project and used in the CalEEMod analysis already assume a 15 percent reduction in vehicle trips due to transit use by Project residents, employees, and guests.  They also assume a reduction in vehicle trips due to the internal capture of trips by the mix of uses within the Project Site. Furthermore, a mitigation measure (MM-TR-5) has already been included to require the Project to implement a Transportation Demand Management Program (TDM) with a performance standard of reducing Project traffic by 15 percent though bike and carpool-like programs, transit incentives, and other elements for both residents and employees. The Project also proposes an urban-scale development with pedestrian-oriented streetscape and circulation. The Project has been designed to draw in pedestrian activity from the surrounding community and provide adequate bicycle facilities in an effort to reduce vehicle trips.

Similar to the Project, the Revised Project is designed to have a minimum capability of five percent electrical vehicle charging in the commercial parking and residential parking garages.  Use of electric vehicles by Project residents, employees, and guests would result in lower mobile source emissions than what is estimated.  However, the number of electric vehicles that would be expected to travel to and from the Project Site is not known at this time and CalEEMod does not provide a module to reduce the motor source emissions due to electrical vehicle charging stations.

Based on this information, the total operational emissions that would be generated by the Revised Project would be slightly lower than what is estimated, although the actual reduction by the proposed features of the Project is not known.

Each decision making body of the City finds that all feasible mitigation measures to substantially reduce or avoid the project's operational air quality impacts have been incorporated into the project. In accordance with CEQA Guidelines Section 15091, the City finds that changes or alterations have been required in, or incorporated into, the project which avoid or substantially lessen these significant environmental impacts. The City also finds that specific economic, legal, social, technological or other considerations, make infeasible additional mitigation measures or project alternatives identified in the EIR.  However, while

CPC-2016-2118-VZC-0281

ICON0000068

VESTING TENTATIVE TRACT MAP NO. 74315                          PAGE 57

implementation of mitigation measures will reduce the impacts, the project's air quality impacts, will be significant and unavoidable.

## TRANSPORTATION/TRAFFIC

The EIR discussed the impacts related to transportation/traffic in Section IV.K of the Revised Draft EIR. The following discussion addresses potential impacts with respect to intersection level of service (LOS), which cannot be fully mitigated even with the implementation of all feasible mitigation measures, and would result in significant and unavoidable impacts.

### LOS Impacts

*Future With Project*

The estimated Project traffic was added to the projected year 2020 future traffic conditions to obtain future traffic volumes with the Project for both peak periods at each study intersection. Future with Project traffic volumes were analyzed to determine the projected V/C ratios and LOS for each study intersection. Seven study intersections would be significantly impacted by the Project's traffic:

- Nordhoff Street and Van Nuys Boulevard (intersection number 2) during the AM peak hour;

- Chase Street and Van Nuys Boulevard (intersection number 5) during the PM peak hour;

- Roscoe Boulevard and Woodman Avenue (intersection number 6) during the AM peak hour;

- Roscoe Boulevard and Van Nuys Boulevard (intersection number 7) during the AM and PM peak hours;

- Roscoe Boulevard and Tobias Avenue (intersection number 8) during the PM peak hour; and

- Roscoe Boulevard and Sepulveda Boulevard (intersection number 9) during the AM and PM peak hours; and

- Roscoe Boulevard and 405 SB Ramps (intersection number 11) during the PM peak hours.

Therefore, the Project would result in a significant traffic impact in the future with Project condition and mitigation would be required to reduce these impacts to the extent feasible. These streets and intersections were reviewed to determine if any potential physical improvements or geometric reconfigurations could be implemented at these locations. Several street improvements were identified to address localized traffic congestion in the study area, including the above-listed significantly impacted intersections, and are required as mitigation measures MM TR-1 through MM TR-4 for the Project. Moreover, the Project would develop a TDM program to reduce Project traffic by 15 percent with bike and carpool programs, transit incentives and other TDM elements for both residents and employees as required by mitigation measure MM TR-5.

These mitigation measures are enumerated below as well as the result of incorporating these measures with the above-identified seven significantly impacted intersections. With implementation of these mitigation measures, impacts at six of the seven intersections in the future with Project traffic condition would remain significant.

### *Mitigation Measures*

**MM TR-1**   At Roscoe Boulevard and Tobias Avenue (study intersection number 8), the Project shall restripe Tobias Avenue to install a southbound left-turn-only lane and a shared thru/right-turn

CPC-2016-2118-VZC-0282

000069

ICON0000069

VESTING TENTATIVE TRACT MAP NO. 74315                                    PAGE   58

lane at Roscoe Boulevard.  The Project shall also restripe Tobias Avenue to provide a left-turn-only lane at the Project's Tobias Avenue driveway.

**MM TR-2**  The Project shall install left-turn channelization on Tobias Avenue along the Project frontage to provide a storage lane for Project traffic entering from Roscoe Boulevard, and install eastbound left-turn phasing on the existing traffic signal located at Roscoe Boulevard and Tobias Avenue.

**MM TR-3**  In addition to the above improvements at Roscoe Boulevard and Tobias Avenue, the Project shall upgrade the existing red flashing signal located at the existing driveway on the south side of the intersection to a yellow flashing signal.  In addition, the Project shall improve this intersection with Continental Crosswalks at both approaches and provide the installation of truncated domes along the signalized driveway to improve pedestrian safety and visibility.

**MM TR-4**  The Project shall install a new traffic signal at Chase Street and Tobias Avenue.  The Project Applicant shall plan, design, and construct the new signal through the Bureau of Engineering B-permit process.

**MM TR-5**  The Project shall develop and implement and Transportation Demand Management (TDM) program with a performance standard of reducing Project traffic by 15 percent through bike and carpool-like programs, transit incentives, and other elements for both residents and employees.  A preliminary TDM program shall be prepared and provided to the City of Los Angeles Department of Transportation (LADOT) prior to the issuance of building permits for the Project.  A final TDM program shall be prepared and approved by LADOT prior to the issuance of any certificate of occupancy.  (A sample startup TDM program is provided in Appendix K to the Traffic Impact Study prepared by Overland Traffic Consultants, Inc., August 2016.)  The TDM program shall include, but not be limited to, the following strategies:

- Provide an internal Transportation Management Coordination Program with an on-site transportation coordinator (on-site or off-site);
- Design the Project to ensure a bicycle, transit and pedestrian friendly environment;
- Provide on-site transit routing and schedule information;
- Provide rideshare matching services;
- Provide preferential rideshare loading/unloading or parking location;
- Provide transit and share incentives;
- Provide up to two on-site car-share spaces.

*Impacts After Mitigation*

Future cumulative traffic impacts with the implementation of the roadway improvements required by mitigation measures MM TR-1 through MM TR-4 and the Project TDM Program required by mitigation measure MM TR-5 would reduce traffic impacts at one of the seven intersections to a less-than-significant level (at Roscoe Boulevard and Tobias Avenue).  Significant traffic impacts, however, would remain at the following six study intersections:

- Nordhoff Street and Van Nuys Boulevard (intersection number 2) during the AM peak hours;

- Chase Street and Van Nuys Boulevard (intersection number 5) during the PM peak hours;

- Roscoe Boulevard and Woodman Avenue (intersection number 6) during the AM peak hours;

CPC-2016-2118-VZC-0283

**000070**

ICON0000070

VESTING TENTATIVE TRACT MAP NO. 74315                                    PAGE  59

- Roscoe Boulevard and Van Nuys Boulevard (intersection number 7) during the AM and PM peak hours;

- Roscoe Boulevard and Sepulveda Boulevard (intersection number 9) during the AM and PM peak hours; and

- Roscoe Boulevard and the 405 Freeway SB off Ramps (intersection number 11) during the PM peak hours.

Therefore, the Project would result in significant and unavoidable impacts to the above-identified intersections in the future with Project traffic conditions.

## Alternative 5

Under Alternative 5, a similar amount of demolition and development would occur at the Project Site as would occur with the Project. Construction traffic impacts of the alternative would be similar to the Project's less-than-significant impacts. Under Alternative 5, traffic conditions would change in the vicinity. Alternative 5 would generate fewer vehicle trips than the Project. Similar to the Project, growth in traffic due to the combined effects of continuing development, intensification of development, and related projects would result in reduced level of service at study intersections located in the vicinity of Alternative 5.

Trip generation of Alternative 5 would be lower than the Project. Alternative 5 would generate 4,484 daily trips, 341 a.m. peak hour trips, and 422 p.m. peak hour trips, compared to 7,996 daily trips, 462 a.m. peak hour trips, and 662 p.m. peak hour trips under the Project.

Implementation of Alternative 5 would result in one significant project traffic impact in the "Existing + Project" condition, compared to four significant impacts that would occur under the Project. As shown in Table VI-29 [of the Final EIR], the potential traffic impact would occur at Roscoe Boulevard and Tobias Avenue (pm peak hour). The same traffic mitigation measures would be necessary for mitigating the existing plus project traffic impacts for this alternative to a less-than-significant level.

However, under "Future with Project cumulative 2020 conditions", significant traffic impacts at seven intersections (the same intersections identified above for the Original Project) would occur under Alternative 5.

### Mitigation Measures

The same mitigation measures would be implemented under Alternative 5 as would be implemented under the Original Project. See Mitigation Measures MM TR-1 through MM TR-5.

### Impacts After Mitigation

The same traffic mitigation measures that would be implemented under the Original Project would be necessary for mitigating the future plus project traffic impacts. Mitigation measures would reduce the significant traffic impacts to a less-than-significant level at three of the seven intersections. However, following implementation of traffic mitigation measures, significant impacts at the following four intersections would remain:

- Chase Street and Van Nuys Boulevard (intersection number 5) during the PM peak hours;

- Roscoe Boulevard and Woodman Avenue (intersection number 6) during the AM peak hours;

CPC-2016-2118-VZC-0284

- Roscoe Boulevard and Van Nuys Boulevard (intersection number 7) during the AM and PM peak hours; and

- Roscoe Boulevard and Sepulveda Boulevard (intersection number 9) during the AM and PM peak hours.

