EXHIBIT 7

FILED
Superior Court of California
County of Los Angeles

JUL 30 2019

Sherri R. Carter, Executive Officer/Clerk
By _____ Jennifer Luna , Deputy

Southwest Regional Council of Carpenters,
et al. v. City of Los Angeles, et al.,
BS175189

Decision on (1) motion to augment record
granted; (2) petition for writ of mandate
granted

     Petitioners Southwest Regional Council of Carpenters and Laborers International Union of North America Local 300 seek a writ of mandate directing Respondents City of Los Angeles, Los Angeles City Council ("City Council"), and Department of City Planning ("Department") (collectively "City") to set aside the City's certification of an Environmental Impact Report ("EIR") along with the associated project approvals.

     The court has read and considered the moving papers, joint opposition, and reply, heard oral argument on July 16, 2019, and renders the following decision.

### A. Statement of the Case

     Petitioners commenced this proceeding on October 1, 2018.  The verified Petition states a single cause of action under the California Environmental Quality Act ("CEQA") and alleges in pertinent part as follows.

     On April 6, 2017, the City released a Draft EIR ("DEIR") for public review and comment describing a project including a 540,000 gross square foot mixed-use development ("Project") located on an 8.9-acre site in the Panorama City community of Los Angeles, California.  The Project described in the DEIR included the construction of seven buildings, with approximately 200,000 square feet of commercial area, 422 multi-family residential units, and parking for approximately 1,690 vehicles.  The commercial uses would be in five separate buildings and served by a six-level parking structure.  The Project would include a 1,200-seat multiplex cinema, restaurants, and other commercial uses.  The residences would be in two separate seven-story buildings.  The Project would require demotion of three existing vacant commercial buildings and associated parking areas currently at the Project site.

     Petitioners and others submitted extensive written comments on the DEIR which suggested additional feasible mitigation measures.  The comments raised issues not identified in the DEIR such as hazardous soil contamination and significant emissions of nitrogen oxides ("NOx").

     On August 31, 2017, the City issued a Revised Draft EIR ("RDEIR") to correct errors in the DEIR's traffic analysis.  The RDEIR was otherwise identical to the DEIR.  Petitioners again submitted extensive written comments on feasible mitigation measures and alternatives for the Project.

     The City issued the Final EIR (FEIR") on February 23, 2018.  The FEIR provided an identical description for the Project, but introduced a new alternative containing 675 residential units, which is more than 250 additional residential units than for any alternative considered in the previous environmental reports.  Petitioners submitted extensive comments which focused on the Project and its 422 residential units and 200,000 square feet of commercial space.

     On March 20, 2018, the City's Planning Department's Advisory Agency adopted a Project that was not described in any CEQA document ("Revised Project").  The Revised Project included 623 residential units and 60,000 square feet of commercial space.  The Revised Project was not

1

mentioned in any of the DEIR, RDEIR, and FEIR. None of the experts or public commenters were able to provide comments on the Revised Project because it had never been discussed in any CEQA document.

On March 29, 2018, Petitioners appealed the Advisory Agency's decision, pointing out that the Revised Project had not been previously mentioned and that therefore the project description was legally inadequate. The City stated that it would not respond to any comments on the Revised Project or FEIR.

On April 26, 2018, the City Planning Commission ("CPC") certified the FEIR and approved the Revised Project.

Petitioners appealed to the City Council. On August 29, 2018, the City Council held a hearing to consider the FEIR, as well as Petitioners' appeal of the CPC's approval of the Revised Project. The City Council certified the FEIR and approved the Revised Project without the opportunity for public comment.

Petitioners argue that the City prejudicially abused its discretion and failed to comply with the requirements of CEQA by relying on the FEIR's flawed analysis and inadequate project description and approving the Revised Project and certifying the FEIR.

## B. Standard of Review

A party may seek to set aside an agency decision for failure to comply with CEQA by petitioning for either a writ of administrative mandamus (CCP §1094.5) or of traditional mandamus. CCP §1085. A petition for administrative mandamus is appropriate when the party seeks review of a "determination, finding, or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of noncompliance with [CEQA]." Public Resources ("Pub. Res.") Code §21168. This is generally referred to as an "adjudicatory" or "quasi-judicial" decision. Western States Petroleum Assn. v. Superior Court, ("Western States") (1995) 9 Cal.4th 559, 566-67. A petition for traditional mandamus is appropriate in all other actions "to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with [CEQA]." Where an agency is exercising a quasi-legislative function, it is properly viewed as a petition for traditional mandamus. Id. at 567; Pub. Res. Code §21168.5.

At issue is Petitioners' CEQA challenge to the City's quasi-adjudicative action to approve Revised Project's entitlements and certifying the FEIR. This procedural setting, where a hearing was required, is governed by administrative mandamus. The City also acted in a quasi-legislative capacity in approving the Revised Project's entitlements of zone change and tract map, which is governed by traditional mandamus. In determining whether to grant a petition for either procedure in a CEQA case, the court decides whether there was a prejudicial abuse of discretion. Public entities abuse their discretion if their actions or decisions do not substantially comply with the requirements of CEQA. Sierra Club v. West Side Irrigation District, (2005) 128 Cal.App.4th 690, 698. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence. Western States, supra, 9 Cal.4th at 568; Pub. Res. Code §21168.5.

The court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts. Vineyard Area

2

Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, ("Vineyard") (2007) 40 Cal.4th 412, 435.  Challenges to an agency's failure to proceed in the manner required by CEQA, such as an EIR's failure to address a required subject or to disclose information about a project's environmental effects, are subject to a less deferential standard than challenges to an agency's substantive factual conclusions.  Id. at 435.  In reviewing these claims, the court must "determine *de novo* whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements'."  Id; Sierra Club v. County of Fresno, ("Sierra Club") (2018) 6 Cal.5th 502, 512.  Whether an issue is procedural or factual "is not always clear".  Id. at 513.  Clear-cut procedural issues—such as whether "the agency provide[d] sufficient notice and opportunity to comment on a draft EIR" and whether "the agency omit[ted] the required discussion of alternatives"—are reviewed *de novo* and "courts will invalidate an EIR that fails to meet them." Id. at 512.

Greater deference is accorded to factual findings under the substantial evidence standard of review.  Id. At 512.  "Substantial evidence" is defined as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.  Guidelines[1] §15384(a).  A court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument."' Sierra Club, *supra*, 6 Cal.5th at 512.  When reviewing factual determinations—such as the decision to use a particular methodology and reject another—substantial evidence review is appropriate.  Id. at 514.

Whether substantial evidence exists is a question of law.  *See* California School Employees Association v. DMV, (1988) 203 Cal.App.3d 634, 644.  Argument, speculation, and unsubstantiated opinion or narrative will not suffice.  Guidelines, 15384(a), (b).  An EIR may not be overturned simply because the record reveals a "disagreement among experts."  Cadiz Land Co. v. Rail Cycle, (2000) 83 Cal.App.4th 74, 97.  A petitioner must describe the evidence favorable to the agency and show why it is lacking.  "Failure to do so is fatal."  Defend the Bay v. City of Irvine, (2004) 119 Cal.App.4th 1261, 1266.  If the record contains any substantial evidence supporting the agency's decision, the decision must be upheld.  Banning Ranch Conservancy v. City of Newport Beach, (2012) 211 Cal.App.4th 1209, 1230.

The court also may have to determine "whether an EIR's discussion of environmental impacts is adequate, that is, whether the discussion sufficiently performs the function of facilitating 'informed agency decisionmaking and informed public participation.'"  Id. at 513 (citation omitted).  "[T]he adequacy of an EIR's discussion of environmental impacts is an issue distinct from the extent to which an agency is correct in its determination whether the impacts are significant." Id. at 514.  Where the issue is the adequacy of an EIR's discussion of a potentially significant impact, "[t]he ultimate inquiry . . . is whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and consider meaningfully the issues raised by the proposed project.'" Id. at 516 (citation omitted).

---

[1]As an aid to carrying out the statute, the State Resources Agency has issued regulations called "Guidelines for the California Environmental Quality Act" ("Guidelines"), contained in Code of Regulations, Title 14, Division 6, Chapter 3, beginning at section 15000.

3

This "ultimate inquiry" on the adequacy of an EIR's discussion is generally a mixed question of law and fact. The court must engage in *de novo* review to determine "whether the EIR serves its purpose as an informational document." Id. at 516. This is an issue of law and no deference is given to the agency's determination." Washoe Meadows Community v. Department of Parks and Recreation, ("Washoe") (2017) 17 Cal.App.5th 277, 286.  However, "to the extent factual questions (such as the agency's decision which methodologies to employ for analyzing an environmental effect) predominate, a substantial evidence standard of review will apply." South of Market Community Action Network v. City and County of San Francisco, ("SoMa") (2019) 33 Cal.App.5th 321, 332. "[I]n reviewing an EIR's discussion, [courts] do not require technical perfection or scientific certainty." Sierra Club, *supra*, 6 Cal.5th at 515. The "overriding issue on review is thus whether the lead agency reasonably and in good faith discussed a project in detail sufficient to enable the public to discern from the EIR the analytic route the . . . agency traveled from evidence to action." SoMa, *supra*, 33 Cal.App.5th at 331 (citation omitted).

## C. Governing Law
### 1. CEQA

The purpose of CEQA, (Pub. Res. Code §21000 *et seq.*), is to maintain a quality environment for the people of California both now and in the future. Pub. Res. Code § 21000(a). "[T]he overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing environmental damage." Save Our Peninsula Committee v. Monterey County Board of Supervisors, (2001) 87 Cal.App.4th 99, 117. CEQA must be interpreted "so as to afford the fullest, broadest protection to the environment within reasonable scope of the statutory language." Friends of Mammoth v. Board of Supervisors, (1972) 8 Cal.3d 247, 259.

The Legislature chose to accomplish its environmental goals through public environmental review processes designed to assist agencies in identifying and disclosing both environmental effects and feasible alternatives and mitigations. Pub. Res. Code §21002. Public agencies must regulate both public and private projects so that "major consideration is given to preventing environmental damage, while providing a decent home and satisfying living environment for every Californian." Pub. Res. Code §21000(g).

Under CEQA, a "project" is defined as any activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment (1) undertaken directly by any public agency, (2) supported through contracts, grants, subsidies, loans or other public assistance, or (3) involving the issuance of a lease, permit, license, certificate, or other entitlement for use by a public agency. Pub. Res. Code §21065. The word "may" in this context means a reasonable possibility. Citizen Action to Serve All Students v. Thornley, (1990) 222 Cal.App.3d 748, 753. "Environment" means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, and objects of historic or aesthetic significance. Guidelines §15060.5.

An EIR must be prepared for a project if the agency concludes that "there is substantial evidence, in light of the whole record... that the project may have a significant effect on the environment." Pub. Res. Code §21080(d). The EIR is the "heart" of CEQA, providing agencies with in-depth review of projects with potentially significant environmental effects. Laurel Heights, *supra*, 6 Cal.4th at 1123. An EIR describes the project and its environmental setting,

identifies the potential environmental impacts of the project, and identifies and analyzes mitigation measures and alternatives that may reduce significant environmental impacts. Id. Using the EIR's objective analysis, agencies "shall mitigate or avoid the significant effects on the environment... whenever it is feasible to do so. Pub. Res. Code §21002.1. The EIR serves to "demonstrate to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its actions." No Oil, Inc. v. City of Los Angeles, (1974) 13 Cal.3d 68, 86. It is not required to be perfect, merely that it be a good faith effort at full disclosure. Kings County Farm Bureau v. City of Hanford, (1990) 221 Cal.App.3d 692, 711-12. A reviewing court passes only on its sufficiency as an informational document and not the correctness of its environmental conclusions. Laurel Heights, supra, 47 Cal.3d at 392.

All EIRs must cover the same general content. Guidelines §§ 15120-32. An EIR should be prepared with a sufficient degree of analysis to provide decision-makers with information which enables them to make a decision which intelligently takes account of environmental consequences. The environmental effects need not be exhaustively reviewed, but the EIR's sufficiency is viewed in the light of what is reasonably feasible. Guidelines §15151. The level of specificity of an EIR is determined by the nature of the project and the "rule of reason." Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners, (1993) 18 Cal.App.4th 729, 741-42. The degree of specificity "will correspond to the degree of specificity involved in the underlying activity which is described in the EIR." Guidelines §15146. The ultimate decision whether to approve a project is a nullity if based upon an EIR that does not provide decision-makers, and the public, with the information about the project required by CEQA. Santiago County Water District v. County of Orange, (1981) 118 Cal.App.3d 818, 829.

If a local agency's non-elected body certifies an EIR, that certification may be appealed to the local agency's elected decision-making body, if any. Pub. Res. Code §21151(c).

### 2. City's Regulatory Framework

The City is a charter city. The City's Department of City Planning ("Planning Department") shall have and exercise all powers and duties provided for it by the Charter or by ordinance. City Charter §550. The Planning Department's planning commissions possess the power to hear and determine applications for, or appeals related to conditional use permits and other similar quasi-judicial approvals, in accordance with procedures prescribed by ordinance. City Charter §552(c).

Any development project which creates an increase of 50,000 gross square feet or more of non-residential floor area must obtain site plan approval from the director of the Planning Department ("director") or his/her designee. LAMC §160.05(C)(1)(a); §160.05(G)(1)-(2). As part of the application for site plan review, the project applicant must file necessary forms and information for environmental review as prescribed by the director. LAMC §160.05(G)(2). Appeals from the director's site plan determinations are heard by the CPC. LAMC 160.05(H)(1)-(2).

Any development project which divides land into two, three, or four parcels must submit a parcel map approved by the Planning Department's Advisory Agency. LAMC §17.50(B). Appeals of the Advisory Agency's parcel map decisions are also heard and determined by the CPC. LAMC §§ 21.17.02, 17.54(A).

