EXHIBIT 10

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SOUTHWEST REGIONAL COUNCIL OF CARPENTERS et al., | **COURT OF APPEAL – SECOND DIST.** <br> **F I L E D** <br> Mar 07, 2022 <br> DANIEL P. POTTER, Clerk <br> S. Veverka   Deputy Clerk |
| Petitioners and Respondents, | B301374 |
| v. | (Los Angeles County |
| CITY OF LOS ANGELES et al., | Super. Ct. No. BS175189) |
| Defendants and Appellants; | |
| THE ICON AT PANORAMA, LLC, | |
| Real Party in Interest and Appellant. | |

APPEAL from a Judgment of the Superior Court of Los Angeles County. James C. Chalfant, Judge. Reversed.

Michael N. Feuer, Los Angeles City Attorney, Leonard P. Aslanian, Assistant City Attorney, Terry Kaufmann Macias and Kathryn C. Phelan, Deputy City Attorneys; Thomas Law Group, Tina A. Thomas, Amy R. Higuera, and Christopher J. Butcher for

Appellants, City of Los Angeles, Los Angeles City Council, and
Department of City Planning.

Ambruster Goldsmith & Delvac LLP, Damon P. Mamalakis
for Real Party in Interest and Appellant, The Icon at Panorama,
LLC.

Lozeau Drury, Richard T. Drury, Brian B. Flynn and
Rebecca L. Davis for Plaintiffs and Respondents, Southwest
Regional Council of Carpenters and Laborers' International
Union of North America, Local 300.

Rob Bonta, Attorney General of California, Edward Ochoa,
Senior Assistant Attorney General, Sarah E. Morrison,
Supervising Deputy Attorney General, Scott J. Lichtig, Lani M.
Maher, Deputy Attorneys General for Amicus Curiae Attorney
General of California.

Cox, Castle & Nicholson, Michael H. Zischke and Amy F.
Foo for Amicus Curiae California Building Industry Association,
California Business Properties Association, Building Industry
Association of the Bay Area.

Law Offices of Ryan Gordon and Ryan Gordon for Amicus
Curiae Saul Mejia.

Remy, Moose, Manley, Whitman F. Manley and Nathan O.
George for Amicus Curiae League of California Cities and
California State Association of Counties.

California Renter's Legal Advocacy and Education Fund,
Dylan Casey as Amicus Curiae.

David Petit for Amicus Curiae Natural Resources Defense
Council, Planning and Conservation League and Coalition for
Clean Air.

_____

2

The Icon at Panorama, LLC (Icon) proposed a mixed-use commercial and residential development in the Panorama City neighborhood of Los Angeles, to be called The Icon at Panorama. The City of Los Angeles (City) certified a final environmental impact report (FEIR) and approved the project. Southwest Regional Council of Carpenters and Laborers' International Union of North America, Local 300 (collectively, Petitioners), challenged the approval, principally arguing the City approved a project not described in the draft or final environmental impact reports. The trial court granted the unions' writ petition, finding the City's draft environmental impact report (DEIR) and FEIR lacked an accurate, stable, and finite project description as required by cases interpreting the California Environmental Quality Act (CEQA). (See, e.g., *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 193 (*Inyo*); *Washoe Meadows Community v. Department of Parks and Recreation* (2017) 17 Cal.App.5th 277, 288 (*Washoe Meadows*).) The trial court also concluded that the FEIR failed to adequately address a comment on local sewer capacity. It ordered the City to prepare and circulate a new or supplemental Environmental Impact Report (EIR).

Because we agree with the City and Icon that the City's EIRs contained a sufficiently accurate, stable and finite project description, and that the City's response to the comment regarding local sewer capacity was adequate given the nature of the proposed development, we reverse.

3

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### 1.    *DEIR, April 6, 2017.*

The developer, Icon, conceived of what the parties refer to as the Project as a mixed-use development on an approximately nine-acre site in Panorama City. The site is bounded on three sides by city streets: Roscoe Boulevard, Tobias Avenue, and Cedros Avenue.

Three commercial structures (a former Montgomery Ward, a restaurant, and an automotive repair shop, all vacant since 2003), occupy the Project site. The site is surrounded by a mix of residential, retail, office, and restaurant development, and is in a "Transit Priority Area."

On April 6, 2017, the City, as lead agency,[1] released the DEIR for public review and comment.[2] As described in the DEIR, Icon proposed to demolish the existing structures and build seven buildings, consisting of 422 residences (totaling 387,000 square feet), an additional 200,000 square feet of commercial space, including a 1,200-seat theater complex, a grocery store, and

---

[1]    A "'[l]ead agency'" is "the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." (Public Resources Code § 21067; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn.4.) Unless otherwise indicated, all further statutory references are to the Public Resources Code.

[2]    Once a DEIR is prepared, the public is provided notice and an opportunity to comment. (§ 21092.) These comments and responses, if any, are subsequently published in a FEIR. (Cal. Code Regs., tit. 14, §§ 15088–15089, 15204, subd. (a).)

associated parking for 1,690 vehicles in a multi-story parking structure. The commercial space would occupy five one- and two-story buildings with a six-level parking garage, and the residential units would occupy two seven-story buildings with two stories of above-ground parking. The Project would not include any affordable housing units.

The DEIR stated the Project was designed to provide for the efficient and functional development of the underutilized site, by allowing for regional commercial development through the replacement of vacant buildings and surface parking lots with new housing and commercial uses to meet community and regional demands. The Project would create new housing to meet the needs of existing residents and projected population growth within the Mission Hills/Panorama City/North Hills Community Plan area. In addition, the Project would eliminate blight and enhance the visual quality of Panorama City by providing a new and attractive development. The DEIR warned, however, that the Project would result in significant unavoidable environmental impacts, including emissions of volatile organic compounds and nitrous oxides resulting from increased traffic.

The DEIR listed four smaller alternatives to the Project:

(1) The required "No Project" alternative of no development whatsoever.

(2) The "Reduced Project" alternative consisting of 283 residential units (257,300 square feet), 134,000 square feet of commercial space, and 1,132 parking spaces. The residential units would be in two buildings up to five stories high, and the commercial uses would be in three separate one- and two-story buildings. According to the DEIR: "The design and configuration of this alternative would be similar to the Project. The main

5

difference would be the total square footage and building height,
resulting in a mixed use development with approximately 67
percent of the mass of the [P]roject."

(3) The "All Commercial Project" alternative containing no
residential units and consisting of 583,000 square feet of floor
area, with 2,500 parking spaces in a nine-story parking structure.
Per the DEIR, "[t]he proposed shopping center would feature a
mix of retail land uses that would complement the nearby
Panorama Mall shopping center to the east." The All Commercial
Project would consist of multiple buildings of up to three stories
with height limits of 60 feet.

(4) The "By-Right Project" alternative would be developed
without the zoning change required for the Project and would
include 350 residential units totaling 259,600 square feet, with
approximately 160,000 square feet of commercial space, and
1,350 parking spaces. The DEIR noted: "To conform to the
existing zoning requirements, the uses within the By-Right
Project Alternative would be segregated. The residential units
would be constructed within an L-shaped building up at the
northeastern portion of the Project Site. The seven-story
residential building would front Tobias Avenue and would wrap
around a two-story commercial building. Two additional smaller
commercial buildings (one and two stories) would front Roscoe
Boulevard."

Public comment on the DEIR highlighted two principal
issues: hazardous soil contamination and traffic impact.
Petitioners' expert soil consultant (Soil Water Air Protection
Enterprise (SWAPE)) opined the DEIR did not identify health
risks to construction workers and failed to consider harm to the
groundwater from soil contamination resulting from past site

uses as an automotive repair facility. Petitioners' traffic expert Daniel T. Smith opined that traffic service at the nearby intersection of Roscoe and Woodman would be reduced to an F level of service (due to increased traffic flow). Commenters asserted the DEIR failed to consider the proposed expansion of the adjacent Panorama Mall, which would add 266,000 square feet of commercial space next to the Project. In addition, the Los Angeles' Sanitation Department (LASAN) commented that wastewater would be handled by the Hyperion Water Reclamation Plant, which had sufficient capacity for the project. Detailed gauging, however, would be needed at the time of permitting to identify the local sewer connection point. If immediately adjacent sewer lines had insufficient capacity to convey anticipated wastewater, the developer would be required to pay for building sewer lines to a point in the sewer system with sufficient capacity.

