# EXHIBIT 3

CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                UNITED STATES DISTRICT COURT
 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
     The Icon at Panorama, LLC,    )
 4                                 ) Case No.:
           Plaintiff,              ) 2:19-CV-00181-CBM
 5                                 ) (MRW)
       vs.                         )
 6                                 ) Pages 1 to 386
     Southwest Regional Council of )
 7   Carpenters; Laborers          )
     International Union of North  )
 8   America Local 300; Daniel     )
     Langford, an individual;      )
 9   Alexis Olbrei, an individual; )
     Ron Diament, an individual;   )
10   Peter Rodriguez, an           )
     individual; Ernesto Pantoja,  )
11   an individual; Sergio Rascon, )
     an individual; Angel Olvera,  )
12   an individual; SWAPE, LLC, a  )
     California corporation; Smith )
13   Engineering & Management, a   )
     California corporation;       )
14   unnamed spouses of all named  )
     individual Defendants, and    )
15   DOES 1 through 10, inclusive, )
                                   )
16        Defendants.              )
     _____)
17
18
             *** CONFIDENTIAL -- ATTORNEYS EYES ONLY ***
19                        DEPOSITION OF:
                     ERAN FIELDS, VOLUME I
20                FRIDAY, SEPTEMBER 22, 2023
                         9:28 a.m.
21
22
23   REPORTED BY:
     Vickie Blair
24   CSR No. 8940, RPR-CRR
     JOB NO. 6058796
25   PAGES 1 - 386
```

Page 1

### Page 2

1  Deposition of ERAN FIELDS, the witness, taken on behalf
   of the Defendants, on Friday, September 22, 2023,
2  9:28 a.m., 330 North Brand Boulevard, Fourth Floor,
   Lexington Conference Room, Glendale, California before
3  VICKIE BLAIR, CSR No. 8940, RPR-CRR.
4  APPEARANCES OF COUNSEL:
5  FOR PLAINTIFF THE ICON AT PANORAMA, LLC:
6     MORRISON & FOERSTER LLP
      BY WHITNEY R. O'BYRNE, Partner
7     707 Wilshire Boulevard
      Los Angeles, California  90017-3543
8     (213) 892-5200
      wobyrne@mofo.com
9     (Appearing Remotely)
10    MORRISON & FOERSTER LLP
      BY TIMOTHY A. TROST, Associate
11    707 Wilshire Boulevard
      Los Angeles, California  90017-3543
12    (213) 892-5200
      ttrost@mofo.com
13
      MORRISON & FOERSTER LLP
14    BY CHRISTOPHER R. ADLER, Associate
      707 Wilshire Boulevard
15    Los Angeles, California  90017-3543
      (213) 892-5492
16    cadler@mofo.com
17 FOR DEFENDANTS LABORERS INTERNATIONAL UNION OF NORTH
   AMERICA LOCAL 300, ERNESTO PANTOJA, SERGIO RASCON, ANGEL
18 OLVERA, AND SMITH ENGINEERING & MANAGEMENT:
19    REICH, ADELL & CVITAN
      A Professional Law Corporation
20    BY LAURENCE S. ZAKSON, Partner
      330 North Brand Boulevard
21    Suite 250
      Glendale, California  91203
22    (213) 386-3860
      (213) 386-5583 Fax
23    laurencez@rac-law.com
24
25

### Page 3

1  APPEARANCES OF COUNSEL: (Continued)
2  FOR DEFENDANTS LABORERS INTERNATIONAL UNION OF NORTH
   AMERICA LOCAL 300, ERNESTO PANTOJA, SERGIO RASCON, ANGEL
3  OLVERA, AND SMITH ENGINEERING & MANAGEMENT: (Continued)
4     REICH, ADELL & CVITAN
      A Professional Law Corporation
5     BY AARON G. H. LAWRENCE, Partner
      330 North Brand Boulevard
6     Suite 250
      Glendale, California  91203
7     (213) 386-3860
      (213) 386-5583 Fax
8     aaronl@rac-law.com
9  FOR DEFENDANTS SOUTHWEST REGIONAL COUNCIL OF CARPENTERS
   DANIEL LANGFORD, ALEXIS OLBREI, RON DIAMENT, and PETE
10 RODRIGUEZ:
11    SHANLEY APC
      BY DESMOND C. LEE, Attorney at Law
12    533 South Fremont Avenue
      9th Floor
13    Los Angeles, California  90071
      (213) 488-4100
14    (213) 488-4180 Fax
      dlee@shanleyapc.com
15
      WILLIAMS & CONNOLLY LLP
16    BY EDWARD C. REDDINGTON, Partner
      680 Maine Avenue SW
17    Washington, D.C.  20024
      202-434-5063
18    ereddington@wc.com
      (Appearing Remotely)
19
      WILLIAMS & CONNOLLY LLP
20    BY DANIELLE J. BARONDESS, Associate
      680 Maine Avenue SW
21    Washington, D.C.  20024
      202-434-5246
22    dbarondess@wc.com
      (Appearing Remotely)
23
24
25

### Page 4

1     WILLIAMS & CONNOLLY LLP
      BY WILLIAM D. FERRARO, Associate
2     680 Maine Avenue SW
      Washington, D.C.  20024
3     202-434-5429
      wferraro@wc.com
4
   FOR DEFENDANT SWAPE, LLC:
5
      TYSON & MENDES
6     BY SAMUEL CAMP, Associate
      5661 La Jolla Boulevard
7     San Diego, California  92037
      (858) 459-4400
8     scamp@tysonmendes.com
9
   ALSO PRESENT:
10
      ERNESTO PANTOJA
11
      STEVEN TOGAMI, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25

### Page 5

1             I N D E X
2
3  WITNESS         EXAMINATION           PAGE
4  ERAN FIELDS
5       (MR. ZAKSON)              16
6       (MR. LAWRENCE)           218
7       (MR. REDDINGTON)         313
8
9       LUNCH RECESS
10      Page 149
11
12      QUESTIONS INSTRUCTED BY COUNSEL NOT TO ANSWER
13          None
14          INFORMATION REQUESTED
15          None
16
17          E X H I B I T S
18 EXHIBIT NO.  PAGE   DESCRIPTION
19 Exhibit 701   35  Prospect Report:  ICON Panorama,
20          February 29, 2016, Bates numbers
21          ICON0035419 through ICON0035422
22 Exhibit 702   41  "Dear Icon at Panorama" letter
23          dated May 30, 2017, Bates number
24          ICON0048631
25

2 (Pages 2 - 5)

## Page 6

E X H I B I T S (Continued)

| EXHIBIT NO. | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 703 | 55 | Screenshots from Fairfield Residential website |
| Exhibit 704 | 60 | Email, Bates number ICON0015599 |
| Exhibit 705 | 66 | Email, Bates number ICON0022358 |
| Exhibit 706 | 68 | Email chain, Bates number ICON0015339 |
| Exhibit 707 | 74 | Email, Bates numbers ICON0039399 and ICON0039400 |
| Exhibit 708 | 76 | Email chain, Bates number ICON0018436 |
| Exhibit 709 | 81 | Email, Bates number ICON0018727 |
| Exhibit 710 | 85 | Email chain, Bates numbers ICON0025420 and ICON0025421 |
| Exhibit 711 | 87 | Email chain, Bates numbers ICON0074149 through ICON0074151 |
| Exhibit 712 | 89 | Email chain, Bates number ICON00150855 |
| Exhibit 713 | 94 | Letter from Sheppard Mullin dated May 22, 2017, Bates numbers ICON0004483 through ICON0004493 |
| Exhibit 714 | 110 | Email chain, Bates number LA0005488 |

## Page 7

E X H I B I T S (Continued)

| EXHIBIT NO. | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 715 | 112 | Email chain, Bates numbers LA0005489 and LA0005490 |
| Exhibit 716 | 113 | Vesting Tentative Tract Map Number VTT-74315 (stamped map dated February 2, 2018), Bates numbers ICON0003489 through ICON0003578 |
| Exhibit 717 | 115 | Plaintiff The ICON at Panorama, LLC's Responses and Objections to Defendant Sergio Rascon's First Set of Requests for Production |
| Exhibit 718 | 118 | Plaintiff The ICON and Panorama LLC's First Supplemental Responses and Objections to Defendant Sergio Rascon's First Set of Interrogatories |
| Exhibit 719 | 123 | Email chain, Bates numbers ICON0068731 through ICON0068760 |
| Exhibit 720 | 132 | Email chain, Bates numbers ICON0061802 through ICON0061815 |
| Exhibit 721 | 136 | Letter from Buchalter dated February 6, 2023, Bates numbers ICON0070793 and ICON0070794 |

## Page 8

E X H I B I T S (Continued)

| EXHIBIT NO. | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 722 | 138 | Email, Bates number ICON0061015, and spreadsheet titled "14665 Roscoe Blvd. - Panorama City, CA, Offer Comparison Matrix, May 4, 2021" |
| Exhibit 723 | 145 | Email, Bates number ICON0063671 |
| Exhibit 724 | 151 | Email, Bates number ICON0071177 |
| Exhibit 725 | 152 | Email, Bates number ICON0061682 |
| Exhibit 726 | 154 | Plaintiff The ICON at Panorama, LLC's Responses and Objections to Defendant Laborers International Union of North America Local 300's First Set of Requests for Production |
| Exhibit 727 | 164 | Los Angeles Department of City Planning, Public Scoping Meeting, Friday, September 9, 2016, information |
| Exhibit 728 | 168 | Letter from Los Angeles Conservancy dated September 8, 2016, Bates numbers ICON0001028 through ICON0001031 |

## Page 9

E X H I B I T S (Continued)

| EXHIBIT NO. | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 729 | 169 | Email chain, Bates numbers LA0012283 and ICON0012284 |
| Exhibit 730 | 192 | Email with attached Letter of Commitment, Bates numbers LL300 0155054 through LL300 0155059 |
| Exhibit 731 | 196 | Email, Bates number ICON0018727 |
| Exhibit 732 | 198 | Bates numbers ICON0013080 through ICON0013099 |
| Exhibit 733 | 219 | Letter from Torrey Pines Bank dated November 10, 2015, Bates numbers ICON0034581 through ICON0034584 |
| Exhibit 734 | 221 | Email with attachments, Bates numbers ICON0048607 through ICON0048613 |
| Exhibit 735 | 223 | Email with attachment, Bates numbers ICON0048702 and ICON0048703 |
| Exhibit 736 | 225 | Spreadsheet, Bates numbers ICON0048407.01 through ICON0048407.18 |

E X H I B I T S (Continued)

| EXHIBIT NO. | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 737 | 260 | Plaintiff the ICON at Panorama, LLC's Responses and Objections to Defendant Angel Olvera's First Set of Interrogatories |
| Exhibit 738 | 275 | Email, Bates numbers ICON0043845 and ICON0043846 |
| Exhibit 739 | 275 | Spreadsheet, Bates numbers ICON0043846.01 through ICON0043846.20 |
| Exhibit 740 | 277 | Email, Bates numbers ICON0050825 and ICON0050826 |
| Exhibit 741 | 278 | Spreadsheet, Bates numbers ICON0050826.01 through ICON0050826.20 |
| Exhibit 742 | 279 | Email chain, Bates numbers ICON0062420 through ICON0062422 |
| Exhibit 743 | 279 | Spreadsheet, Bates numbers ICON0062422.01 through ICON0062422.18 |
| Exhibit 744 | 285 | Email with attachments, Bates numbers ICON0071515 through ICON0071536 |

Page 10

E X H I B I T S (Continued)

| EXHIBIT NO. | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 745 | 285 | Spreadsheet, Bates numbers ICON0071536.01 through ICON0071536.18 |
| Exhibit 746 | 288 | Email with attachments, Bates numbers ICON0071537 through ICON0071555 |
| Exhibit 747 | 292 | The Icon at Panorama Pro Forma Models |
| Exhibit 748 | 311 | Email with attachment, Bates numbers ICON0068838 and ICON0068839 |
| Exhibit 749 | 318 | ICON Panorama Investor List, Bates number ICON0074157 |
| Exhibit 751 | 322 | Spreadsheet, Bates number ICON0036501 |
| Exhibit 750 | N/A | (Marked as Exhibit 734) |
| Exhibit 752 | 330 | Email chain, Bates numbers ICON0012723 and ICON0012724 |
| Exhibit 753 | 352 | Email with attachment, Bates numbers SWRCC_000128751 and SWRCC_000128752 |

Page 11

E X H I B I T S (Continued)

| EXHIBIT NO. | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 754 | 368 | Memorandum of Understanding between Southwest Regional Council of Carpenters and The ICON Panorama, LLC, Bates numbers ICON0012411 through ICON0012414 |

PREVIOUSLY MARKED EXHIBITS

| EXHIBIT NO. | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 582 | 72 | Resolution |
| Exhibit 586 | 78 | Email chain, Bates number ICON00502097 |
| Exhibit 588 | 99 | Email, Bates number LA0005168 |
| Exhibit 589 | 100 | Email, Bates number LA0005434 |
| Exhibit 590 | 103 | Email, Bates number ICON0048291 |
| Exhibit 591 | 104 | Email chain, Bates number ICON0052755 |
| Exhibit 592 | 105 | Email chain, Bates numbers ICON0042078 and ICON0042079 |
| Exhibit 593 | 106 | Email, Bates number ICON0052856 |
| Exhibit 594 | 108 | Email chain, Bates numbers ICON0048376 and ICON0048377 |

Page 12

PREVIOUSLY MARKED EXHIBITS (Continued)

| EXHIBIT NO. | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 595 | 108 | Tobias Avenue, Conceptual Striping Improvement, Figure 1, Bates number ICON0048378 |
| Exhibit 627 | 266 | Email chain with attachments, Bates numbers CWD00001081 through CWD00001085 |
| Exhibit 632 | 268 | Email chain, Bates numbers ICON0013024 through ICON0013026 |
| Exhibit 633 | 272 | Email chain, Bates numbers ICON0015195 through ICON0015197 |

Page 13

### Page 94