Alternative 5 would result in two fewer intersections that are significantly impacted under this alternative compared to the Project: Nordhoff Street and Van Nuys Boulevard (intersection number 2) and Roscoe Boulevard and the 405 Freeway SB off-ramps (intersection number 11).

## FINDINGS

The Revised Project, a reduced version of Alternative 5, would substantially reduce intersection level of service impacts compared to the Original Project because it would result in fewer vehicle trips than the Original Project, and would cause similar, but reduced, intersection level of service impacts to those of Alternative 5. Therefore, based on the EIR analysis and the whole of the record, the City finds that the Revised Project's impacts are significant, and that Mitigation Measures MM TR-1 through MM TR-5 are hereby incorporated into the Revised Project. As stated above, Mitigation Measures MM TR-1 through MM TR-5 would reduce three intersection impacts to less than significant levels; however, significant impacts would remain at four intersections.

Each decision making body of the City finds that all feasible mitigation measures to substantially reduce or avoid the project's operational traffic impacts have been incorporated into the project. In accordance with CEQA Guidelines Section 15091, the City finds that changes or alterations have been required in, or incorporated into, the project which avoid or substantially lessen these significant environmental impacts. The City also finds that specific economic, legal, social, technological or other considerations, make infeasible additional mitigation measures or project alternatives identified in the Final EIR. However, while implementation of mitigation measures will reduce the impacts, the project's future year traffic impacts, will be significant and unavoidable.

## RATIONALE

The trip generation calculations, scope, and methodologies contained in the Traffic Study were determined in consultation with LADOT, consistent with LADOT Traffic Study guidelines and with the Institute of Transportation Engineers (ITE) trip generation methodologies. These were approved by a Traffic Impact Study Memorandum of Understanding (MOU) prior to the preparation of the Traffic Study. The Project trip adjustments are reviewed on a case-by-case basis through MOU process.

The traffic study concluded that the Revised Project would result in significant operational impacts at seven study intersections. Implementation of mitigation measures MM TR-1 through MM TR-5 would reduce traffic impacts at three of the seven intersections to a less-than-significant level. No feasible mitigation measures are available that could reduce impacts at the following intersections to less than significant: Chase Street and Van Nuys Boulevard (pm peak hours), Roscoe Boulevard and Woodman Avenue (am peak hours), Roscoe Boulevard and Van Nuys Boulevard (am and pm peak hours); and Roscoe Boulevard and Sepulveda Boulevard (am and pm peak hours).

The mitigation measures identified in the EIR for the Revised Project would quantitatively reduce some of the significant impacts through physical and operational improvements to two intersections to aide in the efficient movement of vehicles and through the implementation of a TDM program for the Project Site to promote peak period trip reductions.

CPC-2016-2118-VZC-0285

VESTING TENTATIVE TRACT MAP NO. 74315

PAGE  61

These mitigation measures are consistent with the City's Transportation Impact Study Guidelines and the Institute of Transportation Engineers trip generation methodologies. The TDM program details a set of strategies proposed for the Project designed to reduce peak hour vehicular traffic to and from the Project Site. The TDM program implemented an achievable TDM trip reduction credit of 15 percent. The TDM trip reduction credit was applied consistent with LADOT policies and was approved by LADOT as a feasible measure. The Project Site is located within a regional center, one block or approximately a ¼ mile west of Van Nuys Boulevard, in proximity to a number of bus lines including Metro Rapid Buses, with bus connections to the Metro Orange Line and Metrolink stations. According to the East San Fernando Valley Transit Corridor Study Project prepared by Metro, Van Nuys Boulevard has the highest north-south transit boardings in the San Fernando Valley; approximately 50 percent of the Boulevard's boardings occur along a 2.8-mile stretch, between the Metro Orange Line and Roscoe Boulevard, and of the study area population, 35 percent is transit-dependent. These facts support the use of the allowable vehicle trip adjustments for the multi-use Project. In addition, the Project would improve vehicle movement at the Tobias Avenue intersections with Roscoe Boulevard and Chase Street.

Moreover, the LADOT and the Traffic Study considered physical intersection improvements at the significantly impacted study intersections where the implementation of the TDM program would not mitigate the impacts to a level of insignificance. LADOT determined that other physical traffic mitigation improvements at these impacted intersections were infeasible because of existing physical conditions, existing right-of-way limitations, or conflicts with adopted plans and policies. Therefore, the EIR concluded that operational traffic impacts were significant and unavoidable at four intersections.

The Project Site is also located adjacent to mass transit. Even though the EIR identified operational traffic significant unavoidable impacts, the location of the Project would encourage pedestrian activity and use of alternatives modes of transportation due to its location and the numerous options for mass transit around the Project Site. This Project is consistent with the City's vision for development on the Project Site and the long-range planning considerations of increasing density in a regional center to reduce traffic and environmental impacts.

## 7.     FINDINGS REGARDING PROJECT ALTERNATIVES

CEQA requires that an EIR analyze a reasonable range of feasible alternatives that could substantially reduce or avoid the significant impacts of a project while also meeting the project's basic objectives. An EIR must identify ways to substantially reduce or avoid the significant effects that a project may have on the environment (Public Resources Code Section 21002.1). Accordingly, the discussion of alternatives shall focus on alternatives to a project or its location which are capable of avoiding or substantially reducing any significant effects of the project, even if these alternatives would impede to some degree the attainment of the project objectives, or would be more costly. The alternative analysis included in the EIR, therefore, identified a reasonable range of project alternatives focused on avoiding or substantially reducing the project's significant impacts.

### Project Objectives

Section 15124(b) of the California Environmental Quality Act (CEQA) Guidelines states that a project description shall contain "a statement of the objectives sought by the proposed project." In addition, Section 15124(b) of the State CEQA Guidelines further states that "the statement of objectives should include the underlying purpose of the project." The following objectives for the Project demonstrate the underlying purpose of the Project to redevelop an underutilized site with a balanced mix of uses in support of regional goals for housing and transit-oriented development, contributing to the revitalization of Panorama City:

CPC-2016-2118-VZC-0286

ICON0000073

VESTING TENTATIVE TRACT MAP NO. 74315                                    PAGE   62

1) Provide for the efficient and functional development of an underutilized site, which is designated to allow for regional commercial development, through the replacement of vacant buildings and surface parking lots with new housing and commercial uses to meet community and regional demands;

   a.  Develop new housing to meet the needs of existing residents and projected population growth within the Mission Hills – Panorama City – North Hills Community Plan area.

   b.  Provide for safe pedestrian and bicycle connectivity between the Project's residential and commercial areas, adjacent commercial uses, and nearby transit facilities.

   c.  Promote pedestrian activity in the area by removing paved surface parking lots and vacant buildings, and activating the street frontage with ground level retail and commercial uses, sidewalks, street trees, and landscaping.

2) Foster local economic development and job creation in the Mission Hills – Panorama City – North Hills Community Plan Area and the San Fernando Valley; and

   a.  Develop a project with a balanced mix of uses to act as a catalyst and encourage investment in the commercial district.

   b.  Provide permanent job opportunities and temporary construction jobs.

   c.  Meet the demand from the immediate and surrounding community for a destination commercial center that includes diverse commercial uses and services, and pedestrian amenities.

3) Eliminate blight and enhance the visual quality of Panorama City by providing a new and attractive development in Panorama City.

   a.  Support infill development in an existing urban area with adequate infrastructure and public transit access for the planned density of the Mission Hills-North Hills-Panorama City Community Plan area.

   b.  Enhance the identity and appearance of the district by designing an integrated and architecturally-unified mixed-use development.

**Alternatives in the Draft and Final EIRs**

CEQA requires that an EIR analyze a reasonable range of feasible alternatives that could substantially reduce or avoid the significant impacts of a project while also meeting a project's basic objectives.

Each decision-making body of the City finds that given the potential impacts of the project, the EIR considered a reasonable range of alternatives to the project to provide informed decision-making in accordance with Section 15126.6 of the CEQA Guidelines.

Based on the significant environmental impacts of the project and the objectives established for the project, the following five alternatives to the Original Project were evaluated in Section VI (Alternatives) of the Draft EIR, and Section III of the Final EIR:

- <u>Alternative 1:</u>  No Project

CPC-2016-2118-VZC-0287

- <u>Alternative 2:</u>  Reduced Project

- <u>Alternative 3:</u>  All Commercial Project

- <u>Alternative 4:</u>  By-Right Project

- <u>Alternative 5:</u>  Reduced Commercial Project

These alternatives and their impacts are summarized below.  As discussed in Section VI (Alternatives) of the Draft EIR, an alternative was considered and rejected that would develop the Project Site entirely with residences.  This alternative was rejected because it would not meet a primary objective of the Project (Objective #2) to promote economic development and investment through the balanced mix of uses, permanent job opportunities, or meeting demand for a destination commercial center in the commercial district.

**Summary of Findings**

Based upon the following analysis, the City finds, pursuant to CEQA Guidelines Section 15091 that Alternative 5 (Reduced Commercial Project) would substantially lessen or avoid significant effects the Project would have on the environment and would be feasible based on specific objective of the Project economic, legal, social, technological, or other considerations, including provision of employment opportunities for highly trained workers. The Reduced Commercial Project Alternative would have lower significant and unavoidable impacts than the Project with respect to traffic and operational air quality, and lower less-than-significant impacts than the Project with respect to greenhouse gas emissions, operational noise, operational vibration, public services, utilities and energy. Importantly, the significant impact of the Project on the intersection of Roscoe Boulevard and the 405 Freeway SB off-ramps (intersection number 11) and on the intersection of Nordhoff Street and Van Nuys Boulevard (intersection number 2) would be avoided under this alternative. The Reduced Commercial Project Alternative would also be feasible and would attain the City's policy objectives by contributing a substantial number of housing units towards the City's critical housing needs, and by providing an appropriate density and mix of uses to create a transit-oriented development complementary with the City's and County's investments in transit infrastructure and operations for the area.