No additional appeal to the City Council is permitted from the CPC's decision on site plan

5

approval and parcel map entitlements.  The City also has no specific procedure for appeal of an EIR and follows CEQA statutory law.  *See* Pub. Res. Code §21151(c).

### C. Motion to Augment Record
### 1. Applicable Law

For cases arising under CEQA, the contents of the administrative record is governed by Pub. Res. Code section 21167.6(e) ("section 21167.6"):

(e) The record of proceedings shall include, but is not limited to, all of the following items:

(1) All project application materials.

(2) All staff reports and related documents prepared by the respondent public agency with respect to its compliance with the substantive and procedural requirements of this division and with respect to the action on the project.

(3) All staff reports and related documents prepared by the respondent public agency and written testimony or documents submitted by any person relevant to any findings or statement of overriding considerations adopted by the respondent agency pursuant to this division.

(4) Any transcript or minutes of the proceedings at which the decisionmaking body of the respondent public agency heard testimony on, or considered any environmental document on, the project, and any transcript or minutes of proceedings before any advisory body to the respondent public agency that were presented to the decisionmaking body prior to action on the environmental documents or on the project.

(5) All notices issued by the respondent public agency to comply with this division or with any other law governing the processing and approval of the project.

(6) All written comments received in response to, or in connection with, environmental documents prepared for the project, including responses to the notice of preparation.

(7) All written evidence or correspondence submitted to, or transferred from, the respondent public agency with respect to compliance with this division or with respect to the project.

(8) Any proposed decisions or findings submitted to the decisionmaking body of the respondent public agency by its staff, or the project proponent, project opponents, or other persons.

(9) The documentation of the final public agency decision, including the final environmental impact report, mitigated negative declaration, or negative declaration, and all documents, in addition to those referenced in paragraph (3), cited or relied on in the findings or in a statement of overriding considerations adopted pursuant to this division.

(10) Any other written materials relevant to the respondent public agency's compliance with this division or to its decision on the merits of the project, including the initial study, any drafts of any environmental document, or portions thereof, that have been released for public review, and copies of studies or other

6

documents relied upon in any environmental document prepared for the project and either made available to the public during the public review period or included in the respondent public agency's files on the project, and all internal agency communications, including staff notes and memoranda related to the project or to compliance with this division.

(11) The full written record before any inferior administrative decisionmaking body whose decision was appealed to a superior administrative decisionmaking body prior to the filing of litigation.

Section 21167.6(e) "contemplates that the administrative record will include pretty much everything that ever came near a proposed development or to the agency's compliance with CEQA in responding to that document." County of Orange v. Superior Court, (2003) 113 Cal.App.4th 1, 8.

Extrinsic evidence is generally not admissible for quasi-adjudicatory administrative mandamus challenging a permit; review is confined to the record. Western States, *supra*, 9 Cal.4th at 573. Evidence outside the record may be considered at trial only if it (1) could not with reasonable diligence have been presented at the administrative hearing, or (2) was improperly excluded at the hearing. CCP §1094.5(e); Transcentury Properties, Inc. v. State of California, (19745) 41 Cal.App.3d 835, 842.

The trial court makes determinations of the completeness of the administrative record. Madera Oversight Coalition, Inc. v. County of Madera, (2011) 199 Cal.App.4th 48, 63, *disapproved on other grnds.*, Neighbors for Smart Rail v. Exposition Metro Line Construction Authority, (2013) 57 Cal.4th 439. Specifically, the trial court resolves disputes between the parties over what should be included in, or excluded from, the administrative record. Ibid.

Section 21167.6(e) is not an abrogation of the attorney-client privilege or work product privilege, and those privileges are still applicable. California Oak Foundation v. County of Tehama, (2009) 174 Cal.App.4th 1217, 1221. The party claiming the attorney-client privilege, or the attorney work-product doctrine, has the burden of establishing the preliminary facts necessary to show that the privilege applies. Citizens for Ceres v. Superior Court, ("Ceres") (2013) 217 Cal.App.4th 889, 911. This preliminary showing is normally made through declarations. Ibid.

## 2. Analysis

Petitioners seek to augment the administrative record with relevant pages from the City's "L.A. CEQA Thresholds Guide" ("CEQA Thresholds"). Mot. at 2; Drury Decl. Ex. A. The City does not oppose.

Section 21167(e)(10) provides for inclusion in the record of (1) written materials relevant to the agency's compliance with CEQA or its decision on the merits of the project that have been released for public review, and (2) other documents relied upon in any environmental document prepared for the project and either made available during the public review period or included in the agency's files for the project.

Petitioners argue that the CEQA Thresholds properly should be part of the Administrative Record. Petitioners assert that the CEQA Thresholds is judicially noticeable as an official act of a government agency (Evid. Code §452(c)), and the document is relevant because the FEIR heavily relied on and cited it. Mot. at 2.

7

Petitioners are correct.  The City relied on its CEQA Thresholds in the FEIR.  AR 476.
The CEQA Thresholds is relevant to the City's decision as a guide governing the application of
CEQA in the City, and it is properly subject to judicial notice.

The motion to augment the record is granted.

### D. Statement of Facts[2]
#### 1. Project Description

Real Party-in-Interest The Icon at Panorama, LLC ("Icon") is the Project applicant.  AR
427.

On August 9, 2016, the City issued a Notice of Preparation for the Project EIR and held a
scoping meeting shortly thereafter.  AR 4017.

On April 6, 2017, the City released the Project DEIR for a 46-day public review and
comment period.  AR 4277.  The Project is located on an 8.9-acre site located at 14651-14697 W.
Roscoe Blvd., 8313-8413 N. Tobias Ave., in the City's Panorama City community ("Project site").
AR 374.  A Montgomery Ward store, an automobile repair shop, and a restaurant formerly
occupied the Project site's existing three commercial structures.  They have been unoccupied since
2003, and a chain-link fence surrounds the Project site.  AR 432.  A mix of residential, retail, office
and restaurant uses surround the location.  AR 458.

The DEIR described the Project as the demolition of three buildings totaling 172,500
square feet and associated parking area and the construction of seven buildings with 200,000
square feet of commercial space and 422 multi-family residential units, with parking for 1690
vehicles and 858 bicycles.  AR 374.  The commercial uses would be in five one- and two-story
buildings on the eastern and southern portions of the property with a separate six-level parking
structure in the center of the property.  AR 374.  The commercial uses would include a 1,200-seat
multiplex cinema and restaurants.  AR 435.  The residential units would be in two separate seven-
story buildings on the western and northern parts of the Project site with two levels of above-
ground parking.  AR 374.

The DEIR stated that the Project would result in significant unavoidable environmental
impacts relative to air quality (operation daily emissions for volatile organic compounds ("VOCs")
and NOx) and traffic.  AR 819.

The DEIR included four Project alternatives, all of which were smaller than the proposed
Project: (a) Alternative 1 (the No Project alternative) included no residential or commercial

---

[2] In reply, Petitioners request judicial notice of (1) pages 22, 620, and 621 from a DEIR for
a project prepared by the San Francisco Planning Department and dated October 15, 2014 (Ex. 1),
(2) Page RTC-12 from the Final Responses to Comments on the same DEIR prepared by the San
Francisco Planning Department, dated August 13, 2015 (Ex. 2), and (3) Pages 7-14 from a FEIR
for a project prepared by the City of Riverside, dated June 2019.

A DEIR is not subject to judicial notice.  The court need not decide whether a FEIR ever
may be subject to judicial notice because the joint opposition correctly argues (a) these exhibits
are inadmissible extra-record evidence and therefore are irrelevant, (b) the contents of the exhibits
cannot be relied upon for the truth of the studies and expert opinions contained in them, and (c)
their inclusion without notice violates the parties' November 8, 2018 stipulation and order.  The
requests are denied.

8

development (AR 826); (b) Alternative 2 (the Reduced Project alternative) included 283 residential units (AR 835); (c) Alternative 3 (the All Commercial Project) included no residential units (AR 849); and (d) Alternative 4 (the By-Right Project) included 350 residential units.  AR 863.

### 2. Public Comments

Petitioners submitted written comments on the DEIR which analyzed the Project and suggested additional feasible mitigation measures.  AR 4494-517.

#### a. SWAPE

Petitioners attached an analysis from their expert consultant, Soil Water Air Protection Enterprise ("SWAPE").  AR 4519-51.  SWAPE opined in part that the DEIR failed to identify health risks to construction workers, neighbors, and groundwater from soil contamination on the Project site from decades of industrial use as an automotive repair facility.  AR 4521-22.  SWAPE identified likely contamination of the Project site from polychlorinated biphenyls ("PCBs"), a probable human carcinogen.  AR 4522.

SWAPE also opined that the DEIR failed to properly calculate the Project's air quality impacts from significant emissions of NOx, due in part to the modeling estimate's use of an incorrect square footage for the residential use and movie theater.  AR 4522-27.  SWAPE calculated that, contrary to the DEIR's conclusions, the Project would have NOx emissions during the construction phase exceeding the South Coast Air Quality Management District's ("SCAQMD") CEQA significance thresholds.  AR 4526-27.  SWAPE additionally concluded that the DEIR failed to implement all feasible mitigation measures to reduce operational air emissions.  AR 4529-30.

SWAPE further concluded that the DEIR failed to include a health risk assessment ("HRA") from diesel particulate matter ("DPM") during Project construction and operation.  AR 4530-36.  Using the methodology required by the California Office of Environmental Health Hazard Assessment ("OEHHA") and SCAQMD, SWAPE calculated that the Project's construction would create a cancer risk from DPM exposure of 308 persons per million – 30 times above the CEQA significance threshold of 10 per million.  AR 4536.  SWAPE opined that the DEIR failed entirely to analyze this impact and therefore failed to adopt feasible mitigation measures to reduce it.  AR 4536.

SWAPE finally concluded that the Project would have significant greenhouse gas ("GHG") emissions, contrary to the conclusions of the DEIR.  AR 4545.  SWAPE suggested additional mitigation measures to reduce VOC, NOx, and GHG emissions such as the implementation of diesel control measures, limiting construction equipment idling, and replacing or retrofitting engines in older construction vehicles.  AR 4537-39.

#### b. Smith

Petitioners also submitted comments on traffic impacts from Traffic Engineer Daniel T. Smith, PE, ("Smith") who concluded that the Project would severely impact traffic at the intersection of Roscoe and Woodman streets, slowing traffic to the lowest possible Level of Service (F).  AR 4706.  Smith concluded that the City should approve the environmentally preferred alternative, Alternative 2.  AR 4705.

9

### 3. The RDEIR

On August 31, 2017, based on comments received during the DEIR comment period, the City issued the RDEIR for another 46-day comment period. AR 2551-613, 4711. The RDEIR's stated purpose was to further inform decisionmakers and the general public of the Project's potential transportation and traffic impacts based on new significant information received since the DEIR's issuance. AR 2556.

The project description in the RDEIR was identical to that in the DEIR, as pertinent including 422 residential units, 200,000 square feet of commercial space, and a 1,200-seat multiplex theater. AR 2557-58. The RDEIR did not add any alternative projects. The RDEIR's traffic analysis noted that the Project would significantly impact seven intersections. AR 2609. The mitigation measures included roadway improvements and the installation of a new traffic signal. AR 2608-09. The RDEIR stated that the mitigation measures would reduce the traffic impact to less than significant levels for one of the seven intersections, but significant traffic impacts would remain at the other six intersections. AR 2610.

Petitioners again submitted a traffic comment from Smith, who stated that the RDEIR significantly underestimated the traffic that would be generated by the Project and failed to impose feasible mitigation measures and alternatives. AR 4903-06. Smith opined that the RDEIR underestimated Project traffic by approximately 2,000 trips per day and made unreasonable assumptions that the Project would achieve maximum traffic reductions. AR 4902-05. Smith concluded that that the Project's numerous significant and unavoidable traffic impacts would be more extensive and severe than the RDEIR disclosed. AR 4906. Smith again recommended approval of Alternative 2, the environmentally preferred alternative. AR 4906.

Petitioners submitted another comment from SWAPE which concluded that, due to the RDEIR's underestimation of Project traffic, it also underestimated the air pollution impacts from Project traffic. AR 4917. SWAPE opined that the RDEIR's methodology for analyzing the traffic impacts was flawed. AR 4912. SWAPE concluded that an updated traffic impact analysis must be prepared to adequately evaluate the Project's traffic-related impacts using a correct estimation of the number of daily vehicle trips that will occur during Project operation. AR 4917.

### 4. The FEIR

On February 23, 2018, the City issued the FEIR. AR 2949-3201. The project description was unchanged, again stating that there would be 200,000 square feet of commercial space and 422 residential units. AR 2951. The FEIR included an additional alternative, Alternative 5 (Reduced Commercial Project). AR 3170. Alternative 5 would be a project with a smaller commercial floor area (60,000 square feet, removing the movie theater and a grocery store), more residences (approximately 675 residences), and 1200 parking spaces (940 spaces for residential use and 260 spaces for commercial use). AR 3170-90. The FEIR's analysis of Alternative 5 stated that it would reduce traffic impacts by reducing the number of significant and unavoidable traffic impacts from six to four intersections through a reduction of the number of jobs and job-related trips. AR 3489. *See* AR 3636 3714, 5474-75.

Petitioners submitted another comment letter which included Smith's opinion that the Project would generate 5,233 vehicle trips per day rather than the 3,416 trips per day forth in the FEIR. AR 5147. Smith concluded that the FEIR failed to adopt a fair share funding traffic mitigation impact proposed by CalTrans and improperly deferred traffic impacts mitigation in a

10

Transportation Demand Management Plan ("Transportation Plan").  AR 5147.  Smith further opined that the FEIR failed to adopt the environmentally superior alternative which would dramatically reduce traffic impacts and which it was legally required to adopt. AR 5151, 5153.