Petitioners requested that the City adopt an alternative with reduced traffic impact, and suggested mitigation measures for emissions and traffic impacts.

### 2.   *Revised DEIR (RDEIR), August 31, 2017.*

The City revised the DEIR after considering the comments, and on August 31, 2017, released the RDEIR for public review and comment.  The RDEIR's primary focus was traffic. It noted the Project would affect seven intersections, but with roadway improvements and new signals, impacts could be reduced at one of the seven intersections.  The RDEIR's description of the Project and alternatives was identical to the DEIR; it did not add any new alternatives to the project.

Again, Petitioners and others submitted written
commentary, including Smith's opinion that the RDEIR
underestimated traffic impacts and vehicle trips per day, and
that the Project's significant and unavoidable impact would be
more severe than the RDEIR disclosed. Smith recommended
adoption of Alternative 2. SWAPE opined that due to this
underestimation of traffic, air pollution was similarly
understated in the DEIR. Further, SWAPE opined that an
updated traffic analysis was required that should be based upon
a correct estimation of vehicle trips per day.

### 3.     *Final EIR (FEIR), February 23, 2018.*

On February 23, 2018, the City issued its FEIR for the
Project. The Project description was the same as the DEIR, but
the FEIR added a new "Alternative 5," which consisted of 675
residential units (615,000 square feet of floor area), and a smaller
commercial component consisting of 60,000 square feet of office
space. Alternative 5 deleted the theater, grocery store, and
parking garage from the proposal. Alternative 5 would have 1,200
parking spaces, 940 for residential use and 260 for commercial
use. "The residential units would be developed along Cedros
Avenue in the western, central, and northern portions of the
Project Site. The commercial land uses would be developed in the
southern (Roscoe Boulevard) and eastern (Tobias Avenue)
portions of the project site. . . . An approximately 16,895-square-
foot public plaza would be located along Tobias Avenue, which
would function as passive landscaped and hardscaped area for
visitors and residents."

The reduction in commercial development reflected in
Alternative 5 was intended to reduce adverse effects on traffic

and air quality, while the increase in housing was designed to
address regional housing shortages. The FEIR responded to
Petitioners' comments regarding air quality analysis related to
construction activities.

In response, Smith opined that Alternative 5 would
generate more traffic than the FEIR stated, and the FEIR failed
to adopt an appropriate mitigation measure or the
environmentally superior alternative. Petitioners' written
comments in response to the FEIR highlighted what they
contended were excessive impacts on schools and the fire
department, and the FEIR's inadequate responses to sanitation
issues, in particular LASAN's comment described above.

### 4.   *Advisory Agency Approval of the Revised Project, A Smaller Version of Alternative 5, March 20, 2018.*

In March 2018, City staff recommended approval of a
smaller version of Alternative 5. This new alternative project had
not been included in the DEIR, RDEIR or the FEIR. Therefore,
the public had not received notice of or an opportunity to
comment on it as part of the EIR process. The new proposal
consisted of 623 residential units, with 60,000 feet of commercial
space. The parties refer to this new alternative as the Revised
Project. Compared to Alternative 5, the Revised Project contained
52 fewer residences (resulting in 99,430 fewer square feet of
residential construction), and the same commercial area.

In particular, the residences all would be within two
separate buildings, with one building spanning the entire
frontage of the site along Cedros Avenue, and the other
residential building positioned within the central portion of the

site, overlooking the public plaza on Tobias Avenue. Both buildings would reach six- and seven-stories in height, with four and five stories of residential uses over two levels of podium parking. Commercial uses would be located within two separate one-story buildings, fronting on Roscoe Boulevard and Tobias Avenue, located on the eastern and southern portions of the site. The two commercial buildings would be separated by an approximately 17,000 square-foot plaza, and served by a central surface parking lot and a ground-floor podium parking area below one of the residential structures. The revised Project similarly included the demolition and removal of the three existing vacant commercial buildings and associated surface parking areas.

On March 20, 2018, the Advisory Agency of the Planning Commission approved the Revised Project. The Advisory Agency described it as a "slightly reduced" version of the FEIR's Alternative 5, designed to eliminate some unavoidable impacts of the original Project.

### 5.   *Petitioners Appeal to the Planning Commission and City Council, April and August 2018.*

On April 3, 2018, Petitioners appealed the Advisory Agency approval of the Revised Project to the Planning Commission. Petitioners asserted the Revised Project did not comply with CEQA because the project description had changed after closure of public comments.[3] Petitioners pointed out that there had been extensive comments for a project never approved, and that the approved project had unstudied impacts on traffic, air quality,

---

[3]   There is no formal comment period for a FEIR. (See § 21091.)

schools, fire, police, and sewage. They asserted that such an EIR—one that added significant new information after the public comment period had expired—required new notice and recirculation for additional comments.

After a hearing held April 26, 2018, the Planning Commission observed that the Project was supported by local community groups, including the Chamber of Commerce, the LAPD, and area residents, and that the Revised Project had the same unavoidable impacts as the Project. The Planning Commission denied the appeal.

Petitioners appealed that decision to the Los Angeles City Council, raising the same arguments, but the Planning and Land Use Management Committee (which hears such appeals) denied the appeal. In August 2018, the City certified the Revised Project of 623 residential units and 60,000 square feet of commercial space.

### 6. *Petition for Writ of Mandate.*

Petitioners filed a verified petition for writ of mandate on October 1, 2018, seeking a set-aside of the Revised Project, the City's findings, and the project approval, based on (1) what they contend was an inadequate project description in the EIR because neither the DEIR, the RDEIR, nor the FEIR described the project that was ultimately approved; (2) failure to recirculate the EIR based upon the substantially changed project; (3) failure to adequately disclose and/or mitigate impacts to air quality, greenhouse gases, traffic, hazardous materials, and public services; and (4) failure to adequately analyze a reasonable range of alternatives.

Petitioners also argued that the revised project description violated the CEQA requirement of a "stable, accurate and finite project" description throughout the CEQA process. Respondents countered that the project remained a mixed-use project; as a result, the question was not whether the project description was stable, but rather whether the changes constituted "significant new information" requiring recirculation of the EIR under section 15088.5.

### 7.   *Trial Court Ruling.*

The trial court granted the petition after finding the City violated CEQA by failing to provide a stable, accurate, and finite project description and failing to address LASAN's comment adequately.

The court first addressed the City's argument that the project description was accurate, stable and finite, and that the issue was properly framed as whether the Revised Project constituted "new information" addressable only under CEQA's recirculation provisions, section 21092.1 and CEQA Guidelines[4] section 15088.5, subdivision (a). As framed by the trial court, "[t]he issue becomes whether the City's presentation and approval of the Revised Project can only be addressed as new information under [section 21092.1] and Guidelines section 15088.5, and not as a violation of the separate requirement for 'an accurate, stable and finite' project description."

Although it found petitioners had waived any argument that recirculation of a new or revised EIR containing a description of the Revised Project was required by Guidelines

---

4     The CEQA Guidelines are found at Cal. Code Regs., tit. 14, section 15000, et seq. (hereinafter "Guidelines").

section 15088.5, the court agreed that the Revised Project did not
constitute "new information" requiring recirculation of the FEIR
pursuant to that Guideline. The court held, however, that
nothing in section 15088.5, foreclosed an argument that the
project description had changed too much, i.e., was "unstable,"
even though recirculation was not required under section
21092.1.