```
 1  of the issues that came up was result of comments made    11:24:40
 2  by the owner of the mall across the street; is that       11:24:43
 3  correct?                                                  11:24:43
 4      A    Primstor, yes.                                   11:24:46
 5      Q    I want to show you a document which we're        11:24:47
 6  going to mark for identification as Exhibit 713. It's     11:24:58
 7  a letter on Sheppard Mullen letterhead, bearing Bates     11:25:01
 8  stamp numbers ICON 4483 through 4493.                     11:25:06
 9           First, have you seen this document before?       11:25:18
10           I'm sorry, I'm going too fast.                   11:25:26
11      A    Yes, I remember this.                            11:25:46
12           (Deposition Exhibit 713 was marked               11:25:46
13           for identification and is attached               11:25:46
14           hereto.)                                         11:25:49
15  BY MR. ZAKSON:                                            11:25:49
16      Q    And do you recognize this as the comment         11:25:49
17  letter that was filed by the Sheppard Mullen firm on      11:25:51
18  behalf of Primstor?                                       11:25:57
19      A    Yes, sir.                                        11:25:58
20      Q    And were you surprised when Primstor filed       11:25:58
21  this comment?                                             11:26:03
22      A    I was.                                           11:26:03
23      Q    You were?                                        11:26:03
24      A    I was, yeah.                                     11:26:04
25      Q    So, prior to receiving this comment, had         11:26:05
```

### Page 95

```
 1  you met with Primstor's principal?                        11:26:08
 2      A    I did.                                           11:26:10
 3      Q    Had anyone from Primstor communicated with       11:26:10
 4  ICON about the concerns in the letter which has been      11:26:13
 5  marked for identification as Exhibit 713 prior to it      11:26:16
 6  being filed with the City of Los Angeles?                 11:26:19
 7           MR. TROST:  Objection to form.                   11:26:22
 8           THE WITNESS:  No, I don't recall them            11:26:22
 9  bringing it to our attention after meeting them.          11:26:27
10  BY MR. ZAKSON:                                            11:26:30
11      Q    And, when you met with Primstor, you             11:26:35
12  understood that they were generally supportive of your   11:26:38
13  project; is that correct?                                 11:26:42
14           MR. TROST:  Objection to form.                   11:26:43
15           THE WITNESS:  That's what they                   11:26:43
16  represented. We reached out to them as just a courtesy   11:26:46
17  to explain the project -- since they were neighbors,     11:26:48
18  explain the project to them, and -- and as part of our   11:26:50
19  outreach, a general outreach.                             11:26:55
20  BY MR. ZAKSON:                                            11:27:01
21      Q    So when you received this comment, you           11:27:01
22  asked Primstor to meet with you; correct?                 11:27:03
23      A    I think that's -- that was the next kinda       11:27:05
24  step.                                                     11:27:14
25      Q    And when you met with Primstor, you              11:27:14
```

### Page 96