In addition, as the Revised Project is a reduced version of Alternative 5, the findings for Alternative 5 are also applicable to the Revised Project, as it would also result in lessened environmental impacts and would be feasible.

**ALTERNATIVE 1: NO PROJECT**

**Description of Alternative**

Under Alternative 1, the No Project Alternative, no new development would occur for the foreseeable future. The existing vacant commercial buildings, totaling approximately 172,500 square feet and surface parking areas, would remain.  The No Project Alternative assumes the development of the related projects.

**Impact Summary of Alternative**

The No Project Alternative (Alternative 1) would result in fewer impacts on the existing environment, because it would not include any new development and associated traffic, noise, air or GHG emissions, or demand for public services and utilities.  The Project would result in significant and unavoidable impacts to

CPC-2016-2118-VZC-0288

operational air quality and traffic.  Comparatively, the No Project Alternative would avoid these significant and unavoidable Project-related impacts because no new development would occur on the Project Site.

**Findings**

Alternative 1, No Project, would not cause environmental impacts, because the new impacts projected to occur from development of the Project would be avoided or reduced.  Therefore, this Alternative would be the environmentally superior alternative.  However, CEQA requires that if the environmentally superior alternative is the "no project" alternative, the EIR shall also identify an environmentally superior alternative from among the other alternatives (CEQA Guidelines, Section 15126.6[e][2]).  In addition, this Alternative would not satisfy any of the Project Objectives.  Pursuant to Public Resources Code Section 21081(a)(3), the City finds that the specific economic, legal, social, technological, or other considerations, including considerations identified in Section 8 of these Findings (Statement of Overriding Considerations), make Alternative 1, No Project Alternative, infeasible.

**Rationale for Findings**

Although the No Project Alternative would have fewer impacts than both the Original Project and Revised Project, it would not satisfy any of the Project Objectives.  In addition, this Alternative would not provide certain benefits associated with the Project, including the development of additional housing units, creation of new employment opportunities, enhancement of the property and community, or implementation of energy efficiency, energy conservation, or water quality measures.  Therefore, for the reasons stated above, this Alternative is infeasible and less desirable than the Project, and is rejected.

**Reference**

For a complete discussion of impacts associated with Alternative 1, please see Section VI pages VI-5 to VI-11 of the Draft EIR. In addition, a summary comparative matrix is provided in Table VI-36 on page III-24 of the Final EIR.

**ALTERNATIVE 2: REDUCED PROJECT**

**Description of Alternative**

Under Alternative 2, Reduced Project, the Project would be reduced by approximately 33 percent from the Original Project.  This would result in the construction of a mixed use project with approximately 283 multi-family residences totaling approximately 257,300 square feet of permitted floor area, and approximately 134,000 square feet of commercial space.  The residential units would be provided in two buildings up to five stories over one-to two levels of above ground parking facilities.  The commercial land uses would be provided in three separate one and two story buildings and a four-level parking structure for commercial uses.  The design and configuration of this alternative would be similar to the Project.  The main difference would be the total square footage and building height, resulting in a mixed-use development with approximately 67 percent of the mass of the Original Project.

**Impact Summary of Alternative**

The Original Project would result in significant and unavoidable impacts to operational air quality and traffic.  Comparatively, the Reduced Project Alternative would reduce, but not avoid these significant and unavoidable Project-related impacts.  Regional operational emissions of VOC would be reduced below the SCAQMD significance threshold.  However, regional NOx emissions would remain above the SCAQMD threshold.  As such, the significant and unavoidable impacts of the Alternative would be lower than the

CPC-2016-2118-VZC-0289

significant and unavoidable impacts of the Original Project. Under the Reduced Project Alternative, three of six significantly impacted intersections could be mitigated to less than significant under the "Future + Project cumulative 2020 condition". However, three intersections would remain significant and unavoidable after mitigation, compared to six intersections that would remain significant and unavoidable after mitigation under the Original Project. The significant and unavoidable impacts of the Alternative would be lower than the significant and unavoidable impacts of the Original Project.

The Revised Project would similarly result in significant and unavoidable impacts in regards to operational air quality and traffic. However, the Revised Project would not mitigate the significant VOC impact to less than significant levels like Alternative 2, and the Revised Project would result in one additional significant intersection impact as compared to Alternative 2. The significant and unavoidable impacts of Alternative 2 would be lower than the significant and unavoidable impacts of the Revised Project.

**Findings**

With this Alternative, the environmental impacts projected to occur would be generally less than those projected to occur from the Project. However, this Alternative would not maximize the development possibilities, or fully support regional goals for housing and transit-oriented development, or provide the critical mass and mix of uses necessary to successfully activate the area. Pursuant to Public Resources Code Section 21081(a)(3), the City finds that the specific economic, legal, social, technological, or other considerations, including considerations identified in Section 8 of these Findings (Statement of Overriding Considerations), make this Alternative, the Reduced Project Alternative, infeasible.

**Rationale for Findings**

The Reduced Project Alternative would have fewer impacts than the Original and Revised Projects and would mostly satisfy the Project Objectives, although to a lesser degree than the Original and Revised Projects. In regards to the City's planning goals and policies, this Alternative would not develop as much housing as the Original and Revised Projects in order to meet the City's critical housing needs. City policies also encourage a high density of uses in regional centers to maximize density on redevelopment sites located adjacent to transit opportunities, and General Plan Framework characterizes Regional Centers as having FARs typically ranging from 1:5:1 to 6:1 and building heights typically between six to twenty stories or higher. This Alternative would result in a 1:1 FAR and six story buildings, and would not maximize the development possibilities or provide the critical mass and mix of uses necessary to successfully activate the area. The Mission Hills – Panorama City – North Hills Community Plan also identifies the Panorama City Regional Center as a major development opportunity site, identifies the need to maximize development opportunities of the future transit system and to locate higher residential densities near commercial centers and major bus routes, and encourages mixed-use projects along transit corridors and pedestrian oriented districts. Alternative 2 would meet these objectives to some degree, but would not fully realize the Community Plan's objectives to maximize density and development on a key site within a commercial center and in proximity to transit opportunities. Furthermore, regarding social and other considerations, maximizing density of development on the Project Site to implement a mixed use project that can deliver the amount and type of commercial uses and variety of residential rental units is desired by the City to support both housing demand and future Metro transit improvements along the Van Nuys Boulevard corridor. The reduced density associated with Alternative 2 does not satisfy the Project's underlying purpose and key objectives to the same extent, providing less than 300 residential units within a nine-acre transit-oriented site, and conflicts with the City's planning goals and is undesirable from a policy standpoint. Therefore, for the reasons stated above, this Alternative is infeasible and less desirable than the Project, and is rejected.

CPC-2016-2118-VZC-0290

VESTING TENTATIVE TRACT MAP NO. 74315                                          PAGE   66

**Reference**

For a complete discussion of impacts associated with Alternative 2, please see Section VI pages VI-13 to VI-25 of the Draft EIR. In addition, a summary comparative matrix is provided in Table VI-36 on page III-24 of the Final EIR.

## ALTERNATIVE 3:  ALL COMMERCIAL PROJECT

**Description of Alternative**

Alternative 3, the All Commercial Project Alternative, would construct a shopping center with approximately 583,000 square feet of floor area. Parking spaces would be provided in a nine story parking structure. The proposed shopping center would feature a mix of retail land uses that would complement the nearby Panorama Mall shopping center to the east, across Tobias Avenue. The shopping center would be constructed in multiple buildings that would be up to three stories, and extend up to 60 feet high.

**Impact Summary of Alternative**

The Original Project would result in significant and unavoidable impacts to operational air quality and traffic. Comparatively, the All Commercial Project Alternative would not avoid these significant and unavoidable Project-related impacts, but would reduce impacts related to population, public services, and water usage. Regional operational emissions of VOC and NOx emissions would remain above the SCAQMD thresholds, and the total amount of these emissions would be higher than those of the Original Project. As such, the significant and unavoidable impacts of the Alternative would be greater than the significant and unavoidable impacts of the Original Project. Under the Reduced Project Alternative, two of eight significantly impacted intersections could be mitigated to less than significant under the "Future + Project cumulative 2020 condition". However, six intersections would remain significant and unavoidable after mitigation, the same as the six intersections that would remain significant and unavoidable under the Original Project. The significant and unavoidable impacts of the Alternative would be similar, but slightly higher, than the significant and unavoidable impacts of the Original Project. Comparatively, the All Commercial Project Alternative would also have similar but increased significant and unavoidable operational air quality and traffic impacts and increased less-than-significant impacts to operational noise, utilities (solid waste), and energy conservation.

The Revised Project would also result in significant and unavoidable impacts in regards to operational air quality and traffic. The Revised Project would similarly be unable to mitigate the significant VOC and NOx impacts to less than significant levels like Alternative 3, and the Revised Project would result in two fewer significant intersection impact as compared to Alternative 3. The significant and unavoidable impacts of the Revised Project would be less than the significant and unavoidable impacts of Alternative 3.