Petitioners' letter also argued that the Project would have significant impacts on public services such as the fire department, sewers, and schools, and that the FEIR proposed an unlawful mitigation for the school impacts.  AR 5147-49.  Finally, Petitioners argued that the FEIR failed to respond adequately to SWAPE's comments on the Project's significant air quality and GHG impacts and on the failure to adopt feasible mitigation measures that have been imposed on similar projects. AR 5149-50.

### 5. The Advisory Agency Decision

On March 20, 2018, the Advisory Agency held a public hearing to consider a vesting tentative tract map (Map No. 74315), vesting zone change (from Zone [Q]C2-1-CDO and [Q]P-1-CDO to Zone (T)(Q)C2-1-CDO), conditional use permit for alcohol sales ("CUP"), site plan review, design overlay review, and reduction of open space. AR 3489, 3494.

In March 2018, prior to the Advisory Agency hearing, Real Party submitted refinements to the Project ("Revised Project").  AR 5483.  While Alternative 5 proposed 675 residences and 60,000 square feet of commercial space, the Revised Project includes 623 multi-family residences totaling approximately 515,571 square feet of residential floor area, 60,000 square feet of commercial space, and associated parking facilities.  AR 32.  As compared to Alternative 5, the Revised Project has 52 fewer residential units, approximately 99,430 square feet less residential floor area, and the same commercial floor area. AR 32.

The Planning Department staff report for the Revised Project recommended approval of the tract map for the Revised Project and certification of the FEIR. AR 3497.

On March 27, 2018, the Advisory Agency issued a Letter of Determination stating that it had certified the FEIR for the Project and approved the vesting tentative tract map.  AR 196-97.  The Advisory Agency selected the Revised Project in lieu of the Project.  AR 28.  The Agency described the Revised Project as a slightly reduced version of Alternative 5 that would eliminate some significant unavoidable impacts and reduce several other impacts compared to the original Project and its environmental impacts would be substantially similar to Alternative 5. AR 32.

The Advisory Agency adopted mitigation measures for the Revised Project, a mitigation monitoring program, Findings of Fact, and a Statement of Overriding Considerations. AR 190-91, 278-364.  The Advisory Agency findings detail the Revised Project's significant and unavoidable impacts, impacts that are feasibly mitigated, and impacts that will be less than significant without mitigation. AR 300, 307-46, 355-57.

The Advisory Agency adopted a Statement of Overriding Considerations, stating that the City recognizes that significant and unavoidable air quality and transportation/traffic impacts would result from implementation of the Revised Project. AR 358.  The Advisory Agency found that after (a) adopting all feasible mitigation measures, (b) rejecting as infeasible the alternatives to the Revised Project, and (c) recognizing all significant and unavoidable impacts, the Revised Project's benefits outweigh and override its significant unavoidable impacts from construction noise and construction and operational traffic.  AR 358.  Specifically, the following Project benefits outweighed the unavoidable environmental impacts: (1) substantially improving existing site conditions by transforming vacant buildings, (2) providing substantial new housing to "help

11

respond to the City's critical housing deficiency," (3) providing a transit-oriented and smart growth development that reduces vehicle miles traveled, and (4) creating significant temporary and permanent jobs and City economic benefits.  AR 358-59.

### 6. The CPC Appeal

On April 3, 2018, Petitioners appealed the Advisory Agency's decision to the CPC.  AR 5232-34.

The CPC staff report concluded that the Revised Project has the same unavoidable impacts for air quality and traffic as the Project, with all other impacts deemed to be less than significant. AR 5484-85. The staff report noted that Project was supported by local community groups and residents, including the Panorama City Chamber of Commerce, the Panorama City Neighborhood Council, LAPD, Mission Community Hospital, PATH (People Assisting the Homeless), local residents, and others.  AR 5469, 5485.

Petitioners submitted written and oral comments to the CPC arguing that the City had rendered the CEQA process meaningless by altering the Project after the close of the comment period for the DEIR and RDEIR.  AR 5278-80, 5835.  Petitioners asserted that there had been extensive public comments and responses for a Project never approved, and the City instead approved a Revised Project that is dramatically different than the Project or any alternative described in the DEIR or RDEIR. AR 5279-80. Only in the FEIR was a project loosely resembling the Revised Project (Alternative 5) presented.  AR 5279.  Ultimately, the Advisory Agency selected an alternative not studied in any CEQA document. AR 5279. This alternative would increase the number of residential units to 623, which is 48% larger than the proposed Project. It would have a greater impact on police, fire, schools, sewage treatment and other social services and a greater traffic GHG, air quality and other impacts, none of which had been studied.  AR 5279.  Yet, the City refused to respond to any comments on the FEIR and failed to impose mitigation measures to reduce the impacts of the Revised Project. AR 5280.

Petitioners argued that when the lead agency adds significant new information to an EIR prior to final certification, it must issue new notice and must recirculate the revised EIR for additional commentary and consultation pursuant to CEQA.  AR 5280-83.  Petitioners also asserted that the City failed to comply with CEQA by adopting a Revised Project that was not discussed in any of the DEIR, RDEIR, or FEIR. AR 5282. Petitioners claimed that a supplemental recirculated DEIR is required to analyze the Revised Project with full opportunity for public review and comment and that the City would otherwise violate CEQA by approving the Revised Project. AR 5283.

On April 26, 2018, the CPC held a hearing on the appeal and Revised Project entitlements. AR 6000.  The CPC denied the appeal, approved and recommended that the City Council adopt the zone change, and approved the CUP, the site plan review, design review, and reduction of open space.  AR 6000-02.  The CPC found that, by reducing the residential units from the number proposed in Alternative 5, the Revised Project results in the same, or reduced, environmental impacts compared to the Project and Alternative 5.  AR 300, 355-57.

On May 17, 2018, the CPC issued its Letter of Determination concurring with the Planning Department's adoption of the Statement of Overriding Consideration.   AR 6000-02.

### 7. The City Council Appeal

12

Petitioners appealed to the City Council on May 25, 2018, raising the same arguments they made to the CPC.  AR 6202-04.

On August 21, 2018, the City Council's Planning and Land Use Management ("PLUM") Committee heard the appeal.  PLUM adopted a motion recommending that the City Council deny the appeal, uphold the CPC's approval of the Revised Project, and approve the zone change. AR 3579-81.

On August 29, 2018, the City Council unanimously adopted the PLUM Committee's recommendations.  AR 184-85.  The City issued a Notice of Determination on August 30, 2018. AR 8.

### E. Analysis

Petitioners contend that the City's approval of the Revised Project must be set aside because the FEIR (1) fails to maintain a stable project description, (2) fails to adequately address the environmental impacts to air quality, GHGs, traffic, hazardous materials, public services, and cumulative impacts, and (3) fails to respond to comments and adopt all feasible mitigation measures.

#### 1.  Failure to Maintain a Stable Project Description

Petitioners argue that the City's approval of the Revised Project must be set aside because it is a project not described or analyzed in any prior CEQA document. Pet. Op. Br. at 7-13.

Through the EIR process, CEQA "provide[s] public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment."  Pub. Res. Code §21061.  The ability of informed citizens to participate in environmental review is a key tenet of CEQA.  Washoe, *supra*, 17 Cal.App.5th at 285 ("Informed public participation is essential to environmental review under CEQA.").  In order to adequately apprise the public of a project and its environmental impacts, an EIR must contain "an accurate, stable and finite" project description.  Id. at 287; Citizens for a Sustainable Treasure Island v. City and County of San Francisco, ("Treasure Island") (2014) 227 Cal.App.4th 1036, 1045; County of Inyo v. City of Los Angeles, ("Inyo") (1977) 71 Cal.App.3d at 185, 193.  "[A] project description that gives conflicting signals to decision makers and the public about the nature and scope of the project is fundamentally inadequate and misleading."  Treasure Island, *supra*, 277 Cal.App.4th at 1052.  However, the courts review EIRs "not for perfection but for adequacy, completeness, and a good faith effort at full disclosure."  Guidelines §15151.

The failure to maintain a stable project description is a failure to proceed in the manner required by law subject to *de novo* review.  Washoe, *supra*, 17 Cal.App.5th at 287; SoMa, *supra*, 33 Cal.App.5th at 332 ("Whether an EIR correctly describes a project is a question of law, subject to de novo review.").  As Washoe explained: "When it is alleged a DEIR is inadequate to 'apprise all interested parties of the true scope of the project,' the issue is one of law and no deference is given to the agency's determination." 17 Cal.App.5th at 286.

#### a. Pertinent Facts

On April 6, 2017, the DEIR described the Project as the construction of seven buildings, with 422 multi-family residential units, approximately 200,000 commercial square footage, and parking for approximately 1690 vehicles. AR 374-86. All alternatives in the DEIR were smaller

13

than the Project. AR 826.

On August 31, 2017, the RDEIR was issued to address errors in the DEIR's traffic analysis. The RDEIR similarly described the Project as including a maximum of 422 residential units and approximately 200,000 square feet of commercial space. AR 2557-58. No new alternatives were introduced in the RDEIR.

On February 23, 2018, the City issued the FEIR, again describing the Project as 422 residential units and 200,00 square feet commercial space. AR 2951. The FEIR introduced Alternative 5, which involved 675 residential units -- more than 250 additional residential units than for any alternative considered in the DEIR or RDEIR -- and 60,000 square feet of commercial space, which was much less than the Project. AR 3170.

On March 20, 2018, the Advisory Agency adopted the Revised Project, which reduced Alternative 5 to 623 residential units and 60,000 square feet of commercial space. AR 28. The FEIR, and hence Alternative 5, had not been subject to a formal comment period, and no comments were submitted on the Revised Project's 623 residential units and 60,000 square feet of commercial space prior to the Advisory Agency's adoption of it. Pet. Op. Br. at 8-9.

### b. Inyo, Washoe, and SoMa
### (i) Inyo

In Inyo, the court addressed whether an EIR project description for the extraction of subsurface water satisfied the requirements of CEQA. 71 Cal.App.3d at 185. The court noted that "an accurate, stable and finite project description is the sine qua non of an informative and legally sufficient EIR." Id. at 199. The EIR described the project as a 51-cubic feet per second increase in the water extraction rate. Id. at 189. However, the court noted that "the project concept expands and contracts from place to place within the EIR." Id. at 190. Even though not included in the project description, some sections of the EIR analyzed a "recommended project" with higher rates of groundwater extraction as well as the development of infrastructure to export water to Los Angeles. Id. The court explained: "The small-scale groundwater project described at the outset was dwarfed by the 'recommended project' ultimately endorsed by the final EIR and approved by the board of commissioners." Id. at 199.

As such, the City's approval of the FEIR was a failure to proceed in the manner required by law. Id. at 200. The court stated that, while the CEQA process is not designed to freeze the initial project as the project ultimately approved, and new and unforeseen insights may emerge that require project revision, the selection of a narrow project as the launching pad for a vastly wider proposal frustrated CEQA's public informational aims. Id. at 199-200. Although "the informative quality of the EIR environmental forecasts" was not affected by the initial project description, the court underscored that "[t]he defined project and not some other project must be the EIR's bona fide subject." Id. at 197, 199. The EIR's failure to properly describe the project, regardless of the adequacy of its environmental analysis, frustrated CEQA's public information aims. Id. at 199-200.

### (ii) Washoe

In Washoe, the California Department of Parks and Recreation proposed an "Upper Truckee River Restoration and Golf Course Reconfiguration Project" because the existing golf course had altered the course and flow of the Upper Truckee River, causing deterioration in the

14

habitat and water quality.  17 Cal.App.5th at 282.  The DEIR described five different project alternatives to reduce sediment discharge from the river into Lake Tahoe.  Id. at 283.  The DEIR did not identify a preferred alternative, and instead proposed that the department would identify the preferred alternative after public comment and a discussion of the decision will be included in the FEIR.  Id. at 281, 283.

The FEIR identified "[a] refined version of Alternative 2" (river restoration with reconfigured 18-hole golf course) as the preferred alternative, stating Alternative 2's acreages had been modified "to address public access issues" and the final design may reflect further modifications as a result of the "normal design refinement process".  The FEIR stated that these minor modifications to Alternative 2 did not require recirculation because they did not change the DEIR's conclusions on the significance of impacts.  Id. at 284.

The court affirmed the trial court's writ setting aside the project approval and FEIR certification because, inter alia, the DEIR did not contain an "accurate, final and stable" project description and this acted as "an obstacle to informed public participation."  Id. at 285, 290.  The court agreed with the trial court:

> "[F]or a project to be stable, the DEIR, the FEIR, and the final approval must describe substantially the same project. An EIR that states the eventual proposed project will be somewhere in 'a reasonable range of alternatives' is not describing a stable proposed project. A range of alternatives simply cannot be a stable proposed project."  Id. at 288 (emphasis added).

The fact that the DEIR thoroughly analyzed Alternative 2's environmental impacts – a version of which was ultimately approved as the project -- did not alter the analysis.  Id. at 288.  The court held that "an agency's failure to propose a stable project is not confined to 'the informative quality of the EIR's environmental forecasts.'"  Id. at 288 (quoting Inyo, supra, 71 Cal.App.3d at 197).  Inconsistencies in a project's description, or the failure to identify and select any project at all, impairs the public's right and ability to participate in the environmental review process.  Ibid.  "A description of a broad range of possible projects, rather than a preferred or actual project, presents the public with a moving target and requires a commenter to offer input on a wide range of alternatives that may not be in any way germane to the project ultimately approved."  Ibid.  While there may be situations in which the presentation of a small number of closely related alternatives would not present an undue burden on the public, the difference between the five projects was too vast because each created a different footprint on the land.  Ibid.