 In evaluating the stability of the project description, the
court analyzed and applied *Inyo, supra,* 71 Cal.App.3d 185,
*Washoe Meadows, supra,* 17 Cal.App.5th 277, *South of Market
Community Action Network v. City and County of San Francisco*
(2019) 33 Cal.App.5th 321 (*SoMa*), and *Citizens for a Sustainable
Treasure Island v. City and County of San Francisco* (2014) 227
Cal.App.4th 1036 (*Treasure Island*).

 The trial court concluded the project description was
impermissibly unstable. "As in *Washoe Meadows* and *Inyo,* the
City's approval of the Revised Project must be set aside because
the Project described in the DEIR, RDEIR, and FEIR differed
significantly from the Revised Project adopted by the Advisory
Agency. The difference between the Revised Project's 623
residential units and 60,000 square feet of commercial space and
the Project's 422 residential units and 200,000 square feet of
commercial space . . . runs afoul of the CEQA
requirement . . . [that] 'for a project to be stable, the DEIR, the
FEIR, and the final approval must describe substantially the
same project.'" In particular, the court took issue with the fact
the Revised Project was never subject to a formal comment
period, which in the court's view presented a "moving target
which impaired the public's ability to participate in the
environmental review process."

13

The court rejected the City's reliance on *SoMa,* where two project alternatives (one commercial and one residential) that had similar physical footprints were evaluated side-by-side, with public comment on both schemes. "*SoMa* does not support the City's proposition that 'a project description is not rendered inadequate by changes in the allocation of space between defined project uses.'" The trial court distinguished *SoMa,* where there was one project with two options, and rejected the City's contention that the Revised Project was essentially the same mixed-use project as the original Project and the alternatives presented in the various iterations of the EIR, and was thus a "quintessential example of how CEQA" was supposed to operate as a project evolves in response to public comment.

The court opined, "an EIR's informative quality about environmental effects are irrelevant where different project descriptions vitiate the EIR process as a vehicle for intelligent public participation. . . . The issue is not whether the Revised Project has the same footprint, location, and environmental impacts as the Project, but rather whether the DEIR provided an accurate description of the Project and alternatives regardless of environmental impacts." "In this case, the Revised Project, a variant of Alternative 5 proposed in the FEIR, was adopted and was materially different than any alternative in the DEIR."

The court therefore concluded the DEIR "failed to identify a project or any alternative with a similar number of residential units and amount of commercial space as identified in the Revised Project. . . . The Revised Project's scope of 623 residential units was outside the range of any of the alternatives of the DEIR or RDEIR. . . . In sum, the problem with the stability of the

14

Project description is the City's timing by presenting Alternative 5 for the first time in the FEIR."

The court observed that although failure to comply with CEQA's informational requirements does not require reversal unless the petitioner establishes prejudice, the differing project descriptions resulted in prejudice. The trial court concluded "the failure to include relevant information preclude[d] informed decision making and informed public participation, thereby thwarting the statutory goals of the EIR process," citing *Washoe Meadows.* The court also addressed substantive arguments regarding the FEIR's evaluation of environmental impacts (air quality, traffic, health risks, and public service impacts), and found fault only with what it concluded was a failure by the City to respond adequately to LASAN's evaluation of local sewer capacity. The trial court found error in the City's failure to fully analyze sewage impacts based on a potential lack of immediately available local sewer line capacity.

The trial court ordered the FEIR certification and Revised Project approval set aside, and ordered the City to prepare a new or supplemental EIR for public comment.

The trial court entered final judgment on September 25, 2019, issuing a writ of mandate.

## DISCUSSION

The City argues on appeal that (1) Petitioners waived any recirculation challenge; (2) the trial court erred in adding a "materially different" test to CEQA's stable project description requirement because "significant new information" under section 15088.5 is the only ground upon which a trial court can order recirculation of an EIR; (3) the project description was not unstable; and (4) the City's response to LASAN's comment

15

regarding sewer impacts was adequate. Four amicus briefs[5] argue in favor of project approval, contending the trial court erred in not applying the section 15088.5 standard, and further argue that the trial court's test injects uncertainty into the CEQA process, discourages lead agencies from approving smaller projects in response to comments, and will result in a slowdown of new housing construction in a time of need. The California Attorney General and the Natural Resources Defense Council filed amicus briefs urging affirmance and asserting that the City's interpretation of CEQA would undermine public participation and informed decision-making.

## I.   OVERVIEW OF CEQA AND STANDARD OF REVIEW.

### A.   CEQA's Purpose and the Function of an EIR.

CEQA advances four related purposes: (1) informing "the government and public about a proposed [project's] potential environmental impacts;" (2) identifying "ways to reduce or avoid environmental damage;" (3) preventing "environmental damage by requiring project changes via alternatives or mitigation measures when feasible;" and (4) disclosing "to the public the rationale for governmental approval of a project that may significantly impact the environment. [Citation.]" (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382 (*CBIA*).)

---

5      California Renters Legal Advocacy and Education Fund, the League of California Cities and California State Association of Counties, the California Building Industry Association, and Saul Mejia, an individual, filed amicus briefs urging reversal.

"To further these goals, CEQA requires [public] agencies follow a three-step process when planning an activity that could fall within its scope. [Citations.] First, the agency must determine whether a proposed activity is a '[p]roject,' i.e., an activity that is undertaken, supported, or approved by a public agency and that 'may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment.' [Citation.]" (*CBIA, supra,* 62 Cal.4th at p. 382.) "Second, if the proposed activity is a project, the agency must [determine] whether the project is exempt from the CEQA review process under either a statutory exemption [citation] or a categorical exemption set forth in the CEQA Guidelines [citations]. If the agency determines the project is not exempt, it must then decide whether the project may have a significant environmental effect. [If not,] the agency 'must "adopt a negative declaration to that effect."' [Citations.]" (*Ibid.*, fn. omitted.) Finally, "if the agency finds the project 'may have a significant effect on the environment,' it must prepare an EIR before approving the project. [Citations.]" (*Ibid.*; *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511-512 (*County of Fresno*).)

An EIR "is an informational document" designed to "provide public agencies and the public in general with detailed information about the effect [of] a proposed project . . . on the environment." (§ 21061.) The EIR also provides methods by "which the significant effects of such a project might be minimized" and proposes alternatives to the project. (*Ibid.*) "The EIR must set forth not only environmental impacts and mitigation measures to be reviewed and considered by state and local agencies, but also project alternatives [citations]—*including*

*a 'no project' alternative.* [Citation.] . . . '[T]he mitigation and
alternatives discussion forms the core of the EIR.' [Citation.]"
(*Friends of the Eel River v. North Coast Railroad Authority* (2017)
3 Cal.5th 677, 713, Emphasis in original.)

## B.  Standard of Review.

An agency abuses its discretion under CEQA either by
failing to proceed in the manner CEQA requires or by reaching
factual conclusions unsupported by substantial evidence.
(*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2
Cal.5th 918, 935 (*Banning Ranch Conservancy*).) This
"procedural issues/factual issues dichotomy" works well for courts
reviewing agency determinations. (*County of Fresno, supra,* 6
Cal.5th at p. 512.) Judicial review of these two types of error
differs significantly, however. "'While we determine de novo
whether the agency has employed the correct procedures,
"scrupulously enforc[ing] all legislatively mandated CEQA
requirements" [citation], we accord greater deference to the
agency's substantive factual conclusions. In reviewing for
substantial evidence, the reviewing court "may not set aside an
agency's approval of an EIR on the ground that an opposite
conclusion would have been equally or more reasonable," for, on
factual questions, our task "is not to weigh conflicting evidence
and determine who has the better argument." [Citation.]'
[Citation.]" (*Banning Ranch Conservancy, supra,* 2 Cal.5th at
p. 935.)