```
 1  expressed frustration that they had filed a comment       11:27:17
 2  without giving you a heads-up; is that correct?           11:27:20
 3           MR. TROST:  Objection to form.                   11:27:23
 4           THE WITNESS:  I don't remember, but I            11:27:24
 5  think that's right, I think that's right.                 11:27:25
 6  BY MR. ZAKSON:                                            11:27:26
 7      Q    And you were a little bit heated in that         11:27:27
 8  meeting, weren't you?                                     11:27:29
 9           MR. TROST:  Objection to form.                   11:27:30
10           THE WITNESS:  Which meeting?                     11:27:30
11  BY MR. ZAKSON:                                            11:27:32
12      Q    The -- the -- well, it could have been --       11:27:32
13  when you expressed your frustration to Primstor about    11:27:34
14  having filed a comment, you were a little bit heated,    11:27:37
15  weren't you?                                              11:27:40
16      A    That I don't remember, I don't know if I         11:27:41
17  was heated, I don't know.                                 11:27:43
18      Q    You don't recall?                                11:27:44
19      A    There was a -- it was a -- a discussion, I       11:27:44
20  think it was fairly civil ultimately.                     11:27:52
21      Q    So you don't recall if you started out           11:27:57
22  heated in that conversation?                              11:27:59
23           MR. TROST:  Objection to form.                   11:28:01
24           THE WITNESS:  Can you define what "heated"       11:28:01
25  means.                                                    11:28:04
```

### Page 97

```
 1  BY MR. ZAKSON:                                            11:28:04
 2      Q    You were -- you expressed your frustration       11:28:08
 3  in a very visible way during that meeting; correct?       11:28:12
 4           MR. TROST:  Objection to form.                   11:28:17
 5           THE WITNESS:  It's a very tough question         11:28:17
 6  to answer. I was there to try to address their            11:28:21
 7  concerns, but certainly frustrated that they didn't       11:28:28
 8  raise any concerns when we met, and that would have       11:28:35
 9  been what we felt was the appropriate neighborly thing    11:28:41
10  to do, which is normal, and I think I mentioned to them  11:28:45
11  that they could have saved a lot of time and effort and  11:28:50
12  money going to an expensive law firm if we could have    11:28:52
13  just had a burger at In-n-Out Burger and just handled    11:28:56
14  this.                                                     11:29:00
15  BY MR. ZAKSON:                                            11:29:00
16      Q    Did -- did you shout at the Primstor             11:29:00
17  representatives at that meeting?                          11:29:02
18           MR. TROST:  Objection to form.                   11:29:05
19           THE WITNESS:  I don't recall that, no, I         11:29:06
20  don't think so, but I don't know. I don't recall that    11:29:08
21  at all.                                                   11:29:10
22  BY MR. ZAKSON:                                            11:29:13
23      Q    So those comments from the Sheppard Mullen       11:29:24
24  firm on behalf of Primstor prompted the -- a revised     11:29:29
25  draft EIR; isn't that correct?                            11:29:33
```

**Page 98**

```
1         MR. TROST: Objection to form.              11:29:40
2         THE WITNESS: The city determined that we   11:29:41
3  should circulate the EIR based on a future accumulative  11:29:42
4  impact, so that's what we did, based on their potential  11:29:46
5  project down the road.                           11:29:50
6  BY MR. ZAKSON:                                   11:29:50
7     Q   And that was because of the inclusion of   11:29:52
8  the Panorama mall across the road and related traffic  11:29:55
9  impacts; correct?                                11:29:59
10    A   The potential project, yeah.              11:29:59
11    Q   And you were present at the deposition    11:30:05
12 of -- I'm going to screw up her name, but         11:30:10
13 Ms. Zasadzien?                                   11:30:13
14    A   Milena.                                   11:30:13
15    Q   Yes.                                      11:30:14
16    A   I was, yes.                               11:30:15
17    Q   And you heard her say that the traffic    11:30:16
18 impacts from the Panorama mall were what triggered the  11:30:20
19 revised draft EIR; is that correct?              11:30:27
20    A   Yes, I did.                               11:30:29
21    Q   And the revised draft EIR is an additional 11:30:32
22 step between a DIR and a final E- -- EIR; correct?  11:30:37
23    A   That's correct.                           11:30:43
24        MR. TROST: Objection to form.             11:30:45
25 ///                    ///
```

**Page 99**

```
1  BY MR. ZAKSON:                                   11:30:45
2     Q   And the consequence of an additional step  11:30:45
3  is that it lengthens the environmental review process  11:30:47
4  by the City of L.A.; isn't that correct?         11:30:49
5         MR. TROST: Objection to form.             11:30:54
6         THE WITNESS: That's correct.              11:30:55
7  BY MR. ZAKSON:                                   11:30:56
8     Q   I'm very glad you remembered that comment  11:31:21
9  by Ms. Zasadzien because that's a gigantic transcript.  11:31:24
10        So I'm going to show you what's been       11:31:45
11 previously marked as Exhibit 588. Let me know when you  11:31:47
12 have that in front of you if you would, please.  11:32:21
13        So you've seen the email that's           11:32:33
14 Exhibit 588 before today; correct?               11:32:36
15    A   Yes.                                      11:32:53
16        (Exhibit 588 herein referenced was        11:32:53
17        previously marked and is attached hereto.) 11:32:54
18 BY MR. ZAKSON:                                   11:32:54
19    Q   And -- and so you not only sent -- I'm    11:32:56
20 sorry, so, first of all, Arturo in the -- this email is  11:32:59
21 Arturo Sneider, who's a principal at Primstor; is that  11:33:05
22 correct?                                         11:33:10
23    A   That's correct.                           11:33:10
24    Q   And the purpose of this email was to have  11:33:10
25 a meeting with Primstor to discuss the comments in that  11:33:12
```

**Page 100**

```
1  Sheppard Mullen letter; correct?                 11:33:17
2     A   That's -- yes.                            11:33:19
3     Q   And -- and you were a part of the         11:33:20
4  discussions from that point forward; is that correct?  11:33:23
5     A   I was.                                    11:33:26
6     Q   And after you sent that letter, or that   11:33:27
7  email, rather, Exhibit 588, you then met with Mr. --  11:33:38
8  sorry, had a phone call with Mr. Sneider and his team.  11:33:46
9         Do you recall that?                       11:33:49
10    A   I don't remember what the next steps were, 11:33:49
11 I do remember having discussions with them, and then  11:33:51
12 having that meeting in person with our traffic  11:34:01
13 consultants and Sheppard Mullen.                 11:34:04
14    Q   I'm going to show you what's been marked  11:34:06
15 previously as Exhibit 589, and that's an email from you  11:34:09
16 Mr. Dantona and Mr. Pantoja and Ms. Zasadzien.   11:34:18
17        You've seen this before; correct?         11:34:21
18    A   One second.                               11:34:22
19        Okay.                                     11:34:32
20        (Exhibit 589 herein referenced was        11:34:32
21        previously marked and is attached hereto.) 11:34:33
22 BY MR. ZAKSON:                                   11:34:33
23    Q   And this indicates that you had a phone   11:34:34
24 call with Mr. Sneider and his team to discuss some of  11:34:35
25 his concerns and that you -- correct?            11:34:38
```

**Page 101**

```
1     A   Yeah.                                     11:34:42
2     Q   And then you followed that up with a      11:34:43
3  planned meeting; correct?                        11:34:45
4     A   Yes.                                      11:34:46
5     Q   And did that meeting actually take place? 11:34:51
6     A   It did.                                   11:34:55
7     Q   Okay. And when did that meeting take     11:34:56
8  place?                                           11:34:57
9     A   I thought we discussed it earlier, that's 11:34:58
10 when I got very heated, apparently.              11:35:00
11    Q   And who was present at that meeting?      11:35:04
12    A   It was actually not Arturo, it was his    11:35:05
13 partner and traffic consultant and the land use  11:35:09
14 attorney; and then from our side, our land -- our land  11:35:20
15 use attorney, our consultant, PSOMAS, and myself, and I  11:35:23
16 can't remember if our traffic engineer was there, but  11:35:28
17 he may have been.                                11:35:31
18    Q   So when you say the -- you mentioned      11:35:36
19 PSOMAS, but you mentioned a traffic consultant.  11:35:38
20        So that's the Primstor traffic consultant? 11:35:42
21    A   Yeah, they had a traffic consultant there, 11:35:46
22 and I don't recall if our traffic consultant was at the  11:35:48
23 meeting, they could have been. Leandro was the person  11:35:50
24 representing Primstor.                           11:35:59
25    Q   All right. So Leandro is the person that  11:36:00
```

26 (Pages 98 - 101)

```
 1        MR. TROST: Objection to form.           12:21:14
 2        THE WITNESS: I thought I responded to    12:21:15
 3  that in the previous question. It's the same question.  12:21:17
 4  BY MR. ZAKSON:                                 12:21:23
 5    Q   So you'd give the same answer, which is  12:21:23
 6  that you're not aware of other than --         12:21:27
 7    A   And the answer was that I am certain there  12:21:29
 8  are many; but, at this stage, I can't name them.  12:21:34
 9    Q   Okay. Are you aware of someone by the    12:21:44
10  name of Jeff Abraham?                          12:21:45
11    A   Yes.                                     12:21:47
12    Q   Jeff Abraham, at least for some time     12:21:49
13  period, was associated with a company called Newmark?  12:21:51
14    A   That's correct.                          12:21:53
15    Q   What's your understanding of what Newmark  12:21:54
16  is?                                            12:21:59
17    A   It's a brokerage firm.                   12:21:59
18    Q   That's a real estate brokerage firm?    12:22:01
19    A   Yes.                                     12:22:03
20    Q   And is Mr. Abraham a real estate agent?  12:22:04
21    A   He's a real estate broker, I think he    12:22:09
22  would be offended by real estate agent.        12:22:14
23    Q   Okay. A real estate broker?              12:22:17
24    A   Yes.                                     12:22:19
25    Q   And you had some correspondence with     12:22:19
                                                     Page 122
```