**Findings**

With this Alternative, the new environmental impacts projected to occur from development would be generally greater than those projected to occur from the Original and Revised Projects and would not meet the project objectives to the same degree as the Project. Pursuant to Public Resources Code Section 21081(a)(3), the City finds that the specific economic, legal, social, technological, or other considerations, including considerations identified in Section 8 of these Findings (Statement of Overriding Considerations), make Alternative 3, the All Commercial Project Alternative, infeasible.

CPC-2016-2118-VZC-0291

000078
ICON0000078

### Rationale for Findings

The All Commercial Project Alternative would meet the objectives of the Project related to fostering local economic development and job creation, and eliminating blight and enhancing the visual quality of Panorama City, but would not meet the objectives of the Project related to developing new housing to serve the community. Alternative 3 would only provide commercial uses, which would not provide the critical mass and mix of uses necessary to successfully activate the existing underutilized area. In regards to the City's planning goals and policies, the Mission Hills – Panorama City – North Hills Community Plan identifies the Panorama City Regional Center as a major development opportunity site, identifies the need to locate higher residential densities near commercial centers and major bus routes and encourages mixed-use projects along transit corridors and pedestrian oriented districts. As this Alternative does not propose any residential uses, it would not help respond to the unmet housing demand in both the Community Plan area and the City as a whole. Further, this Alternative would not maximize the potential mixed-use and transit-oriented development possibilities at the Project Site to the same extent as the Original Project. Alternative 3 does not fully satisfy the underlying purpose of the Project or its key objectives, and conflicts with the City's planning goals and is undesirable from a policy standpoint, as it relates to housing and the jobs/housing balance for development within a regional center transit corridor. Therefore, for the reasons stated above, this Alternative is infeasible and less desirable than the Project, and is rejected.

### Reference

For a complete discussion of impacts associated with Alternative 3, please see Section VI pages VI-27 to VI-39 of the Draft EIR. In addition, a summary comparative matrix is provided in Table VI-36 on page III-24 of the Final EIR.

## ALTERNATIVE 4:  BY-RIGHT PROJECT

### Description of Alternative

Under Alternative 4, the By-Right Project Alternative, the Project Site would be developed without a zone change. This would result in the construction of a mixed-use project with approximately 350 multi-family residences totaling approximately 259,600 square feet of floor area, and approximately 160,000 square feet of commercial space. To conform to the existing zoning requirements, the uses within the By-Right Project Alternative would be segregated. The residential units would be provided in an L-shaped building up at the northeastern portion of the Project Site. The seven-story residential building would front Tobias Avenue and would wrap around a two-story commercial building. Two additional smaller commercial buildings (one and two stories) would front Roscoe Boulevard. A surface parking lot would occupy the western and central portions of the Project Site.

Unlike the Project and Alternatives 2 and 3, Alternative 4 would not require a zone change. Rather, Alternative 4 would include a zone boundary adjustment as allowed under LAMC Section 12.30. Alternative 4 would also include a density bonus as allowed under LAMC Section 12.22-25(a), which would permit this alternative to have a floor-area-ratio of 3:1 in exchange for setting aside 11 percent (39 units) of the total residential units for Very Low Income residential units.

### Impact Summary of Alternative

The By-Right Project Alternative would have lower impacts than the Project. The Original Project would result in significant and unavoidable impacts to operational air quality and traffic. Comparatively, the By-Right Project Alternative would reduce, but not avoid, these significant and unavoidable Project-related impacts. Regional operational emissions of VOC would be reduced below the SCAQMD significance

CPC-2016-2118-VZC-0292

threshold.  However, regional NOx emissions would remain above the SCAQMD threshold.  As such, the significant and unavoidable impacts of the Alternative would be lower than the significant and unavoidable impacts of the Original Project.  Under the By-Right Project Alternative, four of six significantly impacted intersections could be mitigated to less than significant.  However, two intersections would remain significant and unavoidable after mitigation, compared to six intersections that would remain significant and unavoidable after mitigation under the Original Project and four intersections under the Revised Project.

The Revised Project would similarly result in significant and unavoidable impacts in regards to operational air quality and traffic. However, the Revised Project would not mitigate the significant VOC impact to less than significant levels like Alternative 4, and the Revised Project would result in two additional significant intersection impacts as compared to Alternative 4. The significant and unavoidable impacts of Alternative 4 would be lower than the significant and unavoidable impacts of the Revised Project.

**Findings**

With this Alternative, the new environmental impacts projected to occur from development of the Project would be generally less than those projected to occur from the Original and Revised Projects. However, this Alternative would not maximize the development possibilities, enhance the commercial appearance or viability of the property, or provide the critical mass and mix of uses to activate the area. Pursuant to Public Resources Code Section 21081(a)(3), the City finds that the specific economic, legal, social, technological, or other considerations, including considerations identified in Section 8 of these Findings (Statement of Overriding Considerations), make Alternative 4, the By-Right Project Alternative, infeasible.

**Rationale for Findings**

The By-Right Project Alternative would have lower impacts than the Project. However, the By-Right Project alternative would achieve the Project Objectives to a lesser degree than the Project, and would not satisfy specific sub-objectives. With respect to Objective 1, although the By-Right Project Alternative would replace vacant buildings and develop an unutilized site, it would retain an expansive surface parking lot on the Project Site, and provide fewer housing units than the Project.  In addition, this Alternative would not provide pedestrian and bicycle connectivity to the same degree as the Project. With respect to Objective 2, although the By-Right Alternative would create new jobs, it would not act as a catalyst and encourage investment in the commercial district, and pedestrian amenities because the majority of the site would still be a surface parking lot.  With respect to Objective 3, although the By-Right Project Alternative would provide a new development in an existing urban area, it would not enhance the identity and appearance of the district by designing an integrated and architecturally-unified mixed-use development compared to the integrated mix of uses, amenities, pedestrian orientation, and open space that would characterize the Project. In regards to the City's planning goals and policies, this Alternative would not develop as much housing as the Project in order to meet the City's critical housing needs.  City policies also encourage a high density of uses in regional centers to maximize density on redevelopment sites located adjacent to transit opportunities. This Alternative would not maximize the development possibilities or provide the critical mass and mix of uses necessary to successfully activate the area. The By-Right Alternative would not achieve the goals of the Citywide Design Guidelines or the Community Design Overlay District and would be less visually appealing because the majority of the site would continue to function as a surface parking lot. Furthermore, regarding social and other considerations, maximizing density of development on the Project Site to implement a mixed use project that can deliver the amount and type of commercial uses and variety of residential rental units is desired by the City to support both housing demand and future Metro transit improvements along the Van Nuys Boulevard corridor.  Alternative 4 does not fully satisfy the underlying purpose of the Project or its key objectives, and conflicts with the City's planning goals for housing and site planning, and is undesirable from a policy standpoint. Therefore, for the reasons stated above, this Alternative is infeasible and less desirable than the Project, and is rejected.

CPC-2016-2118-VZC-0293

000080

ICON0000080

VESTING TENTATIVE TRACT MAP NO. 74315

PAGE 69

**Reference**

For a complete discussion of impacts associated with Alternative 4, please see Section VI pages VI-41 to VI-56 of the Draft EIR. In addition, a summary comparative matrix is provided in Table VI-36 on page III-24 of the Final EIR.

## ALTERNATIVE 5: REDUCED COMMERCIAL PROJECT

### Description of Alternative

Partly in response to comments received on the Draft EIR, the City requested that the Project Applicant consider Alternative 5, the Reduced Commercial Project Alternative. Under this Alternative, the Project Site would be developed with less commercial floor area and more residences than under the Original Project. This would result in the construction of a mixed-use project with approximately 675 multi-family residences totaling approximately 615,000 square feet of floor area, and approximately 60,000 square feet of commercial space. The residential units would be developed along Cedros Avenue in the western, central, and northern portions of the Project Site. The commercial land uses would be developed in the southern (Roscoe Boulevard) and eastern (Tobias Avenue) portions of the Project Site. Parking would be provided in structures and a surface parking lot. An approximately 16,895-square-foot public plaza would be located along Tobias Avenue, which would function as a passive landscaped and hardscaped area for visitors and residents.

### Impact Summary of Alternative

The Reduced Commercial Project Alternative would have lower impacts than the Original Project. The Original Project would result in significant and unavoidable impacts to operational air quality and traffic. Comparatively, the Reduced Commercial Project Alternative would reduce, but not avoid, these significant and unavoidable Project-related impacts for VOCs and NOx. As such, the significant and unavoidable impacts of this alternative would be similar, but lower than the significant and unavoidable impacts of the Original Project. Under the Reduced Commercial Project Alternative, three of seven significantly impacted intersections could be mitigated to less than significant. However, four intersections would remain significant and unavoidable after mitigation, compared to the six impacted intersections resulting from the Original Project. The significant and unavoidable impacts of the Alternative would be lower than the significant and unavoidable impacts of the Original Project.

Since the Revise Project is a reduced version of Alternative 5, the Revised Project would also result in significant and unavoidable impacts in regards to operational air quality and traffic. The Revised Project would similarly be unable to mitigate the significant VOC and NOx impacts to less than significant levels like Alternative 5, and the Revised Project would result in the same significant intersection impacts as compared to Alternative 5. However, these significant and unavoidable impacts of the Revised Project would be slightly lessened than the significant and unavoidable impacts of Alternative 5, since the Revised Project provide 52 (eight percent) fewer residential units.

### Findings

With this Alternative, the new environmental impacts projected to occur from development would be generally less than those projected to occur from the Original Project. In addition, this Alternative would provide the same critical mass of uses necessary to activate the area, and would meet all of the Project Objectives to approximately the same extent as the Project. Pursuant to Public Resources Code Section 21081(a)(3), the City finds that the specific economic, legal, social, technological, or other considerations,

CPC-2016-2118-VZC-0294

**000081**

ICON0000081

including considerations identified in Section 8 of these Findings (Statement of Overriding Considerations), make Alternative 5, the Reduced Commercial Project Alternative, feasible.