The court found that the prejudice required by Pub. Res. Code section 21005 exists "'if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the goals of the EIR process.'"  Id. at 290 (citation omitted).  "A deficiency in the EIR may be deemed prejudicial under this standard 'regardless of whether a different outcome would have resulted if the public agency had complied with those provisions.'"  Id. (citing Pub. Res. Code §21005(a)).  Because the DEIR failed to designate a stable project, the court held that the lower court properly granted the writ petition challenging the project.  Id.

**(iii) SoMa**

In SoMa, the city and county of San Francisco approved a mixed-use business and

15

residential project. 33 Cal.App.5th at 327. The DEIR "described two 'options' for the [mixed-use] project, an 'Office Scheme' and a 'Residential Scheme.'" 33 Cal.App.5th at 328. The overall square footage was substantial the same in both project schemes, with varying mixes of office and residential use. Id. at 328. The DEIR discussed nine alternatives to the project, including a "Preservation Alternative" which was a similar mixed-use project that would avoid demolition of a nearby building and reduce certain environmental impacts. Id.

In upholding the approval of the revised project based on the DEIR's Preservation Alternative, the SoMa court found the petitioners' claim that the DEIR presented multiple possible projects to be specious. Id. at 332. The court explained that the office and residential schemes were two project options with the same overall square footage but a varying mix of residential and office uses." Id. at 333. Both involved construction of new floor space, similar massing and land use, and retention of some buildings and demolition of others. Id. at 333. The DEIR set forth in text and table format the square footage for both schemes. Id. at 333. The public was able to comment without confusion on the two schemes. Id. at 333. Thus, there was one project with two options for different allocations of residential and office uses. Id. at 333-34.

The The SoMa court distinguished Inyo:

> "[In Inyo,] throughout the EIR process, the project description varied, with the result that the "small-scale groundwater project described at the outset was dwarfed by the 'recommended project' ultimately endorsed" that dealt with "important, large-scale phases of the city aqueduct management program." The [Inyo] court concluded the agency's selection of a "narrow project as the launching pad for a vastly wider proposal frustrated CEQA's public information aims." Here, there were no similar fluctuations in the project description during the EIR process, nor is the initial project description a misleading fragment of the ultimately approved project. Id. at 335. (citations omitted).[3]

The SoMa court also distinguished Washoe, stating that the SoMa project description clearly described a mixed-use project at a specific location with two options for allocations of office and residential use. Id. at 335. While the petitioners complained that the FEIR adopted a revised project that was a variant of the preservation alternative identified in the DEIR, the court stated that the petitioners had not identified any component of the revised project that had not been "addressed in the DEIR or subject to public comment." Id. at 335 (emphasis added). Further, CEQA's reporting process is not intended to "handcuff decisionmakers" or "freeze the ultimate proposal in the precise mold of the initial project" since CEQA's purpose is to encourage adopting alternatives that reduce environmental impacts. Id. at 335-36. "The whole point of requiring evaluation of alternatives in the DEIR is to allow thoughtful consideration and public participation regarding other options that may be less harmful to the environment." Id. at 335-36.

## b. The Adequacy of the Project Description

---

[3] See also Treasure Island, supra, 227 Cal.App.4th at 1055 ("Many of the environmental impacts described in [Inyo's] EIR were related to the much broader project, rather than the smaller project described").

16

Petitioners note that the Revised Project has 623 residential units and 60,000 square feet of commercial space and differs from the Project that was described in the DEIR, RDEIR, and FEIR, all of which had 422 residential units and 200,000 square feet of commercial space. The City introduced Alternative 5 – which had 675 residential units and 200,000 square feet of commercial space – for the first time in the FEIR, and it was never subjected to a formal comment period. Pet. Op. Br. at 8.

### (i). Recirculation Due to Significant New Information

The joint opposition of the City and Real Party[4] argues that the City's consideration of additional alternatives after the DEIR was circulated for public comment did not violate the CEQA requirement that the EIR project description be accurate, stable, and finite. The City argues that the question instead is whether the "changes in the project" constitute "'significant new information' requiring recirculation." Guidelines §15088.5. Opp. at 16. The City notes that it determined that the Revised Project did not require recirculation of the FEIR (AR 364, 3165), and that "[a]n agency's determination not to recirculate an EIR is given substantial deference and is presumed to be correct." Beverly Hills Unified School Dist. v. Los Angeles County Metro. Transp. Auth., (2015) 241 Cal.App.4th 627, 661. Opp. at 16-17. The City contends that Petitioners waived any challenge that the Revised Project constituted significant new information requiring recirculation under Guidelines section 15088.5 by failing to discuss it in their opening brief. South County, supra, 221 Cal.App.4th at 331-32 ("failure to present argument with references to the record and citation to legal authority results in a forfeiture"). Opp. at 16.

At the July 16, 2019 hearing, Petitioners counsel agreed that Petitioners are not contending that the Revised Project is new information requiring recirculation under Guidelines section 15088.5 (although they do argue that recirculation is required for other reasons). Instead, Petitioners seek the remedy of a new or supplemental EIR addressing the Revised Project due to the City's failure to provide a stable project description. Thus, any argument that the Revised Project constitutes new information that must be recirculated under Guidelines section 15088.5 has been waived.

The issue becomes whether the City's presentation and approval of the Revised Project can only be addressed as new information under Pub. Res. Code §21092.1 and Guidelines section 15088.5, and not as a violation of the separate requirement for "an accurate, stable and finite" project description. See Washoe, supra, 17 Cal.App.5th at 287.[5] A lead agency is required to

---

[4] For convenience, the court will refer to the joint opposition of the City and Real Party as made by only by the City.

[5] Apart from different remedies of recirculation (Guidelines §15088.5) and a new/supplemental EIR (stable project description), the two issues have different standards of review. As stated ante, the failure to maintain a stable project description is a failure to proceed in the manner required by law subject to de novo review. Washoe, supra, 17 Cal.App.5th at 287. The existence of new information requiring revision and recirculation of the EIR is governed by the substantial evidence standard of review. Laurel Heights Improvement Association v. Regents of the University of California, ("Laurel Heights II") (1993) 6 Cal.4th 1112, 1135; Friends of College of San Mateo Gardens v. San Mateo County Community College District, (2016) 1 Cal.5th 13 937, 953.

17

recirculate an EIR and consult anew when "significant new information" – defined as including changes in the project -- is added to the EIR after public notice but before certification. Guidelines §15088.5. "New information" includes "changes in the project or environmental setting as well as additional data or other information", but new information added to an EIR is not significant unless it "deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement." Guidelines §15088.5(a) (emphasis added).

Examples of significant new information requiring recirculation include "new significant environmental impacts from the project or from a new mitigation measure," "substantial increase in the severity of an environmental impact," "feasible project alternative or mitigation measure considerably different from others previously analyzed that would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it", and where "the draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded." Guidelines §15088.5(a) (emphasis added).[6]

The critical issue for recirculation is whether the new information added to the EIR is significant. Pub. Res. Code §21092.1. A change in the project is not significant unless the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement." Guidelines §15088.5(a). Opp. at 16.

The City persuasively argues that the Revised Project is not a new alternative constituting new information under Guidelines section 15088.5. As the City points out, a new alternative is not significant new information unless it is (a) feasible, (b) considerably different from other alternatives analyzed, (c) clearly lessens the significant environmental impacts of the proposed project, and (d) the project's proponent declines to adopt it. Guidelines §15088.5(a)(3). Opp. at 16. There is no dispute that the Revised Project is feasible. The City also determined that the Revised Project "clearly lessen[s] the significant environmental impacts of the [P]roject" by reducing the number and magnitude of significant impacts. AR 355-56. However, Real Party, which is the Project proponent, did not decline to adopt the Revised Project. Thus, the City's consideration and ultimate approval of the Revised Project did not require recirculation of the FEIR as a new alternative under Guidelines section 15088.5. Laurel Heights II, supra, 6 Cal.4th at 1142("Recirculation is only required when a discussion of a new feasible project alternative,

---

[6]Whether the new information requires revision and recirculation, or a subsequent/supplemental EIR, depends on timing. If significant new information is brought to the agency's attention prior to certification, the agency is required to revise and recirculate that information as part of the EIR. Pub. Res. Code §21092.1; Guidelines §15088.5; Cadiz Land Co. v. Rail Cycle, (2000) 83 Cal.App.4th 74, 95. A subsequent or supplemental EIR is required where an EIR has been prepared and certified, and new information of substantial importance, which was not known and could not have been known in the exercise of reasonable diligence at the time the EIR was prepared and certified, becomes available. Pub. Res. Code §21166; Guidelines §§ 15162(a)(3), 15163; Laurel Heights II, supra, 6 Cal.4th at 1129.

18

which will not be implemented, is added to the EIR."). Opp. at 17.

The City less persuasively argues that its approval of the Revised Project did not render the DEIR fundamentally and basically inadequate under Guidelines section 15088.5(a)(4). The City argues that project changes proposed after a DEIR is released for public comment that reduce the size or environmental impacts of a proposed project do not establish that an EIR is fundamentally and basically inadequate, relying on Beverly Hills Unified School District v. Los Angeles County Metropolitan Transportation Authority, (2015) 241 Cal.App.4th 627, 663, 666 (recirculation not required because new information eliminating subway station did not change project's environmental impacts, did not increase project's size, and did not increase the work necessary to construct it) and High Sierra Rural Alliance v. County of Plumas, (2018) 29 Cal.App.5th 102, 129 (general plan update's increased restrictions on building size did not render the EIR fundamentally and basically inadequate to require recirculation). Opp. at 17.

This caselaw, which concerns the elimination of a project component and/or an increased restriction on development, is not substantially similar to the Revised Project, which for the first time in the FEIR significantly increased residential housing while reducing commercial space. Petitioners potentially could have argued under Guidelines section 15088.5(a)(4) that the DEIR was fundamentally and basically inadequate to support the FEIR's Alternative 5 and the Revised Project. The court need not decide whether such an argument is viable because nothing in Guidelines section 15088.5 forecloses Petitioner's contention that the City's approval of the Revised Project is infirm because of an unstable project description that prevented an opportunity for public comment.

### (ii). Stable Project Description

As in Washoe and Inyo, the City's approval of the Revised Project must be set aside because the Project described in the DEIR, RDEIR, and FEIR differed significantly from the Revised Project adopted by the Advisory Agency. The difference between the Revised Project's 623 residential units and 60,000 square feet of commercial space and the Project's 422 residential units and 200,000 square feet of commercial space described in the DEIR, RDEIR, and FEIR runs afoul of the CEQA requirement that "for a project to be stable, the DEIR, the FEIR, and the final approval must describe substantially the same project." Washoe, supra, 17 Cal.App.5th at 288; see Inyo, supra, 71 Cal.App.3d at 193. Pet. Op. Br. at 11-12.

The City's approval of the Revised Project -- which was an amended version of the FEIR's Alternative 5, not included in the DEIR or RDEIR, and never subject to a formal comment period -- sent "conflicting signals to decision makers and the public about the nature and scope of the project", rendering the CEQA process "fundamentally inadequate and misleading." Treasure Island, supra, 277 Cal.App.4th at 1052. Just as in Washoe -- where no project was settled upon during the EIR process -- and Inyo -- where the adopted final project differed significantly from the proposed project in the EIR -- the CEQA process presented a moving target which impaired the public's ability to participate in the environmental review process." See Washoe, supra, 17 Cal.App.5th at 288. Pet. Op. Br. at 12.

The adequacy of the FEIR's discussion of environmental impacts from Alternative 5's larger 675 residential units is irrelevant to the stable project description issue. Inyo explained that an EIR's failure to provide a stable and finite project renders it deficient even if "the informative quality of the EIR environmental forecasts [were] not affected by the ill-conceived, initial project

19

description". 71 Cal.App.3d at 197, 199. Washoe relied on Inyo to reiterate that the adequacy of the EIR's analysis of environmental impacts is irrelevant, where there is a failure to maintain a project description. 17 Cal.App.5th at 288. Thus, Petitioners correctly argue that the City cannot rely on the FEIR's environmental analysis of Alternative 5's 675 residential units to justify the adoption of the Revised Project's 623 residential units where the DEIR and RDEIR made no mention of such a project and where Alternative 5 was not subject to a formal comment period. Pet. Op. Br. at 12.

The City argues that this case is a quintessential example of how CEQA is supposed to operate -- the Project evolved in response to public comments and to reduce the number and extent of significant and unavoidable impacts. Opp. at 13. Throughout the administrative process, the Project consisted of a mixed-use development project at the Project site. By approving the Revised Project, the City approved a total 12,000-sq.ft. reduction in mixed-use development compared to the Project. The Revised Project achieves this reduction by shifting the mix of uses to increase residential units and decrease commercial square footage. AR 3585. Opp. at 14.

The City contends that adding a new alternative to the FEIR that reduces environmental impacts is a proper response to public comments requesting a reduction in impacts. The Guidelines explicitly recognize that public comments on a DEIR are most helpful when they suggest "additional specific alternatives . . . that would provide better ways to avoid or mitigate the significant environmental effects." Guidelines §15204(a). "CEQA allows, if not encourages, public agencies to revise projects in light of new information revealed during the CEQA process." Treasure Island, supra, 227 Cal.App.4th at 1062. "The CEQA reporting process is not designed to freeze the ultimate proposal in the precise mold of the initial project; indeed, new and unforeseen insights may emerge during investigation, evoking revision of the original proposal." Western Placer, supra, 144 Cal.App.4th at 898 (quoting Inyo, supra, 71 Cal.App.3d at 199-200). Opp. at 18.