"Where an EIR is challenged as being legally inadequate, a
court presumes a public agency's decision to certify the EIR is
correct, thereby imposing on a party challenging it the burden of
establishing otherwise. [Citations.]" (*Sierra Club v. City of*

18

*Orange* (2008) 163 Cal.App.4th 523, 530 (*City of Orange*).) Our review in a CEQA case, as in other mandamus actions, is the same as that of the trial court. (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1162 (*Bay-Delta*).) We review the agency's action, not the trial court's decision, and our inquiry extends only to whether there has been a prejudicial abuse of discretion on the part of the agency. (*Id.* at pp. 1161–1162.) We do not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document. (*Id.* at p. 1161.) Generally, that inquiry is a mixed question of law and fact subject to de novo review, "but to the extent factual questions predominate, the more deferential substantial evidence standard" of review applies. (*County of Fresno*, *supra,* 5 Cal.5th at p. 516.)

The failure to comply with CEQA's informational requirements does not require reversal unless there is prejudice. (§ 21005, subd. (b).) Such prejudice is found, however, if the failure to include relevant information precludes informed decision-making and informed public comment. (*Washoe Meadows, supra*, 17 Cal.App.5th at p. 290.) The omission of relevant information is deemed prejudicial "'regardless of whether a different outcome would have resulted if the public agency had complied with those provisions.' [Citations.]" (*Ibid.*, citing § 21005, subd. (a).)

## II.    THE REVISED PROJECT DESCRIPTION COMPLIED WITH CEQA.

### A.    CEQA's Stable Project Requirement.

The primary purpose "of an EIR is to give the public and government agencies the information needed to make informed

decisions, thus protecting "'not only the environment but also
informed self-government.'" [Citation.]" (*Bay-Delta, supra,* 43
Cal.4th at p. 1162.) "The ultimate inquiry, as case law and the
CEQA Guidelines make clear, is whether the EIR includes
enough detail 'to enable those who did not participate in its
preparation to understand and to consider meaningfully the
issues raised by the proposed project.' [Citations.]" (*County of
Fresno, supra,* 6 Cal.5th at p. 516.) The sufficiency of an EIR is to
be evaluated in light of what is reasonably feasible. (*California
Oak Foundation v. Regents of the University of Southern
California* (2010) 188 Cal.App.4th 227, 262.) "The overriding
issue on review is thus 'whether the [lead agency] reasonably and
in good faith discussed [a project] in detail sufficient [to enable]
the public [to] discern from the EIR the "analytic route the . . .
agency traveled from evidence to action." [Citation.]' [Citation.]"
(*Ibid.*)

A draft EIR must contain a project description. (*SoMa,
supra,* 33 Cal.App.5th at p. 332.) An accurate project description
is the "*sine qua non*" of an informative and legally sufficient EIR.
(*Ibid.*) The project description must include (a) the precise
location and boundaries of the proposed project, (b) a statement
of the objectives sought by the proposed project, (c) a general
description of the project's technical, economic and environmental
characteristics, and (d) a statement briefly describing the
intended use of the EIR. (Guidelines, § 15124, subds. (a)–(d).)

The project description must be "accurate, stable and
finite[.]" (*Inyo, supra*, 71 Cal.App.3d at p. 193.) "A project
description that gives conflicting signals to decision makers and
the public about the nature of the project is fundamentally
inadequate and misleading. [Citation.]" (*SoMa, supra,* 33

Cal.App.5th at p. 332.) This description of the project is an indispensable element of a valid EIR. (*Washoe Meadows, supra*, 17 Cal.App.5th at p. 287.) Whether the EIR adequately describes the project is reviewed de novo. (*Ibid.*)

A quintet of cases evaluating whether a project description remained stable throughout the EIR process provides some guideposts for interpreting the stable project description requirement. A salient conclusion emerges from these cases: a stable description permits informed public participation in the environmental review process. Without that, the purposes of CEQA are nullified and the statute is violated.

### 1. *Inyo.*

*Inyo* was the first decision to articulate the need for a stable, definite, and unambiguous project description as part of CEQA's environmental review process. The project in *Inyo* involved the extraction of subsurface water in the Owens Valley by the City of Los Angeles's Department of Water and Power. (*Inyo, supra*, 71 Cal.App.3d at p. 188.) Although the EIR initially described the project as a proposed increase in extraction of subsurface water, other portions of the EIR discussed different proposals. (*Id.* at p. 190.) These proposals included adding extensive infrastructure, including canals, substantially increased pumping of groundwater, and export of additional groundwater through the City's aqueducts to the San Fernando Valley. (*Ibid.*) As a result, it was unclear what project was being evaluated. The environmental impact discussed in the FEIR was extensive, including irreversible changes to natural vegetation. (*Id.* at p. 191.)

*Inyo* acknowledged that the EIR adequately described the
broader project's environmental effects, and thus the informative
quality of the EIR's environmental forecasts were not affected by
the "ill-conceived, initial project description." (*Inyo, supra*, 71
Cal.App.3d at p. 197 [elasticity of project concept did not vitally
affect the impact sections of the report].) Nonetheless, the court
concluded that the "incessant shifts among different project
descriptions [within the same EIR] vitiate[d] the City's EIR
process as a vehicle for intelligent public participation," because
"[a] curtailed, enigmatic or unstable project description draws a
red herring across the path of public input." (*Id.* at pp. 197, 198.)

### 2.    *Washoe Meadows.*

More recently, in *Washoe Meadows, supra*, 17 Cal.App.5th
277, the court reiterated CEQA's requirement of a clear and
unambiguous project description. In *Washoe Meadows*, the
California State Department of Parks and Recreation (the
Department) proposed the "'Upper Truckee River Restoration and
Golf Course Reconfiguration Project'" to improve Truckee River
and Lake Tahoe water quality, and to preserve and protect
wildlife habitat. (*Id.* at pp. 282–284.) The draft EIR identified five
alternatives for the project without specifying a preferred
alternative, stating the Department would select a preferred
alternative after "'receipt and evaluation of public comments.'"
(*Id.* at p. 283.) A discussion of that decision would be included in
the FEIR. (*Ibid.*) The FEIR "identified '[a] refined version of
Alternative 2'" as the "proposed preferred alternative" and
explained the environmental rationales for the choice. (*Id.* at pp.
283–284.)

*Washoe Meadows* found this project description legally impermissible under CEQA. (*Washoe Meadows, supra*, 17 Cal.App.5th at p. 285.) "Dispositive of this appeal is the [draft] EIR's failure to provide the public with an accurate, stable and finite description of the project." (*Ibid*.) "Rather than providing inconsistent descriptions of the scope of the project at issue, the DEIR did not describe a project at all. Instead, it presented five different alternatives . . . ." (*Id*. at p. 288.) "'A DEIR that states the eventual proposed project will be somewhere in "a reasonable range of alternatives" is not describing a stable proposed project.'" (*Ibid*.) "But as [*Inyo*] makes clear, the problem with an agency's failure to propose a stable project is not confined to 'the informative quality of the EIR's environmental forecasts.' [Citation.] Rather, inconsistencies in a project's description, or (as here) the failure to identify or state any project at all, impairs the public's right and ability to participate in the environmental review process." (*Ibid*.) In particular, *Washoe Meadows* took issue with the vast differences in the five alternatives, each located in a different place along the Truckee River and thus creating a different footprint, and each creating a different set of impacts requiring different mitigation measures. (*Id*. at p. 289.)

*Washoe Meadows* found the Department was able to provide certainty; it had selected a preferred alternative as part of its public scoping process for the project. (*Washoe Meadows, supra*, 17 Cal.App.5th at pp. 283–284.) But it simply failed to "describe a project at all. Instead, it presented five different alternatives for addressing the Upper Truckee River's contribution to the discharge of sediment into Lake Tahoe, and indicated that following a period for public comment, one of the

alternatives, or a variation thereof, would be selected as the project." (*Id*. at p. 288.)