```
 1  Mr. Abraham about the ICON Panorama project in about  12:22:26
 2  2020 and 2021; correct?                        12:22:31
 3        MR. TROST: Objection to form.            12:22:34
 4        THE WITNESS: I have, yes.                12:22:35
 5  BY MR. ZAKSON:                                 12:22:35
 6    Q   And the purpose of that communication was  12:22:42
 7  to potentially retain Newmark and Mr. Abraham to assist  12:22:53
 8  you with the ICON Panorama project; is that correct?  12:22:57
 9        MR. TROST: Objection to form.            12:23:00
10        THE WITNESS: Assist in what way?         12:23:01
11  BY MR. ZAKSON:                                 12:23:04
12    Q   In any way.                              12:23:05
13    A   That's pretty general. Can you just be a  12:23:05
14  bit more specific, if you don't mind, please.  12:23:13
15    Q   I'm going to show you what we'll marked  12:23:15
16  for identification as Exhibit 719. It's a very long  12:23:20
17  email string starting on page Bates stamp ICON 68731,  12:23:23
18  ending on Bates stamp ICON 68760.              12:23:30
19        Let me know when you have it in front of  12:23:35
20  you if you would, please.                      12:23:37
21    A   Okay.                                    12:23:38
22        (Deposition Exhibit 719 was marked       12:23:38
23        for identification and is attached       12:23:38
24        hereto.)                                 12:23:38
25  ///                       ///
                                                     Page 123
```

```
 1  BY MR. ZAKSON:                                 12:23:38
 2    Q   So this email string generally includes  12:24:18
 3  Mr. Ruvelson; correct?                         12:24:21
 4    A   Yes.                                     12:24:22
 5    Q   And it includes someone named John       12:24:25
 6  DeGrinis or DeGrinis?                          12:24:28
 7    A   Yes.                                     12:24:31
 8    Q   Do you know who Mr. DeGrinis is?         12:24:31
 9    A   Seems as if he's a colleague of Jeff     12:24:34
10  Abraham.                                       12:24:34
11    Q   Okay. I'm going to go through this email  12:24:43
12  string with you the way emails work, so we're going to  12:24:44
13  start on the last page and work our way forward.  12:24:47
14    A   Okay.                                    12:24:49
15    Q   So I'd like to direct your attention to  12:24:50
16  the page that bears at the bottom ICON 68757.  12:24:55
17        Do you see that?                         12:25:13
18    A   Yes.                                     12:25:13
19    Q   So this references a tour that you gave  12:25:13
20  to -- to -- was it just Mr. Abraham or was it more than  12:25:24
21  Mr. Abraham?                                   12:25:28
22    A   Hmm, I think it was more than him, from  12:25:28
23  what I remember. It was a little while ago. We met,  12:25:34
24  you know, a number of times, so let's assume Jeff.  12:25:36
25    Q   So at least Jeff and --                  12:25:40
                                                     Page 124
```

```
 1    A   Sure.                                    12:25:40
 2    Q   -- possibly others?                      12:25:42
 3    A   Yeah.                                    12:25:43
 4    Q   And the purpose of this meeting was to   12:25:43
 5  discuss selling the project?                   12:25:47
 6    A   Yes.                                     12:25:47
 7    Q   And the reference to the set on the "Saw"  12:25:48
 8  movie is a joke, I take it?                    12:25:54
 9    A   Seems -- seems so, yes.                  12:25:58
10    Q   Okay. I'm going to next ask you to turn  12:26:04
11  to the page which says 68749 at the bottom. Let me     12:26:15
12  know when you're there.                        12:26:28
13    A   Yep.                                     12:26:30
14    Q   So you might want to look first just at --  12:26:31
15  on page 68748, it shows the to and from, so from  12:26:35
16  Mr. Abraham to Mr. Ruvelson and you and Mr. DeGrinis.  12:26:41
17        Do you see that?                         12:26:45
18    A   Uh-huh, yep.                             12:26:45
19    Q   Okay. And that's not what I wanted ask   12:26:47
20  you about, I just wanted you to have that for context.  12:26:49
21    A   Okay.                                    12:26:51
22    Q   So, going to the next page, 68749,       12:26:53
23  Mr. Abraham is talking about a marketing piece, and --  12:26:58
24  so the purpose of that marketing piece is to market The  12:27:06
25  ICON project to potential purchasers; is that correct?  12:27:11
                                                     Page 125
```

### Page 126

```
 1   A    Correct.                          12:27:13
 2   Q    And then I'm going to ask you if you know   12:27:14
 3   if Mr. Abraham marketed the property in 2019 to any   12:27:30
 4   prospects?                             12:27:35
 5   A    I think he did.                   12:27:36
 6   Q    Isn't it true that he marketed it to four   12:27:37
 7   prospects in 2019?                     12:27:43
 8   A    I don't remember exactly how many, but --   12:27:45
 9   Q    And isn't it true --              12:27:45
10   A    -- could have, yeah.              12:27:47
11   Q    I'm sorry.  Were you finished?    12:27:48
12   A    Yeah, sorry.                      12:27:51
13   Q    I didn't mean to step on you.     12:27:51
14        And isn't it true that all of them passed   12:27:54
15   on the project at that time?           12:27:57
16        MR. TROST:  Objection to form.    12:27:59
17        THE WITNESS:  I don't remember, but could   12:27:59
18   be true.                               12:28:03
19   BY MR. ZAKSON:                         12:28:05
20   Q    None of them actually pursued purchasing   12:28:05
21   The ICON project; isn't that correct?  12:28:07
22   A    In 2019?                          12:28:13
23   Q    Correct.                          12:28:14
24   A    That's correct.                   12:28:14
25   Q    All right.  I'm going to ask you to turn   12:28:15
```

### Page 127

```
 1   to the page that bears the Bates stamp at the bottom   12:28:17
 2   68745.                                 12:28:20
 3   A    Okay.                             12:28:31
 4   Q    Are you there?                    12:28:31
 5   A    I am.                             12:28:33
 6   Q    Okay.  So Mr. Abraham writes you on   12:28:33
 7   May 14, 2020, towards the bottom of the page, and this   12:28:37
 8   is during the COVID pandemic.          12:28:44
 9        Do you recall this email?         12:28:45
10   A    Yeah, it is.                      12:28:46
11   Q    And Mr. Abraham asks you if COVID has   12:28:51
12   altered your development plans.        12:28:58
13        And how did you respond to that?  12:29:00
14   A    Where would that be?              12:29:02
15   Q    That might be on 68744.           12:29:12
16   A    I wrote (as read):                12:29:16
17           Hi Jeff, hope all is well.  Sorry   12:29:20
18        for our nonresponse.  I'll discuss with   12:29:22
19        Billy and send you some available times   12:29:25
20        next week.                        12:29:27
21   Q    So did you, in fact, ever catch up with   12:29:29
22   Mr. Abraham about potentially continuing to sell the   12:29:32
23   project?                               12:29:34
24   A    I don't remember.                 12:29:36
25   Q    You don't have any recollection one way or   12:29:37
```

### Page 128

```
 1   the other?                             12:29:39
 2   A    I don't, I really don't, no.      12:29:39
 3   Q    Okay.  I'm going to ask you to turn to   12:29:41
 4   page bearing at the bottom 68741.  And, again, the   12:29:43
 5   email starts on 68740.  It's from you to Mr. Abraham   12:29:55
 6   and Mr. Ruvelson, copying Mr. DeGrinis.   12:30:01
 7        Do you see that?                  12:30:06
 8   A    Hmm, is this starting at the top?  Yes.   12:30:06
 9   Q    So this -- this question that you posed   12:30:10
10   where you say "Thanks Jeff," you're asking Mr. Abraham   12:30:20
11   if he went back on the market, if you might have takers   12:30:26
12   when you didn't before?  Is that what that question   12:30:31
13   means?                                 12:30:34
14        MR. TROST:  Objection to form.    12:30:35
15        THE WITNESS:  Hmm, let me see.    12:30:36
16        I think before he says (as read): 12:30:39
17           Last year was soft marketing.  We   12:30:40
18        only went to a few users.  Doing a full   12:30:42
19        blown marketing approach would certainly   12:30:48
20        lead to more interest --          12:30:52
21   BY MR. ZAKSON:                         12:30:53
22   Q    So that was -- that was --        12:30:53
23   A    -- and has increased.             12:30:53
24        So I wrote thanks to that, but last time   12:30:55
25   there weren't that many takers, "anything changed?"   12:30:57
```

### Page 129