The Revised Project is a slightly reduced version of Alternative 5, and therefore would similarly eliminate several significant impacts and reduce other impacts as compared to the Original Project.

**Rationale for Findings**

The Reduced Commercial Project Alternative would reduce, but not avoid, the significant and unavoidable Project-related impacts, resulting in two fewer intersection impacts. In addition, the Reduced Commercial Project alternative would achieve all the Project Objectives. With respect to Objective 1, the Reduced Commercial Project Alternative would replace vacant buildings and develop an unutilized site, and activate the commercial street frontages along Roscoe Boulevard and Tobias Avenue. The public plaza along Tobias Avenue would provide safe pedestrian connectivity between the Project Site and nearby commercial uses. In addition, this alternative would develop more housing than the Project or any of the other alternatives, in-line with the City's goals to provide housing to meet the area's critical housing needs. With respect to Objective 2, the Reduced Commercial Alternative would create new jobs and encourage investment in the commercial district. Although this alternative would provide less commercial space than the Project, it would similarly provide a balanced mix of land uses that would act as a catalyst and encourage investment in the commercial district. This alternative would also create a destination commercial center that includes a diversity of land uses and pedestrian amenities, such as the public plaza. With respect to Objective 3, the Reduced Commercial Project Alternative would provide a new development in an existing urban area, and it would enhance the identity and appearance of the district by designing an integrated and architecturally-unified mixed-use development with an integrated mix of uses, amenities, pedestrian orientation, and open space.

City policies also encourage a high density of uses in regional centers to maximize density on redevelopment sites located adjacent to transit opportunities, and General Plan Framework characterizes Regional Centers as having FARs typically ranging from 1:5:1 to 6:1 and building heights typically between six to twenty stories or higher. Alternative 5 would result in a 1.5:1 FAR and six story buildings, and would maximize the development possibilities and provide the critical mass and mix of uses necessary to successfully activate the area. The Mission Hills – Panorama City – North Hills Community Plan also identifies the Panorama City Regional Center as a major development opportunity site, identifies the need to maximize development opportunities of the future transit system and to locate higher residential densities near commercial centers and major bus routes, and encourages mixed-use projects along transit corridors and pedestrian oriented districts. Alternative 5 would meet these objectives to maximize density and development on a key site within a commercial center and in proximity to transit opportunities.

Furthermore, regarding social and other considerations, maximizing density of development on the Project Site to implement a mixed use project that can deliver the amount and type of commercial uses and variety of residential rental units is desired by the City to support both housing demand and future Metro transit improvements along the Van Nuys Boulevard corridor. Alternative 5 satisfies the underlying purpose of the Project and its key objectives, and supports the City's planning goals and is desirable from a policy standpoint. Therefore, for the reasons stated above, this Alternative (and therefore, the Revised Project) is feasible and less impactful than the Original Project.

The Revised Project is a slightly reduced version of Alternative 5 with a fewer number of residential units. As compared to Alternative 5, the Revised Project would include 52 fewer residential units, and the same commercial floor area. All impacts from the Revised Project are substantially similar to the impacts of Alternative 5 as described in the EIR. Thus, by approval of the Revised Project, the City is, in effect, adopting this Alternative.

CPC-2016-2118-VZC-0295

VESTING TENTATIVE TRACT MAP NO. 74315

PAGE  71

**Reference**

For a complete discussion of impacts associated with Alternative 5, please see Section III pages III-6 to III-23 of the Final EIR.  In addition, a summary comparative matrix is provided in Table VI-36 on page III-24 of the Final EIR.

## ENVIRONMENTALLY SUPERIOR ALTERNATIVE

Section 15126.6(e)(2) of the State CEQA Guidelines requires that an analysis of alternatives shall identify an environmentally superior alternative among the alternatives evaluated in an EIR and that, if the "no project" alternative is the environmentally superior alternative, the EIR shall also identify another environmentally superior alternative among the remaining alternatives.

In the EIR, Alternative 1, No Project, is considered to be the overall environmentally superior alterative because it would avoid nearly all of the impacts that would occur under the Project.  It should be noted that, although most impacts would be avoided, the beneficial aspects of the Project, such as upgrading the property, enhancing the community and the fulfillment of numerous regional and City plan and policy goals for the area would not occur.

Based on the analysis of alternatives in the EIR, Alternative 2, Reduced Project Alternative, is identified as the environmentally superior alternative.  The Reduced Commercial Project Alternative would have lower significant and unavoidable impacts than the Project with respect to traffic, including the elimination of the significant impact in terms of operational air quality VOCs, three fewer impacts to intersection capacity, and lower less-than-significant impacts than the Project with respect to noise, public services, utilities and energy. Additionally, the Reduced Project Alternative would mostly satisfy the objectives of the Project, although to a lesser degree than the Project.

However, this Alternative, and Alternatives 1, 3, and 4, would not satisfy the Project Objectives to the same degree as the Original Project.  In regards to the City's planning goals and policies, these Alternatives would not develop as much housing as the Project in order to meet the City's critical housing needs.  City policies also encourage a high density of uses in regional centers to maximize density on redevelopment sites located adjacent to transit opportunities. These Alternatives would not maximize the development possibilities or provide the critical mass and mix of uses necessary to successfully activate the area. Furthermore, regarding social and other considerations, maximizing density of development on the Project Site to implement a mixed use project that can deliver the amount and type of commercial uses and variety of residential rental units is desired by the City to support both housing demand and future Metro transit improvements along the Van Nuys Boulevard corridor. The reduced densities or housing associated with these alternatives does not satisfy the Project's underlying purpose and key objectives to the same extent, and conflicts with the City's planning goals and is undesirable from a policy standpoint. Therefore, these alternatives are rejected as infeasible.

However, Alternative 5 does substantially meet the Project's underlying purpose and objectives and is feasible from a policy standpoint. The Alternative would result in similar, but reduced, significant and unavoidable impacts in terms of operational VOCs and NOx, and two fewer intersection traffic impacts than the Original Project. In addition, it would lessen the less-than-significant impacts for greenhouse gas emissions, operational noise, operational vibration, water, and energy as compared to the Original Project. Importantly, the significant impact of the Original Project on the intersection of Roscoe Boulevard and the 405 Freeway SB off-ramps (intersection number 11) and on the intersection of Nordhoff Street and Van Nuys Boulevard (intersection number 2) would be avoided under this alternative.

CPC-2016-2118-VZC-0296

000083

ICON0000083

The Revised Project, which is a slightly reduced version of Alternative 5, with eight percent fewer residential units and the same amount of commercial floor area, would result in similar environmental impacts of Alternative 5. Therefore, the City finds that Alternative 5 is considered to be the feasible environmentally superior alternative and the City approves Alternative 5 as the Revised Project.

**Alternatives Analyzed in the Draft and Final EIR:**

To be comprehensive, the City restates its findings of infeasibility provided regarding each of the Alternative discussed above including Alternatives 1-4, which were analyzed in detail in the Draft EIR. In conclusion, the City rejects the alternatives above as being infeasible, due either to not meeting the project objectives, potentially generating greater impacts than would the project, not being economically feasible, and/or not reducing significant impacts associated with the project, and based on specific economic, legal, social, technological, or other considerations, including provision of employment opportunities for highly trained workers, that make infeasible the these project alternatives.

## 8.    STATEMENT OF OVERRIDING CONSIDERATIONS

The EIR identifies unavoidable significant impacts that would result from implementation of the project. Section 21081 of the California Public Resources Code and Section 15093(b) of the CEQA Guidelines provide that when a decision of a public agency allows the occurrence of significant impacts that are identified in the EIR, but are not at least substantially mitigated to an insignificant level or eliminated, the lead agency must state in writing the reasons to support its action based on the EIR and/or other information in the record. The State CEQA Guidelines require, pursuant to CEQA Guidelines Section 15093(b), that the decision-maker adopt a Statement of Overriding Considerations at the time of approval of a project if it finds that significant adverse environmental effects have been identified in the EIR that cannot be substantially mitigated to an insignificant level or be eliminated. These findings and the Statement of Overriding Considerations are based on the documents and materials that constitute the record of proceedings, including, but not limited to, the Final EIR and all technical appendices attached thereto.

Based on the analysis provided in the EIR, implementation of the Project would result in significant impacts that cannot be feasibly mitigated with respect to: Air Quality (VOC and NOx emissions which violate air quality standards and result in a cumulative increase in criteria pollutants) and Traffic and Transportation (cumulative operational traffic impacts that would conflict with the applicable measures of effectiveness for performance of the circulation system).

Accordingly, the City adopts the following Statement of Overriding Considerations. The City recognizes that significant and unavoidable impacts would result from implementation of the project. Having (i) adopted all feasible mitigation measures, (ii) rejected as infeasible the alternatives to the project discussed above, (iii) recognized all significant, unavoidable impacts, and (iv) balanced the benefits of the project against the project's significant and unavoidable impacts, the City hereby finds that each of the project's benefits, as listed below, outweigh and override the significant unavoidable impacts relating to construction noise and construction and operational traffic.

The below stated reasons summarize the benefits, goals and objectives of the Project, and provide the detailed rationale for the benefits of the Project. These overriding considerations of economic, social, aesthetic, and environmental benefits for the Project justify adoption of the Project and certification of the completed EIR. Each of the following overriding consideration separately and independently (i) outweighs the adverse environmental impacts of the Project, and (ii) justifies adoption of the Project and certification of the completed EIR. In particular, achieving the underlying purpose for the Project would be sufficient to override the significant environmental impacts of the Project.