The City further argues that the FEIR demonstrates that the Revised Project will result in an overall reduction from the environmental impacts associated with the Project. The FEIR analyzes Alternative 5, which proposed the same decrease in commercial space and 52 more residential units than the Revised Project. AR 3170, 5463. The FEIR demonstrates that Alternative 5's decrease in commercial square footage, removal of certain commercial uses, and increase in residential units would result in an overall reduction in environmental impacts from the Project. AR 3188-89. Specifically, Alternative 5 reduced the already less than significant energy, water, noise, and GHG impacts, and it also reduced the significant and unavoidable air quality and traffic impacts. Ibid. By further reducing Alternative 5's residential units, the Revised Project results in the same or reduced environmental impacts. AR 300, 355-57 (CPC Findings). Because the change in the allocation between residential and commercial uses caused no new significant impacts and reduced the number and extent of significant impacts overall, the revisions remained in line with the DEIR's Project description and environmental analysis. Opp. at 14.

The City concludes that Petitioners fail to recognize the difference between: (1) a project that is revised in response to public input to reduce impacts, and (2) a project description that obscures the scope of impacts and "draws a red herring across the path of public input." See SoMa, supra, 33 Cal.App.5th at 332. Opp. at 18. Lead agencies "should ordinarily respond to comments suggesting a new alternative . . . by either explaining why further consideration of the alternative was rejected or providing an evaluation of the alternative." 1 Kostka & Zischke, Practice Under

20

[CEQA] (2d ed. 2012 Update), § 15.41. "[N]o provision in CEQA or the Guidelines. . . require[s] all changes made to a project after the final EIR is released but prior to certification to be included in the EIR." Western Placer Citizens for an Agricultural & Rural Env't v. County of Placer, ("Western Placer") (2006) 144 Cal.App.4th 890, 899. Opp. at 15.

The City relies on SoMa, where the city and county approved a revised project that was a variant of the Preservation Alternative identified in the EIR. 33 Cal.App.5th at 321, 335. The petitioners argued that by considering two options and ultimately approving a variant of a project alternative, the EIR did not include a "finite description of a single project." Id. at 332, 335-36. In rejecting the petitioners' argument, the court emphasized that CEQA's reporting process is not intended to "handcuff decisionmakers" or "freeze the ultimate proposal in the precise mold of the initial project" since CEQA's purpose is to encourage alternatives that reduce environmental impacts. Id. at 335-36. The court explained that "the project description clearly identified a mixed-use development project at a specific, defined location with two options for allocations of office and residential use." Id. at 335. The court rejected petitioners' argument that "the project description is inadequate because the ultimate approval adopted characteristics of one of the proposed alternatives" by explaining "that in fact, is one of the key purposes of the CEQA process." Id. at 336. Opp. at 15.

According to the City, SoMa demonstrates that variations within a mixed-use development project do not create a "curtailed, misleading, or inconsistent" project description and this case is analogous. Pursuant to SoMa, a project description is not inadequate where there are only changes in the allocation of space between defined project uses. The Project and Revised Project both consist of a residential and commercial mixed-use development, and both variations contain "substantially the same overall gross square footage." See SoMa, supra, 33 Cal.App.5th at 333. As such changes do not render the project description inadequate, the change also did not impair informed public participation. Id. at 332-36; see also Dry Creek Citizens Coalition v. County of Tulare, (1999) 70 Cal.App.4th 20, 36 (project description not inadequate where it did not "narrow[] the scope of environmental review . . ."). Opp. at 18.

SoMa does not support the City's proposition that "a project description is not rendered inadequate by changes in the allocation of space between defined project uses." Opp. at 19. The DEIR in SoMa described two options for the mixed-use project: an Office Scheme and a Residential Scheme. 33 Cal.App.5th at 328. Both involved construction of new floor space, similar massing and land use, and retention of some buildings and demolition of others. Id. at 333. The DEIR set forth the square footage for both schemes and the public was able to comment without confusion on both schemes. Id. at 333. Thus, there was one project with two options for different allocations of residential and office uses. Id. at 333-34. The SoMa DEIR also contained a "Preservation Alternative," a similar mixed-use project that would avoid the demolition of a nearby building and reduce certain environmental impacts. Id. In upholding approval of a revised project based on the DEIR's Preservation Alternative, the SoMa court explained that no component of the revised project had not been "addressed in the DEIR or subject to public comment." Id. at 335 (emphasis added). "The whole point of requiring evaluation of alternatives in the DEIR is to allow thoughtful consideration and public participation regarding other options that may be less harmful to the environment." Id. at 335-36.

Thus, the City wrongly concludes that the mixed-use project in SoMa could entail any combination of residential units and office space without running afoul of CEQA. The SoMa

21

approved project was close to the DEIR's Preservation Alternative and well within the DEIR's range of alternatives. The DEIR's Preservation Alternative had 812,700 square-feet of office space and 750 residential units, and the project ultimately approved in the FEIR had 711,300 square-feet of office space (~100,000 fewer square feet) and 702 residential units (48 fewer residential units). The SoMa court upheld the project approval was upheld because the DEIR presented several alternatives and "the ultimate approval adopted characteristics of one of the proposed alternatives." Id. at 336. That is not true in this case for the Revised Project's significant increase in residential units.

The City also argues that Washoe and Inyo are distinguishable. According to the City, the Washoe court emphasized that the differences between the alternatives was too vast because each would have a "different footprint on public land" and result in "a different set of impacts, requiring different mitigation measures." 17 Cal.App.5th at 289. The City contends that, unlike Washoe and like SoMa, the Project description at all times consisted of a mixed-use development project at a specific site. There was no dramatic change between the Project, Alternative 5, and the Revised Project and no change in footprint; the Project Site remained the same 8.9-acre site. AR 5463, 5532. Additionally, unlike the alternatives in Washoe, Alternative 5 was proposed specifically to reduce the Project's impacts, and the Revised Project reduces impacts further still. AR 303, 355, 3188-89. Opp. at 19-20.

The City argues that the EIR's project description in Inyo was for a relatively small increase in pumping for unanticipated uses within the Owens Valley, but the actual project involved numerous activities, including pumping groundwater for export from the Owens Valley to Los Angeles County via two aqueducts. 71 Cal.App.3d at 189-90. Unlike Inyo and like SoMa, there has been "no similar fluctuations in the project description during the EIR process, nor is the initial project description a misleadingly small fragment of the ultimately approved project." SoMa, supra, 33 Cal.App.5th at p. 335. The City notes that, the Project has always been a mixed-use development on a fixed 8.9-acre site. Given that the Revised Project includes the same uses, substantially the same total development, and reduces Project impacts, Inyo is not analogous. Opp. at 20-21.

The City's distinction of Washoe and Inyo ignores the fact that an EIR's informative quality about environmental effects are irrelevant where different project descriptions vitiate the EIR process as a vehicle for intelligent public participation. Inyo, supra, 71 Cal.App.3d at 197. "[A]n agency's failure to propose a stable project is not confined to 'the informative quality of the EIR's environmental forecasts.'" Washoe supra, 17 Cal.App.5th at 228. The issue is not whether the Revised Project has the same footprint, location, and environmental impacts as the Project, but rather whether the DEIR provided an accurate description of the Project and alternatives regardless of environmental impacts. The pertinent inquiry is whether the City provided "[a] curtailed, enigmatic or unstable project description." Inyo, supra, 71 Cal.App.3d at 198. As Inyo and Washoe make clear, the City's failure to provide a stable project description throughout the environmental review process violated CEQA, regardless of the comparative environmental impacts between the Revised Project and the Project. Reply at 3-5.[7]

---

[7]Petitioners also contend that the City is wrong that the Revised Project will have the same or fewer environmental impacts. They argue that, by adding 201 residential units, the Revised Project will increase impacts on public services of sewer, fire, police, schools, and parks. The

22

Moreover, while the City is correct that <u>Washoe</u> and <u>Inyo</u> are distinguishable, they still are instructive. The DEIR in <u>Washoe</u> presented five dramatically different alternatives reducing sediment discharge from the Upper Truckee River into Lake Tahoe without selecting one. 17 Cal.App.5th at 283. The <u>Washoe</u> court expressly stated that "for a project to be stable, <u>the DEIR, the FEIR, and the final approval must describe substantially the same project.</u> <u>Id.</u> at 288 (emphasis added). The court added that there may be situations in which the presentation of a small number of closely related alternatives would not present an undue burden on the public, the difference between the five projects was too vast. <u>Ibid.</u>

In this case, the DEIR failed to identify a project or any alternative with a similar number of residential units and amount of commercial space as identified in the Revised Project. The DEIR's Project description and alternatives (aside from the No Project alternative) contemplated a project with 0 to 422 residential units and 391,000 to 584,000 square feet of commercial space. AR 826. The Revised Project's scope of 623 residential units and 60,000 square feet of commercial space was outside the range of any of the alternatives in the DEIR or RDEIR. Unlike <u>Washoe</u>, where the DEIR presented the alternative ultimately adopted in a refined version in the FEIR, Alternative 5 was only presented in the FEIR and the Revised Project was never presented at all in a CEQA document. As such, the DEIR "failed to identify the project being proposed", and thereby failed to provide a stable project description throughout the EIR process. <u>See Washoe, supra</u>, 17 Cal.App.5th at 289. Reply at 4. <u>Inyo</u>'s language is similarly instructive: "[t]he defined project and not some other project must be the EIR's bona fide subject." <u>Id.</u> at 197, 199.

The City further relies (Opp. at 15) on <u>Sierra Club v. City of Orange</u>, ("<u>City of Orange</u>") (2008) 163 Cal.App.4th 523, 529, which concerned a supplemental EIR for the Irvine Company's development of 6800 acres of land. An alternative considering a no development variant had been added in the FEIR in response to public comments. <u>Id.</u> at 547. Petitioner Sierra Club claimed that the supplemental EIR failed to evaluate a reasonable range of alternatives. <u>Id.</u> at 545. The <u>City of Orange</u> court concluded that the "inclusion of new material in the final EIR is not fatal" because what matters is whether significant new information is added after the public comment period closes. <u>Id.</u> at 547. Since the FEIR was issued in advance of public hearings, the new information did not render the discussion of project alternatives defective. <u>Ibid.</u>

As Petitioners argue, <u>City of Orange</u> stands for the proposition that the addition of information is a FEIR is not necessarily defective. Reply at 2-3. As such, it is consistent with <u>Washoe</u>'s suggestion that there may be situations in which the presentation of closely related alternatives would not present an undue burden on the public. 17 Cal.App.5th at 288. <u>City of Orange</u> is distinguishable from the instant case because the project ultimately approved had been consistently described as a 6,800-acre residential development and the new information was a late-added alternative that was not selected. <u>Id.</u> at 528, 547. This late addition to the range of alternatives is not analogous to a situation where the City approved a version of Alternative 5 that itself was not introduced until the FEIR. Reply at 2-3.

In the joint opposition and again at the July 16 hearing, Real Party relied on <u>South County</u>

FEIR acknowledges that Alternative 5 will generate 96,300 daily gallons of wastewater, a 7.8% increase in the Project's 89,320-gallon daily sewer demand. AR 3183. Petitioners' expert, SWAPE, also presented evidence that the Revised Project will have significant construction air quality impacts. AR 7026-27. Reply at 6. <em>See post.</em>

23

Citizens for Smart Growth v. County of Nevada, ("South County") (2013) 221 Cal.App.4th 316, 332. *See also* Opp. at 15. In South County, an EIR was issued for a large retail project. 221 Cal.App.4ᵗʰ at 322. The planning commission staff report recommended approval of a particular alternative ("staff alternative"), which was a modified version of a DEIR alternative. Id. at 323. The planning commission recommended that the county board of supervisors approve the staff alternative. Ibid. After the planning commission recommendation, the developer submitted a new alternative addressing some of the planning commission's concerns which staff recommended for approval ("revised project"). Id. at 329. The board of supervisors approved the revised project. Id. at 329. The petitioner did not challenge the revised project and only challenged the county's failure to recirculate the staff alternative when the planning commission decided to approve it. Id. at 329.

The South County court noted that information occurring after release of the FEIR but prior to certification need not be included in the FEIR unless the agency determines that it is new information triggering the requirement for recirculation. Id. at 329. A petitioner fails to show that "the failure to recirculate the final EIR is not failure to proceed in the manner required by law unless the . . . [new project] alternative meets the factual definition of '[s]ignificant new information'". Guidelines §15088.5(a)(3). The court held that the petitioner failed to show that the staff alternative and the project were significantly different than the other alternatives analyzed in the FEIR. Id. at 330-31.

South County plainly is distinguishable as a case in which a new alternative proposed after preparation of the FEIR was immaterially different from the earlier alternatives and was not adopted anyway. In this case, the Revised Project, a variant of Alternate 5 proposed in the FEIR, was adopted and was materially different than any alternative in the DEIR. South County's reliance on Guidelines section 15088.5 also has no bearing on whether the Project description remained stable.

In sum, the problem with the stability of the Project description is the City's timing by presenting Alternative 5 for the first time in the FEIR. As Petitioners argue, given that SoMa does not stand for a legal proposition that any configuration of uses in a mixed-use development is permissible as long as the DEIR contemplates a mixed-use development, the City cannot overcome the fact that Alternative 5 was not discussed in the DEIR and available for public comment before the Revised Project, a revised version of Alternative 5, was approved. Reply at 7. The Revised Project has 201 more units than were discussed for the Project identified in the DEIR, and this number also is significantly greater than the number of residential units in the DEIR's range of alternatives. Had the DEIR provided an alternative with a number of residential units reasonably close to the 623 units approved in the Revised Project, it would have allowed for "thoughtful consideration and public participation". SoMa, *supra*, 33 Cal.App.5th at 335-36.

### (iii) Prejudice

The City argues that Petitioners fail to establish any prejudice. The City contends that Petitioners are wrong in suggesting that "no comments were submitted on the Revised Project". Pet. Op. Br. at 9. The record demonstrates that the public had ample opportunity to review and comment on Alternative 5 and the Revised Project, and it overwhelmingly supported both, with only Petitioners objecting. Opp. at 21.