It did not matter to the *Washoe Meadows* court that the draft EIR thoroughly analyzed the alternative that was ultimately selected in the final EIR. (*Washoe Meadows, supra*, 17 Cal.App.5th at p. 288.) "[T]he problem with an agency's failure to propose a stable project is not confined to 'the informative quality of the EIR's environmental forecasts.' [Citation.]" (*Ibid*.) Rather, a failure to identify or select a project at all "impairs the public's right and ability to participate in the environmental review process." (*Ibid*.)

### 3.    *SoMa.*

The project in *SoMa* involved a four-acre site in downtown San Francisco in the area of Fifth and Mission Streets intended to provide mixed-use space for the area's technology industry. (*SoMa, supra,* 33 Cal.App.5th at pp. 327–328.) The existing space consisted of seven parking lots and eight buildings with approximately 317,700 square feet of space that included the historic Chronicle Building. (*Id* at p. 328.) THE DEIR described two options for the project, a "residential scheme" and an "office scheme." (*Ibid*.) The project would consist of buildings ranging from 195 to 470 feet tall. (*Ibid*.) Under both schemes, the project's square footage was approximately the same, although the office scheme had a larger "'building envelope' and higher density than the residential scheme." (*Ibid*.) Following public comment, the City's planning commission approved the project. (*Id*. at pp. 328-329)

In *SoMa,* the petitioners challenged the FEIR as "inadequate" because it presented two different schemes, and as

a result was confusing and hampered their "ability to understand which project was actually proposed and analyzed." (*SoMa, supra,* 33 Cal.App.5th at p. 332.) *SoMa* rejected this contention because under both schemes, the project involved construction of ground floor space, similar massing of structures, retention of the historic Chronicle Building, demolition of all other buildings on the site, and construction of four new buildings ranging from 195 to 470 feet. (*Id.* at p. 333.) The DEIR contained text and tables describing in detail both schemes. (*Ibid.*) Thus, "the record reveals the EIR in this case described one project—a mixed-use development involving the retention of two historic buildings, the demolition of all other buildings on the site, and the construction of four new buildings and active ground floor space—with two options for different allocations of residential and office units. The analysis was not curtailed, misleading, or inconsistent. If anything, it carefully articulated two possible variations and fully disclosed the maximum possible scope of the project. The project description here enhanced, rather than obscured, the information available to the public." (*Id.* at pp. 333–334, fn. omitted.)

In conclusion, *SoMa* observed "[p]laintiffs do not dispute the [draft] EIR's project description met CEQA technical requirements, and do not describe any information that was required to be included in the project description but was not. [Citation.]" (*SoMa, supra,* 33 Cal.App.5th at p. 332.) In fact, the draft EIR included "site plans, illustrative massing, building elevations, cross-sections and representative floor plans for both options." (*Id.* at p. 333.) Thus, the project description met the information required by the Guidelines. (*Id.* at p. 355; see also Guidelines, § 15093, subd. (a) [requiring a general description of the project's technical, economic and environmental

characteristics].) "In any event, when assessing the legal
sufficiency of an EIR, we do not look for perfection, but [for]
'adequacy, completeness, and a good faith effort at full
disclosure.' [Citations.]" (*Soma*, *supra*, at p. 334.)

### 4.    *Treasure Island.*

*Treasure Island* involved a 20-year development plan to
convert a former military base on a man-made island in the San
Francisco Bay into a new mixed-use community. (*Treasure
Island, supra*, 227 Cal.App.4th at p. 10431044.) The island was
contaminated with hazardous waste requiring extensive cleanup.
(*Id.* at p. 1056.) As a result, the project proponents could not
precisely predict when the island would be available for
development. (*Id.* at pp. 1056–1057.)

The City and County of San Francisco certified the FEIR
containing a mixed-use development consisting of up to 8,000
residential units (25 percent of which were to be below-market),
up to 140,000 square feet of retail space and 100,000 square feet
of new office space, restoration and reuse of historic buildings,
300 acres of park, plus bike and transit facilities. (*Treasure
Island, supra*, 227 Cal.App.4th at p. 1044.) Due to the hazardous
materials cleanup, the project was to be constructed in phases
over a 15- to 20-year period. (*Ibid.*)

*Treasure Island* rejected claims that the project description
was inadequate and misleading. (*Treasure Island, supra*, 227
Cal.App.4th at p. 1055.) *Treasure Island* concluded that a project
description that included both fixed elements (such as street
layouts) and conceptual elements (such as the shape of buildings
or specific landscape designs) was all that could be meaningfully
provided at present. (*Id.* at pp. 1053–1054.) Although the EIR in

*Treasure Island* did not describe the details of all elements of the project, the agency committed to conduct subsequent CEQA review when project details were developed. (*Id.* at p. 1051.) "The EIR repeatedly acknowledges the duty to perform supplemental review under section 21166 as the [p]roject builds out over 15 to 20 years." (*Ibid.*) Thus, the EIR could not be faulted for not providing detail that, due to the nature of the project, simply did not exist at the time of the FEIR. (*Id.* at p. 1054, citing Guidelines, § 15146 ["'[T]he degree of specificity required in an EIR will correspond to the degree of specificity involved in the underlying activity which is described in the EIR.'"].)

  *Treasure Island* distinguished *Inyo* on the ground that *Inyo* did not address "a situation where the project was rendered unstable simply because specific building and design decisions were not made in the EIR. Rather, in [*Inyo,*] the parameters of the prospective project itself were unclear [because initially the] EIR described the project as a 51-cubic-feet-per-second increase in surface pumping to supply water used in the Owens Valley. [Citation.] The EIR, however, went on to analyze a project far greater in scope, including higher rates of pumping and a vast infrastructure needed to deliver water to Los Angeles County. [Citation.] [Further,] the project description changed throughout the EIR itself." (*Treasure Island, supra*, 227 Cal.App.4th at pp. 1054–1055.) In the case before it, *Treasure Island* found the EIR was sufficient because it contained an 84-page section describing the project in great detail, including project features, site plans, permits, and agencies with jurisdiction. (*Id.* at p. 1055.)

27

548

### 5. *Stop the Millennium.*

In 2008, Millennium Hollywood LLC (Millennium) proposed to build a mixed-use development with a hotel, office space, a sports club, residences, commercial space and restaurants. (*STOPTHEMILLENNIUMHOLLYWOOD.COM v. City of Los Angeles* (2019) 39 Cal.App.5th 1, 6 (*Stop the Millennium*).) The project site consisted of 4.47 acres near Hollywood Boulevard on Vine Street surrounding the historic Capitol Records building. (*Ibid.*) The project would consist of three separate towers arising out of low-rise buildings surrounding the preserved Capitol Records building and incorporate extensive open space. (*Ibid.*) The permit application contained detailed site plans, elevations for the buildings, and architectural renderings. (*Id.* at p. 7.) After being informed the enclosed balconies would require a variance, Millennium took no further action on the project until 2011. (*Ibid.*)

Millennium submitted a new proposal in April 2011. The proposal's project shared similarities with the 2008 project, but did not contain much detail about what Millennium proposed to build, instead describing a project that was "'a mix of land uses, including residential dwelling units, luxury hotel rooms, office and associated uses, restaurant space, [a] health and fitness club [ ] and retail establishments.'" (*Stop the Millennium, supra,* 35 Cal.App.5th at pp. 7–8.) The draft EIR similarly contained few specifics, stating that the project "'would implement a Development Agreement . . . that would vest the [p]roject's entitlements, establish detailed *and flexible* development parameters for the Project Site and ensure that the [p]roject is completed consistent with [these parameters].'" (*Id.* at p. 9.) Further, the DEIR stated that because flexibility was key, "a

conceptual plan has been prepared as an *illustrative scenario* to demonstrate *a potential development program*." (*Id.* at pp. 9–10.) The conceptual plan and two other scenarios were identified in the DEIR. (*Id.* at p. 10.) The FEIR, published in 2013, included without modification the project description in the DEIR. (*Id.* at p. 11.)