```
 1        And then he responded "it's almost been   12:31:00
 2   five months."                          12:31:03
 3   Q    Actually, it's the other way around   12:31:03
 4   because it's an email.                 12:31:05
 5        So your question was (as read):   12:31:08
 6           Has anything changed?          12:31:09
 7        And then his answer is what would be above   12:31:10
 8   that as opposed to below.              12:31:12
 9   A    Oh, okay.  So -- okay.  Kind of the same,   12:31:16
10   right, his response, within the theme of it.   12:31:19
11   Q    So basically -- so -- but my question   12:31:24
12   really went to what you were asking for Mr. Abraham to   12:31:28
13   tell you, and I think that what you were asking him to   12:31:31
14   tell you is why, if there were no takers in 2019, there   12:31:40
15   would be in 2020; is that correct?     12:31:44
16   A    Generally wanted to get an understanding   12:31:45
17   of, if we're going to do this again, whether things   12:31:48
18   would change.                          12:31:51
19   Q    And you refer to the fact that there were,   12:31:52
20   quote, "not takers," closed quote, in 2019; is that   12:31:57
21   correct?                               12:32:01
22   A    That's what it says, yes.         12:32:01
23   Q    And so Mr. Abraham makes his pitch to you;   12:32:02
24   correct?                               12:32:12
25   A    I guess.                          12:32:12
```

33 (Pages 126 - 129)

Page 130

```
 1        MR. TROST:  Objection to form.        12:32:13
 2        THE WITNESS:  Where is this -- the --  12:32:13
 3  which one -- last year was more a marketing person is  12:32:17
 4  what you mean?  We only went to a few takers a full  12:32:22
 5  blow -- is that what?                       12:32:25
 6  BY MR. ZAKSON:                              12:32:26
 7     Q    Yes.                                12:32:26
 8     A    Pitches, yeah, okay.                12:32:27
 9     Q    So if you'd now look at the page that  12:32:28
10  bears at the bottom six -- ICON 68738 --    12:32:32
11     A    Uh-huh.                             12:32:32
12     Q    -- so you're referring to a conversation  12:32:38
13  with Mr. Abraham; is that correct?          12:32:41
14     A    Yep.                                12:32:45
15     Q    Was that just you and Mr. Abraham or was  12:32:45
16  anybody else on that conversation, to your  12:32:48
17  recollection?                               12:32:51
18     A    I don't remember, may have been just him.  12:32:51
19     Q    Was that a phone call?              12:32:54
20     A    It must have been, yes.             12:32:56
21     Q    And so you tell Mr. Abraham that you're  12:32:57
22  "okay with marketing this for sale, as we discussed."  12:33:04
23        "This" is the ICON Panorama project?  12:33:07
24     A    Correct.                            12:33:10
25     Q    And then you ask him what he needs from  12:33:11
```

Page 131

```
 1  you to start the process, and you guys execute some  12:33:18
 2  paperwork thereafter; is that correct?      12:33:21
 3        MR. TROST:  Objection to form.        12:33:23
 4        THE WITNESS:  That's what it says.    12:33:28
 5        I don't -- Jeff, listing agreements, sent  12:33:29
 6  versions, circle back, end of the week, touch --  12:33:38
 7  listing agreement, please call to discuss.  12:33:40
 8        Am I going the wrong direction?       12:33:45
 9        MR. TROST:  No, I think you've got the  12:33:47
10  right one.                                  12:33:50
11        THE WITNESS:  Oh, yeah.  Okay.  So they're  12:33:51
12  all away, and then -- yes, first page, seems like we  12:33:53
13  fully executed the agreement.               12:33:58
14  BY MR. ZAKSON:                              12:34:00
15     Q    Thank you.                          12:34:03
16        You can hand that back to the court    12:34:04
17  reporter.                                   12:34:14
18        So do you recall that Mr. Abraham did, in  12:34:14
19  fact, uncover at least one offer?           12:34:35
20     A    I recall there was an offer, there was an  12:34:39
21  offer.                                      12:34:42
22     Q    I'm sorry?                          12:34:42
23     A    I recall there was at least one offer,  12:34:42
24  yeah.                                       12:34:45
25     Q    So next in order will be Exhibit 720.  I'm  12:34:45
```

Page 132

```
 1  going to show you a document, a series of emails, and  12:34:49
 2  attach- -- or an email and attachment marked for  12:34:55
 3  identification as Exhibit 720 bearing the Bates stamp  12:34:58
 4  numbers ICON 61802 through 61815.           12:35:02
 5        Was the Costco offer one of the offers  12:35:56
 6  that was brought to you by Mr. Abraham or did it come  12:35:59
 7  from someone else?                          12:36:01
 8        MR. TROST:  Objection to form.        12:36:07
 9        THE WITNESS:  Hmm, hold on.  I thought the  12:36:08
10  Costco offer came from Bill Baumann and Pat from the  12:36:14
11  Clover Company, but Bill also works with Jeff Abraham,  12:36:24
12  he's just a different division of Newmark.  12:36:30
13        (Deposition Exhibit 720 was marked    12:36:30
14         for identification and is attached   12:36:30
15         hereto.)                             12:36:39
16  BY MR. ZAKSON:                              12:36:39
17     Q    So you received expression of interest  12:36:44
18  from Costco; correct?                       12:36:47
19     A    We did.                             12:36:48
20     Q    And, when you received that expression of  12:36:48
21  interest from Costco, Costco also sent you basically a  12:36:54
22  letter expressing its interest; correct?    12:37:04
23     A    Yes.                                12:37:06
24     Q    And would you call that a letter of  12:37:06
25  intent?                                     12:37:08
```

Page 133

```
 1     A    Yes.                                12:37:08
 2     Q    And there's a discussion of an increase in  12:37:08
 3  the transfer tax.                           12:37:16
 4        Do you see that on -- I think it was page  12:37:18
 5  16810 -- I'm sorry, 61802?                  12:37:24
 6     A    Yep, I see that.                    12:37:29
 7     Q    This was a so-called mansion tax on  12:37:30
 8  transfers over $5 million.                  12:37:33
 9        Do you recall that?                   12:37:36
10     A    Yes.                                12:37:37
11     Q    ICON didn't anticipate the possibility of  12:37:37
12  this transfer tax when it undertook the     12:37:41
13  development of -- or undertook its discussions with  12:37:43
14  Costco; is that correct?                    12:37:46
15        MR. TROST:  Objection to form.        12:37:48
16        THE WITNESS:  Just repeat that question.  12:37:50
17  BY MR. ZAKSON:                              12:37:51
18     Q    Did -- did ICON anticipate the possibility  12:37:52
19  of this transfer tax when it undertook to develop --  12:37:53
20  the conversations with Costco?              12:37:59
21     A    I don't remember if they were anticipated,  12:38:02
22  we just raised that issue when we found out about that  12:38:04
23  possibility.                                12:38:07
24     Q    Okay.  But that transfer tax did not exist  12:38:09
25  at the time that you started The ICON project in 2016;  12:38:11
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 134

```
 1  correct?                                           12:38:16
 2      A    Correct.                                  12:38:16
 3           MR. TROST:  Objection to form.            12:38:17
 4           THE WITNESS:  Sorry.                      12:38:18
 5  BY MR. ZAKSON:                                     12:38:18
 6      Q    And it did not exist at the time that you 12:38:18
 7  got your entitlements in 2018; is that correct?    12:38:20
 8      A    That's correct.                           12:38:23
 9      Q    And it was not adopted until November of  12:38:23
10  2022; correct?                                     12:38:30
11           MR. TROST:  Objection to form.            12:38:31
12           THE WITNESS:  I think it was adopted in   12:38:32
13  November, but it went -- it was -- went into place in 12:38:34
14  April, the following year -- year, I think, is when it 12:38:38
15  was triggered.                                     12:38:43
16  BY MR. ZAKSON:                                     12:38:44
17      Q    So, turning your attention to page 61807, 12:38:44
18  which is this letter of intent from Costco, I see that 12:38:53
19  it was signed by you.                              12:39:00
20           Was it ever signed by Costco?             12:39:02
21      A    Ult- -- let me see.  I don't remember,    12:39:05
22  but --                                             12:39:15
23      Q    You don't have any recollection whether   12:39:15
24  Costco ever signed this?                           12:39:17
25      A    No, sometimes you miss these things and   12:39:18
```