CPC-2016-2118-VZC-0297

000084

ICON0000084

1.  **Site Redevelopment**. The Revised Project would substantially improve the existing conditions on the Project Site, by transforming vacant buildings and surface parking into a mixed-use complex, incorporating a pedestrian-friendly site and building design, providing a substantially improved streetscape, increasing onsite landscaping and open space areas, and enhancing the aesthetic and character of the Project Site. In this respect, the Project is an opportunity to implement a redevelopment project strategically positioned adjacent to transit opportunities and with direct synergy within a regional commercial center in the Panorama City Center of the City.

2.  **Supports City's Housing Goals.** The Revised Project will help respond to the City's critical housing deficiency, as well as the Mayor's housing goal to add 100,000 new residential units within the City by 2020, and further the goals of the City's Housing Element of its General Plan by adding 623 new housing units to the Project Site. The Project would include a range of unit types, ranging from studio to three-bedroom units, and would be able to accommodate a diversity of households.

3.  **Community-Serving Features**. The Revised Project will serve existing and new residents with a development that combines complementary uses, such as retail and residential uses, that are designed to serve residents, the surrounding neighborhood, visitors, and the larger community, and amenities such as an approximately 16,895-square-foot public plaza, new landscaped areas, and various streetscape improvements.

4.  **Smart Growth.** The Revised Project will support efforts to achieve local and regional sustainability and mobility goals by promoting and encouraging transit usage and the reduction of automobile trips through the incorporation of pedestrian pathways, transit linkages, ample bicycle parking and storage, a well-balanced mix of on-site amenities, and a Traffic Demand Management program to encourage more efficient and alternative modes of transportation. The Revised Project would also be in a transit-oriented area, one block from the Van Nuys Boulevard corridor, which has the highest north-south transit boardings in the San Fernando Valley, experiencing nearly 25,000 daily boardings on Metro buses, and within an area of high transit-dependency (35%).

5.  **Employment and Tax Revenue.** The Revised Project will create approximately 1,200 temporary construction jobs and 160 permanent jobs at the Project Site, and would provide economic benefits for the City as it would generate new public revenues, such as sales tax, property tax and business tax revenues.

## 9.     FINDINGS ON MITIGATION MONITORING PLAN

Pursuant to Section 15091 (a)(1) of the CEQA Guidelines, the City finds that implementation of the mitigation measures and project design features included in Section IV of the Final EIR would substantially lessen the significant environmental effects resulting from the Revised Project. These mitigation measures and project design features have been required in, or incorporated into the Project. In accordance with Section 15091(d) and Section 15097 of the CEQA Guidelines that require a public agency to adopt a program for reporting or monitoring required changes or conditions of approval to substantially lessen significant environmental effects, the Mitigation Monitoring Plan provided as Section IV of the Final EIR is hereby adopted as the mitigation monitoring plan for this Project.

CPC-2016-2118-VZC-0298

**10.    FINDINGS ON CHANGES TO THE DRAFT EIR AND RECIRCULATION**

**CHANGES TO THE DRAFT EIR**

During the Draft EIR public comment period, a letter was received from a representative of Primestor CFIC/CG, LLC ("Primestor") indicating that the Draft EIR's cumulative traffic impact analysis was deficient and did not address the expansion of the adjacent Panorama City Mall, located at 8401 N. Van Nuys Boulevard, as a related project. The letter from Primestor is included as Letter No. 7 in the Final EIR. The letter states that proposed expansion of the Panorama Mall would result in an additional 266,000 square feet of commercial land uses at a site adjacent to the Project. An application for the Panorama Mall expansion was received by the City on February 13, 2017, six months after the issuance of the Notice of Preparation for the ICON Project.

The Draft EIR adequately analyzed cumulative impacts based on assumptions of ambient growth rates and all other closely related past, present, and reasonably foreseeable probable future projects known at the time of the issuance of the NOP, the established baseline condition and environmental setting. The Panorama Mall expansion project had not yet been proposed at that time and was not reasonably foreseeable, and was therefore not included in the analysis. Moreover, CEQA permits a Lead Agency to set a reasonable cut-off date – typically at the issuance of the NOP – to determine baseline conditions and is not required to continuously update these conditions or a list of related projects.

Although not required to do so under CEQA, the City in its discretion decided to update the baseline to include the Panorama Mall expansion as a related project, based on the size, scope, and location of that project, to provide a more conservative cumulative impact analysis. The new information presented in the comment letter identified a significant change to the future environmental setting immediately adjacent to the Project Site and, therefore, the Lead Agency revisited its original analysis in order to incorporate this new information. An updated analysis found that with the inclusion of the Panorama Mall expansion as a related project, traffic generated by the Project, in conjunction with cumulative development in the area, would result in a new significant and unavoidable impact at the intersection of Roscoe Boulevard and the I-405 SB Ramps (intersection number 11) during the weekday afternoon peak hours. This new significant environmental impact was not previously identified in the Draft EIR, and therefore recirculation of the traffic analysis portion of the Draft EIR was required.

Pursuant to Section 15088.5 of the State CEQA Guidelines, a Revised Draft EIR was prepared to provide the public an opportunity to review and comment on the changes to the Project's traffic analysis based on the addition of the Panorama City Mall expansion as a related project. The revision was limited to the addition of the Panorama Mall expansion project to the related projects list (Related Project No. 20) and an update to the Draft EIR Section IV.K (Transportation/Traffic) of the Draft EIR. The inclusion of the Panorama Mall did not otherwise change the remainder of the conclusions of other impact areas of the Draft EIR (see Section IV, Revisions, Clarifications, and Corrections to the Draft EIR) in the Final EIR.

The Revised Draft EIR was circulated for public review from August 31 to October 16, 2017. The Final EIR was published on February 23, 2018 and includes responses to comments in Primestor's letter (Letter No. 7) regarding the Draft EIR, as well as all comment letters received on both the Draft EIR and the Revised Draft EIR, as specified in CEQA Guidelines Section 15088.5(f).

An Errata was completed on March 23, 2018 to make minor corrections to the Final EIR. The Errata included a correction to remove changes in the Final EIR identifying Alternative 5 as the Environmentally Superior Alternative, and that the original Draft EIR discussion of identifying Alternative 2 (Reduced Project Alternative) as the superior alternative should stand. The Errata also addressed the correction to the

CPC-2016-2118-VZC-0299

number of impacted intersections after migitation for Alternative 3 (All Commercial Alternative) under future cumulative conditions as three, rather than two, based on the inclusion of the Panorama Mall as a related project. The Errata further states that this information does not represent significant new information that would affect the analysis or conclusions presented in the Final EIR.

## FINDINGS REGARDING FINAL EIR

Pursuant to CEQA, on the basis of the review and consideration of the Final EIR, the City finds the following:

1. Factual corrections and minor changes have been set forth as clarifications and modifications to the Draft EIR;

2. The factual corrections and minor changes to the Draft EIR are not substantial changes in the Draft EIR that would deprive the public of a meaningful opportunity to comment on a substantial adverse environmental effect of the Project, a feasible way to mitigate or avoid such an effect, or a feasible project alternative;

3. The factual corrections and minor changes to the Draft EIR will not result in new significant environmental effects or substantially increase the severity of the previously identified significant effects disclosed in the Draft EIR;

4. The factual corrections and minor changes in the Draft EIR will not involve mitigation measures or alternatives that are considerably different from those analyzed in the Draft EIR that would substantially reduce one or more significant effect on the environment; and

5. The factual corrections and minor changes to the Draft EIR do not render the Draft EIR so fundamentally inadequate and conclusory in nature that meaningful public review and comment would be precluded.

Thus, none of the conditions set forth in CEQA requiring recirculation of a Draft EIR have been met, except as described above.  Incorporation of the factual corrections and minor changes to the Draft EIR into the Final EIR does not require the Final EIR to be circulated for public comment.

## 11.   OTHER CEQA CONSIDERATIONS

1. The City, acting through the Department of City Planning is the "Lead Agency" for the project, evaluated the EIR.  The City finds that the EIR was prepared in compliance with CEQA and the CEQA Guidelines. The City finds that it has independently reviewed and analyzed the EIR for the Project, that the Draft EIR and Revised Draft EIR, which were circulated for public review, reflected its independent judgment and that the Final EIR reflects the independent judgment of the City.

2. The EIR evaluated the following potential project and cumulative environmental impacts:  air quality, cultural resources, geology and soils, greenhouse gas emissions, hazards and hazardous materials, hydrology and water quality, land use and planning, noise, population and housing, public services, transportation/traffic, utilities and service systems, and energy conservation.  Additionally, the EIR considered Growth Inducing Impacts and Significant Irreversible Environmental Changes.   The significant environmental impacts of the project and the alternatives were identified in the EIR.

3. The City finds that the EIR provides objective information to assist the decision- makers and the public at large in their consideration of the environmental consequences of the Project.  The public review

CPC-2016-2118-VZC-0300

000087

ICON0000087

VESTING TENTATIVE TRACT MAP NO. 74315                                PAGE   76

period provided all interested jurisdictions, agencies, private organizations, and individuals the opportunity to submit comments regarding the Draft EIR and Revised Draft EIR. The Final EIR was prepared after the review period and responds to comments made during the public review periods.

4. Textual refinements and errata were compiled and presented to the decision-makers for review and consideration. The City staff has made every effort to notify the decision-makers and the interested public/agencies of each textual change in the various documents associated with project review. These textual refinements arose for a variety of reasons. First, it is inevitable that draft documents would contain errors and would require clarifications and corrections. Second, textual clarifications were necessitated in order to describe refinements suggested as part of the public participation process.