The Planning Department staff report for the March 20, 2018 Advisory Agency hearing

24

recommended approval of the Revised Project. AR 3489-90. From February through August 28, 2018, the City received over 50 comment letters in support of the Revised Project. AR 5082, 5096-136, 5240-41, 5295, 6516-17, 7601, 7603-05, 7607-09. Opp. at 21.

Testimony from neighbors, local community leaders, and police officers at the April 26, 2018 CPC hearing and the August 21, 2018 PLUM Committee hearing endorsed the Revised Project as a means of providing housing and jobs, and reducing crime, in Panorama City. AR 3627, 3630-34, 3699-712. During the CPC hearing, Gregory Wilkinson, a Panorama City Neighborhood Councilmember, stated:

> "I want to be very clear it sounds like there are some concerns that there was no public input as to the size, scope, concerns of this plan. That's absolutely inaccurate. This developer came to us two years ago, has gone through numerous land use committee meetings, has presented before the entire board, has met with individual board members. We have solicited input from the public at large. Unfortunately not everyone has seen fit to come see us, however, we've tried to reach out. . . .[¶] Most importantly this developer has listened and made adjustments to the plan, based off the input they have received from us and other community stakeholders...." AR 3630-31. Opp. at 21-22.

While the City must respond to all comments made to a DEIR (Guidelines §15087), it was not required to respond to comments on a FEIR. Guidelines §15089(b). Despite this fact, the City responded prior to the CPC appeal to Petitioners' March 19, 2018 written comments on the FEIR. AR 5138-60, 5242-77, 7815-18. On April 23 and 26, 2018, Petitioners submitted comments on the Revised Project. AR 5278-94. Again, although not required by CEQA, the City responded to these comments prior to the August 21, 2018 PLUM Committee hearing. AR 6769-7020. The City concludes that Petitioners and other members of the public had ample time to comment on the Revised Project and did so. Therefore, Petitioners have not demonstrated any prejudice from the City's decision to adopt the Revised Project. Opp. at 22.

Petitioners correctly point out that the City fails to provide legal authority that a petitioner must show prejudice on a claim that the agency failed to provide a stable project description. Reply at 3. By presenting a precursor to the Revised Project for the first time in the FEIR, the City deprived the public of a meaningful opportunity to comment because the train already had left the station. *See* Washoe, *supra*, 17 Cal.App.5th at 288. The court's approval of an iteration of the eventually adopted Revised Project presented for first time in a FEIR "would only countenance the practice of releasing a [DEIR] for public consumption that hedges on important environmental issues while deferring a more detailed analysis to the [FEIR] that is insulated from public review." *See* Mountain Lion Coalition v. Fish & Game Comm'n, (1989) 214 Cal.App.3d 1043, 1052 (declining to consider whether FEIR's cumulative impact analysis cleared up DEIR's deficiencies because it was never subject to public review and comment).

As the Supreme Court has explained, "The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation. Case law is clear that, in such cases, the error is prejudicial." Sierra Club, *supra*, 6 Cal.5th at 515. The Washoe court added: "Although the failure to comply with CEQA's informational requirements does not require reversal unless the petitioner establishes prejudice,

such prejudice is found 'if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.'" 17 Cal.App.5th at 290 (citation omitted). *See* Pub. Res. Code §§ 21005, 21168.5.

The City violated CEQA's informational requirements by its failure to provide a stable project description, thereby establishing prejudice. As a result, the FEIR certification and Revised Project approval must be set aside and a new or supplemental EIR prepared for public comment. While the court has decided that the certification and approval must be set aside, it will address the remaining arguments to comply with a court's duty to address all CEQA issues.

### 2. Evaluation of Environmental Impacts

Petitioners argue that the FEIR fails to adequately address the environmental impacts to air quality, GHGs, traffic, hazardous materials, public services, and cumulative impacts. Pet. Op. Br. at 13. To the extent that Petitioners challenge the sufficiency of impact analysis, the substantial evidence standard governs the court's review. To the extent that Petitioners challenge the FEIR's failure to analyze an impact at all, that is a contention that the FEIR fails as an informational document which is reviewed *de novo*. Sierra Club, *supra*, 6 Cal.5th at 514-16.

Petitioners argue that the environmental impacts of the Revised Project's 623 residential units and 60,000 square feet of commercial space were not analyzed at any point in the CEQA process. The Project in the DEIR and RDEIR analyzed 422 residential units and 200,000 square feet of commercial space and the alternatives that were analyzed were all smaller options. In the FEIR, Alternative 5 discussed a larger 675 residential unit and 60,000 square feet of commercial space project. However, the FEIR's discussion of the environmental impacts of Alternative 5 did not "include[] enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.'" Sierra Club, *supra*, 6 Cal. 5th at 516 (citations omitted). Pet. Op. Br. at 13-14.

Petitioners conclude that the FEIR fails as an informational document because it did not discuss the Revised Project at all and the discussion of Alternative 5 was conclusory. Petitioners cite as conclusory the FEIR's air quality analysis that Alternative 5 would have "a similar amount of excavation and construction", "a similar amount of development", and a similar "amount of air pollutant emissions related to construction" as the Project. AR 3173. The FEIR states without specificity that "due to the increase in residences, VOC emissions and NOx emissions would remain above the SCAQMD threshold and, similar to the Project, impacts would still be significant and unavoidable." Id. Petitioners criticize the FEIR's failure to specify the amount of increased emissions from Alternative 5's additional residences. Because "CEQA requires that the EIR have made a reasonable effort to discuss relevant specifics regarding the connection between . . . the general health effects associated with a particular pollutant and the estimated amount of that pollutant the project will likely produce," the FEIR's discussion of Alternative 5 was not adequate to be relied upon for approval of the Revised Project. Sierra Club, *supra*, 6 Cal. 5th at 521; *see* Vineyard, *supra*, 40 Cal.4th at 443 ("The question is [] not whether the project's significant environmental effects can be clearly explained, but whether they were."). Pet. Op. Br. at 14.

The City initially contends that Petitioners' argument with respect to the Alternative 5 analyses of GHG, hazardous materials, public services, traffic, and cumulative impacts fails to provide supporting argument or evidence and is forfeited. Cal. Farm Bureau Fed'n v. Cal. Wildlife Conservation Bd., (2006) 143 Cal.App.4th 173, 193. Opp. at 23. At the July 16 hearing,

26

Petitioners' counsel admitted that they failed to sufficiently address GHG, hazardous soil contamination, and cumulative impacts, which are therefore waived. Petitioners counsel contended that the opening brief presents sufficient argument and evidence on issues of traffic, air quality, and public services.

The City responds that air quality, public services, and traffic impacts were thoroughly analyzed in the FEIR with supporting evidence in the record. The City contends that, for each of these impacts, the FEIR evaluates both Project-specific and cumulative impacts. Opp. at 23.

### a. Air Quality

The City contends that the FEIR fully analyzed air quality impacts with supporting evidence in the record.

For the Project, the DEIR stated that the daily construction emissions of NOx and VOC over the three-year construction period would be up to 49.3 lbs. for VOC and 55.2 for NOx, respectively, and these levels are well below the SCAQMD thresholds of 75.0 and 100.0 lbs. AR 480. After completion of construction, the daily operational emissions for VOC and NOx would be 61.3 and 86.3 lbs. respectively, which are above the SCAQMD threshold of significance. AR 480-81.

For Alternative 5, the FEIR explained that daily construction pollutant emissions would be similar to the Project and less than significant. AR 3173. Alternative 5's daily operational emissions of VOC and NOx are estimated to be less than the Project because commercial use would be replaced by residential usage, but still above the significance thresholds. AR 3173. The FEIR based this conclusion on the fact that Alternative 5 would have a 44% reduction in mobile source VOC and NOx emissions – which are roughly proportional to trip generation. AR 3173. However, the increased number of residences meant there would be an expected increase in the use of household products emitting VOC and NOx, and those emissions would remain above the SCAQMD threshold. As a result, and similar to the Project, Alternative 5's air quality impacts would be significant and unavoidable. Ibid. Opp. at 22-23.

Petitioners reply that the FEIR's air quality analysis makes nothing but conclusory statements for Alternative 5: "a similar amount of excavation and construction", "a similar amount of development would occur", "the amount of air pollutant emissions related to construction would be similar to the Project and less than significant", and the increase in residences would cause operational VOC and NOx emissions to remain above the SCAQMD threshold and "similar to the Project, impacts would still be significant and unavoidable." AR 3173. Petitioners note that the FEIR cites no technical quantitative analysis to support these conclusions and merely states that "[due to increased residences and decreased commercial space, "trip generation would be reduced by approximately 44%."[8] Id. Reply at 7-8.

---

[8]The City describes as unremarkable the FEIR's conclusion that Alternative 5 (and hence the Revised Project) further reduce the Project's air quality impacts by replacing commercial development with residential development. AR 3173; Mani Brothers Real Estate Group v. City of Los Angeles, ("Mani Brothers") (2007) 153 Cal.App.4th 1385, 1392 ("Environmental impacts would be reduced because residential development tends to cause fewer impacts compared to retail or office development, primarily because residential development would generate significantly less traffic."). Opp. at 23.

27

Petitioners rely on Sierra Club, which held inadequate an EIR's general discussion of adverse health effects from a project's air emissions of NOx, carbon monoxide, particulate matter, and ozone without an explanation of the nature and magnitude of impact. 6 Cal.5th at 519. The court explained that CEQA requires an EIR to make a reasonable effort to discuss relevant specifics regarding the connection between two segments of information in the EIR, including the general health effects associated with a project and the estimated amount of pollutant the project will produce. Id. at 521. A connection between emissions and human health must be made, or the EIR must explain why it is not scientifically possible to do so. Id. at 520.

Sierra Club, which requires a connection between air emissions and health effects, is not on point. Petitioners are not contending that the FEIR's air quality discussion for Alternative 5 fails to provide a connection between estimated pollutants and health effects; they are contending that the FEIR fails to provide specific quantities for Alternative 5. Sierra Club does not support this conclusion. There appears to be nothing wrong with an EIR stating that a project will have certain identified quantities of air pollutants and that an alternative will have similar, albeit fewer, quantities of pollutants. The FEIR essentially provided the Project's air pollutant quantities as a cap on Alternative 5's quantities, which is permissible. The issue becomes whether this conclusion of a cap is supported.

The City contends that Petitioners ignore the July 23, 2018 Kunzman Study when they claim that no quantitative evidence supports the FEIR's conclusion that Alternative 5 would reduce VOC and NOx emissions compared to the Project. AR 6886-7020. The Kunzman Study was submitted for the City Council appeal as part of the Planning Department's response to Petitioners' April 28, 2018 comments on air quality and its SWAPE study. AR 6775. This technical study provides quantitative estimates for all air quality emissions of Alternative 5 and shows that the mitigated daily operational emissions for VOC and NOx would be 26.5 and 45.3 ppd, respectively, both of which are less than the Project. AR 6904. According to the City, the Kunzman Study demonstrates that Alternative 5 (and hence the Revised Project) would result in reduced air quality impacts compared to the Project. AR 6771-72, 6887-7020. *See, e.g.*, Beverly Hills, *supra*, 241 Cal.App.4th at 665 (relying on an air quality memo to reject recirculation argument); Western Placer, *supra*, 144 Cal.App.4th at 901-02, 906 (information not in the EIR, but in the record, was substantial evidence supporting agency's decision not to recirculate). Opp. at 22-23.

As Petitioners argue (Reply at 8), the Kunzman Study, dated approximately three months after the Revised Project had been approved and prepared in response to Petitioners' SWAPE comments for the City Council appeal, cannot be used to support the FEIR or the decision to approve the Revised Project because it is a *post hoc* rationalization that runs afoul of CEQA. Vineyard, *supra*, 40 Cal.4th at 443. Neither Petitioners, Petitioners' experts, nor the public at large had an opportunity to review or comment on the Kunzman Study prior to preparation of the FEIR and approval of the Revised Project. Because the Kunzman Study was not available during the EIR process, the FEIR failed to "include[] sufficient detail to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." Sierra Club, *supra*, 6 Cal.5th at 516.[9]

---

[9] At the July 16 hearing, Real Parties' counsel argued that the Kunzman Study is properly in the record and was properly considered by the City. Petitioners counsel acknowledged that the City could rely on the Kunzman Study to conclude that recirculation is unnecessary, but the City

28

Petitioners contend that, without the Kunzman Study, the April 26, 2018 comments of their
expert, SWAPE, are the sole analysis of the Revised Project's construction emission air impacts.
AR 7025-29. SWAPE concluded that the Revised Project's daily construction emissions of
approximately 102 lbs. of NOx would exceed the daily threshold set by SCAQMD in contradiction
to the FEIR's conclusion that construction emissions would be less than significant. AR 7026-27.
Because the City failed to conduct an air quality analysis of Alternative 5 or the Revised Project,
SWAPE's analysis stands as the only substantial evidence of the Revised Project's impact on air
quality. Reply at 8-9.

The SWAPE comments are a quantitative assessment of the Revised Project's construction
emission air impacts. However, as post-FEIR information on air quality, the SWAPE comments
stand on the same footing as the Kunzman Study. Both qualify as new information, but new
information added to an EIR is not significant unless it "deprives the public of a meaningful
opportunity to comment upon a substantial adverse environmental effect of the project."
Guidelines §15088.5(a) (emphasis added). Examples of significant new information requiring
recirculation include a "substantial increase in the severity of an environmental impact". Ibid. An
EIR must be recirculated when it is changed in a way that deprives the public of a meaningful
opportunity to comment upon a substantial environmental impact. Guidelines §15088.5(a); see
Ventura Foothills Neighbors v. County of Ventura, (2014) 232 Cal.App.4th 429, 436 (15-foot
height increase from project described in DEIR required supplemental EIR).