The trial court concluded the project description was not stable or finite because the conceptual approach used to define the project impermissibly deferred a portion of the environmental impact analysis. (*Stop the Millennium, supra,* 35 Cal.App.5th at p. 14.) *Stop the Millennium* relied on *Inyo* and *Washoe Meadows.* (*Id.* at p. 18.) "In this case, the project description is not simply inconsistent, it fails to describe the siting, size, mass, or appearance of any building proposed to be built at the project site. The draft EIR does not describe a building development project at all. Rather, it presents different conceptual scenarios that Millennium or future developers may follow for the development of this site. These concepts and development scenarios—none of which may ultimately be constructed—do not meet the requirement of a stable or finite proposed project." (*Id.* at p. 18.) *Stop the Millennium* affirmed the trial court, finding Millennium's conceptual approach to the project failed to present any concrete proposal, thereby creating an obstacle to informed public participation. (*Id.* at p. 20.)

29

## B.     The Revised Project—a Variant of Alternative 5—Complied With CEQA.

### 1.     The Revised Project Retained the Same Components.

As the case law illustrates, the requirement of an accurate, stable, and finite project description is the "sine qua non" of an informative and legally sufficient EIR. (*SoMa, supra,* 33 Cal.App.5th at p. 332.) As noted above, this requirement has been reiterated in a number of cases since the seminal case of *Inyo.* (See, e.g., *Treasure Island, supra*, 227 Cal.App.4th at p. 1052 ["This court is among the many which have recognized that a project description that gives conflicting signals to decision makers and the public about the nature and scope of the project is fundamentally inadequate and misleading [citation.]"]; *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 84–89 [EIR failed as an informational document because the project description was inconsistent and obscure as to the true purpose and scope of the project]; *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 653 ["'[a]n EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project[ ]'"].)

Here, the City did not violate CEQA's requirement of an accurate, stable, and finite project description. The project, from inception through approval, was a mixed-use commercial/ residential project on a defined project site. The only changes involved the composition and ratio of the residential to commercial footprint, but the proposals demonstrate that the

30

overall size of the project remained consistent, and the site remained the same.

The project started as a nearly equal balance of commercial (200,000 square feet) and residential (387,000 square feet, 422 units) uses. The four alternatives in the DEIR included a mixed-use project containing 283 residential units and a reduced commercial footprint, an all-commercial project of 583,000 square feet in a nine-story structure, and a mixed-use project that did not require a zoning change but would consist of 350 residences (259,600 square feet) and 160,000 square feet of commercial space in a seven-story residential tower and a two-story commercial building.

Alternative Five, presented in the FEIR, consisted of 675 residences (615,000 square feet), and a reduced amount of commercial space (60,000 square feet), with the latter reduction in size intended to address comments regarding traffic impacts from commercial development. Ultimately, the Revised Project had a slightly smaller residential component than Alternative 5 (623 residences), and the same amount of commercial space (60,000 square feet).

In terms of the buildings' profile, the initial DEIR presented a mix of building uses that ranged from seven buildings in the initial project (one- and two-story buildings), to the Reduced Project alternative in the DEIR (one- and two-story commercial uses with two five-story buildings comprising the residential component), the All Commercial Project (multiple buildings up to three stories, with a nine-story parking structure), and the By Right Project with a seven-story residential building. The Revised Project contained three fewer commercial buildings than the original project and contained the

31

same number of residential buildings (two), each of which would be six to seven stories high.

An analysis of the various permutations of the project alternatives establishes that if residential units were added, commercial space was subtracted. Various arrangements of building profiles were proposed within this framework, yet the physical layout of the project itself remained consistent and within the defined outline of the project site. Admittedly, the approved project had a slightly different mix of residential versus commercial development than the alternatives presented in the DEIR and FEIR. While the number of residences in the approved project exceeded the number of housing units in the various alternatives in the DEIR, it was less than the number of residences in the FEIR's alternative 5. Under the circumstances, the project definition was sufficiently accurate and stable.

*Inyo* is readily distinguishable. In *Inyo*, the project description was flawed because it was internally inconsistent within the DEIR and because the actual project was much larger in scope than some versions of the project description in the DEIR. (*Inyo, supra,* 71 Cal.App.3d at pp. 197, 198.) Here, the public was given the opportunity to consider and comment on various alternative compositions of the proposed residential/commercial mixed-use development all within a defined project footprint. The alternative selected, although not included within the DEIR or FEIR, mitigated traffic impacts by altering the residential/commercial mix, stayed within the project footprint, and was consistent with the mixed-use project definition.

*Washoe Meadows* also is readily distinguishable. As noted above, in that case the state agency presented multiple project

alternatives, all with different footprints and differing environmental impacts, leading the court to conclude the public was confused about which project to comment on. Here, the project alternatives presented for public input had the same footprint as each other and the Revised Project was very similar in scope and use to alternatives considered. There was no evidence of widely varying environmental impact between the various project alternatives presented to the public and the Revised Project.

In *Treasure Island,* the project description did not include all environmental mediation because the scope of the necessary work was not known at the time of the EIR. (*Treasure Island, supra,* 227 Cal.App.4th at p. 1055.) Here, the size and condition of the property was fixed and did not necessitate future evaluations.

In *SoMa,* there were two alternatives, one commercial and one residential, that were fully vetted in the EIRs. (*Soma, supra,* 33 Cal.App.5th at pp. 333–334.) Here, the Project, its alternatives, and the Revised Project all involved varying mixes of residential and commercial uses on a well defined site. Although the Revised Project was not publicly vetted, it was not so significantly different from the project alternatives in the DEIR to conclude the project definition was unstable.

Finally, unlike *Stop the Millennium,* which had no meaningful project description, the descriptions of the initial project, all alternatives, and the Revised Project were sufficiently detailed. Each project contained site renderings and layouts, square footages, and building descriptions.

In summary, we agree with the City's arguments that consideration of additional alternatives after a draft EIR is

circulated does not render a project description unstable. Here, the DEIR contained all the mandatory elements under CEQA, including a general description of the project's characteristics (including environmental impacts), its objectives, and its intended uses. (See Guidelines, §15124.)

### 2. Public Comment on the Revised Project was not Required.

We acknowledge that the public had no opportunity to comment on the specific project actually approved, because it was not included in any EIR circulated for comment. But CEQA does not appear to require the public be afforded an opportunity to comment on the final approved project by either including it as an alternative in the DEIR or RDEIR—or recirculating a RDEIR that contains a description of the final approved project and allows for public comment. CEQA Guidelines section 15088.5 subdivision (a) (3) mandates recirculation where a "feasible project alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the environmental impacts of the project, but the project's proponents decline to adopt it." This is not a situation where the proponent declined to adopt a feasible project alternative or mitigation measure, so that provision does not apply. And in any event, the petitioners waived any recirculation challenge.

Although we believe decision-makers and the public would be better served if the public had an opportunity to comment on the actual project before approval, we decline to engraft that requirement into CEQA. This is especially the case where, as here, the State and region are in the midst of a housing shortage and the dispute centers on the number of residential units

34

approved in an urban in-fill development. (See § 21083.1;
*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60
Cal.4th 1086, 1107.) Section 21083.1 directs courts "not [to]
interpret [the CEQA statutes] or the state guidelines adopted
pursuant to Section 21083 in a manner which imposes procedural
or substantive requirements beyond those explicitly stated in
[CEQA] or in the state guidelines." (§ 21083.1.) The purpose of
section 21083.1 is to "limit judicial expansion of CEQA
requirements" and to "'reduce the uncertainty and litigation risks
facing local governments and project applicants by providing a
"safe harbor" to local entities and developers who comply with the
explicit requirements of the law.'" (*Berkeley Hillside Preservation,
supra,* 60 Cal.4th at p. 1107.)