Page 135

```
 1  they -- it acts as a signature, but it may be just that 12:39:22
 2  this version's missing it, but I can't definitively say 12:39:25
 3  if there was another version, but it's -- their   12:39:32
 4  execution.                                         12:39:35
 5      Q    Is it your best recollection that Costco  12:39:36
 6  signed the letter of intent?                       12:39:39
 7      A    I don't remember --                       12:39:40
 8      Q    Did Costco --                             12:39:40
 9      A    -- but I wouldn't be surprised.           12:39:45
10      Q    Did Costco make an $800,000 deposit?      12:39:47
11      A    Well, this is a letter of intent, we then 12:39:51
12  enter into a purchase and sale agreement, so not off of 12:39:55
13  this.                                              12:39:59
14      Q    So you don't recall if you ever received a 12:40:01
15  deposit from Costco?                               12:41:06
16      A    Under the purchase and sale agreement?    12:41:08
17      Q    Yes.                                      12:41:11
18      A    Yes, we did receive a deposit from them.  12:41:12
19      Q    And at some point Costco terminated that  12:41:14
20  purchase agreement?                                12:41:25
21      A    Yes.                                      12:41:26
22      Q    So the next in order will be Exhibit 721. 12:41:26
23           Is that right, Madam Reporter?            12:41:55
24           THE REPORTER:  Yes.                       12:41:56
25      ///                       ///
```

Page 136

```
 1  BY MR. ZAKSON:                                     12:41:57
 2      Q    I'm going to show you a document marked   12:41:58
 3  for identification as Exhibit 721.  It's a letter on 12:41:58
 4  the Buchalter firm letterhead bearing Bates numbers 12:42:00
 5  ICON 70793 and 70794.                              12:42:02
 6           Have you seen this letter marked for      12:42:34
 7  identification as Exhibit 721 before?              12:42:36
 8      A    Yes.                                      12:42:38
 9           (Deposition Exhibit 721 was marked        12:42:38
10           for identification and is attached        12:42:38
11           hereto.)                                  12:42:39
12  BY MR. ZAKSON:                                     12:42:39
13      Q    And this was a termination of the purchase 12:42:44
14  agreement you just referenced with Costco; is that 12:42:53
15  correct?                                           12:42:55
16      A    It was.                                   12:42:55
17      Q    And do you know why Costco terminated the 12:42:55
18  purchase agreement?                                12:43:01
19           MR. TROST:  Objection to form.            12:43:02
20           THE WITNESS:  From what they told us, the 12:43:02
21  upper management changed their plans related to having 12:43:11
22  more than one of the stores, I guess they have another 12:43:27
23  store fairly close by, so not to kind of cannibalize 12:43:32
24  the other or something like that, it was initially they 12:43:36
25  wanted to have another one there and then they decided 12:43:38
```

Page 137

```
 1  that they didn't, something like that.             12:43:41
 2  BY MR. ZAKSON:                                     12:43:44
 3      Q    So, in other words, because it was too    12:43:44
 4  close to some other store, that's what they told you? 12:43:46
 5      A    Well, that's what they told us.  I don't  12:43:48
 6  know.  They're not obligated to tell us anything   12:43:51
 7  really.                                            12:43:53
 8      Q    So the Costco offer to purchase the       12:43:53
 9  property was for 47 and a half million dollars; is that 12:44:07
10  correct?                                           12:44:11
11      A    It was, but there were some brokerage fees 12:44:11
12  and so on that the purchase price would be reduced by 12:44:14
13  that we were responsible for.                      12:44:19
14      Q    Okay.  And was it Costco's intent to      12:44:20
15  sell -- I'm sorry, was it ICON's intent to sell to 12:44:50
16  Costco if Costco had not terminated the agreement? 12:44:55
17      A    We were under contract; so, if they did   12:44:58
18  not terminate, we would sell it to them, yes.      12:45:01
19      Q    And you're not aware of any reason why    12:45:05
20  ICON would not have gone through with that sale; is 12:45:11
21  that correct?                                      12:45:15
22      A    That's correct.                           12:45:15
23      Q    I'm going to show you now what we'll mark 12:45:17
24  for identification as Exhibit 722.  It is an email and 12:45:37
25  attachment bearing Bates numbers ICON -- or Bate number 12:45:48
```

**Page 158**

```
 1         MR. TROST:  Same objection.            14:12:28
 2         THE WITNESS:  If it's just a broad --  14:12:28
 3  basically have you seen a filing today or did you   14:12:30
 4  receive this or what do you think, or what's the    14:12:33
 5  question I guess, is it related to --               14:12:35
 6  BY MR. ZAKSON:                                      14:12:39
 7     Q    I'm asking about if you've communicated     14:12:39
 8  about anything ever, and then I'll ask you more     14:12:41
 9  specific questions.                                 14:12:44
10     A    Okay.  We -- I -- I cannot answer you now   14:12:44
11  whether we communicated about the CEQA litigation or 14:12:49
12  matters directly without counsel CCed, but we may have. 14:12:56
13     Q    All right.  Why don't you direct your      14:13:04
14  attention to request for production number 11.     14:13:10
15     A    So --                                      14:13:16
16     Q    So the response starts --                  14:13:16
17     A    -- what page?                              14:13:20
18     Q    The response starts -- hold on a second.   14:13:21
19         MR. LAWRENCE:  On page 10.                  14:13:24
20  BY MR. ZAKSON:                                     14:13:25
21     Q    On page 10.                                14:13:25
22     A    Yep.                                       14:13:27
23     Q    So have you and Mr. Ruvelson communicated  14:13:27
24  with one another about the reasons for filing this 14:13:44
25  lawsuit?                                           14:13:47
```

**Page 159**

```
 1         MR. TROST:  Objection to form.              14:13:47
 2         THE WITNESS:  Have we communicated with     14:13:48
 3  each other about the reason for signing -- for filing 14:13:51
 4  this federal lawsuit?                              14:13:54
 5  BY MR. ZAKSON:                                     14:13:55
 6     Q    Yes.                                       14:13:56
 7     A    Yes.                                       14:13:56
 8     Q    And have you done so by email?             14:13:57
 9     A    Hmm, meaning I emailed him or he emailed   14:13:59
10  me and said we should be doing -- I don't -- I don't 14:14:07
11  remember, but possibly.                            14:14:11
12     Q    Yeah, anything relating to your decision  14:14:11
13  to file the lawsuit?                               14:14:14
14         MR. TROST:  Objection.  Calls for          14:14:15
15  attorney-client privilege -- privileged documents -- 14:14:18
16         MR. ZAKSON:  It does not.                   14:14:18
17         MR. TROST:  -- and communications.          14:14:19
18         MR. ZAKSON:  That's a yes-or-no question.   14:14:19
19         MR. TROST:  So long as you can answer       14:14:21
20  without revealing privileged materials, please answer. 14:14:23
21         THE WITNESS:  So what's -- can you just    14:14:27
22  repeat the question, Mr. Zakson.                   14:14:27
23  BY MR. ZAKSON:                                     14:14:30
24     Q    Have you communicated with Mr. Ruvelson   14:14:30
25  about the reason for filing this lawsuit by email? 14:14:31
```

**Page 160**

```
 1     A    I don't remember.                         14:14:41
 2     Q    Have you communicated with Mr. Ruvelson  14:14:41
 3  about the reasons for filing this lawsuit by text 14:14:45
 4  message?                                           14:14:50
 5         MR. TROST:  Same objection.                14:14:50
 6         THE WITNESS:  I don't remember.            14:14:50
 7  BY MR. ZAKSON:                                     14:14:51
 8     Q    Have you undertaken to collect and produce 14:14:52
 9  all of these communications to your counsel?       14:14:54
10         MR. TROST:  Objection to form.             14:14:58
11         THE WITNESS:  We have provided what we --  14:14:59
12  what I found related to this production request or any 14:15:01
13  production request.                                14:15:05
14  BY MR. ZAKSON:                                     14:15:06
15     Q    So you communicate from time to time with 14:15:15
16  Mr. Ruvelson by text message; correct?             14:15:17
17     A    I do.                                     14:15:19
18     Q    Have your text message communications with 14:15:19
19  Mr. Ruvelson included texts about any of the underlying 14:15:24
20  CEQA filings in this case?                         14:15:28
21         MR. TROST:  Objection to form.             14:15:30
22         THE WITNESS:  Again, I don't recall, and I 14:15:30
23  doubt it, but I don't recall.                      14:15:36
24  BY MR. ZAKSON:                                     14:15:37
25     Q    Did you have such -- any such texts in    14:15:39
```