5. The Department of City Planning evaluated comments on environmental issues received from persons who reviewed the Draft EIR and Revised Draft EIR. In accordance with CEQA, the Department of City Planning prepared written responses describing the disposition of significant environmental issues raised. The Final EIR provides adequate, good faith and reasoned response to the comments. The Department of City Planning reviewed the comments received and responses thereto and has determined that neither the comments received nor the responses to such comments add significant new information regarding environmental impacts in the Draft EIR and Revised Draft EIR. The Lead Agency has based its actions on full appraisal of all viewpoints, including all comments received up to the date of adoption of these findings, concerning the environmental impacts identified and analyzed in the EIR.

6. The Final EIR documents changes to the Draft EIR and Revised Draft EIR. The Final EIR provides additional information that was not included in the Draft EIR and Revised Draft EIR. Having reviewed the information contained in the Draft EIR, Revised Draft EIR, and the Final EIR and in the administrative record, as well as the requirements of CEQA and the CEQA Guidelines regarding recirculation of Draft EIRs, the City finds that there are no new significant impacts, substantial increase in the severity of a previously disclosed impact, significant information in the record of proceedings or other criteria under CEQA that would require recirculation of the Draft EIR or Revised Draft EIR, or preparation of a supplemental or subsequent EIR.

Specifically, the City finds that:

a. The Responses To Comments contained in the Final EIR fully considered and responded to comments claiming that the project would have significant impacts or more severe impacts not disclosed in the Draft EIR and/or Revised Draft EIR and include substantial evidence that none of these comments provided substantial evidence that the project would result in changed circumstances, significant new information, considerably different mitigation measures, or new or more severe significant impacts than were discussed in the Draft EIR and/or Revised Draft EIR.

b. The City has thoroughly reviewed the public comments received regarding the Project and the Final EIR as it relates to the Project to determine whether under the requirements of CEQA, any of the public comments provide substantial evidence that would require recirculation of the EIR prior to its adoption and has determined that recirculation of the EIR is not required.

c. None of the information submitted after publication of the Final EIR, including testimony at and documents submitted for the public hearings on the Project, constitutes significant new information or otherwise requires preparation of a supplemental or subsequent EIR. The City does not find this information and testimony to be credible evidence of a significant impact, a

CPC-2016-2118-VZC-0301

substantial increase in the severity of an impact disclosed in the Final EIR, or a feasible mitigation measure or alternative not included in the Final EIR.

7.  The mitigation measures identified for the project were included in the Draft, Revised Draft, and Final EIRs. As revised, the final mitigation measures for the project are described in the Mitigation Monitoring Program (MMP). Each of the mitigation measures identified in the MMP is incorporated into the project. The City finds that the impacts of the project have been mitigated to the extent feasible by the mitigation measures identified in the MMP.

8.  CEQA requires the Lead Agency approving a project to adopt a MMP or the changes to the project which it has adopted or made a condition of project approval in order to ensure compliance with the mitigation measures during project implementation. The mitigation measures included in the EIR as certified by the City as adopted by the City serves that function. The MMP includes all of the mitigation measures and project design features adopted by the City in connection with the approval of the project and has been designed to ensure compliance with such measures during implementation of the project. In accordance with CEQA, the MMP provides the means to ensure that the mitigation measures are fully enforceable. In accordance with the requirements of Public Resources Code Section 21081.6, the City hereby adopts the MMP.

9.  In accordance with the requirements of Public Resources Section 21081.6, the City hereby adopts each of the mitigation measures expressly set forth herein as conditions of approval for the project.

10. The custodian of the documents or other material which constitute the record of proceedings upon which the City's decision is based is the City Department of City Planning.

11. The City finds and declares that substantial evidence for each and every finding made herein is contained in the EIR, which is incorporated herein by this reference, or is in the record of proceedings in the matter.

12. The City is certifying an EIR for, and is approving and adopting findings for, the entirety of the actions described in these Findings and in the EIR as comprising the project.

13. The EIR is a Project EIR for purposes of environmental analysis of the project. A Project EIR examines the environmental effects of a specific project. The EIR serves as the primary environmental compliance document for entitlement decisions regarding the Project by the City and other regulatory jurisdictions.

14. The City finds that none of the public comments to the Draft EIR, Revised Draft EIR, or subsequent public comments or other evidence in the record, including any changes in the project in response to input from the community and the Council Office, include or constitute substantial evidence that would require recirculation of the Final EIR prior to its certification and that there is no substantial evidence elsewhere in the record of proceedings that would require substantial revision of the Final EIR prior to its certification, and that the Final EIR need not be recirculated prior to its certification.

CPC-2016-2118-VZC-0302

**FINDINGS OF FACT (SUBDIVISION MAP ACT)**

In connection with the approval of Vesting Tentative Tract Map No. 74315 the Advisory Agency of the City of Los Angeles, pursuant to Sections 66473.1, 66474.60, .61 and .63 of the State of California Government Code (the Subdivision Map Act), makes the prescribed findings as follows:

(a) THE PROPOSED MAP IS CONSISTENT WITH APPLICABLE GENERAL AND SPECIFIC PLANS.

Section 66411 of the Subdivision Map Act (Map Act) establishes that local agencies regulate and control the design of subdivisions. Chapter 2, Article I, of the Map Act establishes the general provisions for tentative, final, and parcel maps. The Vesting Tentative Tract Map was prepared by a Registered Professional Engineer and contains the required components, dimensions, areas, notes, legal description, ownership, applicant and site address information as required by the Los Angeles Municipal Code ("LAMC"). The Vesting Tentative Tract Map has been filed to vacate the existing alley and for the subdivision of an approximately 8.9-acre (393,571 square foot) site into 6 lots (1 master lots and 5 airspace lots), in conjunction with the construction of a mixed-use building containing up to 623 dwelling units and a maximum of 60,000 square feet of commercial floor area.

The Los Angeles Municipal Code (LAMC) implements the goals, objectives, and policies of the Community Plan through adopted zoning regulations. The Zoning Code regulates, but is not limited to, the maximum permitted density, height, and the subdivision of land. The adopted Mission Hills - Panorama City - North Hills Community Plan does not address subdivision explicitly, however, the plan does provide for land designations with corresponding zones. The subject property is designated for Regional Commercial land uses corresponding to the CR, C2, C4, RAS3, RAS4, R3, R4, R5, P and PB zones. The concurrent Zone Change request to rezone the project site from [Q]C2-1-CDO and [Q]P-1-CDO to the (T)(Q)C2-1-CDO Zone for the entire site is consistent with the range of zones under the site's land use designation. The construction of the mixed-use development would be consistent with the land use designation of the site and the proposed zoning of the site.

The Vesting Tract Map for the proposed development of a mixed-use building would be allowable under the proposed zone and the existing land use designation, consistent with the General and Community Plans and the request is consistent with Article 7 (Division of Land Regulations) of the Los Angeles Municipal Code. The project site is not governed by a specific plan.

(b) THE DESIGN AND IMPROVEMENT OF THE PROPOSED SUBDIVISION ARE CONSISTENT WITH APPLICABLE GENERAL AND SPECIFIC PLANS.

Section 66418 of the Subdivision Map Act defines the term "design" as follows: "Design" means: (1) street alignments, grades and widths; (2) drainage and sanitary facilities and utilities, including alignments and grades thereof; (3) location and size of all required easements and rights-of-way; (4) fire roads and firebreaks; (5) lot size and configuration; (6) traffic access; (7) grading; (8) land to be dedicated for park or recreational purposes; and (9) such other specific physical requirements in the plan and configuration of the entire subdivision as may be necessary to ensure consistency with, or implementation of, the general plan or any applicable specific plan. Further, Section 66427 of the Subdivision Map Act expressly states that the "Design and location of buildings are not part of the map review process for condominium, community apartment or stock cooperative projects."

Section 17.05-C of the Los Angeles Municipal Code enumerates design standards for Subdivisions and requires that each Tentative Map be designed in conformance with the Street Design Standards and in conformance to the General Plan. Section 17.05-C, third paragraph, further establishes that density calculations include the areas for residential use and areas designated for public uses, except for land set aside for street purposes ("net area").

CPC-2016-2118-VZC-0303

ICON0000090

The design and layout of the map is consistent with the design standards established by the Subdivision Map Act and Division of Land Regulations of the Los Angeles Municipal Code. Several public agencies (including the Bureau of Engineering, Bureau of Sanitation, Bureau of Street Lighting, Department of Water and Power, Fire Department, Department of Building and Safety, and Department of Transportation, Department of Recreation and Parks) have reviewed the map and found the subdivision design satisfactory and have imposed improvement requirements and/or conditions of approval. Bureau of Engineering requires dedication and improvements to Roscoe Boulevard, Cedros Avenue, Tobias Street, and an alleyway in accordance with the Panorama City Center Streetscape Plan and the City's Street Standards. Sewers are available and have been inspected and deemed adequate in accommodating the proposed project's sewerage needs. Fire and traffic access, as well as site grading, have been reviewed and deemed appropriate. Additional traffic improvement or control measures for adjacent roadways and nearby intersections have been included for traffic and pedestrian safety.

The subdivision will be required to comply with all regulations pertaining to grading, building permits, and street improvement permit requirements. Conditions of Approval for the design and improvement of the subdivision are required to be performed prior to the recordation of the tentative map, building permit, grading permit, or certificate of occupancy.

Further, the Community Plan designates the property for Regional Commercial land uses, and the project includes a zone change to the corresponding C2 Zone. The proposed Regional Center Land Use Designation, including the proposed corresponding C2 Zone, permit commercial, mixed-use and residential development subject to a minimum lot area of 5,000 square feet. The project provides lot areas greater than the minimum.

Therefore, as conditioned, the design and improvement of the proposed subdivision is consistent with the intent and purpose of the applicable General Plan.

(c) THE SITE IS PHYSICALLY SUITABLE FOR THE PROPOSED TYPE OF DEVELOPMENT.