Petitioners argue that only SWAPE studied the Revised Project, but the Revised Project is
immaterially different from Alternative 5 reviewed in the Kunzman Study. In evaluating new
information, the City was entitled to credit the expert opinion of its Kunzman Study over the
SWAPE comments to conclude that the Revised Project's air quality impacts are the same as those
in Alternative 5 and reduced from those of the Project. As such, the City was not required to
recirculate the FEIR with an updated air quality analysis to ensure that VOC and NOx emissions
are fully mitigated. Reply at 9.

### 3.  Failure to Disclose, Evaluate, Mitigate, and Respond to Comments

Petitioners argue that the FEIR failed to respond to comments with a "reasoned, good faith
analysis", failed to adopt all feasible mitigation, and improperly deferred mitigation performance
standards. Pet. Op. Br. at 16.

#### a. Pertinent Law

An EIR's responses to comments must be detailed and must provide a reasoned, good faith
analysis. Guidelines §15088(c). Failure to provide a substantive response to comments can render
the EIR legally inadequate. Rural Land Owners Assoc. v. City Council, (1983) 143 Cal.App.3d
1013, 1020.

An EIR is required to describe all feasible mitigation measure which could minimize
significant adverse impacts. Pub. Res. Code §§ 21002; Guidelines §11526.4(a)(1), (2). "CEQA
requires the [lead agency] to avoid or mitigate, if feasible, the significant environmental effects of
their project." City of Marina v. Bd. of Trustees of the Cal. State Univ., (2006) 39 Cal.4th 341,
359. "CEQA does not authorize an agency to proceed with a project that will have significant,

---

could not rely on it as substantial evidence to support the FEIR. Reply at 8. The court agrees.

29

unmitigated effects on the environment, based simply on a weighing of those effects against the project's benefits, unless the measures necessary to mitigate those effects are truly infeasible." Uphold Our Heritage v. Town of Woodside, (2007) 147 Cal.App.4th 587, 603.

Mitigation is not required for environmental effects which are not found to be significant. Guidelines §15126.4(a)(3). Additionally, "[a]n EIR may properly decline to consider a proposed mitigation measure if substantial evidence supports the EIR's determination that the proposed mitigation measure would not reduce a significant impact, or that the proposed mitigation measure is infeasible. . ." San Franciscans for Livable Neighborhoods v. City and County of San Francisco, (2018) 26 Cal.App.5th 596, 636.

"Formulation of mitigation measures should not be deferred until some future time...[but] measures may specify performance standards which would mitigate the significant effect of the project and which may be accomplished in more than one specified way." Guidelines §15126.4(a)(1)(B). The lead agency's ability to identify and describe performance criteria in the EIR without further details is an exception to the general rule against deferral of mitigation measures. Sacramento Old City Association v. City Council, ("SOCO") (1991) 229 Cal.App.3d 1011. While the details may be deferred, the agency is required to commit itself to eventually devising measures that will satisfy specific performance criteria or standards adopted at the time of project approval. Id. at 1028-29.

The failure of an EIR to adequately respond comments or adopt all feasible mitigation measures and the improper deferral of mitigation both are failures to proceed in a manner required by law subject to de novo review. Sierra Club, supra, 6 Cal.5th at 516; Vineyard, supra, 40 Cal.4th at 435.

### b. Traffic Impacts

On March 19, 2018, Petitioners submitted written comments on the FEIR. AR 5144-60. Smith, Petitioners' traffic expert, Smith, that the FEIR failed to correct an underestimation in the RDEIR of approximately 1,000 vehicle trips per day. AR 5147. Smith also pointed out that the FEIR failed to correct the RDEIR's miscalculation of vehicle trips based on the square footage of commercial space. Id. Petitioners' comments also alleged that the FEIR improperly deferred mitigation measures by requiring a "Transportation Demand Management Plan" as a mitigation measure without providing details about what that plan would be. See Guidelines §15126.4(a)(1)(B) ("Formulation of mitigation measures should not be deferred until some future time."). Pet. Op. Br. at 14-15.

The City responds that Petitioners' March 19, 2018 comments to the FEIR were nearly identical to their comments to the RDEIR to which the City fully responded. AR 3156-57 (Responses 13-7, 13-8), 3159-61 (Response 13-14), 5486-87. Moreover, despite the fact that a lead agency need not do so after the comment period ends, the Planning Department responded to Petitioners' March 19, 2018 comments. Pub. Res. Code §21092.5(c); AR 5242-94. Opp. at 24.

The City staff explained there was no underestimation of 1000 trips per day based on the estimate for a single theater rather than a multiplex:

"The commenter states the project underestimates the trips per day by 1,000 trips per day because the EIR utilizes a traffic generation estimate for a single-theater instead of a multiplex theater....The project trip generation methodologies

30

contained in the Traffic Study were determined in consultation with LADOT and approved via a Traffic Impact Study Memorandum of Understanding (MOU)." AR 5245.

City staff explained that the Traffic Study properly used trip codes for theaters, and the codes do not exist for single screen theaters. AR 5245. In any event, the Revised Project does not include a theater and the trip estimate for it therefore is irrelevant. AR 3246. Opp. at 24.

City staff also explained that the FEIR did not miscalculate trips based on commercial square footage of the shopping center because the Traffic Study calculated trips based on the individual components of the shopping center which was more conservative approach:

> "The Traffic Study's project trip generation approach evaluated the restaurant, market, health club, retail, and theater use separately for a more detailed calculation of the potential trips....When compared to the shopping center equation method, the sum of the individual uses produced a much higher AM peak hour traffic generation and verified the daily and PM peak hour trip generation. These numbers are substantially greater (and thus, more conservative) than the numbers suggested in this comment. Furthermore, the method used in the Draft EIR and Revised Draft EIR is the standard method that is accepted by the LADOT....These project trip generation methodology and calculations were approved by LADOT prior to the preparation of the Traffic Study, and adequately estimated trip generation from the project." AR 5244.

Finally, the City explained that the TDM Mitigation Measure did not improperly defer mitigation because it adopted several strategies to reduce Project-related traffic and set a performance standard of reducing such traffic by 15%:

> "The proposed TDM program is specific in that it includes several strategies to reduce project traffic....In accordance with CEQA..., mitigation "measures may specify performance standards which would mitigate the significant effect of the project and which may be accomplished in more than one specified way." As indicated in Mitigation Measure MM TR-5, the proposed TDM strategies are tied to a performance standard of reducing project traffic by 15 percent. Sources, . . . have assessed the effectiveness of various trip reduction measures . . . which demonstrate that the TDM Plan can accomplish 15% trip reduction . . . Therefore, there is no deferral of mitigation." AR 5246.

The City concludes that it fully responded to all of Petitioners' traffic comments, including comments received after the close of the public comment period, by addressing each in detail and presenting thorough reasoning regarding why the comments were not accepted. That is all CEQA requires. Guidelines §15088(c). Moreover, the City argues that none of the alleged errors has merit. The City was entitled to rely upon its experts -- the traffic consultant and LADOT – in concluding that the trip calculations were correct. Guidelines §15151; City of Long Beach v. Los Angeles Unified School District, ("City of Long Beach") (2009) 176 Cal.App.4th 889, 908. Opp.

31

at 25.

Petitioners do not reply to these issues. The City properly responded to comments on traffic impacts and did not improperly defer mitigation from traffic impacts.

### c. Air Quality Impacts

The FEIR found that Project operations could result in mass daily operational emissions of NOx and VOCs above the significance thresholds. The FEIR found that, in compliance with CEQA, the City had adopted all feasible mitigation measures to reduce the impacts from NOx and VOCs, and there were no feasible mitigation measures that could reduce those impacts to less than significant. AR 339-42 (Findings).

Petitioners' March 19, 2018 comments stated that the FEIR admitted the Revised Project would have significant air quality impacts, but it failed to adopt all feasible air quality mitigation measures. AR 5149-50. AR 3173. Petitioners' expert, SWAPE, suggested a number of feasible mitigation measures, and the City rejected them not because they are infeasible, but because they were taken from the Sacramento Metropolitan Air Quality Management District ("SMAQMD") and not SCAQMD. AR 3103-04 (Response 8-45). Petitioners argue that the City improperly rejected these measures based on their origin and not their infeasibility. Pub. Res. Code §§ 21002, 21081(a); Guidelines §§ 15126.4, 15091. The fact that measures had been implemented in Sacramento is evidence of their feasibility, not infeasibility. The City has no substantial evidence that the proposed air quality mitigation measures were infeasible within the meaning of CEQA. *See* Uphold Our Heritage v. Town of Woodside, *supra,* 147 Cal.App.4th at 603. Therefore, the City was precluded from adopting a statement of overriding considerations. Pet. Op. Br. at 15.

The City argues that it did not wrongly reject mitigation measures to reduce significant and unavoidable air quality impacts. Opp. at 26. The City's response to Petitioners' comments to the RDEIR stated: "Project development is already required to comply with the LA Green Building Code as well as the current CalGreen Code requirements for building efficiency. Several of the measures recommended in this comment are consistent with the current building requirements." AR 3098-99. In response to Petitioners' March 2018 suggested mitigation measures to address the Project's operational NOx and particulate emissions, the City explained that feasible mitigation measures had been incorporated into the Revised Project's design and regulatory compliance, and that the proposed measures would not reduce the primary source (household use of consumer products) of operational VOC emissions:

> "With respect to the recommended measures from this commenter, they are not likely to have any affect (*sic.*) on VOC emissions because most of the area source emissions would be generated by consumer products, including cleaning supplies, kitchen aerosols, cosmetics, and toiletries. None of the recommended measures… addresses this primary source of VOC emissions." AR 5250 (Response 7).

Opp. at 26.

The City noted that Petitioners suggested mitigation measures adopted by SMAQMD to apply to the Project's construction NOx and DPM emission impacts. AR 3103. The City explained that the FEIR found the Project's construction-related air quality emissions would be less than significant, and therefore no mitigation was required. AR 5250 (April 23, 2018 memo), 7805-06

32

(CPC appeal staff report). Mitigation is not required for effects which are not found to be significant. Guidelines §15126.4(a)(3). As such, the proposed measures were rejected as unnecessary. Opp. at 26.

In sum, the City contends that its responses show that (1) no additional feasible mitigation measures exist for operational NOx and VOC emissions, (2) Petitioners' proposed measures for NOx and VOC operational emissions either duplicate Revised Project measures or do not affect the household source of those emissions, and (3) certain of the proposed measures will not reduce either NOx or VOC emissions. Opp. at 27.

Petitioners do not reply to the City's arguments concerning the mitigation of operational emissions. Petitioners instead focus on construction-related emissions and argue that their expert, SWAPE, provided the only substantial evidence of the Revised Project's significant impacts on air quality from construction-related NOx emissions. SWAPE suggested numerous mitigation measures to reduce NOx construction impacts. AR 3070-71. Petitioners argue that the City's response to SWAPE's suggested mitigation measures did not claim—as the City does now—that such measures were unnecessary. Rather, the City responded only that "the suggested measures are from [SMAQMD] and are not from the SCAQMD. AR 3103. Moreover, the City never analyzed the construction-related NOx emissions of the Revised Project, so it cannot claim such mitigation measures are unnecessary. Petitioners conclude that the City's response is not substantial evidence that the mitigation measures were infeasible. Reply at 10.

Petitioners are incorrect. SWAPE initially suggested these mitigation measures in response to the RDEIR for the Project, and the City's response did state that the proposed measures were from SMAQMD, not SCAQMD. AR 3088, 3103. However, the FEIR included Alternative 5 (which is immaterially different from the Revised Project) and analyzed Alternative 5's construction-related NOx emissions. In March 2018, SWAPE provided comments to the FEIR that were nearly identical to their comments to the RDEIR. The City's response to those comments expressly stated that the Revised Project would not have significant construction air quality impacts and therefore mitigation was unnecessary. AR 7805-06.

The City can rely on this additional response even though it was not included in the FEIR. Unlike the project description, an agency may supplement a response to comment throughout the EIR review process, particularly where a commenter submits a new comment. Nor have Petitioners shown any prejudice from this supplemental response.

As a result, the City was entitled to rely upon its expert's opinion that the Revised Project's air quality construction impacts would be less than significant, and this determination is owed deference. Guidelines §15151; City of Long Beach, supra, 176 Cal.App.4th at 901-02. Since the City's expert concluded that no construction air quality impacts would be significant, SWAPE's proposed mitigation measures were unnecessary. See San Franciscans for Livable Neighborhoods v. City and County of San Francisco, supra, 26 Cal.App.5th at 636.

#### d. Health Risk Impacts

Petitioners' March 19, 2018 comments stated that SWAPE had pointed out that the RDEIR relied upon an outdated HRA methodology. AR 5150-51. OEHHA updated its HRA guidelines in 2015, yet the FEIR continued to rely on HRA methodology from 2003. AR 5151. As pointed out by SWAPE in an attachment to Petitioners' comment letter, SCAQMD has determined that "[t]he 2015 Guidance Manual supersedes OEHHA's 2003 version of its Guidance Manual." AR

5157. Petitioners argue that the FEIR's reliance on outdated methodology was improper because CEQA requires that an agency apply the analysis developed by relevant expert agencies. Berkeley Keep Jets Over the Bay Comm. v. Board of Port Comm'rs, ("Berkeley") (2001) 91 Cal.App.4th 1344, 1364-67. The City's failure to incorporate OEHHA's updated methodology for evaluation of an HRA rendered the FEIR legally deficient as an informational document. Pet. Op. Br. at 15-16.

The City persuasively argues that Petitioners are incorrect. Toxic air contaminants are a broad class of compounds known to cause or contribute to cancer and other adverse health effects. AR 466. Diesel exhaust is the predominant toxic air contaminant in urban air. AR 466. An HRA can aid in the analysis of the emission of toxic air contaminants, including the sources of those emissions (stationary or mobile sources), the duration of those emissions (temporary or long-term), and the impacts on sensitive receptors near toxic air contaminant-emitting sources. There is a possibility of toxic air contaminant emission from construction (temporary emissions from construction equipment) and operation (from mobile sources only; the Project's residential and retail uses are not stationary sources emitting toxic air contaminants). Both were evaluated in the DEIR. AR 484. For either construction or operations, the only toxic air contaminant of concern is DPM. AR 466, 484.