Here, the City complied fully with CEQA's information
requirements by providing a combined total of 92 days of public
comment on the DEIR, which resulted in revision to the original
Project based on public comments received. From March 2018
when the Revised Project was identified by City staff in response
to public comment, to the final City Council hearing in August
2018 approving the Revised Project, the public had five months
and multiple public hearings to comment on the Revised Project.
And, indeed, the City received comments on the Revised Project,
which—with the exception of Petitioners' comments—
overwhelmingly supported the Revised Project, as well as its
reduction in environmental impacts and increase in critically
needed housing. (See, e.g., AR 3621-3634,3699-3713, 5240, 5295,
6516, 7601, 7603-7605, 7609.) The City contends this is precisely
the way "CEQA is supposed to work." (*Treasure Island, supra*,
227 Cal.App.4th at 1062.)

35

Moreover, petitioners cannot show any prejudice flowing from the City's inclusion of Alternative 5 in the FEIR and its approval of the Revised Project, although neither was circulated for an official period of public comment. The record establishes there was extensive commentary on the original alternatives, and that commentary on factors like traffic and environmental contamination were taken into account before preparation of the FEIR, and formed the basis for the Revised Project. Thus, there was no prohibited impediment to informed decision-making.

## C.    Recirculation Under Section 15088.5

### 1.    *When Recirculation is Required.*

The parties dispute whether recirculation under the standards of section 15088.5 is the only test for recirculating an EIR for additional public review. The City contends the trial court's "materially different" project alternative test conflicts with case law on circulation, thereby rendering the recirculation test meaningless. (See, e.g., *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 223-224.) The City also asserts that Petitioners waived any argument under section 15088.5. Petitioners assert that recirculation contemplated by 15088.5 has no application to an unstable project description.

"If the lead agency adds 'significant new information' to the EIR subsequent to the close of the public comment period but prior to certification of the final EIR, CEQA requires that the lead agency provide a new public comment period. (§ 21092.1.)" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1124-1125, italics omitted, fn. omitted, (*Laurel Heights II*); *Mount Shasta Bioregional Ecology*

36

*Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 217.) Recirculation means making the revised EIR available for public review and consulting with the other agencies again before certifying the EIR. (Guidelines, § 15088.5, subd. (a).) "New information added to an EIR is not 'significant' unless the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement." (*Ibid*.)

"'Significant new information' requiring recirculation include[s], for example, a disclosure showing that: [¶] (1) A new significant environmental impact would result from the project or from a new mitigation measure proposed to be implemented[;] [¶] (2) A substantial increase in the severity of an environmental impact would result unless mitigation measures are adopted that reduce the impact to a level of insignificance[;] [¶] (3) A feasible project alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it[;] [¶] (4) The draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded." (Guidelines, § 15088.5, subd. (a).)

Recirculation is thus "not required simply because new information is added. . . . '[T]he final EIR will almost always contain information not included in the draft EIR' given the CEQA statutory requirements of circulation of the draft EIR, public comment, and response to these comments prior to certification of the final EIR. . . . '[R]ecirculation was intended to

be an exception, [not] the general rule.' [Citation.]" (*South County Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 328 (*South County*).)

Under section 15088.5, we review for substantial evidence an agency's decision not to revise and recirculate an EIR. (Guidelines, § 15088.5, subd. (e).) In doing so, we resolve reasonable doubts regarding the agency's decision in favor of upholding the administrative decision. (*Laurel Heights II, supra,* 6 Cal.4th at pp. 1133, 1135.)

> 2.    *Applying Section 15088.5, The Revised*
> *Alternative 5 Did Not Require Recirculation.*

Here, although we agree Petitioners waived the section 15088.5 issue by failing to raise it as grounds for recirculation, as our analysis above demonstrates, recirculation was not required by Guidelines section 15088.5, subdivision (a)(3) because the Revised Project was not "considerably different from other alternatives previously analyzed" in the DEIR.

In *Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, a county's EIR analyzing a proposed aggregate mine did not violate CEQA by failing to include and analyze a revised project description submitted by the developer after the final EIR was prepared. *Western Placer* concluded CEQA does not per se require a revised project description be included in the final EIR itself. On the facts before it, the court found substantial evidence in the record demonstrating the changed project was not significant new information requiring additional analysis in, or recirculation of, the FEIR. (*Id.* at pp. 895–896.)

Indeed, here the Revised Project was presaged by the various alternatives in the original DEIR as discussed above. Further, the approach here, in which various components of the project were revised to meet the public commentary, complies with CEQA. In *California Oak Foundation v. The Regents of the University of California* (2010) 188 Cal.App.4th 227, the court upheld a "mix-and-match" approach, in which components from different alternatives were substituted for one another, because such an approach was sufficient to "encourage informed decision-making and public participation." (*Id*. at pp. 274, 276.)

As observed in *South County, supra*, 221 Cal.App.4th 316, the final EIR (or in this case, approved project) by necessity will contain new information. (*Id*. at p. 328.) In other words, not every proposed alternative to a project that might emerge during the decision-making process triggers recirculation, particularly where, as here, the proposed alternative is substantially similar to the alternatives already evaluated in the EIR. Further, we should not strain to require recirculation under the guise of an unstable project definition or by relying on a "materially different" standard not present in CEQA, for by doing so, we engraft unnecessary requirements that CEQA does not sanction. (See § 21083.1; *Berkeley Hillside Preservation v. City of Berkeley, supra*, 60 Cal.4th at p. 1107.) [6]

---

[6]     We note that none of the cases discussed above considering an unstable project description was based upon recirculation demands under section 15088.5. (See, e.g., *SoMa, supra,* 35 Cal.App.5th at p. 329 [challengers sought set aside of the certification of the EIR and approval of the project]; *Stopthemilleniumhollywood.com, supra,* 39 Cal.App.5th at p. 12 [same]; *Inyo, supra,* 71 Cal.App.3d 185 [challenge to return of

### III. THE CITY ADEQUATELY RESPONDED TO LASAN'S COMMENTS.

As noted above, the trial court concluded the FEIR's response to LASAN's comment about local sewer line capacity was inadequate. The City principally argues (1) the City's response was adequate under CEQA standards, and it was not required to undertake additional local sewer line analysis; (2) substantial evidence supports the City's determination that the Project's impact on sewer capacity was less than significant, and there was no evidence of potential impact from construction of sewer lines; and (3) in any event, Petitioners cannot raise a new wastewater argument for the first time in reply. Petitioners respond that the City's failure to include a project or alternative in the DEIR or RDEIR based on wastewater generation rates for a 675-unit residential project rendered LASAN's comment regarding increased wastewater evaluation meaningless.[7]

---

writ]. In both *Treasure Island, supra,* 227 Cal.App.4th 1036 and *Washoe Meadows, supra,* 17 Cal.App.5th 277, challenges under section 15088.5 were directed at issues other than the project description. (*Treasure Island, supra,* 227 Cal.App.4th at pp. 1061–1063 [new information challenge to EIR made under section 15088.5 separate from unstable project description challenge]; *Washoe Meadows, supra,* 17 Cal.App.5th at p. 290 [challenge under section 15088.5 for failure to explain selection of alternative and difference in vegetation maps between DEIR and FEIR].

[7]     Petitioners move to strike two pages (pages 64 and 65) of Appellants' Joint Reply Brief wherein Appellants conclude that the 623-unit approved project would generate less wastewater

A.    Factual Background.

The City prepared a Wastewater Facilities Plan in 1982
and updated it in 1991. The 1991 plan contained plans for
facilities through 2010 and at the time of the DEIR regulated
wastewater facilities in the City. In 1990, the City adopted
Ordinance No. 166,060 to address the problem of insufficient
wastewater treatment capacity. The ordinance established sewer
permit allocation regulations for projects discharging wastewater
to the Hyperion Water Reclamation Plant (Hyperion Plant).