**Page 161**

```
 1  your possession in January of 2019 when you filed this 14:15:41
 2  lawsuit?                                           14:15:44
 3         MR. TROST:  Objection to form.              14:15:45
 4         THE WITNESS:  I think I just answered.  I   14:15:45
 5  don't recall if I -- so I don't know -- I provided what 14:15:49
 6  I found in texts related to this litigation, which was 14:15:52
 7  I don't think anything.                            14:15:55
 8  BY MR. ZAKSON:                                     14:15:58
 9     Q    Have you texted Mr. Ruvelson about ICON's 14:16:02
10  interactions with the laborers union?              14:16:04
11         MR. TROST:  Objection to form.  Vague.    14:16:09
12         THE WITNESS:  With the Laborers union at   14:16:10
13  any given time?                                    14:16:14
14  BY MR. ZAKSON:                                     14:16:15
15     Q    I'm asking you at any time, yeah.         14:16:15
16     A    I don't remember.  Maybe, I don't         14:16:18
17  remember.  I didn't find any, anything related to that. 14:16:19
18     Q    When you say "I didn't find anything,"    14:16:23
19  what is it you're saying that you didn't find?    14:16:27
20     A    Meaning I went into -- from my            14:16:31
21  recollection, I went into my text messages to look at 14:16:37
22  anything related to this lawsuit and didn't find  14:16:39
23  anything.                                          14:16:42
24     Q    Have you texted with Mr. Ruvelson about  14:16:42
25  the Superior Court's ruling on the union's CEQA   14:16:49
```

```
 1  preference there?                         18:37:50
 2          THE REPORTER: That's fine, Counsel.   18:37:51
 3          MR. REDDINGTON: Okay.              18:37:51
 4          THE REPORTER: You can re- -- you can put  18:37:55
 5  652 stamp on it.                           18:37:58
 6          MR. REDDINGTON: 752; right?        18:38:07
 7          THE REPORTER: 752, I'm sorry. Yes.  18:38:07
 8          MR. REDDINGTON: All right. And I -- I'll  18:38:07
 9  just note we -- we're -- we are -- this is not a highly  18:38:08
10  confidential document, so I don't know if anybody's  18:38:10
11  there that was asked to step out or not, but we're off  18:38:13
12  the highly confidential one now.           18:38:16
13  BY MR. REDDINGTON:                         18:38:16
14      Q    And, for the record, what is going to be  18:38:22
15  now Exhibit 752, Mr. Fields, is -- is a document Bates  18:38:25
16  labeled ICON0012723.                       18:38:28
17      A    Okay. I'm waiting for it to load up.  18:38:34
18      Q    Okay. No worries. Just let me know when  18:38:37
19  you have it.                               18:38:39
20      A    Okay.                            18:38:39
21           I just got it. Okay. Got it.     18:38:42
22           (Deposition Exhibit 752 was marked  18:38:47
23           for identification and is attached  18:38:47
24           hereto.)                         18:38:48
25  ///                      ///
                                              Page 330
```

```
 1  BY MR. REDDINGTON:                         18:38:48
 2      Q    All right. And this looks like an email  18:38:48
 3  exchange, at the top, between Mr. Ruvelson and you  18:38:50
 4  on -- on June 12, 2017; is that right?     18:38:55
 5      A    Yes.                             18:38:58
 6      Q    And do you remember what Mr. Ruvelson was  18:38:59
 7  writing about when he said "I never heard anything back  18:39:03
 8  from you"?                                 18:39:06
 9      A    I do not.                        18:39:07
10      Q    And do you remember what he was asking  18:39:08
11  about when he asked you to "Please advise"?  18:39:12
12      A    Hmm, I can speculate what -- I just don't  18:39:16
13  remember what he meant, but I'm guessing to review  18:39:32
14  these general contractors, that Ron Diament suggested.  18:39:35
15      Q    And are you just guessing that by  18:39:42
16  inferring that from the -- from what you're seeing in  18:39:45
17  the email now?                             18:39:46
18      A    Yes.                             18:39:47
19      Q    All right.                       18:39:48
20      A    Sorry.                           18:39:48
21      Q    And that's fair.                 18:39:48
22           But you don't have a -- you don't actually  18:39:49
23  remember what this was about?              18:39:51
24      A    Hmm, again, if you're asking me if I  18:39:52
25  remember what this was about, I don't. But I can infer  18:39:56
                                              Page 331
```

```
 1  what, if you want me to, but not --        18:40:00
 2      Q    I mean, I don't want you to guess, I'm  18:40:04
 3  just interested in whether you know or not.  18:40:06
 4      A    No, I don't. Sorry.              18:40:10
 5      Q    Okay. So, in May of 2017, an      18:40:10
 6  environmental attorney named Richard Drury and his law  18:40:18
 7  firm, Lozeau Drury, submitted comments on the draft EIR  18:40:22
 8  for the ICON project to the Department of City  18:40:26
 9  Planning.                                  18:40:29
10           You're -- you -- you're aware of that;  18:40:30
11  right?                                     18:40:31
12      A    I am, yes.                       18:40:31
13      Q    All right. And do you know Mr. Drury  18:40:32
14  personally?                                18:40:34
15      A    I do not.                        18:40:35
16      Q    Have you ever spoken with him?    18:40:35
17      A    I think just pleasantries, and I think at  18:40:39
18  some of the hearings that he attended, he was there  18:40:50
19  kind of standing with his clients. I'm sorry, this --  18:40:53
20      Q    Yeah, no worries. I usually walk away  18:41:03
21  with that at some point during a deposition.  18:41:05
22      A    I just never -- it keeps falling off.  18:41:08
23  Okay. Hopefully this works.                18:41:13
24           So we may have said -- you know, spoken  18:41:13
25  briefly, but nothing that I specific -- specifically  18:41:16
                                              Page 332
```

```
 1  remember.                                  18:41:18
 2      Q    All right. And -- and nothing     18:41:24
 3  substantive, just exchanging pleasantries --  18:41:25
 4      A    I think so.                      18:41:25
 5      Q    -- Hi, how are you, that sort of thing?  18:41:28
 6      A    I think so mostly, yes.          18:41:30
 7      Q    Okay. And do you remember the first time  18:41:31
 8  you might have met him to -- to exchange pleasantries?  18:41:33
 9      A    Hmm, I'm -- I think it was the first  18:41:35
10  hearing that they showed up to to -- "they" meaning his  18:41:44
11  clients and himself, to speak in opposition to a  18:41:48
12  project -- of our project.                 18:41:53
13      Q    And, when you say "a hearing," are you  18:41:54
14  talking about a hearing before one of the -- the city  18:41:56
15  commissions or are -- or are you speaking about the  18:42:02
16  lawsuit?                                   18:42:05
17      A    Oh, no, no, one of the city's -- not  18:42:05
18  necessarily commissions because there were a number of  18:42:08
19  hearings, it started with agency hearings and then land  18:42:11
20  use committee and planning commission, city council, so  18:42:20
21  there were a number of them.               18:42:20
22           So I think the first one he was there and  18:42:23
23  he spoke in opposition, and also some of the union  18:42:25
24  members spoke in opposition, as well.      18:42:29
25           And I think, after that, they approached  18:42:32
                                              Page 333
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   Q    All right.                      18:48:08
 2   A    But certainly -- certainly phone  18:48:15
 3  conversations and texts.              18:48:16
 4   Q    Do you have -- do you have a specific  18:48:17
 5  memory of any particular conversations with Mr. -- with  18:48:18
 6  Ron in that time period between June of 2017 and August  18:48:22
 7  of 2017?                               18:48:26
 8   A    Yeah, I think we -- we listed him in the  18:48:30
 9  complaint.                             18:48:32
10        We -- he was reaching out to say that they  18:48:32
11  will find ways to help us get approved if we use them,  18:48:39
12  and that, if we don't, you know, he knows how to  18:48:43
13  maneuver through this whole situation, and --  18:48:47
14        And, again, always the emphasis and focus  18:48:50
15  of "Hire us and this all goes away," and "How do we  18:48:57
16  find a way" -- it was kind of like a very "How do we  18:49:04
17  find a way to get on your job, and have you hire us?"  18:49:07
18  That was kind of the crux of it.       18:49:11
19        And I think my consistent response was,  18:49:12
20  "We're open to it, and we would like to find a way, but  18:49:18
21  at this stage it's very challenging to do that, and  18:49:24
22  potentially infeasible, but maybe there's certain areas  18:49:31
23  now that we can talk about that we would be okay with  18:49:35
24  including you on the job."             18:49:41
25        So that was the gist of -- I mean,  18:49:42
                                          Page 338
```

```
 1  consistently throughout, not even during that time,  18:49:46
 2  always the discussions that we had.    18:49:49
 3   Q    And you're giving me your -- your sense of  18:49:52
 4  the gist of the conversations sort of writ large with  18:49:55
 5  Mr. Diament?                           18:49:59
 6   A    What do you mean my -- those were the  18:50:00
 7  conversations, I'm not --              18:50:03
 8   Q    Well, I guess I'm asking you: Are you  18:50:05
 9  telling me that at any time Mr. Diament said to you  18:50:06
10  "Hire us and this all goes away?" Did he use those  18:50:12
11  words?                                 18:50:14
12   A    Hmm, I don't know if exactly that, but  18:50:14
13  something similar to that. That was always the theme  18:50:19
14  of the discussion.                     18:50:23
15   Q    Can you tell me any specific day or  18:50:25
16  conversation you had with Mr. Diament that he said  18:50:28
17  those exact words?                     18:50:32
18   A    Hmm, I -- I mean, six years later, seven  18:50:33
19  years later, I, unfortunately, can't.  18:50:38
20        But those were the conversations.  18:50:39
21   Q    Can you tell me the exact words of any  18:50:48
22  conversations you had with Mr. Diament that weren't in  18:50:52
23  writing?                               18:50:56
24   A    I don't remember.                18:50:57
25        But, generally, it was "Why don't you do  18:50:57
                                          Page 339
```

```
 1  the right thing? Hire us to do this work."  18:51:05
 2        And we mentioned some things about his dad  18:51:13
 3  or something because I think his dad was from Israel or  18:51:17
 4  something, some discussions about that.  18:51:20
 5        But there was always kind of an attempt to  18:51:22
 6  ingratiate himself to -- so that we'd end up signing  18:51:26
 7  with the understanding that, of course, this is what  18:51:28
 8  this is all about.                     18:51:35
 9        I wish I could tell you otherwise, but  18:51:36
10  that's what it was.                    18:51:37
11   Q    All right. Anything else you can remember  18:51:41
12  about your conversations with Mr. Diament in advance of  18:51:42
13  the hummus bar meeting?                18:51:45
14   A    Hmm, I don't remember, no, probably not.  18:51:50
15   Q    All right. And do you remember the date  18:51:52
16  the hummus bar meeting took place?     18:51:57
17   A    I think you mentioned it, I don't  18:51:59
18  remember, but when was it? Sorry.      18:52:01
19   Q    Well, I think I gave you the month,  18:52:03
20  August 2017.                           18:52:06
21        Does that -- does that sound right?  18:52:06
22   A    Maybe, yeah, could be.            18:52:08
23   Q    And who do you remember being at that  18:52:11
24  lunch?                                 18:52:13
25   A    It was myself; Eran Shargal, who worked  18:52:13
                                          Page 340
```

```
 1  with me; Ron Diament; Dan Langford from the Carpenters;  18:52:20
 2  and I don't remember if Alexia was there or not.  18:52:35
 3        But then Carl, I forgot his last name,  18:52:39
 4  from C.W. Driver; and David Pintar from C.W. Driver.  18:52:43
 5   Q    And do you remember how long the meeting  18:52:49
 6  was?                                   18:52:51
 7   A    It was a lunch, so probably an hour, I  18:52:54
 8  would guess, or so.                    18:53:00
 9   Q    And what was the tenor of the meeting?  18:53:00
10   A    It was just an introduction of kind of the  18:53:02
11  general contractor that we were hoping to use  18:53:05
12  potentially on this job, and how it all would work and  18:53:07
13  if there were going to be opportunities to kind of work  18:53:11
14  together in a way and make introduction.  18:53:13
15   Q    And, other than that sort of high-level  18:53:16
16  discussion, do you remember any specifics of what was  18:53:22
17  discussed at the meeting?              18:53:26
18   A    Hmm, not specifically. I mean, I -- it  18:53:30
19  was really about just a group -- two groups meeting and  18:53:35
20  talking about kind of the experiences that you had and  18:53:39
21  who C.W. Driver was and so on. And a little bit about  18:53:44
22  our project, I think, too, but --      18:53:50
23        Gen- -- general stuff mostly, I think.  18:53:53
24   Q    Do you remember anything specifically said  18:53:55
25  by anybody who was there from the Carpenters?  18:53:57
                                          Page 341
```