The project site is currently improved with three low-rise commercial buildings and surface parking lots. The project site is physically suitable for the proposed type of development. The site is relatively flat and is not located in a slope stability study area, high erosion hazard area, or Alquist-Priolo Fault Zone. According to a memo from the Department of Building and Safety, Grading Division, dated March 13, 2017, the property is located outside of a City of Los Angeles Hillside Area; is exempt or located outside of a State of California liquefaction, earthquake induced landslide, or fault-rupture hazard zone; and does not require any grading or construction of an engineered retaining structure to remove potential geologic hazards. The tract has been approved contingent upon approval from the Department of Building and Safety, Grading Division prior to the recordation of the map and issuance of any permits.

The site is not subject to the Specific Plan for the Management of Flood Hazards (floodways, floodplains, mud prone areas, coastal high-hazard and flood-related erosion hazard areas). The subject site is not otherwise located in a hazardous zone and does not contain any known hazards (i.e., toxic waste, very high fire hazard severity zone etc.). In addition, the environmental analysis conducted for the project found that the tract map and development of the project would not result in any significant impacts in terms of geological or seismic impacts, hazards and hazardous materials, and fire safety. Therefore, the project site is physically suitable for the proposed type of development.

(d) THE SITE IS PHYSICALLY SUITABLE FOR THE PROPOSED DENSITY OF DEVELOPMENT.

CPC-2016-2118-VZC-0304

VESTING TENTATIVE TRACT MAP NO. 74315                                    PAGE  80

The General Plan identifies, through its Community and Specific Plans, geographic locations where planned and anticipated densities are permitted. Zoning applying to the sites throughout the city, are allocated based on the type of land use, physical suitability and future population growth expected to occur. The proposed C2 Zone and Height District 1 applying to the subject site permits a maximum floor area ratio of 1.5:1 and a residential density of one dwelling unit per 400 square feet of lot area and an overall required minimum lot size is 5,000 square feet. The site contains 388,535 net square feet of land, and contingent upon the approval of Case No. CPC-2016-2118-VZC-MCUP-CU-SPR-CDO-DD, would be allowed a maximum floor area of 582,802 square feet and a residential density of 971 dwelling units. Therefore, the project's proposed density of up to 571,146 square feet of floor area and 623 dwelling units is consistent with the general provisions and area requirements of the Planning and Zoning Code.

Surrounding uses are within the R3, R4, C2, and P zones and are generally developed with multi-family residential uses, commercial uses, and surface parking lots. The subject site is a relatively flat, in-fill lot, in a substantially developed urban area with adequate infrastructure. The area is easily accessible via improved streets, highways and transit systems. The environmental review conducted by the Department of City Planning (Case No. ENV-2016-1061-EIR, SCH No. 2016081031), establishes that the physical characteristics of the site and the proposed density of development are generally consistent with existing development and urban character of the surrounding community. Therefore, the project site is physically suitable for the proposed density of development.

(e) THE DESIGN OF THE SUBDIVISION AND THE PROPOSED IMPROVEMENTS ARE NOT LIKELY TO CAUSE SUBSTANTIAL ENVIRONMENTAL DAMAGE OR SUBSTANTIALLY AND AVOIDABLY INJURE FISH OR WILDLIFE OR THEIR HABITAT.

The Project proposes an infill development within the highly-urbanized Regional Center of Panorama City in the City of Los Angeles. The Tract Map subdivision design includes one master lots and five airspace lots, resulting in a master lot over the entire project site, and then airspace lots to separate the residential, and commercial occupancies and shared facilities. Improvements include the development of two residential apartment buildings, two commercial buildings, a central plaza and shared fire lane, as well as improvements to adjacent streets and utility connections. The subdivision design and improvements and consistent with the existing urban development of the area. There are no habitat conservation plans or natural community conversation plans which presently govern any portion of the project site or vicinity. The environmental review for the Project concludes that the Project Site does not contain or support any known species identified as candidate, sensitive, or special status by local or regional plans, policies or regulations, or by the California Department of Fish and Game or U.S. Fish and Wildlife Service. Impacts upon biological resources were determined to result in no impact or would be less than significant and no mitigation measures are required. Therefore, the design of the subdivision would not cause substantial environmental damage or substantially and avoidably injure fish or wildlife or their habitat.

(f) THE DESIGN OF THE SUBDIVISION AND THE PROPOSED IMPROVEMENTS ARE NOT LIKELY TO CAUSE SERIOUS PUBLIC HEALTH PROBLEMS.

The proposed subdivision and subsequent improvements are subject to the provisions of the Los Angeles Municipal Code (e.g., the Fire Code, Planning and Zoning Code, Health and Safety Code) and the Building Code. Other health and safety related requirements as mandated by law would apply where applicable to ensure the public health and welfare (e.g., asbestos/lead abatement, seismic safety, flood hazard management).

The project is not located over a hazardous materials site or flood hazard area and is not located on unsuitable soil conditions. The project would not place any occupants or residents near a hazardous materials site or involve the use or transport of hazardous materials or substances.

CPC-2016-2118-VZC-0305

The development would be connected to the City's sanitary sewer system, where collected sewage is directed to sewer treatment plants, which have been upgraded to meet Statewide Ocean Discharge Standards. Additionally, an environment assessment consistent with the requirements of the California Environmental Quality Act (CEQA) was prepared for the proposed project, which indicates that no adverse impacts to the public health or safety would occur as a result of the design and improvement of the site. Therefore, the design of the subdivision and the proposed improvements are not likely to cause serious public health problems.

(g)   THE DESIGN OF THE SUBDIVISION AND THE PROPOSED IMPROVEMENTS WILL NOT CONFLICT WITH EASEMENTS ACQUIRED BY THE PUBLIC AT LARGE FOR ACCESS THROUGH OR USE OF PROPERTY WITHIN THE PROPOSED SUBDIVISION.

The property currently contains an existing north-south 20-foot wide public alleyway, which is intended to connect Chase Street from the north to Roscoe Boulevard to the south. However, the alley has been closed off to the public for several years, and currently outlets at the northern property boundary westward through onto an adjacent residential street, Cedros Avenue. As part of the tract map, the alleyway will be relocated to allow for access from Chase Street to the north, with an outlet eastward onto an adjacent commercial street (Tobias Avenue), connecting with Roscoe Boulevard at a signalized intersection. The Bureau of Engineering and the Department of Transportation have found the alley design sufficient to continue to provide adequate public access through and adjacent to the site.

Otherwise, there are no recorded instruments identifying easements encumbering the project site for the purpose of providing public access. The project site contains legally recorded lots identified by the Assessor Parcel Record. The site is surrounded by private and public properties that adjoin improved public streets and sidewalks designed and improved for the specific purpose of providing public access throughout the area. The project site does not adjoin or provide access to a public resource, natural habitat, Public Park or any officially recognized public recreation area. Therefore, the design of the subdivision and the proposed improvements would not conflict with easements acquired by the public at large for access through or use of property within the proposed subdivision.

(h)   THE DESIGN OF THE PROPOSED SUBDIVISION WILL PROVIDE, TO THE EXTENT FEASIBLE, FOR FUTURE PASSIVE OR NATURAL HEATING OR COOLING OPPORTUNITIES IN THE SUBDIVISION. (REF. SECTION 66473.1)

In assessing the feasibility of passive or natural heating or cooling opportunities in the proposed subdivision design, the applicant has prepared and submitted materials which consider the local climate, contours, configuration of the parcels to be subdivided and other design and improvement requirements.

Providing for passive or natural heating or cooling opportunities will not result in reducing allowable densities or the percentage of a lot which may be occupied by a building or structure under applicable planning and zoning in effect at the time the tentative map was filed. The lot layout of the subdivision has taken into consideration the maximizing of the north/south orientation. The topography of the site has been considered in the maximization of passive or natural heating and cooling opportunities.

In addition, prior to obtaining a building permit, the subdivider shall consider building construction techniques, such as overhanging eaves, location of windows, insulation, exhaust fans; planting of trees for shade purposes and the height of the buildings on the site in relation to adjacent development.

These findings shall apply to both the tentative and final maps for Vesting Tentative Tract Map No. 74315.

CPC-2016-2118-VZC-0306

000093

ICON0000093

VESTING TENTATIVE TRACT MAP NO. 74315                                    PAGE   82

VINCENT P. BERTONI, AICP
Advisory Agency

Heather Bleemers
Deputy Advisory Agency

HB:MZ:dn

Note:   If you wish to file an appeal, it must be filed within 10 calendar days from the decision date as noted in this letter. For an appeal to be valid to the City Planning Commission, it must be accepted as complete by the City Planning Department and appeal fees paid, prior to expiration of the above 10-day time limit.  Such appeal must be submitted on Master Appeal Form No. CP-7769 at the Department's Public Offices, located at:

Figueroa Plaza                              Marvin Braude San Fernando Valley
201 N. Figueroa St., 4th Floor              Development Service Center
Los Angeles, CA 90012                       6262 Van Nuys Blvd., Room 251
213 482-7077                                Van Nuys, CA 91401
                                            818 374-5050

West Los Angeles
Development Service Center
1828 Sawtelle Blvd., 2nd Floor
Los Angeles, CA 90025
310 231-2901

**Forms are also available on-line at http://planning.lacity.org.**

If you seek judicial review of any decision of the City pursuant to California Code of Civil Procedure Section 1094.5, the petition for writ of mandate pursuant to that section must be filed no later than the 90th day following the date on which the City's decision became final pursuant to California Code of Civil Procedure Section 1094.6.  There may be other time limits which also affect your ability to seek judicial review.

If you have any questions, please call Development Services Center staff at (213) 482-7077, (818) 374-5050, or (310) 231-2901.

CPC-2016-2118-VZC-0307

**000094**

ICON0000094