SCAQMD is the expert air quality agency with jurisdiction over the Revised Project. An HRA is potentially required only if toxic air contaminant screening criteria are met. As SCAQMD has yet to develop its own HRA methodology, it uses the OEHHA 2003 Guidance. AR 3094. The OEHHA Guidance was developed for the federal Air Toxics Hot Spots Information and Assessment Act ("Hot Spots Act"), which "is designed to provide information to state and local agencies and to the general public on the extent of airborne emissions from stationary sources . . ." AR 3094, 7807-08. In the SCAQMD air basin, the Hot Spot Act is implemented through SCAQMD Rule 1401 et. seq. for stationary new source review and permitting, which includes the 2015 OEHHA Guidance. Ibid. The Project is not subject to SCAQMD Rule 1401 because it is not a new stationary source. AR 5255-57 (Response 15). Based on SCAQMD's methodology using the OEHHA 2003 Guidance, no HRA was required as toxic air contaminant impacts are less than significant. Ibid. Opp. at 27-28.

Petitioners' claim that the OEHHA 2015 Guidance superseded its 2003 Guidance is incorrect. The OEHHA 2015 Guidance was promulgated under the federal Hot Spots Act, not CEQA. AR 3094. SCAQMD selects the pertinent HRA methodology, and it recommends the OEHHA 2003 Guidance. AR 3095 (SCAQMD "will continue to use the previous [2003] guidelines for CEQA determinations"). The City also has discretion to select the appropriate methodology. Guidelines §15064(b); Sierra Club v. County of Fresno, (2018) 6 Cal.5th 502, 514 ("a decision to use a particular methodology and reject another is amenable to substantial evidence review"). Opp. at 28.

Using the OEHHA 2003 Guidance, the DEIR determined that the Project's operation would not be a significant source of toxic air contaminants. AR 484. The DEIR noted that the typical sources of acutely and chronically hazardous toxic air contaminants are industrial truck stops and warehouse distribution facilities, neither of which would be part of the Project. AR 310. Therefore, no HRA was required for toxic air contaminants emitted from Project operation. This was explained to Petitioners in Response 8-19. AR 3093-97. Opp. at 29.

The DEIR also analyzed construction DPM emissions and determined that the impacts

34

from these short-term emissions to be less than significant following SCAQMD methodology. AR 484. OEHHA guidance does not apply to preparation of an HRA for DPM construction emissions, and the City informed Petitioners of this fact in response to their RDEIR comment. AR 3094. As a result, "SCAQMD has utilized OEHHA guidance for certain stationary source emissions for non-CEQA purposes, but has not yet adopted any HRA guidance for construction emissions." Ibid. Because the potential health risks associated with both construction and operational activities would be less than significant, the City responded to Petitioners that no HRA was required. AR 3097 (Response to 8-19). Opp. at 29.

Petitioners reliance on Berkeley, supra, 91 Cal.App.4th at 1364-67, is inapt. There, the agency declined to consider toxic air contaminant health risks on the basis that no standard was available. Id. at 1369-70. In this case, the DEIR evaluated toxic air contaminants and the potential for an HRA using SCAQMD's standard, the OEHHA 2003 Guidance, for operational impacts and using its own expert evaluation of construction impacts.

In reply, Petitioners argue that the City cannot avoid the FEIR's reliance on an outdated HRA methodology by citing statements from SCAQMD staff during a 2015 rulemaking process. AR 3094-95. According to Petitioners, these statements directly contradict more recent SCAQMD staff comments which advocate use of the 2015 OEHHA Guidance to account for the increased susceptibility of children to toxic air contaminants. Reply at 9-10. Petitioners provide no admissible evidence to support this contention.

The City's expert's analysis followed SCAQMD guidance, is entitled to deference, and is supported by substantial evidence. City of Long Beach, supra, 176 Cal.App.4th at pp. 899-902; Guidelines §15151.

### e. Public Services Impacts
Petitioners' March 19, 2018 comments argued that the FEIR failed to adequately respond to comments from the Los Angeles Fire Department ("LAFD") and Department of Sanitation ("Sanitation"). AR 5147-49.

### (i) Fire Protection Services Impact
Petitioners argue that LAFD commented that "fire protection would be inadequate" based on inadequate fire stations and facilities in proximity to the Project site. The FEIR took the position that such an impact need not be evaluated unless new fire stations were constructed. AR 5148. Petitioners commented that this conclusion ignored the fact that humans are a part of the environment and a project may have a significant effect on the environment if, inter alia, "[t]he environmental effects of a project will cause substantial adverse effects on human beings, either directly or indirectly." Pub. Res. Code §21083(b)(3); see also Guidelines §15126.2 (a project may cause a significant effect by bringing people to hazards). AR 5148. As such, Petitioners argue that the FEIR failed to adequately respond to LAFD's fire protection concerns. Pet. Op. Br. at 16.

LAFD commented that the Project will increase the need for fire protection and emergency medical services and, based on response distance from existing fire stations, fire protection services would be inadequate. AR 2994. The comment also stated that compliance with specified regulatory measures, and any additional recommendations later made, would reduce the impacts to an acceptable level. AR 2997. Opp. at 30.

The City's response in the FEIR stated that response times are not CEQA impacts by

35

themselves because CEQA requires assessment only of physical impacts to the environment. AR 2998. The City relied on City of Hayward v. Trustees of California State University, (2015) 242 Cal.App.4th 833, 843, which held that an increase in demand for public services can lead to a potentially significant environmental impact only if construction or expansion of a facility is required. The response concluded that a mere increase in demand for social services does not by itself constitute a significant environmental impact. AR 2998. Rather, response time is one of many factors in determining whether the Project would foreseeably result in the construction of new or expanded public service facilities which could cause significant impact to the environment. Ibid.

The FEIR response therefore stated that the analysis of whether there would be a significant impact emergency services impact is based on whether a significant impact would result from the construction of new or expanded facilities. The response further noted that a population increase does not necessarily result in an increased demand for emergency services. AR 2999. This is due to the fact that -- while a population increase may result in increased density and more residential construction -- modern buildings are constructed in accordance with increasingly stringent building and fire codes, making them safer and more resistant to fire. AR 2999. The FEIR's response concluded that the Project will not cause the construction of new or expanded facilities because the Project is implementing LAFD's recommendations for compliance with existing regulations to ensure that the growth associated with the Project would not result in substantially increased demand for fire protection services requiring new or expanded fire stations. AR 2999. Opp. at 31.

The City's response to the LAFD comment letter and the FEIR's analysis of fire protection impacts were adequate. LAFD concluded that compliance with regulations would adequately address its concern and the City agreed to do so. Although LAFD accepted the FEIR's response, Petitioners assert that the City's response only analyzed impacts to the physical environment (new fire stations) and not fire impacts on human beings. However, the FEIR took into consideration potential adverse effects on human beings by noting that it considered population, emergency response time, and modern building features in determining whether the Revised Project would have a significant fire protection impact. AR 2997.

In reply, Petitioners contend that the City's response to LAFD's comment was made for the Project, not Alternative 5 or the Revised Project. The City concedes that LAFD concluded that impacts would be reduced to an acceptable level only if the City incorporated LAFD's recommendations on the DEIR and "any additional recommendations made during later reviews of the proposed project." AR 2997. When the Project morphed into the Revised Project, LAFD had no opportunity to make further recommendations. The City is relying on responses to a comment made for the Project's 422 residential units without acknowledging that Alternative 5 and the Revised Project greatly increased that number. Petitioners contend that the City cannot rely on LAFD's recommendations when LAFD was unaware that the Revised Project would contain over 200 additional residential units. Reply at 11-12.[10]

_____

[10] At the July 16 hearing, Petitioners counsel pointed out that Mani Brothers supports its view that a project change from a commercial project to a predominantly residential project can result in an increased impact on public services which must be addressed in a subsequent environmental document. 153 Cal.App.3d at 1389, 1405.

36

As Real Party's counsel argued at the July 16, hearing, Petitioners' reply raises a new issue. The issue in Petitioners' moving papers was the adequacy of the City's response to LAFD's comment with respect to human impacts. For the first time in reply, Petitioners have argued that the response may have been adequate for the Project, but not the Revised Project. This is an improper expansion of issues, and Petitioners have waived their contention that the City never responded to LAFD's comments with respect to the Revised Project. Regency Outdoor Advertising v. Carolina Lances, Inc., (1995) 31 Cal.App.4th 1323, 1333.[11]

The City's responses to LAFD's comment about the Project's fire protection services were adequate and the significance determination for the Project is supported by substantial evidence.

### (ii) Sewer Impacts

The DEIR contained a wastewater impact analysis section for the Project. AR 781-89. Sanitation commented on sewer plant capacity: "Ultimately, this sewage flow will be conveyed to the Hyperion Water Reclamation Plant, which has sufficient capacity for the project." AR 2987, 3126. *See* AR 5486. As for local capacity, Sanitation concluded: "Based on the estimated flows, it appears the sewer system might be able to accommodate the total flow for your proposed project." AR 2987. Sanitation stated that detailed gauging would need to be conducted at the time of permitting to identify the specific sewer connection point and, that if that sewer or line did not have sufficient flow capacity at that time, the developer "will be required to build sewer lines to a point in the sewer system with sufficient capacity." AR 2987.

The FEIR's response to comments noted that Sanitation commented that it had conducted a preliminary evaluation of the Project's potential impacts to wastewater and provided a calculation of projected wastewater discharge from the Project. AR 2991 (Response 5-1). Sanitation commented that the Project might be able to accommodate the total flow of the Project, and that further detailed gauging and evaluation will be needed as part of the permit process. AR 2991 (Response 5-2). Sanitation further noted that the sewage will be conveyed to the Hyperion Treatment Plant, which has sufficient capacity to accommodate the Project. Ibid. The FEIR's response stated that Sanitation's comment validates the DEIR and no additional analysis is necessary. Ibid.

Petitioners contend that the FEIR's response was inadequate because it directly contradicts Sanitation's conclusion that further analysis was required. At the least, Real Party should have been required to cover the Project's fair share of the costs associated with any sewer upgrades that may be required. *See* Sundstrom v. Cnty. of Mendocino, (1988) 202 Cal.App.3d 296, 307. By failing to analyze and mitigate the Project's sewage impacts, and by failing to respond substantively to Sanitation's comment, the FEIR fails as an informational document concerning the Project's impact on sewage. Pet. Op. Br. at 16.

The City argues that the response was sufficient, and no further analysis was required. Sanitation commented was that local capacity may be able to accommodate the Project's sewage flow, but detailed gauging would have to be performed at the time of permitting. If necessary, Real Party would have to build sewer lines. As Petitioners contend, this is an improper deferral of

---

[11]Real Party also argued at the July 16 hearing that the Alternative 5 analysis addresses fire and sewer impacts. AR 3638-39. As Petitioners' counsel argued, the cited comments from the April 26, 2018 CPC appeal hearing are not substantial evidence.

37

environmental assessment under <u>Sundstrom</u>, *supra*, 202 Cal.App.3d at 307. Petitioners counsel at the July 16 hearing pointed out that there could be construction air and traffic impacts that result should Real Party be required to build a sewer line. This issue was required to be analyzed and not deferred until it occurred.

Petitioners also contend in reply that the City wrongly relies on Sanitation comments to the Project to conclude that the Revised Project would not have a significant impact on sewers. Reply at 11. Petitioners' point out that neither Sanitation's April 24, 2017 comment on the DEIR, nor its September 13, 2017 comment on the RDEIR concerned Alternative 5 or the Revised Project. In fact, Sanitation's September 13, 2017 comment to the RDEIR expressly cautioned that its April 24, 2017 comments were valid only because "[n]o changes have taken place regarding the wastewater generation." AR 3126. Petitioners note that the FEIR's analysis of wastewater generation from Alternative 5 explicitly stated that Alternative 5 "would generate 96,300 gallons of wastewater, which would be approximately 7.8 percent more than the Project's 89,320 gallons of wastewater per day." AR 3183. Because both Alternative 5 and the Revised Project have more residential units than the Project proposed in the DEIR, the resulting increase in wastewater generation renders Sanitation's comments inapplicable. As such, the City's conclusion that "Sanitation's letter is still valid" is incorrect. AR 3127. Reply at 11.

At the July 16, hearing, Real Party's counsel argued that Petitioners' reply raises a new issue. The court again agrees. The issue addressed in Petitioners' moving papers was the adequacy of the City's response to Sanitation's comment about the Project's sewage impacts. For the first time in reply, Petitioners argue that the response addressed the Project, a project that no longer exists, and failed to address the Revised Project. The adequacy of the response for the Revised Project is an issue that is waived. <u>Regency Outdoor Advertising v. Carolina Lances, Inc.</u>, *supra*, 31 Cal.App.4th at 1333.

The City's response to Sanitation's comment about the Project's sewer capacity was inadequate -- not because it failed to analyze the Revised Project, which is an issue Petitioners waived -- but because it failed to fully analyze the sewage impacts from a lack of local capacity.

### F. Conclusion

The Petition is granted. The FEIR certification and Revised Project approval must be set aside and a new or supplemental EIR prepared for public comment. Petitioners' counsel is ordered to prepare a proposed judgment and writ of mandate consistent with this decision, serve them on counsel for the opposing parties for approval as to form, wait ten days after service for any objections, meet and confer if there are objections, and then submit the proposed judgment and writ along with a declaration stating the existence/non-existence of any unresolved objections. An OSC re: judgment is set for September 17. 2019 at 1:30 p.m.

Dated: July 30, 2019

Superior Court Judge

38

455