The Hyperion Plant has the capacity to treat 450 million
gallons per day of wastewater generated in the western portion of
Los Angeles County and the City of Los Angeles. Quite apart
from capacity at the Hyperion Plant or other treatment plants,
the City requires, as part of the normal construction and building
process, that an applicant confirm with the City that the capacity
of the local and trunk lines that would service the project are
sufficient to accommodate the project's sewer flows during the

_____

than the originally proposed 422-unit project. Petitioners contend
this factual assertion appears nowhere in the record and
therefore is improper. (See, e.g., *Western States Petroleum Assn.
v. Superior Court* (1995) 9 Cal.4th 559, 576, 578 [extra-record
evidence prohibited on appeal].) The City argues that the motion
arises from an argument waived at trial and, in any event, the
chart is based upon evidence in the administrative record; i.e.,
the necessary factual information permitting a reasonable
inference that less wastewater would be generated appears in the
record. We deny the motion to strike because, as discussed below,
total wastewater discharge estimates do not affect the adequacy
of the City's response to the LASAN comments regarding local
sewer line capacity.

construction and operation phases. "Furthermore, a Project shall implement any upgrades to the sewer system serving the Project that could be needed to accommodate the Project's wastewater generation."

Currently, the Project site is unoccupied. The Project was estimated to generate 89,320 gallons per day of wastewater. The DEIR outlined potential wastewater impacts on the infrastructure serving the Project. The existing sewer lines that currently serve and would continue to serve the Project site consist of two eight-inch lines on Cedros and Tobias Avenues, which join to feed an 18-inch line on Van Nuys Boulevard, which in turn feeds into a 60-inch line on Hart Street, and an 18-inch line on Hazeltine Street. The flow from Hazeltine Street feeds into a 36-inch line before discharging into a 54-inch sewer line on Chandler Boulevard.

The DEIR stated that although the Project would generate wastewater from the site, wastewater treatment facilities (namely, the Hyperion Plant) could accommodate the additional sewage flow. "As a result, the Project would not result in the need for new or additional wastewater treatment facilities. Therefore, Project impacts to Wastewater treatment capacity would be less than significant."

In response at Comment 5-2, LASAN observed that "[b]ased on the estimated flows, it appears the sewer system might be able to accommodate the total flow for your proposed project. Further detailed gauging and evaluation will be needed as part of the permit process to identify a specific sewer connection point. *If the public sewer has insufficient capacity then the developer will be required to build sewer lines to a point in the sewer system with sufficient capacity. A final approval for sewer*

*capacity and connection permit will be made at that time.*
Ultimately, this sewage flow will be conveyed to the Hyperion
Water Reclamation Plant, which has sufficient capacity for the
project." (Emphasis added.)

In response to LASAN's comment, the City stated that "the
comment includes information about sewer availability and
provides the current approximate flow level and design capacities
of the local sewer system. The commenter indicated that the
sewer system might be able to accommodate the total flow of the
Project, and that further detailed gauging and evaluation will be
needed as part of the permit process. The commenter also
indicates that the sewage from the Project will be conveyed to the
Hyperion Treatment Plant, which has sufficient capacity to
accommodate the Project. The comment validates the information
provided in the draft EIR. No additional analysis is necessary."

On March 19, 2018, Petitioners objected to the FEIR's
statement that "no further analysis is necessary" of sewage
capacity. "Clearly further analysis is required, as [LASAN]
concludes that analysis is required. There are few more basic
environmental issues than the proper disposal of sewage. It is
well established that when a project will create a need for
additional sewage capacity, the CEQA document must analyze
that impact, including how sewage will be transported and
treated. The Project should cover its fair share of the costs of any
sewage upgrades that may be required. (*Sundstrom v. County of
Mendocino* (1988) 202 Cal.App.3d 296, 307 [(*Sundstrom*)].) The
EIR is legally inadequate for failing to respond substantively to
[LASAN's] comment and failing to conduct the required analysis
and mitigation of the Project's sewage impacts."

43

564

Nonetheless, on April 26, 2018, the City's Planning Department rejected any challenge to the adequacy of the sewer analysis, finding LASAN stated that "the sewer capacity is adequate for the project." The FEIR found "the sewer system might be able to accommodate the total flow of the project, and [ ] further detailed gauging and evaluation will be needed as part of the permit process. Comment Letter 5 in the Final EIR also indicates that the sewage from the project would be conveyed to the Hyperion Treatment Plant, which has sufficient capacity to accommodate the project." Thus, the Planning Department concluded that LASAN had in fact validated the information provided in the DEIR.

The trial court found the City's response to LASAN's comment in the DEIR inadequate because the City "failed to fully analyze the sewage impacts from a lack of local capacity," resulting in "an improper deferral of an environmental assessment."

## B.   Discussion.

The City contends the response to LASAN's comment was adequate under section 21091, subdivision (d)(2)(B) and Guidelines section 15088 because: (1) LASAN in fact did not have concerns because the Hyperion Plant had sufficient capacity for the Project's wastewater, and the local infrastructure "might" have capacity to transport the Project's wastewater to the Hyperion Plant; (2) LASAN did not request the City to undertake additional analysis at the time of the DEIR, instead requiring "'further detailed gauging and evaluation' of the sewer lines 'as part of the permit process'"; and (3) the City's response that there

44

was sufficient capacity at Hyperion Plant "validates the information provided in the Draft EIR."

Section 21091, subdivision (d) requires the lead agency to consider comments received on a draft EIR. The agency must evaluate the comments and respond in writing. (§ 21021, subd. (d)(2)(A).) The response "shall describe the disposition of each significant environmental issue that is raised by commenters. The responses shall be prepared consistent with Section 15088[.]" (§ 21021, subd. (d)(2)(B).) Guidelines, section 15088 requires in relevant part that "[t]here must be good faith, reasoned analysis in response. Conclusory statements unsupported by factual information will not suffice. The level of detail contained in the response, however, may correspond to the level of detail provided in the comment[.]" (Guidelines, § 15088, subd. (c); *King & Gardiner Farms LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 879 (*King & Gardiner*).)

As explained in *King & Gardiner, supra,* 45 Cal.App.5th 814, "[t]he requirement for a 'reasoned analysis' is satisfied when the lead agency 'particularly set[s] forth in detail the reasons why the particular comments and objections were rejected.' [Citation.] The requirement for a detailed statement is designed to promote the integrity of the process by preventing stubborn problems or serious criticism from being swept under the rug. [Citation.] Also, conclusory statements afford no basis for a comparison of the problems involved with the mitigation proposed by the agency and the mitigation proposed in comments. [Citation.] Despite the requirements for details and a reasoned analysis, agencies 'generally have considerable leeway' regarding their response to a public comment. [Citation.]" (*Id.* at p. 880.)

Here, we conclude that the City's response to LASAN's comment was adequate. In addition to verifying the Hyperion Plant has sufficient capacity for the Project, LASAN noted that the Project might require additional local sewer line capacity, and further study would be required to determine where to connect to the local sewer trunk lines. LASAN made clear it would determine during the permitting process whether additional local sewer line capacity would be required to service the additional residential units being proposed, and that if required, additional capacity would be constructed at the developer's expense. "If the public sewer has insufficient capacity then the developer will be required to build sewer lines to a point in the sewer system with sufficient capacity. A final approval for sewer capacity and connection permit will be made at that time." Although LASAN's original comments were directed at the original 422-unit project, they would apply also to the 623-unit Revised Project.

There is no evidence in the record that any needed local sewer construction work would cause any environmental problems, other than possible temporary traffic delays that might be occasioned by opening streets for sewer line upgrades. That is an insufficient reason to require additional environmental review or invalidate the City's approvals of the revised project.

46

## DISPOSITION

The judgment of the Superior Court is reversed. Appellants are to recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

CURREY, J

We concur:

MANELLA, P.J.

MICON, J.*

---

\*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

47