86 (Pages 338 - 341)

```
 1  anything about having to use a signatory general    19:34:46
 2  contractor, does it, not even best efforts?         19:34:50
 3         MR. TROST:  Objection to form.  This        19:34:52
 4  document speaks for itself.                         19:34:53
 5         THE WITNESS:  And that's not true.  It      19:34:54
 6  does say that in paragraph three.  I mean, I don't -- 19:34:56
 7  BY MR. REDDINGTON:                                  19:35:01
 8     Q   All right.  You agree with me that the      19:35:01
 9  document contemplated that ICON could pre-qualify any 19:35:03
10  bidder, signatory or nonsignatory, at ICON's sole  19:35:06
11  discretion?                                         19:35:11
12         MR. TROST:  Objection to form.             19:35:11
13         THE WITNESS:  Again, I -- I'll repeat what 19:35:11
14  I say.  I think this whole document is full of     19:35:15
15  minefields that you, as an attorney, and if you were 19:35:19
16  ever to actually represent someone, you would never 19:35:22
17  allow them to sign anything remotely near this, and 19:35:25
18  that's what I will say.                             19:35:28
19  BY MR. REDDINGTON:                                  19:35:30
20     Q   Were you acting as an attorney for ICON    19:35:30
21  here?                                               19:35:35
22     A   I was.                                      19:35:35
23     Q   And at what stage in the process did you   19:35:35
24  begin acting as an attorney for ICON?              19:35:37
25     A   I mean, I don't -- I don't -- I've always  19:35:39
```
Page 382

```
 1  been an attorney as part of ICON.                   19:35:42
 2     Q   So you've been acting as an attorney in    19:35:46
 3  your discussions with --                            19:35:49
 4         (Discussion held off the record.)          19:35:50
 5         MR. TROST:  Okay.  This is a new line of   19:35:50
 6  questioning.                                        19:35:52
 7         THE WITNESS:  Yeah, it's a new line of     19:35:52
 8  questioning.                                        19:35:54
 9         MR. TROST:  It's seven hours and 35        19:35:54
10  minutes.  This line of questioning could have been -- 19:35:56
11  if this line of questioning was important, it could 19:35:58
12  have been brought up hours ago.  I'm sorry, this is it. 19:35:59
13         This is a new line of questioning.  I've   19:36:01
14  given you two -- after I've already said this is the 19:36:03
15  last one, I gave you two more, seven hours and 35  19:36:05
16  minutes.                                            19:36:08
17         MR. REDDINGTON:  And you -- and I -- well, 19:36:08
18  we could be asking questions right now.            19:36:09
19         MR. TROST:  No, we can't because --        19:36:11
20         (Simultaneous speaking.)                   19:36:22
21         MR. TROST:  -- it's seven hours --
22         MR. REDDINGTON:  If you're walking away,
23  that's fine.
24         THE REPORTER:  You all are cutting each
25  other off.
```
Page 383

```
 1         MR. REDDINGTON:  Mr. Fields, thank you for
 2  your time, I object to your cutting me off in the  19:36:23
 3  middle of my exam, and I reserve the right to -- to 19:36:24
 4  return to finish your deposition.                   19:36:26
 5         MR. TROST:  The deposition is over.  It's  19:36:28
 6  seven hours and 35 minutes.  That's what the protective 19:36:29
 7  order contemplates.  That's what we've complied with. 19:36:31
 8  Have a good night.                                  19:36:34
 9         THE WITNESS:  Thank you.                   19:36:35
10         MR. REDDINGTON:  Bye-bye, have a nice      19:36:38
11  night.                                              19:36:39
12         THE WITNESS:  Yeah, you, too.              19:36:40
13         VIDEOGRAPHER TOGAMI:  Off the record?      19:36:43
14  Anything else?  Sorry.                              19:36:43
15         MR. TROST:  No, we're done.                19:36:44
16         VIDEOGRAPHER TOGAMI:  Okay.  We are off    19:36:45
17  the record at 7:36 p.m., and this concludes today's 19:36:47
18  testimony given by Eran Fields.                    19:36:51
19         The total number of media used was six and 19:36:54
20  will be retained by Veritext Legal Solutions.      19:36:58
21  Thank you.                                          19:37:00
22         (Whereupon, at 7:37 p.m., the              19:37:01
23         deposition of ERAN FIELDS was adjourned
24         and continued sine die.)
25               ---000---
```
Page 384

```
 1                    DECLARATION
 2
 3
 4         I, ERAN FIELDS, hereby declare that I am
 5  the deponent in the within matter; that I have read the
 6  foregoing deposition and know the contents thereof, and
 7  I declare that the same is true of my knowledge, except
 8  as to the matters which are therein stated.
 9         I certify under penalty of perjury of the
10  laws of the State of California that the foregoing is
11  true and correct.
12         Executed this _____ day of_____,
13  2023, at _____, _____.
14
15
16
17
18         _____
19              ERAN FIELDS
20
21
22
23
24
25
```
Page 385

97 (Pages 382 - 385)