# Exhibit A

  

February 19, 2018

Stephen Haase, Chairperson
City of San Diego Planning Commission
1222 First Ave, fifth floor
San Diego, CA 92101
planningcommission@sandiego.gov

Council President Pro Tem Barbara Bry
District 1
City Administration Building
202 C Street, 10th Floor
San Diego, CA 92101
barbarabry@sandiego.gov

Councilmember Chris Cate
District 6
City Administration Building
202 C Street, 10th Floor
San Diego, CA 92101
chriscate@sandiego.gov

Councilmember Mark Kersey
District 5
City Administration Building
202 C Street, 10th Floor
San Diego, CA 92101
markkersey@sandiego.gov

Jeffrey A. Peterson, Development Project Manager
Development Services Department
1222 First Avenue, MS 501
San Diego, CA 92101
JAPeterson@sandiego.gov

Gary Levitt
Sea Breeze Properties
3525 Del Mar Heights Rd. Ste. 246
San Diego CA 92130
gary@seabreezeproperties.com

Dear Chairperson Haase, Members of the Planning Commission, Councilmembers, Mr. Levitt, and Mr. Patterson,

In advance of the February 22 Planning Commission meeting on the Merge 56 Project, we wanted to voice concerns about the Project, along with potential solutions, because these issues are more complex than 3 minutes of testimony can cover. Hopefully first two issues can be settled easily. The third and especially fourth issues need more thought, and in the case of the fourth, this requires attention from City Council. The people included in this letter are either directly involved in the decision making or have this project in their council districts (Merge 56 is in District 6, but impacts will occur upstream in District 5 and downstream in District 1).

We will not hide that we oppose the project. The reason is that Del Mar Mesa's MSCP and MHPA lands are home to a large number of highly sensitive species and habitat. These species are "protected" by inclusion in Los Peñasquitos Canyon Park, a California Department of Fish and Wildlife (CDFW) Ecological Reserve (ecological reserve is the most restricted category of land that CDFW owns), and two parcels in the US Fish and Wildlife Service (USFWS) San Diego National Wildlife Refuge. To the knowledge of Frank Landis ( writer of the letter, long-time member of the California Native Plant Society, a long-time volunteer for SD Parks and Recreation, and the current chair of the Los Peñasquitos Canyon Preserve Citizen's Advisory Committee) all three of these land owners, City Parks, CDFW and USFWS, are understaffed and under-resourced for their current workload, let alone what will come if all three developments go

in.  The influx of thousands of people caused by Merge 56 and the sister projects it enables, are going to heavily impact Del Mar Mesa, quite likely leading to loss of sensitive and listed species that this part of the MSCP and MHPA was set up to protect.  We are trying to prevent that loss, pure and simple.

This coalition wrote of these concerns in a letter on the Merge 56 DEIR, and the responses provided in the FEIR concern us.  Here we highlight two issues that should be easy to fix before the project is implemented.  Two others will prove harder, but the ultimate benefits make them worth serious consideration.

**Issue 1.  Deer Creek and the culvert under Camino Del Sur**

As background, the southern extension of Camino Del Sur past Torrey Santa Fe Road will involve filling in Deer Creek at the point of crossing.  There are insufficient funds create a bridge to cross the creek, so the Project proposes burying wetlands under the road and routing the creek through a culvert through the fill that will support the road.

The problem is the dirt fill and the culvert.  If the culvert clogs and/or gets overwhelmed by floodwater, the water could start eroding the road fill, finding its own way through the dirt and possibly undermining the road.  Flood water could also spurt at high pressure through the too-narrow pipe, causing hydraulic scouring downstream  in Del Mar Mesa Preserve.  Water might also back up under Highway 56 (see figure 1 on the next page).

My (Landis) understanding, from talking with Mr. Levitt, is that he believes that the water in Deer Creek comes largely from the Merge 56 project site, and the boundaries of the hydrological analysis in the DEIR appear to come from this understanding.

This is a misunderstanding.  At least three culverts flow into Deer Creek from north of the project.  East of Camino Del Sur and  north of Merge 56, an 84" diameter circular culvert runs under Highway 56 and drains part of Rancho Peñasquitos (as shown in figure 1).  Next to the 84" culvert is a smaller culvert that apparently drains Highway 56.   West of Camino Del Sur, another smaller culvert drains Torrey Highlands, and it appears that this storm drain could be buried by the fill for the road.  All three culverts carry stormwater from Rancho Peñasquitos into Deer Creek.  Given that the Preserve portion of Deer Creek is not only part of the MSCP but has trails running along and across it, we want to insure that it is not damaged by construction in its headwaters.

The DEIR comment on this issue was dismissed in the FEIR response as a trivial engineering issue.  While it *is*  an engineering issue that is easily resolved, the critical problem is the frame of analysis.  If the engineer *only looks at runoff from the Merge 56 site*, then the culvert under Camino Del Sur is properly sized.  If the engineer also takes *all stormwater drainage from that part of Rancho Peñasquitos into account*, then the proposed culvert is too small.

The solution is to insure that the engineer takes *all the drainage* into account when designing the culvert under Camino Del Sur, so that the culvert is properly sized for its purpose.  We would suggest that the Storm Water Division be consulted, simply to insure that Merge 56 does not affect their use of Deer Creek to drain stormwater from Rancho Peñasquitos.  As they will be responsible maintaining the culvert, it should meet their needs.

With this solution, water flows smoothly into the Preserve, hopefully not causing more hydraulic scouring than Deer Creek already experiences.  No one, the City, the property owners, residents, or environmentalists, wants a chronic infrastructure problem caused by incorrectly designed stormwater plumbing.  Hopefully this will be easy to correct.

Page 3 of 7



Figure 1. Google Earth view of the project area.  White line is a crude depiction of the unpaved watershed northeast of the freeway, although water enters this drainage from the surrounding developments.  The blue line is the approximate course of the  84" existing culvert.  The red line is the approximate course of the proposed 72" culvert, under Camino Del Sur and downstream of the 84" culvert.

**Issue 2.  Invasive Non-Native Plants in Deer Creek**

The problem is simple: there is a 0.12 acre patch of tamarisk *(Tamarix ramosissima*), along with pampas grass (*Cortaderia jubata*) and at least one Mexican fan palm (*Washingtonia robusta*) in the Merge 56 section of Deer Creek, in places where they will not be removed by the construction of the Project.  The fix is simple: removal of these non-native, invasive, noxious weeds.

It is not expensive.  CNPSSD uses the Bradley method[1] to remove weeds and restore native vegetation in suitable areas at $1,500 per acre, due to our use of trained and licensed volunteers.  We are not soliciting work in Deer Creek.  Rather, the point is that removal of 0.12 acre of weeds will not be a huge financial burden when licensed professionals are used, even if that cost is passed on to homeowners as a trivial increase in home prices.

Weed removal is important, because seeds from these weeds are flowing down Deer Creek into the Preserve.  I (Landis) have helped weed along the creek, and the weeds in the creek channel much less accessible inside the Preserve than they are at Merge 56.  Moreover, the park is short-staffed and all volunteers are busy.  If the City wishes to follow its management plans for the MSCP and the Del Mar Mesa NRMP and to keep weeds under control, getting the weeds out of Merge 56 and other upstream areas is an important step.

Our DEIR comment proposing weed was shot down in the FEIR response on the theory that it is not required by the MHPA adjacency guidelines (section 1.4.3 of the MSCP Subarea Plan).  The relevant statement is "No invasive non-native plant species shall be introduced into areas adjacent to the MHPA"  by a new project.  The FEIR response also confused controlling weeds already on the site with avoiding introducing new weeds onto the site.

The problem with the FEIR response is that invasive, non-native species have been introduced, and the MHPA adjacency rules apply to current land management as well as to new projects.  This stated in section 1.5, Adjacency Management Issues (p.53): "Invasive Exotics Control and Removal...2. Remove giant reed, tamarisk, pampas grass, castor bean, artichoke thistle, and other exotic invasive species from creek and river systems, canyons and slopes, and elsewhere within the MHPA as funding or other assistance becomes available. If possible, it is recommended that removal begin upstream and/or upwind and move downstream/downwind to control reinvasion. Priorities for removal should be based on invasive species' biology (time of flowering, reproductive capacity, etc.), the immediate need of a specific area, and where removal could increase the habitat available for use by covered species such as the least Bell's vireo. Avoid removal activities during the reproductive seasons of sensitive species and avoid/ minimize impacts to sensitive species or native habitats. Monitor the areas and provide additional removal and apply herbicides if necessary. If herbicides are necessary, all safety and environmental regulations must be observed. The use of heavy equipment, and any other potentially harmful or impact-causing methodologies, to remove the plants may require some level of environmental or biological review and/or supervision to ensure against impacts to sensitive species."

We submit that the land owners of Rhodes Crossing have not followed their duties as landowners adjacent to the MHPA.  Construction of Merge 56 will remove the large population of artichoke thistles and other noxious invasives on the site.  Deer Creek will be disturbed by construction, and 2018 looks to be a low-rainfall year, so access to riparian weeds will be straightforward.  Therefore, the Merge 56 project is the appropriate venue to remove all invasive non-native plant species from the Project site.

---

[1] http://www.aabr.org.au/learn/what-i-bush-regeneration/general-principles/the-bradley-method/

We would also submit that this is not financially burdensome on Mr. Levitt, but that dealing with the failure to remove those weeds will be a substantial and long-term burden on the MHPA lands in the Preserve.

Finally, we would ask Planning in the future to insure that landowners proposing projects adjacent to the MHPA fulfill their management obligations under MHPA adjacency rules as part of the project process. This will better serve the City as a whole. It is inexpensive compared with ecological restoration, and it can be justified as a simple good neighbor policy.

**Issue 3.  Greenhouse Gas Emissions**

CNPS  supports science-based, rational policies and actions, on the local, state, national, and international levels, that lead to the reduction of greenhouse gases without endangering California's native flora. As noted in the ruling on the *Center for Biological Diversity et al. vs. California Department of Fish and Wildlife and Newhall Land and Farming Company* ("Newhall Ranch"), which had the California Native Plant Society as a co-plaintiff, the California Superior Court stated that "in fact a greater degree of reduction may be needed from new land use projects than from the economy as a whole: Designing new buildings and infrastructure for maximum energy efficiency and renewable energy use is likely to be easier, and is more likely to occur, than achieving the same savings by retrofitting of older structures and systems." In the Torrey Highlands area, there are five unbuilt developments left: the Meridian development, Santa Fe Summit, Merge 56, Rhodes Crossing, and the Preserve at Torrey Highlands. After that, Torrey Highlands will only be able to help meet citywide energy conservation goals by ad hoc homeowner decarbonization. As noted below, this will be quite expensive, slowing the City's efforts to decarbonize and meet state goals.

The problem with the Project's greenhouse gas analysis is that currently the property actually sequesters greenhouse gas in its long-lived plants. Once it is developed, the property will generate substantially more greenhouse gas, and the only offset is that the Project might decrease miles driven for some Park Village residents. Merge 56 will increase greenhouse gas emissions over current circumstances. The checklist analysis cited in the Project EIR is irrelevant to this reality.

We can also confidently say that San Diego's greenhouse gas emissions must drop to zero in a few decades in order to avoid severe climate change. This is true for every municipality in the world. Therefore, the City and its residents are on the hook for removing all greenhouse gas producing infrastructure and retrofitting all properties to decarbonize them. Based on my (Landis) experience as a homeowner working to decarbonize my home, the retrofit cost is $30,000-$40,000. Multiply this cost per house across the entire city and there is a serious problem with making this happen. As noted in the *Newhall Ranch* ruling above, it is easier to build than to retrofit. Therefore, all reasonable measures need to be taken in new developments. Since we currently live in a fossil-fueled society and some emissions are inevitable, it is also prudent, in new Projects such as Merge 56, to take measures to make decarbonization easier and cheaper in the future.

The proposed Project has a number of worthwhile features, to its credit. We would suggest the following measures as well:
- Minimize the use of natural gas. In the Project EIR, natural gas emissions are the third highest category of  greenhouse gas emissions. To meet future zero-emission goals, Merge 56's  natural gas systems will be removed in coming decades, likely piecemeal. Before the gas system is entirely shut down, it will have the problem of providing gas to a few scattered

users in a system full of haphazardly sealed, leaky pipes (per LA's experience with their aging natural gas system).  This needs to be avoided as much as possible.

To minimize this problem, use electric appliances where possible and make the gas system easy to remove.  The electric equivalents of natural gas appliances are readily available and the same price or cheaper than their gas-powered counterparts.  There is no reason, other than fashion and prejudice, for homes to have natural gas installed.  Additionally, design the natural gas supply system to make it easy to remove it, for instance by making it easy to seal off pipes and to remove meters and buried pipes without digging up every road.

- Increase installation of solar power.  My high end solar panels will pay for themselves in under 6 years simply by selling power to SDG&E as I currently do.  Solar panels are an investment that will provide a predictable revenue stream to building owners for decades.

- Design buildings to hold large batteries.  The design of my 1980s house is an example of how not to do it, as the breaker box and gas main are directly atop each other, and a house battery is supposed to be as close to the main breakers as possible (putting a large and flammable battery next to the gas main and high voltage lines will create a fire hazard for my house).  Again, my house does not meet modern codes, but it illustrates a totally avoidable design flaw.  In Merge 56 buildings, separate the electrical main and gas meters for safety, and design spaces near the boxes so that batteries can be installed easily, and insure that gas lines can be removed with minimum trouble.

- Enhance the existing willows and cattails in the Project portion of Deer Creek.  The primary way to do this is by controlling weeds like tamarisk using the Bradley method, which relies on helping native plants to regenerate themselves, rather than restoration planting.  Doing this will sequester some carbon (in willow wood and sediments) and help clean the water coming off the Project before it goes downstream.

Annually maintain the riparian area by weeding, using the Bradley method.  If trees (especially willows) are attacked by shothole borer beetles, immediately cut down and chip the infected trunks so that the infestation does not spread to all the trees in the Project and adjacent MHPA.  Rapid detection and removal is the cheapest control method available, and it avoids the truly massive costs of cutting down all street trees, as is happening at UC Irvine.  Moreover willows can resprout if the infestation is controlled early.

The FEIR response to comments emphasized that the CAP checklist insures that the greenhouse gas emissions are less than significant.  That is not the point of the *Newhall Ranch* ruling, which is that the new developments need to take on a disproportionate role in fighting climate change, especially in areas where the opportunities for new developments are limited, such as Rancho Peñasquitos.  This part of the City will have trouble making 2050 greenhouse gas reduction goals if it depends entirely on voluntary house and building retrofits.  Merge 56 can not only lead the way, it can generate money by doing so.

**Issue 4: Impact to MHPA land management**

This is an issue for the City that has become critical since the DEIR was circulated.  The Del Mar Mesa Preserve part of City Parks is understaffed for its current workload, as are CDFW and USFWS lands.  Merge 56 will add hundreds of residents and a large parking lot right at the trailhead.  Worse, while there is a NRMP for Del Mar Mesa, it does not consider the impacts of Merge 56 or its sister projects.

If the City is to fulfill its obligations under the MSCP, MHPA, Del Mar Mesa NRMP,
and Vernal Pool HCP, it needs to increase staffing and funding to this part of the MSCP, and it
needs to help its partners in the wildlife agencies to do the same (perhaps through SANDAG
intervention).

We in CNPSSD are already considering petitioning for emergency listing of two other
Del Mar Mesa species under the California Endangered Species Act, simply due to existing
impacts from things like mountain bikes and weed encroachments.  The more people who live in
the area, the worse the situation will get.

The point here is to keep growing problems from becoming critical.  San Diego County
currently has more native species than any county in the US.  So far, only a handful (like the
grizzly bear) have been lost.  However, too many San Diego species have populations that are
only a few percent of their numbers even 50 years ago, and they cling to existence in places like
Del Mar Mesa.  It will not take much more neglect to turn San Diego from a conservation
success story to the extinction capital of California, if not the US.  We all play a part in dealing
with this, conservationists, residents, agencies, the City, and land owners adjacent to the MHPA.
Everyone has a part to play, and hopefully we can find ways to work together to keep all of San
Diego's diversity going forward.

Thank you for taking these comments.  We are happy to meet with planners, the
developer, or developer's representatives to iron this out.  Please feel free to contact Frank Landis
(310-883-8569, franklandis03@yahoo.com) with any questions, comments, or concerns, and
please forward this letter to the developers as necessary.

Sincerely,

Frank Landis, PhD
Conservation Chair, California Native Plant
Society, San Diego Chapter

Pamela Heatherington
Board of Directors, Environmental Center of San
Diego

Van K. Collinsworth
Geographer / Director, Preserve Wild Santee
Conservation Coordinator, California Chaparral
Institute

/S/
George Courser
Conservation Committee Chair
Sierra Club San Diego

# Exhibit B



T 510.836.4200      410 12th Street, Suite 250      www.lozeaudrury.com
F 510.836.4205      Oakland, Ca 94607               rebecca@lozeaudrury.com

February 21, 2018

***Via Email and Hand Delivery***
City of San Diego Planning Commission
1222 First Ave., Fifth Floor
San Diego, CA 92101
planningcommission@sandiego.gov

E. Shearer-Nguyen, Environmental Planner
City of San Diego Development Services Center
1222 First Ave., MS 501
San Deigo, CA 92101
DSDEAS@sandiego.gov

***Via Email Only***
Carmina Trajano, Recording Secretary
Planning Commission
City of San Diego
202 C Street
San Diego, CA 92101
CTrajano@sandiego.gov

Jeffrey A. Peterson
Development Project Manager
JAPeterson@sandiego.gov

**Re:    Merge 56 Environmental Impact Report; Project No. 360009;
          SCH No. 2014071065**

Honorable Members of the City of San Diego Planning Commission:

This letter is submitted on behalf of Laborers International Union of North America, Local 89, and its members living in and near the City of San Deigo (collectively "LIUNA") regarding the Final Environmental Impact Report ("FEIR") prepared for Merge 56 Development, Project No. 360009 (SCH No. 2014071065) (the "Project").

After reviewing the FEIR, together with our team of expert consultants, LIUNA is concerned that the FEIR fails to adequately respond to comments raised by others, fails to adequately analyze significant environmental impacts, and fails to mitigate significant impacts that will occur as a results of the Project.

In addition to these comments, LIUNA submits the expert comments of wildlife biologist Dr. Shawn Smallwood.  Dr. Smallwood's comments and resume are attached hereto as Exhibit A.  LIUNA also submits herewith comments from the environmental consulting firm Soil/Water/Air Protection Enterprise ("SWAPE").  SWAPE's comments and the resumes of their consultants are attached hereto as Exhibit B.  LIUNA also submits comments from expert transportation analyst Daniel Smith, Jr., P.E., a registered civil and traffic engineer.  Mr. Smith's expert comments and resume are attached hereto as Exhibit C.  Although this comment will highlight some of the experts' technical comments below, the Commission should review each of the concerns raised in those expert comments.

Merge 56 FEIR
San Diego Planning Commission
February 21, 2018
Page 2 of 16

LIUNA requests that the Planning Commission refrain from certifying the EIR at this time but request staff to reconsider the analyses and require additional mitigation measures in order to address the Project's significant air quality impacts, GHG emissions, health risks, biological impacts, and traffic impacts that the Project as proposed will cause.

## I. Project Description

The Project consists of two components: 1) a mixed-use development, and 2) the public roads that adjoin the proposal. FEIR, p. 3-2. The mixed-used development component of the Project consists of a local mixed-use center that would contain commercial, office, hotel, and residential uses on a 41.34 acre, triangular shape property. *Id*. The Project would allow for construction of 525,000 square feet of commercial office, theater/cinema, and hotel uses. *Id*. It would also allow for 242 residences (158 multi-family and 84 single family). *Id*. The Project also includes associated site improvements such as utilities, storm drains/detention basins, internal private streets, hardscape, site walls, and landscaping. In addition, a 3.83-acre area in the northern portion of the site would be retained as Open Space and placed in a conservation easement. The Project also includes a 0.93-mile extension of Camino Del Sur, and a 0.38-mile extension of Carmel Mountain Road. FEIR, p. 3-4. Part of the Project includes reclassification to downgrade these roads from four-lane majors to two-lane collectors.

## II. Analysis

### A. The Project Will Have Significant Air Quality and Greenhouse Gas Impacts that Have Not Been Mitigated.

The environmental consulting firm, Soil, Water, Air Protection Enterprise ("SWAPE"), concludes that the Project will have very significant air quality impacts, far above applicable CEQA significance thresholds set by the San Deigo Air Quality Management District ("SDAQMD"). In particular the ***Project will create cancer risks more than four times above the SDAQMD's CEQA significance thresholds***, due largely to the close proximity of the Project to nearby residences. In addition, the FEIR fails to demonstrate that the Project will not generate greenhouse gas emissions (GHGs) above significance thresholds. As such, an EIR is required to analyze these impacts, and to propose feasible mitigation measures and alternatives to reduce or eliminate the impacts.

### 1. The FEIR Fails to Disclose the Serious Cancer Risks to the Nearby Residential Communities Created by the Project's Diesel Engine Exhaust.

SWAPE conducted a health risk assessment to demonstrate the potential health risk posed by Project construction to nearby sensitive receptors. SWAPE, p. 2. The result of this analysis demonstrates that the Project will have a significant health risk impacts as a result of Project-related diesel particulate matter ("DPM"). *Id*. SWAPE concludes that the Project will create cancer risks in the nearby residential community more than four times above the CEQA

Merge 56 FEIR
San Diego Planning Commission
February 21, 2018
Page 3 of 16

significance thresholds.  The EIR fails to analyze this impact at all.

A project will result in a significant impact if it would impact a sensitive receptor, and result in a cancer risk of greater than 10 in one million.  A two-story, single family residential development associated with the Rancho Penasquitos community is located east of the Project site.  FEIR, p. 2-2.  In addition, the southern portion of the Project site is adjacent to single-family residential development in the Park Village neighborhood, as well as a public elementary school (Park Village Elementary School).  FEIR, p. 2-2.  Despite the proximity of these sensitive receptors to the Project, the EIR contains no quantified health risk assessment or any other analysis of the Project's potential health impacts from Project-related emissions.

| The Maximum Exposed Individual at an Existing Residential Receptor (MEIR) | | | | | |
|---|---|---|---|---|---|
| Activity | Duration (years) | Concentration (µg/m$^3$) | Breathing Rate (L/kg-day) | ASF | Cancer Risk |
| Construction | 2.00 | 0.1317 | 1090 | 10 | 4.3E-05 |
| *Infant Exposure Duration* | **2.00** | | | *Infant Exposure* | **4.3E-05** |
| Construction | 0.35 | 0.1317 | 572 | 3 | 1.2E-06 |
| Operation | 12.65 | 0.1290 | 572 | 3 | 4.2E-05 |
| *Child Exposure Duration* | **14.00** | | | *Child Exposure* | **4.3E-05** |
| Operation | 14.00 | 0.1290 | 261 | 1 | 7.1E-06 |
| *Adult Exposure Duration* | **14.00** | | | *Adult Exposure* | **7.1E-06** |
| Lifetime Exposure Duration | **30.00** | | | Lifetime Exposure | **9.4E-05** |

According to SWAPE's analysis, the excess cancer risks in children and infants at a sensitive receptor located approximately 50 meters away would be 43 in one million.  *Id*. at 4.  In addition, the excess cancer risk over the course of a residential lifetime (30 years) is approximately 94 in one million, or more than nine times the threshold of significance.  *Id*. at 4-5.  These child, infantile, and lifetime cancer risks all exceed the San Diego Air Pollution Control District threshold of 10 excess cancer deaths per one million people.  *Id*. at 5.  This is a significant impact that must be disclosed in a revised EIR and mitigated.  By failing to include any discussion of this significant impact, the FEIR fails as an informational document.

      **2.**      **The FEIR Does Not Include Feasible Mitigation Measures to Reduce the Project's Significant Health Risk Impacts, and Without Requiring These Feasible Measures, the City Cannot Adopt a Statement of Overriding Considerations.**

An agency may adopt a statement of overriding considerations only *after* it has imposed all feasible mitigation measures to reduce a project's impact to less than significant levels.  CEQA Guidelines §§ 15126.4, 15091.  CEQA prohibits agencies from approving projects with

Merge 56 FEIR
San Diego Planning Commission
February 21, 2018
Page 4 of 16

significant environmental impacts when feasible mitigation measures can substantially lessen or avoid such impacts.  Pub. Res. Code § 21002.  As explained in CEQA Guidelines section 15092(b)(2), an agency is prohibited from approving a project unless it has "[e]liminated or substantially lessened all significant effects on the environment where feasible."

    As SWAPE's analysis demonstrates, the Project will have a significant air quality and health risk impact.  As a result, the EIR must require all feasible mitigations to reduce these impacts stemming from the Project's Diesel Particulate Matter emissions.  As SWAPE notes, DPM is a byproduct of diesel fuel combustion, and is emitted by on-road vehicles and off-road construction equipment.  SWAPE, p. 5.  The following feasible mitigation measures will reduce DPM, and are described more fully in SWAPE's comment letter (pages 5-10:

**Construction-related mitigation measures:**
- Require implementation of diesel control measures
- Repower or replace older construction equipment engines
- Install retrofit devices on existing construction equipment
- Use electric and hybrid construction equipment
- Institute a heavy-duty off-road vehicle plan
- Implement a construction vehicle inventory tracking system

**Mobile Source Mitigation to Reduce Operational Emissions:**
- Reduce vehicle miles traveled by increasing transit accessibility
- Increased bike paths/bike lanes
- Provide electric vehicle parking and charging
- Limit parking supply
- Unbundle parking costs from property costs
- Implement commute trip reduction program
- Provide ride sharing programs
- Implement subsidized or discounted transit program
- Provide end of trip facilities
- Encourage telecommuting and alternative work schedules
- Implement car-sharing programs
- Provide employer-sponsored vanpool/shuttle
- Implement commute trip reduction marketing
- Implement preferential parking permit program
- Price workplace parking
- Implement employee parking "cash out"
- Implement transit access improvements
- Expand transit network

    Until each of the above mitigation measures are incorporated as enforceable measures into the Project approval, the City will not be in a position to make a finding of overriding considerations for the Project's significant health-related impacts.

Merge 56 FEIR
San Diego Planning Commission
February 21, 2018
Page 5 of 16

> **3.**     **The FEIR's Greenhouse Gas Analysis and Mitigation Measures Do Not Comply with CEQA.**

The FEIR concludes that the Project's GHG impacts will be less than significant, but the analysis and conclusion are not properly supported.  CEQA allows the significance of a project's GHG impacts to be determined based on whether the Project would conflict with an applicable plan, policy, or regulation adopted for the purpose of reducing the emissions of GHGs.  When an agency bases its GHG analysis on such a plan, certain requirements must be met.  For example, CEQA Guidelines section 15183.5(b)(2) specifies that:

> An environmental document that relies on a greenhouse gas reduction plan for a cumulative impacts analysis must identify those requirements specified in the plan that apply to the project, and, if those requirements are not otherwise binding and enforceable, incorporate those requirements as mitigation measures applicable to the project.

The FEIR does not comply with this standard.

In order to conclude that the Project's GHG impacts will be insignificant, the FEIR relies on the City of San Diego's Climate Action Plan ("CAP").  FEIR, p. 5.7-20.  The CAP includes a "CAP Consistency Checklist" which contains measures that are required to be implemented on a project-by-project basis to ensure that the emissions targets identified in the CAP are met.  *Id.* at 5.7-11.  Implementation of the measure ensures that new development is consistent with the CAP's assumptions for relevant CAP strategies to achieve the identified GHG reduction targets.  *Id*.

A CAP Consistency Checklist was prepared for the Project.  The Checklist purports to identify which requirements of the CAP the Project will comply with.  Using compliance with the CAP as a significance threshold, the FEIR concludes, "through implementation of the project design features outlined above related to reducing GHGs, the project would ensure that it would be consistent with the CAP's assumptions and GHG reduction strategies geared toward achieving the identified GHG reduction targets in the CAP."  *Id*.  The FEIR therefore concludes that "no significant GHG emissions impacts are identified; no mitigation would be required."  *Id*.

The CAP Consistency Checklist, however, is not, in and of itself, "binding and enforceable."  As a result, CEQA requires each of the requirements specified in the CAP that apply to the Project be incorporated as enforceable mitigation measures.  14 CCR 15183.5(b)(2).  Yet none of the CAP consistency checklist requirements are included as mitigation measures or as mandatory conditions of Project approval.  By failing to include the CAP requirements as enforceable mitigation measures, the FEIR fails to comply with CEQA.
//
//
//

Merge 56 FEIR
San Diego Planning Commission
February 21, 2018
Page 6 of 16

     **4.**     **The FEIR Fails to Demonstrate Compliance with Executive Order B-30-15.**

The CAP Consistency Checklist, on which the on which the Project's GHG analysis relies, only accounts for the reductions in GHG emissions required to meet the 2020 emission reduction targets set forth in AB 32.  In relying exclusively on the CAP, the FEIR fails to demonstrate consistency with the more stringent 2030 reduction targets set forth in Executive Order B-30-15.  Executive Order B-30-15 requires statewide emissions reductions of 40% below 1990 levels by 2030.  Without any evidence showing that the Project would comply with these more stringent goals, the Project may have a potentially significant impact that has not been analyzed and mitigated.  A revised FEIR should be prepared to demonstrate the Project's consistency with Executive Order B-30-15.

     **B.**     **The FEIR Fails to Fully Analyze and Mitigate the Project's Biological Impacts.**

     **1.**     **The FEIR Fails to Analyze the Project's Potentially Significant Impacts on Animals as a Results of Window Collisions.**

Window collisions are estimated to be the second or third largest source of human-caused bird mortality in the United States, involving up to one billion bird fatalities per year.  Smallwood, p. 12.  Despite these drastic numbers, the FEIR includes no analysis of the Project's potential window collision impacts.  As Dr. Smallwood notes

The EIR was prepared for the construction of 242 dwelling units without any regard to window materials or the numbers and sizes of windows, window orientation, or landscaping around windows.  All of these factors contribute to rates of bird collisions with windows.

Smallwood, p. 12.

In order to mitigate these potential impacts to birds, Dr. Smallwood recommends the following mitigation measures:

- Minimizing use of glass
- Placing glass behind some type of screening (i.e. grilles, shutters, exterior shades)
- Using glass with inherent properties to reduce collisions, such as patterns, window films, decals, or tape
- Turning off lights during migration season

*Id*.  The FEIR should be revised to fully analyze and mitigate this potentially significant impact.

     **2.**     **The FEIR's Cumulative Biological Resources Analysis Violates CEQA and is Not Supported by Substantial Evidence.**

The FEIR's conclusion that the Project will not result in a cumulatively significant biological impact is based on improper reasoning and is not supported by substantial evidence.

An EIR must discuss significant cumulative impacts.  14 CCR § 15130(a).  This requirement flows from CEQA section 21083, which requires a finding that a project may have a significant effect on the environment if "the possible effects of a project are individually limited but cumulatively considerable. . . . 'Cumulatively considerable' means that the incremental effects of an individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects."

"Cumulative impacts" are defined as "two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts."  14 CCR § 15355(a).  "[I]ndividual effects may be changes resulting from a single project or a number of separate projects."  *Id.*  "The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time."  *Comm. for a Better Env't v. Cal. Resources Agency ("CBE v. CRA")* (2002) 103 Cal.App.4th 98, 117; 14 CCR § 15355(b).  A legally adequate cumulative impacts analysis views a particular project over time and in conjunction with other related past, present, and reasonably foreseeable probable future projects whose impacts might compound or interrelate with those of the project at hand.

The FEIR's cumulative biological impact analysis consists of two paragraphs.  It starts by acknowledging that the Project:

> would result in a number of significant direct and indirect impacts to biological resources, most of which would occur outside of the MHPA.  This would include impact to a number of sensitive habitats, areas under Corps, CDFW, and/or City jurisdiction (i.e. wetlands and non-wetland waters/streambed), including vernal and road pools, and sensitive plant and wildlife species.

FEIR, p. 6-4. The FEIR even goes on to admit that:

> According to the City Biology Guidelines, direct impacts to vernal pools may be considered cumulatively significant, as would impacts to State or federal listed species not covered by the MSCP, on a case-by-case basis.

*Id*.  But then the FEIR completely dismisses these potential cumulative impacts, stating:

> Due to each project's need to comply with City regulations pertaining to impacts to biological resources, impacts would not be considerable and not cumulatively significant.

Merge 56 FEIR
San Diego Planning Commission
February 21, 2018
Page 8 of 16

*Id*.

This conclusion does not constitute an analysis. A cumulative impact analysis, like the rest of the EIR, must provide specificity, and must be more than a conclusion "devoid of any reasoned analysis." *Whitman v. Board of Supervisors* (1979) 88 Cal.App.3d 397, 411. "[I]t is vitally important that an EIR avoid minimizing the cumulative impacts. Rather, it must reflect a conscientious effort to provide public agencies and the general public with adequate and relevant detailed information about them. (CEQA, § 21061.)" *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1984) 151 Cal.App.3d 61, 79; *see also Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 723.

The FEIR's conclusory cumulative impacts analysis provides no such information. Without even the most basic information about any of the cumulative projects or their environmental impacts, the FEIR's general cumulative impact conclusions is not supported by substantial evidence. Lacking any substantial evidence, the FEIR fails to provide sufficient information for the public and decisionmakers to evaluate cumulative biological impacts that may result from approval of the proposed Project. The amount of information provided for each of the listed projects does not give the reviewing public or decisionmakers any information about the cumulative projects' biological impacts, information that is needed to assess the validity of the cumulative impacts conclusions included in the FEIR. Indeed, the FEIR provides no specific information about any environmental impact that any of the listed cumulative projects will have.

Even if the conclusion was supported by evidence, it is based on the flawed premise that a Project cannot have a cumulative impact as long as it, and the other cumulative projects, comply with applicable laws and regulations. The entire purpose of the cumulative impact analysis is to prevent the situation where projects individually comply with applicable laws, without looking at the bigger picture. This argument, applied over and over again, has resulted in major environmental damage, and is a major reason why CEQA was enacted. As the court stated in *CBE v. CRA,* 103 Cal. App. 4th at 114:

Cumulative impact analysis is necessary because the full environmental impact of a proposed project cannot be gauged in a vacuum. One of the most important environmental lessons that has been learned is that environmental damage often occurs incrementally from a variety of small sources. These sources appear insignificant when considered individually, but assume threatening dimensions when considered collectively with other sources with which they interact.

A new cumulative impacts analysis is needed for the Project that complies with CEQA's requirement to look at the Project's environmental impact, combined with the impacts of other past, current, and probable future projects. The FEIR must be revised to fully analyze the Project's cumulative impacts.
//
//

Merge 56 FEIR
San Diego Planning Commission
February 21, 2018
Page 9 of 16

### 3.      The FEIR Fails to Analyze Impacts to Certain Special-Status Species.

Dr. Smallwood concludes that the biological analysis conducted as part of the FEIR is incomplete and inadequate.  According to Dr. Smallwood, the FEIR "dismisses the occurrence potential of some special-status species by mischaracterizing their habitat needs."  Smallwood, p. 4.

For example, the occurrence potential of Burrowing owl was determined by the FEIR to be low because the species "*would have been observed if present*."  Dr. Smallwood disagrees with this premise, noting:

> Having performed many burrowing owl surveys for many years, I have to object to this conclusion.  Burrowing owls are often difficult to detect, especially during the winter months which is when surveys were performed for Coastal California Gnatcatcher.  According to Alden (2017), one or more biologists spent 7 hours and 47 min on site searching for Coastal California Gnatcatcher on three dates:  10 and 17 December 2013 and 7 January 2017.  This survey effort comes nowhere close to the standards listed in the burrowing owl survey guidelines (CDFW 2012).

Smallwood, p. 5.

Similarly, the FEIR states that the occurrence potential for Loggerhead shrike were determined to be low because the species "would have been observed if present."  Dr. Smallwood disagrees.  "Like other special-status species, loggerhead shrikes are not easy to detect.  One cannot expect to detect this species after a few winter visits searching for Coastal California Gnatcatcher."  *Id*.

In addition to mischaracterizing the potential for certain species, the FEIR also fails to adequately address impacts on certain species that were observed on site because their special-status was not taken into account.  *Id.*  Specifically, Dr. Smallwood points to the Red-tailed hawk, Red-shouldered hawk, and American kestrel, all of which are protected by California Department of Fish and Wildlife Code 3503.5 (Birds of prey).

Moreover, Dr. Smallwood concludes that 35 special-status species were not, but should have been, considered in the EIR.  *Id.*  These species are listed in Table 1 of Dr. Smallwood's comments.  Most of these species are not covered under the MSCP, and nearly all of the bird species have been detected nearby the project site and reported on eBird (http://ebird.org/ebird/explore).  In addition, with no justification, the EIR completely failed to analyze any potential impacts on bats, pocket mice, and American, which Dr. Smallwood is certain occur on site.  *Id*. at 6.

The FEIR is incomplete because it fails to analyze potential impacts to these species.  A revised FEIR should be drafted that fully accounts for each of the species discussed in Dr. Smallwood's comments.

Merge 56 FEIR
San Diego Planning Commission
February 21, 2018
Page 10 of 16

> **4.      Mitigation Measure Bio-4 Constitutes Improperly Deferred
> Mitigation.**

CEQA disallows deferring the formulation of mitigation measures to post-approval
studies.  14 CCR § 15126.4(a)(1)(B); *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d
296, 308-309.  An agency may only defer the formulation of mitigation measures when it
possesses "'meaningful information' reasonably justifying an expectation of compliance."
*Sundstrom* at 308; *see also Sacramento Old City Association v. City Council of Sacramento*
(1991) 229 Cal.App.3d 1011, 1028-29 (mitigation measures may be deferred only "for kinds of
impacts for which mitigation is known to be feasible").  A lead agency is precluded from making
the required CEQA findings unless the record shows that all uncertainties regarding the
mitigation of impacts have been resolved; an agency may not rely on mitigation measures of
uncertain efficacy or feasibility.  *Kings County Farm Bureau v. City of Hanford* (1990) 221
Cal.App.3d 692, 727 (finding groundwater purchase agreement inadequate mitigation because
there was no evidence that replacement water was available).  This approach helps "insure the
integrity of the process of decisionmaking by precluding stubborn problems or serious criticism
from being swept under the rug."  *Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist.
Agricultural Assn.* (1986) 42 Cal.3d 929, 935.

Moreover, "mitigation measure[s] [that do] no more than require a report be prepared and
followed" do not provide adequate information for informed decisionmaking under CEQA.
*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 794;
Guidelines § 15126.4(a)(1)(B).  By deferring the development of specific mitigation measures,
the City has effectively precluded public input into the development of those measures.  CEQA
prohibits this approach. As explained by the court in *Communities for a Better Env't v.
Richmond* (2010) 184 Cal.App.4th 70, 92:

> [R]eliance on tentative plans for future mitigation after completion of the CEQA process
> significantly undermines CEQA's goals of full disclosure and informed decisionmaking;
> and[,] consequently, these mitigation plans have been overturned on judicial review as
> constituting improper deferral of environmental assessment.

Mitigation measure Bio-4 constitutes just the type of deferred mitigation CEQA
prohibits.  The FEIR provides that:

> Prior to the issuance of the first construction and/or grading permit, mitigation for direct
> impacts to San Diego fairy shrimp in two vernal pools located on the Mixed-Use
> Development site and direct impacts to San Diego fairy shrimp designated Critical
> Habitat shall be determined through consultation with USFWS through a Section 7
> Consultation with the Corps and addressed in an amended and/or new Biological
> Opinion.

Merge 56 FEIR
San Diego Planning Commission
February 21, 2018
Page 11 of 16

FEIR, p. ES-29.  Mitigation measures Bio-4 then goes on to state that the "mitigation shall be
conducted in accordance with a mitigation plan to be approved by the USFWS and City prior to
issuance of grading permits."  *Id*. at p. ES-30.

Mitigation measures Bio-4 defers the preparation of a mitigation plan until after
completion of CEQA review, without imposing any substantive standards, without providing for
any public review, and subject to approval by the USFWS.  It is improper for a mitigation plan to
be created at some later time, after the CEQA process is complete.  CEQA requires mitigation
measures be

Deferral of mitigation is also impermissible if it removes the CEQA decision-making
body from its decision-making role.  The City may not delegate the formulation and approval of
mitigation measures to address environmental impacts because an agency's legislative body must
ultimately review and vouch for all environmental analysis mandated by CEQA.  *Sundstrom v
County of Mendocino* (1988) 202 Cal.App.3d 296, 306-308.  Thus, the FEIR may not rely on
programs to be developed and implemented later without approval by the City.  Yet that is
precisely what MM BIO-4 does.

Here, the lead agency has improperly delegated its legal responsibility of determining
what constitutes adequate mitigation to the USFWS.  MM BIO-4 calls for a mitigation plan that
is prepared by the Project Applicant, "through consultation with the USFWS through a Section 7
Consultation with the Corps," approved by USFWS and the City.

The FEIR may not rely on a fairy shrimp mitigation plan to be developed, approved, and
implemented later, at some future time after the Project has been approved.  Without valid
mitigation, the Project's significant impact on San Diego fairy shrimp remains significant.

## 5.    There is No Evidence that Mitigation Measure Bio-3 is Feasible.

Mitigation measures must be feasible, enforceable, and effective.  A public agency may
not rely on mitigation measures of uncertain efficacy or feasibility.  *Kings County Farm Bureau
v. City of Hanford* (1990) 221 Cal.App.3d 692, 727 (finding groundwater purchase agreement
inadequate mitigation measure because no record evidence existed that replacement water was
available).  "Feasible" means capable of being accomplished in a successful manner within a
reasonable period of time, taking into account economic, environmental, legal, social and
technological factors.  14 CCR § 15364.  A lead agency may not make the required CEQA
findings unless the administrative record clearly shows that all uncertainties regarding the
mitigation of significant environmental impacts have been resolved.  Mitigation measures must
be fully enforceable through permit conditions, agreements or other legally binding instruments.
(14 CCR § 15126.4(a)(2).)

Here, there is no evidence that Mitigation Measures Bio-3 is feasible.  MM Bio-3
requires that, prior to the issuance of the first construction and/or grading permit, mitigation for
direct impacts to 61.2 acres of sensitive upland vegetation communities and Nuttall's scrub oak

Merge 56 FEIR
San Diego Planning Commission
February 21, 2018
Page 12 of 16

shall be accomplished through preservation of a minimum of 51.8 acres of suitable habitat/mitigation credit.  FEIR, p. ES-27 to 28.  As part of this measure, the FEIR provides that:

> The Applicant shall meet the 32.7-acre upland mitigation requirement for the Mixed-Use Development through the assignment of credits in the Deer Canyon Mitigation Bank, the acquisition of land available at the Crescent Heights site owned by Pardee Homes and/or the acquisition of land available in the East Elliot community.  Any MHPA land acquired from Pardee Homes or others for Project mitigation would be dedicated in fee title to the City of San Diego.  Conveyance of any land in fee title to the City shall require approval from the Park and Recreation Department Open Space Division Deputy Director.

*Id*. at ES-28.  The measure then states:

> Final mitigation compliance may be a combination of these three options; ***would be dependent upon credit/land availability***; and would be subject to City and wildlife agency approval prior to issuance of the first grading permit.

*Id*. (emph. added).
This mitigation measure does not comply with CEQA because there is no evidence that it is feasible.  There is no evidence that sufficient land and/or mitigation credits are available to fully satisfy this mitigation measure.

In comments on the DEIR, the U.S. Fish and Wildlife Service ("USFWS") and the California Department of Fish and Wildlife ("CDFW") raised concerns about the feasibility of Mitigation Measure Bio-3.  They requested that the EIR provide a description of available and appropriate mitigation banks, and required the EIR include an accounting of the available credits by vegetation type.  They also requested documentation on the establishment of the Crescent Heights site for contribution and banking of excess mitigation.   The FEIR provides none of this information in response to comments.  *See* RTC-12.

In response to comments from USFWS and CDFW, the FEIR states that "the proposed mitigation sites and/or combination of sites currently include sufficient land for the project's required mitigation.  Further, prior to issuance of the first grading permit Mitigation Measure Bio-3 requires the project to demonstrate that the required amount and type of habitat has been secured, to the satisfaction of the City."  RTC-12.

The conclusory statement that sites "currently include sufficient land for the project's required mitigation" is not a sufficient response.  First, there is no evidence to support the conclusion that sufficient land is available.  No accounting was provided, as requested by the wildlife agencies.  Moreover, just because land is currently available, does not mean it will be available when the Project developer is ready to obtain the land.

Without substantial evidence that mitigation measures Bio-3 is feasible, the Project's impact to upland vegetation communities remains significant.  A revised EIR must fully mitigate

Merge 56 FEIR
San Diego Planning Commission
February 21, 2018
Page 13 of 16

this significant impact in a manner that complies with CEQA.

> **C.     The FEIR Fails as an Informational Document Because It Does Not Disclose the Full Extent of the Project's Traffic Impacts.**

> **1.     The FEIR's Project Description is Incomplete.**

The FEIR fails to describe the Project in a manner sufficient to allow for an assessment of the Project's traffic impacts, as well as air quality impacts that are based on the traffic analysis. "An accurate, stable and finite project description is the *sine qua non* of an informative and legally adequate EIR." *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 192; 14 CCR 15124.  Without an accurate description on which to base the EIR's analysis, CEQA's objective of furthering public disclosure and informed decision making would be stymied.  A project description that omits integral components of the project may result in an EIR that fails to disclose all of the impacts of the project. *Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818, 829.  "[A]n accurate project description is necessary for an intelligent evaluation of the potential environmental effects of a proposed activity." *San Joaquin Raptor/Wildlife Rescue Ctr. v. County of Stanislaus* (1994) 27 Ca.App.4th 713, 730.

Table 8-1 of Appendix B of the FEIR contains the FEIR's trip generation analysis for the Project.  It describes the Project in very vague terms, including 9,000 square feet of "Retail – Unnamed," a 120-room hotel with no description of whether it will include a restaurant, conference, function or banquet facilities will be included, 10,564 square feet of "Market Hall," and 39,262 square feet of "Other Retail."  Smith, p. 2.  The lack of information about what the Project will actually entail prevents an accurate assessment of the Project's traffic impacts.  As Traffic Engineer Dan Smith points out, "[t]he public and public policy decisionmakers are simply asked to accept on good faith that whatever goes into these undetermined spaces is truly represented by the trip generation rates employed in FEIR Appendix B."  Smith, p. 2.  A more detailed Project description is required to more accurately analyze the Project's traffic impacts.

> **2.     The FEIR's Traffic Analysis Contains an Implausible Level of Service/Delay Calculations and an Underlying Inconsistencies.**

Traffic engineer Dan Smith reviewed the comparison of LOS/Delay calculations for Existing versions Existing + Project scenarios, presented in FEIR Appendix B, Table 9-1. Smith, p. 5.  Mr. Smith took notice of Intersection #3, the intersection of Camino Del Sur, Wolverine Way, and Fallhaven Road. *Id*. at 6.  Despite the fact that the intersection was already at a LOS E in the AM Peak, the addition of Project traffic did not change the average vehicle delay at the intersection at all. *Id*. at 4.  Mr. Smith took issue with this finding because the Project Trip Distribution figure indicates that 11 or 12 percent of Project traffic will pass through this intersection. *Id*.  The 11 to 12 percent of total Project traffic amounts to at least 131 to 142 trips through this intersection in the AM Peak. *Id*.  According to Mr. Smith, this is enough to cause a change in delay at an intersection that was already LOS E. *Id*.

Merge 56 FEIR
San Diego Planning Commission
February 21, 2018
Page 14 of 16

Having found the discrepancy at Intersection #3, Mr. Smith also looked at the Existing and Existing + Project calculations sheets for Intersection #21, the intersection of Black Mountain Road with Park Village road and Adolphia Street. *Id.* This intersection is already at LOS E with existing conditions. *Id.* According to the trip distribution calculations, the total Project generated trips added to the intersection is supposed to be 13 percent of Project trips. *Id.* This would amount to 155 added trips in the AM peak period. *Id.* However, when the calculation sheets are compared, the Existing + Project scenario has <u>96 fewer trips</u> passing through the intersection than the Existing conditions. *Id.* at 6-7. At PM peak hours for this location, the Existing + Project scenario should have 272 more traffic movements at the intersection than Existing conditions. *Id.* at 7. Instead, the FEIR shows a net decrease of 3 traffic movements in the Existing + Project conditions. *Id.* According to Mr. Smith, "This is not credible." *Id.*

As Mr. Smith explains, the FEIR's calculation sheets and data sheets are significantly different from the narrative description, tables, and figures that are supposed to be analyzing the data. "When the actual calculation sheets and base data sheets are significantly discrepant from the narrative description and tables and figures embedded therein, the validity of the entire analysis is undermined. The entire traffic analysis must be redone in a manner that renders the calculations, figures, tables, and the narrative consistent." Smtih, p. 7.

### D.     The FEIR Fails to Adequately Respond to Comments.

An FEIR's responses to comments must be detailed and must provide a reasoned, good faith analysis. 14 CCR §15088(c ). Failure to provide a substantive response to a comment render the EIR legally inadequate. *Rural Land Owners Assoc. v. City Council* (1983) 143 Cal.App.3d 1013, 1020.

The responses to comments on a draft EIR must state reasons for rejecting suggested mitigation measures and comments on significant environmental issues. "Conclusory statements unsupported by factual information" are not an adequate response. 14 CCR §15088(b, c); *Cleary v. County of Stanislaus* (1981) 118 Cal.App.3rd 348. The need for substantive, detailed response is particularly appropriate when comments have been raised by experts or other agencies. *Berkeley Keep Jets v. Bd. of Port Comm'rs* (2001) 91 Cal.App.4th 1344, 1367; *People v. Kern* (1976) 72 Cal.app.3d 761. A reasoned analysis of the issue and references to supporting evidence are required for substantive comments raised. *Calif. Oak Found. v. Santa Clarita* (2005) 133 Cal.App.4th 1219.

The FEIR's response to comments fail to meet these standards. See the comments of Dr. Shawn Smallwood, attached hereto as Exhibit A, regarding the inadequacy of the FEIR's response to comments on biological resources. A revised FEIR should provide reasoned responses, supported by factual information.
//

Merge 56 FEIR
San Diego Planning Commission
February 21, 2018
Page 15 of 16

    **E.**    **The FEIR Fails to Provide Substantial Evidence to Support a Finding of Overriding Consideration.**

    The FEIR admits that the Project will have significant, unmitigated environmental impacts.  As a result, a statement of overriding considerations will be required.  Under CEQA, when an agency approves a project with significant environmental impacts that will not be fully mitigated, it must adopt a "statement of overriding considerations" finding that, because of the project's overriding benefits, it is approving the project despite its environmental harm.  14 CCR § 15043; PRC § 21081(B); *Sierra Club v. Contra Costa County* (1992) 10 Cal.App.4th 1212, 1222.)  A statement of overriding considerations expresses the "larger, more general reasons for approving the project, such as the need to create new jobs, provide housing, generate taxes and the like."  *Concerned Citizens of South Central LA v. Los Angeles Unif. Sch. Dist.* (1994) 24 Cal.App.4th 826, 847.

    A statement of overriding considerations must be supported by substantial evidence in the record.  14 CCR § 15093(b); *Sierra Club v. Contra Costa County* (1992) 10 Cal.App.4th 1212, 1223.  The agency must make "a fully informed and publicly disclosed" decision that "specifically identified expected benefits form the project outweigh the policy of reducing or avoiding significant environmental impacts of the project."  14 CCR § 15043(b).  As with all findings, the agency must present an explanation to supply the logical steps between the ultimate finding and the facts in the record.  *Topenga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515.

    Key among the findings that the lead agency *must* make is that:

    Specific economic, legal, social, technological, or other considerations, including ***the provision of employment opportunities to highly trained workers***, make infeasible the mitigation measures or alternatives identified in the environmental impact report … [and that those] benefits of the project outweigh the significant effects on the environment.

PRC § 21081(a)(3), (b).

    Thus, the City must make specific findings, supported by substantial evidence concerning both the environmental impacts of the Project and the economic benefits including, "the provision of employment opportunities for highly trained workers."  The FEIR fails to provide substantial evidence to support a statement of overriding considerations.

    The FEIR makes no effort whatsoever to analyze the fiscal impacts related to jobs to be created by the proposed project or the quality of the new jobs. The FEIR makes no attempt to determine whether new jobs created by the Project, in either the construction phase or the operational phase, will be for "highly trained workers," and what the likely salary and wage ranges of these jobs will be.  Without this information, the City lacks substantial evidence to make any statement of overriding considerations.

Merge 56 FEIR
San Diego Planning Commission
February 21, 2018
Page 16 of 16

In short, the City cannot find that the economic benefits of the Project outweigh the environmental costs if it does not know what the economic benefits will be.  A revised FEIR is required to provide this information.

**III.    Conclusion**

LIUNA asks that the Planning Commission refrain from certifying the FEIR or recommending approval of the Merge 56 Project in order to allow staff additional time to address the attached expert comments and the following additional concerns.  Please include this letter and all accompanying expert comments and enclosures hereto in the record of proceedings for this project.  Thank you for your attention to these comments.

Very truly yours,

Rebecca L. Davis

# EXHIBIT A

Shawn Smallwood, PhD
3108 Finch Street
Davis, CA  95616

Elizabeth Shearer-Nguyen
San Diego Development Services Center
1222 1st Avenue
MS 501
San Diego, CA 92101

14 February 2018

RE:  Merge 56 EIR

Dear Ms. Shearer-Nguyen,

I write to comment on the EIR prepared for Merge 56 (City of San Diego 2017), which I understand is to be a new development on 72.34 acres in the City of San Diego, including 41.34-acre mixed-use development and 31 acres of public road improvements to complete undeveloped segments of Camino Del Sur and Carmel Mountain Road.

My qualifications for preparing expert comments are the following.  I earned a Ph.D. degree in Ecology from the University of California at Davis in 1990, where I subsequently worked for four years as a post-graduate researcher in the Department of Agronomy and Range Sciences.  My research has been on animal density and distribution, habitat selection, habitat restoration, interactions between wildlife and human infrastructure and activities, conservation of rare and endangered species, and on the ecology of invading species.  I have authored numerous papers on special-status species issues, including "Using the best scientific data for endangered species conservation," published in Environmental Management (Smallwood et al. 1999), and "Suggested standards for science applied to conservation issues" published in the Transactions of the Western Section of The Wildlife Society (Smallwood et al. 2001).  I served as Chair of the Conservation Affairs Committee for The Wildlife Society – Western Section.  I am a member of The Wildlife Society and the Raptor Research Foundation, and I've been a part-time lecturer at California State University, Sacramento.  I was also Associate Editor of wildlife biology's premier scientific journal, The Journal of Wildlife Management, as well as of Biological Conservation, and I was on the Editorial Board of Environmental Management.

I have performed wildlife surveys in California for thirty-three years.  Over these years, I studied the impacts of human activities and human infrastructure on wildlife, including on golden eagle, Swainson's hawk, burrowing owl, San Joaquin kangaroo rat, mountain lion and other species.  I have also performed wildlife surveys at many proposed project sites.  I also collaborate with colleagues worldwide on the underlying science and policy issues related to anthropogenic impacts on wildlife.  I have performed research on wildlife mortality caused by wind turbines, electric distribution lines, agricultural practices, and road traffic.

My CV is attached.

1

My comments are in response to the City of San Diego's ("City") responses to comments submitted by in a joint letter from the US Fish and Wildlife Service and California Department of Fish and Wildlife (Letter B3) and in a letter drafted by a collection of environmental advocacy groups (letter J), both letters appearing in the Final Draft EIR.

**Letter B3, Response 3:**  Rather than demonstrating avoidance and minimization of project impacts to special-status species in the San Diego National Wildlife Refuge/MHPA, as requested by the US Fish and Wildlife Service and California Department of Fish and Wildlife, the City simply asserted its existing right to extend Camino Del Sur into the Refuge/MHPA.  The City's response implied that the only potential impacts to wildlife in the MHPA included habitat loss and fatalities caused during a temporary period of construction.  The City dismissed the habitat loss impact by asserting an existing right to take the habitat for Camino Del Sur, and it argued that construction fencing and worker awareness measures will minimize construction-related impacts.  However, the response did not address traffic impacts on wildlife in the MHPA that will be caused by the extension of Camino Del Sur.  With 8,500 daily trips projected in 2035, the risk of wildlife traffic fatalities would be high.  A trip generation of 8,500 per day would equate to 354 per hour or 6 per minute.  A car passing any point on the road every 10 seconds (6 per minute) on average would provide insufficient time for animals such as western spadefoot or coastal rosy boa to avoid being crushed under car tires.  Many other species, including birds, would fall victim to car traffic at this projected trip rate.

**Letter B3, Response 4:**  USFWS and CDFW requested that the FEIR demonstrate avoidance of impacts to vernal pools when roads are extended for the project.  The City's response was "...*the City met with the USFWS and CDFW during the preparation of the Draft EIR in accordance with the City Biology Guidelines to discuss the rationale for why the project would be the Biologically Superior Option. As described in the Draft EIR, the USFWS has noted in a Biological Opinion for the site that the preservation of the two isolated pools was not desirable, and that it would be preferable to impact the pools and provide mitigation elsewhere (USFWS 2012). The USFWS and CDFW provided concurrence with the biologically superior design and analysis for impacts to wetland resources on October 20, 2016*."  The City's response begs the question about why USFWS and CDFW would express concern about the vernal pools if they had already agreed that the City's plan was the biologically superior option.  As an ecologist having focused on wildlife conservation and habitat fragmentation, I find the notion preposterous that the preservation of existing vernal pools would be undesirable, regardless of who carried the notion.  "Creating" vernal pools in exchange for destroying existing vernal pools cannot qualify as a biologically superior design because there is no way to truly replace the unique suites of species and ecological processes that generated the original vernal pools (CNPS 1998).  Avoidance measures are prioritized under CEQA as superior to any type of mitigation.

**Letter B3, Response 5:**  USFWS and CDFW requested more mitigation to ensure minimization of impacts to the Refuge/MHPA due to trespass by humans, pets, lighting and invasive species.  The City responded by saying that these impacts would be

prevented by installing fencing, signs warning against trespass, baffled lights, no "installation" of invasive species, and a spatial buffer between the Refuge boundary and residences. However, these impacts could be further reduced to realigning road entry to the development so that it does not take habitat in the MHPA.

**Letter B3, Response 7:** USFWS and CDFW commented that on-site avoidance of project impacts is preferable to off-site compensatory mitigation. They also requested that the EIR be updated to inform the public that a certain mitigation bank is no longer available as a mitigation option, as claimed in the DEIR. The City responded by claiming that CEQA does not require on-site avoidance over off-site mitigation. My understanding is that CEQA encourages mitigation in the following priority order: avoidance, minimization, reduction, rectification, and compensation. The City's response falsely implies that off-site acquisition and on-site preservation are of equal value. It also claims that off-site acquisition is acceptable so long as the off-site land is of equal or greater value than the habitat being lost. It implies that habitat lost is valuated against off-site acquisitions by whatever mitigation ratio is used, as if all habitat areas are the same but for spatial extent.

**Letter B3, Response 15:** USFWS and CDFW recommended enforceable mitigation measures related to avoiding and minimizing impacts to the MHPA due to encroachment from residents, pets, and other invasive species, but the response did not address enforceability. The EIR should specify an up-front commitment of funds to protect the MHPA from impacts caused by project residents and various forms of pollutants. Erecting a fence and signing it are not enough.

**Letter B3, Response 17:** Spillover effects of street lighting. It is not enough to note the comment. Part of the MHPA will be degraded due to lighting, even if measures are taken to dampen the spillover effects. The extent of the impact should be quantified and compensatory mitigation provided.

**Letter B3, Response 22:** The response fails to address the comment that the Mitigation Monitoring and Reporting Program needs to be revised to address the 55 barrel cacti the applicant says will be relocated. The response merely states that, though the applicant does not have to relocate the barrel cacti, it'll be done anyway. The USFWS and CDFW are saying that the effectiveness of the relocation needs to be monitored. What if all 55 barrel cacti perish within the first year of relocation? I would hazard to guess that the USFWS and CDFW, like me, are skeptical that the relocation will save these cacti. I will add that monitoring is needed to measure the potential impacts of dumping 55 cacti onto the vernal pool mitigation area. How is this measure a benefit to the vernal pools?

**Letter B3, Response 23:** Similar to response 22, the response fails to address the comment that the Mitigation Monitoring and Reporting Program needs to be revised to address the effectiveness of planting wildlife unfriendly plants along the road median to discourage use of the road verges by wildlife. The response focused solely on the mitigation measure, and neglected to address the monitoring of the mitigation measure's effectiveness.

**Letter B3, Response 24:** USFWS and CDFW requested an accounting of mitigation directed toward upland species potentially affected by the project. In response, the City provided no accounting of the mitigation, but instead described an exclusive process for deciding which mitigation would be acceptable. The City's decision on acceptability effectively excludes members of the public from meaningfully participating with the CEQA process, because they cannot know what sites the City is examining or what factors the City is considering when deciding on acceptability.

**Letter B3, Response 28:** USFWS and CDFW requested a redesign of the alignment of Camino Del Sur so that it avoids direct impacts in the MHPA. The response rejects the redesign on the grounds that impacts to the MHPA would be mitigated to less than significant levels. The impacts in question total 2.2 acres of upland habitat, according to both the commenter and responder. However, the 2.2 acres would not be the entirety of the impact. For one thing, the EIR projects Camino Del Sur will have 8,500 daily car trips in 2035. This many car trips would result in many collisions between wildlife and automobiles.

A more honest response to comment 28 would have been that the realignment would result in a significant loss in profits from the project. The realignment is perfectly feasible, and would shift the car traffic impacts off of the MHPA, but it would squeeze out multiple housing units.

**Letter B3, Response 30:** USFWS and CDFW included a list of standards for vernal pool mitigation, to which the City of San Diego offered no response other than to say that the list does not address the adequacy of the EIR. However, if any of the listed standards have not been met in the EIR's formulation of vernal pool mitigation, then the list does go to the adequacy of the EIR.

**Response J2:** The growth-inducing impacts of the Camino Del Sur extensions was not addressed by the response. According to the comment, the road extension would enable two additional development projects to go forward. If so, these additional projects would add to the 8,500 daily car trips along Camino Del Sur, thereby further endangering wildlife using the MHPA.

**Response J3:** The comment points out that later development projects within a region typically encounter greater resistance due to larger environmental impacts caused within increasingly smaller fragments of habitat. The response dismisses this comment by claiming "*The Draft EIR analyzes and discloses the project's potential for significant impacts to biological resources, including the adjacency issues, and identifies mitigation for the impacts*." However, I disagree that the EIR analyzes and discloses the project's potential impacts, and because not all of the impacts are disclosed, they also are not mitigated.

The EIR dismisses the occurrence potential of some special-status species by mischaracterizing their habitat needs. The following are examples taken from Alden (2017: Table 5).

4

The occurrence potential of Northern red-diamond rattlesnake (*Crotalus ruber*) was determined to be low because the species was said to prefer "*rocky outcroppings within coastal sage scrub or chaparral habitats. Rocky outcroppings are not present in the Project study area.*"  How would Alden (2017) know what northern red-diamond rattlesnakes prefer?  The EIR provides no evidence in support of the amazing assertion that this species is constrained to rocky outcroppings.  I posit that the habitat constraint is untrue.

The occurrence potential of Burrowing owl (*Athene cunicularia*) was determined to be low because the species "*would have been observed if present.*"  Having performed many burrowing owl surveys for many years, I have to object to this conclusion.  Burrowing owls are often difficult to detect, especially during the winter months which is when surveys were performed for Coastal California Gnatcatcher.  According to Alden (2017), one or more biologists spent 7 hours and 47 min on site searching for Coastal California Gnatcatcher on three dates:  10 and 17 December 2013 and 7 January 2017.  This survey effort comes nowhere close to the standards listed in the burrowing owl survey guidelines (CDFW 2012).

The occurrence potential of Loggerhead shrike (*Lanius ludovicianus*) was determined to be low because the species "*would have been observed if present.*"  Having surveyed large areas for loggerhead shrike, I have to disagree with this conclusion.  Like other special-status species, loggerhead shrikes are not easy to detect.  One cannot expect to detect this species after a few winter visits searching for Coastal California Gnatcatcher.

The occurrence potential of San Diego desert woodrat (*Neotoma lepida intermedia*) was determined to be low because the species "*nests likely would have been observed if present.*"  Having searched large areas for woodrat nests, I disagree with this conclusion.  Woodrat nests often occur in the thickest available vegetation or the most obscure locations; they are not always easy to locate.  Furthermore, woodrats are relatively easy to live-trap, so it would have made sense to trap for this species to determine presence/absence.  It is unjustifiable to say that because they were not observed during surveys focused on some other species, San Diego desert woodrats are unlikely present.

Some species observed on site (Alden 2017: App. E) were not addressed adequately in the impacts assessment because their special-status was not considered.  These species included Red-tailed hawk (*Buteo jamaicensis*), Red-shouldered hawk (*Buteo lineatus*), and American kestrel (*Falco sparverius*).  All three of these species are protected by California Department of Fish and Wildlife Code 3503.5 (Birds of prey).  Another species seen on site was savannah sparrow, which was likely the large-billed savannah sparrow (*Passerculus sandwichensis rostratus*) – a California Bird Species of Special Concern with priority 2 (Shuford and Gardali 2008).

The special-status species listed in Table 1 were not considered by Alden (2017) or the EIR.  Most of these species are not covered under the MSCP, and nearly all of the bird species have been detected nearby the project site and reported on eBird

(http://ebird.org/ebird/explore).  The EIR neglected bats for reasons unstated.  It
would be absurd to conclude bats are absent from the site.  The same would be true of
pocket mice and American badger.

**Response J4:**  The City provided a mere "comment noted" to a description of  unique
ecological resources on site and the City's recent affirmation of those values,
including the City Council's unanimous vote to protect the Natural Resource
Management Plan for the Preserve in perpetuity.

**Response J6:**  The response dismisses the comment that all impacts need to be
analyzed, including cumulative impacts, claiming that the EIR analysis "the whole of the
project."  A cumulative impacts assessment could have identified the existing, ongoing,
or planned future projects in the region.  I saw no such assessment in the EIR.  Another
approach, given the many projects that have already been built in the area, could have
been to identify all the remaining patches of habitat and which species likely can be
found in them.  This latter approach would have revealed the high degree of habitat
fragmentation already in evidence.

I applied an indicator approach to get a sense of how much habitat fragmentation has
already taken place within the local area.  Using Google Earth I extended 2.5-mile
(4,005 m) transects to the north, east, south, and west of the project site and I measured
the extent of open space and the number of habitat patches along each of those transects
(Figure 1).  To the north I measured 1,382 m of open space along 3 patches.  To the east I
measured 0 m of open space along 0 patches.  To the south I measured 1,481 m along 3
patches.  To the west I measured 3,272 m along 1 contiguous patch of open space.
Altogether I measured 38% of the four transects remain in open space within 7 patches.
In other words, 62% of habitat in the area has already been converted to houses,
commercial buildings and roadways.  This exercise should be repeated at a regional
scale to get a better sense of habitat fragmentation and cumulative effects.

Repeating this exercise using 5-mile transect instead of 2.5-mile transects extending
north, south, east, west from the project site, the cumulative transect overlapping open
space reduces to 33% (Figure 1).  Where open space used to occur contiguously 5 miles
in every direction from the project site, now only a third of the area remains in 12
fragments of open space useful to special-status species of wildlife as habitat.  The
average habitat fragment is a mere 874 m across with an average anthropogenic
landscape separation of 1,959 m.  The level of habitat fragmentation in the project area
is nothing short of catastrophic for 52 special-status species of wildlife.  Cumulative
impacts must be assessed appropriately, and mitigation formulated.

**Table 1.** *Special-status wildlife species not assessed in the EIR for likelihood of occurrence at the project site, and whether covered under San Diego MSCP.*

| Common name, *Species name* | Status[1] | MSCP cover | eBird post |
|---|---|---|---|
| Coastal rosy boa, *Lichanura trivirgata* | FSC [1993] | No | |
| San Diego ringneck snake, *Diadophis punctatus similis* | CNDDB | No | |
| San Diego Banded gecko, *Coleonyx variegatus abbotti* | SSC | No | |
| South coast garter snake, *Thamnophis sirtalis* | SSC | No | |
| Ferruginous hawk, *Buteo regalis* | CDFW 3503.5, TWL | Yes | Nearby |
| Sharp-shinned hawk, *Accipiter striatus* | CDFW 3503.5 | No | Nearby |
| Merlin, *Falco columbarius* | CDFW 3503.5, TWL | No | Nearby |
| Peregrine falcon, *Falco peregrinus* | CE, CFP | Yes | Nearby |
| Barn owl, *Tyto alba* | CDFW 3503.5 | No | Nearby |
| Long-eared owl, *Asio otus* | SSC3 | No | |
| Great-horned owl, *Bubo virginianus* | CDFW 3503.5 | No | Nearby |
| Southwestern willow flycatcher, *Empidonax traillii Extimus* | FE, CE | Yes | Nearby |
| Olive-sided flycatcher, *Contopus cooperi* | SSC2 | No | Nearby |
| Vermilion flycatcher, *Pyrocephalus rubinus* | SSC2 | No | Nearby |
| Clark's marsh wren, *Cistothorus palustris clarkae* | SSC2 | No | Nearby |
| Least Bell's vireo, *Vireo belli pusillus* | FE, CE | Yes | Nearby |
| Yellow warbler, *Setophaga petechia* | SSC2 | No | Nearby |
| Yellow-breasted chat, *Icteria virens* | SSC3 | No | Nearby |
| Grasshopper sparrow, *Ammodramus savannarum* | SSC2 | No | Nearby |
| Tricolored blackbird, *Agelaius tricolor* | SSC1 | Yes | Nearby |
| Yellow-headed blackbird, *Xanthocephalus xanthocephalus* | SSC3 | No | Nearby |
| Pallid bat, *Antrozous pallidus* | SSC | No | |
| Townsend's western big-eared bat, *Plecotus t. townsendii* | SSC | No | |
| Western red bat, *Lasiurus blossevillii* | SSC | No | |
| Western yellow bat, *Lasiurus xanthinus* | SSC | No | |
| Small-footed myotis, *Myotis cililabrum* | WBWG | No | |
| Long-eared myotis, *Myotis evotis* | WBWG | No | |
| Fringed myotis, *Myotis thysanodes* | WBWG | No | |
| Long-legged myotis, *Myotis volans* | WBWG | No | |
| Yuma myotis, *Myotis yumanensis* | WBWG | No | |
| Western mastiff bat, *Eumops perotis* | SSC | No | |
| Pocketed free-tailed bat, *Nyctinomops femorosaccus* | SSC | No | |
| Mountain lion, *Puma concolor* | CFP | Yes | |
| American badger, *Taxidea taxus* | SSC | Yes | |
| Los Angeles pocket mouse, *Perognathus longimembris brevinasus* | SSC | No | |

[1] Listed as FE = federal endangered, FCC = U.S. Fish and Wildlife Service Bird of Conservation Concern, CE = California endangered, SSC = California species of special concern (not threatened with extinction, but rare, very restricted in range, declining

throughout range, peripheral portion of species' range, associated with habitat that is declining in extent), CFP = California Fully Protected (CDFG Code 4700), CDFW 3503.5 = California Department of Fish and Wildlife Code 3503.5 (Birds of prey), and SSC1, SSC2 and SSC3 = California Bird Species of Special Concern priorities 1, 2 and 3, respectively (Shuford and Gardali 2008), and TWL = Taxa to Watch List (Shuford and Gardali 2008), WBWG = Western Bat Working Group listing as moderate or high priority.



**Figure 1.** *Indicators approach to assessing habitat fragmentation along 2.5-mile (thin red lines) and 5-mile (added thick red lines) transect extended from the project site to the north, south, east, and west from the proposed project site. The approach measures intersected lengths of transect overlapping open space other than landfills and golf courses.*

**Response J7:** The City denies that it relied on past EIR's for its CEQA review of the currently proposed project. This means that the baseline data underlying potential biological impacts for most wildlife species consists of only three wintertime surveys for Coastal California Gnatcatcher. Seven hours and 47 minutes of gnatcatcher surveys seems grossly inadequate for assessing potential impacts to 52 special-status species of

wildlife.  Special-status species observed on site include San Diego fairy shrimp (*Branchinecta sandiegonensis*), Coastal California gnatcatcher (*Polioptila californica californica*), Orange-throated whiptail (*Aspidoscelis hyperythra*), Coast horned lizard (*Phrynosoma blainvillii*), San Diego black-tailed jackrabbit (*Lepus californicus bennettii*), Western spadefoot (*Spea hammondii*), Two-striped garter snake (*Thamnophis hammondii*), and Cooper's hawk (*Accipiter cooperii*).  Species considered to have moderate to high likelihood of occurrence included Silvery legless lizard (*Anniella pulchra pulchra*), Coronado skink (*Plestiodon skiltonianus interparietalis*), Bell's sage sparrow (*Amphispiza belli belli*), Southern California rufous-crowned sparrow (*Aimophila ruficeps canescens*), Northern harrier (*Circus cyaneus*), White-tailed kite (*Elanus leucurus*), California horned lark (*Eremophila alpestris actia*), Dulzura pocket mouse (*Chaetodipus californicus femoralis*), and Northwestern San Diego pocket mouse (*Chaetodipus fallax fallax*).  Add all of these species to those listed in my Table 1, and the project poses potential impacts to 52 special-status species of wildlife.  Twenty-eight of the species listed in my Table 1 are not even covered by the MSCP.  The survey effort devoted to characterizing existing conditions is grossly inadequate.

**Response J12:**  The City of San Diego dismisses the comment about invasive species being inadequately addressed.  The City says the EIR analyzes invasive species impacts and provides mitigation.  However, this response addresses only invasive plant species.  As part of a long-term monitoring effort along 129 miles of road transect in the Sacramento Valley, I have mapped changes to the surveyed landscape along with changes to the distribution and abundance of wildlife species.  I have yet to publish many of the results from this monitoring effort (earlier papers included Smallwood 1995, Erichsen et al. 1996, Smallwood et al. 1996, Smallwood and Nakamoto 2009), but I can report here certain strong patterns related to invasive species.  As residential developments have been built along my survey transect, I counted increases in invasive species such as rock pigeons, Eurasian collared-doves, European starlings, house sparrows, Virginia opossums, brown rats, and house cats.  From residential developments, I recorded these species spilling over into natural areas and agricultural lands.  The EIR inadequately addresses the impacts of invasive vertebrate species, which will use the new development as a starting point to compete with native species for resources in the MHPA and beyond.  Additional invasive species to be concerned about would include house mouse, European ferret, monk parakeet, rose-ringed parakeet, spotted turtledove, and eastern gray squirrel among others (Smallwood and Salmon 1992)

**Response J13:**  The comment was that no measure, such as a constructed movement corridor or road undercrossing, is included in the EIR for wildlife of all sizes to be able to safely cross the road, thereby fragmenting the habitat and posing significant mortality due to vehicle collisions with wildlife.  The City dismisses the comment.  It says "*...the Draft EIR determined that the project would not interfere substantially with the movement of wildlife species or with established wildlife corridors, including linkages identified in the MSCP Plan under the City's applicable thresholds of significance.*"  However, the City's response confuses the meaning of wildlife movement corridor and introduces a false CEQA standard for assessing impacts.

9

Regarding wildlife movement, the EIR focused on whether the project would affect any documented wildlife movement corridors, as if wildlife movement in a region occurs within corridors.  But the CEQA standard is whether a project will "*Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors...*" The primary phrase of the standard goes to wildlife movement regardless of whether the movement is channeled by a corridor.  It would be absurd to conclude that wildlife do not forage on the site or that they do not stop over on the site during migration.  Birds cannot fly through buildings, nor can pocket mice or spadefoot toads safely negotiate their ways through them.  It would be absurd to conclude that the project would have no impact on wildlife movement in the region.  Of course it would.

To assess whether the project would interfere with wildlife movement in the region, it would be important to determine whether migrating species stop over on the proposed project site.  Surveys could be performed for this purpose, or one could review the available literature to assess the likelihood of particular special-status species use of stop-over habitat during migration.  Another method for assessing impacts on movement would be to search the site for trails or watch it at night using a thermal imaging camera. Radar is another tool that could be used to detect nocturnal travel by terrestrial animals, migrating birds, or bats.  Without making a serious effort to ascertain whether and how wildlife move across the proposed project site, there is no defensible basis for concluding that the project will have no significant impact on wildlife movement in the region.

I have spent a lot of my research time in the study of wildlife movement, beginning in 1985 with my statewide track survey for mountain lions.  Since then I have also collected thousands of flight paths of birds I observed flying over large areas during behavior surveys where I related periodic positions of the periods to mapped terrain features including stream courses, ridge crests, roads, and many others.  I have examined millions of positions collected from GPS-telemetered golden eagles.  And with the use of my thermal imaging camera over 900 hours of surveys, I have mapped the routes taken by birds and mammalian carnivores traveling over large areas at night.  What I have learned is that whereas certain terrain features often channel wildlife movement, most travel paths are located far from such features.  Thinking about it, this makes sense.  If wildlife only traveled along "movement corridors," predators would readily predict travel paths and capture their prey, and prey would readily predict travel paths and evade capture by their predators.  In fact, the scientific literature on corridors reveals movement corridors as more of a human-conceived landscape structure rarely supported by evidence (Smallwood 2015).  The corridor concept applies more to constructing features to offset the effects of habitat fragmentation, so is more related to something that humans create for wildlife and less related to animals finding and using natural features of the landscape for travel (Smallwood 2015).

The comment expressed disappointment that a constructed corridor is not offered in the EIR.  This comment expresses an accurate notion of what wildlife professionals mean by wildlife corridors – that it's a constructed artefact in response to habitat fragmentation,

and not a natural feature of the landscape. This said, constructed corridor features, though often built over and under roads, lacks empirical support as a simple solution. For example, tunnel under-crossings were constructed on Vasco Road in Contra Costa County, California, and wildlife were monitored to test whether the under-crossings were used and road fatalities reduced. However, based on patterns of fatalities on the road the investigators found that wildlife continued to cross the road wherever they encountered the road (Mendelsohn et al. 2009). The results of Mendelsohn et al. (2009) do not inspire confidence in the effectiveness of road-crossing structures, so the details of such structures would need to be shared in the public review process. Mendelsohn et al. (2009) suggested expanded fencing to force migrating wildlife into the tunnels. This and other ideas to further channel wildlife into constructed corridors need to be explored and efficacy monitored.

With or without constructed corridors to mitigate traffic impacts on wildlife, the comment raised a substantial issue (Foreman et al. 2003). Wildlife will be killed along the expanded roadway built for the project, and increased use of existing roads will also increase wildlife fatalities (see Figure 7 in Kobylarz 2001). I have personally witnessed animals killed by cars and trucks, including a rattlesnake on US 395, a gopher snake on Old Altamont Pass Road, a red-tailed hawk on I-5, as examples of traffic fatalities that quickly come to mind. I have documented thousands of animals killed on California's roads, including along 129 miles of road transect across the Sacramento Valley and surveyed many times since 1989. Over the past year I documented hundreds of wildlife fatalities along roads leading to my field research station in eastern Alameda County. Animals often killed have included mice, squirrels, cottontails, jackrabbits, deer, mammalian carnivores, birds of all kinds, toads, snakes and lizards. The toll on roads does not happen just once when the project is built, but continues on an on until wildlife are depleted from the area.

Many thousands of roadkill wildlife incidents have been reported to the UC Davis Road Ecology Center (Shilling et al. 2017). In 2017, one of the major hotspots of road-killed wildlife overlapped Highway 56 in the project area (Shilling et al. 2017). In fact, the wildlife roadkill hotspot in the project area was found to be statistically highly significant (see Figure 5 of Shilling et al. 2017). The costs to drivers is also high (Shilling et al. 22017). The EIR should assess wildlife mortality that will be caused by increased traffic on new and existing roadways, and it should provide mitigation measures.

## Additional Comments

According to the Merge 56 Development Project Conceptual Vernal Pool Mitigation Plan – May 25, 2016 (page 3), "Surplus" pools...would be retained by the City to be used as mitigation for future City project impacts to vernal pool habitat. I suggest replacing the term "surplus pools" to something like "additional created vernal pools." The EIR should not give the impression that created vernal pools are equal in value to natural vernal pools, nor should it imply that vernal pools, whether created or natural, are in surplus supply. Most of California's vernal pools have been destroyed, so a surplus would not be possible.

11

**Detection Surveys**.—The City of San Diego should implement the available protocols and guidelines on detection surveys for special-status species of wildlife.  There are 52 special-status species potentially affected by the proposed project, and each species comes with unique methods that are needed to determine presence or absence of the species.  Therefore, there are many survey protocols needed at Merge 56.  One example would be the CDFW (2012) survey guidelines for burrowing owl, which calls for a survey to assess habitat, then three surveys by qualified biologists, each survey separated by at least 3 weeks from any other survey through the breeding season.

**Window Impacts on Wildlife**.--Even though window collisions have been estimated to be the second or third largest source of human-caused bird mortality in the USA, involving up to 1 billion bird fatalities per year (Klem 1990, 2010; Dunn 1993, Loss et al. 2014), the EIR lacks any assessment of window collision impacts.  The EIR was prepared for the construction of 3,150 dwelling units without any regard to window materials or the numbers and sizes of windows, window orientation, or landscaping around windows.  All of these factors contribute to rates of bird collisions with windows.  Transparency and reflectance increase collision risk, but there are materials available to minimize the effects of transparency and reflectance, including the glass itself.  I recommend consulting available guidelines on minimizing impacts to wildlife caused by windows.  For example, the American Bird Conservancy produced an excellent set of guidelines recommending:  (1) Minimize use of glass; (2) Placing glass behind some type of screening (grilles, shutters, exterior shades); (3) Using glass with inherent properties to reduce collisions, such as patterns, window films, decals or tape; and (4) Turning off lights during migration seasons (Sheppard and Phillips 2015).  The City of San Francisco (San Francisco Planning Department 2011) also has a set of building design guidelines, based on the excellent guidelines produced by the New York City Audubon Society (Orff et al. 2007).

**Fund wildlife rehabilitation facilities as mitigation**.--Wildlife will be killed and injured by the increased automobile travel resulting from the project, as well as due to pets and window collisions.  The impacts to injured wildlife can be rectified by helping to pay the costs of wildlife rehabilitation facilities, which operate on volunteer support and inadequate budgets.  Leyvas and Smallwood (2015) surveyed 38 rehabilitation facilities to assess the cost of rehabilitating raptors injured by wind turbines, and recommend $3,230/injured raptor would serve as a reasonable interim mitigation cost.  However, wildlife injured by car traffic will include animals other than raptors.  Most of these non-raptor animals likely cost less to rehabilitate or to care for until those who cannot be released or placed in the care of others need to be euthanized humanely.  In the absence of any additional cost summaries from rehabilitation facilities, I hazard to guess that $500 per injured animal would be reasonable.

The next challenge is estimating how many animals will require treatment during the life of the project.  Live, injured animals will contribute directly to the costs incurred by rehabilitation facilities receiving the animals, but animals killed outright by cars or windows or pets should also contribute to compensatory mitigation.  Compensating for animals that are killed can come in the form of rehabilitating animals that were injured by other projects or anthropogenic activities.  As a starting point, I suggest assessing

12

$100 per project-caused fatality. Still, there has yet to be a basis for multiplying these dollar amounts by the numbers of killed and injured wildlife caused by the project. And it should be remembered that most of the animals killed will never be documented.

There are two ways that project impacts can be assessed for deciding upon a rehabilitation fee. One way is to predict project-level impacts, but this prediction would be highly uncertain. One could use fatality and injury rates from studies of impacts caused by road traffic, windows and pets. A projected injury rate could be multiplied by $3,230 per raptor and $500 per non-raptor, and a projected fatality rate could be multiplied by $100 per fatality. In their road fatality study, Mendelsohn et al. (2009) found 1.7% of the animals they found to be still living, though it was unknown how many injured wildlife moved away from the roadway on their own volition and were not recorded during the study. A 4% injury rate might be a reasonable basis in the absence of additional study results. So, perhaps for every animal injured on the roadway and delivered to a rehabilitation facility, the cost for the injury is paid ($3230 per raptor and $500 per non-raptor) plus $2,500 is paid for all the projected dead animals per injured animal.

The second way to assess the impact is to fund scientific monitoring. This second way would necessitate a delay in establishing the cost-basis of the mitigation fee, but learning about the impacts would justify the delay. Of course, as scientific monitoring proceeds, a mitigation fee can be paid based on the injuries and fatalities that are found. Upon completion of the monitoring, an annual fee would be paid based on the average annual findings from the monitoring effort. I suggest splitting a fund among multiple wildlife rehabilitation facilities in the region. However it is done, I recommend that the City of San Diego not leave it to wildlife rehabilitators to repair injured animals on their own funding.

Thank you for your attention,

*Shawn Smallwood*

Shawn Smallwood, Ph.D.

**REFERENCES CITED**

Alden Environmental, Inc. 2017. Biological Technical Report for the Merge 56 Development Project. Prepared for Sea Breeze Properties, LLC, San Diego, California.

CDFW (California Department of Fish and Wildlife). 2012. Staff Report on Burrowing Owl Mitigation. Sacramento, California.

CNPS (California Native Plant Society).  1998.  Policy on Mitigation Guidelines Regarding Impacts to Rare, Threatened, and Endangered Plants. http://www.cnps.org/cnps/archive/mitigation.pdf

City of San Diego.  2017.  Final Draft Environmental Impact Report: Merge 56.  SCH No. 2014071065.  City of San Diego, California.

Dunn, E. H.  1993.  Bird mortality from striking residential windows in winter.  Journal of Field Ornithology 64:302-309.

Erichsen, A. L., K. S. Smallwood, A. M. Commandatore, D. M. Fry, and B. Wilson.  1996. White-tailed Kite movement and nesting patterns in an agricultural landscape. Pages 166-176 in D. M. Bird, D. E. Varland, and J. J. Negro, eds., Raptors in human landscapes.  Academic Press, London.

Forman, T. T., D. Sperling, J. A. Bisonette, A. P. Clevenger, C. D. Cutshall, V. H. Dale, L. Fahrig, R. France, C. R. Goldman, K. Heanue, J. A. Jones, F. J. Swanson, T. Turrentine, and T. C. Winter.  2003.  Road Ecology.  Island Press, Covello, California.

Klem, D., Jr.  1990.  Collisions between birds and windows:  mortality and prevention. Journal of Field Ornithology 61:120-128.

Klem, D., Jr.  2010.  Avian mortality at windows: the second largest human source of bird mortality on earth. Pages 244-251 in Proc. Fourth Int. Partners in Flight Conference: Tundra to Tropics.

Kobylarz, B.  2001.  The effect of road type and traffic intensity on amphibian road mortality.  Journal of Service Learning in Conservation Biology 1:10-15.

Loss, S. R., T. Will, S. S. Loss, and P. P. Marra.  2014.  Bird–building collisions in the United States:  Estimates of annual mortality and species vulnerability.  The Condor: Ornithological Applications 116:8-23.  DOI: 10.1650/CONDOR-13-090.1

Mendelsohn, M., W. Dexter, E. Olson, and S. Weber.  2009.  Vasco Road wildlife movement study report.  Report to Contra Costa County Public Works Department, Martinez, California.

Orff, K., H. Brown, S. Caputo, E. J. McAdams, M. Fowle, G. Phillips, C. DeWitt, and Y. Gelb.  2007.  Bbird-safe buildings guidelines.  New York City Audubon, New York.

San Francisco Planning Department.  2011.  Standards for bird-safe buildings.  San Francisco Planning Department, City and County of San Francisco, California.

Sheppard, C., and G. Phillips. 2015.  Bird-friendly building Design, 2nd Ed., American Bird Conservancy, The Plains, Virginia.

Shilling, F., D. Waetjen, and K. Harrold.  2017.  Impact of Wildlife-Vehicle Conflict on California Drivers and Animals. https://roadecology.ucdavis.edu/files/content/projects/CROS-CHIPs_Hotspots_2017_Report_fin.pdf

Shuford, W. D., and T. Gardali, [eds.]. 2008. California bird species of special concern: a ranked assessment of species, subspecies, and distinct populations of birds of immediate conservation concern in California. Studies of Western Birds 1. Western Field Ornithologists, Camarillo, California.

Smallwood, K. S.  1995.  Scaling Swainson's hawk population density for assessing habitat-use across an agricultural landscape.  J. Raptor Research 29:172-178.

Smallwood, K. S.  2015.  Habitat fragmentation and corridors.  Pages 84-101 in M. L. Morrison and H. A. Mathewson, Eds., Wildlife habitat conservation: concepts, challenges, and solutions.  John Hopkins University Press, Baltimore, Maryland, USA.

Smallwood, K. S. and T. P. Salmon.  1992.  A rating system for potential exotic vertebrate pests.  Biological Conservation 62:149-159.

Smallwood, K. S. and B. Nakamoto.  2009.  Impacts of West Nile Virus Epizootic on Yellow-Billed Magpie, American Crow, and other Birds in the Sacramento Valley, California.  The Condor 111:247-254.

Smallwood, K. S., B. J. Nakamoto, and S. Geng.  1996.  Association analysis of raptors on an agricultural landscape. Pages 177-190 in D.M. Bird, D.E. Varland, and J.J. Negro, eds., Raptors in human landscapes.  Academic Press, London.

Smallwood, K.S., J. Beyea and M. Morrison. 1999.  Using the best scientific data for endangered species conservation.  Environmental Management 24:421-435.

Smallwood, K.S., A. Gonzales, T. Smith, E. West, C. Hawkins, E. Stitt, C. Keckler, C. Bailey, and K. Brown.  2001.  Suggested standards for science applied to conservation issues. Transactions of the Western Section of the Wildlife Society 36:40-49.

# Kenneth Shawn Smallwood
## Curriculum Vitae

3108 Finch Street
Davis, CA  95616
Phone (530) 756-4598
Cell (530) 601-6857
puma@dcn.org

Born May 3, 1963 in
Sacramento, California.
Married, father of two.

## Ecologist

**Expertise**

- Finding solutions to controversial problems related to wildlife interactions with human industry, infrastructure, and activities;

- Wildlife monitoring and field study using GPS, thermal imaging, behavior surveys;

- Using systems analysis and experimental design principles to identify meaningful ecological patterns that inform management decisions.

**Education**

Ph.D. Ecology, University of California, Davis. September 1990.
M.S. Ecology, University of California, Davis. June 1987.
B.S. Anthropology, University of California, Davis. June 1985.
Corcoran High School, Corcoran, California. June 1981.

**Experience**

- 477 professional publications, including:
- 81 peer reviewed publications
- 24 in non-reviewed proceedings
- 370 reports, declarations, posters and book reviews
- 8 in mass media outlets
- 87 public presentations of research results at meetings
- Reviewed many professional papers and reports
- Testified in 4 court cases.

Editing for scientific journals:  Guest Editor, *Wildlife Society Bulletin*, 2012-2013, of invited papers representing international views on the impacts of wind energy on wildlife and how to mitigate the impacts. Associate Editor, *Journal of Wildlife Management*, March 2004 to 30 June 2007. Editorial Board Member, *Environmental Management*, 10/1999 to 8/2004. Associate Editor, *Biological Conservation*, 9/1994 to 9/1995.

Member, Alameda County Scientific Review Committee (SRC), August 2006 to April 2011. The

1

five-member committee investigated causes of bird and bat collisions in the Altamont Pass
Wind Resource Area, and recommended mitigation and monitoring measures. The SRC
reviewed the science underlying the Alameda County Avian Protection Program, and advised
the County on how to reduce wildlife fatalities.

Consulting Ecologist, 2004-2007, California Energy Commission (CEC). Provided consulting
services as needed to the CEC on renewable energy impacts, monitoring and research, and
produced several reports. Also collaborated with Lawrence-Livermore National Lab on research
to understand and reduce wind turbine impacts on wildlife.

Consulting Ecologist, 1999-2013, U.S. Navy. Performed endangered species surveys, hazardous
waste site monitoring, and habitat restoration for the endangered San Joaquin kangaroo rat,
California tiger salamander, California red-legged frog, California clapper rail, western
burrowing owl, salt marsh harvest mouse, and other species at Naval Air Station Lemoore;
Naval Weapons Station, Seal Beach, Detachment Concord; Naval Security Group Activity,
Skaggs Island; National Radio Transmitter Facility, Dixon; and, Naval Outlying Landing Field
Imperial Beach.

Fulbright Research Fellow, Indonesia, 1988. Tested use of new sampling methods for numerical
monitoring of Sumatran tiger and six other species of endemic felids, and evaluated methods
used by other researchers.

### Peer Reviewed Publications

Smallwood, K. S.  2017.  Long search intervals under-estimate bird and bat fatalities caused by
wind turbines.  Wildlife Society Bulletin 41:224-230.

Smallwood, K. S.  2017.  The challenges of addressing wildlife impacts when repowering wind
energy projects.  Pages 175-187 in Köppel, J., Editor, Wind Energy and Wildlife Impacts:
Proceedings from the CWW2015 Conference. Springer.  Cham, Switzerland.

May, R., Gill, A. B., Köppel, J. Langston, R. H.W., Reichenbach, M., Scheidat, M., Smallwood, S.,
Voigt, C. C., Hüppop, O., and Portman, M. 2017.  Future research directions to reconcile wind
turbine–wildlife interactions. Pages 255-276 in Köppel, J., Editor, Wind Energy and Wildlife
Impacts:  Proceedings from the CWW2015 Conference. Springer.  Cham, Switzerland.

Smallwood, K. S.  2017.  Monitoring birds.  M. Perrow, Ed., Wildlife and Wind Farms - Conflicts
and Solutions, Volume 2. Pelagic Publishing, Exeter, United Kingdom.  www.bit.ly/2v3cR9Q

Smallwood, K. S., L. Neher, and D. A. Bell.  2017.  Siting to Minimize Raptor Collisions: an
example from the Repowering Altamont Pass Wind Resource Area.  M. Perrow, Ed., Wildlife
and Wind Farms - Conflicts and Solutions, Volume 2.  Pelagic Publishing, Exeter, United
Kingdom.  www.bit.ly/2v3cR9Q

Johnson, D. H., S. R. Loss, K. S. Smallwood, W. P. Erickson.  2016.  Avian fatalities at wind
energy facilities in North America: A comparison of recent approaches.  Human–Wildlife
Interactions 10(1):7-18.

Sadar, M. J., D. S.-M. Guzman, A. Mete, J. Foley, N. Stephenson, K. H. Rogers, C. Grosset, K. S. Smallwood, J. Shipman, A. Wells, S. D. White, D. A. Bell, and M. G. Hawkins.  2015.  Mange Caused by a novel Micnemidocoptes mite in a Golden Eagle (*Aquila chrysaetos*).  Journal of Avian Medicine and Surgery 29(3):231-237.

Smallwood, K. S.  2015.  Habitat fragmentation and corridors.  Pages 84-101 in M. L. Morrison and H. A. Mathewson, Eds., Wildlife habitat conservation: concepts, challenges, and solutions.  John Hopkins University Press, Baltimore, Maryland, USA.

Mete, A., N. Stephenson, K. Rogers, M. G. Hawkins, M. Sadar, D. Guzman, D. A. Bell, J. Shipman, A. Wells, K. S. Smallwood, and J. Foley.  2014.  Emergence of Knemidocoptic mange in wild Golden Eagles (Aquila chrysaetos) in California.  Emerging Infectious Diseases 20(10):1716-1718.

Smallwood, K. S.  2013.   Introduction: Wind-energy development and wildlife conservation.  Wildlife Society Bulletin 37: 3-4.

Smallwood, K. S.  2013.  Comparing bird and bat fatality-rate estimates among North American wind-energy projects.  Wildlife Society Bulletin 37:19-33.  + Online Supplemental Material.

Smallwood, K. S., L. Neher, J. Mount, and R. C. E. Culver.  2013. Nesting Burrowing Owl Abundance in the Altamont Pass Wind Resource Area, California.  Wildlife Society Bulletin: 37:787-795.

Smallwood, K. S., D. A. Bell, B. Karas, and S. A. Snyder.  2013.  Response to Huso and Erickson Comments on Novel Scavenger Removal Trials.  Journal of Wildlife Management 77: 216-225.

Bell, D. A., and K. S. Smallwood.  2010.  Birds of prey remain at risk.  Science 330:913.

Smallwood, K. S., D. A. Bell, S. A. Snyder, and J. E. DiDonato.  2010.  Novel scavenger removal trials increase estimates of wind turbine-caused avian fatality rates.  Journal of Wildlife Management 74: 1089-1097 + Online Supplemental Material.

Smallwood, K. S., L. Neher, and D. A. Bell.  2009.  Map-based repowering and reorganization of a wind resource area to minimize burrowing owl and other bird fatalities.  Energies 2009(2):915-943.  http://www.mdpi.com/1996-1073/2/4/915

Smallwood, K. S. and B. Nakamoto.  2009.  Impacts of West Nile Virus Epizootic on Yellow-Billed Magpie, American Crow, and other Birds in the Sacramento Valley, California.  The Condor 111:247-254.

Smallwood, K. S., L. Rugge, and M. L. Morrison.  2009.  Influence of Behavior on Bird Mortality in Wind Energy Developments:  The Altamont Pass Wind Resource Area, California. Journal of Wildlife Management 73:1082-1098.

Smallwood, K. S. and B. Karas.  2009.  Avian and Bat Fatality Rates at Old-Generation and

Repowered Wind Turbines in California.  Journal of Wildlife Management 73:1062-1071.

Smallwood, K. S.  2008.  Wind power company compliance with mitigation plans in the Altamont Pass Wind Resource Area.  Environmental & Energy Law Policy Journal 2(2):229-285.

Smallwood, K. S., C. G. Thelander.  2008.  Bird Mortality in the Altamont Pass Wind Resource Area, California.  Journal of Wildlife Management 72:215-223.

Smallwood, K. S.  2007.  Estimating wind turbine-caused bird mortality.  Journal of Wildlife Management 71:2781-2791.

Smallwood, K. S., C. G. Thelander, M. L. Morrison, and L. M. Rugge.  2007.  Burrowing owl mortality in the Altamont Pass Wind Resource Area.  Journal of Wildlife Management 71:1513-1524.

Cain, J. W. III, K. S. Smallwood, M. L. Morrison, and H. L. Loffland.  2005.  Influence of mammal activity on nesting success of Passerines.  J. Wildlife Management 70:522-531.

Smallwood, K.S.  2002.  Habitat models based on numerical comparisons.  Pages 83-95 *in* Predicting species occurrences: Issues of scale and accuracy, J. M. Scott, P. J. Heglund, M. Morrison, M. Raphael, J. Haufler, and B. Wall, editors.  Island Press, Covello, California.

Morrison, M. L., K. S. Smallwood, and L. S. Hall.  2002.  Creating habitat through plant relocation: Lessons from Valley elderberry longhorn beetle mitigation.  Ecological Restoration 21: 95-100.

Zhang, M., K. S. Smallwood, and E. Anderson.  2002.  Relating indicators of ecological health and integrity to assess risks to sustainable agriculture and native biota. Pages 757-768 *in* D.J. Rapport, W.L. Lasley, D.E. Rolston, N.O. Nielsen, C.O. Qualset, and A.B. Damania (eds.), Managing for Healthy Ecosystems, Lewis Publishers, Boca Raton, Florida USA.

Wilcox, B. A., K. S. Smallwood, and J. A. Kahn.  2002.  Toward a forest Capital Index.  Pages 285-298 *in* D.J. Rapport, W.L. Lasley, D.E. Rolston, N.O. Nielsen, C.O. Qualset, and A.B. Damania (eds.), Managing for Healthy Ecosystems, Lewis Publishers, Boca Raton, Florida USA.

Smallwood, K.S.  2001.  The allometry of density within the space used by populations of Mammalian Carnivores.  Canadian Journal of Zoology 79:1634-1640.

Smallwood, K.S., and T.R. Smith.  2001.  Study design and interpretation of Sorex density estimates.  Annales Zoologi Fennici 38:141-161.

Smallwood, K.S., A. Gonzales, T. Smith, E. West, C. Hawkins, E. Stitt, C. Keckler, C. Bailey, and K. Brown.  2001.  Suggested standards for science applied to conservation issues. Transactions of the Western Section of the Wildlife Society 36:40-49.

Geng, S., Yixing Zhou, Minghua Zhang, and K. Shawn Smallwood. 2001. A Sustainable Agro-ecological Solution to Water Shortage in North China Plain (Huabei Plain).  Environmental Planning and Management 44:345-355.

Smallwood, K. Shawn, Lourdes Rugge, Stacia Hoover, Michael L. Morrison, Carl Thelander. 2001. Intra- and inter-turbine string comparison of fatalities to animal burrow densities at Altamont Pass.  Pages 23-37 in S. S. Schwartz, ed., Proceedings of the National Avian-Wind Power Planning Meeting IV.  RESOLVE, Inc., Washington, D.C.

Smallwood, K.S., S. Geng, and M. Zhang.  2001. Comparing pocket gopher (*Thomomys bottae*) density in alfalfa stands to assess management and conservation goals in northern California. Agriculture, Ecosystems & Environment 87: 93-109.

Smallwood, K. S. 2001.  Linking habitat restoration to meaningful units of animal demography. Restoration Ecology 9:253-261.

Smallwood, K. S.  2000.  A crosswalk from the Endangered Species Act to the HCP Handbook and real HCPs. Environmental Management 26, Supplement 1:23-35.

Smallwood, K. S., J. Beyea and M. Morrison. 1999.  Using the best scientific data for endangered species conservation.  Environmental Management 24:421-435.

Smallwood, K. S.  1999.  Scale domains of abundance among species of Mammalian Carnivora. Environmental Conservation 26:102-111.

Smallwood, K.S.  1999.  Suggested study attributes for making useful population density estimates. Transactions of the Western Section of the Wildlife Society 35:  76-82.

Smallwood, K. S. and M. L. Morrison.  1999.  Estimating burrow volume and excavation rate of pocket gophers (Geomyidae).  Southwestern Naturalist 44:173-183.

Smallwood, K. S. and M. L. Morrison.  1999.  Spatial scaling of pocket gopher (*Geomyidae*) density.  Southwestern Naturalist 44:73-82.

Smallwood, K. S.  1999.  Abating pocket gophers (*Thomomys* spp.) to regenerate forests in clearcuts.   Environmental Conservation 26:59-65.

Smallwood, K. S.  1998.  Patterns of black bear abundance. Transactions of the Western Section of the Wildlife Society 34:32-38.

Smallwood, K. S.  1998.  On the evidence needed for listing northern goshawks (*Accipter gentilis*) under the Endangered Species Act:  a reply to Kennedy.  J. Raptor Research 32:323-329.

Smallwood, K. S., B. Wilcox, R. Leidy, and K. Yarris. 1998. Indicators assessment for Habitat Conservation Plan of Yolo County, California, USA.  Environmental Management 22: 947-958.

Smallwood, K. S., M. L. Morrison, and J. Beyea.  1998.  Animal burrowing attributes affecting hazardous waste management.  Environmental Management 22: 831-847.

Smallwood, K. S, and C. M. Schonewald. 1998.  Study design and interpretation for mammalian

carnivore density estimates. Oecologia 113:474-491.

Zhang, M., S. Geng, and K. S. Smallwood.  1998.  Nitrate contamination in groundwater of Tulare County, California.  Ambio 27(3):170-174.

Smallwood, K. S. and M. L. Morrison.  1997.  Animal burrowing in the waste management zone of Hanford Nuclear Reservation.  Proceedings of the Western Section of the Wildlife Society Meeting 33:88-97.

Morrison, M. L., K. S. Smallwood, and J. Beyea.  1997.  Monitoring the dispersal of contaminants by wildlife at nuclear weapons production and waste storage facilities.  The Environmentalist 17:289-295.

Smallwood, K. S.  1997. Interpreting puma (*Puma concolor*) density estimates for theory and management.  Environmental Conservation 24(3):283-289.

Smallwood, K. S.  1997.  Managing vertebrates in cover crops: a first study.  American Journal of Alternative Agriculture 11:155-160.

Smallwood, K. S. and S. Geng.  1997.  Multi-scale influences of gophers on alfalfa yield and quality. Field Crops Research 49:159-168.

Smallwood, K. S. and C. Schonewald.  1996. Scaling population density and spatial pattern for terrestrial, mammalian carnivores.  Oecologia 105:329-335.

Smallwood, K. S., G. Jones, and C. Schonewald.  1996. Spatial scaling of allometry for terrestrial, mammalian carnivores. Oecologia 107:588-594.

Van Vuren, D. and K. S. Smallwood.  1996.  Ecological management of vertebrate pests in agricultural systems.  Biological Agriculture and Horticulture 13:41-64.

Smallwood, K. S., B. J. Nakamoto, and S. Geng.  1996.  Association analysis of raptors on an agricultural landscape. Pages 177-190 in D.M. Bird, D.E. Varland, and J.J. Negro, eds., Raptors in human landscapes.  Academic Press, London.

Erichsen, A. L., K. S. Smallwood, A. M. Commandatore, D. M. Fry, and B. Wilson.  1996.  White-tailed Kite movement and nesting patterns in an agricultural landscape.  Pages 166-176 in D. M. Bird, D. E. Varland, and J. J. Negro, eds., Raptors in human landscapes.  Academic Press, London.

Smallwood, K. S.  1995.  Scaling Swainson's hawk population density for assessing habitat-use across an agricultural landscape.  J. Raptor Research 29:172-178.

Smallwood, K. S. and W. A. Erickson.  1995.  Estimating gopher populations and their abatement in forest plantations.  Forest Science 41:284-296.

Smallwood, K. S. and E. L. Fitzhugh. 1995.   A track count for estimating mountain lion *Felis*

*concolor californica* population trend.  Biological Conservation 71:251-259

Smallwood, K. S.  1994.  Site invasibility by exotic birds and mammals.  Biological Conservation 69:251-259.

Smallwood, K. S.  1994.  Trends in California mountain lion populations.  Southwestern Naturalist 39:67-72.

Smallwood, K. S.  1993.  Understanding ecological pattern and process by association and order.  Acta Oecologica 14(3):443-462.

Smallwood, K. S. and E. L. Fitzhugh.  1993.  A rigorous technique for identifying individual mountain lions *Felis concolor* by their tracks.  Biological Conservation 65:51-59.

Smallwood, K. S.  1993.  Mountain lion vocalizations and hunting behavior.  The Southwestern Naturalist 38:65-67.

Smallwood, K. S. and T. P. Salmon.  1992.  A rating system for potential exotic vertebrate pests.  Biological Conservation 62:149-159.

Smallwood, K. S.  1990.  Turbulence and the ecology of invading species.  Ph.D. Thesis, University of California, Davis.

# EXHIBIT B


**SWAPE** Technical Consultation, Data Analysis and
Litigation Support for the Environment

2656 29th Street, Suite 201
Santa Monica, CA 90405

Matt Hagemann, P.G, C.Hg.
(949) 887-9013
mhagemann@swape.com

Feb. 6, 2018

Richard Drury
Lozeau | Drury LLP
410 12th Street, Suite 250
Oakland, CA 94607

Subject:     Comments on the Merge 56 Development Project

Dear Mr. Drury,

We have reviewed the December 2017 Final Environment Impact Report (FEIR) for the Merge 56
Development Project ("Project") located in the City of San Diego. The Project proposes to construct a
Multi-Use development, public road improvements, and a General Plan Amendment in order to change
the existing land use zone ("Commercial Employment, Retail and Services; Residential; and Parks, Open
Space") to "Multiple Use."  The Project would include the construction of approximately 185,368 square
feet of office space, a 50,000 square foot cinema, 168,250 square feet of retail space, a 120-room hotel,
and 242 residences over 41.34-acres. The Project also proposes public road improvements over 31
acres, including extensions to Camino Del Sur and Carmel Mountain Road.

Our review concludes that the FEIR fails to adequately evaluate the Project's Air Quality and Greenhouse
Gas (GHG) impacts. As a result, emissions and health impacts associated with the construction and
operations of the proposed Project are underestimated and inadequately addressed. A revised Project-
specific FEIR should be prepared to adequately assess and mitigate the potential health risk and GHG
impacts the Project may have on the surrounding environment.

# Air Quality

## Diesel Particulate Matter Health Risk Emissions Inadequately Evaluated

The FEIR fails to evaluate or even mention the potential health risk posed to nearby sensitive receptors
as a result of exposure to diesel particulate matter (DPM) emissions that would be released during
construction and operation of the proposed Project. The omission of a quantified health risk assessment
(HRA) is a significant issue, as the Project's health risk impact is unknown. As a result, until a proper HRA
is prepared to adequately evaluate the Project's health-related impacts, the Project should not be
approved.

1

The omission of a quantified health risk is inconsistent with the most recent guidance published by Office of Environmental Health Hazard Assessment (OEHHA), the organization responsible for providing recommendations and guidance on how to conduct health risk assessments in California. In February of 2015, OEHHA released its most recent *Risk Assessment Guidelines: Guidance Manual for Preparation of Health Risk Assessments*, which was formally adopted in March of 2015.[1] This guidance document describes the types of projects that warrant the preparation of a health risk assessment. Construction activities for the proposed Project will produce emissions of DPM through the exhaust stacks of construction equipment over an approximate 2-year period (FEIR, p. 3-11). The OEHHA document recommends that all short-term projects lasting at least two months be evaluated for cancer risks to nearby sensitive receptors.[2] Once construction is complete, Project operation will generate approximately 19,468 vehicle trips per day, which will generate additional exhaust emissions, thus continuing to expose nearby sensitive receptors to DPM emissions (Appendix B, Table 8-1, p. 40). The OEHHA document recommends that exposure from projects lasting more than 6 months should be evaluated for the duration of the project and recommends that an exposure duration of 30 years be used to estimate individual cancer risk for the maximally exposed individual resident (MEIR).[3] Even though we were not provided with the expected lifetime of the Project, we can reasonably assume that the Project will operate for at least 30 years, if not more.  Therefore, per OEHHA guidelines, health risk impacts from Project construction and operation should have been evaluated by the EIR. These recommendations reflect the most recent health risk assessment policy, and as such, an assessment of health risks to nearby sensitive receptors from construction and operation should be included in a revised CEQA evaluation for the Project.

In an effort to demonstrate the potential risk posed by Project construction to nearby sensitive receptors, we prepared a simple screening-level health risk assessment. The results of our assessment, as described below, demonstrate that DPM emissions generated over the course of Project construction and operation may result in a significant health risk impact.

As of 2011, the Environmental Protection Agency (EPA) recommends AERSCREEN as the leading air dispersion model, due to improvements in simulating local meteorological conditions based on simple input parameters.[4] The model replaced SCREEN3, and AERSCREEN is included in the OEHHA[5] and the California Air Pollution Control Officers Associated (CAPCOA)[6] guidance as the appropriate air dispersion

---

[1] "Risk Assessment Guidelines Guidance Manual for Preparation of Health Risk Assessments." OEHHA, February 2015, *available at:* https://oehha.ca.gov/media/downloads/crnr/2015guidancemanual.pdf

[2] "Risk Assessment Guidelines Guidance Manual for Preparation of Health Risk Assessments." OEHHA, February 2015, *available at:* https://oehha.ca.gov/media/downloads/crnr/2015guidancemanual.pdf, p. 8-18

[3] "Risk Assessment Guidelines Guidance Manual for Preparation of Health Risk Assessments." OEHHA, February 2015, *available at:* https://oehha.ca.gov/media/downloads/crnr/2015guidancemanual.pdf, p. 8-6, 8-15

[4] "AERSCREEN Released as the EPA Recommended Screening Model," USEPA, April 11, 2011, *available at:* http://www.epa.gov/ttn/scram/guidance/clarification/20110411_AERSCREEN_Release_Memo.pdf

[5] "Risk Assessment Guidelines Guidance Manual for Preparation of Health Risk Assessments." OEHHA, February 2015, *available at:* https://oehha.ca.gov/media/downloads/crnr/2015guidancemanual.pdf

[6] "Health Risk Assessments for Proposed Land Use Projects," CAPCOA, July 2009, *available at:* http://www.capcoa.org/wp-content/uploads/2012/03/CAPCOA_HRA_LU_Guidelines_8-6-09.pdf

model for Level 2 health risk screening assessments ("HRSAs"). A Level 2 HRSA utilizes a limited amount of site-specific information to generate maximum reasonable downwind concentrations of air contaminants to which nearby sensitive receptors may be exposed. If an unacceptable air quality hazard is determined to be possible using AERSCREEN, a more refined modeling approach is required prior to approval of the Project.

We prepared a preliminary health risk screening assessment of the Project's construction impact to sensitive receptors using the annual $PM_{10}$ exhaust estimates from the FEIR's annual CalEEMod output files (Appendix F, pp. 1028). According to Google Earth, the closest sensitive receptors to the Project site are located approximately 60 meters away. Consistent with recommendations set forth by OEHHA, we used a residential exposure duration of 30 years, starting from the infantile stage of life. The FEIR's CalEEMod output files indicate that construction activities will generate approximately 1,358 pounds of DPM over the approximate 860-day construction period (Appendix F, pp. 1035). The AERSCREEN model relies on a continuous average emission rate to simulate maximum downward concentrations from point, area, and volume emission sources. To account for the variability in equipment usage and truck trips over Project construction, we calculated an average DPM emission rate by the following equation.

$$Emission\ Rate\left(\frac{grams}{second}\right) = \frac{1,358\ lbs}{860\ days} \times \frac{453.6\ grams}{lb} \times \frac{1\ day}{24\ hours} \times \frac{1\ hour}{3,600\ seconds} = \mathbf{0.008288}\ \boldsymbol{g/s}$$

Using this equation, we estimated a construction emission rate of 0.008288 grams per second (g/s). The CalEEMod model's annual emissions indicate that operational emissions will generate approximately 565 pounds of DPM per year over a 27.6-year operational period. Applying the same equation used to estimate the construction DPM emission rate, we estimated the following emission rate for Project operation.

$$Emission\ Rate\left(\frac{grams}{second}\right) = \frac{565\ lbs}{365\ days} \times \frac{453.6\ grams}{lb} \times \frac{1\ day}{24\ hours} \times \frac{1\ hour}{3,600\ seconds} = \mathbf{0.008121}\ \boldsymbol{g/s}$$

Using this equation, we estimated an operational emission rate of 0.008121 g/s. Construction and operation was simulated as a 66.0-acre rectangular area source in AERSCREEN, with dimensions of 567 meters by 471 meters. A release height of three meters was selected to represent the height of exhaust stacks on operation equipment and other heavy-duty vehicles, and an initial vertical dimension of one and a half meters was used to simulate instantaneous plum dispersion upon release. An urban meteorological setting was selected to model-default inputs for wind speed and direction distribution.

The AERSCREEN model generates maximum reasonable estimates of single-hour DPM concentrations from the Project site. EPA guidance suggests that in screening procedures, the annualized average concentration of an air pollutant be estimated by multiplying the single-hour concentration by 10%.[7] For example, for the MEIR the single-hour concentration estimated by AERSCREEN for Project construction is approximately 1.317 μg/m$^3$ DPM at approximately 50 meters downwind. Multiplying this single-hour concentration by 10%, we get an annualized average concentration of 0.1317 μg/m$^3$ for Project

---

[7] http://www.epa.gov/ttn/scram/guidance/guide/EPA-454R-92-019_OCR.pdf

construction at the MEIR. For Project operation, the single-hour concentration at the MEIR estimated by AERSCREEN is approximately 1.290 µg/m³ DPM at approximately 50 meters downwind. Multiplying this single-hour concentration by 10%, we get an annualized average concentration of 0.1290 µg/m³ for Project operation at the MEIR.

We calculated the excess cancer risk for each sensitive receptor using applicable HRA methodologies prescribed by OEHHA and the San Diego Air Pollution Control District (SDAPCD). Consistent with the construction schedule proposed by the FEIR, the annualized average concentration for construction was used for the first 2 years of the infantile stage of life (0-2 years) and the first 0.35 years of the child stage of life (2 to 16 years). The annualized average concentration for operation was used for the remaining 30-year exposure period, which makes up the remainder of the child stage of like (2 to 16 years) and adult stages of life (16 to 30 years). Consistent with OEHHA guidance, we used Age Sensitivity Factors (ASFs) to account for the heightened susceptibility of young children to the carcinogenic toxicity of air pollution.[8] According to the updated guidance, quantified cancer risk should be multiplied by a factor of ten during the first two years of life (infant) and should be multiplied by a factor of three during the child stage of life (2 to 16 years). Furthermore, in accordance with guidance set forth by OEHHA, we used 95th percentile breathing rates for infants.[9] We used a cancer potency factor of 1.1 (mg/kg-day)$^{-1}$ and an averaging time of 25,550 days. The results of our calculations are shown below.

| The Maximum Exposed Individual at an Existing Residential Receptor (MEIR) | | | | | |
|---|---|---|---|---|---|
| Activity | Duration (years) | Concentration (µg/m³) | Breathing Rate (L/kg-day) | ASF | Cancer Risk |
| Construction | 2.00 | 0.1317 | 1090 | 10 | 4.3E-05 |
| *Infant Exposure Duration* | **2.00** | | | *Infant Exposure* | **4.3E-05** |
| Construction | 0.35 | 0.1317 | 572 | 3 | 1.2E-06 |
| Operation | 12.65 | 0.1290 | 572 | 3 | 4.2E-05 |
| *Child Exposure Duration* | **14.00** | | | *Child Exposure* | **4.3E-05** |
| Operation | 14.00 | 0.1290 | 261 | 1 | 7.1E-06 |
| *Adult Exposure Duration* | **14.00** | | | *Adult Exposure* | **7.1E-06** |
| **Lifetime Exposure Duration** | **30.00** | | | **Lifetime Exposure** | **9.4E-05** |

The excess cancer risk to adults, children, and infants at a sensitive receptor located approximately 50 meters away, over the course of Project construction and operation, are approximately 7, 43, and 43 in one million, respectively. Furthermore, the excess cancer risk over the course of a residential lifetime

---

[8] "Risk Assessment Guidelines Guidance Manual for Preparation of Health Risk Assessments." OEHHA, February 2015, *available at:* http://oehha.ca.gov/air/hot_spots/2015/2015GuidanceManual.pdf

[9] "Supplemental Guidelines for Preparing Risk Assessments for the Air Toxics 'Hot Spots' Information and Assessment Act," June 5, 2015, *available at:* http://www.aqmd.gov/docs/default-source/planning/risk-assessment/ab2588-risk-assessment-guidelines.pdf?sfvrsn=6, p. 19

"Risk Assessment Guidelines Guidance Manual for Preparation of Health Risk Assessments." OEHHA, February 2015, *available at:* http://oehha.ca.gov/air/hot_spots/2015/2015GuidanceManual.pdf

(30 years) is approximately 94 in one million. Consistent with OEHHA guidance, exposure was assumed to begin in the infantile stage of life to provide the most conservative estimates of air quality hazards. The infantile, child, and lifetime cancer risks all greatly exceed the SDAPCD threshold of 10 in one million, thus resulting in a potentially significant impact not previously addressed or identified by the FEIR.

It should be noted that our analysis represents a screening-level health risk assessment, which is known to be more conservative, and tends to err on the side of health protection.[10] The purpose of a screening-level health risk assessment, however, is to determine if a more refined health risk assessment needs to be conducted. If the results of a screening-level health risk are above applicable thresholds, then the Project needs to conduct a more refined health risk assessment that is more representative of site specific concentrations. Our screening-level health risk assessment demonstrated that construction and operation of the Project could result in a potentially significant health risk impact. As a result, a refined health risk assessment must be prepared to examine the air quality impacts generated by Project construction and operation using site-specific meteorology. A revised FEIR must be prepared to adequately evaluate the Project's health risk impact and should include additional mitigation measures to reduce these impacts to a less-than-significant level. Without a refined health risk assessment and mitigation addressing the findings of such an assessment, substantial evidence supports a fair argument that the Project may lead to significant public health impacts due to DPM emissions.

## Mitigation Measures Available to Reduce Construction Emissions

Our health risk assessment demonstrates that Project construction-related DPM emissions would result in a significant health risk impact. Therefore, additional mitigation measures must be identified and incorporated in a revised FEIR to reduce these emissions to a less than significant level.

Additional mitigation measures can be found in CAPCOA's *Quantifying Greenhouse Gas Mitigation Measures,* which attempt to reduce Greenhouse Gas (GHG) levels, as well as reduce criteria air pollutants, such as particulate matter.[11] Diesel particulate matter ("DPM") is a byproduct of diesel fuel combustion and is emitted by on-road vehicles and by off-road construction equipment.  Mitigation for criteria pollutant emissions should include consideration of the following measures in an effort to reduce construction emissions.

### *Require Implementation of Diesel Control Measures*

The Northeast Diesel Collaborative ("NEDC") is a regionally coordinated initiative to reduce diesel emissions, improve public health, and promote clean diesel technology. The NEDC recommends that contracts for all construction projects require the following diesel control measures: [12]

---

[10] http://oehha.ca.gov/air/hot_spots/2015/2015GuidanceManual.pdf p. 1-5
[11] http://www.capcoa.org/wp-content/uploads/2010/11/CAPCOA-Quantification-Report-9-14-Final.pdf
[12] Diesel Emission Controls in Construction Projects, *available at:*
http://www2.epa.gov/sites/production/files/2015-09/documents/nedc-model-contract-sepcification.pdf

- All diesel onroad vehicles on site for more than 10 total days must have either (1) engines that meet EPA 2007 onroad emissions standards or (2) emission control technology verified by EPA[13] or the California Air Resources Board (CARB)[14] to reduce PM emissions by a minimum of 85 percent.
- All diesel generators on site for more than 10 total days must be equipped with emission control technology verified by EPA or CARB to reduce PM emissions by a minimum of 85 percent.
- All diesel nonroad construction equipment on site for more than 10 total days must have either (1) engines meeting EPA Tier 4 nonroad emission standards or (2) emission control technology verified by EPA or CARB for use with nonroad engines to reduce PM emissions by a minimum of 85 percent for engines 50 horse power (hp) and greater and by a minimum of 20 percent for engines less than 50 hp.
- All diesel vehicles, construction equipment, and generators on site shall be fueled with ultra-low sulfur diesel fuel (ULSD) or a biodiesel blend[15] approved by the original engine manufacturer with sulfur content of 15 parts per million (ppm) or less.

*Repower or Replace Older Construction Equipment Engines*

The NEDC recognizes that availability of equipment that meets the EPA's newer standards is limited.[16] Due to this limitation, the NEDC proposes actions that can be taken to reduce emissions from existing equipment in the *Best Practices for Clean Diesel Construction* report.[17] These actions include but are not limited to:

- Repowering equipment (i.e. replacing older engines with newer, cleaner engines and leaving the body of the equipment intact).

Engine repower may be a cost-effective emissions reduction strategy when a vehicle or machine has a long useful life and the cost of the engine does not approach the cost of the entire vehicle or machine. Examples of good potential replacement candidates include marine vessels, locomotives, and large construction machines.[18] Older diesel vehicles or machines can be repowered with newer diesel engines or in some cases with engines that operate on alternative fuels (see section "Use Alternative Fuels for Construction Equipment" for details). The original engine is taken out of service and a new engine with reduced emission characteristics is installed. Significant emission reductions can be achieved, depending on the newer engine and the vehicle or machine's ability to accept a more modern engine and emission control system. It should be noted, however, that newer engines or higher tier engines are not

---

[13] For EPA's list of verified technology: http://www3.epa.gov/otaq/diesel/verification/verif-list.htm
[14] For CARB's list of verified technology: http://www.arb.ca.gov/diesel/verdev/vt/cvt.htm
[15] Biodiesel lends are only to be used in conjunction with the technologies which have been verified for use with biodiesel blends and are subject to the following requirements: http://www.arb.ca.gov/diesel/verdev/reg/biodieselcompliance.pdf
[16] http://northeastdiesel.org/pdf/BestPractices4CleanDieselConstructionAug2012.pdf
[17] http://northeastdiesel.org/pdf/BestPractices4CleanDieselConstructionAug2012.pdf
[18] http://www3.epa.gov/otaq/diesel/technologies/engines.htm

necessarily cleaner engines, so it is important that the Project Applicant check the actual emission standard level of the current (existing) and new engines to ensure the repower product is reducing emissions for PM10.[19]

- Replacement of older equipment with equipment meeting the latest emission standards.

Engine replacement can include substituting a cleaner highway engine for a nonroad engine. Diesel equipment may also be replaced with other technologies or fuels. Examples include hybrid switcher locomotives, electric cranes, LNG, CNG, LPG or propane yard tractors, forklifts or loaders. Replacements using natural gas may require changes to fueling infrastructure.[20] Replacements often require some re-engineering work due to differences in size and configuration. Typically there are benefits in fuel efficiency, reliability, warranty, and maintenance costs.[21]

### *Install Retrofit Devices on Existing Construction Equipment*

PM emissions from alternatively-fueled construction equipment can be further reduced by installing retrofit devices on existing and/or new equipment. The most common retrofit technologies are retrofit devices for engine exhaust after-treatment. These devices are installed in the exhaust system to reduce emissions and should not impact engine or vehicle operation.[22] It should be noted that actual emissions reductions and costs will depend on specific manufacturers, technologies and applications.

### *Use Electric and Hybrid Construction Equipment*

CAPCOA's *Quantifying Greenhouse Gas Mitigation Measures*[23] report also proposes the use of electric and/or hybrid construction equipment as a way to mitigate criteria pollutant emissions, such as particulate matter. When construction equipment is powered by grid electricity rather than fossil fuel, direct emissions from fuel combustion are replaced with indirect emissions associated with the electricity used to power the equipment. Furthermore, when construction equipment is powered by hybrid-electric drives, emissions from fuel combustion are also greatly reduced and criteria air pollutants would be 100% reduced for equipment running on electricity. Electric construction equipment is available commercially from companies such as Peterson Pacific Corporation[24] and Komptech USA[25],

---

[19] Diesel Emissions Reduction Program (DERA): Technologies, Fleets and Projects Information, *available at:* https://nepis.epa.gov/Exe/ZyPDF.cgi/P100CVIS.PDF?Dockey=P100CVIS.PDF

[20] National Clean Diesel Campaign, p. 19 *available at*: https://www.epa.gov/sites/production/files/2017-02/documents/fy17-state-program-guide-2017-02.pdf

[21] Cleaner Diesels: Low Cost Ways to Reduce Emissions from Construction Equipment, p. 29 *available at*: https://www.epa.gov/sites/production/files/2015-09/documents/cleaner-diesels-low-cost-ways-to-reduce-emissions-from-construction-equipment.pdf

[22] https://www.epa.gov/verified-diesel-tech/learn-about-verified-technologies-clean-diesel

[23] http://www.capcoa.org/wp-content/uploads/2010/11/CAPCOA-Quantification-Report-9-14-Final.pdf

[24] Peterson Electric Grinders Brochure, *available at:* http://www.petersoncorp.com/wp-content/uploads/peterson_electric_grinders1.pdf

[25] Komptech Green Efficiency Brochure, *available at:* https://www.komptech.com/index.php?eID=tx_nawsecuredl&u=0&g=0&t=1499460496&hash=629664449e3954477f6857f98ad1d73f8f2ec20d&file=fileadmin/komptech/brochures/Green_Efficiency_eng_2015.pdf

which specialize in the mechanical processing equipment like grinders and shredders. Construction equipment powered by hybrid-electric drives is also commercially available from companies such as Caterpillar.[26] For example, Caterpillar reports that during an 8-hour shift, its D7E hybrid dozer burns 19.5 percent fewer gallons of fuel than a conventional dozer while achieving a 10.3 percent increase in productivity. The D7E model burns 6.2 gallons per hour compared to a conventional dozer which burns 7.7 gallons per hour.[27]  Fuel usage and savings are dependent on the make and model of the construction equipment used.  The Project Applicant should calculate project-specific savings and provide manufacturer specifications indicating fuel burned per hour.

### *Institute a Heavy-Duty Off-Road Vehicle Plan*

CAPCOA's *Quantifying Greenhouse Gas Mitigation Measures*[28] report recommends that the Project Applicant provide a detailed plan that discusses a construction vehicle inventory tracking system to ensure compliances with construction mitigation measures.  The system should include strategies such as requiring hour meters on equipment, documenting the serial number, horsepower, manufacture age, fuel, etc. of all onsite equipment and daily logging of the operating hours of the equipment. Specifically, prior to the construction of a Project the contractor should submit a certified list of all diesel vehicles, construction equipment, and generators to be used on site. [29] The list should include the following: [30]

- Contractor and subcontractor name and address, plus contact person responsible for the vehicles or equipment.
- Equipment type, equipment manufacturer, equipment serial number, engine manufacturer, engine model year, engine certification (Tier rating), horsepower, engine serial number, and expected fuel usage and hours of operation.
- For the emission control technology installed: technology type, serial number, make, model, manufacturer, EPA/CARB verification number/level, and installation date and hour-meter reading on installation date.

### *Implement a Construction Vehicle Inventory Tracking System*

CAPCOA's *Quantifying Greenhouse Gas Mitigation Measures*[31] report recommends that the Project Applicant provide a detailed plan that discusses a construction vehicle inventory tracking system to ensure compliances with construction mitigation measures. The system should include strategies such as requiring engine run time meters on equipment, documenting the serial number, horsepower, manufacture age, fuel, etc. of all onsite equipment and daily logging of the operating hours of the

---

[26] http://www.cat.com/en_US/products/new/power-systems/electric-power-generation.html
[27] http://s7d2.scene7.com/is/content/Caterpillar/C811572
[28] http://www.capcoa.org/wp-content/uploads/2010/11/CAPCOA-Quantification-Report-9-14-Final.pdf
[29] Diesel Emission Controls in Construction Projects, *available at:*
http://www2.epa.gov/sites/production/files/2015-09/documents/nedc-model-contract-sepcification.pdf
[30] USEPA's Construction Fleet Inventory Guide is a useful tool in identifying the information required.
http://www2.epa.gov/sites/production/files/2015-09/documents/construction-fleet-inventory-guide.pdf
[31] http://www.capcoa.org/wp-content/uploads/2010/11/CAPCOA-Quantification-Report-9-14-Final.pdf

equipment.  Specifically, for each onroad construction vehicle, nonroad construction equipment, or generator, the contractor should submit to the developer's representative a report prior to bringing said equipment on site that includes: [32]

- Equipment type, equipment manufacturer, equipment serial number, engine manufacturer, engine model year, engine certification (Tier rating), horsepower, and engine serial number.
- The type of emission control technology installed, serial number, make, model, manufacturer, and EPA/CARB verification number/level.
- The Certification Statement[33] signed and printed on the contractor's letterhead.

Furthermore, the contractor should submit to the developer's representative a monthly report that, for each onroad construction vehicle, nonroad construction equipment, or generator onsite, includes: [34]

- Hour-meter readings on arrival on-site, the first and last day of every month, and on off-site date.
- Any problems with the equipment or emission controls.
- Certified copies of fuel deliveries for the time period that identify:
  - Source of supply
  - Quantity of fuel
  - Quality of fuel, including sulfur content (percent by weight).

In addition to those measures, we also recommend that the City require the Applicant to implement the following mitigation measures, called "Enhanced Exhaust Control Practices,"[35] that are recommended by the Sacramento Metropolitan Air Quality Management District ("SMAQMD"):

1. The project representative shall submit to the lead agency and District a comprehensive inventory of all off-road construction equipment, equal to or greater than 50 horsepower, that will be used an aggregate of 40 or more hours during any portion of the construction project.
   - The inventory shall include the horsepower rating, engine model year, and projected hours of use for each piece of equipment.
   - The project representative shall provide the anticipated construction timeline including start date, and name and phone number of the project manager and on-site foreman.
   - This information shall be submitted at least 4 business days prior to the use of subject heavy-duty off-road equipment.

---

[32] Diesel Emission Controls in Construction Projects, *available at:* http://www2.epa.gov/sites/production/files/2015-09/documents/nedc-model-contract-sepcification.pdf
[33] Diesel Emission Controls in Construction Projects, *available at:* http://www2.epa.gov/sites/production/files/2015-09/documents/nedc-model-contract-sepcification.pdf The NEDC Model Certification Statement can be found in Appendix A, p. 10.
[34] Diesel Emission Controls in Construction Projects, *available at:* http://www2.epa.gov/sites/production/files/2015-09/documents/nedc-model-contract-sepcification.pdf
[35] http://www.airquality.org/LandUseTransportation/Documents/Ch3EnhancedExhaustControlFINAL10-2013.pdf

- The District's Equipment List Form can be used to submit this information.
- The inventory shall be updated and submitted monthly throughout the duration of the project, except that an inventory shall not be required for any 30-day period in which no construction activity occurs.

2. The project representative shall provide a plan for approval by the lead agency and District demonstrating that the heavy-duty off-road vehicles (50 horsepower or more) to be used in the construction project, including owned, leased, and subcontractor vehicles, will achieve a project wide fleet-average 20% $NO_x$ reduction and 45% particulate reduction compared to the most recent CARB fleet average.
   - This plan shall be submitted in conjunction with the equipment inventory.
   - Acceptable options for reducing emissions may include use of late model engines, low-emission diesel products, alternative fuels, engine retrofit technology, after-treatment products, and/or other options as they become available.
   - The District's Construction Mitigation Calculator can be used to identify an equipment fleet that achieves this reduction.

3. The project representative shall ensure that emissions from all off-road diesel powered equipment used on the project site do not exceed 40% opacity for more than three minutes in any one hour.
   - Any equipment found to exceed 40 percent opacity (or Ringelmann 2.0) shall be repaired immediately. Non-compliant equipment will be documented and a summary provided to the lead agency and District monthly.
   - A visual survey of all in-operation equipment shall be made at least weekly.
   - A monthly summary of the visual survey results shall be submitted throughout the duration of the project, except that the monthly summary shall not be required for any 30-day period in which no construction activity occurs. The monthly summary shall include the quantity and type of vehicles surveyed as well as the dates of each survey.

4. The District and/or other officials may conduct periodic site inspections to determine compliance. Nothing in this mitigation shall supersede other District, state or federal rules or regulations.

When combined together, these measures offer a cost-effective way to incorporate lower-emitting equipment into the Project's construction fleet, which subsequently, reduces particulate matter emissions released during Project construction. A revised FEIR must be prepared to include additional mitigation measures, as well as include an updated air quality assessment to ensure that the necessary mitigation measures are implemented to reduce construction emissions. Furthermore, the Project Applicant needs to demonstrate commitment to the implementation of these measures prior to Project approval to ensure that the Project's construction-related emissions are reduced to the maximum extent possible.

## Mobile Source Mitigation Available to Reduce Operational Emissions

The results of our health risk assessment also demonstrate that operation of the Project would result in significant DPM emissions. Therefore, in an effort to reduce the Project's operational DPM emissions,

we recommend the following mitigation measures that will result in a reduction in the total vehicle miles traveled (VMT) during operation, and will therefore result in a reduction in criteria air pollutant emissions.  As stated in the section above, additional mitigation measures can be found in CAPCOA's Quantifying Greenhouse Gas Mitigation Measures, which attempt to reduce criteria air pollutant emissions such as $PM_{10}$.[36] These emissions are byproduct of fuel combustion during vehicle travel. Mitigation for criteria pollutant emissions should include consideration of the following mobile mitigation measures in an effort to reduce operational $PM_{10}$ emissions to below thresholds.

### *Reduce VMT by Increasing Transit Accessibility*

Making transit more accessible encourages the use of other modes of transportation and therefore reduces VMT.  According to CAPCOA, implementation of this mitigation measure would reduce mobile source emissions by 0.5 to 24.6 percent.  The Project would need to include, at a minimum, the following design features:

- A transit station/stop with high-quality, high-frequency bus service located within a five to ten-minute walk, or roughly a quarter of a mile from stop to edge of development
- Or a rail station located within a 20-minute walk or roughly half a mile from station edge to development
- Fast, frequent, and reliable transit service connecting to a high percentage of regional destinations
- Neighborhood designed for walking and bicycling

### *Locate Project Near Bike Path/Bike Lane*

A Project that is designed around an existing or planned bicycle facility encourages alternative mode use.  This measure is most effective when applied in combination of multiple design elements that encourage this use. This measure should be grouped with the Increase Destination Accessibility strategy to increase the opportunities for multi-modal travel.

### *Provide Electric Vehicle Parking*

This mitigation measure implements accessible electric vehicle parking to reduce tailpipe emissions. Design features include conductive/inductive electric vehicle charging stations and signage prohibiting parking of non-electric vehicles.

### *Limit Parking Supply*

This mitigation measure will change parking requirements and types of supply within the Project site to encourage "smart growth" development and alternative transportation choices by Project residents and employees, resulting in less VMTs. This will be accomplished in a multi-faceted strategy:
- Elimination (or reduction) of minimum parking requirements
- Creation of maximum parking requirements

---

[36] http://www.capcoa.org/wp-content/uploads/2010/11/CAPCOA-Quantification-Report-9-14-Final.pdf

- Provision of shared parking

### Unbundle Parking Costs from Property Costs

This measure would unbundle parking costs from property costs. Unbundling separates parking from property costs, requiring those who wish to purchase parking spaces to do so at an additional cost from the property cost. This removes the burden from those who do not wish to utilize a parking space. Parking will be priced separately from home rents/purchase prices or office leases. An assumption is made that the parking costs are passed through to the vehicle owners/drivers utilizing the parking spaces.

### Implement Commute Trip Reduction (CTR) Program

The Project could implement a voluntary Commute Trip Reduction (CTR) program with employers to discourage single-occupancy vehicle trips and encourage alternative modes of transportation such as carpooling, taking transit, walking, and biking.  The main difference between a voluntary and a required program is:

- Monitoring and reporting is not required
- No established performance standards (i.e. no trip reduction requirements)

The CTR program will provide workers with assistance in using alternative modes of travel. The CTR program should include all of the following to apply the effectiveness reported by the literature:

- Carpooling encouragement
- Ride-matching assistance
- Preferential carpool parking
- Flexible work schedules for carpools
- Half time transportation coordinator
- Vanpool assistance
- Bicycle end-trip facilities

### Provide Ride-Sharing Programs

Increasing the vehicle occupancy by ride sharing will result in fewer cars driving the same trip, and thus a decrease in VMT. The Project can include a ride-sharing program as well as a permanent transportation management association membership and funding requirement. Funding may be provided by Community Facilities, District, or County Service Area, or other non-revocable funding mechanism. The Project can promote ride-sharing programs through a multi-faceted approach such as:

- Designating a certain percentage of parking spaces for ride sharing vehicles
- Designating adequate passenger loading and unloading and waiting areas for ride-sharing vehicles

12

- Providing a web site or message board for coordinating rides

### *Implement Subsidized or Discounted Transit Program*

This Project could provide subsidized/discounted daily or monthly public transit passes. The Project may also provide free transfers between all shuttles and transit to participants. These passes can be partially or wholly subsidized by the employer or development. Many entities use revenue from parking to offset the cost of such a Project.

### *Provide End of Trip Facilities*

The Project can provide "end-of-trip" facilities for bicycle riders including showers, secure bicycle lockers, and changing spaces. End-of-trip facilities encourage the use of bicycling as a viable form of travel to destinations, especially to work. End-of-trip facilities provide the added convenience and security needed to encourage bicycle commuting.

### *Encourage Telecommuting and Alternative Work Schedules*

Encouraging telecommuting and alternative work schedules reduces the number of commute trips and therefore VMT traveled by employees. Alternative work schedules could take the form of staggered starting times, flexible schedules, or compressed work weeks.

### *Implement Car-Sharing Program*

This Project could implement a car-sharing program to allow people to have on-demand access to a shared fleet of vehicles on an as-needed basis.  User costs are typically determined through mileage or hourly rates, with deposits and/or annual membership fees.  The car-sharing program could be created through a local partnership or through one of many existing car-share companies. Car-sharing programs may be grouped into three general categories: residential- or citywide-based, employer-based, and transit station-based. Transit station-based programs focus on providing the "last-mile" solution and link transit with commuters' final destinations.

### *Provide Employer-Sponsored Vanpool/Shuttle*

The Project could implement an employer-sponsored vanpool or shuttle.  A vanpool will usually service workers' commute to work while a shuttle will service nearby transit stations and surrounding commercial centers.  Employer-sponsored vanpool programs entail an employer purchasing or leasing vans for employee use, and often subsidizing the cost of at least program administration, if not more. The driver usually receives personal use of the van, often for a mileage fee.  Scheduling is within the employer's purview, and rider charges are normally set on the basis of vehicle and operating cost.

### *Implement Commute Trip Reduction Marketing*

The Project can implement marketing strategies to reduce commute trips. Information sharing and marketing are important components to successful commute trip reduction strategies. Implementing

commute trip reduction strategies without a complementary marketing strategy will result in lower VMT reductions. Marketing strategies may include:

- New employee orientation of trip reduction and alternative mode options
- Event promotions
- Publications

### Implement Preferential Parking Permit Program

The Project can provide preferential parking in convenient locations (such as near public transportation or building front doors) in terms of free or reduced parking fees, priority parking, or reserved parking for commuters who carpool, vanpool, ride-share or use alternatively fueled vehicles. The Project should provide wide parking spaces to accommodate vanpool vehicles.

### Price Workplace Parking

The Project can implement workplace parking pricing at its employment centers. This may include: explicitly charging for parking for its employees, implementing above market rate pricing, validating parking only for invited guests, not providing employee parking and transportation allowances, and educating employees about available alternatives.

### Implement Employee Parking "Cash-Out"

The Project may require employers to offer employee parking "cash-out." The term "cashout" is used to describe the employer providing employees with a choice of forgoing their current subsidized/free parking for a cash payment equivalent to the cost of the parking space to the employer.

### Implement Transit Access Improvements

This Project can improve access to transit facilities through sidewalk/ crosswalk safety enhancements and bus shelter improvements.

### Expand Transit Network

The Project may expand the local transit network by adding or modifying existing transit service to enhance the service near the Project site. This will encourage the use of transit and therefore reduce VMT.

When combined, these measures offer a cost-effective, feasible way to incorporate lower-emitting design features into the proposed Project, which subsequently, reduces emissions released during Project operation. A revised FEIR must be prepared to include additional mitigation measures, as well as include an updated air quality analysis to ensure that the necessary mitigation measures are implemented to reduce Project emissions to below thresholds. Furthermore, the Project Applicant needs to demonstrate commitment to the implementation of these measures prior to Project approval, to ensure that the Project's emissions are reduced to the maximum extent possible.

## Greenhouse Gas

### Failure to Adequately Evaluate Greenhouse Gas Impact

The FEIR concludes that the Project's GHG impacts would be less than significant, yet fails to provide proper justification to support this claim. As a result, the Project's GHG impacts are inadequately addressed.

The FEIR relies upon the City of San Diego's Climate Action Plan (CAP) to determine the significance of the Project's GHG impact (p. 5.7-20). Using this significance criteria, the FEIR concludes that "through implementation of the project design features outlined above related to reducing GHGs, the project would ensure that it would be consistent with the CAP's assumptions and GHG reduction strategies geared toward achieving the identified GHG reduction targets in the CAP" and therefore determines that "no significant GHG emissions impacts are identified; no mitigation would be required" (p. 5.7-20). This conclusion, however, as well as the justification provided in the FEIR to support this significance determination, are incorrect and inadequate.

While the FEIR states that the Project would be consistent with CAP, the FEIR fails to actually demonstrate compliance with all of the applicable criteria disclosed in the City's CAP. Specifically, the FEIR fails to comply with the following requirement, as required by Section 15183.5 *Tiering and Streamlining the Analysis of Greenhouse Gas Emissions* of the CEQA guidelines,

> "An environmental document that relies on a greenhouse gas reduction plan for a cumulative impacts analysis must identify those requirements specified in the plan that apply to the project, and, if those requirements are not otherwise binding and enforceable, incorporate those requirements as mitigation measures applicable to the project."[37]

As stated above, CEQA requires the FEIR to identify which requirements apply to the Project and requires that the FEIR make these requirements binding and enforceable to the Project by listing them as mitigation measures, if they are not already binding and enforceable in the City's CAP. However, review of the FEIR demonstrates that the Project fails to include any of the CAP's measures that the FEIR claims the Project would be consistent with as mitigation measures or as mandatory conditions of Project approval (see excerpt below) (FEIR, p. ES-61).

---

[37]

https://govt.westlaw.com/calregs/Document/I872A68805F7511DFBF66AC2936A1B85A?viewType=FullText&originationContext=documenttoc&transitionType=CategoryPageItem&contextData=%28sc.Default%29

| Table ES-1 PROJECT IMPACTS AND PROPOSED MITIGATION | | |
| --- | --- | --- |
| **IMPACT** | **MITIGATION MEASURES** | **ANALYSIS OF SIGNIFICANCE AFTER MITIGATION** |
| **GREENHOUSE GAS EMISSIONS** | | |
| Would the project generate greenhouse gas emissions, either directly or indirectly, that may have a significant impact on the environment? | No mitigation measures would be required. | Less than significant |
| Would the project conflict with an applicable plan, policy, or regulation of an agency adopted for the purpose of reducing the emissions of greenhouse gases? | No mitigation measures would be required. | Less than significant |

As you can see, the FEIR determines that "no mitigation measures would be required" and therefore does not include any of the CAP's measures within its mitigation. As a result, the FEIR fails to show compliance with the City of San Diego's CAP and should not be used to determine the Project's significance. A revised FEIR should be prepared with an updated GHG analysis in order to adequately assess and address the Project's potential GHG impact.

## Failure to Demonstrate Compliance with Executive Order B-30-15

The CAP Consistency Checklist relies upon the CAP Consistency Supporting Documentation to help determine the significance of the Project's GHG impact. The CAP Consistency Checklist, however, only accounts for the reductions required to meet the 2020 emission reductions set forth by AB 32. Governor Brown recently issued an executive order to establish an even more ambitious GHG reduction target for 2030, which is not addressed in the CAP Consistency Checklist. By failing to demonstrate consistency with the reduction targets set forth by Executive Order B-30-15 for 2030, the Project may conflict with an applicable plan, policy, or regulation adopted for the purpose of reducing GHG emissions. As a result, the Project may have a potentially significant impact that was not previously addressed in the Consistency Evaluation, and as such, a revised FEIR should be prepared.

Executive Order B-30-15 requires emissions reductions above those mandated by AB 32 to reduce GHG emissions 40 percent below their 1990 levels by 2030.[38] 1990 statewide GHG emissions are estimated to be approximately 431 million MTCO$_2$e (MMTCO$_2$e).[39] Therefore, by 2030 California will be required to reduce statewide emissions by 172 MMTCO$_2$e (431 x 40%), which results in a statewide limit on GHG emissions of 259 MMTCO$_2$e. 2020 "business-as-usual" levels are estimated to be approximately 509 MMTCO$_2$e.[40] In order to successfully reach the 2030 statewide goal of 259 MMTCO$_2$e, California would have to reduce its emissions by 49 percent below the "business-as-usual" levels. This reduction target is consistent with goals set forth by other recently passed legislature, such as SB 32,[41] indicating that

---

[38] http://gov.ca.gov/news.php?id=18938
[39] http://www.arb.ca.gov/cc/inventory/data/bau.htm
[40] http://energyinnovation.org/wp-content/uploads/2015/04/CA_CapReport_Mar2015.pdf
[41] http://www.latimes.com/politics/la-pol-ca-jerry-brown-signs-climate-laws-20160908-snap-story.html

compliance with these more aggressive reduction goals, beyond what is mandated by AB 32, will be necessary.

This 49 percent reduction target should be considered as a threshold of significance against which to measure Project impacts. Because the proposed Project is unlikely to be redeveloped again prior to 2030, the 2030 goals are applicable to any evaluation of the Project's impacts. A revised FEIR should be prepared to demonstrate the Project's compliance with these more aggressive measures specified in Executive Order B-30-15. Specifically, the Project should demonstrate, at a minimum, a reduction of 49 percent below "business-as-usual" levels. It should be noted that this reduction percentage is applicable to statewide emissions, which is not directly applicable to a project-level analysis.  As a result, an additional analysis would need to be conducted to translate the new statewide targets into a project-specific threshold against which Project GHG emissions can be compared.  A revised FEIR should be prepared to quantify any reductions expected to be achieved by mitigation measures, shown by substantial evidence that such measures will be effective, and should demonstrate how these measures will reduce the emissions below the new 2030 significance threshold.

Sincerely,

Paul E. Rosenfeld, Ph.D.

Matt Hagemann, P.G., C.Hg.

Hadley Nolan

17

**SWAPE** Technical Consultation, Data Analysis and
Litigation Support for the Environment

**SOIL WATER AIR PROTECTION ENTERPRISE**
2656 29th Street, Suite 201
Santa Monica, California 90405
Attn: Paul Rosenfeld, Ph.D.
Mobil: (310) 795-2335
Office: (310) 452-5555
Fax: (310) 452-5550
Email: prosenfeld@swape.com

# Paul Rosenfeld, Ph.D.

*Principal Environmental Chemist*

**Chemical Fate and Transport & Air Dispersion Modeling**

**Risk Assessment & Remediation Specialist**

## Education:

Ph.D. Soil Chemistry, University of Washington, 1999. Dissertation on VOC filtration.
M.S. Environmental Science, U.C. Berkeley, 1995. Thesis on organic waste economics.
B.A. Environmental Studies, U.C. Santa Barbara, 1991.  Thesis on wastewater treatment.

## Professional Experience:

Dr. Rosenfeld is the Co-Founder and Principal Environmental Chemist at Soil Water Air Protection Enterprise (SWAPE). His focus is the fate and transport of environmental contaminants, risk assessment, and ecological restoration. Dr. Rosenfeld has evaluated and modeled emissions from unconventional oil drilling, oil spills, boilers, incinerators and other industrial and agricultural sources relating to nuisance and personal injury.  His project experience ranges from monitoring and modeling of pollution sources as they relate to human and ecological health. Dr. Rosenfeld has investigated and designed remediation programs and risk assessments for contaminated sites containing petroleum, chlorinated solvents, pesticides, radioactive waste, PCBs, PAHs, dioxins, furans, volatile organics, semi-volatile organics, perchlorate, heavy metals, asbestos, PFOA, unusual polymers, MtBE, fuel oxygenates and odor.  Dr. Rosenfeld has evaluated greenhouse gas emissions using various modeling programs recommended by California Air Quality Management Districts.

## Professional History:

Soil Water Air Protection Enterprise (SWAPE); 2003 to present; Principal and Founding Partner
UCLA School of Public Health; 2007 to 2011; Lecturer (Assistant Researcher)
UCLA School of Public Health; 2003 to 2006; Adjunct Professor
UCLA Environmental Science and Engineering Program; 2002-2004; Doctoral Intern Coordinator
UCLA Institute of the Environment, 2001-2002; Research Associate
Komex $H_2O$ Science, 2001 to 2003; Senior Remediation Scientist
National Groundwater Association, 2002-2004; Lecturer
San Diego State University, 1999-2001; Adjunct Professor
Anteon Corp., San Diego, 2000-2001; Remediation Project Manager
Ogden (now Amec), San Diego, 2000-2000; Remediation Project Manager
Bechtel, San Diego, California, 1999 – 2000; Risk Assessor
King County, Seattle, 1996 – 1999; Scientist
James River Corp., Washington, 1995-96; Scientist
Big Creek Lumber, Davenport, California, 1995; Scientist
Plumas Corp., California and USFS, Tahoe 1993-1995; Scientist
Peace Corps and World Wildlife Fund, St. Kitts, West Indies, 1991-1993; Scientist
Bureau of Land Management, Kremmling Colorado 1990; Scientist

## Publications:

Chen, J. A., Zapata, A R., Sutherland, A. J., Molmen, D. R,. Chow, B. S,. Wu, L. E., **Rosenfeld, P. E.,** Hesse, R. C., (2012) Sulfur Dioxide and Volatile Organic Compound Exposure To A Community In Texas City Texas Evaluated Using Aermod and Empirical Data. *American Journal of Environmental Science*, 8(6), 622-632.

**Rosenfeld, P.E**. & Feng, L. (2011). *The Risks of Hazardous Waste.* Amsterdam: Elsevier Publishing.

Cheremisinoff, N.P., & **Rosenfeld, P.E.** (2011). *Handbook of Pollution Prevention and Cleaner Production: Best Practices in the Agrochemical Industry*, Amsterdam: Elsevier Publishing.

Gonzalez, J., Feng, L., Sutherland, A., Waller, C., Sok, H., Hesse, R., **Rosenfeld, P.** (2010). PCBs and Dioxins/Furans in Attic Dust Collected Near Former PCB Production and Secondary Copper Facilities in Sauget, IL. *Procedia Environmental Sciences*. 113–125.

Feng, L., Wu, C., Tam, L., Sutherland, A.J., Clark, J.J., **Rosenfeld, P.E.** (2010). Dioxin and Furan Blood Lipid and Attic Dust Concentrations in Populations Living Near Four Wood Treatment Facilities in the United States. *Journal of Environmental Health*. 73(6), 34-46.

Cheremisinoff, N.P., & **Rosenfeld, P.E.** (2010). *Handbook of Pollution Prevention and Cleaner Production: Best Practices in the Wood and Paper Industries*. Amsterdam: Elsevier Publishing.

Cheremisinoff, N.P., & **Rosenfeld, P.E.** (2009). *Handbook of Pollution Prevention and Cleaner Production: Best Practices in the Petroleum Industry*. Amsterdam: Elsevier Publishing.

Wu, C., Tam, L., Clark, J., **Rosenfeld, P**. (2009). Dioxin and furan blood lipid concentrations in populations living near four wood treatment facilities in the United States. *WIT Transactions on Ecology and the Environment, Air Pollution*, 123 (17), 319-327.

Tam L. K.., Wu C. D., Clark J. J. and **Rosenfeld, P.E.** (2008). A Statistical Analysis Of Attic Dust And Blood Lipid Concentrations Of Tetrachloro-p-Dibenzodioxin (TCDD) Toxicity Equivalency Quotients (TEQ) In Two Populations Near Wood Treatment Facilities. *Organohalogen Compounds*, 70, 002252-002255.

Tam L. K.., Wu C. D., Clark J. J. and **Rosenfeld, P.E.** (2008). Methods For Collect Samples For Assessing Dioxins And Other Environmental Contaminants In Attic Dust: A Review. *Organohalogen Compounds*, 70, 000527-000530.

Hensley, A.R. A. Scott, J. J. J. Clark, **Rosenfeld, P.E.** (2007). Attic Dust and Human Blood Samples Collected near a Former Wood Treatment Facility. *Environmental Research*. 105, 194-197.

**Rosenfeld, P.E.,** J. J. J. Clark, A. R. Hensley, M. Suffet. (2007). The Use of an Odor Wheel Classification for Evaluation of Human Health Risk Criteria for Compost Facilities. *Water Science & Technology* 55(5), 345-357.

**Rosenfeld, P. E.,** M. Suffet. (2007). The Anatomy Of Odour Wheels For Odours Of Drinking Water, Wastewater, Compost And The Urban Environment. *Water Science & Technology* 55(5), 335-344.

Sullivan, P. J. Clark, J.J.J., Agardy, F. J., **Rosenfeld, P.E.** (2007). *Toxic Legacy, Synthetic Toxins in the Food, Water, and Air in American Cities*. Boston Massachusetts: Elsevier Publishing,

**Rosenfeld P.E.,** and Suffet, I.H. (Mel) (2007). Anatomy of an Odor Wheel. *Water Science and Technology*.

**Rosenfeld, P.E.,** Clark, J.J.J., Hensley A.R., Suffet, I.H. (Mel) (2007). The use of an odor wheel classification for evaluation of human health risk criteria for compost facilities. *Water Science And Technology*.

**Rosenfeld, P.E.,** and Suffet I.H. (2004). Control of Compost Odor Using High Carbon Wood Ash. *Water Science and Technology*. 49(9),171-178.

**Rosenfeld P. E.,** J.J. Clark, I.H. (Mel) Suffet (2004). The Value of An Odor-Quality-Wheel Classification Scheme For The Urban Environment. *Water Environment Federation's Technical Exhibition and Conference (WEFTEC) 2004.* New Orleans, October 2-6, 2004.

**Rosenfeld, P.E.,** and Suffet, I.H. (2004). Understanding Odorants Associated With Compost, Biomass Facilities, and the Land Application of Biosolids. *Water Science and Technology*. 49(9), 193-199.

**Rosenfeld, P.E.,** and Suffet I.H. (2004). Control of Compost Odor Using High Carbon Wood Ash, *Water Science and Technology*, 49( 9), 171-178.

**Rosenfeld, P. E**., Grey, M. A., Sellew, P. (2004). Measurement of Biosolids Odor and Odorant Emissions from Windrows, Static Pile and Biofilter. *Water Environment Research*. 76(4), 310-315.

**Rosenfeld, P.E.,** Grey, M and Suffet, M. (2002). Compost Demonstration Project, Sacramento California Using High-Carbon Wood Ash to Control Odor at a Green Materials Composting Facility. *Integrated Waste Management Board Public Affairs Office*, Publications Clearinghouse (MS–6), Sacramento, CA Publication #442-02-008.

**Rosenfeld, P.E**., and C.L. Henry.  (2001). Characterization of odor emissions from three different biosolids. *Water Soil and Air Pollution*. 127(1-4), 173-191.

**Rosenfeld, P.E.,** and Henry C. L., (2000).  Wood ash control of odor emissions from biosolids application. *Journal of Environmental Quality*. 29, 1662-1668.

**Rosenfeld, P.E.,** C.L. Henry and D. Bennett. (2001). Wastewater dewatering polymer affect on biosolids odor emissions and microbial activity. *Water Environment Research*. 73(4), 363-367.

**Rosenfeld, P.E.,** and C.L. Henry. (2001). Activated Carbon and Wood Ash Sorption of Wastewater, Compost, and Biosolids Odorants. *Water Environment Research*, 73, 388-393.

**Rosenfeld, P.E.,** and Henry C. L., (2001). High carbon wood ash effect on biosolids microbial activity and odor. *Water Environment Research*. 131(1-4), 247-262.

Chollack, T. and **P. Rosenfeld. (**1998). Compost Amendment Handbook For Landscaping. Prepared for and distributed by the City of Redmond, Washington State.

**Rosenfeld, P. E**. (1992)  The Mount Liamuiga Crater Trail. *Heritage Magazine of St. Kitts*, 3(2).

**Rosenfeld, P. E.**  (1993). High School Biogas Project to Prevent Deforestation On St. Kitts.  *Biomass Users Network*, 7(1).

**Rosenfeld, P. E. (**1998). Characterization, Quantification, and Control of Odor Emissions From Biosolids Application To Forest Soil. Doctoral Thesis. University of Washington College of Forest Resources.

**Rosenfeld, P. E**. (1994).  Potential Utilization of Small Diameter Trees on Sierra County Public Land. Masters thesis reprinted by the Sierra County Economic Council. Sierra County, California.

**Rosenfeld, P. E**. (1991).  How to Build a Small Rural Anaerobic Digester & Uses Of Biogas In The First And Third World. Bachelors Thesis. University of California.

## Presentations:

**Rosenfeld, P.E.,** Sutherland, A; Hesse, R.; Zapata, A. (October 3-6, 2013). Air dispersion modeling of volatile organic emissions from multiple natural gas wells in Decatur, TX. *44th Western Regional Meeting, American Chemical Society.* Lecture conducted from Santa Clara, CA.

Sok, H.L.; Waller, C.C.; Feng, L.; Gonzalez, J.; Sutherland, A.J.; Wisdom-Stack, T.; Sahai, R.K.; Hesse, R.C.; **Rosenfeld, P.E.** (June 20-23, 2010). Atrazine: A Persistent Pesticide in Urban Drinking Water. *Urban Environmental Pollution.* Lecture conducted from Boston, MA.

Feng, L.; Gonzalez, J.; Sok, H.L.; Sutherland, A.J.; Waller, C.C.; Wisdom-Stack, T.; Sahai, R.K.; La, M.; Hesse, R.C.; **Rosenfeld, P.E.** (June 20-23, 2010). Bringing Environmental Justice to East St. Louis, Illinois. *Urban Environmental Pollution.* Lecture conducted from Boston, MA.

**Rosenfeld, P.E.** (April 19-23, 2009). Perfluoroctanoic Acid (PFOA) and Perfluoroactane Sulfonate (PFOS) Contamination in Drinking Water From the Use of Aqueous Film Forming Foams (AFFF) at Airports in the United States. *2009 Ground Water Summit and 2009 Ground Water Protection Council Spring Meeting*, Lecture conducted from Tuscon, AZ.

**Rosenfeld, P.E.** (April 19-23, 2009). Cost to Filter Atrazine Contamination from Drinking Water in the United States" Contamination in Drinking Water From the Use of Aqueous Film Forming Foams (AFFF) at Airports in the United States. *2009 Ground Water Summit and 2009 Ground Water Protection Council Spring Meeting.* Lecture conducted from Tuscon, AZ.

Wu, C., Tam, L., Clark, J., **Rosenfeld, P** (20-22 July, 2009). Dioxin and furan blood lipid concentrations in populations living near four wood treatment facilities in the United States. Brebbia, C.A. and Popov, V., eds., *Air Pollution XVII: Proceedings of the Seventeenth International Conference on Modeling, Monitoring and Management of Air Pollution.* Lecture conducted from Tallinn, Estonia.

**Rosenfeld, P. E.** (October 15-18, 2007). Moss Point Community Exposure To Contaminants From A Releasing Facility. *The 23rd Annual International Conferences on Soils Sediment and Water.* Platform lecture conducted from University of Massachusetts, Amherst MA.

**Rosenfeld, P. E.** (October 15-18, 2007). The Repeated Trespass of Tritium-Contaminated Water Into A Surrounding Community Form Repeated Waste Spills From A Nuclear Power Plant. *The 23rd Annual International Conferences on Soils Sediment and Water.* Platform lecture conducted from University of Massachusetts, Amherst MA.

**Rosenfeld, P. E.** (October 15-18, 2007). Somerville Community Exposure To Contaminants From Wood Treatment Facility Emissions. The *23rd Annual International Conferences on Soils Sediment and Water.* Lecture conducted from University of Massachusetts, Amherst MA.

**Rosenfeld P. E.** (March 2007). Production, Chemical Properties, Toxicology, & Treatment Case Studies of 1,2,3-Trichloropropane (TCP). *The Association for Environmental Health and Sciences (AEHS) Annual Meeting.* Lecture conducted from San Diego, CA.

**Rosenfeld P. E.** (March 2007). Blood and Attic Sampling for Dioxin/Furan, PAH, and Metal Exposure in Florala, Alabama. *The AEHS Annual Meeting.* Lecture conducted from San Diego, CA.

Hensley A.R., Scott, A., **Rosenfeld P.E.,** Clark, J.J.J. (August 21 – 25, 2006). Dioxin Containing Attic Dust And Human Blood Samples Collected Near A Former Wood Treatment Facility. *The 26th International Symposium on Halogenated Persistent Organic Pollutants – DIOXIN2006.* Lecture conducted from Radisson SAS Scandinavia Hotel in Oslo Norway.

Hensley A.R., Scott, A., **Rosenfeld P.E.,** Clark, J.J.J. (November 4-8, 2006). Dioxin Containing Attic Dust And Human Blood Samples Collected Near A Former Wood Treatment Facility. *APHA 134 Annual Meeting & Exposition.* Lecture conducted from Boston Massachusetts.

**Paul Rosenfeld Ph.D**. (October 24-25, 2005). Fate, Transport and Persistence of PFOA and Related Chemicals. Mealey's C8/PFOA. *Science, Risk & Litigation Conference.* Lecture conducted from The Rittenhouse Hotel, Philadelphia, PA.

**Paul Rosenfeld Ph.D**. (September 19, 2005). Brominated Flame Retardants in Groundwater: Pathways to Human Ingestion, *Toxicology and Remediation PEMA Emerging Contaminant Conference.* Lecture conducted from Hilton Hotel, Irvine California.

**Paul Rosenfeld Ph.D**. (September 19, 2005). Fate, Transport, Toxicity, And Persistence of 1,2,3-TCP. *PEMA Emerging Contaminant Conference.* Lecture conducted from Hilton Hotel in Irvine, California.

**Paul Rosenfeld Ph.D**. (September 26-27, 2005). Fate, Transport and Persistence of PDBEs. *Mealey's Groundwater Conference.* Lecture conducted from Ritz Carlton Hotel, Marina Del Ray, California.

**Paul Rosenfeld Ph.D**. (June 7-8, 2005). Fate, Transport and Persistence of PFOA and Related Chemicals. *International Society of Environmental Forensics: Focus On Emerging Contaminants.* Lecture conducted from Sheraton Oceanfront Hotel, Virginia Beach, Virginia.

**Paul Rosenfeld Ph.D**. (July 21-22, 2005). Fate Transport, Persistence and Toxicology of PFOA and Related Perfluorochemicals. *2005 National Groundwater Association Ground Water And Environmental Law Conference*. Lecture conducted from Wyndham Baltimore Inner Harbor, Baltimore Maryland.

**Paul Rosenfeld Ph.D**. (July 21-22, 2005). Brominated Flame Retardants in Groundwater: Pathways to Human Ingestion, Toxicology and Remediation. *2005 National Groundwater Association Ground Water and Environmental Law Conference.* Lecture conducted from Wyndham Baltimore Inner Harbor, Baltimore Maryland.

**Paul Rosenfeld, Ph.D**. and James Clark Ph.D. and Rob Hesse R.G. (May 5-6, 2004). Tert-butyl Alcohol Liability and Toxicology, A National Problem and Unquantified Liability. *National Groundwater Association. Environmental Law Conference.* Lecture conducted from Congress Plaza Hotel, Chicago Illinois.

**Paul Rosenfeld, Ph.D**. (March 2004). Perchlorate Toxicology. *Meeting of the American Groundwater Trust*. Lecture conducted from Phoenix Arizona.

Hagemann, M.F., **Paul Rosenfeld, Ph.D**. and Rob Hesse (2004). Perchlorate Contamination of the Colorado River. *Meeting of tribal representatives*. Lecture conducted from Parker, AZ.

**Paul Rosenfeld, Ph.D**. (April 7, 2004). A National Damage Assessment Model For PCE and Dry Cleaners. *Drycleaner Symposium. California Ground Water Association*. Lecture conducted from Radison Hotel, Sacramento, California.

Rosenfeld, P. E., Grey, M., (June 2003) Two stage biofilter for biosolids composting odor control. *Seventh International In Situ And On Site Bioremediation Symposium Battelle Conference* Orlando, FL.

**Paul Rosenfeld, Ph.D**. and James Clark Ph.D. (February 20-21, 2003) Understanding Historical Use, Chemical Properties, Toxicity and Regulatory Guidance of 1,4 Dioxane. *National Groundwater Association. Southwest Focus Conference. Water Supply and Emerging Contaminants..* Lecture conducted from Hyatt Regency Phoenix Arizona.

**Paul Rosenfeld, Ph.D**. (February 6-7, 2003). Underground Storage Tank Litigation and Remediation. *California CUPA Forum*. Lecture conducted from Marriott Hotel, Anaheim California.

**Paul Rosenfeld, Ph.D**. (October 23, 2002) Underground Storage Tank Litigation and Remediation. *EPA Underground Storage Tank Roundtable*. Lecture conducted from Sacramento California.

**Rosenfeld, P.E**. and Suffet, M. (October 7- 10, 2002). Understanding Odor from Compost, *Wastewater and Industrial Processes. Sixth Annual Symposium On Off Flavors in the Aquatic Environment. International Water Association*. Lecture conducted from Barcelona Spain.

**Rosenfeld, P.E**. and Suffet, M. (October  7- 10, 2002). Using High Carbon Wood Ash to Control Compost Odor. *Sixth Annual Symposium On Off Flavors in the Aquatic Environment. International Water Association*. Lecture conducted from Barcelona Spain.

**Rosenfeld, P.E**. and Grey, M. A. (September 22-24, 2002). Biocycle Composting For Coastal Sage Restoration. *Northwest Biosolids Management Association*. Lecture conducted from Vancouver Washington..

**Rosenfeld, P.E**. and Grey, M. A. (November 11-14, 2002). Using High-Carbon Wood Ash to Control Odor at a Green Materials Composting Facility. *Soil Science Society Annual Conferenc*e.  Lecture conducted from Indianapolis, Maryland.

**Rosenfeld. P.E**. (September 16, 2000). Two stage biofilter for biosolids composting odor control. *Water Environment Federation*. Lecture conducted from Anaheim California.

**Rosenfeld. P.E. (**October 16, 2000). Wood ash and biofilter control of compost odor. *Biofest*. Lecture conducted from Ocean Shores, California.

**Rosenfeld, P.E. (**2000). Bioremediation Using Organic Soil Amendments. *California Resource Recovery Association*. Lecture conducted from Sacramento California.

**Rosenfeld, P.E**., C.L. Henry, R. Harrison.  (1998).  Oat and Grass Seed Germination and Nitrogen and Sulfur Emissions Following Biosolids Incorporation With High-Carbon Wood-Ash. *Water Environment Federation 12th Annual Residuals and Biosolids Management Conference Proceedings*. Lecture conducted from Bellevue Washington.

**Rosenfeld, P.E.**, and C.L. Henry.  (1999).  An evaluation of ash incorporation with biosolids for odor reduction. *Soil Science Society of America*. Lecture conducted from Salt Lake City Utah.

**Rosenfeld, P.E.**, C.L. Henry, R. Harrison.  (1998). Comparison of Microbial Activity and Odor Emissions from Three Different Biosolids Applied to Forest Soil. *Brown and Caldwell*. Lecture conducted from Seattle Washington.

**Rosenfeld, P.E.**, C.L. Henry.  (1998).  Characterization, Quantification, and Control of Odor Emissions from Biosolids Application To Forest Soil.  *Biofest*. Lecture conducted from Lake Chelan, Washington.

**Rosenfeld, P.E**, C.L. Henry, R. Harrison. (1998). Oat and Grass Seed Germination and Nitrogen and Sulfur Emissions Following Biosolids Incorporation With High-Carbon Wood-Ash. Water Environment Federation 12th Annual Residuals and Biosolids Management Conference Proceedings. Lecture conducted from Bellevue Washington.

**Rosenfeld, P.E.**, C.L. Henry, R. B. Harrison, and R. Dills.  (1997). Comparison of Odor Emissions From Three Different Biosolids Applied to Forest Soil.  *Soil Science Society of America*. Lecture conducted from Anaheim California.

## Teaching Experience:

UCLA Department of Environmental Health (Summer 2003 through 20010) Taught Environmental Health Science 100 to students, including undergrad, medical doctors, public health professionals and nurses.  Course focused on the health effects of environmental contaminants.

National Ground Water Association, Successful Remediation Technologies. Custom Course in Sante Fe, New Mexico. May 21, 2002.  Focused on fate and transport of fuel contaminants associated with underground storage tanks.

National Ground Water Association; Successful Remediation Technologies Course in Chicago Illinois. April 1, 2002. Focused on fate and transport of contaminants associated with Superfund and RCRA sites.

California Integrated Waste Management Board, April and May, 2001. Alternative Landfill Caps Seminar in San Diego, Ventura, and San Francisco. Focused on both prescriptive and innovative landfill cover design.

UCLA Department of Environmental Engineering, February 5, 2002. Seminar on Successful Remediation Technologies focusing on Groundwater Remediation.

University Of Washington, Soil Science Program, Teaching Assistant for several courses including: Soil Chemistry, Organic Soil Amendments, and Soil Stability.

U.C. Berkeley, Environmental Science Program Teaching Assistant for Environmental Science 10.

## Academic Grants Awarded:

California Integrated Waste Management Board. $41,000 grant awarded to UCLA Institute of the Environment. Goal: To investigate effect of high carbon wood ash on volatile organic emissions from compost. 2001.

Synagro Technologies, Corona California: $10,000 grant awarded to San Diego State University.
Goal: investigate effect of biosolids for restoration and remediation of degraded coastal sage soils. 2000.

King County, Department of Research and Technology, Washington State. $100,000 grant awarded to University of Washington: Goal: To investigate odor emissions from biosolids application and the effect of polymers and ash on VOC emissions. 1998.

Northwest Biosolids Management Association, Washington State.  $20,000 grant awarded to investigate effect of polymers and ash on VOC emissions from biosolids. 1997.

James River Corporation, Oregon:  $10,000 grant was awarded to investigate the success of genetically engineered Poplar trees with resistance to round-up. 1996.

United State Forest Service, Tahoe National Forest:  $15,000 grant was awarded to investigating fire ecology of the Tahoe National Forest. 1995.

Kellogg Foundation, Washington D.C.  $500 grant was awarded to construct a large anaerobic digester on St. Kitts in West Indies. 1993.

## Deposition and/or Trial Testimony:

In The Superior Court of  the State of California, County of Alameda
          Charles Spain., Plaintiff vs. Thermo Fisher Scientific, et al., Defendants
          Case No.: RG14711115
          Rosenfeld Deposition, September, 2015

In The Iowa District Court In And For Poweshiek County
          Russell D. Winburn, et al., Plaintiffs vs. Doug Hoksbergen, et al., Defendants
          Case No.: LALA002187
          Rosenfeld Deposition, August 2015

In The Iowa District Court For Wapello County
          Jerry Dovico, et al., Plaintiffs vs. Valley View Sine LLC, et al., Defendants
          Law No,: LALA105144 - Division A
          Rosenfeld Deposition, August 2015

In The Iowa District Court For Wapello County
          Doug Pauls, et al.,, et al., Plaintiffs vs. Richard Warren, et al., Defendants
          Law No,: LALA105144 - Division A
          Rosenfeld Deposition, August 2015

In The Circuit Court of Ohio County, West Virginia
          Robert Andrews, et al. v. Antero, et al.
          Civil Action N0. 14-C-30000
          Rosenfeld Deposition, June 2015

In The Third Judicial District County of Dona Ana, New Mexico
          Betty Gonzalez, et al. Plaintiffs vs. Del Oro Dairy, Del Oro Real Estate LLC, Jerry Settles and Deward
          DeRuyter, Defendants
          Rosenfeld Deposition: July 2015

In The Iowa District Court For Muscatine County
          Laurie Freeman et. al. Plaintiffs vs. Grain Processing Corporation, Defendant
          Case No 4980
          Rosenfeld Deposition: May 2015

In the Circuit Court of the 17th Judicial Circuit, in and For Broward County, Florida
          Walter Hinton, et. al. Plaintiff, vs. City of Fort Lauderdale, Florida, a Municipality, Defendant.
          Case Number CACE07030358 (26)
          Rosenfeld Deposition: December 2014

In the United States District Court Western District of Oklahoma
          Tommy McCarty, et al., Plaintiffs, v. Oklahoma City Landfill, LLC d/b/a Southeast Oklahoma City
          Landfill, et al. Defendants.
          Case No. 5:12-cv-01152-C
          Rosenfeld Deposition: July 2014

In the County Court of Dallas County Texas
          Lisa Parr et al, *Plaintiff*, vs. Aruba et al, *Defendant.*
          Case Number cc-11-01650-E
          Rosenfeld Deposition: March and September 2013
          Rosenfeld Trial: April 2014

In the Court of Common Pleas of Tuscarawas County Ohio

John Michael Abicht, et al., *Plaintiffs*, vs. Republic Services, Inc., et al., *Defendants*
Case Number: 2008 CT 10 0741 (Cons. w/ 2009 CV 10 0987)
Rosenfeld Deposition: October 2012

In the Court of Common Pleas for the Second Judicial Circuit, State of South Carolina, County of Aiken
David Anderson, et al., *Plaintiffs*, vs. Norfolk Southern Corporation, et al., *Defendants*.
Case Number: 2007-CP-02-1584

In the Circuit Court of Jefferson County Alabama
Jaeanette Moss Anthony, et al., *Plaintiffs*, vs. Drummond Company Inc., et al., *Defendants*
Civil Action No. CV 2008-2076
Rosenfeld Deposition: September 2010

In the Ninth Judicial District Court, Parish of Rapides, State of Louisiana
Roger Price, et al., *Plaintiffs*, vs. Roy O. Martin, L.P., et al., *Defendants*.
Civil Suit Number 224,041 Division G
Rosenfeld Deposition: September 2008

In the United States District Court, Western District Lafayette Division
Ackle et al., *Plaintiffs*, vs. Citgo Petroleum Corporation, et al., *Defendants*.
Case Number 2:07CV1052
Rosenfeld Deposition: July 2009

In the United States District Court for the Southern District of Ohio
Carolyn Baker, et al., *Plaintiffs*, vs. Chevron Oil Company, et al., *Defendants*.
Case Number 1:05 CV 227
Rosenfeld Deposition: July 2008

In the Fourth Judicial District Court, Parish of Calcasieu, State of Louisiana
Craig Steven Arabie, et al., *Plaintiffs*, vs. Citgo Petroleum Corporation, et al., *Defendants*.
Case Number 07-2738 G

In the Fourteenth Judicial District Court, Parish of Calcasieu, State of Louisiana
Leon B. Brydels, *Plaintiff*, vs. Conoco, Inc., et al*., Defendants*.
Case Number 2004-6941 Division A

In the District Court of Tarrant County, Texas, 153rd Judicial District
Linda Faust, *Plaintiff*, vs. Burlington Northern Santa Fe Rail Way Company, Witco Chemical Corporation A/K/A Witco Corporation, Solvents and Chemicals, Inc. and Koppers Industries, Inc., *Defendants*.
Case Number 153-212928-05
Rosenfeld Deposition: December 2006, October 2007
Rosenfeld Trial: January 2008

In the Superior Court of the State of California in and for the County of San Bernardino
Leroy Allen, et al., *Plaintiffs*, vs. Nutro Products, Inc., a California Corporation and DOES 1 to 100, inclusive, *Defendants*.
John Loney, Plaintiff, vs. James H. Didion, Sr.; Nutro Products, Inc.; DOES 1 through 20, inclusive, *Defendants*.
Case Number VCVVS044671
Rosenfeld Deposition: December 2009
Rosenfeld Trial: March 2010

In the United States District Court for the Middle District of Alabama, Northern Division
James K. Benefield, et al., *Plaintiffs*, vs. International Paper Company, *Defendant*.
Civil Action Number 2:09-cv-232-WHA-TFM
Rosenfeld Deposition: July 2010, June 2011

In the Superior Court of the State of California in and for the County of Los Angeles
Leslie Hensley and Rick Hensley, *Plaintiffs*, vs. Peter T. Hoss, as trustee on behalf of the Cone Fee Trust; Plains Exploration & Production Company, a Delaware corporation; Rayne Water Conditioning, Inc., a California Corporation; and DOES 1 through 100, *Defendants.*
Case Number SC094173
Rosenfeld Deposition: September 2008, October 2008

In the Superior Court of the State of California in and for the County of Santa Barbara, Santa Maria Branch
Clifford and Shirley Adelhelm, et al., all individually, *Plaintiffs*, vs. Unocal Corporation, a Delaware Corporation; Union Oil Company of California, a California corporation; Chevron Corporation, a California corporation; ConocoPhillips, a Texas corporation; Kerr-McGee Corporation, an Oklahoma corporation; and DOES 1 though 100, *Defendants.*
Case Number 1229251  (Consolidated with case number 1231299)
Rosenfeld Deposition: January 2008

In the United States District Court for Eastern District of Arkansas, Eastern District of Arkansas
Harry Stephens Farms, Inc, and Harry Stephens, individual and as managing partner of Stephens Partnership, *Plaintiffs*, vs. Helena Chemical Company, and Exxon Mobil Corp., successor to Mobil Chemical Co., *Defendants.*
Case Number 2:06-CV-00166 JMM (Consolidated with case number 4:07CV00278 JMM)
Rosenfeld Deposition: July 2010

In the United States District Court for the Western District of Arkansas, Texarkana Division
Rhonda Brasel, et al., *Plaintiffs*, vs. Weyerhaeuser Company and DOES 1 through 100, *Defendants.*
Civil Action Number 07-4037
Rosenfeld Deposition: March 2010
Rosenfeld Trial: October 2010

In the District Court of Texas 21st Judicial District of Burleson County
Dennis Davis, *Plaintiff*, vs. Burlington Northern Santa Fe Rail Way Company, *Defendant.*
Case Number 25,151
Rosenfeld Trial: May 2009

In the United States District Court of Southern District of Texas Galveston Division
Kyle Cannon, Eugene Donovan, Genaro Ramirez, Carol Sassler, and Harvey Walton, each Individually and on behalf of those similarly situated, *Plaintiffs,* vs. BP Products North America, Inc., *Defendant.*
Case 3:10-cv-00622
Rosenfeld Deposition: February 2012
Rosenfeld Trial: April 2013

In the Circuit Court of Baltimore County Maryland
Philip E. Cvach, II et al., *Plaintiffs* vs. Two Farms, Inc. d/b/a Royal Farms, Defendants
Case Number: 03-C-12-012487 OT
Rosenfeld Deposition: September 2013



2503 Eastbluff Dr., Suite 206
Newport Beach, California 92660
Tel: (949) 887-9013
Fax: (949) 717-0069
Email: mhagemann@swape.com

## Matthew F. Hagemann, P.G., C.Hg., QSD, QSP

Geologic and Hydrogeologic Characterization
Industrial Stormwater Compliance
Investigation and Remediation Strategies
Litigation Support and Testifying Expert
CEQA Review

**Education:**

M.S. Degree, Geology, California State University Los Angeles, Los Angeles, CA, 1984.

B.A. Degree, Geology, Humboldt State University, Arcata, CA, 1982.

**Professional Certification:**

California Professional Geologist

California Certified Hydrogeologist

Qualified SWPPP Developer and Practitioner

**Professional Experience:**

Matt has 25 years of experience in environmental policy, assessment and remediation.  He spent nine years with the U.S. EPA in the RCRA and Superfund programs and served as EPA's Senior Science Policy Advisor in the Western Regional Office where he identified emerging threats to groundwater from perchlorate and MTBE.  While with EPA, Matt also served as a Senior Hydrogeologist in the oversight of the assessment of seven major military facilities undergoing base closure.  He led numerous enforcement actions under provisions of the Resource Conservation and Recovery Act (RCRA) while also working with permit holders to improve hydrogeologic characterization and water quality monitoring.

Matt has worked closely with U.S. EPA legal counsel and the technical staff of several states in the application and enforcement of RCRA, Safe Drinking Water Act and Clean Water Act regulations.  Matt has trained the technical staff in the States of California, Hawaii, Nevada, Arizona and the Territory of Guam in the conduct of investigations, groundwater fundamentals, and sampling techniques.

Positions Matt has held include:
- Founding Partner, Soil/Water/Air Protection Enterprise (SWAPE) (2003 – present);
- Geology Instructor, Golden West College, 2010 – present;
- Senior Environmental Analyst, Komex H2O Science, Inc (2000 -- 2003);

- Executive Director, Orange Coast Watch (2001 – 2004);
- Senior Science Policy Advisor and Hydrogeologist, U.S. Environmental Protection Agency (1989–1998);
- Hydrogeologist, National Park Service, Water Resources Division (1998 – 2000);
- Adjunct Faculty Member, San Francisco State University, Department of Geosciences (1993 – 1998);
- Instructor, College of Marin, Department of Science (1990 – 1995);
- Geologist, U.S. Forest Service (1986 – 1998); and
- Geologist, Dames & Moore (1984 – 1986).

**Senior Regulatory and Litigation Support Analyst:**

With SWAPE, Matt's responsibilities have included:

- Lead analyst and testifying expert in the review of numerous environmental impact reports under CEQA that identify significant issues with regard to hazardous waste, water resources, water quality, air quality, greenhouse gas emissions and geologic hazards.
- Lead analyst and testifying expert in the review of environmental issues in license applications for large solar power plants before the California Energy Commission.
- Stormwater analysis, sampling and best management practice evaluation at industrial facilities.
- Manager of a project to provide technical assistance to a comunity adjacent to a former Naval shipyard under a grant from the U.S. EPA.
- Technical assistance and litigation support for vapor intrusion concerns.
- Manager of a project to evaluate numerous formerly used military sites in the western U.S.
- Manager of a comprehensive evaluation of potential sources of perchlorate contamination in Southern California drinking water wells.
- Manager and designated expert for litigation support under provisions of Proposition 65 in the review of releases of gasoline to sources drinking water at major refineries and hundreds of gas stations throughout California.
- Expert witness on two cases involving MTBE litigation.
- Expert witness and litigation support on the impact of air toxins and hazards at a school.
- Expert witness in litigation at a former plywood plant.

With Komex H2O Science Inc., Matt's duties included the following:

- Senior author of a report on the extent of perchlorate contamination that was used in testimony by the former U.S. EPA Administrator and General Counsel.
- Senior researcher in the development of a comprehensive, electronically interactive chronology of MTBE use, research, and regulation.
- Senior researcher in the development of a comprehensive, electronically interactive chronology of perchlorate use, research, and regulation.
- Senior researcher in a study that estimates nationwide costs for MTBE remediation and drinking water treatment, results of which were published in newspapers nationwide and in testimony against provisions of an energy bill that would limit liability for oil companies.
- Research to support litigation to restore drinking water supplies that have been contaminated by MTBE in California and New York.
- Expert witness testimony in a case of oil production-related contamination in Mississippi.
- Lead author for a multi-volume remedial investigation report for an operating school in Los Angeles that met strict regulatory requirements and rigorous deadlines.

- Development of strategic approaches for cleanup of contaminated sites in consultation with clients and regulators.

**Executive Director:**

As Executive Director with Orange Coast Watch, Matt led efforts to restore water quality at Orange County beaches from multiple sources of contamination including urban runoff and the discharge of wastewater.  In reporting to a Board of Directors that included representatives from leading Orange County universities and businesses, Matt prepared issue papers in the areas of treatment and disinfection of wastewater and control of the dischrge of grease to sewer systems.  Matt actively participated in the development of countywide water quality permits for the control of urban runoff and permits for the discharge of wastewater.  Matt worked with other nonprofits to protect and restore water quality, including Surfrider, Natural Resources Defense Council and Orange County CoastKeeper as well as with business institutions including the Orange County Business Council.

**Hydrogeology:**

As a Senior Hydrogeologist with the U.S. Environmental Protection Agency, Matt led investigations to characterize and cleanup closing military bases, including Mare Island Naval Shipyard, Hunters Point Naval Shipyard, Treasure Island Naval Station, Alameda Naval Station, Moffett Field, Mather Army Airfield, and Sacramento Army Depot.  Specific activities were as follows:

- Led efforts to model groundwater flow and contaminant transport, ensured adequacy of monitoring networks, and assessed cleanup alternatives for contaminated sediment, soil, and groundwater.
- Initiated a regional program for evaluation of groundwater sampling practices and laboratory analysis at military bases.
- Identified emerging issues, wrote technical guidance, and assisted in policy and regulation development through work on four national U.S. EPA workgroups, including the Superfund Groundwater Technical Forum and the Federal Facilities Forum.

At the request of the State of Hawaii, Matt developed a methodology to determine the vulnerability of groundwater to contamination on the islands of Maui and Oahu. He used analytical models and a GIS to show zones of vulnerability, and the results were adopted and published by the State of Hawaii and County of Maui.

As a hydrogeologist with the EPA Groundwater Protection Section, Matt worked with provisions of the Safe Drinking Water Act and NEPA to prevent drinking water contamination.  Specific activities included the following:

- Received an EPA Bronze Medal for his contribution to the development of national guidance for the protection of drinking water.
- Managed the Sole Source Aquifer Program and protected the drinking water of two communities through designation under the Safe Drinking Water Act. He prepared geologic reports, conducted public hearings, and responded to public comments from residents who were very concerned about the impact of designation.

- Reviewed a number of Environmental Impact Statements for planned major developments, including large hazardous and solid waste disposal facilities, mine reclamation, and water transfer.

Matt served as a hydrogeologist with the RCRA Hazardous Waste program.  Duties were as follows:

- Supervised the hydrogeologic investigation of hazardous waste sites to determine compliance with Subtitle C requirements.
- Reviewed and wrote "part B" permits for the disposal of hazardous waste.
- Conducted RCRA Corrective Action investigations of waste sites and led inspections that formed the basis for significant enforcement actions that were developed in close coordination with U.S. EPA legal counsel.
- Wrote contract specifications and supervised contractor's investigations of waste sites.

With the National Park Service, Matt directed service-wide investigations of contaminant sources to prevent degradation of water quality, including the following tasks:

- Applied pertinent laws and regulations including CERCLA, RCRA, NEPA, NRDA, and the Clean Water Act to control military, mining, and landfill contaminants.
- Conducted watershed-scale investigations of contaminants at parks, including Yellowstone and Olympic National Park.
- Identified high-levels of perchlorate in soil adjacent to a national park in New Mexico and advised park superintendent on appropriate response actions under CERCLA.
- Served as a Park Service representative on the Interagency Perchlorate Steering Committee, a national workgroup.
- Developed a program to conduct environmental compliance audits of all National Parks while serving on a national workgroup.
- Co-authored two papers on the potential for water contamination from the operation of personal watercraft and snowmobiles, these papers serving as the basis for the development of nation-wide policy on the use of these vehicles in National Parks.
- Contributed to the Federal Multi-Agency Source Water Agreement under the Clean Water Action Plan.

**Policy:**

Served senior management as the Senior Science Policy Advisor with the U.S. Environmental Protection Agency, Region 9. Activities included the following:

- Advised the Regional Administrator and senior management on emerging issues such as the potential for the gasoline additive MTBE and ammonium perchlorate to contaminate drinking water supplies.
- Shaped EPA's national response to these threats by serving on workgroups and by contributing to guidance, including the Office of Research and Development publication, Oxygenates in Water: Critical Information and Research Needs.
- Improved the technical training of EPA's scientific and engineering staff.
- Earned an EPA Bronze Medal for representing the region's 300 scientists and engineers in negotiations with the Administrator and senior management to better integrate scientific principles into the policy-making process.
- Established national protocol for the peer review of scientific documents.

**Geology:**

With the U.S. Forest Service, Matt led investigations to determine hillslope stability of areas proposed for timber harvest in the central Oregon Coast Range. Specific activities were as follows:

- Mapped geology in the field, and used aerial photographic interpretation and mathematical models to determine slope stability.
- Coordinated his research with community members who were concerned with natural resource protection.
- Characterized the geology of an aquifer that serves as the sole source of drinking water for the city of Medford, Oregon.

As a consultant with Dames and Moore, Matt led geologic investigations of two contaminated sites (later listed on the Superfund NPL) in the Portland, Oregon, area and a large hazardous waste site in eastern Oregon. Duties included the following:

- Supervised year-long effort for soil and groundwater sampling.
- Conducted aquifer tests.
- Investigated active faults beneath sites proposed for hazardous waste disposal.

**Teaching:**

From 1990 to 1998, Matt taught at least one course per semester at the community college and university levels:

- At San Francisco State University, held an adjunct faculty position and taught courses in environmental geology, oceanography (lab and lecture), hydrogeology, and groundwater contamination.
- Served as a committee member for graduate and undergraduate students.
- Taught courses in environmental geology and oceanography at the College of Marin.

Matt currently teaches Physical Geology (lecture and lab) to students at Golden West College in Huntington Beach, California.

**Invited Testimony, Reports, Papers and Presentations:**

**Hagemann, M.F.**, 2008. Disclosure of Hazardous Waste Issues under CEQA. Presentation to the Public Environmental Law Conference, Eugene, Oregon.

**Hagemann, M.F.**, 2008. Disclosure of Hazardous Waste Issues under CEQA. Invited presentation to U.S. EPA Region 9, San Francisco, California.

**Hagemann, M.F.,** 2005. Use of Electronic Databases in Environmental Regulation, Policy Making and Public Participation. Brownfields 2005, Denver, Coloradao.

**Hagemann, M.F.,** 2004. Perchlorate Contamination of the Colorado River and Impacts to Drinking Water in Nevada and the Southwestern U.S. Presentation to a meeting of the American Groundwater Trust, Las Vegas, NV (served on conference organizing committee).

**Hagemann, M.F.**, 2004. Invited testimony to a California Senate committee hearing on air toxins at schools in Southern California, Los Angeles.

Brown, A., Farrow, J.,  Gray, A. and **Hagemann, M.,** 2004.  An Estimate of Costs to Address MTBE Releases from Underground Storage Tanks and the Resulting Impact to Drinking Water Wells. Presentation to the Ground Water and Environmental Law Conference, National Groundwater Association.

**Hagemann, M.F.,** 2004.  Perchlorate Contamination of the Colorado River and Impacts to Drinking Water in Arizona and the Southwestern U.S.  Presentation to a meeting of the American Groundwater Trust, Phoenix, AZ (served on conference organizing committee).

**Hagemann, M.F.,** 2003.  Perchlorate Contamination of the Colorado River and Impacts to Drinking Water in the Southwestern U.S.  Invited presentation to a special committee meeting of the National Academy of Sciences, Irvine, CA.

**Hagemann, M.F.**, 2003.  Perchlorate Contamination of the Colorado River.  Invited presentation to a tribal EPA meeting, Pechanga, CA.

**Hagemann, M.F.**, 2003.  Perchlorate Contamination of the Colorado River.  Invited presentation to a meeting of tribal repesentatives, Parker, AZ.

**Hagemann, M.F.**, 2003.  Impact of Perchlorate on the Colorado River and Associated Drinking Water Supplies.  Invited presentation to the Inter-Tribal Meeting, Torres Martinez Tribe.

**Hagemann, M.F.**, 2003.  The Emergence of Perchlorate as a Widespread Drinking Water Contaminant. Invited presentation to the U.S. EPA Region 9.

**Hagemann, M.F.**, 2003.  A Deductive Approach to the Assessment of Perchlorate Contamination.  Invited presentation to the California Assembly Natural Resources Committee.

**Hagemann, M.F.**, 2003.  Perchlorate: A Cold War Legacy in Drinking Water.  Presentation to a meeting of the National Groundwater Association.

**Hagemann, M.F.**, 2002.  From Tank to Tap: A Chronology of MTBE in Groundwater.  Presentation to a meeting of the National Groundwater Association.

**Hagemann, M.F.**, 2002.  A Chronology of MTBE in Groundwater and an Estimate of Costs to Address Impacts to Groundwater.   Presentation to the annual meeting of the Society of Environmental Journalists.

**Hagemann, M.F.**, 2002.  An Estimate of the Cost to Address MTBE Contamination in Groundwater (and Who Will Pay).  Presentation to a meeting of the National Groundwater Association.

**Hagemann, M.F.**, 2002.  An Estimate of Costs to Address MTBE Releases from Underground Storage Tanks and the Resulting Impact to Drinking Water Wells.  Presentation to a meeting of the U.S. EPA and State Underground Storage Tank Program managers.

**Hagemann, M.F.**, 2001.  From Tank to Tap: A Chronology of MTBE in Groundwater.   Unpublished report.

**Hagemann, M.F.**, 2001.  Estimated Cleanup Cost for MTBE in Groundwater Used as Drinking Water. Unpublished report.

**Hagemann, M.F.**, 2001.  Estimated Costs to Address MTBE Releases from Leaking Underground Storage Tanks.  Unpublished report.

**Hagemann, M.F.**, and VanMouwerik, M., 1999.   Potential Water Quality Concerns Related to Snowmobile Usage. Water Resources Division, National Park Service, Technical Report.

VanMouwerik, M. and **Hagemann, M.F.** 1999, Water Quality Concerns Related to Personal Watercraft Usage. Water Resources Division, National Park Service, Technical Report.

**Hagemann, M.F.**, 1999, Is Dilution the Solution to Pollution in National Parks? The George Wright Society Biannual Meeting, Asheville, North Carolina.

**Hagemann, M.F.**, 1997, The Potential for MTBE to Contaminate Groundwater. U.S. EPA Superfund Groundwater Technical Forum Annual Meeting, Las Vegas, Nevada.

**Hagemann, M.F.**, and Gill, M., 1996, Impediments to Intrinsic Remediation, Moffett Field Naval Air Station, Conference on Intrinsic Remediation of Chlorinated Hydrocarbons, Salt Lake City.

**Hagemann, M.F.**, Fukunaga, G.L., 1996, The Vulnerability of Groundwater to Anthropogenic Contaminants on the Island of Maui, Hawaii. Hawaii Water Works Association Annual Meeting, Maui, October 1996.

**Hagemann, M. F.**, Fukanaga, G. L., 1996, Ranking Groundwater Vulnerability in Central Oahu, Hawaii. Proceedings, Geographic Information Systems in Environmental Resources Management, Air and Waste Management Association Publication VIP-61.

**Hagemann, M.F.**, 1994. Groundwater Characterization and Cleanup at Closing Military Bases in California. Proceedings, California Groundwater Resources Association Meeting.

**Hagemann, M.**F. and Sabol, M.A., 1993. Role of the U.S. EPA in the High Plains States Groundwater Recharge Demonstration Program. Proceedings, Sixth Biennial Symposium on the Artificial Recharge of Groundwater.

**Hagemann, M.F.**, 1993. U.S. EPA Policy on the Technical Impracticability of the Cleanup of DNAPL-contaminated Groundwater. California Groundwater Resources Association Meeting.

**Hagemann, M.F.**, 1992. Dense Nonaqueous Phase Liquid Contamination of Groundwater: An Ounce of Prevention... Proceedings, Association of Engineering Geologists Annual Meeting, v. 35.

**Other Experience:**

Selected as subject matter expert for the California Professional Geologist licensing examination, 2009-2011.

# HADLEY KATHRYN NOLAN



**SOIL WATER AIR PROTECTION ENTERPRISE**
2656 29th Street, Suite 201
Santa Monica, California 90405
Mobile: (678) 551-0836
Office: (310) 452-5555
Fax: (310) 452-5550
Email: hadley@swape.com

## EDUCATION

*UNIVERSITY OF CALIFORNIA, LOS ANGELES*   **B.S.  ENVIRONMENTAL SCIENCES & ENVIRONMENTAL SYSTEMS AND SOCIETY**   *JUNE 2016*

## PROJECT EXPERIENCE

***SOIL WATER AIR PROTECTION ENTERPRISE***                                                                               ***SANTA MONICA, CA***

AIR QUALITY SPECIALIST

**SENIOR PROJECT ANALYST: CEQA ANALYSIS & MODELING**

- Modeled construction and operational activities for proposed land use projects using CalEEMod to quantify criteria air pollutant and greenhouse gas (GHG) emissions.
- Organized presentations containing figures and tables that compare results of criteria air pollutant analyses to thresholds.
- Quantified ambient air concentrations at sensitive receptor locations using AERSCREEN, a U.S. EPA recommended screening level dispersion model.
- Conducted construction and operational health risk assessments for residential, worker, and school children sensitive receptors.
- Prepared reports that discuss adequacy of air quality and health risk analyses conducted for proposed land use developments subject to CEQA review by verifying compliance with local, state, and regional regulations.

**SENIOR PROJECT ANALYST: GREENHOUSE GAS MODELING AND DETERMINATION OF SIGNIFICANCE**

- Evaluated environmental impact reports for proposed projects to identify discrepancies with the methods used to quantify and assess GHG impacts.
- Quantified GHG emissions for proposed projects using CalEEMod to produce reports, tables, and figures that compare emissions to applicable CEQA thresholds and reduction targets.
- Determined compliance of proposed land use developments with AB 32 GHG reduction targets, with GHG significance thresholds recommended by Air Quality Management Districts in California, and with guidelines set forth by CEQA.

**PROJECT ANALYST: ASSESSMENT OF AIR QUALITY IMPACTS FROM PROPOSED DIRECT TRANSFER FACILITY**

- Assessed air quality impacts resulting from implementation of a proposed Collection Service Agreement for Exclusive Residential and Commercial Garbage, Recyclable Materials, and Organic Waste Collection Services for a community.
- Organized tables and maps to demonstrate potential air quality impacts resulting from proposed hauling trip routes.
- Conducted air quality analyses that compared quantified criteria air pollutant emissions released during construction of direct transfer facility to the Bay Area Air Quality Management District's (BAAQMD) significance thresholds.
- Prepared final analytical report to demonstrate local and regional air quality impacts, as well as GHG impacts.

**PROJECT ANALYST: EXPOSURE ASSESSMENT OF LEAD PRODUCTS FOR PROPOSITION 65 COMPLIANCE DETERMINATION**

- Calculated human exposure and lifetime health risk for over 300 lead products undergoing Proposition 65 compliance review.
- Compiled and analyzed laboratory testing data and produced tables, charts, and graphs to exhibit emission levels.
- Compared finalized testing data to Proposition 65 Maximum Allowable Dose Levels (MADLs) to determine level of compliance.
- Prepared final analytical lead exposure Certificate of Merit (COM) reports and organized supporting data for use in environmental enforcement statute Proposition 65 cases.

## ACCOMPLISHMENTS

- **Academic Honoree,** Dean's List, University of California, Los Angeles          ***MAR 2013, MAR 2014, JAN 2015, JAN 2016***

# EXHIBIT C



S M I T H   E N G I N E E R I N G   &   M A N A G E M E N T

February 18, 2018

Mr. Richard Drury
Lozeau Drury
410 12th Street, Suite 250
Oakland, CA 94607

**Subject:** **Merge 56 Development Project  (SCH # 2014071065)**

P18003

Dear Mr. Drury:

At your request, I have reviewed the Final Environmental Impact Report (the "FEIR") for the Merge 56 Development Project (the "Project") in the City of San Diego (the "City").  The Project involves a mixed use development of office, retail and residential uses.   My review is specific to the traffic and transportation section of the IS/MND and its supporting documentation.

My qualifications to perform this review include registration as a Civil and Traffic Engineer in California and over 49 years professional consulting engineering practice in the traffic and transportation industry.  I have both prepared and performed adequacy reviews of numerous transportation and circulation sections of environmental impact reports prepared under the California Environmental Quality Act (CEQA) including many similar combined housing and commercial projects.  My professional resume is attached.

Findings of my review are summarized below.

**Existing Condition Traffic Data Base Is Stale**

The 'existing' intersection traffic counts the FEIR traffic analysis relies on were taken in the Spring of 2014.  They were collected for a completely different project.  The freeway counts are for 2013, taken from Caltrans web site.  No new counts were taken.  The preparers just accepted whatever free data was

Mr. Richard Drury
February 18, 2018
Page 2

available.  There was no effort to at least update the counts by growth factors to the year the traffic analysis report was issued, 2016.  So the counts were 2 to 3 years old at the time the traffic report was prepared and now, as the EIR is in its final stages of approval, they are 4 to 5 years old.  Use of stale data without adjustment to current conditions is inadequate

**The Project Description Is Too Vague To Reasonably Estimate Trip Generation**

A clear project description is critical to the adequacy of environmental documents prepared under CEQA.  FEIR Appendix B, Table 8-1, that presents the FEIR's trip generation analysis for the Project, includes a number of vaguely defined uses.  These include 9,000 square feet of "Retail - Unnamed", a 120 room hotel with no specification of what restaurant, conference, function and banqueting facilities may be included, 10,564 square feet of "Market Hall" - a term not yet well defined in traffic engineering reference sources, and 39,262 square feet of "Other Retail".  The public and public policy decisionmakers are simply asked to accept on good faith that whatever goes into these undetermined spaces is truly represented by the trip generation rates employed in FEIR Appendix B.  The section below explores that topic as well as other deficiencies in the FEIR trip generation analysis.

**The Project's Traffic Impact Study Underestimates Project Trip Generation**

All trip generation rates employed in the FEIR's Appendix B traffic study are sourced to the City of San Diego's *Trip Generation Manual, 2003 Edition* (the "City's Manual").  Unless otherwise noted, all of our comments with respect to trip generation rates are referenced to that same source.

Appendix B, Table 8-1 includes a grouping of uses that the trip generation analysis treats as a Community Shopping Center of 101,284 square feet which according to the City's Manual would have a daily trip generation rate of 70 trips per thousand square feet.  The uses involved include a Fitness Center of 21,885 square feet (roughly 20 percent of the center), a Grocery of 29,573 square feet (roughly 30 percent of the Center, a Market Hall of 10,564 square feet (roughly 10 percent of the Center) and undefined Other Retail comprising 39,262 square feet (about 40 percent of the Center).  It is questionable whether the trip generation of this combination and size of uses is adequately reflected by the Community Shopping Center trip generation rate of 70 trips per thousand square feet.

For instance, if the 29,573 square feet titled as a 'Grocery' were instead called a 'Supermarket', the City's Manual indicates a daily trip generation rate of 150 trips per thousand square feet would apply, more than double the rate being used in the traffic study.  It is similarly possible that the undefined 'Other Retail that

Mr. Richard Drury
February 18, 2018
Page 3

comprises about 40 percent of the Center could be comprised of uses that have a much higher trip generation rate than that defined for a Community Shopping Center.  For example, one or more banks or credit unions could occupy some of the space.  Such facilities (without drive through) have a trip generation rate according to the City's Manual of 150 trips per thousand square feet, again more than double the rate applied in the FEIR's traffic study.

In historic terms, a "market hall" or "market house" was a roofed building with substantially open sides (which sometimes could be closed up) that was a place for purchase and sale of foodstuffs, hard goods and provisions or livestock.  Sometimes the market hall had an enclosed second floor used as a meetingplace for civic meetings.  In modern shopping center development parlance, "market hall"  has come to mean a similar style of building that groups a number of trendy 'fast food' and 'high turnover' restaurants, coffee shops, bar and/or brew pub, bakery/pastry shop, cheese shop, liquor store (usually decorously termed a 'bottle shop' around a common atrium and outdoor seating.  In other words, a trendy fast food court.  It is doubtful that the 70 trip per thousand square feet community shopping center trip generation rate employed in the FEIR adequately describes the trip activity that would be generated by the "market hall".  If this space were evaluated as 'Fast Food', the City's Manual indicates a daily trip generation rate of 700 trips per thousand square feet, 10 times the rate being used in the FEIR's traffic analysis.

Additionally, this grouping of retail in the Project barely fits the City's Manual size definition to qualify as a Community Shopping Center.  Such Centers are defined in the City's Manual as being 100,000 square feet or more but less than 300,000 square feet on a site of 10 acres or more.  The FEIR does not make clear what the acreage of its so called Community Shopping Center is, but it clearly is just 1,284 square feet above the minimum square footage.  If the floor area of the buildings were just 1,285 square feet less, this portion of the project would have to be analyzed as a 'Neighborhood Shopping Center' which the City's Manual indicates has a trip generation rate of 120 daily trips per thousand gross square feet, 71 percent higher than the Community Shopping Center rate.  While it seems intuitively unreasonable that a shopping center of 99,999 square feet would generate *4910 more daily trips than similar center that is just 1,285 square feet larger*, that is the way the provisions of the City's Manual works.  However, it sets up the opportunity for developments to game the system through clever sizing of the uses as well as through clever naming of the uses.

An example of clever semantics is in the trip generation analysis of the proposed Hotel component.  The FEIR traffic analysis treats it as a 'Resort Hotel' which entitles it to a daily trip generation rate of 8 daily trips per room according to the City's Manual.  However, nothing about the location or the nature of the overall development suggests that this would be a 'Resort Hotel'.  If it is treated as an ordinary 'Hotel', the City's Manual assigns to it a daily trip generation rate of 10

Mr. Richard Drury
February 18, 2018
Page 4

trips per room and it would generate 240 more daily trips than assumed in the FEIR trip generation analysis.

A similar circumstance applies in the 47 dwelling units that are described as 'Affordable Units'. The FEIR traffic analysis evaluates these at a trip rate of 6 daily trips per unit. However, per the City's Manual, that trip generation rate applies to Multiple Dwelling Units at a density of over 20 units per acre. Nothing in the FEIR Project Description establishes that these units are at a density of over 20 units per acre. Hence, the City Manual's rate of 8 daily trips per dwelling unit for densities of less than 20 units per acre should have been applied and would have resulted in a generation of 94 more daily trips than assumed in the FEIR.

Similar in circumstance are the 111 'Townhomes' in the Project. This is a category of dwelling unit that the City's Manual does not directly address. The FEIR traffic study analyzes them at the rate for 'multiple dwelling units under 20 units per acre' (8 daily trips per unit). However, the drawings in the Project Description establish that these are clearly not multiple units. Each has its own independent access to the street instead of the joint access that is one of defining features of multiple units. These are single family, common wall dwelling units. The most reasonable rate from the City's manual that they can be analyzed at, given CEQA's demand for a good faith effort to disclose impact, is the rate for 'Single Family Detached in an Urbanizing Area' (10 trips per dwelling unit). This would result in 222 more daily trips generated by the Project than estimated in the FEIR traffic analysis.

The FEIR's Appendix B traffic study claims at page 38 that the Project's daily driveway count[1] trip generation of 19,468 does not exceed the previously entitled project's daily driveway trip generation count of 19,500. However, any one of the several flaws in the FEIR's trip generation described above would make the statement untrue.

The differences in Project trip generation reflected in the above paragraphs are of a scale that would affect the Level of Service/Delay calculations (LOS/Delay) and findings of significant traffic impacts on intersections roadway segments, freeways and freeway ramps.
It is noteworthy and to its credit that the FEIR traffic analysis apparently does not deduct adjustments for attracted passer-by traffic from its trip generation before assigning Project traffic to roadways and intersections despite the fact that the City's Manual does allow such adjustments for certain land uses. There are good reasons why this step was not taken:

---

[1] The City's Manual defines both a 'driveway count trip generation' and a 'cumulative trip generation'. Driveway count trip generation means gross trip generation before adjustment for attraction of existing passer-by traffic. Cumulative trip generation means net trip generation after deduction for attraction of existing passer-by traffic, where applicable.

Mr. Richard Drury
February 18, 2018
Page 5

- The uses theoretically eligible for passer-by adjustments to trip generation only account for a small portion of the Project trip generation.
- Since the roadways serving most of the Project's ultimate frontage do not exist yet, there is no existing traffic from which to attract passers by.
- The comparison to the previously entitled project is entirely in terms of driveway trip generation.

## Reassignment of Existing and Future Project and Non-Project Traffic Volumes Is Inadequately Explained

The FEIR Appendix B traffic analysis indicates that it has made adjustments to projections of traffic between various routes and intersections in the study area. There are reasonable reasons for doing so. The Project and others will construct segments of major routes that do not exist at present, leading some existing traffic to shift to new route opportunities when that is of advantage. Also, the future traffic assignments are based on runs of the SANDAG traffic model. Those model runs include assumptions of certain roadway widening projects that may not occur or are unlikely to occur.

FEIR Appendix B presents through map information an indication of what adjustments to route assignments has been made. But it provides no indication of how its analysts determined how large the adjustments to make and to what routes the adjusted traffic should be assigned. There are conventional transportation engineering techniques for carrying out such refinements. One is to make another run of the SANDAG model with the road network adjusted to reflect what is currently known about future capacities. Another is to make applications of the California Bypass Diversion Curve Equation. However, in this case there is no indication of an accepted unbiased procedure. Instead, the traffic reassignments seem to have been made based on subjective belief[2]. Adjustments to traffic assignments based on 'belief' have the distinct appearance of blatant attempts to shift traffic away from capacity-sensitive roads, intersections or intersection approaches with the objective of avoiding disclosure of significant traffic impacts. This would not be in keeping with the good faith effort to disclose impact that CEQA demands. The FEIR must clearly document how the traffic reassignments were performed under a recognized and unbiased transportation engineering technique or redo the work using such a technique.

## Implausible Level of Service/Delay Calculations and Underlying Inconsistencies Undermine Credibility of Findings

In reviewing the comparison of LOS/Delay calculations for the Existing versus Existing + Project conditions as presented in FEIR Appendix B, Table 9-1, our

---

[2] "Believed" is the word used twice on FEIR Appendis B, page 39 to describe the traffic reassignment process.

Mr. Richard Drury
February 18, 2018
Page 6

attention was drawn to Intersection # 3, the intersection of Camino Del Sur,
Wolverine Way and Fallhaven Road.  Our attention was drawn by the fact that,
despite the fact that the intersection was already in LOS E in the AM peak, the
addition of Project traffic did not change average vehicle delay at the intersection
by one iota.  This seemed very curious because Appendix B Figure 8-1a, the
Project Trip Distribution, indicated that 11 or 12 percent of Project traffic would
pass through the intersection (depending on whether one reads the mapped
percentages or the intersection diagram on the Figure - a discrepancy that is a
puzzle in itself).  The 11 to 12 percent of Project total traffic - even at the
understated figures estimated by the FEIR traffic generation analysis - amounts
to 131 or 142 trips through the subject intersection in the AM peak, certainly
enough to cause a change in delay at an intersection already in LOS E.
Furthermore, the figures indicating adjustments to Project traffic distribution give
no indication that there were any adjustments to trip distribution made at this
intersection.  Because of these considerations, we made a careful comparison of
the computation sheets for Existing LOS/delay, Existing + Project LOS/Delay and
the actual existing traffic count sheet for the intersection.[3]  That comparison
reveals the following:

- There is a difference of 3 total vehicle movements between the Count
  sheet and the Existing Condition calculation sheet in the AM peak hour out
  of a total count of 1825 vehicle movements, a fact that is not significant.
- A total of 151 vehicle movements are recorded as being on a different
  movement between the Count sheet and the Existing Condition calculation
  sheet.  This is significant.
- On the Existing + Project calculation sheet, only 52 vehicle movements
  are added to the total on the Existing calculation sheet for the AM peak
  hour.  The net addition should have been 131 or 142 movements.  The
  discrepancy is highly significant.

Having seen the above inconsistency, we checked the Existing and Existing +
Project calculation sheets for intersection # 21, Black Mountain Road with Park
Village Road and Adolphia Street, an intersection already in LOS E in the
existing condition where addition of Project traffic would implausibly cause
reductions in delay.  This is an intersection where the preparers revised the
project trip distribution but where the additions on Black Mountain Road were
supposed to equal the subtractions on Park Village Road.  According to the
original and revised trip distributions, the total Project generated vehicle trips
added to the intersection is supposed to be 13 percent of Project trips in either
case.  That would be 155 added trips in the AM peak period.  However, when the
calculation sheets are compared, the Existing + Project scenario has *96 trips*

---

[3] The existing traffic count sheet for the subject intersection is found at FEIR Appendix B .pdf page 207.
The existing conditions calculation sheet is found at .pdf page258 and the Existing + Project calculation
sheet is at .pdf page 300 of the same document.

Mr. Richard Drury
February 18, 2018
Page 7

*fewer passing through the intersection than the Existing condition.*[4] Obviously, the results presented in the text and tabulations are nonsense.

We also checked the more critical PM peak hour at this location.  If the original or the revised trip distribution were followed, the Existing + Project scenario should have 272 more traffic movements at this location than the Existing condition[5].  In fact, the calculation sheets show a net decrease of 3 traffic movements in the Existing + Project condition.  This is not credible

When the actual calculation sheets and base data sheets are significantly discrepant from the narrative description and tables and figures embedded therein, the validity of the entire analysis is undermined.  The entire traffic analysis must be redone in a manner that renders the calculations, figures, tables and the narrative consistent.  The reader should understand that the LOS/Delay calculations the FEIR relies on were produced by a commercially available called Synchro.  Synchro is a traffic simulation program in which the total intersection volumes and individual turning movement volumes considered in the calculations are generated by statistical probabilities.  This is in contrast to other popular commercially available LOS/Delay analysis programs like HCM and Traffix which perform the analysis based on actual traffic counts or actual deterministic traffic assignment predictions.  Because Synchro is a simulation model in which the individual turn movement and total traffic analyzed in the intersection simulation is generated by probability functions, the actual volume it analyzes in the LOS/Delay computation process on an individual simulation run can vary substantially from the movements indicated in actual traffic counts or deterministic future traffic assignments.

Because of this characteristic, most analysts take several actions to avoid anomalous and irrelevant results.  First, in  evaluation of any scenario, they base the evaluation on the average of 10 runs of the simulation on the theory that with enough runs, the traffic predicted by the probability function will balance out low estimates with high estimates.  Second, they calibrate/validate the simulation against counted existing traffic, adjusting the simulation's parameters until the average of a 10 run set of the simulation produces total traffic and turn patterns reasonably equivalent to the counts.  Then, on runs analyzing future scenarios, they check that the average volumes of a 10 run set of simulations reasonably compare to the volumes predicted through deterministic traffic assignments to assure that the simulation is not predicting anomalous results.  It is evident that such reasonable assurance procedures have not been employed in the case of the Merge 56 FEIR traffic analysis.

---

[4] The Existing condition and Existing + Project calculation sheets for the AM peak period for this intersection are found respectively at .pdf pages 268 and 310 of FEIR Appendix B.
[5] The calculation sheets for Intersection 21 for the Existing and Existing + Project conditions for the PM peak hour can be found respectively at .pdf pages 280 and 322 of FEIR Appendix B.

Mr. Richard Drury
February 18, 2018
Page 8

**Conclusion**

This concludes my current comments on the Merge 56 Development Project. For the reasons stated above, the traffic analysis is inadequate for certification of this EIR and approval of this Project.  Revised traffic analysis that addresses the above defects must be performed.

Sincerely,

Smith Engineering & Management
A California Corporation

Daniel T. Smith Jr., P.E.
President

Attachment 1
Resume of Daniel T. Smith Jr., P.E.

Mr. Richard Drury
February 18, 2018
Page 9



SMITH ENGINEERING & MANAGEMENT

## DANIEL T. SMITH, Jr.
## President

### EDUCATION

Bachelor of Science, Engineering and Applied Science, Yale University, 1967
Master of Science, Transportation Planning, University of California, Berkeley, 1968

### PROFESSIONAL REGISTRATION

California No. 21913 (Civil)          Nevada No. 7969 (Civil)     Washington No. 29337 (Civil)
California No. 938 (Traffic)          Arizona No. 22131 (Civil)

### PROFESSIONAL EXPERIENCE

Smith Engineering & Management, 1993 to present. President.
DKS Associates, 1979 to 1993.  Founder, Vice President, Principal Transportation Engineer.
De Leuw, Cather & Company, 1968 to 1979.  Senior Transportation Planner.
Personal specialties and project experience include:

**Litigation Consulting.**  Provides consultation, investigations and expert witness testimony in highway design, transit design and traffic engineering matters including condemnations involving transportation access issues; traffic accidents involving highway design or traffic engineering factors; land use and development matters involving access and transportation impacts; parking and other traffic and transportation matters.

**Urban Corridor Studies/Alternatives Analysis.**  Principal-in-charge for State Route (SR) 102 Feasibility Study, a 35-mile freeway alignment study north of Sacramento.   Consultant on I-280 Interstate Transfer Concept Program, San Francisco, an AA/EIS for completion of I-280, demolition of Embarcadero freeway, substitute light rail and commuter rail projects.   Principal-in-charge, SR 238 corridor freeway/expressway design/environmental study, Hayward (Calif.)  Project manager, Sacramento Northeast Area multi-modal transportation corridor study. Transportation planner for I-80N West Terminal Study, and Harbor Drive Traffic Study, Portland, Oregon.  Project manager for design of surface segment of Woodward Corridor LRT, Detroit, Michigan.  Directed staff on I-80 National Strategic Corridor Study (Sacramento-San Francisco), US 101-Sonoma freeway operations study, SR 92 freeway operations study, I-880 freeway operations study, SR 152 alignment studies, Sacramento RTD light rail systems study, Tasman Corridor LRT AA/EIS, Fremont-Warm Springs BART extension plan/EIR, SRs 70/99 freeway alternatives study, and Richmond Parkway (SR 93) design study.

**Area Transportation Plans.** Principal-in-charge for transportation element of City of Los Angeles General Plan Framework, shaping nations largest city two decades into 21'st century.  Project manager for the transportation element of 300-acre Mission Bay development in downtown San Francisco.  Mission Bay involves 7 million gsf office/commercial space, 8,500 dwelling units, and community facilities.  Transportation features include relocation of commuter rail station; extension of MUNI-Metro LRT; a multi-modal terminal for LRT, commuter rail and local bus; removal of a quarter mile elevated freeway; replacement by new ramps and a boulevard; an internal roadway network overcoming constraints imposed by an internal tidal basin; freeway structures and rail facilities; and concept plans for 20,000 structured parking spaces.  Principal-in-charge for circulation plan to accommodate 9 million gsf of office/commercial growth in downtown Bellevue (Wash.).  Principal-in-charge for 64 acre, 2 million gsf multi-use complex for FMC adjacent to San Jose International Airport.  Project manager for transportation element of Sacramento Capitol Area Plan for the state governmental complex, and for Downtown Sacramento Redevelopment Plan.  Project manager for Napa (Calif.) General Plan Circulation Element and Downtown Riverfront Redevelopment Plan, on parking program for downtown Walnut Creek, on downtown transportation plan for San Mateo and redevelopment plan for downtown Mountain View (Calif.), for traffic circulation and safety plans for California cities of Davis, Pleasant Hill and Hayward, and for Salem, Oregon.

Mr. Richard Drury
February 18, 2018
Page 10

**Transportation Centers**. Project manager for Daly City Intermodal Study which developed a $7 million surface bus terminal, traffic access, parking and pedestrian circulation improvements at the Daly City BART station plus development of functional plans for a new BART station at Colma. Project manager for design of multi-modal terminal (commuter rail, light rail, bus) at Mission Bay, San Francisco. In Santa Clarita Long Range Transit Development Program, responsible for plan to relocate system's existing timed-transfer hub and development of three satellite transfer hubs. Performed airport ground transportation system evaluations for San Francisco International, Oakland International, Sea-Tac International, Oakland International, Los Angeles International, and San Diego Lindberg.

**Campus Transportation**. Campus transportation planning assignments for UC Davis, UC Berkeley, UC Santa Cruz and UC San Francisco Medical Center campuses; San Francisco State University; University of San Francisco; and the University of Alaska and others. Also developed master plans for institutional campuses including medical centers, headquarters complexes and research & development facilities.

**Special Event Facilities**. Evaluations and design studies for football/baseball stadiums, indoor sports arenas, horse and motor racing facilities, theme parks, fairgrounds and convention centers, ski complexes and destination resorts throughout western United States.

**Parking.** Parking programs and facilities for large area plans and individual sites including downtowns, special event facilities, university and institutional campuses and other large site developments; numerous parking feasibility and operations studies for parking structures and surface facilities; also, resident preferential parking .

**Transportation System Management & Traffic Restraint**. Project manager on FHWA program to develop techniques and guidelines for neighborhood street traffic limitation. Project manager for Berkeley, (Calif.), Neighborhood Traffic Study, pioneered application of traffic restraint techniques in the U.S. Developed residential traffic plans for Menlo Park, Santa Monica, Santa Cruz, Mill Valley, Oakland, Palo Alto, Piedmont, San Mateo County, Pasadena, Santa Ana and others. Participated in development of photo/radar speed enforcement device and experimented with speed humps. Co-author of Institute of Transportation Engineers reference publication on neighborhood traffic control.

**Bicycle Facilities**. Project manager to develop an FHWA manual for bicycle facility design and planning, on bikeway plans for Del Mar, (Calif.), the UC Davis and the City of Davis. Consultant to bikeway plans for Eugene, Oregon, Washington, D.C., Buffalo, New York, and Skokie, Illinois. Consultant to U.S. Bureau of Reclamation for development of hydraulically efficient, bicycle safe drainage inlets. Consultant on FHWA research on effective retrofits of undercrossing and overcrossing structures for bicyclists, pedestrians, and handicapped.

**MEMBERSHIPS**

Institute of Transportation Engineers Transportation Research Board

**PUBLICATIONS AND AWARDS**

*Residential Street Design and Traffic Control*, with W. Homburger *et al*. Prentice Hall, 1989.

Co-recipient, Progressive Architecture Citation, *Mission Bay Master Plan*, with I.M. Pei WRT Associated, 1984.

*Residential Traffic Management, State of the Art Report,* U.S. Department of Transportation, 1979.

*Improving The Residential Street Environment*, with Donald Appleyard et al., U.S. Department of Transportation, 1979.

*Strategic Concepts in Residential Neighborhood Traffic Control*, International Symposium on Traffic Control Systems, Berkeley, California, 1979.

*Planning and Design of Bicycle Facilities: Pitfalls and New Directions*, Transportation Research Board, Research Record 570, 1976.

Co-recipient, Progressive Architecture Award, *Livable Urban Streets, San Francisco Bay Area and London*, with Donald Appleyard, 1979.

# Exhibit C

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

```
 1                    SUPERIOR COURT OF CALIFORNIA

 2                      COUNTY OF SAN DIEGO

 3

 4   _____ )
                                    )
     LABORERS INTERNATIONAL UNION OF )
 5   NORTH AMERICA, LOCAL UNION 89,  )
                                     ) Case No.
 6                     Petitioner,   ) 37-2018-00035233-
                                     ) CU-WM-NC
 7   vs.                             )
                                     )
 8   CITY OF SAN DIEGO; and CITY COUNCIL )
     OF THE CITY OF SAN DIEGO,       )
 9                                   )
                       Respondents,  )
10   _____ )
                                     )
11   GARY LEVITT, and SEA BREEZE 56 LLC, )
                                     )
12                     Respondents.  )
     _____ )
13

14

15

16      REPORTER'S TRANSCRIPT OF VIDEO-ARCHIVED PROCEEDING

17        CITY OF SAN DIEGO PLANNING COMMISSION MEETING

18                  OF FEBRUARY 22, 2018

19                ITEM 3, MERGE 56 PROJECT

20

21

22            TRANSCRIBED ON AUGUST 14, 2018

23   TRANSCRIBED BY JENNIFER G. TORRES, CSR NO. 13022

24

25
```

Peterson Reporting Video & Litigation Services                    1

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

```
 1              (Begin transcription of video-archived

 2              proceeding, time stamp 52:14.)

 3         CHAIRPERSON HAASE:  All right.  So our item is

 4   Item Number Three, the Merge 56.  This is a Process 5

 5   decision.

 6         So with that, Jeff, why don't we move straight

 7   into our -- well, actually, I see -- Commissioner Austin

 8   you're on the lights.  Did you want to make any comment?

 9         COMMISSIONER AUSTIN:  I'm sorry.  I didn't --

10         CHAIRPERSON HAASE:  I just see you on the lights,

11   and I don't know if I should clear that.

12         COMMISSIONER AUSTIN:  (Inaudible).

13         CHAIRPERSON HAASE:  Oh, okay.

14         COMMISSIONER AUSTIN:  Left over from the last

15   time.  Sorry.

16         CHAIRPERSON HAASE:  No worries.  Thank you.

17         Okay.  Mr. Peterson.

18         MR. PETERSON:  Good morning, Planning

19   Commissioners.  My name is Jeff Peterson.  I'm the

20   development project manager for the project before you.

21         The application before you today is for the

22   construction of a mixed-use development comprised of 242

23   residential units and commercial, office, theater, and

24   hotel use.  Of the 242, 47 of them will be affordable

25   housing units on site.
```

Peterson Reporting Video & Litigation Services                    2

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1              Development of the project requires the

2      certification of an Environmental Impact Report; adoption

3      of the Findings of Statement of Overriding Consideration;

4      adoption of the Mitigation, Monitoring, and Reporting

5      Program; adoption of an amendments to the General Plan and

6      the Torrey Pines Highlands -- Torrey Highlands Subarea and

7      the Rancho Penasquitos Community Plans; adoptions of a

8      rezone; approval of a Planned Development Permit which

9      inclu -- which includes deviations to the development

10     regulations, a Site Development Permit due to impacts to

11     the environmentally sensitive lands, Conditional Use

12     Permit due to the cinema theater that is over 5,000 square

13     feet, a Vesting Tentative Map, public right-of-way

14     vacation, and an easement vacation.

15             The deviations and the justifications are in the

16     report to the Planning Commission.

17             The project site is located south of State

18     Route 56 between Camino Del Sur and Black Mountain Road.

19     The scenario of the site and the project area is outlined

20     in black.

21             This aerial shows the area of the Merge 56

22     Project, the City's roadways, the open space, and the

23     trails.

24             This is a photo of the site looking east on

25     Camino Del Sur.

AR005776

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1          And into the sight at the same location.

2          And a view from the south of Camino Del Sur

3    looking towards the north.

4          The 41.3 acre merge development site is pro -- is

5    part of the Rhodes Crossing Vesting Tentative Map

6    Number 7938, which was approved by the City Council on

7    March 29th, 2004.  The project was approved through the

8    accompanying PDP, SDP, and CUP, of which all of the

9    approvals would be amended as part of this development.

10   The Rhodes Crossing was proposing a regional-commercial

11   development with residential in the upper east side of the

12   site.  This is the site plan of what was previously

13   approved.

14         The Merge 56 Project proposes a mixed-use

15   development comprised of 242 units and commercial office

16   and theater and hotel use.  The northern portion of the

17   site would contain the mixed-use development, and the

18   southern portion of the site would contain the

19   single-family dwelling unit construction.

20         The project also includes the extensions of

21   Camino Del Sur and Carmel Mountain Road, and the

22   improvement also includes the construction of the southern

23   portion of Camino Del Sur, which is already on city-owned

24   property.

25         This is a color rendering of the northern portion

AR005777

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    of the site plan, the hotel, and also the offices along

2    Camino Del Sur, the -- and also the commercial development

3    is located within the urban center with multi-family

4    complex located east and south of the urban center.

5           This is a Pedestrian Circulation Plan that has

6    been designed to -- for a walkable community with multiple

7    access into and out of the urban center, which also

8    provides multiple accesses down to the single-family

9    resident developments to the south.

10           The following is a rendering of the view of the

11    center or the plaza, and also along the side is

12    architectural concepts of what potentially would be

13    developed.

14           Also, a rendering of the interior and also

15    indication of seating areas and architectural designs for

16    landscaping within the area.

17           Also, the plaza looking the opposite way.  And

18    you could see the town -- in the far background, you can

19    see the three-story townhomes.

20           And this is a rendering of the townhomes and some

21    of the architectural landscaping concepts on the side.

22           And, also, a rendering of the hotel and office

23    complex, which includes the parking structure that's

24    adjacent to it and also -- it will also have it's own

25    little plaza within it.

AR005778

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1          And here's a rendering of the ho -- office off of

2    Camino Del Sur at the entrance, so you can see what it

3    looks like from the street.

4          And the single-family residence dwelling units we

5    arranged in the clusters around private alleys accessed

6    from the interior, private drives.  Single-family units

7    would be constructed of three architectural styles:

8    Formal Spanish, Spanish colonial, and Santa Barbara.  The

9    building materials would include stucco, wood, and/or

10   stone.

11         The Community Plan Amendments is required to

12   change the land use designation of the project site in the

13   Torrey Highlands Subarea Plan from commercial-regional and

14   medium, high-density residential to local, mixed-use

15   center.

16         And this would be the entire site showing it

17   being re --

18         The zoning -- the rezoning would modify the

19   underlying zone to come -- to commercial -- from

20   commercial to Commercial C-3-5 in residential small lot

21   RX-1-2 to make the project site consistent with the

22   proposed land use as part of the Community Plan Amendment.

23         A right-of-way vacation for portions of the

24   roadway would be required due to modifications of the road

25   dimension and associated with the downgraded

AR005779

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    classifications and a realignment of an existing section

2    of Carmel Mountain Road to avoid grading impacts to

3    off-site vernal pool preservations.  And the right-of-way

4    vacations, as you can see, are going to be the small

5    little areas in the dark gray and also along the area.

6          The project site contains an, approximately,

7    5,700 -- 5,750 square foot, triangular-shaped drainage

8    slope and temporary public service easement, located in

9    the northwest corner.  The easement was originally

10   obtained to address stormwater discharge and shall be

11   vacated.  The project site and adjacent stormwater BMP's

12   have been incorporated within the adjacent right-of-way

13   improvements, therefore, the easement is no longer

14   required.

15         On November 12th, 2015, the Del Mar Mesa Planning

16   Board voted 6-0-2 to recommend approval of the project.

17   On May 3rd, 2017, the Rancho de los Penasquitos Planning

18   Board, the community group overseeing the Torrey Highlands

19   Subarea Plan area, voted 16-0-0 to recommend approval of

20   the project.

21         The project consists of two components:  A

22   mixed-use development and the public roads that align the

23   proposal.  The development component of the project would

24   consist of local, land-use center containing commercial,

25   office, hotel, and residential use.  And the project would

AR005780

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    incorporate the extension of Camino Del Sur and the Carmel

2    Mountain Road that is part of the public road, which are a

3    part of the circulation elements of the Torrey Pine

4    Highlands and the Rancho Penasquitos communities, which

5    would provide local access to the regional area.

6           Therefore, the project implements the goals of

7    the Torrey Pine High -- Highlands Subarea, Rancho

8    Penasquitos Community Plan and the General Plan.  In

9    addition, the project would materially assist in

10   accomplishing the City goals by providing a market-rate

11   housing and affordable housing units, opportunities, and

12   transit-friendly areas near employment centers.

13          Staff recommends that the Planning Commission

14   recommend to the City Council certification of the

15   Environmental Impact Report; and adopt the Findings and

16   Statement of Overriding Consideration; adopt the

17   Mitigation, Monitoring and Reporting Program; adopt the

18   amendments to the General Plan and the Torrey Highland

19   Community Subarea Plan and the Rancho Penasquitos

20   Community Plan; approve the rezone; approve the Planned

21   Development Permit, Site Development Permit, Conditional

22   Use Permit; and approve Vesting Tentative Map, easement

23   vacation, and public right-of-way vacation.

24          This concludes staff's re -- report.

25          CHAIRPERSON HAASE:  Thank you.

Peterson Reporting Video & Litigation Services                    8

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1          Are there any clarifying questions for staff?

2          Yes.  Go ahead, Commissioner Hofman.

3          COMMISSIONER HOFMAN:  Yeah, I noticed that the

4    community planning group vote for Del Mar Mesa was back in

5    November 2015, and then it went to Rancho Penasquitos in

6    May 2017.

7          Staff, do you know what happened during that

8    period?  Did the project change?  I mean that's a long

9    period of time to get to the next board.  And if it did,

10   did it go back to the Del Mar group?

11         MR. PETERSON:  The change -- there was only a

12   very small portion of the property site that is within the

13   Del Mar area, and so they were just, basically, voting to

14   see if they retain their rights to it.

15         COMMISSIONER HOFMAN:  Can you point that out?

16         MR. PETERSON:  Yes.

17         In the area where the community plan area is,

18   where Del Mar is, right along the roadway, so if we go

19   into the design of the development -- I'm going to try to

20   pull up a better, little drawing on this thing and show

21   where the road work is on it, which is 30 -- so you can

22   see the roadway area within the area.  So the community of

23   Del Mar is right down the center of the road, Del Mar

24   Mesa.  Excuse me.  And it's right over in this area only.

25   So the area that was their discussion was the center of

AR005782

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    the road and also the grading and also the trail system.

2                COMMISSIONER HOFMAN:  Okay.  And traffic as well.

3    So I assume no major changes were made that would have

4    affected their community?

5                MR. PETERSON:  That is correct.

6                COMMISSIONER HOFMAN:  Okay.  Thanks.

7                CHAIRPERSON HAASE:  Any other questions?

8                Jeff, why don't you go over some of the -- you --

9    there was some errata or -- and some other additional

10   documents regarding the permit conditions.  Why don't you

11   cover those before we go into public testimony.

12               MR. PETERSON:  Yes, there -- you -- you have a

13   memo with the revisions to the traffic conditions that

14   were just very minor that kind of clarified a little bit

15   more instead of just having it listed as one thing.  It

16   actually kind of explains a little bit more.  And staff is

17   here to answer that question if you need to.

18               CHAIRPERSON HAASE:  And then on the errata,

19   please.

20               CITY STAFF:  Yes.  Staff prepared an errata to

21   replace an exhibit that staff inadvertently left in

22   prior -- or subsequent to finalization.  I realized there

23   was a wrong exhibit.

24               CHAIRPERSON HAASE:  Okay.  Thank you.

25               So with that, we will move to public testimony.

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    I have speakers both in favor and opposed to the project.

2    It looks like we have two organized presentations, one by

3    Keith Rhodes and one by Randi Coopersmith.

4         Is that correct?  What order did you want to go?

5    Keith -- or Randi, are you first?

6         And then, Gary, I, for some reason, don't have a

7    speaker slip for you.

8         MR. LEVITT:  I'm part of the Randi --

9         CHAIRPERSON HAASE:  Yeah, if you'd fill one out

10   just for the record, we -- we always like to have

11   individual speaker slips.  Thank you.

12        So are you going to start us off then?

13        MR. LEVITT:  Excuse me?

14        CHAIRPERSON HAASE:  You're going to start us off

15   with your presentation?

16        MR. LEVITT:  I will.  I will.

17        CHAIRPERSON HAASE:  Okay.  So right now I have

18   three speaker slips:  Randi Coopersmith, Scott Maas,

19   and -- and you, Gary.  So that will be nine minutes.

20        And then Keith will go separate for nine minutes?

21   Is that how we're going to run the play?  This -- yes.

22   Okay.  Great.

23        All right.  Gary, nine minutes.  Go ahead.

24        MR. LEVITT:  Thank you.

25        It does work?

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

```
 1              Okay.  Well, I'll start in the meantime.  My name

 2      is Gary Levitt.  I'm the -- the unknown founder of the Sea

 3      Breeze properties.  And this is a project that is very

 4      close to our heart and our emotions and -- and something

 5      that we're very, very proud of.

 6              So as you'll see in a minute, we were able to

 7      purchase a piece of property that is 100 percent an

 8      approved project today.  And to take nothing away from the

 9      original applicant, the issue was we bought the property

10      in 2013, yet, it had originally been designed in the early

11      2000's, maybe as early as 1998 and it was a project and is

12      a project today that is a big-box shopping center on

13      40 acres; with a huge parking lot; with six to eight

14      alkaline pads; with a 275,000-square-foot, self-storage

15      facility; and 250,000-square-foot, big-box shopping

16      center; and a five-story apart -- four- to five-story

17      apartment building.  That's what's approved and that's if

18      we -- if you look at the -- the EIR document if the

19      project is denied, you know, that's what the community

20      gets.  Yet, it's not what real estate should be today in

21      2018.

22              So in addition to that, the project consists of

23      the public streets.  So this project was originally

24      approved, the Rhodes Crossing Project was originally

25      approved, as you heard earlier, in 2004.  And it included
```

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    the public streets that, in 2003, were removed from the

2    original application and processed as a city -- as a City

3    project.  Because in 2003, there had been the fires, and

4    all of the people who lived on down south, on the southern

5    edge on the very bottom of the screen over there had one

6    way out during those fires (inaudible).  There was a huge

7    traffic jam.  And after that, Scott Peters' office was

8    able to extract the project for the streets and put it on

9    its own.  And that came up and was actually in process and

10   was ready to be built in 2006 and 2007.  When the

11   recession hit, plus there was some legal issues regarding

12   vernal pools and was all put on hold.

13          After that, the -- the original applicant

14   processed the -- his permit and got it finalized, allowing

15   the development that we see there today to -- to occur.

16   And all of the development surrounding us, all of those

17   homes in the -- in the orange are -- are approved projects

18   and have either been built or the grading permit is

19   already in place.

20          And to the left, to the west there's a church

21   project that is also an approved project.  It's owned by

22   the di -- was owned by the diocese.  There's a separate

23   application pro -- being processed right now for an office

24   project, but there's also an approved project.

25          So we -- if I'd known it was going to be so hard,

AR005786

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

```
 1   I wouldn't -- I wouldn't have done it.  But we,

 2   optimistically, went to the community, when we first tied

 3   up this property and said, "We want to do it differently."

 4   We went to our neighbors.  We went to the community group.

 5   We came down the to the Planning Department, and everybody

 6   gave us encouragements, because what we proposed was a

 7   project that would create a place where people would want

 8   to walk to, that would be a place that was

 9   pedestrian-oriented, a place that had real, mixed uses,

10   vertical and horizontal, a place that would add value to

11   our neighbors that weren't involved in -- in our project

12   but you'd want to live nearby, because you could walk

13   there for a cup of coffee or a meal in the summer's

14   evening.  This is the sort of place we want to create.

15   And we were successful, on paper anyway, as you can see by

16   the fact that we don't have any neighbors out here

17   (inaudible) 500,000-square-foot project oppo -- objecting

18   to it.  We've got neighbors here supporting us.  And we

19   got a 16-0 vote from the planning group.  So I feel very

20   proud about that no matter what happens today and with the

21   City Council.

22          But, also, just as importantly, we took the

23   roads -- and this is really stupid -- because we said

24   to -- we went back to the City and said, "You've got

25   four-lane roads that don't go anywhere."  Because all of
```

AR005787

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    those streets, originally, when they were designed in the

2    late '90's, as part of the transportation network, they

3    went across Penasquitos Canyon into Del Mar Mesa --

4    into -- into Penasquitos -- into Mira Mesa to the south.

5    They went through the Del Mar Mesa Preserve and joined

6    Carmel Mountain Road.  So the same Carmel Mountain Road

7    that goes across the project over there is the same Carmel

8    Mountain Road that's in Carmel Valley.  And, you know,

9    these roads were -- were just designed with four lanes and

10   they had four -- up to 40,000 trips would be able to go on

11   them.  But the reality is they would have 7- and 8,000

12   trips, and we showed the City that and we battled with the

13   City, 'cause initially there was opposition.  There were

14   people in the community who were -- felt that if we

15   were -- we were trying to save money, the FBA projects.

16   We weren't going to save any money.  You know, so -- so --

17   but we were able to be successful.

18          And in addition, we eliminated traffic lights.

19   We created a street that went through the project.  We

20   created roundabouts instead of traffic lights.  You know,

21   so in the end of the day, we are very, very proud of what

22   we are presenting today.

23          When we went to the community, we told them these

24   are the sort of values that we have in our plan.  We

25   wanted to be authentic.  We wanted to be unique.  We

AR005788

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    wanted to be original.  We wanted to be -- have a vibrancy

2    to it that it's worth going to, that it's worth visiting.

3    We wanted to be walkable and we wanted to be sustainable.

4    And just the nature of the project, when you have a true,

5    mixed-use project, the people don't -- you know, they're

6    not car-oriented, we -- we're successful.  You know,

7    you'll hear and you'll see that we've got related from the

8    environmental community who -- who plan on at 5:05 the

9    night before a hearing, despite the fact that they --

10   they've had the EIR for months, saying that 86 pages of

11   our report, saying everything is wrong with what -- with

12   our EIR, you know, I just want to encourage you to ignore

13   that and to pass this onto the planning -- to the City

14   Council and then we'll go and address them.  Because we

15   shouldn't be held up with this sort of nonsense and -- and

16   inaccuracies that -- there are -- are putting -- putting

17   in our way.

18        So I'm going to hand the project over to the --

19   the project architect, to the presentation architect.  But

20   I urge you to look at us based on the fact that it's an

21   improvement to what's originally approved, that it is not

22   a project that's impacting -- that's suddenly coming along

23   to the edge of the Del Mar Mesa Preserve and destroying

24   the impacts of the -- the preservation of the Del Mar Mesa

25   Preserve.  It's a approved project.  It could have been

AR005789

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1  graded years ago.  Around us it's all going to be graded.

2  They already have grading permits, and we have an

3  opportunity to do something very special and add value to

4  our community.

5      CHAIRPERSON HAASE:  Thank you.

6      Scott, we're hovering around two minutes left,

7  but there are some speakers who probably would be willing

8  to cede time.

9      How much time do you think you need?

10      MR. MAAS:  I will be very quick.  Although, Randi

11  has a couple of comments as well.

12      CHAIRPERSON HAASE:  What I was going to request,

13  I see John (inaudible).  Would you be willing to cede

14  three minutes?  Okay.  Why don't we just do that and we'll

15  give you -- give you five minutes.

16      MR. MAAS:  Great.  Well, thank you, Gary.  Thank

17  you, staff.  And thank you, Planning Commissioners.

18      I'm Scott Maas from Safdie Rabines Architects,

19  and I'll try not to repeat anything Jeff said or -- or

20  Gary.  I think Gary's passion speaks for itself on the

21  project.  But I'll just touch on a couple of things real

22  quick.

23      The first thing is in laying out the plan, the

24  design of it, we're trying to create a buffer or

25  transition from the freeway over to the existing

AR005790

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    single-family neighborhoods.  So how that resulted is --

2    is kind of a grading of intensity.  You'll see we've put

3    the mixed-use and highly intense commercial areas right

4    next to the freeway.  And then in the next middle band,

5    it's kind of less intense townhomes and mixed-use

6    buildings, and then finally the single-family homes.  So

7    we kind of did an intentional, slow, transition from

8    commercial from freeway down to the single-family homes.

9    And we thought this was important just to create the sense

10   of the neighborhood and to interact with existing

11   neighborhoods.

12          Obviously, the idea that -- that Gary mentioned,

13   walkability is really critical to this project, so the

14   streets are designed as complete streets.  We've got

15   elements, such as traffic circles, on-street parking, and

16   enhanced pedestrian crossing.  And all that is intended to

17   make this place very walkable.  It's important that we

18   created blocks that were very porous, so we've got

19   connections using landscaped paseos, plazas, and sidewalks

20   throughout the entire project, connects within the

21   projects, as well as the surrounding neighborhoods outside

22   of the project.

23          The streets are also activated with commercial

24   uses brought right to the sidewalk, kind of like we have

25   here in downtown, rather than being set back behind large

AR005791

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1   seas of surface parking.

2        And mentioning parking, it's very critical to

3   this -- to the concept here, shared parking.  We've got

4   four, centralized parking structures in the project, but

5   they're all located behind buildings, so the active

6   commercial uses are front and center.  And the parking is

7   out of sight, out of mind behind everything, and so the

8   car becomes secondary to the pedestrian, and that's really

9   important to the -- to the idea here.

10        This is just a quick, second-floor plan kind of

11   showing you the typical uses above the first floor

12   residential and office.

13        Real quick on this.  Gary mentioned the idea of

14   authenticity and his core values.  So in the building

15   design that's evident in -- in contemporary architectural

16   expression, but one that weaves in warm, natural

17   materials, familiar residential character, and vernacular

18   forms in the buildings and landscaping that draws from

19   the -- the natural habitat adjacent to the project.  This

20   image shows the corner of the cinema and how the lobby

21   spaces brought about to the corner, activating that space,

22   activating the edge of that plaza space and how that

23   weaves into the rest of that block.

24        Looking in the other side of the plaza is -- is

25   the grocer.  So you see it's really important for us that

AR005792

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    we, on both sides of the corner of the plaza, we put the

2    most active uses.  We've got the cinema.  We've got the

3    groceries and their -- their prime entries are right there

4    in the corner, activating those spaces.

5              This is just a quick image of the fitness and

6    affordable housing building, again mixed-use located in

7    the residential above a commercial space.

8              And then the plaza.  So you kind of see an

9    elliptical-shaped plaza space.  And then from traffic

10   circle to traffic circle, we have a promenade that

11   connects, again, the cinema lobby to the grocery lobby.

12   And along that promenade is lined with retail spaces.  You

13   also have the sidewalk out at the street.  And in between

14   is the large plaza park space.  The two yin and yang-type

15   buildings there are envisioned as food halls, market halls

16   that might have small, retail tenants that open out to the

17   plaza.  And really we're tying to create a real town

18   square for this neighborhood, a central plaza neighborhood

19   that has coffee shops, cafes, and neighborhood-serving

20   retail.

21             Again, here, that -- that view that shows the

22   promenade space, the plaza on the right, the market

23   buildings and the retail spaces.

24             And then lastly, just a concept of the townhomes.

25   This is the typology that we're -- we're proposing, kind

AR005793

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1   of a typical, urban, row home, two to -- two to three

2   stories, walk up, front-entry stoop, and parking in the

3   real.  And this is important because it creates another

4   form of activation on the street.  You've got visible

5   entries, stoops at the sidewalks, outdoor terraces, and

6   kind of the eyes on the street with people activating

7   their units and engaging with the sidewalk.

8           So with that, I'm going to turn it over to Randi

9   Coopersmith from Latitude 33.

10          MR. COOPERSMITH:  Good morning and --

11          CHAIRPERSON HAASE:  Randi, before you start,

12  you've got about 30 seconds.  How much time would you

13  like?  And we'll -- we'll --

14          MR. COOPERSMITH:  Three minutes.

15          CHAIRPERSON HAASE:  Okay.  Okay.  Great.  Thank

16  you.  Go ahead.

17          MR. COOPERSMITH:  I'll be brief.  Randi

18  Coopersmith, Latitude 33, planning engineering.  I'm very

19  proud associated with the project.  I think you can see

20  the passion and vision that Gary have -- has.  It's not

21  what your typical developer is doing.  Some people call

22  him crazy, but it's been a pleasure to be associated with

23  him.

24          This is also a really important project to the

25  community, and you're going to hear support from two of

AR005794

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1  the planning group members.  We got 16-0 vote.  There's

2  substantial public benefits that come along with this

3  project.  I'd like to go over those.

4        The first one is it's a completely transformed

5  project from what was approved than the original.  We have

6  a challenge together of making our suburbs exciting.  We

7  haven't done a great job.  This is a different kind of

8  project.  It's -- it's mixed-use.  It's walkable.  It's

9  sustainable.  It's really different.  This is a complete

10  transformation.  This is something that -- the reason why

11  we've got this support.  And -- and we think it's a

12  challenge this project is going to set the bar for.

13        We also put 47 of our -- all affordable units on

14  property.  There's been debates on projects.  We're doing

15  it.

16        Road connections and design.  There is

17  significant roads in this area that have not been built

18  for many, many years and have caused problems for public

19  health and safety.  They are being completed at Camino Del

20  Sur, Carmel Mountain Road, to vi -- to Park Village,

21  absolutely critical from a health and safety standard.

22        Traffic calming.  We're not just doing traffic

23  signals.  We're doing a number of roundabouts on the

24  property, off the property.  We think those are

25  substantial.  They're -- they're very good.  They're

AR005795

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    calming.  They're going to reduce speeds and pollution.

2          Less environmental impact.  By taking what was a

3    four-lane road and questioning that and making it into a

4    two-lane road, we're going have seven acres less impact on

5    the MHP and biology.  That's substantial.

6          Here we go.

7          Reclaimed water connection.  We're going to put a

8    much needed reclaimed water pipe in that also not only

9    serves our project but also Mr. Rhodes' project and the

10   diocese.  Those -- those are substantial project

11   impacts -- benefits.

12         Trails.  Right now there -- people hiking in that

13   area, but there's no official trails.  There's no

14   connections.  We're going to make those happen.  There's a

15   missing link that we're going to -- we're going to finish.

16         Public Facilities Benefit Assessment.  We're

17   going to do -- actually it's over $30 million.  It's

18   almost $33 million in FBA fees.  Those are substantial.

19   Substantial.

20         And then last but not least, we're going to take

21   low-quality, vernal pools and replace those with

22   high-quality, vernal pools at a two-to-one ratio.

23         So this is an important project.  It's got major

24   benefits.  We think it sets the bar for what you should do

25   to make our suburbs exciting.  We failed on that, I think,

AR005796

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1   too many times.  We've got people here to support the

2   project.  And after they're done, we'd be happy to answer

3   any questions.  I thank you for your time.

4           CHAIRPERSON HAASE:  Thank you.

5           Let's go now, Keith Rhodes, you have three

6   speaker slips -- or two others -- excuse me -- Pam

7   Blackwill -- Pam? -- and Stephen ket -- Kettner? -- okay.

8   You'll have nine minutes.

9           MR. RHODES:  Good morning, Mr. Chairman and

10  Members of the Planning Commission.  My name is Keith

11  Rhodes and I developed Rhodes Crossing, the Rhodes

12  Crossing Vesting Tentative Map.  It's been an e-ride for

13  those of you are old enough to remember what that means.

14          I sold three lots of the map to Sea Breeze

15  company.  Sea Breeze is the before you today, of course,

16  the Merge 56 plan, which will create a community plan

17  amendment.

18          Because of the Merge 56 amendments to Carmel

19  Mountain Road and Camino Del Sur roadways, the applicant

20  and the City have worked many hours with me to make sure

21  that the amended roadways will serve both the applicant

22  and my remaining lots and Rhodes Crossing.

23          I would like to address three issues, and one is

24  in the bio -- biology.  We're aware of the language in the

25  City's Biological Guidelines, and we appreciate the

Peterson Reporting Video & Litigation Services                    24

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    assurances from City staff.  However, we would not -- we

2    do not know what the future holds, so we'd prefer to have

3    the following assurances on record.  We have talked to

4    City staff and they have no problem with this being read

5    into the record.

6            May I read it now?

7            Future grading to im -- to implement the

8    remaining portions of the approved Rhodes Crossing VTM --

9    what I have left -- in the areas between Rhodes Crossing

10   EIR limits grading -- of grading and disturbance and the

11   limits of grading and disturbance of the right-of-way for

12   Camino Del Sur and Carmel Mountain Road, as depicted on

13   Merge 56 Map, will not generate additional impacts, or

14   require mitigation, due to disturbance of the native,

15   ornamental, slope, plant mix.  So there -- it's being put

16   to stabilize the slopes, and we don't want to come back

17   and have to mitigate for it when we know we're going to

18   have to go across it anyway.  Staff had no problem with

19   that.

20           The next thing is we understood from our last

21   meeting with City and staff and subsequent e-mails that

22   Merge 56 would be conditioned to construct a

23   300-foot-long, deceleration lane along the front-end

24   portion of Camino Del Sur to accommodate the entrance to

25   Lot 3, which is one of my relaning -- remaining lots -- of

AR005798

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    Rhodes Crossing VTM.  However, Condition 23, under

2    Engineering Requirements for Merge 56, does not seem to

3    reflect the requirement that it would be built,

4    constructed.  We appreciate staff -- if staff could state

5    on the record that that correction -- that correction.

6         I read to you, if I may, No. 23.  Prior to

7    issuance of any construction permits, the owner-permitee

8    shall assure, by permit and bond, full improvement of the

9    deceleration lane on Camino Del Sur adjacent to Lot 3 per

10   City standards satisfactory to the City Engineer.  It does

11   say "assure."

12        I have talked to the engineer for Merge 56.  He

13   believes that -- that means they have to construct it.

14   And the reason it needs to be constructed at the time that

15   the roadway is, you have a two-lane.  One going downhill.

16   One going up.  You will construct -- if the -- if the

17   deceleration isn't constructed at the same time, you would

18   have to come back and interfere with traffic on this

19   two-lane road.  And so doing it all at once -- and so I

20   just want to clarify.  And I -- I would ask the applicant

21   to state that they will be, in fact, constructing that

22   deceleration lane.

23        CHAIRPERSON HAASE:  Why don't we just take a

24   moment on that to the City Engineer.  I can understand

25   that the certainty might not be there as you read that

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    permit condition.  But I'll go to our City Engineer as to

2    whether additional language needs to be added, as far as

3    to construct and assure, or how -- how are we implementing

4    that condition.  'Cause if it's assure, it's just they

5    have to permit it and bond for it, it doesn't mean they

6    have to construct it yet, at least, accor -- how

7    Mr. Rhodes reads that condition.

8        MR. SCHULTZ:  You know, I'm not sure what the

9    request is.  If it is assured by permit and bond, then it

10   would need to be constructed prior to occupancy of -- of

11   the project itself, so I believe it does cover the

12   requirement to construct that deceleration lane.

13       MR. RHODES:  Okay.  Prior to con -- prior to --

14   which project would build it?  I mean I -- I have --

15   Merge 56 will build it.

16       MR. SCHULTZ:  It would be -- it would be a

17   condition of -- of the Merge 56 Project.

18       MR. RHODES:  Yeah, of the Merge 56 Project.

19   That's fine.  As long as that's on the record, that's all

20   I ask for.  Thank you very much.

21       CHAIRPERSON HAASE:  Thank you.

22       MR. RHODES:  There's a third thing and that is --

23   we're up here now, so I can't see the -- the deceleration

24   lane is in green, so that's what I was talking about.

25       Now, if you look in red here, that's a drain --

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    will be a drainage easement.  So we also understood the

2    drainage easement across Rhodes Crossing Vesting Tentative

3    Map would be temporary.  The ultimate design does not need

4    or include the easement, and we should not be required to

5    obtain City Council approval to extinguish the easement

6    that is inconsistent with Rhodes Crossing VTM.  We would

7    prefer to address this now, rather than later.  We don't

8    want to hold up and not sign an easement.

9           But the problem is, if this goes in as a City

10   easement now, that if the roadway were to go first, then

11   that would be needed temporarily until I grade, and the

12   grading I would do, I have a permit in hand to do that

13   grading.  So we would prefer that some ending be -- a time

14   frame be put on that easement so that we don't have to

15   come back to -- to the whole Council process to take that

16   easement off the property when it's not needed.  And it

17   will not be needed when my project and the roadway are

18   constructed.

19           CHAIRPERSON HAASE:  Okay.  Why don't we take

20   another moment.  Louis, you're going to earn your paycheck

21   today, how we vacate or extinguish the easement.

22           MR. SCHULTZ:  Right.  So this -- this is a

23   portion of the project.  There are two projects in this

24   area.  If the Merge 56 Project moved forward, this

25   drainage easement would be required for the project.  But

AR005801

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    if the Rhodes Project came forward, the City Engineer

2    would not require that easement be put in place or the

3    pipe being put -- put in place, because the -- the grading

4    for the roads would preclude the necessity for that pipe.

5         I could propose that we modify one of the

6    conditions.  There is no specific condition for this pipe

7    on the project currently.  It's just part of the exhibit.

8    I can give you my assurances that the City Engineer would

9    not put this easement in there if your project was ahead

10   of the Merge 56, but I -- I don't know a remedy,

11   necessarily, to specifically state that in the -- in the

12   project currently ahead of them that we're looking at now.

13   Yeah.

14        MR. RHODES:  Is there any way to put a -- if both

15   projects -- when both projects are built, this exten --

16   this easement would automatically extinguish?  I mean we

17   wouldn't have to come back through the City Council.

18        MR. SCHULTZ:  Right.  And I don't anticipate that

19   would -- would be the case.  Again, I could -- I could

20   promise you that we can work with you between now and City

21   Council to work with some kind of a separate condition or

22   modification to make that clear.  I don't think that would

23   be an issue for the current applicant, and it's certainly

24   not an issue from an engineering perspective.

25        MR. RHODES:  Right.

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1          MR. SCHULTZ:  We just want to make sure that if

2     that pipe -- because we have two projects with different

3     timelines.  We just want to make sure that there's some

4     con -- some provision that that pipe will go in if it has

5     to.

6          MR. RHODES:  No problem.  We can work that out

7     between now and Council.  It's not a problem.

8          I want you all to know that my speaker slip is

9     for approval.  So thank you for letting me look at these

10    last three issues and I appreciate your time.

11         CHAIRPERSON HAASE:  Thank you.

12         So with that, we'll go on to other speakers that

13    are in support of this project.  Some may not want to

14    speak.  So let me just go ahead and go through the list,

15    and if you'd like to speak, please, come on up.  You'll

16    have three minutes.

17         Tony Parker.  Tony, are you here?  Just -- okay.

18    Paul Metcalf.  I saw Paul.  All right.  Jennifer

19    Montgomery.  Jennifer.  Okay.  Jennifer Stahlhammer.

20    Okay.  Darsana Patel.  Okay.  You'll have three minutes.

21    And after Darsana we'll -- Thomas Clark.  If you'd like to

22    speak.

23         MS. PATEL:  Good morning, Commissioners.  Tom

24    Clark had to leave, because he had work to attend to, but

25    I have his points as well as my own.

Peterson Reporting Video & Litigation Services                    30

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1       I'm a long-time resident of the Park Village

2   neighborhood in the community Rancho Penasquitos.  I do

3   serve on the planning board there, as well as an elected

4   official at the Poway Unified School District.  I'm a

5   trustee.  But today I'm here as a resident of Park Village

6   and I'm only representing myself.

7       People have been waiting for this project for a

8   long time.  This is -- this project is well-thought out.

9   The applicant has come to the planning board many, many

10  times and has taken the concerns of the residents very

11  seriously into consideration and has even made

12  modifications of the project plan according to desires and

13  concerns of the resident, so they've been very attentive

14  and modified their plan according to things that we need.

15      They are going to be bringing in some nice

16  amenities.  There's a DG trail that's planned that goes --

17  connects from the Park Village community all the way up

18  through the Merge 56 plan.  This will allow students and

19  I'm think -- I think about students a lot in my daily

20  life.  It will allow students to actually access their

21  middle school and high school to the north.  Right now

22  there's about a 15- to 20-minute morning commute for those

23  families to get their students to school, because we have

24  to go all the way out on that single road and connect back

25  to Camino Del Sur on the other side, and this will ease

AR005804

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1  traffic and congestion in our community of Park Village.

2      There were some original concerns from community

3  members about reducing the Camino Del Sur from four lanes

4  to two lanes.  I think the traffic studies have shown

5  adequately that the number of trips that are going to be

6  used on that road are significantly less than what was

7  originally proposed and having the road brought down to

8  two lanes does seem to make sense.  There was -- there

9  were some concerns if the community expands, but I don't

10  think that's really going to happen with this project.

11  We're pretty much going to be built out for residences.

12  So having the two lanes also addresses the concerns of

13  traffic and speed on Camino Del Sur.  There were a lot of

14  concerns about that from the community.  Bringing it down

15  to two lanes will reduce the speed on the road overall.

16      Also, this development brings in some very

17  convenient, retail space, and it compliments well the

18  retail space to the north of the 56.  They'll bring in

19  movie theater, the hotel.  These are all things that this

20  portion of the community will take advantage of, and it's

21  an essential part for this community to build and grow.

22      One thing, I do wish there was -- was some kind

23  of transit center, so there are items to this project that

24  we wish there were and there isn't.  I don't think any one

25  project can be all things to all people, but the applicant

AR005805

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1   has done a really good job in trying to do the best they

2   can to serve their needs.

3          But more -- most importantly is the fire concern

4   and the exit for this community.  As you know, there are

5   about 8,000 to 9,000 residents.  That's about 2,500 homes

6   and we have one way to get in and out.  And having a

7   second exit is going to be significant as we look at our

8   growing drought conditions and increasing heat.

9          I thank you for your patience and again my slip

10  was to approve.  Thank you.

11         CHAIRPERSON HAASE:  Thank you.

12         And then Kim Baranek.  Kim, did you want to

13  speak?

14         I don't know if that's me or who.

15         And then John Arenz.  John?

16         Anyone else that would like to address the

17  Commission regarding support of the project?

18         Okay.  With that, we'll go to those in

19  opposition.  I have an organized presentation, Frank

20  Landis.  Frank, I believe you're leading that.  And you

21  have Catherine chappa -- Chappas.  Catherine -- and

22  Elizabeth Mather?  Mather?  So you'll have nine minutes.

23         MR. LANDIS:  Okay.  They actually ceded time to

24  me.  I don't think they wish to speak but we'll --

25         CHAIRPERSON HAASE:  No, I'm giving you nine

AR005806

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    minutes.

2            MR. LANDIS:  -- (inaudible).  Hopefully --

3    hopefully, I can get through it a lot faster than nine

4    minutes.

5            CHAIRPERSON HAASE:  Okay.  Well, that's what you

6    get.  If you do, that would be great.

7            MR. LANDIS:  Yeah.  Anyway, Chairman Haase and

8    Members of the Commission, thank you for taking my

9    testimony.

10           Right now I'm speaking on behalf of the

11   California Native Plant Society, so I -- we do two things.

12   We speak for plant -- we speak on issues of plants, which

13   we advocate for.  We speak on issues of climate change, so

14   you're never going to hear me advocate for development,

15   and I just want to make that clear to everybody in this

16   room.

17           Anyway -- and I hope -- I did send a letter out

18   on Monday.  I -- I know it was late but I hope --

19   hopefully, you guys got a chance to read that.  Thank you.

20           And, in general, we aren't happy with Merge 56,

21   and that's -- shouldn't surprise anybody here.

22           San Diego needs more -- more affordable housing,

23   not -- not a native plant issue.  It does not -- and it

24   does not create sprawl.  Also great.  Not an issue.

25           The problem is Del Mar Mesa Preserve is

Peterson Reporting Video & Litigation Services                34

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1   basically -- is botanically on par with Torrey Pines in

2   terms of the number of rare species in there, and we're

3   putting a large development in front of it.  Yes, it was

4   already approved, but when you put that many people right

5   next -- in a road right next to that kind of area with

6   that many endangered -- endangered and sensitive species,

7   there are going to be more impacts.  And what I'm trying

8   to do here is trying to find ways to mitigate or negate

9   those impacts.  And I think the EIR, especially, didn't do

10  a good job of that, and that's what I'm speaking to today.

11          And, also, the thing -- the point is this is not

12  just one development.  It allows -- it enables two other

13  developments, the Rhodes Crossing and the preserve at

14  Torrey Highlands, which could not go in without that --

15  without that road, so this is -- this is the critical one.

16          And it will cause da -- the deve -- the Merge 56

17  will cause damage.  Some of it is impossible to fix.  I'll

18  probably be working on listings for -- listing packages

19  for two pos -- endangered species issues based on plants

20  that are right adjacent to the project.  I mean this is

21  one of the things we're going to have -- that's going to

22  happen if this project goes in.  If those species are

23  lost, they'll have no way to return.

24          Now, one of the problems the -- with the EIR in

25  particular, and I think that this is something that can be

AR005808

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

 1    fixed, is the mitigation for the damages being caused in

 2    Del Mar Mesa Preserve is mostly being mitigated off the

 3    mesa.  It's being mitigated miles away in, say, McGonagall

 4    Canyon, which, you know, needs some restoration, but it's

 5    already resto -- it's already largely restored and it has

 6    a lot of weeds.

 7              So I'm going to specifically go through three of

 8    the four things I talked about in the letter, which I

 9    think Mr. Rhodes may actually agree with some of these

10    comments, so I'm hoping we can find ways to -- between now

11    and then to, actually, get these fixed.

12              One is the project will -- will fill in Deer

13    Creek.  That's -- they don't have money for a bridge, so

14    the road is going to be on top of dirt fill, and there's

15    going to be a culvert -- the Deer Creek will run through

16    under the fill.  My reading of -- of the document was

17    that, basically -- I'm not a hydrologist but the pipe --

18    the pipe was the same size as the pipe that's -- that

19    feeds into it from under the -- under Highway 56.  And

20    there's a lot of hardscape that's going to be dumping

21    water in there, and I think none of us want the -- the

22    fill to turn into a dam.  So one of the first request is

23    to make sure that the culvert under Camino Del Sur in Deer

24    Creek is the right size.  This is an engineering issue,

25    but again it was blown off in the -- in the EIR and -- and

AR005809

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    then, hopefully, stormwater and everybody can get together

2    and we can make sure that one is the proper size as a

3    specification fix.

4            Second issue is there are a 10th of an acre of

5    tamarisk and a bunch of other weeds on -- on the Merge 56

6    property in Deer Creek.  Those flow -- the water flows

7    drown stream and carries those seeds into the preserve.

8    According to the planning, the -- these -- these don't

9    have to be dealt with.  The only thing they have to worry

10   about for the MHP adjacent properties is that they don't

11   bring more invasives in.  There's already invasives there.

12   The property is going to be disturbed.  It's a fairly good

13   time to, actually, just go through and weed everything

14   out, and it's fair -- it's very cheap.  CMPS does that

15   kind of thing at $1,500 an acre.  That's not per acre, per

16   year.  That's per acre total.  It's -- so it's not a big

17   ask and I think Mr. Rhodes may be -- may be willing to do

18   it.  But just, basically, getting all the weeds off that

19   property, so they don't blow into the preserve.  I think

20   it's a fairly simple thing.

21           Third ask is, basically, increasing greenhouse

22   gas reductions, as much as possible.  And this comes from

23   I'm a homeowner in Rancho Penasquitos.  I'm having to --

24   I'm decarbonizing my home right now.  A lot of the stupid

25   design features that went in the 1980's are really running

AR005810

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    up my expenses for remodeling the house so that I can

2    collect water, so I can put in a house battery without

3    having it sitting on top of the gas main where it will

4    blow up, getting rid of the gas main, getting rid of the

5    gas appliances, a lot of things like, for instance,

6    minimizing the gas infrastructure.  Electric appliances

7    are the same price or cheaper as every natural gas

8    appliance.  There's no particular reason to even install

9    natural gas in the -- in the residential areas, I mean,

10    aside from fashion.  But if you're going to do that, make

11    it easy to get rid of, because probably in a couple of

12    decades, everybody is going to be going to electrical

13    appliances anyway or just don't have them there in the

14    first place.  So that's -- you know, that's a simple thing

15    that actually saves.  That's the third highest greenhouse

16    gas emission in the entire project is just natural gas.

17    Getting rid of it is -- is a good way to save a lot of

18    gas.

19          Other things are just may -- making it -- you

20    know, increasing so -- increasing solar panels.  You know,

21    that's a good investment for every building owner in

22    there, because they can just sell -- they can still sell

23    their energy to SDG&E.

24          Making space for storage batteries.  They don't

25    have storage batteries that you can run your house off

AR005811

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    quite yet or, at least, power your electric car yet.  But

2    it would be great if there's spaces in the garages in the

3    buildings to -- just pre-engineer -- predesigned in so

4    that when that technology becomes available, it's easy to

5    install.  Right now I got to remodel my garage to -- to

6    include that kind of stuff.  So there's a lot of little

7    design features that hopefully don't cost a lot, that will

8    radically de -- over time, decrease the greenhouse gas

9    emissions, and I'm hoping that those -- we get -- we get

10   those into the project.

11        Three minutes.  Wow.

12        Okay.  Now I'll, just for a moment, I'm going to

13   speak as a resident and not for CMPS.

14        Fourth issue wildlife crossing.  As I said CMPS

15   does plants.  This is a wildlife crossing.  Basically,

16   there is -- there's a wildlife corridor.  It's going to be

17   bisected by Camino Del Sur.  The wildlife crossing they've

18   engineered is basically a crosswalk for deer.  You know,

19   it's got shrubs on either side and deer run across the

20   road, which is great.  The problem is we need a wildlife

21   cross that also handles spayedfoot toads, horned lizards,

22   and orange throated whiptails, and if they jump off that

23   curb, they're going to get caught on the road and they're

24   roadkill.  So one of the things I would hope to go in,

25   just -- and in the speaking only as a private citizen --

AR005812

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    is that we reengineer that wildlife crossing a bit so that

2    it, actually, handles all the sensitive species and not

3    just the deer that go -- that are going across there.

4    Because that's one of the major wildlife crossings and --

5    and when you cut it, you're turning the preserve into an

6    island, and then you get all the island effects leading to

7    species extinctions.

8           So, anyway, I'm not going to spend anymore of

9    your time.  I -- I'm quite willing to work with Planning.

10   I think Mr. Rhodes is willing to work with me.

11          MR. LEVITT:  Gary.

12          MR. LANDIS:  Gary.  Yeah, sorry.  I'm sorry.

13          And Mr. Rhodes, too.

14          But Gary Levitt, yeah, are willing to work with

15   me on this to -- and to see if we can get this

16   straightened out before it goes to City Council.

17          CHAIRPERSON HAASE:  Mr. Rhodes, if you could --

18   hold on.  Hold on.  I don't -- have a seat.  If we have a

19   question, we'll get you up here.  Otherwise --

20          MR. LANDIS:  So, anyway, that's my testimony.

21          CHAIRPERSON HAASE:  -- won't be able to finish

22   the public side of it.

23          Thank -- thank you, Mr. -- Dr. Landis.

24          Okay.  Let's finish the public speaking then --

25   or public speakers, and then if we have any questions,

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    we'll get back to you.

2            Next speaker I have is Josh -- is it Bourgeois?

3    Bour -- apol -- apologize if I've not done well on your

4    name.  Josh, are you here?

5            MR. BOURGEOIS:  Yeah.

6            CHAIRPERSON HAASE:  Okay.  You'll have three

7    minutes.

8            MR. BOURGEOIS:  Good morning.  My name is Josh

9    Bourgeois.  So you're pretty close.  I'm with the Golden

10   State Environmental Justice Alliance.  And I'm just here

11   today just to state that we provided a -- a comment letter

12   to the Draft Environmental Impact Report and that we stand

13   by our comment letter, and we believe that the

14   Environmental Impact Report was deficient in the areas

15   listed in the letter, and we believe it should be

16   redrafted and recirculated.

17           And with that I'll go ahead and cede the rest of

18   my time.  Thank you.

19           CHAIRPERSON HAASE:  Thank you.

20           Next speaker is Kay Stewart.  Kay?

21           MS. STEWART:  Good morning.  Thank you for giving

22   me a chance to speak on this.

23           I think the City of San Diego and all of its

24   departments are very lucky to have volunteers who are

25   qualified, skilled, and motivated to try to protect the

AR005814

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1   natural environment here.  And I wanted to say that my --

2   I do not object to this project.  In fact, it's wonderful

3   to see what Mr. Levitt and his team has done to the

4   original ideas, which were not the most wonderful.

5        However, there were comments that were made to

6   the environmental impact statement to the draft that I

7   think should be incorporated, including the issues that

8   Mr. Landis has brought up.  Because they will make a

9   difference.  They are important to our environment and I

10  do think that the environmental impact statement is

11  deficient in those areas.

12       And that's really all I wanted to say, other than

13  I think you should all be very grateful for the hundreds

14  of hours that have been put in and not just at the last

15  minute.  Mr. Landis has been involved with this for

16  probably four or five years, as -- as long as I've been

17  aware of his participation.  It's not a last-minute thing.

18  And I think his issues are significant, and you should

19  find a way to make the environmental impact statement,

20  incorporate those.

21       Thank you.

22       CHAIRPERSON HAASE:  Thank you, Kay.

23       And the last speaker slip I have is Douglas

24  Chermak.  Douglas?

25       Douglas before you start, just so I have

AR005815

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    clarification, we received a letter yesterday from -- is

2    it Lozeau Drury?

3              MR. CHERMAK:  Right.  That's --

4              CHAIRPERSON HAASE:  And you are their client?

5              MR. CHERMAK:  No, I'm partner at the firm.

6              CHAIRPERSON HAASE:  Oh, you're a partner of the

7    firm.

8              MR. CHERMAK:  Yeah.

9              CHAIRPERSON HAASE:  Okay.  You said -- I thought

10   you were representing lou -- L-I-U-N-A.

11             MR. CHERMAK:  Yeah.

12             CHAIRPERSON HAASE:  Are you an employee --

13             MR. CHERMAK:  (Inaudible) Laborer International

14   Union of (inaudible) --

15             CHAIRPERSON HAASE:  You're representing them

16   as -- as their attorney then.

17             MR. CHERMAK:  They are our client.  I'm --

18             CHAIRPERSON HAASE:  They are -- are your client.

19             MR. CHERMAK:  We are their attorney.

20             CHAIRPERSON HAASE:  Okay.  I thought maybe you

21   were a part of that organization, specifically.  So you're

22   the attorney.

23             MR. CHERMAK:  Correct.

24             CHAIRPERSON HAASE:  Okay.  Then I'm talking to

25   the right person.

AR005816

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1           MR. CHERMAK:  Right.

2           CHAIRPERSON HAASE:  You submitted a one-paged

3    letter to the Draft EIR, and then provided us a lot more

4    detail the day before the hearing.  Whether or not it's --

5    it helps us in our decision making, I do think it's a

6    disservice to the public not to allow them the opportunity

7    to see your comments for this hearing.

8           Not sure where that's coming from.

9           So in the future, if it's possible to get these

10   documents out sooner -- it's not just us that looks at

11   them.  The public also would be very interested in your

12   comments, and they don't get the opportunity to see it as

13   well.

14          MR. CHERMAK:  Right.

15          CHAIRPERSON HAASE:  So it makes it difficult for

16   us.

17          MR. CHERMAK:  Right.  I'm -- I'm here.

18   Ms. Davis, my colleague, submitted the letter.  And I

19   really do appreciate that concern.

20          CHAIRPERSON HAASE:  Yeah.

21          MR. CHERMAK:  And it is not an intentional thing.

22   It was -- the way that we got, in terms, of getting our

23   expert comments, putting them together, that was just --

24          CHAIRPERSON HAASE:  That's fine.  Then take it

25   back to the folks who do this type of work, because they

Peterson Reporting Video & Litigation Services                    44

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

 1   sort of wished upon a star, hoping that the document would

 2   be recirculated, and you can't guarantee that that's going

 3   to happen.  It would have been helpful at the time that

 4   the EIR went up for public review to have some comments on

 5   the record for us.

 6           I did read your letter last night so -- at least,

 7   the summary so -- and I'm sure my colleagues did as well.

 8   But it's -- it puts us and the public at a bit of a

 9   disadvantage when we don't get it sooner.

10           MR. CHERMAK:  Right.  It's our --

11           CHAIRPERSON HAASE:  So --

12           MR. CHERMAK:  It's our, you know --

13           CHAIRPERSON HAASE:  And I'm using my time, not

14   yours.

15           MR. CHERMAK:  Yeah, I appreciate that.

16           COMMISSIONER HOFMAN:  And, Mr. Chairman, if I

17   could add to that.

18           CHAIRPERSON HAASE:  Sure.

19           COMMISSIONER HOFMAN:  I don't buy that it wasn't

20   intentional.  I -- I think it was a cheap trick.  Last

21   minute like that, I've seen it all the time over the

22   years.  I didn't like it at all and didn't appreciate it.

23           CHAIRPERSON HAASE:  Well, obviously, we're -- it

24   make -- it makes our job hard.

25           And, again, my concern primarily is the public

AR005818

1    and I did -- I just wanted to let you know I did -- I did

2    not ignore it so you -- so that's --

3         MR. CHERMAK:  And we -- and we appreciate you

4    looking at it and it is late but it's not untimely.

5         CHAIRPERSON HAASE:  Okay.

6         MR. CHERMAK:  So just to --

7         CHAIRPERSON HAASE:  Well, it is what it is and

8    there will be another -- this will be going to the City

9    Council, so there will be time as well.

10        So with that, you have three minutes.  Please.

11        MR. CHERMAK:  Thank you, Commissioner.

12        My name, again, is Doug Chermak.  I'm here on

13   behalf of Laborers International Union of North America

14   Local 89 and its members living in and around the city of

15   San Diego.  We submitted a letter yesterday.  I'm here

16   regarding this development to urge you to reconsider the

17   Final EIR to consider some of the environmental impacts

18   that we've presented that this project is likely to incur.

19        The letter, just to note, includes expert

20   comments from wildlife biologist, Dr. Shawn Smallwood,

21   from Soil Water Air Protection Enterprises and from expert

22   transportation analyst, Daniel Smith.

23        So the project, as we've noted in the letter,

24   indicates -- the letter indicates that the project could

25   result in significant air quality impacts, greenhouse gas

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1   impacts, health risks, biological impacts, and traffic

2   impacts.

3            I wanted to highlight a few of those things with

4   my time here, which is not very much.

5            On air quality the FEIR fails to include health

6   risk analysis -- excuse me -- health risk assessment to

7   analyze impacts to local, sensitive receptors.  SWAPE

8   conducted its own analysis looking at the project's diesel

9   particulate matter, both with respect to construction and

10  operation emissions, and found that the project could

11  create cancer risks more than four times above the CEQA

12  significance thresholds.  And SWAPE included a number of

13  mitigation measures that were not -- both for construction

14  and operational impacts that were not included and ought

15  to be considered and included in the EIR.

16           There's also -- the FEIR failed to demonstrate

17  compliance with Executive Order B-30-15, which requires

18  statewide reductions of emissions 40 percent below 1990

19  levels by 2030.  It needs to consider that.

20           In terms of biological impacts, a few points.

21  One is the FEI -- FEIR fails to consider impacts to

22  animals as a result of window collisions, which is one of

23  the major sources of fatalities for birds in this country.

24  There are a number of special status species that were

25  also not analyzed or their impacts were not mitigated for

AR005820

1   in the FEIR.

2          Also, the -- the cumulative analysis with respect

3   to biological impacts is insufficient.  Notwithstanding,

4   the fact that the EIR, essentially, acknowledges that

5   there's going to be cumulative impacts, but it fails to

6   indicate that they will provide -- that they will result

7   in significant impacts and provide adequate mitigation for

8   those.

9          Finally, I would note there's improper, deferred

10  mitigation in the EIR.  And the traffic analysis is

11  largely inconsistent as indicated by Dr. Smith's comments.

12         So I'm -- I'm happy if you have any other

13  questions.

14         CHAIRPERSON HAASE:  Okay.

15         MR. CHERMAK:  Obviously, there's more points in

16  the letter.  Thank you for your time.

17         CHAIRPERSON HAASE:  You're welcome.

18         Is there anyone else who would like to address

19  the Commission during public comment?

20         Okay.  Seeing none, I will close public

21  testimony.

22         I guess my thought is there were a number of

23  issues that were raised and I thought it might be good to

24  just to allow staff to respond to some of those at a high

25  level, because we may all have those questions.  I'm going

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1   to start off, and I have a little list and you may want to

2   add to that.  So why don't I start off with a few items.

3        The first is just the hydrology study and what's

4   required.  There was a concern that the hydrology study

5   was not broad enough.  I'll go to the City Engineer.  I

6   know we require hydrology studies for everything nowadays

7   and that it -- how it was prepared, how it was reviewed so

8   in our -- just assure us that these things were addressed.

9   There might be a di -- difference of professional opinion.

10  That's a different issue.

11       MR. SCHULTZ:  Right.  You know, there was a

12  drainage study completed for this project.  It did meet

13  our standards.  It did take into account the contributing

14  areas off site the project.  As far as the sizing of the

15  culverts, at -- at this stage, we don't look a lot at

16  sizing.  It's -- it will be taken care of in a ministerial

17  stage.  Our concern is, Is it feasible to build this

18  project the way it shows.  And it is.

19       CHAIRPERSON HAASE:  So what I'm hearing is that

20  there will be a subsequent detail design, and if there

21  need to be changes at that time, we have the ability to do

22  that.

23       MR. SCHULTZ:  That is correct.

24       CHAIRPERSON HAASE:  But the study for this

25  project is -- satisfies the requirement the City needs for

AR005822

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    the -- for the CEQA.

2              MR. SCHULTZ:  Is sufficient.

3              COMMISSIONER HOFMAN:  Chairman --

4              CHAIRPERSON HAASE:  Go ahead.

5              COMMISSIONER HOFMAN:  -- if I can add to that

6    question is just that the -- the complaints seem to be

7    that the hydrology study didn't include enough upstream

8    area in the report to properly size the drain and I

9    totally get.  But -- but the culvert is going to be

10   designed based on that hydrology study.  But in your

11   opinion the hydrology study did cover sufficient upstream

12   bay scenarios.

13             MR. SCHULTZ:  That is correct, yes.

14             COMMISSIONER HOFMAN:  Okay.  Thank you.

15             CHAIRPERSON HAASE:  Okay.  So the second is the

16   broader issue really we talked -- and I'm going to focus

17   just on the -- the emissions and the greenhouse gas, and

18   that has to do with the City has an adopted CAP, Climate

19   Action Plan, and we rely upon that.  There was a checklist

20   performed for this project.  If staff would like to

21   comment to that.  Again, there may be a difference of

22   opinion as to the adequacy of our CAP, but it is -- it is

23   the law of the land, as far as the City is concerned.

24             CITY STAFF:  Correct.  The project did analyze

25   the project and was consistent, was found to be consistent

AR005823

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1   with the Climate Action Plan Consistency Checklist.

2            CHAIRPERSON HAASE:  Okay.  And some of the

3   concerns that were raised, at least reading between the

4   lines, about enforcing that mitigation when it's not a

5   mitigation measure, it's a project design feature.

6            CITY STAFF:  No, they are made conditions.  All

7   the Step Two requirements are made conditions of the

8   permit.

9            CHAIRPERSON HAASE:  Okay.  Thank you.  That's

10  very helpful.

11           The -- there was some other issues that are

12  outside our purview.  I think Dr. Landis raised issues of

13  staffing and things like that, and that's, I don't

14  believe, within the purview of our body anyway.  Why don't

15  we just cover the -- the issue of biology then and the

16  fact that, you know, we have an MSCP and this is --

17  developing there, there was some concerns that cumulative

18  impacts have not been addressed and how we deal with, when

19  we have projects that have coverage and -- for species and

20  for plants, how the MSCP is used.

21           MS. FORBIGER:  Yes, Kristi Forbiger, senior

22  planner with MSCP.

23           The project has been designed and considered all

24  the area-specific management directives for the

25  MSCP-covered species.  The impacts -- direct impacts to

Peterson Reporting Video & Litigation Services          51

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    biological resources, both uplands and wetlands, have been

2    mitigated to below level of significance pursuant to the

3    MSCP and the City's biology guidelines.

4            Furthermore, since the finalization of this EIR,

5    the HCP for vernal pools has been adopted, which then also

6    increased our preserve design.  So for all these reasons,

7    the cumulative impacts resulting from this project are not

8    significant.

9            CHAIRPERSON HAASE:  So this project will be

10   subject -- or the vernal pool HCP, this project will have

11   to comply with.

12           MS. FORBIGER:  Correct.

13           CHAIRPERSON HAASE:  Okay.  Let's see.  Might have

14   one more.  Well, I'll make more of a professional

15   observation regarding the traffic analysis.  As you know

16   the state is moving away from level of service into

17   vehicle miles travelled as a -- as a metric from a CEQA

18   standpoint.  It will be a little while before we get

19   there.  But what I think is a benefit to this project when

20   you look at the mix of uses that have been proposed

21   compared to the previous project, that this is going to

22   meet neighborhood demand, if you will, for certain

23   services and uses.  And I also believe that that will

24   ultimately result in a reduction in vehicle miles

25   travelled.  The people don't have to travel as far.  So if

AR005825

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    I look at it from where we want to be with -- with respect

2    to environmental analysis for vehicle miles travelled, I

3    do see a benefit.  I don't know that that analysis was

4    performed for this project 'cause it probably wasn't

5    required, but I'm more working for my own experience at

6    this point regarding that.

7            Any other questions for staff regarding maybe

8    some of the comments that we received?

9            Commissioner Hofman, I'd like to get this all out

10   sort of now.

11           COMMISSIONER HOFMAN:  I'm just dealing with

12   environmental.

13           CHAIRPERSON HAASE:  Sure.  Sure.

14           COMMISSIONER HOFMAN:  Yeah.

15           The -- Mr. Landis brought up what I thought was

16   reasonable on the surface.  But I'd like staff's comments

17   about the non-native plants that are producing seeds that

18   are washing downstream and why not clear them out now.

19   Seemed reasonable but can you comment on that?

20           MS. FORBIGER:  Yes.  Again, Kristi Forbiger.

21           The -- the area adjacent is the Del Mar Mesa

22   Preserve and we have a Natural Resources Management Plan

23   that has been adopted for that area, which also includes

24   adaptive management measures, which deals with eradifi --

25   eradication of invasive species.  So through

AR005826

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    implementation of the NRMP, those impacts are addressed.

2              CHAIRPERSON HAASE:  Am I -- maybe I'm hearing a

3    different, little story here.  This -- the area of the

4    invasive, is it on the Merge 56 property or is it

5    off-site?

6              MS. FORBIGER:  I believe that they are both.

7    There's invasives on -- on both sides.

8              CHAIRPERSON HAASE:  Okay.

9              MS. FORBIGER:  So with implementation of the

10   project, the invasive species would be removed and --

11             CHAIRPERSON HAASE:  Well, I just want to

12   understand if the request from Dr. Landis was to do work

13   off-site that's not part of this project.

14             MS. FORBIGER:  No.

15             CHAIRPERSON HAASE:  Okay.  All right.  Anything

16   else regarding just (inaudible) --

17             COMMISSIONER AUSTIN:  I guess I just have one

18   question.  It's just tangental to this question.

19             Is -- it sounded like we had a number of

20   questions that came up from folks who are very interested

21   in the environmental issues about this specific project.

22   Then we got a letter very late.  And so this project can

23   go to the City Council potentially, get approved.  But if

24   there's an environmental lawsuit, what's the process for

25   that and how long does it delay the project, generally?

AR005827

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    Do you know that?  Do you have a feeling for that City

2    Attorney?

3         MS. NEUFFER:  Well, it really it depends on

4    what -- what claims are made and, you know, if it's just

5    purely an environmental lawsuit.  You know, it depends on

6    the court system, and, you know, it can take anywhere from

7    six months to a year.

8         COMMISSIONER AUSTIN:  Or more.

9         MS. NEUFFER:  But, you know, at the same time it

10   would depend on whether the applicant can proceed with the

11   project even while it's still in the court system.

12        COMMISSIONER AUSTIN:  Sure.  Okay.  Thank you.

13        CHAIRPERSON HAASE:  Can you --

14        COMMISSIONER AUSTIN:  I'll go ahead and proceed

15   with my other questions if you're done with the

16   environmental part of it.

17        CHAIRPERSON HAASE:  I'll just check with the

18   other commissioners if they're ready to go, just a general

19   commission comment.

20        COMMISSIONER OTSUJI:  Any comment on the wildlife

21   crossing?

22        CITY STAFF:  I'm sorry.  In what respect?  Sorry.

23   I'm not understanding the question.

24        COMMISSIONER OTSUJI:  I mean the staff input in

25   regards to wildlife crossings, defining --

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1          COMMISSIONER AUSTIN:  He has (inaudible) --

2          COMMISSIONER OTSUJI:  -- defining, you know, what

3   the requirements are, specifically, for this project.  It

4   was just brought up so just to get an understanding.

5          CHAIRPERSON HAASE:  Let me try a flavor of that

6   question.

7          There's a wildlife crossing right now.  It

8   appears it's designed only for a mammal, the deer.  Are

9   there other endangered species that would use this area

10  and need it as a crossing and -- that have not been

11  accommodated?  I believe what we're hearing is that's a

12  surface -- it's an at-grade crossing and there's some

13  small critters that may also use it, rather than using

14  some sort of small culvert or something that they could

15  crawl under the road or walk or whatever they do.

16          I thi -- is that the question you're go --

17  getting at?  Okay.

18          CITY STAFF:  So wildlife crossings were analyzed

19  in the EIR, and there are -- it was determined that

20  impacts would be less than significant.  I could defer to

21  MSCP's staff, but again we did identify it and determined

22  that impacts would be less than significant.

23          MS. FORBIGER:  Yeah.  And, furthermore, with the

24  reduced lanes, as well as deterrent vegetation that would

25  not necessarily attract large mammals and reduced speeds

AR005829

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

 1   and it was also determined that those sensitive species

 2   were not located in that area, so impacts to those

 3   sensitive species was then determined to be less than

 4   significant.

 5           COMMISSIONER OTSUJI:  I just wanted to make sure

 6   that these considerations were studied.

 7           CITY STAFF:  Yes, they were.  And there's also a

 8   grade differential to get to the road.  You have to go up

 9   and around.

10           CHAIRPERSON HAASE:  All right.  With that, I

11   think we've kind of covered some of these, maybe not all

12   of them.

13           So we'll go to the commissioners.

14           Commissioner Austin.

15           COMMISSIONER AUSTIN:  Yes.  Thank you.

16           Since the opposition is primarily focused on

17   environmental issues and what we heard, to begin with,

18   were some specific requests.  And I assume those are

19   requests, you know, can they be worked through, and they

20   seemed like areas of true concern about the environmental

21   quality, and -- and there some of these we can do to

22   improve it.  So maybe if we can get Mr. Levitt up just for

23   a minute, I just wanted to ask some questions.

24           I don't know which on these list or things that

25   are doable and which aren't.  Obviously, I'd love to see

AR005830

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1   this project go forward without a lawsuit, and I don't

2   know if that's going to happen.  But what -- what's your

3   feeling about these five issues that were brought up by

4   Mr. Landis?

5          MR. LEVITT:  Mr. Landis and I go back quite --

6   quite a way.

7          COMMISSIONER AUSTIN:  Yeah.

8          MR. LEVITT:  Mr. Landis I have been the chair of

9   Del Mar Mesa Planning Group, and -- and Mr. Landis and I

10  have worked together.  He's -- he's done wonderful work

11  in -- in our community, identifying the plants, and I've

12  got nothing but compliments to say about what he does and

13  his efforts and his volunteerism and his -- and his

14  passion for what he's doing.

15         We will work with him.  I mean I spoke to him

16  before -- before the meeting, because he -- he mentioned

17  the fact that he was in favor of the project.  You know,

18  weeding is a good example.  We said, If it was as simple

19  as saying, Go ahead and we'll -- we will pay $1,500 an

20  acre, I would do it.  I would have done it the moment he

21  asked it.  The reality is in the real world, if we go and

22  touch the property before we get a permit --

23         COMMISSIONER AUSTIN:  Yeah.

24         MR. LEVITT:  -- the fines will be way excee --

25         COMMISSIONER AUSTIN:  Got to -- I --

AR005831

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1         MR. LEVITT:  -- exceeds $1,500.

2         So from a practical perspective, will we work

3    with Mr. Landis, after we get a grading permit and are

4    allowed to the touch the property and first go out there

5    and weed it so that we don't take seeds and distribute

6    them downstream, absolutely.

7         COMMISSIONER AUSTIN:  All right.  Thank you.

8         The other question, which I wonder about when I

9    get a letter, you know, at the last minute and it's not

10   coming from the community; it's coming from a labor union,

11   and I'm wondering what's the motivation there.  Is it

12   really environment or -- and part of the issue is I've --

13   I've heard that over 70 percent of the CEQA lawsuits in

14   California are coming from labor unions, and I hate to see

15   an abuse of the system.

16        And have you been asked for a project labor

17   agreement on this project?

18        MR. LEVITT:  I'm sure that's next.

19        COMMISSIONER AUSTIN:  Yeah, okay.  Just curious.

20        MR. LEVITT:  But the answer will be, No.

21        COMMISSIONER AUSTIN:  What's that?

22        MR. LEVITT:  The answer will be, No.

23        COMMISSIONER AUSTIN:  Yeah, and so like --

24        MR. LEVITT:  The reality is that they haven't

25   read and don't understand the fact that we have a project.

AR005832

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    That without approvals we still have a project.  That they

2    tell us that we're increasing trips but we show that

3    there's a reduction.  They -- they point to the fact that

4    there's a reduction in impacts to certain intersections is

5    because the traffic engineer living in Oakland or Davis

6    doesn't understand that we're building roads here that are

7    taking 2,000 people and giving alternative (inaudible) --

8            COMMISSIONER AUSTIN:  Okay.  And I -- I don't

9    want to get off on the wrong tangent here.  I just wanted

10   to clarify.

11           MR. LEVITT:  Thank you.

12           COMMISSIONER AUSTIN:  So now I'm going to talk

13   about the project specifically.  I look at the project

14   that was approved before, and it was built around the

15   automobile.  It was big, parking lots and it was exactly

16   the wrong thing to do.  I look at this project, it's

17   exactly the right thing to do.  You've got a developer

18   who's willing to go the extra mile to do something that's

19   walkable, something that is making a nice transition from

20   the freeway into the community where there's single-family

21   houses.  They're creating life.  I mean this is a project

22   you'd want built -- been built three years ago, not three

23   years from now.  That's why I get concerned about

24   environmental lawsuits.

25           Housing is a critical need in California,

AR005833

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    affordable housing.  You're doing affordable housing.

2    You've got a sustainable development.  It's sustainable

3    for lots of reasons.  You're thinking about reducing the

4    size of roads.  Great.

5          And you're getting input from the community.

6    There's a reason this thing got the votes it got.  I don't

7    know I don't live that far from this community but far

8    enough away that I don't have a conflict of interest.  But

9    if I was living in this community, I'd want this -- I'd

10   want this tomorrow.  I -- I just can't say enough about

11   the character, the thoughtfulness behind this thing.  It's

12   doing everything right.

13         I'd just mention here, no longer a sea of

14   parking.  It's a mixed-use.  It creates a place.  And I

15   wrote this down before you said it.  It creates a there,

16   there.  We want to see more projects like this in

17   San Diego.

18         The car becomes secondary.  And, you know, it's a

19   necessary evil but it has ruined Southern California,

20   because we've paid too much homage to it and forgot about

21   people.  The traffic circles, another good idea, and

22   you're doing it now, so you don't have to go back like in

23   Del Mar where people don't understand it, so they don't

24   want to vote them in and, you know, all the -- those

25   reasons.

AR005834

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1          It's sustainable.  It's walkable.  It's livable.

2     It's affordable or at least parts of it are.  I know parts

3     of it will be expensive 'cause of where you are.  And part

4     of it will be more expensive, because of the time it

5     takes, which is an outrage.

6          We're going to be having a workshop on housing

7     and the housing needs.

8          And, anyway, I just want to compliment you.  It's

9     going to be an asset to the community, and I hope like

10    heck that if the labor unions are sincere about their

11    environmental issues and this isn't just to hold you up,

12    that you'll be able to work them out.  'Cause I think with

13    those people that I heard that really sounded like they

14    have real issues, those are workable solutions.  So,

15    anyway, I'm not going to make the motion just in case this

16    goes too long and I can't vote on it, so I'll be quiet

17    now.

18          CHAIRPERSON HAASE:  Thank you.

19          Commissioner Hofman, maybe you'll get us going

20    with a motion.

21          COMMISSIONER HOFMAN:  Okay.  Well, let me -- let

22    me start with the Environmental Impact Report.

23          Thank you for getting it to us two weeks ahead of

24    the meeting.  It was a lot to read.  And -- and I did go

25    through it pretty thoroughly.  I looked at the comments,

AR005835

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    the response to comments, and I -- actually when I looked

2    at Mr. Landis' letter and some of the other comments, it

3    made me take note, but I felt the document was adequate,

4    that it was thorough.  It did what CEQA requires, so I

5    have no problems in certifying the EIR as is.

6        CHAIRPERSON HAASE:  And I believe we're making

7    recommendations actually to the Council.

8        COMMISSIONER HOFMAN:  Well, to recommend

9    certification to the City Council.

10       CHAIRPERSON HAASE:  Thank you.

11       COMMISSIONER HOFMAN:  Going to the site plan and

12   the project itself, I have a couple questions that are --

13   but I just want to say overall I very much like the

14   project.  I like the pedestrian orientation.  It's far

15   superior -- no offense because times have changed -- to

16   the original project.  I like the fact there's no sea of

17   parking.  The affordable on-site is a huge benefit, and I

18   wish more projects would do that.  You've added

19   electrical, vehicle stations above the standard.  I love

20   that.  I would recommend, I'm not going to condition, but

21   I'd recommend that maybe you add a couple fast charging

22   stations; that would be wonderful.  As an electric car

23   owner, those are very handy.

24       The -- the question I have is I just want to ask

25   about the setback deviations.  And are those -- can you

AR005836

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1  explain that especially as it relates to the office

2  building off Camino Del Sur?  Is that where the deviations

3  are being requested?  And -- and can you explain, it looks

4  like the deviation was actually to increase setbacks in

5  some cases from a maximum standard.  And the reason I'm

6  asking is 'cause I -- it was hard to discern from reading

7  the report so --

8          CITY STAFF:  Sure.  If you can give me a second

9  just to --

10          COMMISSIONER HOFMAN:  Sure.

11          CITY STAFF:  -- just to give it a once over.

12          CITY STAFF:  And just to help us, Commissioner

13  Hofman, would that be -- I'm guessing it would be Units 4,

14  Lot 1 -- 1 or 2?

15          COMMISSIONER HOFMAN:  That was what was

16  confusing.

17          CITY STAFF:  On the upper --

18          COMMISSIONER HOFMAN:  It didn't really point out

19  to where the deviations.  It went by lot numbers and I

20  think I understand it but I -- I just want to make sure

21  I'm clear on it.

22          CITY STAFF:  Sure.  There's -- and just a general

23  overview, some of these setback deviations when we apply

24  our typical zoning setbacks, these are done with a

25  traditional -- typically with a traditional grid system.

AR005837

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    So in the case of a lot of these setback deviations,

2    because of the use of the private drives and roads and the

3    not-so-traditional lot configuration, our deviations

4    are -- are meant to -- for this particular project are

5    meant to respect the lay of the land and the -- the other

6    configuration and the surrounding developments.  So that's

7    just a general overview.

8         So in Lot 2 that's where we have our six-story

9    office building.  That's Unit 4.

10        And, Jeff, if you could point out the -- the blue

11   building to the northwest right there.  So that would be

12   Lot 2.  That does propose a -- a deviation for the

13   maximum, front setback, and our maximum setback would be

14   from Camino Del Sur.  So -- so, basically, this -- this

15   setback requirement is to provide, of course, a more

16   pedestrian-oriented design, but we don't want to front

17   Camino Del Sur in that manner, so we are requesting a

18   deviation to exceed that setback along that road.

19        COMMISSIONER HOFMAN:  To exceed the setback.

20        CITY STAFF:  I'm sorry to -- to -- to exceed the

21   maximum setback requirement.

22        COMMISSIONER HOFMAN:  Basically net increasing.

23   Right.  And -- and I think that's -- that's a real

24   positive.

25        Going back to my earlier comment earlier in

AR005838

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    the -- this morning, I really wish in your findings you

2    would explain this a little better.  It just makes it so

3    much easier for us to approve these deviations, because I

4    think this is terrific.  This totally improves the

5    project.  I can completely support it and that is a

6    six-story building.  You know, the rezoning, actually,

7    increased the height up to 100 feet right on the road, and

8    that type of deviation to decrease the impact of that

9    building on the road is -- is, I think, a real positive.

10          CITY STAFF:  Thank you.

11          COMMISSIONER HOFMAN:  So with that, I do think

12   it's -- I know Mr. Levitt for a long time and I know he's

13   a quality developer and this is another example and I

14   appreciate the fact that you took all the time that you

15   did, that you stuck with it.  You didn't have to and --

16   and so with that, I'll go ahead and make a motion.  A

17   little bit lengthy but here I go.

18          I'm going to move that the City recommend to the

19   City Council certification of Environmental Impact Report

20   Number 360009/SCH Number 2014071065; and adopt the

21   Findings and Statement of Overriding Considerations and

22   adopt the Mitigation, Monitoring and Reporting Program;

23   and two, recommend that the City Council adopt an

24   amendment to the General Plan and the Torrey Highlands

25   Subarea IV and the Rancho Penasquitos Community Plans

AR005839

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    Number 1266869; and third, recommend that the City Council

2    approve Rezone Ordinance Number 1266781; and four,

3    recommend the City Council approve Planned Development

4    Permit Number 1266871; fifth, recommend the City Council

5    approve Conditional Use Permit Number 1266881; and six,

6    recommend the City Council approve Site Development Permit

7    Number 1266883; and finally, recommend that the City

8    Council approve Vesting Tentative Map Number 1266869,

9    Easement Vacation Number 2076453, and Public Right-of-way

10   Vacation Number 2076458.  And I would include all the

11   addendums that have been added by staff.

12            COMMISSIONER OTSUJI:  Second.

13            CHAIRPERSON HAASE:  Okay.  Thank you.

14            Commissioner Granowitz.

15            COMMISSIONER GRANOWITZ:  (Inaudible).

16            COMMISSIONER OTSUJI:  You can go first --

17            COMMISSIONER GRANOWITZ:  Oh, okay.

18            COMMISSIONER OTSUJI:  -- if you want.  I'll go

19   last.

20            COMMISSIONER GRANOWITZ:  I'll keep these brief,

21   so maybe we can get to a vote before 11:30.

22            I -- I wanted to thank the applicant.  What this

23   project reminds me of is like 20 years ago when we were

24   doing City of Villages.  It's like you really created a

25   city of village where it's really self-contained, and

AR005840

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1   it's -- it's the kinds of development that we should have.

2   I also believe that you will work with Dr. Landis, who I

3   think is sincere in his concerns about the environment.

4         I didn't appreciate getting the document last

5   night.  It felt manipulative and it reminded me a lot of

6   why people want CEQA review, which I'm ambivalent about,

7   because so much of what's real and concerning about the

8   environment needs CEQA review but when it gets abused --

9   so that's just my take.

10         But I'll be supporting the project and I think

11   it's lovely.

12         CHAIRPERSON HAASE:  Thank you.

13         Commissioner Otsuji.

14         COMMISSIONER OTSUJI:  Yes.

15         First comment, we all, up here, love graphics and

16   you guys did a outstanding job in regards to the graphics

17   you presented.  And the reason it's so great is because

18   it's very casual, informal-type of graphics that brings

19   across the concept that you're looking for.  It's not real

20   plastic-looking with a lard -- lot of hard edges.  And we

21   appreciate that.  We get an understanding of what you're

22   looking for.  And, you know, I think we all thank you for

23   that, 'cause all we had to do is look at that and then

24   start reading.

25         A couple of things, to the staff.  Were there any

AR005841

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    park requirements related to this project?

2         MR. PETERSON:  No, the park requirements, I

3    think, were previously covered underneath the permit for

4    Rhodes Crossing so, no, there was not.

5         COMMISSIONER OTSUJI:  Okay.  And the reason I

6    bring that up, there's -- there's -- you know, there's

7    been a movement for a little while in regards to, you

8    know, making sure that, you know, there's sufficient

9    amount of parks throughout the -- the City and -- and the

10   region.  And everybody is looking for, you know, having a

11   park that the community would be able to participate in,

12   at least, within a ten-minute walk of where they live.

13        Love the affordable housing on-site.

14        Two things:  Fire suppression and stormwater.

15   Are there fire suppression zones in this area?  I think

16   there are.  And there's a reason I'm asking this question.

17   I just want to know where they're at.

18        MR. LANE:  Terry Lane, senior planner.

19        There are no official brush management zones,

20   because the development is all inside of the development

21   footprint and surrounded by the roadways and thin

22   manufactured slopes, so we have enough of a buffer with

23   the firebreak at the roadway and the irrigated slopes to

24   avoid having formal brush management zones.

25        COMMISSIONER OTSUJI:  Yeah.  And the reason I ask

AR005842

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    that, I looked at the conceptual planning scheme of the

2    streets on the slopes, and basically they follow the

3    guide -- guidelines of a fire suppression zone.  And I

4    think the reason it's being done is because of the access

5    that they needed for that emergency of getting out of the

6    community if there was a fire there.

7            MR. LANE:  As far as access, I would defer to

8    Fire on that.  But the treatment of the slopes is fire

9    suppressive, yes.

10           COMMISSIONER OTSUJI:  Right.  And just so you

11   understand, you know what that's going to look like,

12   it's -- it gets pretty brutal sometimes until nature takes

13   its course, but it's very minimal and there -- there's a

14   reason for it.  I don't completely agree with it.  But

15   from a standpoint of health safety, that's the reason

16   these things are put in force.  And you'll see a minimum

17   amount of trees there, and there's a reason for that based

18   upon fire suppression logic that they have.

19           On the stormwater biofiltration system, would --

20   would you be able to have the engineer explain the system

21   that's on this site?  I understand it but I just want

22   to --

23           MR. SCHULTZ:  You know, I may be able to add some

24   context for the -- for that.  It's -- it's a mixed system.

25   It has some biofiltration using our -- our standard

AR005843

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    biofiltration basins and then some vaults that address the

2    hydromodification system.

3             COMMISSIONER OTSUJI:  Yeah.  And I understand all

4    that.

5             And I love the planting scheme of this entire

6    project.  I think it meets the Climate Action Plan as we

7    move forth, but I always have a problem with the storm --

8    stormwater biofiltration system with the combination of

9    the units, itself, along with the natural flow.  But both

10   of them are based on mechanical issues.  And I understand

11   why they do this, but it -- it puts a restriction on what

12   you can do, especially, in the basin areas.  You're not

13   allowed to put any trees in there, and I know there are

14   trees that you're able to plant in those areas that will

15   not negatively affect that filtration -- filtration system

16   basically help -- it helps it more.  So -- but I just want

17   to make sure that, you know, we need to walk -- go down

18   this road and get a better understanding of how we're

19   treating the stormwater biofiltration systems that we

20   have.  We're getting better but I completely disagree with

21   the mechanical aspects of the vaults.  To me, they're

22   useless.

23            CHAIRPERSON HAASE:  Thank you.

24            So just to conclude -- and we will get to a vote

25   in time for Doug to make his flight.

AR005844

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1          You know, you're hearing some concern regarding

2     the timeliness of information that this body and others

3     receive infor -- would like to have to -- to review

4     projects adequately.  And, you know, I know a number of us

5     stayed up late to look at a lot of documents last night.

6     As I said earlier, the broader issue is denying the public

7     the right to see this as well for a public hearing.  I

8     have no problem with -- with the letter that was submitted

9     by the law firm because it does make us do our job better,

10    so for that I'll give you a compliment on that.  Although,

11    you might have been beat up a little bit on some other

12    items this morning.

13         One of the things we do though is make a

14    recommendation on the findings of statement of overrides

15    on the Environmental Impact Report and I want to go to

16    that as I -- because I do believe that the findings in the

17    statements of overrides satisfy the requirements in CEQA.

18         On Page 15 of the letter, it states that we do

19    need make specific economic, legal, social, technological,

20    and other concerns and then in -- emphasized in italics is

21    the provision of employment opportunities to highly

22    trained workers.

23         Is that from the CEQA Guidelines or is that --

24    was that added just as a -- probably a focus of this

25    particular applicant?

AR005845

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1              CITY STAFF:  I can look it up specifically.

2         But if I recall from memory that it does talk

3    about economic, but it doesn't specifically -- I do not

4    recall that it specifically refers to employees.

5              CHAIRPERSON HAASE:  Okay.  In looking at the

6    findings, we don't represent it, and my recollection of

7    the CEQA Guidelines, although they're not before me right

8    now, is that while that is -- could be an interpretation

9    of the social and economic, which I appreciate op -- you

10   know, what are the opportunities to make those findings.

11   It's not in the CEQA Guidelines specifically as the

12   language.

13             So with that I -- go ahead.

14             MS. NEUFFER:  It is in there.  That is one of the

15   possible considerations that you can, I guess, consider.

16             CHAIRPERSON HAASE:  What is?

17             MS. NEUFFER:  It's -- it's not required that you

18   make -- that you determine that -- that the project

19   includes that, but that is one of the considerations --

20             CHAIRPERSON HAASE:  Okay.

21             MS. NEUFFER:  -- that you --

22             CHAIRPERSON HAASE:  I was referring to the spe --

23   is that language specific to the CEQA Guidelines?

24             MS. NEUFFER:  It is in the spe --

25             CHAIRPERSON HAASE:  Okay.  So if that is the

AR005846

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    case, then my suggestion is when we write the findings and

2    statement of override -- by the way, I see I have another

3    attorney on my -- on my case here right now -- that we

4    might look at the language in our findings and statements

5    of overrides so that it follows what the CEQA Guidelines

6    say.  It would -- it would be helpful.

7              With that, though, I do see that when I look at

8    economic and social benefits, you know, providing

9    affordable housing is certainly a benefit.  Providing

10   active transportation, walkable and bikeable communities,

11   I believe is a social benefit and a benefit -- a health

12   benefit.  The improved safety response is certainly a

13   benefit to the community.  Reducing trips and reducing VMT

14   is also a benefit.  And then there are employment and

15   financial benefits.

16             I think there -- the question that has been

17   raised in the letter is, Will highly-skilled workers have

18   the opportunity to work in this project.  I think given

19   our intuition and our knowledge project of this nature,

20   the amount of construction and the type of construction

21   will require trained employees.  You don't hire somebody

22   to go do electrical work or concrete work or construction

23   work that doesn't have certain skill sets.  So I do see

24   that whether it's done directly or not, that the nature of

25   the project will have -- will employ skilled workers.  I

AR005847

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

1    can -- I can easily make that finding.  Where -- where

2    they come from, I can't.  And then the applicant has

3    expressed his opinion on that.  And also the financial

4    benefits for the reve -- ultimate -- the tax revenue to

5    the City.

6           So I -- I believe the findings and the statement

7    of overrides are -- satisfy the requirements under CEQA

8    and with that, I will also be supporting the project.

9           I don't know if there's any final comments from

10   commissioners?  Nope?

11          Okay.  With that, we have a motion and a second.

12          Please, vote.

13          That passes 5-0 zero, with Commissioner Whalen

14   absent and Commissioner Peerson recusing.

15          Again, this is a recommendation to the City

16   Council.

17          (End transcription of video-archived meeting,

18          time stamp 2:24:22.)

19                            * * *

20

21

22

23

24

25

AR005848

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

**WORD INDEX**

**< S >**
$1,500  37:15
58:19  59:1
$30  23:17
$33  23:18

**< 1 >**
1  64:14, 14
100  12:7  66:7
10th  37:4
11:30  67:21
1266781  67:2
1266869  67:1, 8
1266871  67:4
1266881  67:5
1266883  67:7
12th  7:15
13022  1:23
14  1:22
15  31:22  72:18
16-0  14:19  22:1
16-0-0  7:19
1980's  37:25
1990  47:18
1998  12:11

**< 2 >**
2  64:14  65:8, 12
2,000  60:7
2,500  33:5
2:24:22  75:18
20  67:23
2000's  12:11
2003  13:1, 3
2004  4:7  12:25
2006  13:10
2007  13:10
2013  12:10
2014071065
66:20
2015  7:15  9:5
2017  7:17  9:6
2018  1:18, 22
12:21
2030  47:19
2076453  67:9
2076458  67:10
20-minute  31:22
22  1:18
23  26:1, 6
242  2:22, 24
4:15

**250,000-square-fo
ot  12:15
275,000-square-fo
ot  12:14
29th  4:7

< 3 >
3  1:19  25:25
26:9
30  9:21  21:12
300-foot-long
25:23
33  21:9, 18
360009  66:20

37-2018-00035233
1:6
3rd  7:17

< 4 >
4  64:13  65:9
40  12:13  47:18
40,000  15:10
41.3  4:4
47  2:24  22:13

< 5 >
5  2:4
5,000  3:12
5,700  7:7
5,750  7:7
5:05  16:4
5-0  75:13
500,000-square-fo
ot  14:17
52:14  2:2
56  1:11, 19  2:4
3:18, 21  4:14
24:16, 18  25:13,
22  26:2, 12
27:15, 17, 18
28:24  29:10
31:18  32:18
34:20  35:16
36:19  37:5  54:4

< 6 >
6-0-2  7:16

< 7 >
7  15:11
70  59:13
7938  4:6**

**< 8 >
8,000  15:11  33:5
86  16:10
89  1:5  46:14

< 9 >
9,000  33:5
90's  15:2

< A >
ability  49:21
able  12:6  13:8
15:10, 17  40:21
62:12  69:11
70:20, 23  71:14
about  14:20
19:21  21:12
27:24  31:19, 22
32:3, 14  33:5, 5
36:8  37:10  51:4
53:17  54:21
57:20  58:3, 12
59:8  60:13, 23
61:3, 10, 20
62:10  63:25
68:3, 6, 7  73:3
above  19:11
20:7  47:11
63:19
absent  75:14
absolutely  22:21
59:6
abuse  59:15
abused  68:8
access  5:7  8:5
31:20  70:4, 7
accessed  6:5
accesses  5:8
accommodate
25:24
accommodated
56:11
accompanying
4:8
accomplishing
8:10
accor  27:6
according  31:12,
14  37:8
account  49:13
acknowledges
48:4
acre  4:4  37:4,
15, 15, 16  58:20
acres  12:13  23:4**

**across  15:3, 7
25:18  28:2
39:19  40:3
68:19
Action  50:19
51:1  71:6
activated  18:23
activating  19:21,
22  20:4  21:6
activation  21:4
active  19:5  20:2
74:10
actually  2:7
10:16  13:9
23:17  31:20
33:23  36:9, 11
37:13  38:15
40:2  63:1, 7
64:4  66:6
adaptive  53:24
add  14:10  17:3
45:17  49:2  50:5
63:21  70:23
added  27:2
63:18  67:11
72:24
addendums
67:11
addition  8:9
12:22  15:18
additional  10:9
25:13  27:2
address  7:10
16:14  24:23
28:7  33:16
48:18  71:1
addressed  49:8
51:18  54:1
addresses  32:12
adequacy  50:22
adequate  48:7
63:3
adequately  32:5
72:4
adjacent  5:24
7:11, 12  19:19
26:9  35:20
37:10  53:21
adopt  8:15, 16,
17  66:20, 22, 23
adopted  50:18
52:5  53:23
adoption  3:2, 4, 5
adoptions  3:7
advantage  32:20**

**advocate  34:13,
14
aerial  3:21
affect  71:15
affected  10:4
affordable  2:24
8:11  20:6  22:13
34:22  61:1, 1
62:2  63:17
69:13  74:9
after  13:7, 13
24:2  30:21  59:3
again  20:6, 11,
21  29:19  33:9
36:25  45:25
46:12  50:21
53:20  56:21
75:15
ago  17:1  60:22
67:23
agree  36:9  70:14
agreement  59:17
ahead  9:2  11:23
21:16  29:9, 12
30:14  41:17
50:4  55:14
58:19  62:23
66:16  73:13
Air  46:21, 25
47:5
align  7:22
alkaline  12:14
All  2:3  4:8
11:23  13:4, 12,
16, 16  14:25
17:1  18:16  19:5
22:13  26:19
27:19  30:8, 18
31:17, 24  32:19,
25, 25  37:18
40:2, 6  41:23
42:12, 13  45:21,
22  48:25  51:6,
23  52:6  53:9
54:15  57:10, 11
59:7  61:24
66:14  67:10
68:15, 22, 23
69:20  71:3
alleys  6:5
Alliance  41:10
allow  31:18, 20
44:6  48:24
allowed  59:4**

AR005849

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

71:*13*
allowing 13:*14*
allows 35:*12*
almost 23:*18*
along 5:*1, 11*
  7:*5* 9:*18* 16:*22*
  20:*12* 22:*2*
  25:*23* 65:*18*
  71:*9*
already 4:*23*
  13:*19* 17:*2* 35:*4*
  36:*5, 5* 37:*11*
also 4:*20, 22*
  5:*1, 2, 7, 11, 14,*
  *14, 17, 22, 24, 24*
  7:*5* 10:*1, 1*
  13:*21, 24* 14:*22*
  18:*23* 20:*13*
  21:*24* 22:*13*
  23:*8, 9* 28:*1*
  32:*12, 16* 34:*24*
  35:*11* 39:*21*
  44:*11* 47:*16, 25*
  48:*2* 52:*5, 23*
  53:*23* 56:*13*
  57:*1, 7* 68:*2*
  74:*14* 75:*3, 8*
alternative 60:*7*
ambivalent 68:*6*
amended 4:*9*
  24:*21*
Amendment
  6:*22* 24:*17*
  66:*24*
amendments 3:*5*
  6:*11* 8:*18* 24:*18*
amenities 31:*16*
AMERICA 1:*5*
  46:*13*
amount 69:*9*
  70:*17* 74:*20*
analysis 47:*6, 8*
  48:*2, 10* 52:*15*
  53:*2, 3*
analyst 46:*22*
analyze 47:*7*
  50:*24*
analyzed 47:*25*
  56:*18*
animals 47:*22*
answer 10:*17*
  24:*2* 59:*20, 22*
anticipate 29:*18*
anybody 34:*21*
anymore 40:*8*

anyway 14:*15*
  25:*18* 34:*7, 17*
  38:*13* 40:*8, 20*
  51:*14* 62:*8, 15*
apart 12:*16*
apartment 12:*17*
apol 41:*3*
apologize 41:*3*
appears 56:*8*
appliance 38:*8*
appliances 38:*5,*
  *6, 13*
applicant 12:*9*
  13:*13* 24:*19, 21*
  26:*20* 29:*23*
  31:*9* 32:*25*
  55:*10* 67:*22*
  72:*25* 75:*2*
application 2:*21*
  13:*2, 23*
apply 64:*23*
appreciate 24:*25*
  26:*4* 30:*10*
  44:*19* 45:*15, 22*
  46:*3* 66:*14* 68:*4,*
  *21* 73:*9*
approval 3:*8*
  7:*16, 19* 28:*5*
  30:*9*
approvals 4:*9*
  60:*1*
approve 8:*20, 20,*
  *22* 33:*10* 66:*3*
  67:*2, 3, 5, 6, 8*
approved 4:*6, 7,*
  *13* 12:*8, 17, 24,*
  *25* 13:*17, 21, 24*
  16:*21, 25* 22:*5*
  25:*8* 35:*4* 54:*23*
  60:*14*
approximately
  7:*6*
architect 16:*19,*
  *19*
Architects 17:*18*
architectural
  5:*12, 15, 21* 6:*7*
  19:*15*
area 3:*19, 21*
  5:*16* 7:*5, 19* 8:*5*
  9:*13, 17, 17, 22,*
  *22, 24, 25* 22:*17*
  23:*13* 28:*24*
  35:*5* 50:*8* 53:*21,*

23 54:*3* 56:*9*
  57:*2* 69:*15*
areas 5:*15* 7:*5*
  8:*12* 18:*3* 25:*9*
  38:*9* 41:*14*
  42:*11* 49:*14*
  57:*20* 71:*12, 14*
area-specific
  51:*24*
Arenz 33:*15*
arranged 6:*5*
aside 38:*10*
asked 58:*21*
  59:*16*
asking 64:*6*
  69:*16*
aspects 71:*21*
Assessment
  23:*16* 47:*6*
asset 62:*9*
assist 8:*9*
associated 6:*25*
  21:*19, 22*
assume 10:*3*
  57:*18*
assurances 25:*1,*
  *3* 29:*8*
assure 26:*8, 11*
  27:*3, 4* 49:*8*
assured 27:*9*
at-grade 56:*12*
attend 30:*24*
attentive 31:*13*
attorney 43:*16,*
  *19, 22* 55:*2* 74:*3*
attract 56:*25*
AUGUST 1:*22*
Austin 2:*7, 9, 12,*
  *14* 54:*17* 55:*8,*
  *12, 14* 56:*1*
  57:*14, 15* 58:*7,*
  *23, 25* 59:*7, 19,*
  *21, 23* 60:*8, 12*
authentic 15:*25*
authenticity
  19:*14*
automatically
  29:*16*
automobile 60:*15*
available 39:*4*
avoid 7:*2* 69:*24*
aware 24:*24*
  42:*17*

< B >
B-30-15 47:*17*
back 9:*4, 10*
  14:*24* 18:*25*
  25:*16* 26:*18*
  28:*15* 29:*17*
  31:*24* 41:*1*
  44:*25* 58:*5*
  61:*22* 65:*25*
background 5:*18*
band 18:*4*
bar 22:*12* 23:*24*
Baranek 33:*12*
Barbara 6:*8*
based 16:*20*
  35:*19* 50:*10*
  70:*17* 71:*10*
basically 9:*13*
  35:*1* 36:*17*
  37:*18, 21* 39:*15,*
  *18* 65:*14, 22*
  70:*2* 71:*16*
basin 71:*12*
basins 71:*1*
batteries 38:*24,*
  *25*
battery 38:*2*
battled 15:*12*
bay 50:*12*
beat 72:*11*
behalf 34:*10*
  46:*13*
believe 27:*11*
  33:*20* 41:*13, 15*
  51:*14* 52:*23*
  54:*6* 56:*11* 63:*6*
  68:*2* 72:*16*
  74:*11* 75:*6*
believes 26:*13*
Benefit 23:*16*
  52:*19* 53:*3*
  63:*17* 74:*9, 11,*
  *11, 12, 13, 14*
benefits 22:*2*
  23:*11, 24* 74:*8,*
  *15* 75:*4*
best 33:*1*
better 9:*20* 66:*2*
  71:*18, 20* 72:*9*
big 37:*16* 60:*15*
big-box 12:*12, 15*
bikeable 74:*10*
bio 24:*24*

biofiltration
  70:*19, 25* 71:*1, 8,*
  *19*
Biological 24:*25*
  47:*1, 20* 48:*3*
  52:*1*
biologist 46:*20*
biology 23:*5*
  24:*24* 51:*15*
  52:*3*
birds 47:*23*
bisected 39:*17*
bit 10:*14, 16*
  40:*1* 45:*8* 66:*17*
  72:*11*
Black 3:*18, 20*
Blackwill 24:*7*
block 19:*23*
blocks 18:*18*
blow 37:*19* 38:*4*
blown 36:*25*
blue 65:*10*
BMP's 7:*11*
Board 7:*16, 18*
  9:*9* 31:*3, 9*
body 51:*14* 72:*2*
bond 26:*8* 27:*5,*
  *9*
botanically 35:*1*
bottom 13:*5*
bought 12:*9*
Bour 41:*3*
Bourgeois 41:*2,*
  *5, 8, 9*
BREEZE 1:*11*
  12:*3* 24:*14, 15*
bridge 36:*13*
brief 21:*17*
  67:*20*
bring 32:*18*
  37:*11* 69:*6*
bringing 31:*15*
  32:*14*
brings 32:*16*
  68:*18*
broad 49:*5*
broader 50:*16*
  72:*6*
brought 18:*24*
  19:*21* 32:*7* 42:*8*
  53:*15* 56:*4* 58:*3*
brush 69:*19, 24*
brutal 70:*12*
buffer 17:*24*
  69:*22*

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

build 27:14, 15
32:21 49:17
building 6:9
12:17 19:14
20:6 38:21 60:6
64:2 65:9, 11
66:6, 9
buildings 18:6
19:5, 18 20:15,
23 39:3
built 13:10, 18
22:17 26:3
29:15 32:11
60:14, 22, 22
bunch 37:5
buy 45:19

< C >
C-3-5 6:20
cafes 20:19
CALIFORNIA
1:1 34:11 59:14
60:25 61:19
call 21:21
calming 22:22
23:1
Camino 3:18, 25
4:2, 21, 23 5:2
6:2 8:1 22:19
24:19 25:12, 24
26:9 31:25 32:3,
13 36:23 39:17
64:2 65:14, 17
cancer 47:11
Canyon 15:3
36:4
CAP 50:18, 22
61:18 63:22
care 49:16
Carmel 4:21
7:2 8:1 15:6, 6,
7, 8 22:20 24:18
25:12
car-oriented 16:6
carries 37:7
Case 1:5 29:19
62:15 65:1 74:1,
3
cases 64:5
casual 68:18
Catherine 33:21,
21
caught 39:23

cause 15:13
27:4 35:16, 17
53:4 62:3, 12
64:6 68:23
caused 22:18
36:1
cede 17:8, 13
41:17
ceded 33:23
center 5:3, 4, 7,
11 6:15 7:24
9:23, 25 12:12,
16 19:3 32:23
centers 8:12
central 20:18
centralized 19:4
CEQA 47:11
50:1 52:17
59:13 63:4 68:6,
8 72:17, 23 73:7,
11, 23 74:5 75:7
certain 52:22
60:4 74:23
certainly 29:23
74:9, 12
certainty 26:25
certification 3:2
8:14 63:9 66:19
certifying 63:5
chair 58:8
Chairman 24:9
CHAIRPERSON
2:3, 10, 13, 16
8:25 10:7, 18, 24
11:9, 14, 17 17:5,
12 21:11, 15
24:4 26:23
27:21 28:19
30:11 33:11, 25
34:5 40:17, 21
41:6, 19 42:22
43:4, 6, 9, 12, 15,
18, 20, 24 44:2,
15, 20, 24 45:11,
13, 18, 23 46:5, 7
48:14, 17 49:19,
24 50:4, 15 51:2,
9 52:9, 13 53:13
54:2, 8, 11, 15
55:13, 17 56:5
57:10 62:18
63:6, 10 67:13
68:12 71:23

73:5, 16, 20, 22,
25
challenge 22:6,
12
chance 34:19
41:22
change 6:12 9:8,
11 34:13
changed 63:15
changes 10:3
49:21
chappa 33:21
Chappas 33:21
character 19:17
61:11
charging 63:21
cheap 37:14
45:20
cheaper 38:7
check 55:17
checklist 50:19
51:1
Chermak 42:24
43:3, 5, 8, 11, 13,
17, 19, 23 44:1,
14, 17, 21 45:10,
12, 15 46:3, 6, 11,
12 48:15
church 13:2
cinema 3:12
19:20 20:2, 11
circle 20:10, 10
circles 18:15
61:21
Circulation 5:5
8:3
citizen 39:25
CITY 1:8, 8, 8,
17 4:6 8:10, 14
10:20 13:2, 2
14:21, 24 15:12,
13 16:13 24:20
25:1, 4, 21 26:10,
10, 24 27:1 28:5,
9 29:1, 8, 17, 20
40:16 41:23
46:8, 14 49:5, 25
50:18, 23, 24
51:6 54:23 55:1,
22 56:18 57:7
63:9 64:8, 11, 12,
17, 22 65:20
66:10, 18, 19, 23
67:1, 3, 4, 6, 7, 24,

25 69:9 73:1
75:5, 15
city-owned 4:23
City's 3:22
24:25 52:3
claims 55:4
clarification 43:1
clarified 10:14
clarify 26:20
60:10
clarifying 9:1
Clark 30:21, 24
classifications
7:1
clear 2:11
29:22 34:15
53:18 64:21
client 43:4, 17, 18
climate 34:13
50:18 51:1 71:6
close 12:4 41:9
48:20
clusters 6:5
CMPS 37:14
39:13, 14
coffee 14:13
20:19
colleague 44:18
colleagues 45:7
collect 38:2
collisions 47:22
colonial 6:8
color 4:25
combination 71:8
come 6:19 22:2
25:16 26:18
28:15 29:17
30:15 31:9 75:2
comes 37:22
coming 16:22
44:8 59:10, 10,
14
comment 2:8
41:11, 13 48:19
50:21 53:19
55:19, 20 65:25
68:15
comments 17:11
36:10 42:5 44:7,
12, 23 45:4
46:20 48:11
53:8, 16 62:25
63:1, 2 75:9
commercial 2:23
4:15 5:2 6:19,

20, 20 7:24 18:3,
8, 23 19:6 20:7
commercial-regio
nal 6:13
COMMISSION
1:17 3:16 8:13
24:10 33:17
34:8 48:19
55:19
Commissioner
2:7, 9, 12, 14 9:2,
3, 15 10:2, 6
45:16, 19 46:11
50:3, 5, 14 53:9,
11, 14 54:17
55:8, 12, 14, 20,
24 56:1, 2 57:5,
14, 15 58:7, 23,
25 59:7, 19, 21,
23 60:8, 12
62:19, 21 63:8,
11 64:10, 12, 15,
18 65:19, 22
66:11 67:12, 14,
15, 16, 17, 18, 20
68:13, 14 69:5,
25 70:10 71:3
75:13, 14
Commissioners
2:19 17:17
30:23 55:18
57:13 75:10
communities 8:4
74:10
Community 3:7
5:6 6:11, 22
7:18 8:8, 19, 20
9:4, 17, 22 10:4
12:19 14:2, 4
15:14, 23 16:8
17:4 21:25
24:16 31:2, 17
32:1, 2, 9, 14, 20,
21 33:4 58:11
59:10 60:20
61:5, 7, 9 62:9
66:25 69:11
70:6 74:13
commute 31:22
company 24:15
compared 52:21
complaints 50:6
complete 18:14
22:9

AR005851

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

completed 22:19
49:12
completely 22:4
66:5 70:14
71:20
complex 5:4, 23
compliance 47:17
compliment 62:8
72:10
compliments
32:17 58:12
comply 52:11
component 7:23
components 7:21
comprised 2:22
4:15
con 27:13 30:4
concept 19:3
20:24 68:19
concepts 5:12, 21
conceptual 70:1
concern 33:3
44:19 45:25
49:4, 17 57:20
72:1
concerned 50:23
60:23
concerning 68:7
concerns 31:10,
13 32:2, 9, 12, 14
51:3, 17 68:3
72:20
conclude 71:24
concludes 8:24
concrete 74:22
Condition 26:1
27:1, 4, 7, 17
29:6, 21 63:20
Conditional 3:11
8:21 67:5
conditioned
25:22
conditions 10:10,
13 29:6 33:8
51:6, 7
conducted 47:8
configuration
65:3, 6
conflict 61:8
confusing 64:16
congestion 32:1
connect 31:24
connection 23:7

connections
18:19 22:16
23:14
connects 18:20
20:11 31:17
consider 46:17
47:19, 21 73:15
Consideration
3:3 8:16 31:11
considerations
57:6 66:21
73:15, 19
considered 47:15
51:23
consist 7:24
Consistency 51:1
consistent 6:21
50:25, 25
consists 7:21
12:22
construct 25:22
26:13, 16 27:3, 6,
12
constructed 6:7
26:4, 14, 17
27:10 28:18
constructing
26:21
construction
2:22 4:19, 22
26:7 47:9, 13
74:20, 20, 22
contain 4:17, 18
containing 7:24
contains 7:6
contemporary
19:15
context 70:24
contributing
49:13
convenient 32:17
Coopersmith
11:3, 18 21:9, 10,
14, 17, 18
core 19:14
corner 7:9
19:20, 21 20:1, 4
correct 10:5
11:4 43:23
49:23 50:13, 24
52:12
correction 26:5,
5
corridor 39:16
cost 39:7

COUNCIL 1:8
4:6 8:14 14:21
16:14 28:5, 15
29:17, 21 30:7
40:16 46:9
54:23 63:7, 9
66:19, 23 67:1, 3,
4, 6, 8 75:16
country 47:23
COUNTY 1:2
couple 17:11, 21
38:11 63:12, 21
68:25
course 24:15
65:15 70:13
COURT 1:1
55:6, 11
cover 10:11
27:11 50:11
51:15
coverage 51:19
covered 57:11
69:3
crawl 56:15
crazy 21:22
create 14:7, 14
17:24 18:9
20:17 24:16
34:24 47:11
created 15:19,
20 18:18 67:24
creates 21:3
61:14, 15
creating 60:21
Creek 36:13, 15,
24 37:6
critical 18:13
19:2 22:21
35:15 60:25
critters 56:13
cross 39:21
Crossing 4:5, 10
12:24 18:16
24:11, 12, 22
25:8, 9 26:1
28:2, 6 35:13
39:14, 15, 17
40:1 55:21 56:7,
10, 12 69:4
crossings 40:4
55:25 56:18
crosswalk 39:18
CSR 1:23
culvert 36:15, 23

50:9 56:14
culverts 49:15
cumulative 48:2,
5 51:17 52:7
CUP 4:8 14:13
curb 39:23
curious 59:19
current 29:23
currently 29:7,
12
cut 40:5
CU-WM-NC 1:6

< D >
da 35:16
daily 31:19
dam 36:22
damage 35:17
damages 36:1
Daniel 46:22
dark 7:5
Darsana 30:20,
21
Davis 44:18
60:5
day 15:21 44:4
de 7:17 39:8
deal 51:18
dealing 53:11
deals 53:24
dealt 37:9
debates 22:14
decades 38:12
decarbonizing
37:24
deceleration
25:23 26:9, 17,
22 27:12, 23
decision 2:5
44:5
decrease 39:8
66:8
Deer 36:12, 15,
23 37:6 39:18,
19 40:3 56:8
defer 56:20 70:7
deferred 48:9
deficient 41:14
42:11
defining 55:25
56:2
Del 3:18, 25 4:2,
21, 23 5:2 6:2
7:15 8:1 9:4, 10,
13, 18, 23, 23

15:3, 5 16:23, 24
22:19 24:19
25:12, 24 26:9
31:25 32:3, 13
34:25 36:2, 23
39:17 53:21
58:9 61:23 64:2
65:14, 17
delay 54:25
demand 52:22
demonstrate
47:16
denied 12:19
denying 72:6
Department 14:5
departments
41:24
depend 55:10
depends 55:3, 5
depicted 25:12
design 9:19
17:24 19:15
22:16 28:3
37:25 39:7
49:20 51:5 52:6
65:16
designation 6:12
designed 5:6
12:10 15:1, 9
18:14 50:10
51:23 56:8
designs 5:15
desires 31:12
despite 16:9
destroying 16:23
detail 44:4
49:20
determine 73:18
determined
56:19, 21 57:1, 3
deterrent 56:24
deve 35:16
developed 5:13
24:11
developer 21:21
60:17 66:13
developing 51:17
development
2:20, 22 3:1, 8, 9,
10 4:4, 9, 11, 15,
17 5:2 7:22, 23
8:21, 21 9:19
13:15, 16 32:16
34:14 35:3, 12

AR005852

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

46:16  61:2  67:3,
6  68:1  69:20, 20
**developments**
5:9  35:13  65:6
**deviation**  64:4
65:12, 18  66:8
**deviations**  3:9,
15  63:25  64:2,
19, 23  65:1, 3
66:3
**DG**  31:16
**di**  13:22  49:9
**DIEGO**  1:2, 8, 8,
17  34:22  41:23
46:15  61:17
**diesel**  47:8
**difference**  42:9
49:9  50:21
**different**  22:7, 9
30:2  49:10  54:3
**differential**  57:8
**differently**  14:3
**difficult**  44:15
**dimension**  6:25
**diocese**  13:22
23:10
**direct**  51:25
**directives**  51:24
**directly**  74:24
**dirt**  36:14
**disadvantage**
45:9
**disagree**  71:20
**discern**  64:6
**discharge**  7:10
**discussion**  9:25
**disservice**  44:6
**distribute**  59:5
**District**  31:4
**disturbance**
25:10, 11, 14
**disturbed**  37:12
**doable**  57:25
**document**  12:18
36:16  45:1  63:3
68:4
**documents**  10:10
44:10  72:5
**doing**  21:21
22:14, 22, 23
26:19  58:14
61:1, 12, 22
67:24
**Doug**  46:12
71:25

**Douglas**  42:23,
24, 25
**downgraded**  6:25
**downhill**  26:15
**downstream**
53:18  59:6
**downtown**  18:25
**Dr**  40:23  46:20
48:11  51:12
54:12  68:2
**Draft**  41:12
42:6  44:3
**drain**  27:25  50:8
**drainage**  7:7
28:1, 2, 25  49:12
**drawing**  9:20
**draws**  19:18
**drives**  6:6  65:2
**drought**  33:8
**drown**  37:7
**Drury**  43:2
**due**  3:10, 12
6:24  25:14
**dumping**  36:20
**dwelling**  4:19
6:4

< E >

**earlier**  12:25
65:25, 25  72:6
**early**  12:10, 11
**earn**  28:20
**ease**  31:25
**easement**  3:14
7:8, 9, 13  8:22
28:1, 2, 4, 5, 8, 10,
14, 16, 21, 25
29:2, 9, 16  67:9
**easier**  66:3
**easily**  75:1
**east**  3:24  4:11
5:4
**easy**  38:11  39:4
**economic**  72:19
73:3, 9  74:8
**edge**  13:5  16:23
19:22
**edges**  68:20
**effects**  40:6
**efforts**  58:13
**eight**  12:13
**EIR**  12:18
16:10, 12  25:10
35:9, 24  36:25
44:3  45:4  46:17

47:15  48:4, 10
52:4  56:19  63:5
**either**  13:18
39:19
**elected**  31:3
**Electric**  38:6
39:1  63:22
**electrical**  38:12
63:19  74:22
**elements**  8:3
18:15
**eliminated**  15:18
**Elizabeth**  33:22
**elliptical-shaped**
20:9
**e-mails**  25:21
**emergency**  70:5
**emission**  38:16
**emissions**  39:9
47:10, 18  50:17
**emotions**  12:4
**emphasized**
72:20
**employ**  74:25
**employee**  43:12
**employees**  73:4
74:21
**employment**
8:12  72:21
74:14
**enables**  35:12
**encourage**  16:12
**encouragements**
14:6
**endangered**  35:6,
6, 19  56:9
**energy**  38:23
**enforcing**  51:4
**engaging**  21:7
**Engineer**  26:10,
12, 24  27:1  29:1,
8  49:5  60:5
70:20
**engineered**  39:18
**engineering**
21:18  26:2
29:24  36:24
**enhanced**  18:16
**Enterprises**
46:21
**entire**  6:16
18:20  38:16
71:5
**entrance**  6:2
25:24

**entries**  20:3
21:5
**environment**
42:1, 9  59:12
68:3, 8
**Environmental**
3:2  8:15  16:8
23:2  41:10, 12,
14  42:6, 10, 19
46:17  53:2, 12
54:21, 24  55:5,
16  57:17, 20
60:24  62:11, 22
66:19  72:15
**environmentally**
3:11
**envisioned**  20:15
**eradication**  53:25
**eradifi**  53:24
**e-ride**  24:12
**errata**  10:9, 18,
20
**especially**  35:9
64:1  71:12
**essential**  32:21
**essentially**  48:4
**estate**  12:20
**evening**  14:14
**everybody**  14:5
34:15  37:1
38:12  69:10
**evident**  19:15
**evil**  61:19
**exactly**  60:15, 17
**example**  58:18
66:13
**excee**  58:24
**exceed**  65:18. 19.
20
**exceeds**  59:1
**exciting**  22:6
23:25
**Excuse**  9:24
11:13  24:6  47:6
**Executive**  47:17
**exhibit**  10:21, 23
29:7
**existing**  7:1
17:25  18:10
**exit**  33:4, 7
**expands**  32:9
**expenses**  38:1
**expensive**  62:3, 4
**experience**  53:5

**expert**  44:23
46:19, 21
**explain**  64:1, 3
66:2  70:20
**explains**  10:16
**expressed**  75:3
**expression**  19:16
**exten**  29:15
**extension**  8:1
**extensions**  4:20
**extinctions**  40:7
**extinguish**  28:5,
21  29:16
**extra**  60:18
**extract**  13:8
**eyes**  21:6

< F >

**Facilities**  23:16
**facility**  12:15
**fact**  14:16  16:9,
20  26:21  42:2
48:4  51:16
58:17  59:25
60:3  63:16
66:14
**failed**  23:25
47:16
**fails**  47:5, 21
48:5
**fair**  37:14
**fairly**  37:12, 20
**familiar**  19:17
**families**  31:23
**far**  5:18  27:2
49:14  50:23
52:25  61:7, 7
63:14  70:7
**fashion**  38:10
**fast**  63:21
**faster**  34:3
**fatalities**  47:23
**favor**  11:1  58:17
**FBA**  15:15
23:18
**feasible**  49:17
**feature**  51:5
**features**  37:25
39:7
**FEBRUARY**
1:18
**feeds**  36:19
**feel**  14:19
**feeling**  55:1  58:3

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

fees 23:18
feet 3:13 66:7
FEI 47:21
FEIR 47:5, 16, 21 48:1
felt 15:14 63:3 68:5
fifth 67:4
fill 11:9 36:12, 14, 16, 22
filtration 71:15, 15
Final 46:17 75:9
finalization 10:22 52:4
finalized 13:14
finally 18:6 48:9 67:7
financial 74:15 75:3
find 35:8 36:10 42:19
finding 75:1
Findings 3:3 8:15 66:1, 21 72:14, 16 73:6, 10 74:1, 4 75:6
fine 27:19 44:24
fines 58:24
finish 23:15 40:21, 24
fire 33:3 69:14, 15 70:3, 6, 8, 8, 18
firebreak 69:23
fires 13:3, 6
firm 43:5, 7 72:9
first 11:5 14:2 17:23 19:11 22:4 28:10 36:22 38:14 49:3 59:4 67:14 68:15
fitness 20:5
five 17:15 42:16 58:3
five-story 12:16, 16
fix 35:17 37:3
fixed 36:1, 11
flavor 56:5
flight 71:25
floor 19:11

flow 37:6 71:9
flows 37:6
focus 50:16 72:24
focused 57:16
folks 44:25 54:20
follow 70:2
following 5:10 25:3
follows 74:5
food 20:15
foot 7:7
footprint 69:21
FORBIGER 51:21, 21 52:12 53:20, 20 54:6, 9, 14 56:23
force 70:16
forgot 61:20
form 21:4
Formal 6:8 69:24
forms 19:18
forth 71:7
forward 28:24 29:1 58:1
found 47:10 50:25
founder 12:2
four 12:16 15:9, 10 19:4 32:3 36:8 42:16 47:11 67:2
four-lane 14:25 23:3
Fourth 39:14
frame 28:14
Frank 33:19, 20
freeway 17:25 18:4, 8 60:20
front 19:6 35:3 65:13, 16
front-end 25:23
front-entry 21:2
full 26:8
Furthermore 52:4 56:23
future 25:2, 7 44:9

< G >
garage 39:5
garages 39:2

GARY 1:11 11:6, 19, 23 12:2 17:16, 20 18:12 19:13 21:20 40:11, 12, 14
Gary's 17:20
gas 37:22 38:3, 4, 5, 6, 7, 9, 16, 16, 18 39:8 46:25 50:17
General 3:5 8:8, 18 34:20 55:18 64:22 65:7 66:24
generally 54:25
generate 25:13
getting 37:18 38:4, 4, 17 44:22 56:17 61:5 62:23 68:4 70:5 71:20
give 17:15, 15 29:8 64:8, 11 72:10
given 74:18
giving 33:25 41:21 60:7
Go 9:2, 10, 18 10:8, 11 11:4, 20, 23 14:25 15:10 16:14 21:16 22:3 23:6 24:5 25:18 27:1 28:10 30:4, 12, 14, 14 31:24 33:18 35:14 36:7 37:13 39:24 40:3 41:17 49:5 50:4 54:23 55:14, 18 56:16 57:8, 13 58:1, 5, 19, 21 59:4 60:18 61:22 62:24 66:16, 17 67:16, 18 71:17 72:15 73:13 74:22
goals 8:6, 10
goes 15:7 28:9 31:16 35:22 40:16 62:16
going 7:4 9:19 11:12, 14, 21 13:25 15:16 16:2, 18 17:1, 12

21:8, 25 22:12 23:1, 4, 7, 14, 15, 15, 17, 20 25:17 26:15, 16 28:20 31:15 32:5, 10, 11 33:7 34:14 35:7, 21, 21 36:7, 14, 15, 20 37:12 38:10, 12, 12 39:12, 16, 23 40:3, 8 45:2 46:8 48:5, 25 50:9, 16 52:21 58:2 60:12 62:6, 9, 15, 19 63:11, 20 65:25 66:18 70:11
Golden 41:9
Good 2:18 21:10 22:25 24:9 30:23 33:1 35:10 37:12 38:17, 21 41:8, 21 48:23 58:18 61:21
grade 28:11 57:8
graded 17:1, 1
grading 7:2 10:1 13:18 17:2 18:2 25:7, 10, 10, 11 28:12, 13 29:3 59:3
Granowitz 67:14, 15, 17, 20
graphics 68:15, 16, 18
grateful 42:13
gray 7:5
Great 11:22 17:16 21:15 22:7 34:6, 24 39:2, 20 61:4 68:17
green 27:24
greenhouse 37:21 38:15 39:8 46:25 50:17
grid 64:25
grocer 19:25
groceries 20:3
grocery 20:11

group 7:18 9:4, 10 14:4, 19 22:1 58:9
grow 32:21
growing 33:8
guarantee 45:2
guess 48:22 54:17 73:15
guessing 64:13
guide 70:3
Guidelines 24:25 52:3 70:3 72:23 73:7, 11, 23 74:5
guys 34:19 68:16

< H >
HAASE 2:3, 10, 13, 16 8:25 10:7, 18, 24 11:9, 14, 17 17:5, 12 21:11, 15 24:4 26:23 27:21 28:19 30:11 33:11, 25 34:5, 7 40:17, 21 41:6, 19 42:22 43:4, 6, 9, 12, 15, 18, 20, 24 44:2, 15, 20, 24 45:11, 13, 18, 23 46:5, 7 48:14, 17 49:19, 24 50:4, 15 51:2, 9 52:9, 13 53:13 54:2, 8, 11, 15 55:13, 17 56:5 57:10 62:18 63:6, 10 67:13 68:12 71:23 73:5, 16, 20, 22, 25
habitat 19:19
halls 20:15, 15
hand 16:18 28:12
handles 39:21 40:2
handy 63:23
happen 23:14 32:10 35:22 45:3 58:2
happened 9:7
happens 14:20
happy 24:2 34:20 48:12

AR005854

Video Transcription of Planning Commision Meeting 2/22/18 8/14/2018

hard 13:25
45:24 64:6
68:20
hardscape 36:20
hate 59:14
HCP 52:5, 10
health 22:19, 21
47:1, 5, 6 70:15
74:11
hear 16:7 21:25
34:14
heard 12:25
57:17 59:13
62:13
hearing 16:9
44:4, 7 49:19
54:2 56:11 72:1,
7
heart 12:4
heat 33:8
heck 62:10
height 66:7
held 16:15
help 64:12 71:16
helpful 45:3
51:10 74:6
helps 44:5 71:16
High 8:7 31:21
48:24
high-density 6:14
highest 38:15
Highland 8:18
Highlands 3:6, 6
6:13 7:18 8:4, 7
35:14 66:24
highlight 47:3
highly 18:3
72:21
highly-skilled
74:17
high-quality
23:22
Highway 36:19
hiking 23:12
hire 74:21
hit 13:11
ho 6:1
Hofman 9:2, 3,
15 10:2, 6 45:16,
19 50:3, 5, 14
53:9, 11, 14
62:19, 21 63:8,
11 64:10, 13, 15,
18 65:19, 22
66:11

hold 13:12 28:8
40:18, 18 62:11
holds 25:2
homage 61:20
home 21:1 37:24
homeowner
37:23
homes 13:17
18:6, 8 33:5
hope 34:17, 18
39:24 62:9
Hopefully 34:2,
3, 19 37:1 39:7
hoping 36:10
39:9 45:1
horizontal 14:10
horned 39:21
hotel 2:24 4:16
5:1, 22 7:25
32:19
hours 24:20
42:14
house 38:1, 2, 25
houses 60:21
housing 2:25
8:11, 11 20:6
34:22 60:25
61:1, 1 62:6, 7
69:13 74:9
hovering 17:6
huge 12:13 13:6
63:17
hundreds 42:13
hydrologist 36:17
hydrology 49:3,
4, 6 50:7, 10, 11
hydromodificatio
n 71:2

< I >
idea 18:12 19:9,
13 61:21
ideas 42:4
identify 56:21
identifying 58:11
ignore 16:12
46:2
im 25:7
image 19:20
20:5
Impact 3:2 8:15
23:2, 4 41:12, 14
42:6, 10, 19
62:22 66:8, 19

72:15
impacting 16:22
impacts 3:10
7:2 16:24 23:11
25:13 35:7, 9
46:17, 25 47:1, 1,
2, 7, 14, 20, 21, 25
48:3, 5, 7 51:18,
25, 25 52:7 54:1
56:20, 22 57:2
60:4
implement 25:7
implementation
54:1, 9
implementing
27:3
implements 8:6
important 18:9,
17 19:9, 25 21:3,
24 23:23 42:9
importantly
14:22 33:3
impossible 35:17
improper 48:9
improve 57:22
improved 74:12
improvement
4:22 16:21 26:8
improvements
7:13
improves 66:4
inaccuracies
16:16
inadvertently
10:21
Inaudible 2:12
13:6 14:17
17:13 34:2
43:13, 14 54:16
56:1 60:7 67:15
inclu 3:9
include 6:9
28:4 39:6 47:5
50:7 67:10
included 12:25
47:12, 14, 15
includes 3:9
4:20, 22 5:23
46:19 53:23
73:19
including 42:7
inconsistent 28:6
48:11
incorporate 8:1
42:20

incorporated
7:12 42:7
increase 64:4
increased 52:6
66:7
increasing 33:8
37:21 38:20, 20
60:2 65:22
incur 46:18
indicate 48:6
indicated 48:11
indicates 46:24,
24
indication 5:15
individual 11:11
infor 72:3
informal-type
68:18
information 72:2
infrastructure
38:6
initially 15:13
input 55:24 61:5
inside 69:20
install 38:8 39:5
instance 38:5
insufficient 48:3
intended 18:16
intense 18:3, 5
intensity 18:2
intentional 18:7
44:21 45:20
interact 18:10
interest 61:8
interested 44:11
54:20
interfere 26:18
interior 5:14 6:6
INTERNATIONA
L 1:4 43:13
46:13
interpretation
73:8
intersections
60:4
intuition 74:19
invasive 53:25
54:4, 10
invasives 37:11,
11 54:7
investment 38:21
involved 14:11
42:15
irrigated 69:23

island 40:6, 6
issuance 26:7
issue 12:9 29:23,
24 34:23, 24
36:24 37:4
39:14 49:10
50:16 51:15
59:12 72:6
issues 13:11
24:23 30:10
34:12, 13 35:19
42:7, 18 48:23
51:11, 12 54:21
57:17 58:3
62:11, 14 71:10
italics 72:20
ITEM 1:19 2:3,
4
items 32:23
49:2 72:12
its 13:9 41:23
46:14 47:8
70:13
IV 66:25

< J >
jam 13:7
Jeff 2:6, 19
10:8 17:19
65:10
JENNIFER 1:23
30:18, 19, 19
job 22:7 33:1
35:10 45:24
68:16 72:9
John 17:13
33:15, 15
joined 15:5
Josh 41:2, 4, 8
jump 39:22
Justice 41:10
justifications
3:15

< K >
Kay 41:20, 20
42:22
keep 67:20
Keith 11:3, 5, 20
24:5, 10
ket 24:7
Kettner 24:7
Kim 33:12, 12
kind 10:14, 16
18:2, 5, 7, 24

AR005855

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

19:*10*  20:8, *25*
21:*6*  22:*7*  29:*21*
32:*22*  35:*5*
37:*15*  39:*6*
57:*11*
**kinds**  68:*1*
**know**  2:*11*  9:*7*
12:*19*  15:*8, 16,*
*20*  16:*5, 6, 12*
25:*2, 17*  27:*8*
29:*10*  30:*8*  33:*4,*
*14*  34:*18*  36:*4*
38:*14, 20, 20*
39:*18*  45:*12*
46:*1*  49:*6, 11*
51:*16*  52:*15*
53:*3*  55:*1, 4, 5, 6,*
*9*  56:*2*  57:*19, 24*
58:*2, 17*  59:*9*
61:*7, 18, 24*  62:*2*
66:*6, 12, 12*
68:*22*  69:*6, 8, 8,*
*10, 17*  70:*11, 23*
71:*13, 17*  72:*1, 4,*
*4*  73:*10*  74:*8*
75:*9*
**knowledge** 74:*19*
**known**  13:*25*
**Kristi**  51:*21*
53:*20*

**< L >**
**labor**  59:*10, 14,*
*16*  62:*10*
**Laborer**  43:*13*
**LABORERS**  1:*4*
46:*13*
**land**  6:*12, 22*
50:*23*  65:*5*
**Landis**  33:*20, 23*
34:*2, 7*  40:*12, 20,*
*23*  42:*8, 15*
51:*12*  53:*15*
54:*12*  58:*4, 5, 8,*
*9*  59:*3*  63:*2*
68:*2*
**lands**  3:*11*
**landscaped**  18:*19*
**landscaping**  5:*16,*
*21*  19:*18*
**land-use**  7:*24*
**lane**  25:*23*  26:*9,*
*22*  27:*12, 24*
69:*18, 18*  70:*7*

**lanes**  15:*9*  32:*3,*
*4, 8, 12, 15*  56:*24*
**language**  24:*24*
27:*2*  73:*12, 23*
74:*4*
**lard**  68:*20*
**large**  18:*25*
20:*14*  35:*3*
56:*25*
**largely**  36:*5*
48:*11*
**lastly**  20:*24*
**last-minute**  42:*17*
**late**  15:*2*  34:*18*
46:*4*  54:*22*  72:*5*
**Latitude**  21:*9, 18*
**law**  50:*23*  72:*9*
**lawsuit**  54:*24*
55:*5*  58:*1*
**lawsuits**  59:*13*
60:*24*
**lay**  65:*5*
**laying**  17:*23*
**leading**  33:*20*
40:*6*
**leave**  30:*24*
**Left**  2:*14*  10:*21*
13:*20*  17:*6*  25:*9*
**legal**  13:*11*
72:*19*
**lengthy**  66:*17*
**letter**  34:*17*
36:*8*  41:*11, 13,*
*15*  43:*1*  44:*3, 18*
45:*6*  46:*15, 19,*
*23, 24*  48:*16*
54:*22*  59:*9*  63:*2*
72:*8, 18*  74:*17*
**letting**  30:*9*
**level**  48:*25*  52:*2,*
*16*
**levels**  47:*19*
**LEVITT**  1:*11*
11:*8, 13, 16, 24*
12:*2*  40:*11, 14*
42:*3*  57:*22*  58:*5,*
*8, 24*  59:*1, 18, 20,*
*22, 24*  60:*11*
66:*12*
**life**  31:*20*  60:*21*
**lights**  2:*8, 10*
15:*18, 20*
**limits**  25:*10, 11*
**lined**  20:*12*

**lines**  51:*4*
**link**  23:*15*
**list**  30:*14*  49:*1*
57:*24*
**listed**  10:*15*
41:*15*
**listing**  35:*18*
**listings**  35:*18*
**little**  5:*25*  7:*5*
9:*20*  10:*14, 16*
39:*6*  49:*1*  52:*18*
54:*3*  66:*2, 17*
69:*7*  72:*11*
**L-I-U-N-A**  43:*10*
**livable**  62:*1*
**live**  14:*12*  61:*7*
69:*12*
**lived**  13:*4*
**living**  46:*14*
60:*5*  61:*9*
**lizards**  39:*21*
**LLC**  1:*11*
**lobby**  19:*20*
20:*11, 11*
**LOCAL**  1:*5*
6:*14*  7:*24*  8:*5*
46:*14*  47:*7*
**located**  3:*17*  5:*3,*
*4*  7:*8*  19:*5*  20:*6*
57:*2*
**location**  4:*1*
**logic**  70:*18*
**long**  9:*8*  27:*19*
31:*8*  42:*16*
54:*25*  62:*16*
66:*12*
**longer**  7:*13*
61:*13*
**long-time**  31:*1*
**look**  12:*18*
16:*20*  27:*25*
30:*9*  33:*7*  49:*15*
52:*20*  53:*1*
60:*13, 16*  68:*23*
70:*11*  72:*5*  73:*1*
74:*4, 7*
**looked**  62:*25*
63:*1*  70:*1*
**looking**  3:*24*
4:*3*  5:*17*  19:*24*
29:*12*  46:*4*  47:*8*
68:*19, 22*  69:*10*
73:*5*
**looks**  6:*3*  11:*2*

44:*10*  64:*3*
**los**  7:*17*
**lost**  35:*23*
**lot**  6:*20*  12:*13*
25:*25*  26:*9*
31:*19*  32:*13*
34:*3*  36:*6, 20*
37:*24*  38:*5, 17*
39:*6, 7*  44:*3*
49:*15*  62:*24*
64:*14, 19*  65:*1, 3,*
*8, 12*  68:*5, 20*
72:*5*
**lots**  24:*14, 22*
25:*25*  60:*15*
61:*3*
**lou**  43:*10*
**Louis**  28:*20*
**love**  57:*25*
63:*19*  68:*15*
69:*13*  71:*5*
**lovely**  68:*11*
**low-quality**  23:*21*
**Lozeau**  43:*2*
**lucky**  41:*24*

**< M >**
**Maas**  11:*18*
17:*10, 16, 18*
**main**  38:*3, 4*
**major**  10:*3*
23:*23*  40:*4*
47:*23*
**making**  22:*6*
23:*3*  38:*19, 24*
44:*5*  60:*19*  63:*6*
69:*8*
**mammal**  56:*8*
**mammals**  56:*25*
**management**
51:*24*  53:*22, 24*
69:*19, 24*
**manager**  2:*20*
**manipulative**
68:*5*
**manner**  65:*17*
**manufactured**
69:*22*
**Map**  3:*13*  4:*5*
8:*22*  24:*12, 14*
25:*13*  28:*3*  67:*8*
**Mar**  7:*15*  9:*4,*
*10, 13, 18, 23, 23*
15:*3, 5*  16:*23, 24*
34:*25*  36:*2*

53:*21*  58:*9*
61:*23*
**March**  4:*7*
**market**  20:*15, 22*
**market-rate**  8:*10*
**materially**  8:*9*
**materials**  6:*9*
19:*17*
**Mather**  33:*22, 22*
**matter**  14:*20*
47:*9*
**maximum**  64:*5*
65:*13, 13, 21*
**McGonagall**  36:*3*
**meal**  14:*13*
**mean**  9:*8*  27:*5,*
*14*  29:*16*  35:*20*
38:*9*  55:*24*
58:*15*  60:*21*
**means**  24:*13*
26:*13*
**meant**  65:*4, 5*
**measure**  51:*5*
**measures**  47:*13*
53:*24*
**mechanical**
71:*10, 21*
**medium**  6:*14*
**meet**  49:*12*
52:*22*
**MEETING**  1:*17*
25:*21*  58:*16*
62:*24*  75:*17*
**meets**  71:*6*
**members**  22:*1*
24:*10*  32:*3*  34:*8*
46:*14*
**memo**  10:*13*
**memory**  73:*2*
**mention**  61:*13*
**mentioned**  18:*12*
19:*13*  58:*16*
**mentioning**  19:*2*
**MERGE**  1:*19*
2:*4*  3:*21*  4:*4, 14*
24:*16, 18*  25:*13,*
*22*  26:*2, 12*
27:*15, 17, 18*
28:*24*  29:*10*
31:*18*  34:*20*
35:*16*  37:*5*  54:*4*
**Mesa**  7:*15*  9:*4,*
*24*  15:*3, 4, 5*
16:*23, 24*  34:*25*

AR005856

Video Transcription of Planning Commision Meeting 2/22/18 8/14/2018

36:2, 3  53:21
58:9
**Metcalf**  30:18
**metric**  52:17
**MHP**  23:5  37:10
**middle**  18:4
31:21
**mile**  60:18
**miles**  36:3
52:17, 24  53:2
**million**  23:17, 18
**mind**  19:7
**minimal**  70:13
**minimizing**  38:6
**minimum**  70:16
**ministerial**  49:16
**minor**  10:14
**minute**  12:6
42:15  45:21
57:23  59:9
**minutes**  11:19,
20, 23  17:6, 14,
15  21:14  24:8
30:16, 20  33:22
34:1, 4  39:11
41:7  46:10
**Mira**  15:4
**missing**  23:15
**mitigate**  25:17
35:8
**mitigated**  36:2, 3
47:25  52:2
**Mitigation**  3:4
8:17  25:14  36:1
47:13  48:7, 10
51:4, 5  66:22
**mix**  25:15  52:20
**mixed**  14:9
70:24
**mixed-use**  2:22
4:14, 17  6:14
7:22  16:5  18:3,
5  20:6  22:8
61:14
**modification**
29:22
**modifications**
6:24  31:12
**modified**  31:14
**modify**  6:18
29:5
**moment**  26:24
28:20  39:12
58:20
**Monday**  34:18

**money**  15:15, 16
36:13
**Monitoring**  3:4
8:17  66:22
**Montgomery**
30:19
**months**  16:10
55:7
**morning**  2:18
21:10  24:9
30:23  31:22
41:8, 21  66:1
72:12
**motion**  62:15, 20
66:16  75:11
**motivated**  41:25
**motivation**  59:11
**Mountain**  3:18
4:21  7:2  8:2
15:6, 6, 8  22:20
24:19  25:12
**move**  2:6  10:25
66:18  71:7
**moved**  28:24
**movement**  69:7
**movie**  32:19
**moving**  52:16
**MSCP**  51:16, 20,
22  52:3
**MSCP-covered**
51:25
**MSCP's**  56:21
**multi-family**  5:3
**multiple**  5:6, 8

**< N >**

**name**  2:19  12:1
24:10  41:4, 8
46:12
**native**  25:14
34:11, 23
**natural**  19:16,
19  38:7, 9, 16
42:1  53:22  71:9
**nature**  16:4
70:12  74:19, 24
**near**  8:12
**nearby**  14:12
**necessarily**
29:11  56:25
**necessary**  61:19
**necessity**  29:4
**need**  10:17  17:9
27:10  28:3
31:14  39:20

**49:21  56:10
60:25  71:17
72:19
**needed**  23:8
28:11, 16, 17
70:5
**needs**  26:14
27:2  33:2  34:22
36:4  47:19
49:25  62:7  68:8
**negate**  35:8
**negatively**  71:15
**neighborhood**
18:10  20:18, 18
31:2  52:22
**neighborhoods**
18:1, 11, 21
**neighborhood-ser
ving**  20:19
**neighbors**  14:4,
11, 16, 18
**net**  65:22
**network**  15:2
**NEUFFER**  55:3,
9  73:14, 17, 21,
24
**never**  34:14
**nice**  31:15  60:19
**night**  16:9  45:6
68:5  72:5
**nine**  11:19, 20,
23  24:8  33:22,
25  34:3
**non-native**  53:17
**nonsense**  16:15
**Nope**  75:10
**NORTH**  1:5
4:3  31:21  32:18
46:13
**northern**  4:16, 25
**northwest**  7:9
65:11
**note**  46:19  48:9
63:3
**noted**  46:23
**noticed**  9:3
**not-so-traditional**
65:3
**Notwithstanding**
48:3
**November**  7:15
9:5
**nowadays**  49:6
**NRMP**  54:1

**Number**  2:4  4:6
22:23  32:5  35:2
47:12, 24  48:22
54:19  66:20, 20
67:1, 2, 4, 5, 7, 8,
9, 10  72:4
**numbers**  64:19

**< O >**

**Oakland**  60:5
**object**  42:2
**objecting**  14:17
**observation**
52:15
**obtain**  28:5
**obtained**  7:10
**Obviously**  18:12
45:23  48:15
57:25
**occupancy**  27:10
**occur**  13:15
**offense**  63:15
**office**  2:23  4:15
5:22  6:1  7:25
13:7, 23  19:12
64:1  65:9
**offices**  5:1
**official**  23:13
31:4  69:19
**off-site**  7:3  54:5,
13
**Oh**  2:13  43:6
67:17
**okay**  2:13, 17
10:2, 6, 24  11:17,
22  12:1  17:14
21:15, 15  24:7
27:13  28:19
30:17, 19, 20, 20
33:18, 23  34:5
39:12  40:24
41:6  43:9, 20, 24
46:5  48:14, 20
50:14, 15  51:2, 9
52:13  54:8, 15
55:12  56:17
59:19  60:8
62:21  67:13, 17
69:5  73:5, 20, 25
75:11
**old**  24:13
**once**  26:19
64:11
**one-paged**  44:2

**on-site**  63:17
69:13
**on-street**  18:15
**op**  73:9
**open**  3:22  20:16
**operation**  47:10
**operational**
47:14
**opinion**  49:9
50:11, 22  75:3
**oppo**  14:17
**opportunities**
8:11  72:21
73:10
**opportunity**  17:3
44:6, 12  74:18
**opposed**  11:1
**opposite**  5:17
**opposition**  15:13
33:19  57:16
**optimistically**
14:2
**orange**  13:17
39:22
**order**  11:4
47:17
**Ordinance**  67:2
**organization**
43:21
**organized**  11:2
33:19
**orientation**  63:14
**original**  12:9
13:2, 13  16:1
22:5  32:2  42:4
63:16
**originally**  7:9
12:10, 23, 24
15:1  16:21  32:7
**ornamental**
25:15
**OTSUJI**  55:20,
24  56:2  57:5
67:12, 16, 18
68:13, 14  69:5,
25  70:10  71:3
**ought**  47:14
**outdoor**  21:5
**outlined**  3:19
**outrage**  62:5
**outside**  18:21
51:12
**outstanding**
68:16

Video Transcription of Planning Commision Meeting 2/22/18 8/14/2018

overall 32:15
63:13
override 74:2
overrides 72:14,
17 74:5 75:7
**Overriding** 3:3
8:16 66:21
overseeing 7:18
overview 64:23
65:7
owned 13:21, 22
owner 38:21
63:23
owner-permitee
26:7

< P >
packages 35:18
pads 12:14
**Page** 72:18
pages 16:10
paid 61:20
**Pam** 24:6, 7
panels 38:20
paper 14:15
par 35:1
park 20:14
22:20 31:1, 5, 17
32:1 69:1, 2, 11
**Parker** 30:17
parking 5:23
12:13 18:15
19:1, 2, 3, 4, 6
21:2 60:15
61:14 63:17
parks 69:9
part 4:5, 9 6:22
8:2, 3 11:8 15:2
29:7 32:21
43:21 54:13
55:16 59:12
62:3
participate 69:11
participation
42:17
particular 35:25
38:8 65:4 72:25
particulate 47:9
partner 43:5, 6
parts 62:2, 2
paseos 18:19
pass 16:13
passes 75:13
passion 17:20

21:20 58:14
**Patel** 30:20, 23
patience 33:9
**Paul** 30:18, 18
pay 58:19
paycheck 28:20
**PDP** 4:8
**Pedestrian** 5:5
18:16 19:8
63:14
pedestrian-oriente
d 14:9 65:16
**Peerson** 75:14
**Penasquitos** 3:7
7:17 8:4, 8, 19
9:5 15:3, 4 31:2
37:23 66:25
people 13:4
14:7 15:14 16:5
21:6, 21 23:12
24:1 31:7 32:25
35:4 52:25 60:7
61:21, 23 62:13
68:6
percent 12:7
47:18 59:13
performed 50:20
53:4
period 9:8, 9
**Permit** 3:8, 10,
12 8:21, 21, 22
10:10 13:14, 18
26:8 27:1, 5, 9
28:12 51:8
58:22 59:3 67:4,
5, 6 69:3
permits 17:2
26:7
person 43:25
perspective
29:24 59:2
**Peters** 13:7
**Peterson** 2:17,
18, 19 9:11, 16
10:5, 12 69:2
**Petitioner** 1:6
photo 3:24
piece 12:7
**Pine** 8:3, 7
**Pines** 3:6 35:1
pipe 23:8 29:3,
4, 6 30:2, 4
36:17, 18, 18
place 13:19
14:7, 8, 9, 10, 14

18:17 29:2, 3
38:14 61:14
**Plan** 3:5 4:12
5:1, 5 6:11, 13,
22 7:19 8:8, 8,
18, 19, 20 9:17
15:24 16:8
17:23 19:10
24:16, 16 31:12,
14, 18 50:19
51:1 53:22
63:11 66:24
71:6
**Planned** 3:8
8:20 31:16 67:3
planner 51:22
69:18
**PLANNING**
1:17 2:18 3:16
7:15, 17 8:13
9:4 14:5, 19
16:13 17:17
21:18 22:1
24:10 31:3, 9
37:8 40:9 58:9
70:1
**Plans** 3:7 66:25
plant 25:15
34:11, 12, 23
71:14
planting 71:5
plants 34:12
35:19 39:15
51:20 53:17
58:11
plastic-looking
68:20
play 11:21
plaza 5:11, 17,
25 19:22, 24
20:1, 8, 9, 14, 17,
18, 22
plazas 18:19
please 10:19
30:15 46:10
75:12
pleasure 21:22
plus 13:11
point 9:15
35:11 53:6 60:3
64:18 65:10
points 30:25
47:20 48:15
pollution 23:1
pool 7:3 52:10

pools 13:12
23:21, 22 52:5
porous 18:18
portion 4:16, 18,
23, 25 9:12
25:24 28:23
32:20
portions 6:23
25:8
pos 35:19
positive 65:24
66:9
possible 37:22
44:9 73:15
potentially 5:12
54:23
**Poway** 31:4
power 39:2
practical 59:2
preclude 29:4
predesigned 39:3
pre-engineer
39:3
prefer 25:2
28:7, 13
prepared 10:20
49:7
presentation
11:15 16:19
33:19
presentations
11:2
presented 46:18
68:17
presenting 15:22
preservation
16:24
preservations 7:3
**Preserve** 15:5
16:23, 25 34:25
35:13 36:2 37:7,
19 40:5 52:6
53:22
pretty 32:11
41:9 62:25
70:12
previous 52:21
previously 4:12
69:3
price 38:7
primarily 45:25
57:16
prime 20:3

prior 10:22
26:6 27:10, 13,
13
private 6:5, 6
39:25 65:2
pro 4:4 13:23
probably 17:7
35:18 38:11
42:16 53:4
72:24
problem 25:4, 18
28:9 30:6, 7
34:25 39:20
71:7 72:8
problems 22:18
35:24 63:5
proceed 55:10,
14
**PROCEEDING**
1:16 2:2
**Process** 2:4
13:9 28:15
54:24
processed 13:2,
14, 23
producing 53:17
professional
49:9 52:14
**Program** 3:5
8:17 66:22
**PROJECT** 1:19
2:20, 20 3:1, 17,
19, 22 4:7, 14, 20
6:12, 21 7:6, 11,
16, 20, 21, 23, 25
8:6, 9 9:8 11:1
12:3, 8, 11, 12, 19,
22, 23, 24 13:3, 8,
21, 21, 24, 24
14:7, 11, 17 15:7,
19 16:4, 5, 18, 19,
22, 25 17:21
18:13, 20, 22
19:4, 19 21:19,
24 22:3, 5, 8, 12
23:9, 9, 10, 23
24:2 27:11, 14,
17, 18 28:17, 23,
24, 25 29:1, 7, 9,
12 30:13 31:7, 8,
12 32:10, 23, 25
33:17 35:20, 22
36:12 38:16
39:10 42:2
46:18, 23, 24

Peterson Reporting Video & Litigation Services

85

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

47:10  49:12, 14, 18, 25  50:20, 24, 25  51:5, 23  52:7, 9, 10, 19, 21  53:4  54:10, 13, 21, 22, 25  55:11  56:3  58:1, 17  59:16, 17, 25  60:1, 13, 13, 16, 21  63:12, 14, 16  65:4  66:5  67:23  68:10  69:1  71:6  73:18  74:18, 19, 25  75:8

projects  13:17  15:15  18:21  22:14  28:23  29:15, 15  30:2  51:19  61:16  63:18  72:4

project's  47:8

promenade  20:10, 12, 22

promise  29:20

proper  37:2

properly  50:8

properties  12:3  37:10

property  4:24  9:12  12:7, 9  14:3  22:14, 24, 24  28:16  37:6, 12, 19  54:4  58:22  59:4

proposal  7:23

propose  29:5  65:12

proposed  6:22  14:6  32:7  52:20

proposes  4:14

proposing  4:10  20:25

protect  41:25

Protection  46:21

proud  12:5  14:20  15:21  21:19

provide  8:5  48:6, 7  65:15

provided  41:11  44:3

provides  5:8

providing  8:10  74:8, 9

provision  30:4  72:21

public  3:13  7:8, 22  8:2, 23  10:11, 25  12:23  13:1  22:2, 18  23:16  40:22, 24, 25  44:6, 11  45:4, 8, 25  48:19, 20  67:9  72:6, 7

pull  9:20

purchase  12:7

purely  55:5

pursuant  52:2

purview  51:12, 14

put  13:8, 12  18:2  20:1  22:13  23:7  25:15  28:14  29:2, 3, 3, 9, 14  35:4  38:2  42:14  70:16  71:13

puts  45:8  71:11

putting  16:16, 16  35:3  44:23

< Q >

qualified  41:25

quality  46:25  47:5  57:21  66:13

question  10:17  40:19  50:6  54:18, 18  55:23  56:6, 16  59:8  63:24  69:16  74:16

questioning  23:3

questions  9:1  10:7  24:3  40:25  48:13, 25  53:7  54:20  55:15  57:23  63:12

quick  17:10, 22  19:10, 13  20:5

quiet  62:16

quite  39:1  40:9  58:5, 6

< R >

Rabines  17:18

radically  39:8

raised  48:23  51:3, 12  74:17

Rancho  3:7  7:17  8:4, 7, 19  9:5  31:2  37:23  66:25

Randi  11:3, 5, 8, 18  17:10  21:8, 11, 17

rare  35:2

ratio  23:22

read  25:4, 6  26:6, 25  34:19  45:6  59:25  62:24

reading  36:1  51:3  64:6  68:24

reads  27:7

ready  13:10  55:18

real  12:20  14:9  17:21  19:13  20:17  21:3  58:21  62:14  65:23  66:9  68:7, 19

realignment  7:1

reality  15:11  58:21  59:24

realized  10:22

really  14:23  18:13  19:8, 25  20:17  21:24  22:9  32:10  33:1  37:25  42:12  44:19  50:16  55:3  59:12  62:13  64:18  66:1  67:24, 25

reason  11:6  22:10  26:14  38:8  61:6  64:5  68:17  69:5, 16, 25  70:4, 14, 15, 17

reasonable  53:16, 19

reasons  52:6  61:3, 25

recall  73:2, 4

receive  72:3

received  43:1  53:8

receptors  47:7

recession  13:11

recirculated  41:16  45:2

Reclaimed  23:7, 8

recollection  73:6

recommend  7:16, 19  8:14  63:8, 20, 21  66:18, 23  67:1, 3, 4, 6, 7

recommendation  72:14  75:15

recommendations  63:7

recommends  8:13

reconsider  46:16

record  11:10  25:3, 5  26:5  27:19  45:5

recusing  75:14

red  27:25

redrafted  41:16

reduce  23:1  32:15

reduced  56:24, 25

reducing  32:3  61:3  74:13, 13

reduction  52:24  60:3, 4

reductions  37:22  47:18

reengineer  40:1

referring  73:22

refers  73:4

reflect  26:3

regarding  10:10  13:11  33:17  46:16  52:15  53:6, 7  54:16  72:1

regards  55:25  68:16  69:7

region  69:10

regional  8:5

regional-commerc ial  4:10

regulations  3:10

relaning  25:25

related  16:7  69:1

relates  64:1

rely  50:19

remaining  24:22  25:8, 25

remedy  29:10

remember  24:13

reminded  68:5

reminds  67:23

remodel  39:5

remodeling  38:1

removed  13:1  54:10

rendering  4:25  5:10, 14, 20, 22  6:1

repeat  17:19

replace  10:21  23:21

Report  3:2, 16  8:15, 24  16:11  41:12, 14  50:8  62:22  64:7  66:19  72:15

REPORTER'S  1:16

Reporting  3:4  8:17  66:22

represent  73:6

representing  31:6  43:10, 15

request  17:12  27:9  36:22  54:12

requested  64:3

requesting  65:17

requests  57:18, 19

require  25:14  29:2  49:6  74:21

required  6:11, 24  7:14  28:4, 25  49:4  53:5  73:17

requirement  26:3  27:12  49:25  65:15, 21

Requirements  26:2  51:7  56:3  69:1, 2  72:17  75:7

requires  3:1  47:17  63:4

residence  6:4

residences  32:11

resident  5:9  31:1, 5, 13  39:13

residential  2:23  4:11  6:14, 20  7:25  19:12, 17  20:7  38:9

AR005859

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

residents 31:*10*
33:*5*
resources 52:*1*
53:*22*
respect 47:*9*
48:*2* 53:*1* 55:*22*
65:*5*
respond 48:*24*
Respondents 1:*9,*
*12*
response 63:*1*
74:*12*
rest 19:*23* 41:*17*
resto 36:*5*
restoration 36:*4*
restored 36:*5*
restriction 71:*11*
result 46:*25*
47:*22* 48:*6*
52:*24*
resulted 18:*1*
resulting 52:*7*
retail 20:*12, 16,*
*20, 23* 32:*17, 18*
retain 9:*14*
return 35:*23*
reve 75:*4*
revenue 75:*4*
review 45:*4*
68:*6, 8* 72:*3*
reviewed 49:*7*
revisions 10:*13*
rezone 3:*8* 8:*20*
67:*2*
rezoning 6:*18*
66:*6*
Rhodes 4:*5, 10*
11:*3* 12:*24* 23:*9*
24:*5, 9, 11, 11, 11,*
*22* 25:*8, 9* 26:*1*
27:*7, 13, 18, 22*
28:*2, 6* 29:*1, 14,*
*25* 30:*6* 35:*13*
36:*9* 37:*17*
40:*10, 13, 17*
69:*4*
rid 38:*4, 4, 11, 17*
right 2:*3* 9:*18,*
*23, 24* 11:*17, 23*
13:*23* 18:*3, 24*
20:*3, 22* 23:*12*
28:*22* 29:*18, 25*
30:*18* 31:*21*
34:*10* 35:*4, 5, 20*
36:*24* 37:*24*

39:*5* 43:*3, 25*
44:*1, 14, 17*
45:*10* 49:*11*
54:*15* 56:*7*
57:*10* 59:*7*
60:*17* 61:*12*
65:*11, 23* 66:*7*
70:*10* 72:*7* 73:*7*
74:*3*
right-of-way
3:*13* 6:*23* 7:*3,*
*12* 8:*23* 25:*11*
67:*9*
rights 9:*14*
risk 47:*6, 6*
risks 47:*1, 11*
Road 3:*18* 4:*21*
6:*24* 7:*2* 8:*2, 2*
9:*21, 23* 10:*1*
15:*6, 6, 8* 22:*16,*
*20* 23:*3, 4* 24:*19*
25:*12* 26:*19*
31:*24* 32:*6, 7, 15*
35:*5, 15* 36:*14*
39:*20, 23* 56:*15*
57:*8* 65:*18* 66:*7,*
*9* 71:*18*
roadkill 39:*24*
roads 7:*22*
14:*23, 25* 15:*9*
22:*17* 29:*4* 60:*6*
61:*4* 65:*2*
roadway 6:*24*
9:*18, 22* 26:*15*
28:*10, 17* 69:*23*
roadways 3:*22*
24:*19, 21* 69:*21*
room 34:*16*
roundabouts
15:*20* 22:*23*
Route 3:*18*
row 21:*1*
ruined 61:*19*
run 11:*21* 36:*15*
38:*25* 39:*19*
running 37:*25*
RX-1-2 6:*21*

< S >
Safdie 17:*18*
safety 22:*19, 21*
70:*15* 74:*12*
SAN 1:*2, 8, 8, 17*
34:*22* 41:*23*

46:*15* 61:*17*
Santa 6:*8*
satisfactory
26:*10*
satisfies 49:*25*
satisfy 72:*17*
75:*7*
save 15:*15, 16*
38:*17*
saves 38:*15*
saw 30:*18*
saying 16:*10, 11*
58:*19*
scenario 3:*19*
scenarios 50:*12*
SCH 66:*20*
scheme 70:*1*
71:*5*
School 31:*4, 21,*
*21, 23*
SCHULTZ 27:*8,*
*16* 28:*22* 29:*18*
30:*1* 49:*11, 23*
50:*2, 13* 70:*23*
Scott 11:*18*
13:*7* 17:*6, 18*
screen 13:*5*
SDG 38:*23*
SDP 4:*8*
SEA 1:*11* 12:*2*
24:*14, 15* 61:*13*
63:*16*
seas 19:*1*
seat 40:*18*
seating 5:*15*
second 33:*7*
37:*4* 50:*15* 64:*8*
67:*12* 75:*11*
secondary 19:*8*
61:*18*
second-floor
19:*10*
seconds 21:*12*
section 7:*1*
see 2:*7, 10* 5:*18,*
*19* 6:*2* 7:*4* 9:*14,*
*22* 12:*6* 13:*15*
14:*15* 16:*7*
17:*13* 18:*2*
19:*25* 20:*8*
21:*19* 27:*23*
40:*15* 42:*3* 44:*7,*
*12* 52:*13* 53:*3*
57:*25* 59:*14*

61:*16* 70:*16*
72:*7* 74:*2, 7, 23*
seeds 37:*7*
53:*17* 59:*5*
Seeing 48:*10*
seen 45:*21*
self-contained
67:*25*
self-storage
12:*14*
sell 38:*22, 22*
send 34:*17*
senior 51:*21*
69:*18*
sense 18:*9* 32:*8*
sensitive 3:*11*
35:*6* 40:*2* 47:*7*
57:*1, 3*
separate 11:*20*
13:*22* 29:*21*
seriously 31:*11*
serve 24:*21*
31:*3* 33:*2*
serves 23:*9*
service 7:*8*
52:*16*
services 52:*23*
set 18:*25* 22:*12*
setback 63:*25*
64:*23* 65:*1, 13,*
*13, 15, 18, 19, 21*
setbacks 64:*4, 24*
sets 23:*24* 74:*23*
seven 23:*4*
shared 19:*3*
Shawn 46:*20*
shopping 12:*12,*
*15*
shops 20:*19*
show 9:*20* 60:*2*
showed 15:*12*
showing 6:*16*
19:*11*
shown 32:*4*
shows 3:*21*
19:*20* 20:*21*
49:*18*
shrubs 39:*19*
side 4:*11* 5:*11,*
*21* 19:*24* 31:*25*
39:*19* 40:*22*
sides 20:*1* 54:*7*
sidewalk 18:*24*
20:*13* 21:*7*

sidewalks 18:*19*
21:*5*
sight 4:*1* 19:*7*
sign 28:*8*
signals 22:*23*
significance
47:*12* 52:*2*
significant 22:*17*
33:*7* 42:*18*
46:*25* 48:*7* 52:*8*
56:*20, 22* 57:*4*
significantly 32:*6*
simple 37:*20*
38:*14* 58:*18*
sincere 62:*10*
68:*3*
single 31:*24*
single-family
4:*19* 5:*8* 6:*4, 6*
18:*1, 6, 8* 60:*20*
site 2:*25* 3:*10,*
*17, 19, 24* 4:*4, 12,*
*12, 17, 18* 5:*1*
6:*12, 16, 21* 7:*6,*
*11* 8:*21* 9:*12*
49:*14* 63:*11*
67:*6* 70:*21*
sitting 38:*3*
six 12:*13* 55:*7*
67:*5*
six-story 65:*8*
66:*6*
size 36:*18, 24*
37:*2* 50:*8* 61:*4*
sizing 49:*14, 16*
skill 74:*23*
skilled 41:*25*
74:*25*
slip 11:*7* 30:*8*
33:*9* 42:*23*
slips 11:*11, 18*
24:*6*
slope 7:*8* 25:*15*
slopes 25:*16*
69:*22, 23* 70:*2, 8*
slow 18:*7*
small 6:*20* 7:*4*
9:*12* 20:*16*
56:*13, 14*
Smallwood 46:*20*
Smith 46:*22*
Smith's 48:*11*
social 72:*19*
73:*9* 74:*8, 11*

AR005860

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

Society 34:*11*
Soil 46:*21*
solar 38:*20*
sold 24:*14*
solutions 62:*14*
somebody 74:*21*
sooner 44:*10*
45:*9*
sorry 2:*9, 15*
40:*12, 12* 55:*22,
22* 65:*20*
sort 14:*14*
15:*24* 16:*15*
45:*1* 53:*10*
56:*14*
sounded 54:*19*
62:*13*
sources 47:*23*
south 3:*17* 4:*2*
5:*4, 9* 13:*4* 15:*4*
southern 4:*18,
22* 13:*4* 61:*19*
space 3:*22*
19:*21, 22* 20:*7, 9,
14, 22* 32:*17, 18*
38:*24*
spaces 19:*21*
20:*4, 12, 23* 39:*2*
Spanish 6:*8, 8*
spayedfoot 39:*21*
spe 73:*22, 24*
speak 30:*14, 15,
22* 33:*13, 24*
34:*12, 12, 13*
39:*13* 41:*22*
speaker 11:*7, 11,
18* 24:*6* 30:*8*
41:*2, 20* 42:*23*
speakers 11:*1*
17:*7* 30:*12*
40:*25*
speaking 34:*10*
35:*10* 39:*25*
40:*24*
speaks 17:*20*
special 17:*3*
47:*24*
species 35:*2, 6,
19, 22* 40:*2, 7*
47:*24* 51:*19, 25*
53:*25* 54:*10*
56:*9* 57:*1, 3*
specific 29:*6*
54:*21* 57:*18*
72:*19* 73:*23*

specifically
29:*11* 36:*7*
43:*21* 56:*3*
60:*13* 73:*1, 3, 4,
11*
specification 37:*3*
speed 32:*13, 15*
speeds 23:*1*
56:*25*
spend 40:*8*
spoke 58:*15*
sprawl 34:*24*
square 3:*12* 7:*7*
20:*18*
stabilize 25:*16*
Staff 8:*13* 9:*1, 7*
10:*16, 20, 20, 21*
17:*17* 25:*1, 4, 18,
21* 26:*4, 4* 48:*24*
50:*20, 24* 51:*6*
53:*7* 55:*22, 24*
56:*18, 21* 57:*7*
64:*8, 11, 12, 17,
22* 65:*20* 66:*10*
67:*11* 68:*25*
73:*1*
staffing 51:*13*
staff's 8:*24*
53:*16*
stage 49:*15, 17*
Stahlhammer
30:*19*
stamp 2:*2* 75:*18*
stand 41:*12*
standard 22:*21*
63:*19* 64:*5*
70:*25*
standards 26:*10*
49:*13*
standpoint 52:*18*
70:*15*
star 45:*1*
start 11:*12, 14*
12:*1* 21:*11*
42:*25* 49:*1, 2*
62:*22* 68:*24*
State 3:*17* 26:*4,
21* 29:*11* 41:*10,
11* 52:*16*
Statement 3:*3*
8:*16* 42:*6, 10, 19*
66:*21* 72:*14*
74:*2* 75:*6*
statements 72:*17*

74:*4*
states 72:*18*
statewide 47:*18*
stations 63:*19, 22*
status 47:*24*
stayed 72:*5*
Step 51:*7*
Stephen 24:*7*
Stewart 41:*20, 21*
stone 6:*10*
stoop 21:*2*
stoops 21:*5*
storage 38:*24, 25*
stories 21:*2*
storm 71:*7*
stormwater 7:*10,
11* 37:*1* 69:*14*
70:*19* 71:*8, 19*
story 54:*3*
straight 2:*6*
straightened
40:*16*
stream 37:*7*
street 6:*3* 15:*19*
20:*13* 21:*4, 6*
streets 12:*23*
13:*1, 8* 15:*1*
18:*14, 14, 23*
70:*2*
structure 5:*23*
structures 19:*4*
stucco 6:*9*
stuck 66:*15*
students 31:*18,
19, 20, 23*
studied 57:*6*
studies 32:*4*
49:*6*
study 49:*3, 4, 12,
24* 50:*7, 10, 11*
stuff 39:*6*
stupid 14:*23*
37:*24*
styles 6:*7*
Subarea 3:*6*
6:*13* 7:*19* 8:*7,
19* 66:*25*
subject 52:*10*
submitted 44:*2,
18* 46:*15* 72:*8*
subsequent
10:*22* 25:*21*
49:*20*

substantial 22:*2,
25* 23:*5, 10, 18,
19*
suburbs 22:*6*
23:*25*
successful 14:*15*
15:*17* 16:*6*
suddenly 16:*22*
sufficient 50:*2,
11* 69:*8*
suggestion 74:*1*
summary 45:*7*
summer's 14:*13*
SUPERIOR 1:*1*
63:*15*
support 21:*25*
22:*11* 24:*1*
30:*13* 33:*17*
66:*5*
supporting
14:*18* 68:*10*
75:*8*
suppression
69:*14, 15* 70:*3,
18*
suppressive 70:*9*
Sur 3:*18, 25* 4:*2,
21, 23* 5:*2* 6:*2*
8:*1* 22:*20* 24:*19*
25:*12, 24* 26:*9*
31:*25* 32:*3, 13*
36:*23* 39:*17*
64:*2* 65:*14, 17*
sure 24:*20* 27:*8*
30:*1, 3* 36:*23*
37:*2* 44:*8* 45:*7,
18* 53:*13, 13*
55:*12* 57:*5*
59:*18* 64:*8, 10,
20, 22* 69:*8*
71:*17*
surface 19:*1*
53:*16* 56:*12*
surprise 34:*21*
surrounded
69:*21*
surrounding
13:*16* 18:*21*
65:*6*
sustainable 16:*3*
22:*9* 61:*2, 2*
62:*1*
SWAPE 47:*7, 12*
system 10:*1*
55:*6, 11* 59:*15*

64:*25* 70:*19, 20,
24* 71:*2, 8, 15*
systems 71:*19*

< T >
take 12:*8* 23:*20*
26:*23* 28:*15, 19*
32:*20* 44:*24*
49:*13* 55:*6* 59:*5*
63:*3* 68:*9*
taken 31:*10*
49:*16*
takes 62:*5* 70:*12*
talk 60:*12* 73:*2*
talked 25:*3*
26:*12* 36:*8*
50:*16*
talking 27:*24*
43:*24*
tamarisk 37:*5*
tangent 60:*9*
tangental 54:*18*
tax 75:*4*
team 42:*3*
technological
72:*19*
technology 39:*4*
tell 60:*2*
temporarily
28:*11*
temporary 7:*8*
28:*3*
tenants 20:*16*
ten-minute 69:*12*
Tentative 3:*13*
4:*5* 8:*22* 24:*12*
28:*2* 67:*8*
terms 35:*2*
44:*22* 47:*20*
terraces 21:*5*
terrific 66:*4*
Terry 69:*18*
testimony 10:*11,
25* 34:*9* 40:*20*
48:*21*
Thank 2:*16*
8:*25* 10:*24*
11:*11, 24* 17:*5,
16, 16, 17* 21:*15*
24:*3, 4* 27:*20, 21*
30:*9, 11* 33:*9, 10,
11* 34:*8, 19*
40:*23, 23* 41:*18,
19, 21* 42:*21, 22*
46:*11* 48:*16*

AR005861

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

50:*14*  51:*9*
55:*12*  57:*15*
59:*7*  60:*11*
62:*18, 23*  63:*10*
66:*10*  67:*13, 22*
68:*12, 22*  71:*23*
**Thanks**  10:*6*
**theater**  2:*23*
3:*12*  4:*16*  32:*19*
**thi**  56:*16*
**thin**  69:*21*
**thing**  9:*20*
10:*15*  17:*23*
25:*20*  27:*22*
32:*22*  35:*11*
37:*9, 15, 20*
38:*14*  42:*17*
44:*21*  60:*16, 17*
61:*6, 11*
**things**  17:*21*
31:*14*  32:*19, 25*
34:*11*  35:*21*
36:*8*  38:*5, 19*
39:*24*  47:*3*  49:*8*
51:*13*  57:*24*
68:*25*  69:*14*
70:*16*  72:*13*
**think**  17:*9, 20*
21:*19*  22:*11, 24*
23:*24, 25*  29:*22*
31:*19, 19*  32:*4,*
*10, 24*  33:*24*
35:*9, 25*  36:*9, 21*
37:*17, 19*  40:*10*
41:*23*  42:*7, 10,*
*13, 18*  44:*5*
45:*20*  51:*12*
52:*19*  57:*11*
62:*12*  64:*20*
65:*23*  66:*4, 9, 11*
68:*3, 10, 22*  69:*3,*
*15*  70:*4*  71:*6*
74:*16, 18*
**thinking**  61:*3*
**third**  27:*22*
37:*21*  38:*15*
67:*1*
**Thomas**  30:*21*
**thorough**  63:*4*
**thoroughly**  62:*25*
**thought**  18:*9*
43:*9, 20*  48:*22,*
*23*  53:*15*
**thoughtfulness**
61:*11*

**Three**  2:*4*  6:*7*
11:*18*  17:*14*
21:*1, 14*  24:*5, 14,*
*23*  30:*10, 16, 20*
36:*7*  39:*11*  41:*6*
46:*10*  60:*22, 22*
**three-story**  5:*19*
**thresholds**  47:*12*
**throated**  39:*22*
**tied**  14:*2*
**time**  2:*2, 15*  9:*9*
17:*8, 9*  21:*12*
24:*3*  26:*14, 17*
28:*13*  30:*10*
31:*8*  33:*23*
37:*13*  39:*8*  40:*9*
41:*18*  45:*3, 13,*
*21*  46:*9*  47:*4*
48:*16*  49:*21*
55:*9*  62:*4*  66:*12,*
*14*  71:*25*  75:*18*
**timelines**  30:*3*
**timeliness**  72:*2*
**times**  24:*1*
31:*10*  47:*11*
63:*15*
**toads**  39:*21*
**today**  2:*21*  12:*8,*
*12, 20*  13:*15*
14:*20*  15:*22*
24:*15*  28:*21*
31:*5*  35:*10*
41:*11*
**told**  15:*23*
**Tom**  30:*23*
**tomorrow**  61:*10*
**Tony**  30:*17, 17*
**top**  36:*14*  38:*3*
**TORRES**  1:*23*
**Torrey**  3:*6, 6*
6:*13*  7:*18*  8:*3, 7,*
*18*  35:*1, 14*
66:*24*
**total**  37:*16*
**totally**  50:*9*  66:*4*
**touch**  17:*21*
58:*22*  59:*4*
**town**  5:*18*  20:*17*
**townhomes**  5:*19,*
*20*  18:*5*  20:*24*
**traditional**  64:*25,*
*25*
**traffic**  10:*2, 13*
13:*7*  15:*18, 20*
18:*15*  20:*9, 10*

22:*22, 22*  26:*18*
32:*1, 4, 13*  47:*1*
48:*10*  52:*15*
60:*5*  61:*21*
**trail**  10:*1*  31:*16*
**trails**  3:*23*
23:*12, 13*
**trained**  72:*22*
74:*21*
**TRANSCRIBED**
1:*22, 23*
**TRANSCRIPT**
1:*16*
**transcription**  2:*1*
75:*17*
**transformation**
22:*10*
**transformed**  22:*4*
**transit**  32:*23*
**transit-friendly**
8:*12*
**transition**  17:*25*
18:*7*  60:*19*
**transportation**
15:*2*  46:*22*
74:*10*
**travel**  52:*25*
**travelled**  52:*17,*
*25*  53:*2*
**treating**  71:*19*
**treatment**  70:*8*
**trees**  70:*17*
71:*13, 14*

**triangular-shaped**
7:*7*
**trick**  45:*20*
**trips**  15:*10, 12*
32:*5*  60:*2*  74:*13*
**true**  16:*4*  57:*20*
**trustee**  31:*5*
**try**  9:*19*  17:*19*
41:*25*  56:*5*
**trying**  15:*15*
17:*24*  33:*1*  35:*7,*
*8*
**turn**  21:*8*  36:*22*
**turning**  40:*5*
**two**  7:*21*  11:*2*
17:*6*  20:*14*  21:*1,*
*1, 25*  24:*6*  28:*23*
30:*2*  32:*4, 8, 12,*
*15*  34:*11*  35:*12,*
*19*  51:*7*  62:*23*
66:*23*  69:*14*

**two-lane**  23:*4*
26:*15, 19*
**two-to-one**  23:*22*
**tying**  20:*17*
**type**  44:*25*  66:*8*
74:*20*
**typical**  19:*11*
21:*1, 21*  64:*24*
**typically**  64:*25*
**typology**  20:*25*

**< U >**
**ultimate**  28:*3*
75:*4*
**ultimately**  52:*24*
**underlying**  6:*19*
**underneath**  69:*3*
**understand**
26:*24*  54:*12*
59:*25*  60:*6*
61:*23*  64:*20*
70:*11, 21*  71:*3,*
*10*
**understanding**
55:*23*  56:*4*
68:*21*  71:*18*
**understood**
25:*20*  28:*1*
**Unified**  31:*4*
**UNION**  1:*4, 5*
43:*14*  46:*13*
59:*10*
**unions**  59:*14*
62:*10*
**unique**  15:*25*
**unit**  4:*19*  65:*9*
**units**  2:*23, 25*
4:*15*  6:*4, 6*  8:*11*
21:*7*  22:*13*
64:*13*  71:*9*
**unknown**  12:*2*
**untimely**  46:*4*
**uplands**  52:*1*
**upper**  4:*11*
64:*17*
**upstream**  50:*7,*
*11*
**urban**  5:*3, 4, 7*
21:*1*
**urge**  16:*20*
46:*16*
**use**  2:*24*  3:*11*
4:*16*  6:*12, 22*
7:*25*  8:*22*  56:*9,*

*13*  65:*2*  67:*5*
**useless**  71:*22*
**uses**  14:*9*  18:*24*
19:*6, 11*  20:*2*
52:*20, 23*

**< V >**
**vacate**  28:*21*
**vacated**  7:*11*
**vacation**  3:*14, 14*
6:*23*  8:*23, 23*
67:*9, 10*
**vacations**  7:*4*
**Valley**  15:*8*
**value**  14:*10*  17:*3*
**values**  15:*24*
19:*14*
**vaults**  71:*1, 21*
**vegetation**  56:*24*
**vehicle**  52:*17, 24*
53:*2*  63:*19*
**vernacular**  19:*17*
**vernal**  7:*3*
13:*12*  23:*21, 22*
52:*5, 10*
**vertical**  14:*10*
**Vesting**  3:*13*
4:*5*  8:*22*  24:*12*
28:*2*  67:*8*
**vi**  22:*20*
**vibrancy**  16:*1*
**VIDEO-ARCHIV**
**ED**  1:*16*  2:*1*
75:*17*
**view**  4:*2*  5:*10*
20:*21*
**Village**  22:*20*
31:*1, 5, 17*  32:*1*
67:*25*
**Villages**  67:*24*
**visible**  21:*4*
**vision**  21:*20*
**visiting**  16:*2*
**VMT**  74:*13*
**volunteerism**
58:*13*
**volunteers**  41:*24*
**vote**  9:*4*  14:*19*
22:*1*  61:*24*
62:*16*  67:*21*
71:*24*  75:*12*
**voted**  7:*16, 19*
**votes**  61:*6*
**voting**  9:*13*
**vs**  1:*7*

AR005862

Video Transcription of Planning Commision Meeting 2/22/18  8/14/2018

**VTM**  25:8  26:1  28:6

**< W >**
**waiting**  31:7
**walk**  14:8, 12  21:2  56:15  69:12  71:17
**walkability**  18:13
**walkable**  5:6  16:3  18:17  22:8  60:19  62:1  74:10
**want**  2:8  11:4  14:3, 7, 12, 14  16:12  25:16  26:20  28:8  30:1, 3, 8, 13  33:12  34:15  36:21  49:1  53:1  54:11  60:9, 22  61:9, 10, 16, 24  62:8  63:13, 24  64:20  65:16  67:18  68:6  69:17  70:21  71:16  72:15
**wanted**  15:25, 25  16:1, 1, 3, 3  42:1, 12  46:1  47:3  57:5, 23  60:9  67:22
**warm**  19:16
**washing**  53:18
**water**  23:7, 8  36:21  37:6  38:2  46:21
**way**  5:17  13:6  16:17  29:14  31:17, 24  33:6  35:23  38:17  42:19  44:22  49:18  58:6, 24  74:2
**ways**  35:8  36:10
**weaves**  19:16, 23
**weed**  37:13  59:5
**weeding**  58:18
**weeds**  36:6  37:5, 18
**weeks**  62:23
**welcome**  48:17
**well**  2:7  10:2  12:1  17:11, 16  18:21  30:25

31:3  32:17  34:5  41:3  44:13  45:7, 23  46:7, 9  52:14  54:11  55:3  56:24  62:21  63:8  72:7
**well-thought**  31:8
**went**  9:5  14:2, 4, 4, 24  15:3, 5, 19, 23  37:25  45:4  64:19
**we're**  11:21  12:5  16:6  17:6, 24  20:17, 25, 25  22:14, 22, 23  23:4, 7, 14, 15, 15, 16, 20  24:24  25:17  27:23  29:12  32:11  35:2, 21  45:23  56:11  60:2, 6  62:6  63:6  71:18, 20
**west**  13:20
**wetlands**  52:1
**We've**  14:18  16:7  18:2, 14, 18  19:3  20:2, 2  22:11  24:1  46:18, 23  57:11  61:20
**Whalen**  75:13
**whiptails**  39:22
**wildlife**  39:14, 15, 16, 17, 20  40:1, 4  46:20  55:20, 25  56:7, 18
**willing**  17:7, 13  37:17  40:9, 10, 14  60:18
**window**  47:22
**wish**  32:22, 24  33:24  63:18  66:1
**wished**  45:1
**wonder**  59:8
**wonderful**  42:2, 4  58:10  63:22
**wondering**  59:11
**wood**  6:9
**work**  9:21  11:25  29:20, 21  30:6, 24  40:9, 10,

14  44:25  54:12  58:10, 15  59:2  62:12  68:2  74:18, 22, 22, 23
**workable**  62:14
**worked**  24:20  57:19  58:10
**workers**  72:22  74:17, 25
**working**  35:18  53:5
**workshop**  62:6
**world**  58:21
**worries**  2:16
**worry**  37:9
**worth**  16:2, 2
**Wow**  39:11
**write**  74:1
**wrong**  10:23  16:11  60:9, 16
**wrote**  61:15

**< Y >**
**yang-type**  20:14
**Yeah**  9:3  11:9  27:18  29:13  34:7  40:12, 14  41:5  43:8, 11  44:20  45:15  53:14  56:23  58:7, 23  59:19, 23  69:25  71:3
**year**  37:16  55:7
**years**  17:1  22:18  42:16  45:22  60:22, 23  67:23
**yesterday**  43:1  46:15
**yin**  20:14

**< Z >**
**zero**  75:13
**zone**  6:19  70:3
**zones**  69:15, 19, 24
**zoning**  6:18  64:24

AR005863

1       REPORTER'S CERTIFICATE

2

3   I, Jennifer G. Torres, Certified Shorthand Reporter

4  for the State of California, do hereby certify:

5

6   That the foregoing proceeding is a verbatim

7  transcription prepared from the electronic sound recording

8  provided to me of the proceedings in the above-entitled

9  matter; that the foregoing is a true and accurate

10  transcript of said proceedings to the best of my ability.

11

12   Dated this 27th day of _August_, 2018

13  at San Diego, California.

14

15

16

17

18         _____

19        JENNIFER G. TORRES
         CSR No. 13022

20

21

22

23

24

25

# Exhibit D

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

```
 1                    SUPERIOR COURT OF CALIFORNIA

 2                        COUNTY OF SAN DIEGO

 3

 4       _____)
                                          )
 5       LABORERS INTERNATIONAL UNION OF   )
         NORTH AMERICA, LOCAL UNION 89,    )
 6                                         ) Case No.
                            Petitioner,    ) 37-2018-00035233-
 7                                         ) CU-WM-NC
         vs.                               )
 8                                         )
         CITY OF SAN DIEGO; and CITY COUNCIL )
         OF THE CITY OF SAN DIEGO,         )
 9                                         )
                            Respondents.   )
10       _____)
                                          )
11       GARY LEVITT, and SEA BREEZE 56 LLC, )
                                          )
12                          Respondents.   )
         _____)
13

14

15          REPORTER'S TRANSCRIPT OF VIDEO-ARCHIVED PROCEEDING

16              CITY OF SAN DIEGO CITY COUNCIL MEETING

17                        OF MAY 22, 2018

18          ITEM 331, MERGE 56, PROJECT NUMBER 360009

19

20               TRANSCRIBED ON AUGUST 17, 2018

21          TRANSCRIBED BY JENNIFER G. TORRES, CSR NO. 13022

22

23

24

25
```

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

```
 1              (Begin transcription of audio-recorded

 2              proceeding, timestamp 2:14:43.)

 3              COUNCIL PRESIDENT COLE:  Clerk, please, introduce

 4   Item 331.

 5              THE CLERK:  Item 331, Merge 56, Project

 6   Number 360009, development project approvals,

 7   certification of an Environmental Impact Report and other

 8   actions.  This item is not subject to the Mayor's veto.

 9              We have a handful of speakers in opposition,

10   others in favor.  Folks will have two minutes a piece, no

11   more than two minutes, so start thinking about that now.

12              COUNCIL PRESIDENT COLE:  Thank you.  Please,

13   introduce yourself for the record.

14              MR. PETERSON:  Good afternoon.  My name is Jeff

15   Peterson.  I'm a development project manager with the

16   Development Services Department.

17              COUNCIL PRESIDENT COLE:  And how much time would

18   you like for your presentation when they get here?

19              MR. PETERSON:  We're going to need about seven

20   minutes.

21              COUNCIL PRESIDENT COLE:  You got it.

22              MR. PETERSON:  Ready?

23              The application before you today is for the

24   construction of a mixed-use development, comprised of 242

25   residential units, commercial, office, theater, and hotel
```

Peterson Reporting Video & Litigation Services                    2

1    use.  Forty-seven of the resi -- residential units are

2    designated as affordable housing units.

3              Development of the project requires approval of

4    an Environmental Impact Report; Findings and Statements of

5    Overriding Consideration; Mitigation, Monitoring and

6    Reporting Program; amendments to the General Plan, the

7    Torrey Pines Subarea Five, and the Rancho Penasquitos

8    Community Plans; also, requires a rezone, a Planned

9    Development Permit, Site Development Permit, Conditional

10   Use Permit, Vesting Tentative Map, easement vacation,

11   public right-of-way vacation, a right-of-way of entry

12   permit; and an agreement establishing endowment funds for

13   maintenance of conservation land.

14             The project site is located south of State

15   Route 56 between Camino Del Sur and Black Mountain Road.

16             The -- this is an air -- aerial of the site and

17   the project area is outlined in black.

18             This aerial shows the 4.34 acre development site

19   and, approximately, 31 acres within the dedicated public

20   right-of-way for the Carmel Mountain Road and Camino Del

21   Sur construction and for -- and shows the open space and

22   the trail.

23             The site photos that sur -- are -- is located at

24   the east section of Camino Del Sur.

25             This is also looking into the site, same area.

AR005905

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1          And also from the south looking north.

2          The Merge 56 development site is part of the

3    Rhodes Crossing Vesting Tentative Map, which was approved

4    by City Council on March 29th, 2004.  Currently, the

5    applicant is entitled to construct the existing approved

6    development, which was a regional, commercial development

7    with residential in the upper east corner of the site.

8    The -- the existing permits would be amended to allow for

9    the proposed Merge 56 Project.

10         The Merge 56 Project proposes a mixed-use

11   development, which is in the northern portion of the site,

12   would contain the commercial office, theater, hotel uses

13   and multi-family development.  And the southern portion

14   would contain single-family resident dwelling units.

15         The project includes the construction of Camino

16   Del Sur, Carmel Mountain Road, which includes the

17   construction of the southern portion of Camino Del Sur,

18   which is are -- which will be located within city-owned

19   property.

20         The -- the northern portion of Merge 56 site

21   would contain the hotel-office complexes along Camino Del

22   Sur and, also, in the center would also include the

23   commercial development and the urban center.  And

24   multi-family residential would be located surrounding the

25   urban center.

AR005906

1          Pedestrian.  The project was designed as a

2     walkable community with multiple access points into and

3     out of the urban center.

4          The following are a few renderings of the view of

5     the urban center.

6          And a -- and a rendering of the surrounding

7     townhomes of the urban center.

8          The following is a rendering of the office and

9     hotel.

10         And then a view of the rendering of the office

11    from Camino Del Sur.

12         The single, dwelling units would be arranged in

13    small clusters around private driveway, accessible from

14    internal private driveways.  Single-family units would be

15    constructed of three architectural styles:  Formal,

16    Spanish, Spanish-colonial, and Santa Barbara.

17         The community plan amendments is required to

18    change the existing land use designations, which are shown

19    on the screen, to local, mixed-use development -- excuse

20    me -- local, mixed-use center.

21         The rezone would be -- modify the underlying zone

22    to make the project site consistent with the proposed land

23    use designation.

24         The project does -- due to the modifications of

25    the road dimensions, a small portion of the right-of-way

AR005907

1    are proposed to be vacated.  In addition, a temporary

2    public right-of-way access easement, located in the

3    northwest corner, would also be vacated.

4           On November 12, 2015, the Del Mar Planning Group

5    voted 6-0-2 to recommend approval of the project.  On

6    May 3, 2017, the Rancho de la los (verbatim) Penasquitos

7    Planning Group, the -- which oversees the Torrey Pine

8    Highlands Subarea Plan voted 16-0-0 to recommend approval

9    the project.  On February 22nd, 2018, the Planning

10   Commission voted 5-0-2 to recommend the City Council

11   approve all actions necessary to approve the project as

12   proposed.

13          Staff recommends the City Council to certify

14   environmental im -- the Environmental Impact Report; adopt

15   the Findings and Statement of Overriding Consideration,

16   adopt the mitigation and monitoring reporting program;

17   adopt the amendments to the General Plan and the Torrey

18   pine -- Torrey Highlands Subarea Five and the Rancho

19   Penasquitos Community Plans; approve the rezone; approve

20   Planned Development Permit, Site Development Permit,

21   Conditional Use Permit, Vesting Tentative Map, easement

22   vacation, and public right-of-way vacations; and, also, to

23   approve the right-of-way of entry and agreement

24   establishing the endowment fund for maintenance of the

25   conve -- conservation land.

AR005908

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1            This concludes staff's report.

2            COUNCIL PRESIDENT COLE:  Thank you.

3            We'll now take public testimony.

4            Clerk, please, proceed.

5            THE CLERK:  Yes.  And, again, individuals will

6       have two minutes a piece.  We'll begin with opposition

7       speakers.  When I call your name, please, come forward.

8       There are seats in the front.

9            Frank Landis is our first speaker.  He's with an

10      organized presentation with Kai (inaudible) Kim.  He'll be

11      followed by Rebecca Davis.

12           Mr. Landis, would you like me to put six minutes

13      on the clock?  Are you -- are you taking --

14           MR. LANDIS:  I can -- I can do it in six minutes,

15      hopefully, less.

16           THE CLERK:  And you have Mr. Kim's time as well?

17           MR. LANDIS:  Ms. Kim.

18           THE CLERK:  Ms. Kim.  I'm sorry.  So you have her

19      time as well?

20           MR. LANDIS:  Yes.

21           THE CLERK:  So I'll put six minutes on the clock

22      for you, and you'll be followed by Rebecca Davis.

23           MR. LANDIS:  Great.  Thank you.

24           President Cole and Members of the Council, thank

25      you for taking my testimony.  I'm speaking on behalf of

AR005909

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1   the California Native Plant Society.  In general, we're

2   not happy with Merge 56.  That should surprise,

3   absolutely, no one here.  Yes, San Diego needs more

4   housing.  Yes, Merge 56 does not create sprawl the other

5   way -- the way other developments threaten to.  That --

6   those are all good.

7            However, the damage caused by the three

8   developments it enables and immediately adjacent to the

9   most valuable part of an ecological reserve, a wildlife

10  refuge, and a city park preserve, that's impossible to

11  fix.  That is the problem with Merge 56.  And,

12  unfortunately, the only way to solve it is to not approve

13  this development.

14           In the bigger picture, San Diego has only so many

15  sensi -- has so many sensitive species teetering on the

16  edge of extinction, that it will take only a little bit

17  more careless development to turn San Diego from a

18  conservation success story into an extinction hot spot.

19  And that's really what we're -- I'm trying to prevent

20  here.

21           If you do choose to approve Merge 56, there are

22  some things that can be done to decrease the damage.  And

23  I want to describe them and I'd ask that you include them

24  as -- as conditions for approving Merge 56.

25           First one, Camino Del Sur, the southern

AR005910

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1    extension, is built on an -- is built on fill.  There's a

2    seven-foot-wide culvert that is supposed to go under it.

3    By my analysis, that's too narrow, because there's

4    actual -- that's supposed to just contain the water coming

5    off of Merge 56.  There's another seven-foot-wide culvert

6    feeding under Highway 56 into that seven-foot-wide

7    culvert, and there's another three-foot-wide culvert

8    coming off the highway.  So you've got more water coming

9    in than it's designed to handle.

10        I would ask City Engineering and Stormwater to

11   sit down and look and see if that thing is -- if that

12   culvert is properly sized and increase the size if

13   necessary so that you don't have a flood on top of a dirt

14   fill -- you know, chewing in the dirt fill and messing up

15   the road.

16        Second thing is there are invasive weeds on the

17   property, especially, in Deer Creek.  Getting (inaudible)

18   Bradley Method to clear a 10th of an acre of tamarisk and

19   other weeds will cost, at most, a few thousand dollars and

20   will save the -- at least, that to City Parks down --

21   immediately downstream.  This management is required under

22   the MSC Subarea Plan.  Rhodes Crossing owners never did

23   it.  Along with the things like willow restoration from

24   cuttings and monitoring our riparian area for shot hold

25   borers, this is the most cost-effective management

AR005911

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1   strategy we can come up with.

2         I believe the developer is amendable to this.

3   You can ask him when it's his turn to stand up.

4         Third thing, wildlife crossing, as I understand

5   it, is basically is designed for deer -- deer and coyotes.

6   It's basically an area where wildlife can cross the road.

7   It's got a hard curb on the road.  Unfortunately, there

8   are things like spayedfoot toads, horned lizards, and

9   orange-throated whiptails also need to cross that and

10  they're a lot smaller.  If they go across the curb into

11  the road, they have no way of getting out of the road.

12  That's why, originally, they recommended a culvert, and

13  that turned out to be too expensive.

14        I would suggest something like a crosswalk,

15  literally just have a ramp going into and out of the road

16  so that if something the size of my thumbnail falls into

17  the road trying to -- trying to leave the vernal pools, it

18  can get back out, something very simple.  It's not as good

19  as a culvert, but it's a lot less than anything else.  I'm

20  not -- again, I'm not sure why that -- why the City

21  insisted on a hard curb all the way through there, but

22  that should be an easy change to make.

23        Fourth one is, just in general, to decrease

24  greenhouse gas emissions from Merge 56 to comply with

25  things like the Newhall Ranch court ruling and also with

AR005912

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1    the new ruling to put more solar panels on roofs from --

2    that the state just passed down.

3           Merge 56 will have to decarbonize over its

4    lifespan to meet City goals under the Climate Action Plan,

5    and designing natural gas and other systems to ease their

6    eventual removal by, say, 2035 will save money and make it

7    easier for property owners to comply with the Climate

8    Action Plan.  Also, things like -- simple things like

9    adding space for storage batteries in garages, so people

10   can store energy off the roads and charge their electric

11   vehicles, run their houses at night would go a long way

12   towards making -- making it possible for the development

13   to comply with Climate Action Plan.  These are all simple

14   changes.  I'm not saying install the battery.  I'm just

15   saying make sure there's room on one side -- on one side

16   of the garage so that when the batteries become available,

17   people can install them without having to remodel their

18   garages.  I'm in the situation where I have to remodel my

19   garage, so I know that it's actually a kind of a hurdle to

20   have just simple design changes getting in the way of

21   developments like that.

22          So, anyway, those are my suggestions, soft

23   shoulder, weeding, enlarging the culvert, and then doing

24   more things to decrease -- to make it easier for people to

25   decrease their carbon footprint as the new technologies

AR005913

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1    become available.  And I hope we can put these as

2    conditions on the project.

3              Thank you very much for taking my testimony.

4              THE CLERK:  Thank you.

5              Our final opposition speaker is Rebecca Davis.

6    Ms. Davis will have two minutes, then we'll turn to the

7    in-favor speakers with an organized presentation with Gary

8    Levitt, Ricardo Rabine (verbatim) and Randi Coopersmith.

9              Ms. Davis, you'll have two minutes.

10             MS. DAVIS:  Good afternoon, President Cole

11   Honorable Council -- Councilmembers.  My name is Rebecca

12   Davis and I represent Laborers International Union of

13   North America Local 89 and its members living in and

14   around San Diego.  We urge the City to decline to certify

15   the EIR for this project, because it fails to comply with

16   CEQA.  We submitted written comments in February, and I

17   want to cover a few, key points from that letter today.

18             First and perhaps most importantly, the EIR

19   contains no analysis of the project's impact on public

20   health as required by CEQA.  According to our experts, the

21   project will create cancer risks to nearby residential

22   properties and the Park Village Elementary School that are

23   more than four times above the San Diego Air Quality

24   Management District's CEQA Significance Threshold as a

25   result of the diesel particulate matter emitted during the

AR005914

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1   project construction and operation.  Our expert determined

2   that the excess cancer risks for children and infants at a

3   sensitive receptor, located 50 meters away, would be

4   43 in 1 million, which is more than four times the

5   ten in 1 million CEQA threshold of significance.  This is

6   a very significant impact that must be disclosed and

7   mitigated.  Yet, the EIR contains no health risk analysis.

8         Second, the EIR's cumulative, biological, impact

9   analysis violates CEQA, because it is based on the flawed

10  premise that a project cannot have a cumulative impact, as

11  long as it and the other cumulative projects comply with

12  applicable laws and regulations.  The entire purposes of

13  the cumulative impact analysis is to prevent the situation

14  where projects individually comply with applicable laws

15  without looking at the bigger picture.  This argument

16  applied over and over again has resulted in major

17  environmental damage and is one of the major reasons why

18  CEQA was enacted in the first place.

19        So to conclude LIUNA urges the City to decline to

20  certify the EIR and instead to prepare and recirculate a

21  revised EIR to address the issues I raised today, as well

22  as others raised in our comment letter.

23        Thank you.

24        THE CLERK:  Thank you.

25        We'll now turn to speakers in favor.  We have an

AR005915

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1    organized presentation.  Gary Levitt, Ricardo Rabine,

2    Randi Coopersmith, all have time or these individuals are

3    here to answer questions, if need be, Greg Mason, Paul

4    Metcalf, Brian Fisch, Kim Baranek, John Keating, and John

5    Eardenson.

6            I can put 15 minutes on the clock for you, sir,

7    and you can manage your own time.  Is that okay?

8            MR. LEVITT:  We can.  Thank you.

9            THE CLERK:  Okay.  Thank you.  And then you'll be

10   followed, after your organized presentation, by Pam

11   Blackwill.

12           MR. LEVITT:  Thank you very much, City Council

13   per -- persons.  Gary Levitt, Sea Breeze Properties.

14           I have looked forward to this day for a long

15   time.  We made an application to the -- the City to amend

16   this -- the existing community plan in August 2013 and

17   finally reached this point today.

18           The original project, as you -- as you heard from

19   Jeff, is a big-box, shopping center that is a regional

20   center in every -- in every nature.  And we were fortunate

21   in that we had the opportunity to buy the property and be

22   able to come back and replan it from the ground up.  It --

23   the project also consists of the roads, the public

24   improvements, that were never built, connecting the --

25   this -- the communities to the south, and to the north of

AR005916

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1    the freeway, back to the 56.  So many, many people have

2    been living with the immediate impacts of the freeway

3    noise and have had no access to get on and use the freeway

4    without going a long way past it.

5           So we went to the community and we've got their

6    support from day one.  Our focus has always been on

7    creating a sense of place for the entire neighborhood and

8    for creating value for our neighbors, so that they had

9    somewhere to go that they would enjoy meeting their

10   friends and family at for years to come, decades to come.

11          In addition on the street transportation network,

12   we went about reducing the size of the roads from

13   four-lane roads down to two-lane roads.  And wherever

14   possible, we were able to change the -- the traffic lights

15   from traffic lights to -- to traffic circles.

16          We also entered the community from day one and as

17   you heard earlier, there is an existing project on the

18   property that consists of, as I mentioned, a regional

19   project, and we promised the community that we wouldn't

20   build one more square foot of building.  We wouldn't build

21   one more -- one more home.  We wouldn't add any traffic to

22   what's existing and approved, and we would do things in a

23   much more respectful way to the community and to the

24   project itself.

25          So our property has our -- our company has

AR005917

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1    certain values that we -- we're trying to adhere to, and

2    these consist of trying to build projects that are

3    authentic to the community, that are -- have a vibrancy,

4    so it's a place that people enjoy coming to, that has a

5    walkable feeling to get to and to walk within, and it's a

6    sustainable project in every way that we can make it

7    sustainable.  And we think that Merge 56, as currently

8    designed, meets those goals.

9            So at this point I'll introduce Ricardo Rabines.

10   He's our project architect.

11           MR. RABINES:  Thank you, Gary.

12           We were very pleased to be working on this

13   project.  We have an opportunity to bring those very

14   interesting values into reality.  We all live in different

15   neighborhoods, especially in suburban neighborhoods, so

16   it's very easy to get lost and not have a sense of

17   identity.  One of the things that we've been dealing with

18   San Diego in all these years is to find the village

19   concept, to find places where feel -- where people feel

20   connected, people you can share spaces with people, parks,

21   office spaces and at the same time be recreational and

22   live and don't feel like you need to get a car to go

23   everywhere just to find those things.  So this project was

24   given us that opportunity.

25           If you can see in the plan, we have located the

AR005918

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1    housing where the housing should be.  We located some of

2    the units.  We have 247 units plus town -- plus affordable

3    housing.  We have located these in front of the

4    commercial, so we're creating a street.  The street idea

5    was to create a hub idea, a place where people will get

6    together and go to different activities.

7         It was very important to choose the proper

8    selection of programming.  Programming is very important

9    because it's the elements that make this place vibrant.

10   In this case we have movies.  We have offices.  We have

11   retail.  We have groceries.  We have fitness.  And,

12   mostly, we have a lot of restaurants ideas and public

13   spaces.  So if you combine that, you basically have enough

14   of amenities to bring people together, all the time for

15   different ages and at different moments.  And that's the

16   idea, create a place that people could gather and not on

17   the indoors, more on the outdoors, more on the streets.

18        And for that, we have create a street that is

19   connecting the two sides of the neighborhoods.  We have

20   put the parking behind, so it's not in front, so you don't

21   have to see the cars.  You'd be able to park and

22   immediately go into the public space, so you can see your

23   neighbors.

24        And -- I think I will take you -- and it's

25   clearly here.  There is a big -- an enormous effort to

AR005919

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1   create these public spaces and public circles.  There is

2   traffic around, getting you into the parking areas.  You

3   don't see the parking.  You sort of enter to the parking

4   and you recognize it.  Mostly, you see the front of the

5   stores, the street moving around and places to gather and

6   housing.

7         So we are very supporting the ideas and

8   (inaudible) to explore ideas where housing, commercial

9   living could be living together and explored together.

10  You could be living, working, entertaining in the same

11  place.  You don't have to take the car to come to other

12  places and that was the main concept.  It's the idea to

13  have a hub, a heart.  It's difficult to achieve it, but I

14  think this point is bringing us and giving us the

15  opportunity to do this.

16        It's a very interesting blend of program in

17  different levels.  If you can see here, cinemas in the

18  corner near to parking, near to plaza, near to restaurant.

19  On the second images, we have on the opposite corner, we

20  have a grocery, so you can -- two blocks you can walk from

21  one corner to another one and in between you can dine.  We

22  have fitness with affordable housing on top.  There are 47

23  units for affordable housing.  And it's mixed, not

24  separated.  It's part of the hub.  It's part of the area

25  of the living experience.  And in the middle, we have two

AR005920

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1    levels of small, office spaces above the garage,

2    commercial and two big, sort of, barn spaces where

3    restaurants and activities could be surrounded by public

4    and green spaces.  This is -- this is what it's all about

5    is trying to create a very energetic, living experience.

6             So, I think, with also good shopping and a lot of

7    nice elements and especially, with the housing.  We have

8    three-story townhouse, two-story townhouse with flats, a

9    combination of units for different type of social groups,

10   small families, big families.  It's a blend that it brings

11   the right approach to a probably a site like this one.

12            And I think I'm going to pass this to Randi.

13            MR. COOPERSMITH:  Thank you and good afternoon.

14   Randi Coopersmith of Latitude 33.

15            Not only do we have an outstanding project, but

16   this project has some very, very substantial public

17   benefits that I'd like to describe to you.  The first one

18   is described as we're transforming a 1990 shopping center,

19   big box into a mixed-use project that is

20   pedestrian-friendly, sustainable, and has unanimous

21   support from the community planning group and Planning

22   Commission.

23            We have 47, on-site, affordable units so there's

24   20 percent of the units that are being built on site.

25   That's double most than the rest of the City.

AR005921

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1          We're building major road connections.  We're

2    building road connection that right now there's 2,500

3    homes that where people -- only have one way in and out

4    during emergency.  They're waiting for years.  This is

5    very substantial, important road improvement.  We're doing

6    traffic calming.  Instead of doing traffic signals, we're

7    doing traffic circles.  We're doing things that you should

8    be doing right now, all projects should be doing.  By

9    reducing the road from four to two lanes, we're saving

10   seven acres of sensitive, biological habitat that

11   wasn't -- wasn't anticipated.

12          And additionally, we're connect -- making the

13   connection of a ma -- major reclaimed water line to not

14   only our property but other properties.  We're connecting

15   a trail that has a missing link.  So there's water lines,

16   trails, affordable housing.

17          We're doing a facilities benefit assessment

18   district of over $30 million.  This is all prevailing

19   wage.  They would be built.  These are major, major

20   improvements in FBA that we're counting.

21          And, additionally, we're replacing low-quality

22   vernal pools with very high-quality at a two-to-one ratio.

23          So it's an outstanding project.  We think it sets

24   the bar very high for what you should be doing in making

25   suburban projects exciting.  As you can see there's major

AR005922

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1   public improvements that we think the community and the

2   City should be waiting for.

3         So with that, we look forward to your vote of

4   support and any questions.  Thank you very much.

5         THE CLERK:  Thank you.

6         Does that conclude your organized presentation?

7   Thank you so much.

8         We'll turn to individual speakers.  You'll each

9   have two minutes.  Please, come forward when your name is

10  called.  Pam Blackwill is our first speaker.

11  Ms. Blackwill be followed by Darshana Patel -- and,

12  Ms. Patel, there are seats in the front, so you can be on

13  deck -- followed by Tony Pauker, followed by Val Macedo.

14        Go ahead, ma'am.  You'll have two minutes.

15        MS. BLACKWILL:  Good afternoon, Council President

16  Cole, Councilmembers.  My name is Pam Blackwill.  I am an

17  associate of Keith Rhodes on the Rhodes Crossing Project

18  in the Penasquitos Torrey Highlands area.  Mr. Rhodes has

19  remaining parcels in the Rhodes Crossing Project that are

20  adjacent to camino -- Carmel Mountain Road and Camino Del

21  Sur, and as you know the roadway projects are part of the

22  Merge 56 Project.

23        Rhodes Crossing is here today not only in support

24  of the Merge 56 Project but also to thank Merge 56 and

25  City staff for the ongoing -- ongoing time they've spent

AR005923

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1   with us working on issues that have cropped up that you

2   sometimes run into with adjacent projects.

3         At Planning Commission earlier this year, we

4   commented on two remaining issues we had, one being a

5   storm drain easement -- we've come to good conclusion on

6   that -- and the second being a 300-foot deceleration lane

7   off of Camino Del Sur into the Rhodes Crossing Lot 3.  We

8   have subsequently received a clarifying e-mail from City

9   staff stating that the City Engineer does interpret the

10  Merge 56 conditions to mean that Merge 56 will build the

11  decel lane concurrently with the Camino Del Sur roadway

12  project with the caveat that the striping will occur by

13  Rhodes as part of our development of Lot 3.

14        Again, we very much appreciate staff's time on

15  this and thank them for helping us resolve our concerns,

16  and we'd really do look forward to the Merge 56 Project

17  coming to fruition.  We feel it's truly a creative and

18  beautiful project for the community, and I thank you for

19  your time today.

20        THE CLERK:  Thank you.

21        Darshana Patel is our next speaker, followed by

22  Tony Pauker, followed by Val Macedo, followed by Mary Ann

23  Eisele.

24        MS. PATEL:  Hi.  Good afternoon, Councilmembers

25  and President Cole.  Thank you for hearing my statement

AR005924

1   today in support of the Merge 56 Project.  I'm a member of

2   the Rancho Penasquitos Planning Board, as well as Poway

3   Unified School District Board of Education Trustee.  While

4   my participation on these boards has given me a broad

5   perspective on this project today, I'm speaking as a

6   resident of Park Village in the community of Rancho

7   Penasquitos.  It's a community that will be directly

8   impacted by that project.  We have over 2,500 hundred

9   homes and about 9,000 residents.

10         As our neighborhood developed, we were reassured

11   that there would be two entry points and exit points in

12   this community.  Right now we only have Park Village Road.

13   This project will bring in and connect Camino Del Sur,

14   which is a much needed egress in case of emergency.

15   Additionally, by connecting this road, we will have the

16   significant benefit of traffic easing as traffic

17   significantly stacks up on Park Village Road during

18   commute hours.  And the commute time going to our middle

19   school and high school and the elementary schools will be

20   cut nearly in half and that's significant.

21         The applicant has heard and incorporated many of

22   the suggestions from the community offered at planning

23   board meetings in areas such as massing, scale, setbacks,

24   and amenities.  One in particular is financially

25   supporting a traffic study for a traffic circle at the

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1    intersection of Dormouse and Camino Del Sur, and that's

2    very important because our elementary school supports a

3    robust and successful special needs program and those most

4    vulnerable students are transported by bus.  Busses are

5    not allowed to do U-turns at intersections.  So a traffic

6    circle at this intersection will cut down the amount of

7    time that our most vulnerable students have to spend in a

8    bus by about 50 percent.

9            The last benefit I want to highlight is the

10   addition of the 47 affordable housing units.  You've heard

11   about the Penasquitos Village and the loss of affordable

12   house -- housing in our community.  With this -- while

13   this development alone will not fix our lack of low-income

14   housing in our community, it's a step in the right

15   direction.

16           I urge the Council to certify, adopt, and approve

17   the elements necessary to approve this walkable community.

18   Thank you very much.

19           THE CLERK:  Thank you.

20           Tony Pauker is our next speaker.  Mr. Pauker will

21   be followed by Val Macedo, followed by Mary Ann Eisele.

22           MR. PAUKER:  I had actually forgot to note that

23   it was just to voice support and give extra time to the

24   applicant who has already spoken, so that's all I've got.

25           THE CLERK:  Thank you.

AR005926

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1           Val Macedo is our next speaker.  And do come

2    forward.  There are seats in the front.  Mary Ann Eisele,

3    you should be on deck ready to speak.

4           And then I'll also note that Jonathan Arenz is

5    also in favor, doesn't need to speak unless necessary.

6           Go ahead, sir.  You'll have two minutes.

7           MR. MACEDO:  Good afternoon, Honorable Chair,

8    Councilmembers, Honorable Chairwoman.  My name is Valentin

9    R. Macedo.  I'm a member of Laborers Local 89, and I'm

10   here in opposition of this project for a couple of

11   reasons.

12          Members like myself who live and travel near the

13   project am concerned about the EIR for this project, does

14   no fully analyze and mitigate the project's environmental

15   impacts.  I am also concerned that the City did not fully

16   consider the impacts the project will have on traffic.

17   Our engineer reviewed the EIR and found that it greatly

18   underestimated the amount of traffic that the project will

19   create.

20          Once again I urge you to follow the process under

21   prudency and thank you for your time.  Thank you.

22          THE CLERK:  Thank you.

23          Mary Ann Eisele is our final speaker in favor.

24          MS. EISELE:  Hello.  Thank you.  I'm here in

25   support of Merge 56.  And I am one of the neighbors that

AR005927

1    is probably the closest to this project.  I could throw a

2    rock at this project, so when you hear them speak about

3    the neighbors, here I am.

4         The ironic thing is I stood here ten years ago in

5    opposition of Rhodes Crossing.  We felt like it was not

6    conducive to the Community Plan and really did not add

7    value to our project, to our community.

8         Merge 56, since that time, has worked tirelessly

9    with our community to create a true, City of Villages

10   concept and something that we are all going to be very

11   proud of.  If you come to our neighborhood, you'll see

12   people walking, kids drive -- riding their bikes to

13   school.  We're a single-family community and we are there

14   in Rancho Penasquitos to get out in nature.  And Merge 56

15   has really created a good blend of scale and density that

16   adds value to our community, and I hope that you will

17   support our community by approving them.

18        Thank you.

19        THE CLERK:  Thank you.

20        That concludes the public speakers on this item.

21        COUNCIL PRESIDENT COLE:  Thank you.

22        Turning to councilmember questions and comments.

23        Councilmember Cate.

24        COUNCILMEMBER CATE:  Thank you, Council

25   President.  Thank you staff for the presentation, as well

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1    to Gary and Randi and everybody with Merge 56 for their

2    work over a number of years to -- to come to this day and

3    I -- I recall when I first ran -- was running for -- for

4    this seat, touring that location, meeting a lot of the

5    neighbors in that -- in that area, and talking about this

6    project and other projects nearby, and I think the point

7    that you had in the presentation about rethinking the

8    concept of -- of commercial centers is a big one.  I mean

9    if you go up to, you know, our neck of the woods, there's

10   a lot of vast -- these are vast parking spaces and parking

11   lots and all the like and -- and how do you reimagine that

12   space with development projects moving forward.  So I

13   think you've done that.  I think it's -- I think it's a

14   gorgeous, beautiful project.

15         One of the things -- thank you, Darshana, for --

16   for coming down here as well, too.

17         But that second connection is huge for this area.

18   And heard it time and time and time and time again.  And I

19   dare anybody to drive out on that road on Park Village

20   during morning or afternoon time and try to get in and out

21   of that place.  I just couldn't imagine what it would be

22   like if something were to happen.  But that second road

23   connection is -- is so much needed.

24         And -- and I know there's a lot of discussion

25   about the four lane versus two lane.  I think ending with

Peterson Reporting Video & Litigation Services          27

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1    the school right there at the -- at that connection,

2    having a two lane and doing what we can to reduce speeding

3    and congestion, all the like on there and the traffic

4    calming I see is -- is a appropriate.  I know there's a

5    lot of debate about that, but I think end up in the right

6    place.

7             And then last but not least that the last speaker

8    mentioned, it's just is working with the community and

9    hearing firsthand from the community about this project

10   and -- and being receptive to the neighbors and what the

11   look -- what's going to be in that location.  But I think

12   whole corridor in this area is going to be transformative

13   over the -- over the near term, and this is kind of the

14   first step, that first project to -- to initiate it,

15   instigate it, and kind of what other projects will -- will

16   look like in the concepts of it.

17            So I just want to say job well done.  I

18   appreciate the feedback from the community as well, too.

19   I think it shows when you have this type of support from

20   the community as well, too.

21            So with that, Council President, I would move

22   (inaudible) staff's recommendation on the three items.  I

23   could read them verbatim if City Attorney needs me to but

24   staff's recommendation on Slide 27 hopefully will suffice.

25            COUNCIL PRESIDENT COLE:  I believe so.  Thank

AR005930

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1   you.

2            COUNCILMEMBER CATE:  Perfect.  Thank you.

3            MS. HALSEY:  Deputy City Attorney Keely Halsey.

4   That would be sufficient.  Thank you.

5            I just want to make one point of clarification

6   for the record with regard to the benefits mentioned for

7   the project.  The FBA fees mentioned, the purpose of those

8   would be to partially offset the costs related to impacts

9   from the project itself, but the benefits for the project

10  are listed in detail in the Statement of Overriding

11  Considerations presented for your review and adoption

12  today.

13           COUNCIL PRESIDENT COLE:  Thank you.

14           Councilmember Kersey.

15           COUNCILMEMBER KERSEY:  Thank you, Council

16  President.  And thank you to everyone involved in this

17  project.  It's been a long time coming, a long journey to

18  get here, and it's exciting to see this project finally

19  moving forward, especially considering the dramatic

20  enhancement that have been made in the redesigns compared

21  to what was originally conceived many years ago.  So I --

22  I just think when you look at this project, it's a -- it's

23  essentially an ideal mix of what we're looking for right

24  now.  You know, we're -- we're providing amenities so that

25  people can, you know, have some options available to them

AR005931

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1   without having to drive a long distance, which in my

2   district can be a little bit hard to come by, in some

3   parts of District 5 and, you know, having, you know,

4   different types of housing on-site, having the affordable

5   housing on-site, which obviously has become a priority for

6   this Council.  I think this is -- this is what this

7   community wants to see, and I think that's evidence by the

8   unanimous approval by the local planning group in

9   Penasquitos, as well as the Del Mar Mesa one next door and

10  so I -- and, of course, the Planning Commission as well.

11          So happy to second the motion on this and look

12  forward to seeing this come to fruition.

13          What is the expected time frame for breaking

14  ground and getting this -- this whole thing constructed,

15  Mr. Levitt?

16          MR. LEVITT:  Thank you.  Thank you for those

17  words.

18          We anticipate putting the grading permit within

19  six months and it's, at least, a year or so of grading and

20  other infrastructure and hope to break ground on vertical

21  construction on homes by the end of 2020 so delivering

22  homes and -- and uses in 2021.  Thank you.

23          COUNCILMEMBER KERSEY:  Very good.  Well, thank

24  you for all your work on this.  And, again, happy to

25  second the motion.

AR005932

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1          COUNCIL PRESIDENT COLE:  Thank you.

2          Council President Pro Tem Bry.

3          COUNCILMEMBER BRY:  Great.  Well, I think about

4    ten feet of this project is in District 1.

5          So several years ago there was another project in

6    District 1, before my time here, that was very

7    controversial.  And in contrast you have worked really

8    well with the community upfront.  You're building 40 -- I

9    think 47 affordable units.  It's a great walkable

10   community.  People don't have to get in their car to go to

11   the grocery store, to go to the gym, to go to a

12   restaurant, and hopefully this is model of what we can

13   build in more areas of our City going forward.  I'm happy

14   to support the motion today.  Thank you.

15         COUNCIL PRESIDENT COLE:  Thank you.

16         So we have a motion by Councilmember Cate that

17   was seconded by Coun -- okay.  Councilmember Sherman just

18   got on the lights.  Go ahead.

19         COUNCILMEMBER SHERMAN:  You're just trying to get

20   through the day real quick.  Aren't you?  I see how that

21   works.

22         For the applicant, how -- how long did it take

23   from conception and starting with the City to get to this

24   point today?

25         UNIDENTIFIED MALE SPEAKER:  Also changed three

AR005933

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1    times.

2            MR. LEVITT:  The first step was initiating a

3    community plan amendment.  That was submitted to the City

4    in August 2013 and came to the Planning Commission, I

5    think, in September 2013.  A long time.

6            COUNCILMEMBER SHERMAN:  How much money do you

7    think you spent so far to get to this point?

8            MR. LEVITT:  It's over $2 million and over --

9    over 10 percent, maybe 15 percent in -- just in City

10   processing fees.

11           COUNCILMEMBER SHERMAN:  Yeah.  See.  That was

12   kind of the point I was wanting to get to.  I mean that's

13   the point I was making earlier about how long it takes and

14   how much it costs to get housing production and units

15   built.  I mean it seems like, to me, you're going to get

16   sticks and bricks up and ready to go in a shorter time

17   span than it took to get through the -- the permitting and

18   regulatory process.  And at the end of the day, all those

19   costs get passed onto the consumer and the price -- you

20   know, the price of the cost of housing.  So, hopefully, we

21   can get better for your next one.

22           Very supportive.  It's a beautiful project.

23   Affordable on site is -- is a big plus and it gets us,

24   like Mr. Kersey said, to a point that I think we're all

25   trying to get to.  So kudos to you and job well done.

AR005934

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

1              COUNCIL PRESIDENT COLE:  Seeing no other

2     councilmembers on the lights, we have a motion by

3     Councilmember Cate.  That was seconded by Councilmember

4     Kersey.

5              Please, vote.

6              Clerk, please, call the roll.

7              THE CLERK:  And that passes unanimously.

8              COUNCIL PRESIDENT COLE:  Thank you.

9              (End transcript of audio-archived proceeding

10    timestamp 2:52:58.)

11                          *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Peterson Reporting Video & Litigation Services                33

**WORD INDEX**

< S >
S2  32:8
S30  20:18

< 1 >
1  13:4, 5  31:4, 6
10  32:9
10th  9:18
12  6:4
13022  1:21
15  14:6  32:9
16-0-0  6:8
17  1:20
1990  19:18

< 2 >
2,500  20:2  23:8
2:14:43  2:2
2:52:58  33:10
20  19:24
2004  4:4
2013  14:16  32:4, 5
2015  6:4
2017  6:6
2018  1:17, 20
6:9
2020  30:21
2021  30:22
2035  11:6
22  1:17
22nd  6:9
242  2:24
247  17:2
27  28:24
29th  4:4

< 3 >
3  6:6  22:7, 13
300-foot  22:6
31  3:19
33  19:14
331  1:18  2:4, 5
360009  1:18  2:6

37-2018-00035233
1:6

< 4 >
4.34  3:18
40  31:8
43  13:4

47  18:22  19:23
24:10  31:9

< 5 >
5  30:3
50  13:3  24:8
5-0-2  6:10
56  1:11, 18  2:5
3:15  4:2, 9, 10,
20  8:2, 4, 11, 21,
24  9:5, 6  10:24
11:3  15:1  16:7
21:22, 24, 24
22:10, 10, 16
23:1  25:25  26:8,
14  27:1

< 6 >
6-0-2  6:5

< 8 >
89  1:5  12:13
25:9

< 9 >
9,000  23:9

< A >
able  14:22
15:14  17:21
about  2:11, 19
15:12  19:4  23:9
24:8, 11  25:13
26:2  27:5, 7, 25
28:5, 9  31:3
32:13
above  12:23
19:1
absolutely  8:3
access  5:2  6:2
15:3
accessible  5:13
According  12:20
achieve  18:13
acre  3:18  9:18
acres  3:19  20:10
across  10:10
Action  11:4, 8, 13
actions  2:8  6:11
activities  17:6
19:3
actual  9:4
actually  11:19
24:22

add  15:21  26:6
adding  11:9
addition  6:1
15:11  24:10
additionally
20:12, 21  23:15
address  13:21
adds  26:16
adhere  16:1
adjacent  8:8
21:20  22:2
adopt  6:14, 16,
17  24:16
adoption  29:11
aerial  3:16, 18
affordable  3:2
17:2  18:22, 23
19:23  20:16
24:10, 11  30:4
31:9  32:23
after  14:16
afternoon  2:14
12:10  19:13
21:15  22:24
25:7  27:20
again  7:5  10:20
13:16  22:14
25:20  27:18
30:24
ages  17:15
ago  26:4  29:21
31:5
agreement  3:12
6:23
ahead  21:14
25:6  31:18
air  3:16  12:23
all  6:11  8:6
10:21  11:13
14:2  16:14, 18
17:14  19:4  20:8,
18  24:24  26:10
27:11  28:3
30:24  32:18, 24
allow  4:8
allowed  24:5
alone  24:13
along  4:21  9:23
already  24:24
also  3:8, 25  4:1,
22, 22  6:3, 22
10.9, 25  11:8
14:23  15:16
19:6  21:24  25:4,

5, 15  31:25
amend  14:15
amendable  10:2
amended  4:8
amendment  32:3
amendments  3:6
5:17  6:17
amenities  17:14
23:24  29:24
AMERICA  1:5
12:13
amount  24:6
25:18
analysis  9:3
12:19  13:7, 9, 13
analyze  25:14
Ann  22:22
24:21  25:2, 23
answer  14:3
anticipate  30:18
anticipated  20:11
anybody  27:19
anyway  11:22
applicable  13:12,
14
applicant  4:5
23:21  24:24
31:22
application  2:23
14:15
applied  13:16
appreciate  22:14
28:18
approach  19:11
appropriate  28:4
approval  3:3
6:5, 8  30:8
approvals  2:6
approve  6:11, 11,
19, 19, 23  8:12,
21  24:16, 17
approved  4:3, 5
15:22
approving  8:24
26:17
approximately
3:19
architect  16:10
architectural
5:15
area  3:17, 25
9:24  10:6  18:24
21:18  27:5, 17
28:12

areas  18:2
23:23  31:13
Arenz  25:4
argument  13:15
arranged  5:12
assessment  20:17
associate  21:17
Attorney  28:23
29:3
audio-archived
33:9
audio-recorded
2:1
AUGUST  1:20
14:16  32:4
authentic  16:3
available  11:16
12:1  29:25

< B >
back  10:18
14:22  15:1
bar  20:24
Baranek  14:4
Barbara  5:16
barn  19:2
based  13:9
basically  10:5, 6
17:13
batteries  11:9, 16
battery  11:14
beautiful  22:18
27:14  32:22
behalf  7:25
believe  10:2
28:25
benefit  20:17
23:16  24:9
benefits  19:17
29:6, 9
better  32:21
big  17:25  19:2,
10, 19  27:8
32:23
big-box  14:19
bigger  8:14
13:15
bikes  26:12
biological  13:8
20:10
bit  8:16  30:2
Black  3:15, 17
Blackwill  14:11
21:10, 11, 15, 16

AR005936

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

blend  18:*16*
19:*10*  26:*15*
blocks  18:*20*
**Board**  23:*2, 3, 23*
boards  23:*4*
borers  9:*25*
box  19:*19*
Bradley  9:*18*
break  30:*20*
breaking  30:*13*
**BREEZE**  1:*11*
14:*13*
Brian  14:*4*
bricks  32:*16*
bring  16:*13*
17:*14*  23:*13*
bringing  18:*14*
brings  19:*10*
broad  23:*4*
Bry  31:*2, 3*
build  15:*20, 20*
16:*2*  22:*10*
31:*13*
building  15:*20*
20:*1, 2*  31:*8*
built  9:*1, 1*
14:*24*  19:*24*
20:*19*  32:*15*
bus  24:*4, 8*
Busses  24:*4*
buy  14:*21*

< C >
**CALIFORNIA**
1:*1*  8:*1*
call  7:*7*  33:*6*
called  21:*10*
calming  20:*6*
28:*4*
Camino  3:*15, 20,*
24  4:*15, 17, 21*
5:*11*  8:*25*  21:*20,*
20  22:*7, 11*
23:*13*  24:*1*
cancer  12:*21*
13:*2*
car  16:*22*  18:*11*
31:*10*
carbon  11:*25*
careless  8:*17*
**Carmel**  3:*20*
4:*16*  21:*20*
cars  17:*21*
**Case**  1:*5*  17:*10*
23:*14*

**Cate**  26:*23, 24*
29:*2*  31:*16*  33:*3*
caused  8:*7*
caveat  22:*12*
center  4:*22, 23,*
25  5:*3, 5, 7, 20*
14:*19, 20*  19:*18*
centers  27:*8*
**CEQA**  12:*16, 20,*
24  13:*5, 9, 18*
certain  16:*1*
certification  2:*7*
certify  6:*13*
12:*14*  13:*20*
24:*16*
**Chair**  25:*7*
**Chairwoman**
25:*8*
change  5:*18*
10:*22*  15:*14*
changed  31:*25*
changes  11:*14,*
20
charge  11:*10*
chewing  9:*14*
children  13:*2*
choose  8:*21*  17:*7*
cinemas  18:*17*
circle  23:*25*  24:*6*
circles  15:*15*
18:*1*  20:*7*
**CITY**  1:*8, 8, 8,*
16, 16  4:*4*  6:*10,*
13  8:*10*  9:*10, 20*
10:*20*  11:*4*
12:*14*  13:*19*
14:*12, 15*  19:*25*
21:*2, 25*  22:*8, 9*
25:*15*  26:*9*
28:*23*  29:*3*
31:*13, 23*  32:*3, 9*
city-owned  4:*18*
clarification  29:*5*
clarifying  22:*8*
clear  9:*18*
clearly  17:*25*
**Clerk**  2:*3, 5*  7:*4,*
5, 16, 18, 21  12:*4*
13:*24*  14:*9*  21:*5*
22:*20*  24:*19, 25*
25:*22*  26:*19*
33:*6, 7*
**Climate**  11:*4, 7,*
13

clock  7:*13, 21*
14:*6*
closest  26:*1*
clusters  5:*13*
**COLE**  2:*3, 12,*
17, 21  7:*2, 24*
12:*10*  21:*16*
22:*25*  26:*21*
28:*25*  29:*13*
31:*1, 15*  33:*1, 8*
combination  19:*9*
combine  17:*13*
come  7:*7*  10:*1*
14:*22*  15:*10, 10*
18:*11*  21:*9*  22:*5*
25:*1*  26:*11*  27:*2*
30:*2, 12*
coming  9:*4, 8, 8*
16:*4*  22:*17*
27:*16*  29:*17*
comment  31:*25*
commented  22:*4*
comments  12:*16*
26:*22*
commercial  2:*25*
4:*6, 12, 23*  17:*4*
18:*8*  19:*2*  27:*8*
**Commission**
6:*10*  19:*22*  22:*3*
30:*10*  32:*4*
communities
14:*25*
**Community**  3:*8*
5:*2, 17*  6:*19*
14:*16*  15:*5, 16,*
19, 23  16:*3*
19:*21*  21:*1*
22:*18*  23:*6, 7, 12,*
22  24:*12, 14, 17*
26:*6, 7, 9, 13, 16,*
17  28:*8, 9, 18, 20*
30:*7*  31:*8, 10*
32:*3*
commute  23:*18,*
18
company  15:*25*
compared  29:*20*
complexes  4:*21*
comply  10:*24*
11:*7, 13*  12:*15*
13:*11, 14*
comprised  2:*24*
conceived  29:*21*

concept  16:*19*
18:*12*  26:*10*
27:*8*
conception  31:*23*
concepts  28:*16*
concerned  25:*13,*
15
concerns  22:*15*
conclude  13:*19*
21:*6*
concludes  7:*1*
26:*20*
conclusion  22:*5*
concurrently
22:*11*
Conditional  3:*9*
6:*21*
conditions  8:*24*
12:*2*  22:*10*
conducive  26:*6*
congestion  28:*3*
connect  20:*12*
23:*13*
connected  16:*20*
connecting  14:*24*
17:*19*  20:*14*
23:*15*
connection  20:*2,*
13  27:*17, 23*
28:*1*
connections  20:*1*
conservation
3:*13*  6:*25*  8:*18*
consider  25:*16*
**Consideration**
3:*5*  6:*15*
**Considerations**
29:*11*
considering
29:*19*
consist  16:*2*
consistent  5:*22*
consists  14:*23*
15:*18*
construct  4:*5*
constructed  5:*15*
30:*14*
construction
2:*24*  3:*21*  4:*15,*
17  13:*1*  30:*21*
consumer  32:*19*
contain  4:*12, 14,*
21  9:*4*
contains  12:*19*

13:*7*
contrast  31:*7*
controversial
31:*7*
conve  6:*25*
**Coopersmith**
12:*8*  14:*2*  19:*13,*
14
corner  4:*7*  6:*3*
18:*18, 19, 21*
corridor  28:*12*
cost  9:*19*  32:*20*
cost-effective
9:*25*
costs  29:*8*  32:*14,*
19
**Coun**  31:*17*
**COUNCIL**  1:*8,*
16  2:*3, 12, 17, 21*
4:*4*  6:*10, 13*  7:*2,*
24  12:*11*  14:*12*
21:*15*  24:*16*
26:*21, 24*  28:*21,*
25  29:*13, 15*
30:*6*  31:*1, 2, 15*
33:*1, 8*
councilmember
26:*22, 23, 24*
29:*2, 14, 15*
30:*23*  31:*3, 16,*
17, 19  32:*6, 11*
33:*3, 3*
**Councilmembers**
12:*11*  21:*16*
22:*24*  25:*8*  33:*2*
counting  20:*20*
**COUNTY**  1:*2*
couple  25:*10*
course  30:*10*
**COURT**  1:*1*
10:*25*
cover  12:*17*
coyotes  10:*5*
create  8:*4*
12:*21*  17:*5, 16,*
18  18:*1*  19:*5*
25:*19*  26:*9*
created  26:*15*
creating  15:*7, 8*
17:*4*
creative  22:*17*
**Creek**  9:*17*
cropped  22:*1*
cross  10:*6, 9*

AR005937

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

Crossing 4:3
9:22 10:4 21:17,
19, 23 22:7 26:5
crosswalk 10:14
CSR 1:21
culvert 9:2, 5, 7,
7, 12 10:12, 19
11:23
cumulative 13:8,
10, 11, 13
curb 10:7, 10, 21
Currently 4:4
16:7
cut 23:20 24:6
cuttings 9:24
CU-WM-NC 1:6

< D >
damage 8:7, 22
13:17
dare 27:19
Darshana 21:11
22:21 27:15
Davis 7:11, 22
12:5, 6, 9, 10, 12
day 14:14 15:6,
16 27:2 31:20
32:18
de 6:6
dealing 16:17
debate 28:5
decades 15:10
decarbonize 11:3
decel 22:11
deceleration 22:6
deck 21:13 25:3
decline 12:14
13:19
decrease 8:22
10:23 11:24, 25
dedicated 3:19
Deer 9:17 10:5,
5
Del 3:15, 20, 24
4:16, 17, 21 5:11
6:4 8:25 21:20
22:7, 11 23:13
24:1 30:9
delivering 30:21
density 26:15
Department 2:16
Deputy 29:3
describe 8:23
19:17

described 19:18
design 11:20
designated 3:2
designation 5:23
designations 5:18
designed 5:1
9:9 10:5 16:8
designing 11:5
detail 29:10
determined 13:1
developed 23:10
developer 10:2
development 2:6,
15, 16, 24 3:3, 9,
9, 18 4:2, 6, 6, 11,
13, 23 5:19 6:20,
20 8:13, 17
11:12 22:13
24:13 27:12
developments
8:5, 8 11:21
DIEGO 1:2, 8, 8,
16 8:3, 14, 17
12:14, 23 16:18
diesel 12:25
different 16:14
17:6, 15, 15
18:17 19:9 30:4
difficult 18:13
dimensions 5:25
dine 18:21
direction 24:15
directly 23:7
dirt 9:13, 14
disclosed 13:6
discussion 27:24
distance 30:1
district 20:18
23:3 30:2, 3
31:4, 6
District's 12:24
doing 11:23
20:5, 6, 7, 7, 8, 8,
17, 24 28:2
dollars 9:19
door 30:9
Dormouse 24:1
double 19:25
downstream 9:21
drain 22:5
dramatic 29:19
drive 26:12
27:19 30:1
driveway 5:13

driveways 5:14
due 5:24
dwelling 4:14
5:12

< E >
Eardenson 14:5
earlier 15:17
22:3 32:13
ease 11:5
easement 3:10
6:2, 21 22:5
easier 11:7, 24
easing 23:16
east 3:24 4:7
easy 10:22 16:16
ecological 8:9
edge 8:16
Education 23:3
effort 17:25
egress 23:14
EIR 12:15, 18
13:7, 20, 21
25:13, 17
EIR's 13:8
Eisele 22:23
24:21 25:2, 23,
24
electric 11:10
Elementary
12:22 23:19
24:2
elements 17:9
19:7 24:17
e-mail 22:8
emergency 20:4
23:14
emissions 10:24
emitted 12:25
enables 8:8
enacted 13:18
endowment 3:12
6:24
energetic 19:5
energy 11:10
Engineer 22:9
25:17
Engineering 9:10
enhancement
29:20
enjoy 15:9 16:4
enlarging 11:23
enormous 17:25
enter 18:3
entered 15:16

entertaining
18:10
entire 13:12
15:7
entitled 4:5
entry 3:11 6:23
23:11
Environmental
2:7 3:4 6:14, 14
13:17 25:14
especially 9:17
16:15 19:7
29:19
essentially 29:23
establishing 3:12
6:24
eventual 11:6
everybody 27:1
evidence 30:7
excess 13:2
exciting 20:25
29:18
excuse 5:19
existing 4:5, 8
5:18 14:16
15:17, 22
exit 23:11
expected 30:13
expensive 10:13
experience 18:25
19:5
expert 13:1
experts 12:20
explore 18:8
explored 18:9
extension 9:1
extinction 8:16,
18
extra 24:23

< F >
facilities 20:17
fails 12:15
falls 10:16
families 19:10, 10
family 15:10
far 32:7
favor 2:10
13:25 25:5, 23
FBA 20:20 29:7
February 6:9
12:16
feedback 28:18
feeding 9:6

feel 16:19, 19, 22
22:17
feeling 16:5
fees 29:7 32:10
feet 31:4
felt 26:5
fill 9:1, 14, 14
final 12:5 25:23
finally 14:17
29:18
financially 23:24
find 16:18, 19, 23
Findings 3:4
6:15
first 7:9 8:25
12:18 13:18
19:17 21:10
27:3 28:14, 14
32:2
firsthand 28:9
Fisch 14:4
fitness 17:11
18:22
Five 3:7 6:18
fix 8:11 24:13
flats 19:8
flawed 13:9
flood 9:13
focus 15:6
Folks 2:10
follow 25:20
followed 7:11, 22
14:10 21:11, 13,
13 22:21, 22, 22
24:21, 21
following 5:4, 8
foot 15:20
footprint 11:25
forgot 24:22
Formal 5:15
fortunate 14:20
Forty-seven 3:1
forward 7:7
14:14 21:3, 9
22:16 25:2
27:12 29:19
30:12 31:13
found 25:17
four 12:23 13:4
20:9 27:25
four-lane 15:13
Fourth 10:23
frame 30:13
Frank 7:9

AR005938

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

freeway  15:1, 2, 3
friends  15:10
front  7:8  17:3, 20  18:4  21:12  25:2
fruition  22:17  30:12
fully  25:14, 15
fund  6:24
funds  3:12

< G >
garage  11:16, 19  19:1
garages  11:9, 18
GARY  1:11  12:7  14:1, 13  16:11  27:1
gas  10:24  11:5
gather  17:16  18:5
General  3:6  6:17  8:1  10:23  13:7
Getting  9:17  10:11  11:20  18:2  30:14
give  24:23
given  16:24  23:4
giving  18:14
go  9:2  10:10  11:11  15:9  16:22  17:6, 22  21:14  25:6  27:9  31:10, 11, 11, 18  32:16
goals  11:4  16:8
going  2:19  10:15  15:4  19:12  23:18  26:10  28:11, 12  31:13  32:15
Good  2:14  8:6  10:18  12:10  19:6, 13  21:15  22:5, 24  25:7  26:15  30:23
gorgeous  27:14
grading  30:18, 19
Great  7:23  31:3, 9
greatly  25:17
green  19:4
greenhouse  10:24

Greg  14:3
groceries  17:11
grocery  18:20  31:11
ground  14:22  30:14, 20
Group  6:4, 7  19:21  30:8
groups  19:9
gym  31:11

< H >
habitat  20:10
half  23:20
HALSEY  29:3, 3
handful  2:9
handle  9:9
happen  27:22
happy  8:2  30:11, 24  31:13
hard  10:7, 21  30:2
health  12:20  13:7
hear  26:2
heard  14:18  15:17  23:21  24:10  27:18
hearing  22:25  28:9
heart  18:13
He'll  7:10
Hello  25:24
helping  22:15
Hi  22:24
high  20:24  23:19
Highlands  6:8, 18  21:18
highlight  24:9
high-quality  20:22
Highway  9:6, 8
hold  9:24
home  15:21
homes  20:3  23:9  30:21, 22
Honorable  12:11  25:7, 8
hope  12:1  26:16  30:20
hopefully  7:15  28:24  31:12  32:20

horned  10:8
hot  8:18
hotel  2:25  4:12  5:9
hotel-office  4:21
hours  23:18
house  24:12
houses  11:11
housing  3:2  8:4  17:1, 1, 3  18:6, 8, 22, 23  19:7  20:16  24:10, 12, 14  30:4, 5  32:14, 20
hub  17:5  18:13, 24
huge  27:17
hundred  23:8
hurdle  11:19

< I >
idea  17:4, 5, 16  18:12
ideal  29:23
ideas  17:12  18:7, 8
identity  16:17
im  6:14
images  18:19
imagine  27:21
immediate  15:2
immediately  8:8  9:21  17:22
Impact  2:7  3:4  6:14  12:19  13:6, 8, 10, 13
impacted  23:8
impacts  15:2  25:15, 16  29:8
important  17:7, 8  20:5  24:2
importantly  12:18
impossible  8:10
improvement  20:5
improvements  14:24  20:20  21:1
inaudible  7:10  9:17  18:8  28:22
include  4:22  8:23
includes  4:15, 16

incorporated  23:21
increase  9:12
individual  21:8
individually  13:14
individuals  7:5  14:2
indoors  17:17
infants  13:2
in-favor  12:7
infrastructure  30:20
initiate  28:14
initiating  32:2
insisted  10:21
install  11:14, 17
instagate  28:15
interesting  16:14  18:16
internal  5:14
INTERNATIONAL  1:4  12:12
interpret  21:24
intersection  24:1, 6
intersections  24:5
introduce  2:3, 13  16:9
invasive  9:16
involved  29:16
ironic  26:4
issues  13:21  22:1, 4
ITEM  1:18  2:4, 5, 8  26:20
items  28:22
its  11:3  12:13

< J >
Jeff  2:14  14:19
JENNIFER  1:21
job  28:17  32:25
John  14:4, 4
Jonathan  25:4
journey  29:17

< K >
Kai  7:10
Keating  14:4
Keely  29:3
Keith  21:17

Kersey  29:14, 15  30:23  32:24  33:4
key  12:17
kids  26:12
Kim  7:10, 17, 18  14:4
Kim's  7:16
kind  11:19  28:13, 15  32:12
know  9:14  11:19  21:21  27:9, 24  28:4  29:24, 25  30:3, 3  32:20
kudos  32:25

< L >
la  6:6
LABORERS  1:4  12:12  25:9
lack  24:13
land  3:13  5:18, 22  6:25
Landis  7:9, 12, 14, 17, 20, 23
lane  22:6, 11  27:25, 25  28:2
lanes  20:9
Latitude  19:14
laws  13:12, 14
leave  10:17
letter  12:17  13:22
levels  18:17  19:1
LEVITT  1:11  12:8  14:1, 8, 12, 13  30:15, 16  32:2, 8
lifespan  11:4
lights  15:14, 15  31:18  33:2
line  20:13
lines  20:15
link  20:15
listed  29:10
literally  10:15
little  8:16  30:2
LIUNA  13:19
live  16:14, 22  25:12
living  12:13  15:2  18:9, 9, 10, 25  19:5

AR005939

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

lizards 10:8
LLC 1:11
LOCAL 1:5
5:19, 20 12:13
25:9 30:8
located 3:14, 23
4:18, 24 6:2
13:3 16:25 17:1,
3
location 27:4
28:11
long 11:11
13:11 14:14
15:4 29:17, 17
30:1 31:22 32:5,
13
look 9:11 21:3
22:16 28:11, 16
29:22 30:11
looked 14:14
looking 3:25
4:1 13:15 29:23
los 6:6
loss 24:11
lost 16:16
lot 10:10, 19
17:12 19:6 22:7,
13 27:4, 10, 24
28:5
lots 27:11
low-income
24:13
low-quality 20:21

< M >
ma 20:13
ma'am 21:14
Macedo 21:13
22:22 24:21
25:1, 7, 9
main 18:12
maintenance
3:13 6:24
major 13:16, 17
20:1, 13, 19, 19,
25
making 11:12,
12 20:12, 24
32:13
MALE 31:25
manage 14:7
management
9:21, 25 12:24
manager 2:15

Map 3:10 4:3
6:21
Mar 6:4 30:9
March 4:4
Mary 22:22
24:21 25:2, 23
Mason 14:3
massing 23:23
matter 12:25
Mayor's 2:8
mean 22:10
27:8 32:12, 15
meet 11:4
MEETING 1:16
15:9 27:4
meetings 23:23
meets 16:8
member 23:1
25:9
Members 7:24
12:13 25:12
mentioned 15:18
28:8 29:6, 7
MERGE 1:18
2:5 4:2, 9, 10, 20
8:2, 4, 11, 21, 24
9:5 10:24 11:3
16:7 21:22, 24,
24 22:10, 10, 16
23:1 25:25 26:8,
14 27:1
Mesa 30:9
messing 9:14
Metcalf 14:4
meters 13:3
Method 9:18
middle 18:25
23:18
million 13:4, 5
20:18 32:8
minutes 2:10, 11,
20 7:6, 12, 14, 21
12:6, 9 14:6
21:9, 14 25:6
missing 20:15
mitigate 25:14
mitigated 13:7
Mitigation 3:5
6:16
mix 29:23
mixed 18:23
mixed-use 2:24
4:10 5:19, 20
19:19
model 31:12

modifications
5:24
modify 5:21
moments 17:15
money 11:6 32:6
Monitoring 3:5
6:16 9:24
months 30:19
morning 27:20
motion 30:11, 25
31:14, 16 33:2
Mountain 3:15,
20 4:16 21:20
move 28:21
movies 17:10
moving 18:5
27:12 29:19
MSC 9:22
multi-family
4:13, 24
multiple 5:2

< N >
name 2:14 7:7
12:11 21:9, 16
25:8
narrow 9:3
Native 8:1
natural 11:5
nature 14:20
26:14
near 18:18, 18,
18 25:12 28:13
nearby 12:21
27:6
nearly 23:20
necessary 6:11
9:13 24:17 25:5
neck 27:9
need 2:19 10:9
14:3 16:22 25:5
needed 23:14
27:23
needs 8:3 24:3
28:23
neighborhood
15:7 23:10
26:11
neighborhoods
16:15, 15 17:19
neighbors 15:8
17:23 25:25
26:3 27:5 28:10
network 15:11

never 9:22
14:24
new 11:1, 25
Newhall 10:25
nice 19:7
night 11:11
noise 15:3
NORTH 1:5
4:1 12:13 14:25
northern 4:11, 20
northwest 6:3
note 24:22 25:4
November 6:4
NUMBER 1:18
2:6 27:2

< O >
obviously 30:5
occur 22:12
offered 23:22
office 2:25 4:12
5:8, 10 16:21
19:1
offices 17:10
offset 29:8
okay 14:7, 9
31:17
Once 25:20
ongoing 21:25,
25
on-site 19:23
30:4, 5
open 3:21
operation 13:1
opportunity
14:21 16:13, 24
18:15
opposite 18:19
opposition 2:9
7:6 12:5 25:10
26:5
options 29:25
orange-throated
10:9
organized 7:10
12:7 14:1, 10
21:6
original 14:18
originally 10:12
29:21
outdoors 17:17
outlined 3:17
outstanding
19:15 20:23

Overriding 3:5
6:15 29:10
oversees 6:7
owners 9:22
11:7

< P >
Pam 14:10
21:10, 16
panels 11:1
parcels 21:19
park 8:10 12:22
17:21 23:6, 12,
17 27:19
parking 17:20
18:2, 3, 3, 18
27:10, 10
Parks 9:20
16:20
part 4:2 8:9
18:24, 24 21:21
22:13
partially 29:8
participation
23:4
particular 23:24
particulate 12:25
parts 30:3
pass 19:12
passed 11:2
32:19
passes 33:7
Patel 21:11, 12
22:21, 24
Pauker 21:13
22:22 24:20, 20,
22
Paul 14:3
Pedestrian 5:1
pedestrian-friendl
y 19:20
Penasquitos 3:7
6:6, 19 21:18
23:2, 7 24:11
26:14 30:9
people 11:9, 17,
24 15:1 16:4, 19,
20, 20 17:5, 14,
16 20:3 26:12
29:25 31:10
percent 19:24
24:8 32:9, 9
Perfect 29:2

AR005940

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

Permit 3:9, 9, 10, 12 6:20, 20, 21 30:18
permits 4:8
permitting 32:17
persons 14:13
perspective 23:5
PETERSON 2:14, 15, 19, 22
Petitioner 1:6
photos 3:23
picture 8:14 13:15
piece 2:10 7:6
Pine 6:7, 18
Pines 3:7
place 13:18 15:7 16:4 17:5, 9, 16 18:11 27:21 28:6
places 16:19 18:5, 12
Plan 3:6 5:17 6:8, 17 9:22 11:4, 8, 13 14:16 16:25 26:6 32:3
Planned 3:8 6:20
Planning 6:4, 7, 9 19:21, 21 22:3 23:2, 22 30:8, 10 32:4
Plans 3:8 6:19
Plant 8:1
plaza 18:18
please 2:3, 12 7:4, 7 21:9 33:5, 6
pleased 16:12
plus 17:2, 2 32:23
point 14:17 16:9 18:14 27:6 29:5 31:24 32:7, 12, 13, 24
points 5:2 12:17 23:11, 11
pools 10:17 20:22
portion 4:11, 13, 17, 20 5:25
possible 11:12 15:14
Poway 23:2

premise 13:10
prepare 13:20
presentation 2:18 7:10 12:7 14:1, 10 21:6 26:25 27:7
presented 29:11
preserve 8:10
PRESIDENT 2:3, 12, 17, 21 7:2, 24 12:10 21:15 22:25 26:21, 25 28:21, 25 29:13, 16 31:1, 2, 15 33:1, 8
prevailing 20:18
prevent 8:19 13:13
price 32:19, 20
priority 30:5
private 5:13, 14
Pro 31:2
probably 19:11 26:1
problem 8:11
proceed 7:4
PROCEEDING 1:15 2:2 33:9
process 25:20 32:18
processing 32:10
production 32:14
Program 3:6 6:16 18:16 24:3
Programming 17:8, 8
PROJECT 1:18 2:5, 6, 15 3:3, 14, 17 4:9, 10, 15 5:1, 22, 24 6:5, 9, 11 12:2, 15, 21 13:1, 10 14:18, 23 15:17, 19, 24 16:6, 10, 13, 23 19:15, 16, 19 20:23 21:17, 19, 22, 24 22:12, 16, 18 23:1, 5, 8, 13 25:10, 13, 13, 16, 18 26:1, 2, 7 27:6, 14 28:9, 14 29:7, 9, 9, 17, 18, 22 31:4, 5 32:22

projects 13:11, 14 16:2 20:8, 25 21:21 22:2 27:6, 12 28:15
project's 12:19 25:14
promised 15:19
proper 17:7
properly 9:12
properties 12:22 14:13 20:14
property 4:19 9:17 11:7 14:21 15:18, 25 20:14
proposed 4:9 5:22 6:1, 12
proposes 4:10
proud 26:11
providing 29:24
prudency 25:21
public 3:11, 19 6:2, 22 7:3 12:19 14:23 17:12, 22 18:1, 1 19:3, 16 21:1 26:20
purpose 29:7
purposes 13:12
put 7:12, 21 11:1 12:1 14:6 17:20
putting 30:18

< Q >
Quality 12:23
questions 14:3 21:4 26:22
quick 31:20

< R >
Rabine 12:8 14:1
Rabines 16:9, 11
raised 13:21, 22
ramp 10:15
ran 27:3
Ranch 10:25
Rancho 3:7 6:6, 18 23:2, 6 26:14
Randi 12:8 14:2 19:12, 14 27:1
ratio 20:22
reached 14:17
read 28:23

Ready 2:22 25:3 32:16
real 31:20
reality 16:14
really 8:19 22:16 26:6, 15 31:7
reasons 13:17 25:11
reassured 23:10
Rebecca 7:11, 22 12:5, 11
recall 27:3
received 22:8
receptive 28:10
receptor 13:5
recirculate 13:20
reclaimed 20:13
recognize 18:4
recommend 6:5, 8, 10
recommendation 28:22, 24
recommended 10:12
recommends 6:13
record 2:13 29:6
recreational 16:21
redesigns 29:20
reduce 28:2
reducing 15:12 20:9
refuge 8:10
regard 29:6
regional 4:6 14:19 15:18
regulations 13:12
regulatory 32:18
reimagine 27:11
related 29:8
remaining 21:19 22:4
remodel 11:17, 18
removal 11:6
rendering 5:6, 8, 10
renderings 5:4
replacing 20:21
replan 14:22
Report 2:7 3:4 6:14 7:1

REPORTER'S 1:15
Reporting 3:6 6:16
represent 12:12
required 5:17 9:21 12:20
requires 3:3, 8
reserve 8:9
resi 3:1
resident 4:14 23:6
residential 2:25 3:1 4:7, 24 12:21
residents 23:9
resolve 22:15
respectful 15:23
Respondents 1:9, 12
rest 19:25
restaurant 18:18 31:12
restaurants 17:12 19:3
restoration 9:23
result 12:25
resulted 13:16
retail 17:11
rethinking 27:7
review 29:11
reviewed 25:17
revised 13:21
rezone 3:8 5:21 6:19
Rhodes 4:3 9:22 21:17, 17, 18, 19, 23 22:7, 13 26:5
Ricardo 12:8 14:1 16:9
riding 26:12
right 19:11 20:2, 8 23:12 24:14 28:1, 5 29:23
right-of-way 3:11, 11, 20 5:25 6:2, 22, 23
riparian 9:24
risk 13:7
risks 12:21 13:2
Road 3:15, 20 4:16 5:25 9:15 10:6, 7, 11, 11, 15,

AR005941

17  20:1, 2, 5, 9
21:20  23:12, 15,
17  27:19, 22
roads  11:10
14:23  15:12, 13,
13
roadway  21:21
22:11
robust  24:3
rock  26:2
roll  33:6
roofs  11:1
room  11:15
Route  3:15
ruling  10:25
11:1
run  11:11  22:2
running  27:3

< S >
SAN  1:2, 8, 8, 16
8:3, 14, 17  12:14,
23  16:18
Santa  5:16
save  9:20  11:6
saving  20:9
saying  11:14, 15
scale  23:23
26:15
School  12:22
23:3, 19, 19  24:2
26:13  28:1
schools  23:19
screen  5:19
SEA  1:11  14:13
seat  27:4
seats  7:8  21:12
25:2
Second  9:16
13:8  18:19  22:6
27:17, 22  30:11,
25
seconded  31:17
33:3
section  3:24
see  9:11  16:25
17:21, 22  18:3, 4,
17  20:25  26:11
28:4  29:18  30:7
31:20  32:11
seeing  30:12
33:1
selection  17:8
sense  15:7  16:16
sensi  8:15

sensitive  8:15
13:3  20:10
separated  18:24
September  32:5
Services  2:16
setbacks  23:23
sets  20:23
seven  2:19  20:10
seven-foot-wide
9:2, 5, 6
share  16:20
Sherman  31:17,
19  32:6, 11
shopping  14:19
19:6, 18
shorter  32:16
shot  9:24
shoulder  11:23
shown  5:18
shows  3:18, 21
28:19
side  11:15, 15
sides  17:19
signals  20:6
Significance
12:24  13:5
significant  13:6
23:16, 20
significantly
23:17
simple  10:18
11:8, 13, 20
single  5:12
single-family
4:14  5:14  26:13
sir  14:6  25:6
sit  9:11
Site  3:9, 14, 16,
18, 23, 25  4:2, 7,
11, 20  5:22  6:20
19:11, 24  32:23
situation  11:18
13:13
six  7:12, 14, 21
30:19
size  9:12  10:16
15:12
sized  9:12
Slide  28:24
small  5:13, 25
19:1, 10
smaller  10:10
social  19:9
Society  8:1

soft  11:22
solar  11:1
solve  8:12
sorry  7:18
sort  18:3  19:2
south  3:14  4:1
14:25
southern  4:13,
17  8:25
space  3:21  11:9
17:22  27:12
spaces  16:20, 21
17:13  18:1  19:1,
2, 4  27:10
span  32:17
Spanish  5:16
Spanish-colonial
5:16
spayedfoot  10:8
speak  25:3, 5
26:2
speaker  7:9
12:5  21:10
22:21  24:20
25:1, 23  28:7
31:25
speakers  2:9
7:7  12:7  13:25
21:8  26:20
speaking  7:25
23:5
special  24:3
species  8:15
speeding  28:2
spend  24:7
spent  21:25  32:7
spoken  24:24
spot  8:18
sprawl  8:4
square  15:20
stacks  23:17
Staff  6:13  21:25
22:9  26:25
staff's  7:1  22:14
28:22, 24
stand  10:3
start  2:11
starting  31:23
State  3:14  11:2
Statement  6:15
22:25  29:10
Statements  3:4
stating  22:9
step  24:14

28:14  32:2
sticks  32:16
stood  26:4
storage  11:9
store  11:10
31:11
stores  18:5
storm  22:5
Stormwater  9:10
story  8:18
strategy  10:1
street  15:11
17:4, 4, 18  18:5
streets  17:7
striping  22:12
students  24:4, 7
study  23:25
styles  5:15
Subarea  3:7  6:8,
18  9:22
subject  2:8
submitted  12:16
32:3
subsequently
22:8
substantial
19:16  20:5
suburban  16:15
20:25
success  8:18
successful  24:3
suffice  28:24
sufficient  29:4
suggest  10:14
suggestions
11:22  23:22
SUPERIOR  1:1
support  15:6
19:21  21:4, 23
23:1  24:23
25:25  26:17
28:19  31:14
supporting  18:7
23:25
supportive  32:22
supports  24:2
supposed  9:2, 4
Sur  3:15, 21, 23,
24  4:16, 17, 22
5:11  8:25  21:21
22:7, 11  23:13
24:1
sure  10:20  11:15
surprise  8:2
surrounded  19:3

surrounding
4:24  5:6
sustainable  16:6,
7  19:20
systems  11:5

< T >
take  7:3  8:16
17:24  18:11
31:22
takes  32:13
talking  27:5
tamarisk  9:18
technologies
11:25
teetering  8:15
Tem  31:2
temporary  6:1
ten  13:5  26:4
31:4
Tentative  3:10
4:3  6:21
term  28:13
testimony  7:3,
25  12:3
Thank  2:12  7:2,
23, 24  12:3, 4
13:23, 24  14:8, 9,
12  16:11  19:13
21:4, 5, 7, 24
22:15, 18, 20, 25
24:18, 19, 25
25:21, 21, 22, 24
26:18, 19, 21, 24,
25  27:15  28:25
29:2, 4, 13, 15, 16
30:16, 16, 22, 23
31:1, 14, 15  33:8
theater  2:25
4:12
thing  9:11, 16
10:4  26:4  30:14
things  8:22
9:23  10:8, 25
11:8, 8, 24  15:22
16:17, 23  20:7
27:15
think  16:7
17:24  18:14
19:6, 12  20:23
21:1  27:6, 13, 13,
13, 25  28:5, 11,
19  29:22  30:6, 7
31:3, 9  32:5, 7,

AR005942

Video Transcription of City Council Meeting 5/22/18 - Item 331  8/14/2018

*24*

thinking 2:11
Third 10:4
thousand 9:19
threaten 8:5
three 5:15 8:7
28:22 31:25
three-foot-wide
9:7
three-story 19:8
Threshold 12:24
13:5
throw 26:1
thumbnail 10:16
time 2:17 7:16,
19 14:2, 7, 15
16:21 17:14
21:25 22:14, 19
23:18 24:7, 23
25:21 26:8
27:18, 18, 18, 18,
20 29:17 30:13
31:6 32:5, 16
times 12:23
13:4 32:1
timestamp 2:2
33:10
tirelessly 26:8
toads 10:8
today 2:23
12:17 13:21
14:17 21:23
22:19 23:1, 5
29:12 31:14, 24
Tony 21:13
22:22 24:20
top 9:13 18:22
TORRES 1:21
Torrey 3:7 6:7,
17, 18 21:18
touring 27:4
town 17:2
townhomes 5:7
townhouse 19:8,
8
traffic 15:14, 15,
15, 21 18:2 20:6,
6, 7 23:16, 16, 25,
25 24:5 25:16,
18 28:3
trail 3:22 20:15
trails 20:16
TRANSCRIBED
1:20, 21

TRANSCRIPT
1:15 33:9
transcription 2:1
transformative
28:12
transforming
19:18
transportation
15:11
transported 24:4
travel 25:12
true 26:9
truly 22:17
Trustee 23:3
try 27:20
trying 8:19
10:17, 17 16:1, 2
19:5 31:19
32:25
turn 8:17 10:3
12:6 13:25 21:8
turned 10:13
Turning 26:22
two 2:10, 11 7:6
12:6, 9 17:19
18:20, 25 19:2
20:9 21:9, 14
22:4 23:11 25:6
27:25 28:2
two-lane 15:13
two-story 19:8
two-to-one 20:22
type 19:9 28:19
types 30:4

< U >
unanimous
19:20 30:8
unanimously
33:7
underestimated
25:18
underlying 5:21
understand 10:4
unfortunately
8:12 10:7
UNIDENTIFIED
31:25
Unified 23:3
UNION 1:4, 5
12:12
units 2:25 3:1,
2 4:14 5:12, 14
17:2, 2 18:23
19:9, 23, 24

24:10 31:9
32:14
upfront 31:8
upper 4:7
urban 4:23, 25
5:3, 5, 7
urge 12:14
24:16 25:20
urges 13:19
use 3:1, 10 5:18,
23 6:21 15:3
uses 4:12 30:22
U-turns 24:5

< V >
vacated 6:1, 3
vacation 3:10, 11
6:22
vacations 6:22
Val 21:13 22:22
24:21 25:1
Valentin 25:8
valuable 8:9
value 15:8 26:7,
16
values 16:1, 14
vast 27:10, 10
vehicles 11:11
verbatim 6:6
12:8 28:23
vernal 10:17
20:22
versus 27:25
vertical 30:20
Vesting 3:10
4:3 6:21
veto 2:8
vibrancy 16:3
vibrant 17:9
VIDEO-ARCHIV
ED 1:15
view 5:4, 10
Village 12:22
16:18 23:6, 12,
17 24:11 27:19
Villages 26:9
violates 13:9
voice 24:23
vote 21:3 33:5
voted 6:5, 8, 10
vs 1:7
vulnerable 24:4,
7

< W >
wage 20:19
waiting 20:4
21:2
walk 16:5 18:20
walkable 5:2
16:5 24:17 31:9
walking 26:12
want 8:23
12:17 24:9
28:17 29:5
wanting 32:12
wants 30:7
water 9:4, 8
20:13, 15
way 8:5, 5, 12
10:11, 21 11:11,
20 15:4, 23 16:6
20:3
weeding 11:23
weeds 9:16, 19
well 7:16, 19
13:21 23:2
26:25 27:16
28:17, 18, 20
30:9, 10, 23 31:3,
8 32:25
went 15:5, 12
We're 2:19 8:1,
19 16:1 17:4
19:18 20:1, 1, 5,
6, 7, 9, 12, 14, 17,
20, 21 26:13
29:23, 24, 24
32:24
we've 15:5
16:17 22:5
whiptails 10:9
wildlife 8:9
10:4, 6
willow 9:23
woods 27:9
words 30:17
work 27:2 30:24
worked 26:8
31:7
working 16:12
18:10 22:1 28:8
works 31:21
written 12:16

< Y >
Yeah 32:11
year 22:3 30:19

years 15:10
16:18 20:4 26:4
27:2 29:21 31:5

< Z >
zone 5:21

AR005943

1                    REPORTER'S CERTIFICATE

2

3          I, Jennifer G. Torres, Certified Shorthand Reporter

4    for the State of California, do hereby certify:

5

6          That the foregoing proceeding is a verbatim

7    transcription prepared from the electronic sound recording

8    provided to me of the proceedings in the above-entitled

9    matter; that the foregoing is a true and accurate

10   transcript of said proceedings to the best of my ability.

11

12          Dated this 27ᵗʰ day of August       , 2018

13   at San Diego, California.

14

15

16

17

18   _____

19              JENNIFER G. TORRES
                CSR No. 13022
20

21

22

23

24

25

AR005944

# Exhibit E

LABORERS PROJECT LABOR AGREEMENT

FOR

MERGE 56 PROJECT


SAN DIEGO COUNTY, CALIFORNIA

1.      INITIAL PROVISIONS

1.1      This Project Labor Agreement ("Agreement") is entered into by and between _____  ("Primary Employer"), and the Southern California District Council of Laborers and its affiliated Local Unions (the "Union") (collectively, the "Parties") to cover certain on-site construction work performed on the Merge 56 Project in the City of San Diego, San Diego County (the "Project"). The Owner of the Project is _____ ("Owner").

1.2      The Project as currently proposed involves the construction of  a mixed-use center containing commercial, office, hotel, and residential uses on a 41.34 acre, triangular shape property; 525,000 square feet of commercial office, theater/cinema, and hotel uses; construction of 242 residences (158 multi-family and 84 single family); associated site improvements such as utilities, storm drains/detention basins, internal private streets, hardscape, site walls, and landscaping; and construction of adjoining public roads and improvements. It is understood and agreed by and between the Parties to this Agreement that the final plans for the Project are subject to modifications and approval by those public agencies possessing lawful approval authority over the Project, and may be modified by Owner and the owners (including, but not limited to, modifications to reduce overall costs), and that this Agreement applies to the Project only as it is finally approved and modified by such entities, agencies the owners and/or Owner.

1.3      If the Primary Employer is bound to the Union's General Contractors Tilt Up Construction Agreement ("GC Tilt Up Agreement"), and to the extent that the GC Tilt Up Agreement is applicable to the Tilt Up Construction on the Project and the Primary Employer actually performs the Tilt Up Construction as the general contractor on the Project (and does not contract any or all of its responsibility as general contractor),  the terms and conditions of the GC Tilt Up Agreement shall govern the Tilt Up Construction on the Project and supersede the terms contained in this Agreement, except for the provisions of  Article 9 of this Agreement which shall remain in full force and effect and binding on the parties to this Agreement. All Non-Tilt Up Construction shall be performed under the terms of this Agreement, whether or not the Primary Employer is bound to the GC Tilt Up Agreement.

1.4      It is the intent of the Parties to establish a Project-specific agreement with the Owner that will provide a skilled workforce represented by the Union and will allow the Employers (as defined in Section 1.7) to perform the Covered Work (as defined in Article 2), subject to the Side Letter, for all or portions of the Project, including determining the number of employees necessary, work schedules, and working conditions (among other things) to allow the Project to be completed in a high quality manner, on schedule, and in a cost competitive manner. As it is essential for the Owner and/or Employers to meet certain dates for

the construction and development of the Project, the Union agrees that time is of essence as it applies to the performance of this Project.

1.5      A large labor pool represented by the Union will be required to perform the work involved in the Project that is covered by this Agreement. The Employers (as defined in Section 1.7) wish and it is the purpose of this Agreement, to ensure that a sufficient supply of skilled craft workers are available at the Project, that all construction work and related work performed by the members of the Union on this Project shall proceed continuously, without interruption, in a safe and efficient manner, and economically with due consideration for the protection of labor standards, wages and working conditions in compliance with applicable law.  In furtherance of these purposes and to secure optimum productivity, harmonious relations between the Parties and the orderly performance of the work, the Parties to this Agreement agree to establish adequate and fair wage levels and working conditions in compliance with applicable law and to ensure there will be no work stoppages, delays or interruptions during the construction of the Project.

1.6      The Primary Employer is a general construction contractor primarily engaged in the building and construction industry. Unless assigned pursuant to the provisions of section 9.4 below, the Primary Employer will perform construction work directly on the Project and will utilize subcontractors to perform work as well.

1.7      As provided below, all, contractors, subcontractors, or other persons or entities assigning, awarding, or subcontracting Covered Work (as defined in Article 2) will be subject to this Agreement by executing Attachment A, the Agreement to be Bound (all of whom, including the Primary Employer, are individually and collectively referred to as an "Employer" or the "Employers"). This Agreement shall not bind or apply to any parents, affiliates, partners, joint ventures, subsidiaries or related entities of any Employer. Each separate Employer shall be separately (and not jointly with the Primary Employer or any other Employer) liable for its own breach of this Agreement.  Nothing in this Agreement, including without limitation, the conduct of Owner or any of the Parties pursuant to this Agreement, shall establish a basis or precedent upon which the Union may attempt to expand beyond the Project or Completion Date its representation, claims of representation, or influence over the owners, Owner's or Employers' operations, business, employees or labor relations.

1.8      The Union is a labor organization whose members are construction industry employees who generally work in close proximity to one another at construction job sites and whose jobs are closely related and coordinated. The Union is a party to a multi-employer collective bargaining agreement known as the Southern California Master Labor Agreement between Southern California General Contractors and the Southern California District Council of Laborers ("Master Agreement") that covers the geographic area of the Project. Where the term Master Agreement is used, it means the existing Master Agreement in effect as

to the Union at the time the Covered Work is performed. The current term of the Master Agreement is July 1, 2015, to June 30, 2018, and the terms of the existing Master Agreement shall continue to be incorporated by reference into this Agreement after June 30, 2018, unless and until it is superseded and replaced by a new Master Agreement on or after July 1, 2018, at which time the new Master Agreement shall control.

1.9     In the interest of the future of the construction industry in the local area, of which the Union is a vital part, and to maintain the most efficient and competitive posture possible, the Union pledges to work and cooperate with the management of the Project to produce the most efficient utilization of labor and equipment in accordance with this Agreement. In addition, the Union shall not afford preferential status to other projects in the jurisdiction to the extent such preference will inhibit the availability of qualified workers for the Project.

1.10     The Parties recognize the importance of economic growth in the area and the creation of job opportunities by the development of this particular Project. By entering into this Agreement, the Parties recognize that the terms and conditions covered by this Agreement are therefore limited to this Project. Accordingly, the Parties have in good faith arrived at the special conditions contained in this Agreement, and the Parties agree to jointly work together to support the Project and make it successful.

2.     <u>SCOPE OF AGREEMENT</u>

2.1     Subject to the provisions of sections 2.2 to 2.4, this Agreement shall cover:

2.1.1     All on-site construction work on the Project described in and covered by the Master Agreement in relation to

- a.) Traffic Control
- b.) Demolition
- c.) Asphalt Paving
- d.) Site Concrete Curb and Gutter/Site Concrete Paving
- e.) Structural Concrete
- f.) Pipeline (Storm Drain, Water Lines, Sewer)
- g.) Fencing
- h.) General Conditions (Clean Up)
- i.) Landscaping
- j.) Pavement Markings
- k.) Site Furnishings
- l.) Sand Blasting
- m.) Fire Proofing
- n.) Signs
- o.) Solar Technologies
- p.) Underground Utilities (including under building slab)
- q.) Concrete Finishing
- r.) Site Prep
- s.) Plaster (Tending)
- t.) Gunite/Shotcrete

(collectively, "Covered Work") to be performed on the Project's building structures themselves and on improvements and infrastructure outside the building structures related to the Project, including work outside the property lines of the Project. (Concrete work in subsections d, e and q shall be referred to as "Covered Concrete Work;" the work described in all other subsections shall be referred to " Covered Non-Concrete Work;" and all work above, including Covered Concrete Work and Covered Non-Concrete Work, shall be referred to collectively as "Covered Work"). Covered Work shall be construed in the broadest terms possible.

      2.1.2    Concrete work described above shall include, but is not limited to, all site concrete work, curb and gutter, concrete paving and structural concrete work; block, brick, and paver work; and cement finishing work, including but not limited to setting all concrete forms and perimeters forms including catch basin structures and drain inlets, curb forms and planks, setting of lines, stakes and grades, setting screed including screed pins; Curb and Gutter Machine Operator; Clary and similar type of Screed Operator (Cement); Grinding Machine Operator (all types); Jackson Vibratory or similar type; Texas Screed and similar type Screed Operator; Scoring Machine Operator; Magnesite, magnesite-terazzo and mastic composition; epoxy urethanes and exotic coatings; Dex-O-Tex Floating and Troweling Machine Operator.

      2.1.3    Concrete Tilt Up Construction shall include but is not limited to: Layout (Foundations, Slab on Grade, Tilt-Up Panels); Excavation; Grading/Haul Spoils; Set Up (Foundations & Slab); Place & Finish Concrete including sack and patch (Footings, Slab, Panels); Stripping of Forms & Clean up; Backfill; Soffcut Slab; Forming Tilt up Panels & "Topoff"; Spraying Bondbreaker; Place Dowel Baskets in Slab; Install & Remove Panel Braces; Lifting of Panels; Plumb & Align Panels following lift, and Caulking.

      2.1.4    All Covered Work done in temporary yards or facilities adjacent to or near the Project which is a part of the Project is covered by this Agreement. The Owner, manufacturers' representatives, vendors' representatives, and facility operating personnel may supervise and direct Covered Work, and the Union agrees that craft work is typically performed as part of a joint effort with these representatives and personnel.

    2.2    Covered Work shall not include any work performed on or near the Project site by federal, state, county, city, or other governmental bodies and/or agencies or their contractors or work performed by utilities or their designated contractors or work performed by the Owner, manufacturers' representatives, vendors' representatives or plant operating or their contractor personnel. Any pre-assembled or manufactured items produced in a manufacturing facility for the assembly or supply of products is excluded from the scope of this Agreement and shall not be considered Covered Work or subcontracting under Article 3 below.

2.3     This Agreement applies to all employees performing Covered Work. It does not apply to work which is not Covered Work, to supervisors not covered by a collective bargaining agreement, to technical or non-manual employees including but not limited to executives, superintendents, office and clerical personnel, drafters, engineers, timekeepers, messengers, guards, security personnel, inspectors, mail carriers or to any other employees above the classification of general foreman who perform administrative/clerical functions.

2.4     This Agreement does not apply to any work, other than Covered Work, on or in connection with the Project, including, but not limited to, the following:

(i)     non-construction support services by Owner or any Employer in connection with the Project;

(ii)    all off-site maintenance of equipment and on-site supervision of on-site repairs or maintenance;

(iii)   delivery and removal of trash dumpsters and portable toilets;

(iv)    any construction work, including tenant improvement work, performed in the future following the "Completion Date" of the Project (or a building thereof) or termination of this Agreement as defined below;

(v)     startup, operation, repair, maintenance and revisions of equipment and systems after initial installation;

(vi)    theming displays and art work;

(vii)   installation of tenant's proprietary automated handling systems

(viii)  delivery, movement, placement, assembly and installation of furniture, fixtures and equipment (FF&E);

(ix)    pre-opening events and activities;

(x)     marketing activities;

(xi)    move-in and commissioning activities;

(xii)   jobsite trailer systems;

(xiii)  carts/kiosks, and portable furnishings;

(xiv)   work by employees of a manufacturer or vendor related to warranties or guarantees after the manufacturer's/vendor's product or equipment has been installed;

(xv)    installation and maintenance of information and communications technology transmission and security equipment and facilities;

(xvi)   on-going maintenance, janitorial, landscape maintenance and security services;

(xvii)  specialty and other testing or inspections

(xviii)   hauling and delivery to the Project site of any and all materials and supplies, as well as off-hauling of debris and excess material and/or mud, may be by any firm and/or mode and shall not be restricted in any manner by this Agreement.

(xix)   work on a structure after a certificate permitting occupancy is issued; and

(xix)   maintenance and repair work, including customer service activity that is not customarily contracted out to a contractor in the construction industry.

2.6     The use of new technology, equipment, machinery, tools and/or labor saving devices and methods of performing work may be initiated by Primary Employer or any other Employer in their respective discretion from time to time.

3.     ASSIGNMENT AND SUBCONTRACTING

3.1 Covered Concrete Work

(a) (i) The Primary Employer and each other Employer agree that they will contract for the assignment, awarding, or subcontracting of Covered Concrete Work, other than Concrete Tilt Up Construction, or authorize another party to assign, award or subcontract Covered Concrete Work other than Concrete Tilt Up Construction, only to a person, firm, corporation, or other entity that, at the time the contract is executed, has become a party to this Agreement by executing Attachment A, the Agreement to be Bound and who is or becomes bound to the full Master Agreement (i.e. bound to the Master Agreement independent of its obligations under this Agreement). The Primary Employer and each other Employer agree that they will contract for the assignment, awarding, or subcontracting of Concrete Tilt Up Construction, or authorize another party to assign, award or subcontract Concrete Tilt Up Construction, only to a person, firm, corporation, or other entity that, at the time the contract is executed, has become a party to this Agreement by executing Attachment A, the Agreement to be Bound and (i) who is or becomes bound to the full Master Agreement (i.e. bound to the Master Agreement independent of its obligations under this Agreement) or (ii)  is signatory to the GC Tilt Up Agreement. All Covered Concrete Work shall be performed only by an Employer that is bound to the appropriate Agreement as provided in this section.

(a) (ii) Each Employer performing Covered Concrete Work on the Project, as a condition to performing such work on the Project, shall be bound to, assign and perform all Covered Concrete Work on the Project under the terms of the Master Agreement and this Agreement, except  in the case of  Concrete Tilt Up Construction, where each Employer agrees to be bound to, assign and perform all such work under the terms of the full Master Agreement or the GC Tilt Up Agreement ( if it is bound to the GC Tilt Up Agreement);

6

(b)  Before being authorized to perform any Covered Concrete Work, Employers, in addition to being bound to the Master Agreement (or the GC Tilt Up Agreement for Concrete Tilt Up Construction ), shall become a party to this Agreement by signing Attachment A, the Agreement to be Bound.  Each Employer agrees that by executing the Agreement to be Bound, it agrees to assign all Covered Concrete Work to the Union. Every Employer shall notify the Union in writing within five (5) business days after it has subcontracted Covered Concrete Work, and shall, at the same, time provide to the Union a copy of the Employer's executed Agreement to be Bound.

(c)  The Employers shall notify each of its contractors and subcontractors of the provisions of this Agreement and require as a condition precedent to the assigning, awarding, or subcontracting of any Covered Concrete Work or allowing any subcontracted Covered Concrete Work to be performed, that all such contractors and subcontractors at all tiers must be bound to the full Master Agreement (or the GC Tilt Up Agreement for Concrete Tilt Up Construction ), and shall become bound to this Agreement. Any Employer that fails to provide the Union with a copy of the Agreement to be Bound executed by its contractor or subcontractor, or that subcontracts Covered Concrete Work to a contractor or subcontractor that is not bound to the full Master Agreement (or the GC Tilt Up Agreement for Concrete Tilt Up Construction ), shall be liable for any failure of that contractor or subcontractor, or any contractor or subcontractor at a lower tier, to comply with the provisions of the Master Agreement (or the GC Tilt Up Agreement for Concrete Tilt Up Construction )  and this Agreement, including damages to the Union for lost work opportunities of its members, and any contributions to any trust funds that the contractor or subcontractor, or any subcontractor to that subcontractor, fails to make for Covered Concrete Work on the Project.

3.2  Covered Non-Concrete Work

(a)  The Primary Employer and each other Employer agree that they will subcontract Covered Non-Concrete Work only to a person, firm, corporation, or other entity who is either (i) bound to the full Master Agreement (i.e. bound to the Master Agreement independent of its obligations under this Agreement) or (ii) becomes a party to this Agreement and who is or becomes bound to the Master Agreement for the Project only (subject to subsection b. below). Further, any Employer performing Covered Non-Concrete Work on the Project shall, as a condition to working on the Project, become bound to and perform all Covered Non-Concrete Work on the Project under the terms of this Agreement and the Master Agreement. Before being authorized to perform any Covered Non-Concrete Work, Employers shall become a party to this Agreement by signing Attachment A, the Agreement to be Bound.  Each Employer agrees that by executing the Agreement to be Bound, it agrees to assign all Covered Non-Concrete Work to the Union. Every Employer shall notify the Union in writing within five (5) business days after it has subcontracted Covered Non-

Concrete Work, and shall, at the same, time provide to the Union a copy of the Employer's executed Agreement to be Bound.

(b) Any Employer not already bound to the Master Agreement set forth in Section 3.2 (a), by virtue of signing this Agreement or the Agreement to be Bound (Attachment A), shall become bound to such Master Agreement to participate on this Project to perform Covered Non-Concrete Work.  Such Employer performing Covered Non-Concrete Work not already bound to the Master Agreement shall not be required to apply the terms of the Master Agreement to any other construction project.  Moreover, any Employer not already bound to the Master Agreement, who becomes bound to the Master Agreement to participate on this Project in order to perform Covered Non-Concrete Work, agrees to become bound to the Master Agreement under this Agreement only for Covered Non-Concrete Work on the Project and only until the Employer's completion of its portion of the Covered Non-Concrete Work on this Project.

(c) Nothing in this Agreement shall in any manner whatsoever limit the rights of the Primary Employer, or any other Employer, to subcontract Covered Non-Concrete Work or to select its contractors or subcontractors; provided, however, that all Employers, at all tiers, assigning, awarding, contracting or performing, or authorizing another to assign, award, contract, or perform Covered Non-Concrete Work shall be required to comply with the provisions of this Agreement and the Master Agreement on the Project.  The Primary Employer and every other Employer shall notify each of its contractors and subcontractors of the provisions of this Agreement and require as a condition precedent to the assigning, awarding, or subcontracting of any Covered Non-Concrete Work or allowing any subcontracted Covered Non-Concrete Work to be performed, that all such contractors and subcontractors at all tiers become bound to this Agreement and the Master Agreement to perform Covered Non-Concrete Work on this Project  as provided in Subsections a and b above.  Any Employer that fails to provide the Union with a copy of the Agreement to be Bound executed by its contractor or subcontractor shall be liable for any failure of that contractor or subcontractor, or any contractor or subcontractor at a lower tier, to comply with the provisions of this Agreement, including any contributions to any trust funds that the contractor or subcontractor, or any subcontractor to that subcontractor, fails to make for Covered Non-Concrete Work on the Project.

3.3      As soon as reasonably possible and in no event later than sixty (60) days prior to commencement of construction the Primary Employer and Union shall conduct a pre-job conference to review the terms of this Agreement and compliance with the Agreement by all Employers on the Project. Prior to the pre-job conference the Primary Employer shall (a) submit to the Union the names and contact information of all Employers that it anticipates will perform work on the Project with a description of the work they will perform, (b) submit all Agreements to be Bound  executed by Employers that will perform Covered Work on the Project (and continue to submit executed Agreements to be Bound to the Union as they

are received), and (c) shall invite all Employers anticipated to perform Covered Work on the Project to the pre-job conference.

4.      WAGES AND BENEFITS

(a)  All employees performing Covered Concrete Work on Concrete Tilt Up Construction (including foremen and general foremen) shall be classified and paid in accordance with the classifications and wage scales set forth in the Master Agreement, as modified by the Union's Tilt-up Concrete Agreement.  All employees performing Covered Concrete Work on Non-Tilt Up Construction (including foremen and general foremen) shall be classified and paid in accordance with the classifications and wage scales set forth in the Master Agreement. If an Employer is bound to the full Master Agreement (independent of its obligations under this Agreement), such Employer may use any private work agreement applicable to this Project.

(b)  All employee performing Covered Non-Concrete Work (including foremen and general foremen) employed by an Employer who is bound to the Master Agreement for work on the Project only or this Project and other work on a project only basis (and not for all work performed in San Diego County for the duration of the Master Agreement) shall be classified and paid in accordance with the classifications and wage scales set forth in the Master Agreement, as modified on Attachment B of this Agreement only. Such Employers shall not be entitled to the wages and fringe benefit contribution rates contained in any Union private work agreement, side letter, memorandum or addendum to the Master Agreement.

(c)  If the Employer contends that there is no classification in the Master Agreement describing the Covered Work to be performed, the Employer shall notify the Union of this, and within five (5) business days, the Union shall notify the Employer of the correct classification.

(d) Notwithstanding the provisions of the preceding subsections, if any Covered Work is subject to the payment of prevailing wages as determined by the California Department of Industrial Relations or the U.S. Department of Labor, such work shall be paid at the rates contained in the Union's Master Agreement in effect at the time the work is performed.

5.      UNION RECOGNITION AND REFERRAL

5.1      The Employers recognize the Union signatory to this Agreement as the sole and exclusive collective bargaining representative for their construction craft employees performing Covered Work for the Project, pursuant to Section 8(f) of the National Labor Relations Act, and further recognize the claimed craft jurisdiction of the Union.

5.2     All employees performing Covered Work shall be or shall become and then remain members in good standing of the Union as a condition of employment on or before the eighth (8th) day of employment performing Covered Work, or the eighth (8th) day following the execution of this Agreement, whichever is later.

5.3     The Union shall be the primary source of all craft employees for Covered Work for the Project pursuant to the terms of the Master Agreement except that an Employer that becomes newly bound to the Master Agreement to participate on this Project, shall be entitled to designate by name up to five (5) core members (four employees and one foreman), or fifty percent (50%) of its workforce whichever is greater. In the event of a reduction-in-force or layoff, such will take place in a manner to assure the number of remaining "core" employees does not exceed, at any time, the permitted number or percentage in the preceding sentence. All core employees shall be employed under and subject to all of the terms of this Agreement. The Union shall cooperate with each Employer's efforts to comply with all applicable laws and regulations related to such local hiring requirements.

5.4     Employers may employ apprentices where work is within their capabilities in the ratio established in the Master Agreement.  The Parties recognize that employing sufficient numbers of apprentices on the Project is needed in order to make the construction process cost effective and efficient. The Union will use its best efforts to dispatch as many apprentices as are requested and within the applicable ratio.

5.5     The Union shall exert its utmost efforts, including requesting assistance from other local unions, to recruit a sufficient number of skilled craftsmen (including apprentices) to fulfill the manpower requirements of the Employers.  In the event the referral facilities maintained by the Union does not refer the employees as requested by the Employer within a forty-eight (48) hour period after such requisition is made by the Employer (Saturdays, Sundays, and holidays excepted), the Employer may employ applicants from any source, but shall arrange for a dispatch to be issued for those applicants from the Union within twenty-four (24) hours of the commencement of employment (Saturdays, Sundays, and holidays excepted), and the dispatch shall upon request be issued by the Union to the employee.

6.     <u>WORK STOPPAGES AND LOCKOUTS</u>

6.1     During the term of this Agreement there shall be no strikes, sympathy strikes, picketing, work stoppages, slow downs, sick-outs, wobbles, boycotts, handbilling, bannering, or "rat-type" displays, where such activity relates to any Employer or the Owner or owners of the Project, or disruptive activity, or interference with the work at, near or pertaining to  the Project site by the Union, its agents, representatives, members, or by any employee for any reason, and there shall be no lockout affecting the Union by any

Employer. Lockout does not refer to discharge, termination, suspension or layoff of employees by an Employer for any reason in the exercise of its rights as set forth in other provisions of this Agreement, nor does lockout include Owner's decision to terminate or suspend work on the Project or any portion thereof for any reason.  Failure of any Union member or employee to cross any picket line established at the Employer's Project site is a violation of this Article and subjects such employee to discipline up to and including discharge.

6.1.1    The Parties acknowledge that work which is not Covered Work (as defined in this Agreement) may be performed by Primary Employer and/or Employers and/or others who are not parties to a collective bargaining agreement. The Union agrees that the Primary Employer or Employers or others may perform both Covered Work and work which is not Covered Work, utilizing non-union workers of any trade for work which is not Covered Work. The Union agrees that if Covered Work and work which is not Covered Work is occurring simultaneously and in close proximity and/or in conjunction with each other, the Union shall permit and require its members to cooperate fully (as set forth in section 6.1 above) in performing all their work.

6.2    The Union shall not sanction, aid or abet, encourage, condone or participate in or continue any work stoppage, strike, picketing, handbilling, bannering or any other disruptive activity at the Project site and shall undertake all reasonable means to prevent or to terminate any such activity. No employee shall engage in activities which violate this Article. Any employee who participates in or encourages any activities which interfere with the normal operation of the Project shall be subject to disciplinary action, including discharge, and, if justifiably discharged for the above reasons, shall not be eligible for rehire.

6.3    The Union shall not be liable for acts of employees for which it has no responsibility as long as the principal officer or officers of the Union immediately instruct, order and use the best efforts of his or their office to cause the employees the Union represents to cease any violations of this Article. The Union complying with this obligation shall not be liable for unauthorized acts of employees it represents. The failure of the Employer to exercise its right in any instance shall not be deemed a waiver of its right in any other instance.

6.4    The Union agrees that if any union or any other persons, whether parties to this Agreement or otherwise, engage in any picketing or work stoppages, the Union shall refuse to honor such picket line or work stoppage.

6.5    In the event of any work stoppage, strike, sympathy strike, picketing, handbilling, bannering or interference with the work or any other disruptive activity in violation of this Article (collectively, a "Work Stoppage"), the Employer may suspend all or any portion of the Project work affected by such

activity, or hire nonunion labor to complete the affected activity while a Work Stoppage is in effect, at the Employer's discretion and without penalty or breach of this Agreement.

6.6      In lieu of, or in addition to, any other action at law or equity, any party may institute the following procedure when a breach of this Article is alleged, after the Union has been notified of the fact.

6.6.1.      The party invoking this procedure shall notify Tom Pagan or Ken Perea, whom the parties to this Agreement agree shall be the permanent Arbitrators under this procedure. With 30 days written notice and agreement by the Union, the Primary Employer may replace any of the permanent Arbitrators with another Arbitrator with construction labor agreement experience. Such agreement shall not be unreasonably withheld. In the event that neither of the permanent Arbitrators are available upon an Employer's request, the American Arbitration Association shall select an alternative arbitrator within twenty-four (24) hours of notice. Notice to the Arbitrator shall be by the most expeditious means available, with notice by fax or electronic means or any other effective written means to the Union.

6.6.2.      Upon receipt of said notice, the Arbitrators named above shall set and hold a hearing within twenty-four (24) hours if it is contended that the violation still exists.

6.6.3.      The Arbitrator shall notify the parties by fax or electronic means or any other effective written means of the place and time he has chosen for this hearing. The hearing shall be completed in one session. A failure of any party or parties to attend said hearing shall not delay the hearing of evidence or issuance of an Award by the Arbitrator.

6.6.4.      The sole issue at the hearing shall be whether or not a violation of this Article has in fact occurred. The award shall be issued in writing within three (3) hours after the close of the hearing, and may be issued without an opinion. If any party desires an opinion, one shall be issued within fifteen (15) days, but its issuance shall not delay compliance with, or enforcement of, the award. The Arbitrator may order cessation of the violation of this Article by the Union, and the award shall be served on all parties by hand or registered mail or by electronic mail upon issuance.

6.6.5.      The award may be enforced by any court of competent jurisdiction upon the filing of this Agreement and all other relevant documents referred to hereinabove in the following manner. The fax or electronic notice of the filing of such enforcement proceedings shall be given to the other party. In the proceeding to obtain a temporary order enforcing the Arbitrator's award as issued under Section 6.6.4 of this Article, all parties waive the right to a hearing and agree that such proceedings may be ex parte. Such agreement does not waive any party's right to participate in a hearing for a final order of enforcement. The Court's order or orders enforcing the Arbitrator's award shall be served on all parties by hand or by delivery to their last known address or by registered mail or by electronic mail. All parties waive the right to require

the issuance of a bond or other security for issuance of an injunction or an appeal to a refusal to issue one under this Article.

6.6.6.    Any rights created by statute or law governing arbitration proceedings inconsistent with the above procedure or which interfere with compliance therewith are hereby waived by the parties to whom they accrue.

6.6.7.    The fees and expenses of the Arbitrator shall be borne by the party or parties found in violation, or in the event no violation is found, such fees and expenses shall be borne by the moving party.

6.7    The procedures contained in Section 6.6 shall be applicable to alleged violations of this Article. Disputes alleging violation of any other provision of this Agreement, including any underlying disputes alleged to be in justification, explanation or mitigation of any violation of this Article, shall be resolved under the grievance procedures of Article 7.

6.8    Notwithstanding the provisions of Section 6.1 above, with seventy-two (72) hours prior written notice to the Primary Employer, the Union retains the right to withhold the services of its members from, but not to picket, a particular contractor or subcontractor who fails to make timely payments to the Union's benefit plans or fails to timely pay its weekly payroll in accordance with its agreements with the Union; provided, however, that in the event the Union or any of its members withhold their services from such contractor or subcontractor, Primary Employer shall have the right to replace such contractor or subcontractor with any other contractor or subcontractor who executes the Agreement to be Bound.

6.9    The Master Agreement shall govern, except to the extent it conflicts with the provisions of this Agreement, in which case the provisions of the Agreement shall prevail. In the event that the current Master Agreement expires and the Union negotiates a successor or extension to the Master Agreement, the Union shall continue to provide employees to the Employers working on the Project under all the terms of the Master Agreement in effect as of the Effective Date of this Agreement until a new Master Agreement is entered into, at which time all terms and conditions of the new Master Agreement shall apply to Covered Work at the Project from the effective date of the new Master Agreement, except to the extent they conflict with any provision of this Agreement, in which case the terms of this Agreement shall prevail.

7.    <u>GRIEVANCE PROCEDURE</u>

7.1    Any question arising out of and during the term of this Agreement involving its interpretation and application (other than successorship and those arising under Article 9) shall be considered a grievance. Questions between or among parties signatory to the Master Agreement arising out

of or involving the interpretation of the Master Agreement shall be resolved under the grievance procedure provided in the Master Agreement.

7.2    The Primary Employer and other Employers, as well as the Union, may bring forth grievances under this Article.

7.3    A grievance shall be considered null and void if not brought to the attention of the Employer within five (5) working days after the incident that initiated the alleged grievance occurred or reasonably should have been discovered, whichever is later. The term "working days" as used in this Article shall exclude Saturdays, Sundays, or holidays regardless of whether any work is actually performed on such days.

7.4    Grievances shall be settled according to the following procedure:

Step 1

The Union representative and the grievant shall attempt to resolve the grievance with the craft supervisor within five (5) working days after the Grievance has been brought to the attention of the Employer. This step may be skipped if the Union, rather than an individual employee, initiates the grievance.

Step 2

In the event the matter remains unresolved in Step 1 above after five (5) working days, within five (5) working days thereafter, the alleged grievance may be referred in writing to the Union Business Manager, or his designated representative, and the site construction manager or Labor Relations representative of the Employer for discussion and resolution. A copy of the written grievance shall also be mailed, faxed or emailed to the Primary Employer.

Step 3

In the event the matter remains unresolved in Step 2 above within five (5) working days, within five (5) working days thereafter, the grievance may be referred in writing to the Union Business Manager, or his designated representative, and the Manager of Labor Relations of the Employer or the Manager's designated representative and the Primary Employer for discussion and resolution.

Step 4

If the grievance is not settled in Step 3 within five (5) working days, within five (5) working days thereafter, either party may request the dispute be submitted to arbitration or the time may be extended by mutual consent of both parties. The request for arbitration and/or the request for an

extension of time must be in writing with a copy to the Primary Employer. Should the parties be unable to mutually agree on the selection of an Arbitrator, selection for that given arbitration shall be made by seeking a list of seven (7) labor arbitrators with construction experience from the Federal Mediation and Conciliation Service and alternately striking names from the list of names on the list until the parties agree on an Arbitrator or until one name remains. The first party to strike a name from the list shall alternate between the party defending the grievance and the party bringing the grievance, with the Union striking first in the first grievance.

7.5     The Arbitrator shall conduct a hearing at which the parties to the grievance shall be entitled to present testimonial and documentary evidence. The parties shall be entitled to file written briefs after the close of the hearing and receipt of the transcript.

7.6     The Arbitrator shall issue a written decision that will be served on all parties and on the Primary Employer. The Arbitrator shall have the authority to utilize any equitable or legal remedy to prevent and/or cure any breach or threatened breach of this Agreement. The Arbitrator's decision shall be final and binding as to all parties signatory to this Agreement. The parties agree that a judgment on the decision may be entered into by a court of competent jurisdiction.

7.7     The cost of the Arbitrator shall be borne equally by the parties to the grievance. All other costs and expenses in connection with the grievance hearing shall be borne by the party who incurs them.

7.8     The Arbitrator's decision shall be confined to the issue(s) posed by the grievance. The Arbitrator shall not have the authority to modify, amend, alter, add to or subtract from any provision of this Agreement.

7.9     Any party to a grievance may invite the Primary Employer to participate in resolution of a grievance. The Primary Employer may, at its own initiative, participate in Steps 1 through 3 of the grievance procedure.

7.10     In determining whether the time limits of Steps 2 through 4 of the grievance procedure have been met, a written referral or request shall be considered timely if it is personally delivered, sent by overnight mail, electronic mail, or faxed within the five (5) working day period. Any of the time periods set forth in this Article may be extended in writing by mutual consent of the parties to the grievance. Failure to process a grievance, or failure to respond in writing within the time limits provided above, without a request for an extension of time, shall be deemed a waiver of such grievance to the other without prejudice, or without precedent to the processing of and/or resolution of like or similar grievances.

7.11     In order to encourage the resolution of disputes and grievances, the Parties agree that settlements shall not be precedent setting.

8.   <u>MANAGEMENT RIGHTS</u>

    8.1    Notwithstanding any provision to the contrary in the Master Agreement, the Employer retains and shall exercise full and exclusive authority and responsibility for the management of its operations and work forces, except as expressly limited by the terms of this Agreement. This authority includes, but is not limited to, the right to:

    8.1.1.    Plan, direct and control the operation and timing of all the work and the work force.

    8.1.2.    Decide the number and type of employees required for the work on both a daily basis and a project basis. There shall be no featherbedding.

    8.1.3.    Hire, promote, and lay off employees as deemed appropriate to meet work requirements and/or skills required, and to select and hire directly all supervisory personnel above the classification of general foreman it considers necessary and desirable, without such persons being referred by the Union. Individual seniority shall not be recognized or applied to employees working under this Agreement.

    8.1.4.    The selection of foremen.

    8.1.5.    Discharge, suspend, or discipline employees for just cause.

    8.1.6.    Require all employees to observe the Employers' and Owners' reasonable Project Rules, Security, Environmental and Safety Regulations, consistent with the provisions of this Agreement. These Project Work Rules and Regulations shall he supplied to the Union, to all employees and posted on the job site.

    8.1.7.    Determine the competency of all employees.

    8.1.8.    Assign and schedule work crews at its sole discretion and determine when overtime will be worked and the number of employees engaged in such work. There shall be no refusal by the Union to perform work, including overtime work, assigned.

    8.1.9.    The Employer shall establish and employees shall observe such reasonable project job site work rules as the Employer deems appropriate.  These rules will be reviewed and discussed at the pre-job conference, posted at the project site by the Employer, and may be amended thereafter as necessary.

    8.1.10.    Utilize any safe work methods, procedures or techniques and select and use any type or kind of materials, apparatus or equipment regardless of source, manufacturer, or designer. The foregoing listing of management rights shall not be deemed to exclude other functions not specifically set forth herein that do not conflict with the terms of this Agreement.

    8.2.    The Union understands the importance of maintaining construction quality and maintaining the construction schedule. The Union also understands that construction errors or delays in construction can result in the loss of production, which creates a great loss to the Primary Employer. Therefore, the Union will

encourage and advise the employees to exhaust every effort, ways, and means to perform work of good quality and quantity. The Parties recognize the necessity for eliminating restrictions and promoting efficiency and agree that no rules, customs, or practices shall be permitted that limit production, efficiency, or increase the time required to do the work, and no limitation shall be placed upon the amount of work which an employee shall perform, nor shall there be any restrictions against the use of any kinds of machinery, tools, or labor-saving devices. No rule or regulation shall be adopted that compromises employee safety. Nothing in this Agreement shall require any employee to engage in an unsafe work practice. The Employer may utilize any methods or techniques of construction, tools, or other labor saving devices to accomplish the work.

8.3.    There shall be no limitation or restriction by Union upon an Employer's choice of materials or design, nor upon the full use and utilization of equipment, machinery, packaging, precast, pre-fabricated, pre-finished, or pre-assembled materials, tools, or other labor saving devices. For Covered Work, the on-site installation or application of all items shall be performed by the Union; provided, however, it is recognized that installation of specialty items which may be furnished by Owner or Employer may be performed by employees employed under this Agreement who may be directed by other personnel in a supervisory role, or, in limited circumstances requiring special knowledge of the particular item(s), may be performed by employees of the vendor or other companies where necessary to protect a manufacturer's warranty or where the employees working under this Agreement lack the required skills to perform the work.

8.4.    The use of new technology, equipment, machinery, tools, and/or labor saving devices and methods of performing work may be initiated by Employer from time-to-time during the Project. Union agrees that it will not in any way restrict the implementation of such new devices or work methods. If there is any disagreement between the Employer and the Union concerning the manner or implementation of such device or method of work, the implementation shall proceed as directed by the Employer, and the Union shall have the right to grieve and/or arbitrate the dispute as set forth in Article 7 of this Agreement.

8.5.    All Employers may utilize the substance abuse and testing program contained in the Master Agreement. If requested by the Primary Employer, the Primary Employer and the Union will negotiate a substitute program consistent with construction industry standards in the area.

9.    <u>SUCCESSORSHIP AND SURVIVABILITY</u>

9.1    Subject to Section 2.4,  the subcontracting obligations described in Article 3, and the obligations of the GC Tilt Up Agreement if applicable to this Project,  are independent obligations of Primary Employer which shall survive any full or partial termination of the Primary Employer's

construction contract with the Owner for Covered Work for any reason, including, without limitation: (i) any full or partial termination or transfer of the Primary Employer's right to control and coordinate construction work on the Project; (ii) any full or partial termination or transfer of a contract, if any, between the Primary Employer and Owner for any Covered Work; (iii) the transfer of all or any portion of the Project or any interest in the Project by Project Owner; or (iv) any other event that results in the replacement of Primary Employer with another contractor; *provided*, *however*, that such Primary Employer's obligations under this Article 9 and Article 3 shall cease upon the execution of a new PLA between the Union and Primary Employer's replacement general contractor.

9.2     Subject to Section 2.4 the Parties agree that: (i) if the Primary Employer's involvement in the Project is terminated as described in Section 9.1, and (ii) Covered Work is performed by a contractor or subcontractor that is not in compliance with the provisions of Article 3  then Primary Employer shall pay liquidated damages, as described in Section 9.3, to compensate for the actual damages caused by reason thereof. The Parties agree that such damages would be unreasonably difficult, costly, inconvenient or impracticable to calculate and, accordingly, they agree to liquidated damages which bear a reasonable relationship to the actual harm suffered by the Union and its members, as provided in Section 9.3 ("Liquidated Damages").

9.3     In that Liquidated Damages are owed as described in Section 9.2, Primary Employer shall pay $30.00 for each hour that work was performed on the Project within the scope of this Agreement by employees of contractors or subcontractors who are not signatory to this Agreement.  The Liquidated Damages shall be paid as follows: Ten Dollars ($10.00) per hour to the Union's Pension Trust described in the Master Agreement, Ten Dollars ($10.00) per hour to the Union's Health & Welfare Trust fund described in the Master Agreement, and Ten Dollars ($10.00) to the Union for the benefit of its membership who lost work opportunities, for each hour of Covered Work performed by the contractor(s) or subcontractor(s) not signatory to this Agreement. The Parties agree that the Union shall enforce, collect and receive Liquidated Damages pursuant to Article 9 on behalf of its Trust Funds. The Trust Funds shall have no right to independently enforce the provisions, including, but not limited to, the Liquidated Damages provisions contained in Article 9. This Agreement to pay liquidated damages does not constitute a waiver of the Primary Employer's ability to contest any claim that a violation of Article 9 has occurred, or the calculation of the amount of liquidated damages owed.

9.4     Upon execution and delivery of an agreement assigning and assuming all the obligations of this Agreement by a contractor capable of performing the Covered Work, and acceptance of said agreement by the Union, which shall not be unreasonably denied, the Primary Employer shall be fully

released from liability for the payment of liquidated damages under Section 9.3 and shall have no liability for any breach of this Agreement by a successor employer or contractor.  The right of the Owner to assign the obligations of this Agreement shall apply on a per-parcel basis such that if Owner sells any or all of the parcels that are part of the Project, Owner may assign, or partially assign as the case may be, this Agreement to subsequent Owners who intend to construct the Project buildings on such parcels.  In the case of such partial assignment, acceptance of said agreement by Union shall not be unreasonably denied and the Primary Employer shall be fully released from liability for the payment of liquidated damages under Section 9.3 and shall have no liability for any breach of this Agreement by a successor employer or contractor.

 9.5 This Article 9 shall be enforceable in any court of competent jurisdiction, and shall not be subject to the grievance procedure of Article 7.

10. <u>GENERAL PROVISIONS</u>

 10.1 If any article or provision of this Agreement shall become invalid, inoperative, and/or unenforceable by operation of law or by declaration of any competent authority of the executive, legislative, judicial or administrative branches of the federal or local government, (a) the remainder of the Agreement or application of such article or provision to persons or circumstances other than to which it has been held invalid, inoperative or unenforceable shall not be affected thereby, and (b) the Parties shall suspend the operation of such article or provision during the period of its invalidity, and the Primary Employer and the Union shall negotiate in its place and stead an article or provision that will satisfy the objections to its validity and that, to the greatest extent possible, will be in accord with the intent and purpose of the article or provision in question. The new article or provision negotiated by the Primary Employer and the Union shall be binding on all parties signatory to this Agreement. At all times relevant the provisions of Article 6 will apply.

 10.2 Except as enumerated in this Agreement, all other terms and conditions of employment described in the Master Agreement shall apply.

 10.3 Any modifications, amendments, or supplements to this Agreement may be entered into between the Primary Employer and the Union.

 10.4 The provisions of this Agreement shall take precedence over conflicting provisions of the Master Agreement. If there is any conflict in any of the provisions, the terms of this Agreement shall govern.

 10.5 Each person executing this Agreement represents and warrants that he or she is authorized to execute this Agreement on behalf of the Party or Parties indicated.

10.6     This Agreement may be executed in any number of counterparts, and each counterpart shall be deemed to be an original document. All executed counterparts together shall constitute one and the same document, and any signature pages may be assembled to form a single original document.

10.7     The Parties agree that Owner and the owners express third party beneficiary of Article 6 of this Agreement and, as such, possesses all of the rights of the Parties to enforce the terms and conditions hereof.

10.8     This Agreement may be executed in any one or more counterparts, each of which shall constitute an original, no other counterpart needing to be produced, and all of which, when taken together, shall constitute but one and the same instrument.  Facsimile or electronic (pdf) signature pages of this Agreement shall be valid and binding as original signatures and shall be considered an agreement of the respective Parties to fully execute and deliver originally signed copies of this Agreement.


11.     <u>TERM OF AGREEMENT</u>

The term of this Agreement shall commence on the date indicated below after execution by all Parties ("Effective Date"), and shall continue in effect until the Completion of All Covered Work on the Project pursuant to Article 2. "Completion of All Covered Work" shall be defined, on a per building basis, (subject to Section 2.4), as the first to occur of (i) issuance of the first Certificate of Occupancy, or (ii) receipt of final inspection or construction approval by the applicable authority having jurisdiction ("Completion Date"). Upon Completion of All Covered Work, on a per building basis (subject to Section 2.4), the Union shall provide Owner, the owners or the Primary Employer written confirmation promptly upon request that the Agreement is no longer in effect. Prior to Completion of All Covered Work, upon request from Owner, the owners or the Primary Employer, the Union shall confirm, in writing, the current status of the Agreement, to include certification that the Agreement has not been modified and is in full force and effect, that there are no known defaults under the Agreement, and such other similar certifications as reasonably requested by Owner, the owners or the Primary Employer.

Notwithstanding any other provision of this Agreement, this Agreement automatically shall end of its own terms, if (a) the Project Approvals and related CEQA certifications and findings (collectively, the "Entitlements") are not obtained; or (b) if the Entitlements or required CEQA documents have been invalidated by a final court order; or (c) the Project is not built by Owner or an affiliate of Owner and a subsequent project at the same location must, again, submit for an entirely new discretionary review under CEQA and the permit approval process Upon any such termination, this Agreement shall have no force or effect and the parties shall have no further obligation to each other by reason thereof.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and effective as of _____, 2018 (the "Effective Date").

SOUTHERN CALIFORNIA DISTRICT COUNCIL OF LABORERS

By: _____

Name: _____

Title: _____

Date: _____

_____

_____

_____

ATTACHMENT A

AGREEMENT TO BE BOUND

PROJECT LABOR AGREEMENT

MERGE 56 PROJECT

The undersigned hereby certifies and agrees that:

1.  It is an Employer as that term is defined in Section 1.7 of the MERGE 56 Project Labor Agreement ("Agreement") because it has been, or will be, awarded a contract or subcontract to assign, award or subcontract Covered Work on the Project (as defined in Sections 1.2 and 2.1 of the Agreement), or to authorize another party to assign, award or subcontract Covered Work, or to perform Covered Work.

2.  In consideration of the award of such contract or subcontract, pursuant to Section 8(f) of the National Labor Relations Act, and in further consideration of the promises made in the Agreement and any attachments thereto (a copy of which was received and is hereby acknowledged), it accepts and agrees to be bound by the terms and conditions of the Agreement, together with any and all amendments and supplements now existing or which are later made thereto.

3.  If it performs Covered Work with its own employees, it will be bound by the legally established trust agreements designated in the Laborers Union's Southern California Master Agreement, and hereby authorizes the parties to such Trust Agreements to appoint trustees and successor trustee to administer the trust funds, and hereby ratifies and accepts the trustees so appointed as if made by the undersigned.

4.  It has no commitments or agreements that would preclude its full and complete compliance with the terms and conditions of the Agreement and the assignment of all Covered Work on the Project to the Laborers Union.

5.  It will secure a duly executed Agreement to be Bound, in form identical to this document, from any Employer(s) at any tier or tiers with which it contracts to assign, award, or subcontract Covered Work on the Project, or to authorize another party to assign, award or subcontract Covered Work, or to perform Covered Work.

DATED: _____          Name of Employer

                                _____

                                _____
                                (Authorized Officer & Title)
                                _____

                                _____
                                (Address)

ATTACHMENT B

WAGE RATES AND FRINGE BENEFITS*

## COVERED CONCRETE WORK

All Covered Concrete Work other than Concrete Tilt Up Construction shall be performed by an Employer bound to the full Master Agreement ( i.e. bound to the Master Agreement independent of its obligations under this Agreement), and shall pay the rates contained in the Master Agreement.

All Concrete Tilt Up Construction shall be performed by an Employer bound to the full Master Agreement (i.e. bound to the Master Agreement independent of its obligations under this Agreement) or the Tilt Up Concrete Agreement if the Employer is bound to that Agreement, and the Employer shall pay the rates contained in the Master Agreement or the Union's Tilt Up Concrete Agreement if the Employer is bound to that Agreement.

## COVERED NON-CONCRETE WORK

1.) Traffic Control – Master Labor Agreement ("MLA") Group 1 (80%).
2.) Demolition – MLA Group 1 (80%) unless using a pneumatic, gas, electric tool, then Group 3 (90%).
3.) Asphalt Paving – MLA Group 1 (80%) for general laborer work and asphalt loader; MLA Group 2 (90%) for the asphalt shoveler; MLA Group 4 (90%) for raker, ironer, dumpman and spreader boxes.
4.) Pipeline (Storm Drain, Water Lines, Sewer) – MLA Group 1 (80%) for general laborer; MLA Group 2 (90%) for pipeline wrapper; MLA Group 3 (90%) for pipe layer backup man and pneumatic, gas, electric tools; MLA Group 4 (90%) for pipe layer; MLA 5 (100%) for welding.
5.) Fencing – MLA Group 1 (80%).
6.) General Conditions (Clean Up) – MLA Group 1 (80%).
7.) Landscaping – Private Landscape Agreement rates.
8.) Pavement Markings – Private Striping Agreement (PSA) Group 1 for traffic control and serviceman; PSA Group 2 for squeegeeman, certified traffic control, bob cat/skid steer; PSA Group 3 for applicator operator (line driver), sweeper operator, shuttleman; and PSA Group 4 for mixer operator.
9.) Site Furnishings – MLA Group 1 (80%).
10.) Sand Blasting – MLA Group 4 (90%).
11.) Fire Proofing – MLA Group 3 (90%).
12.) Signs – MLA Group 1 for general laborer; MLA Group 3 (90%) for pneumatic, gas, electric tools.
13.) Solar Technologies – MLA Group 1 (80%).

14.) Underground Utilities - Underground Utility rates: Group 1 for Utility Laborer; Group 2 for pneumatic, gas, electric tools and pipeline wrapper; Group 3 for pipelayer; and Group 4 for welder.

15.) Site Prep – MLA Group 1 (80%).

16.) Gunite/Shotcrete – Private Gunite/Shotcrete rates

17.) Plaster Tending – Private Plaster tender Rates

*A Laborers classification not mentioned above but used on the Project to perform Covered Work shall be paid the appropriate wage rate and fringe benefit contributions in the MLA or other applicable Agreement (i.e. Landscape Agreement, Utility Agreement and Parking and Highway Improvement (Striping) Agreement), as reduced by this Attachment B. For a fuller description of work, refer to MLA or other applicable Agreement (i.e. Landscape Agreement, Utility Agreement and Parking and Highway Improvement (Striping) Agreement).

<u>MLA Wage and Fringe Benefit Hourly Rates*:</u>

<u>Wage Rates (Engineering):</u>
Group 1(80%): $32.50
Group 2 (90%): $32.96
Group 3 (90%): $33.37
Group 4 (90%): $34.21
Group 5 (100%): $38.33

<u>Fringe Benefit Rates:</u>
Health & Welfare: $4.30
Pension: $4.30
Vacation (includes Supp. Dues): $4.96

<u>Wage Rates (Building):</u>
Group 1: $28.37
Group 2 $28.98
Group 3 $29.62
Group 4 $30.34
Group 5 $36.20

<u>Fringe Benefit Rates:</u>
Health & Welfare: $4.30
Pension: $4.30
Vacation (includes Supp. Dues): $4.96

*Rates will increase July 1, 2019, and every July 1 thereafter. The Union will notify the Employer of the increases, which shall be no more than the increase in the Private Light Commercial rates under the MLA.

<u>Underground Utility Wage and Fringe Benefit Hourly Rates*:</u>

<u>Wage Rates:</u>
Group 1: $29.39
Group 2: $30.56
Group 3: $32.21
Group 4: $34.94

<u>Fringe Benefit Rates:</u>
Health & Welfare: $4.20
Pension: $3.02

Vacation (includes Supp. Dues): $4.59

* These are the rates effective through June 30, 2018. Rates will increase July 1, 2018, and every July 1, thereafter. The Union will notify the Employer of the increases, which shall be no more than the increase in the Private Work Utility Agreement.

Landscape Wage and Fringe benefit Hourly Rates*:

Wage Rates:
Laborer: $12.00**
Leadman: $16.50
Hydroseeder, Truck Driver, Equipment Operator: $20.40

Fringe Benefit Rates*:
Laborer: Vacation (includes supp. dues) - $.51
Leadman: H & W - $2.45; Vacation (includes supp. dues) - $1.27
Hydroseeder, Truck Driver, Operator: H & W - $2.45; Pension - $2.49; Vacation (includes supp. Dues) - $1.51

* These are the rates effective through July 31, 2018. Rates will increase August 1, 2018 and every August 1 thereafter. The Union will notify the Employer of the increases, which shall be no more than the increases in the Private Work Landscape Agreement.

** Rate is $12.00 or 10% over minimum wage, whichever is higher.

Striping (Pavement Markings) Wage and Fringe Benefit Hourly Rates*:

Wage Rates:
Group 1: $26.06
Group 2: $28.16
Group 3: $28.66
Group 4: $31.66

Fringe Benefit Rates:
Health & Welfare: $4.20
Pension: $2.90
Vacation (includes Supp. Dues): $4.59

*These are the rates effective through June 30, 2018. Rates will increase July 1, 2018 and every July 1 thereafter. The Union will notify the Employer of the increases, which shall be no more than the increases in the private rates under the Parking and Highway Improvement (Striping) Agreement.

Plaster Tending*

Wage Rate:  $33.05

Fringe Benefit Rates:
Health & Welfare 4.20

Pension 2.49
Vacation (Supplemental Dues $1.90) 4.87
Apprenticeship & Training 1.02

*These are the rates effective through June 30, 2018. Rates will increase July 1, 2018 and every July 1 thereafter. The Union will notify the Employer of the increases, which shall be no more than the increases in the private rates under the Plaster Tenders Agreement.

### Gunite Shotcrete Wage and Fringe Benefits Rates*

Wage Rates:
ACI Nozzlemen Base Wage $42.08
Rodmen & Nozzlemen Base Wage $41.08
Ground Wire Man Base Wage $41.08
Gunmen Base Wage $40.13
Reboundmen Base Wage $36.59

Fringe Benefit Rates
Health & Welfare 7.12
Gunite Pension 4.20
Vacation (Supplemental Dues $1.83) 5.10

Entry Levels 1 & 2 Wage & Fringe Benefit Rates
Entry Level 1 Base Wage $26.20
Entry Level 2 Base wage $28.20
Health & Welfare 4.20
Gunite Pension 6.11
Vacation (Supplemental Dues $1.83) 5.10

Travel and Out of Town Expense Allowance:
Short subsistence is $65.00 per day
Long subsistence is $75.00 per day
Mileage rate is $0.56

*These are the rates effective through June 30, 2018. Rates will increase July 1, 2018 and every July 1 thereafter. The Union will notify the Employer of the increases, which shall be no more than the increases in the private rates under the Commercial Gunite Shotcrete Agreement.

### PREVAILING WAGE WORK

Any work that is subject to the payment prevailing wages pursuant to the local, state or federal law shall be paid at the rates contained in the Master Agreement.

# Exhibit F

RECEIVED
CITY CLERK'S OFFICE

18 JUL 11 PM 4: 34

SAN DIEGO, CALIF.



F 510.836.4200          410 12th Street, Suite 250          www.lozeaudrury.com
F 510.836.4205          Oakland, Ca 94607                   rebecca@lozeaudrury.com

*By U.S. Mail & E-mail*

July 11, 2018

Myrtle Cole, Council President
Barbara Bry, Council President Pro Tem
City of San Diego City Council
City Administration Building
202 C St., 10th Floor
San Diego, CA 92101
myrtlecole@sandiego.gov
barbarabry@sandiego.gov

Elizabeth Maland, City Clerk
202 C St., Second Floor
San Diego, CA 92101
cityclerk@sandiego.gov

**Re:     Notice of Intent to File Suit Under The California Environmental Quality Act
          Regarding Merge 56 – Project No. 360009 (SCH No. 2014071065) and Related
          Decisions**

Dear President Col, President Pro Tem Bry, and Clerk Maland:

        Please take notice, pursuant to Public Resources Code ("PRC") § 21167.5, that Petitioner
Laborers International Union of North America, Local Union 89 ("Petitioner") intends to file a
Verified Petition for Peremptory Writ of Mandate ("Petition") under the provisions of the
California Environmental Quality Act ("CEQA"), PRC § 21000 *et seq.,* against Respondents the
City of San Diego and the City Council of the City of San Diego ("City" or "Respondents"),
challenging the May 22, 2018 approval of the Merge 56 mixed-use project ("Project")  and
adoption of Resolution R-2018-540 certifying Environmental Impact Report No. 360009/SCH
No. 2014071065 and adopting Findings, a Statement of Overriding Considerations, and a
Mitigation, Monitoring, and Reporting Program for the Merge 56 Project, as well as other
approved resolutions related to the Merge 56 project (O-2018-115, R-2018-548, R-2018-546, R-
2018-541, R-2018-545, R-2018-544).

        Among other issues, Petitioner will allege that the City failed to proceed in the manner
required by law and without substantial evidence by relying on an EIR that fails to properly

Re: Notice of Intent to File Suit
Under the California Environmental Quality Act
June 19, 2018
Page 2 of 3

disclose, analyze, and mitigate the Project's potential significant individual and cumulative biological impact, impacts on human health from diesel emissions, greenhouse gas impacts, and traffic impacts.  The petition being filed will seek the following relief:

1.  For a stay pending trial of Respondents' decisions approving the Project.
2.  For a peremptory writ of mandate ordering:
    a.  Respondents to vacate and set aside their certification of the EIR for the Project, adoption of the Statement of Overriding Considerations, and decisions approving the Project;
    b.  Respondents and Real Party in Interest to suspend all activity under the certification of the EIR and approval of the Project that could result in any change or alternation to the physical environment until Respondents have taken all actions necessary to bring the certification and Project approvals into compliance with CEQA; and
    c.  Respondents to prepare, circulate, and consider an EIR in compliance with CEQA prior to any subsequent action to approve the Project.
3.  For the costs of suit.
4.  For an award of attorney fees pursuant to Code of Civil Procedure § 1021.5 and any other applicable provisions of law or equity.
5.  For any other equitable or legal relief that the Court considers just and proper.


Petitioner urges Respondents to rescind the Notice of Determination and the approvals for the Project, to conduct the appropriate environmental review, and to prepare the appropriate CEQA document for the Project as required by law.

Sincerely,

Rebecca L. Davis
Lozeau Drury LLP
Attorneys for Petitioner Friends of the Eel River

Re: Notice of Intent to File Suit
Under the California Environmental Quality Act
July 11, 2018
Page 3 of 3

## PROOF OF SERVICE

I, Toyer Grear, declare as follows:

I am a resident of the State of California, and employed in Oakland, California. I am over the age of 18 years and am not a party to the above-entitled action. My business address is 410 12th Street, Suite 250, Oakland, California, 94607.

On July 11, 2018, I served a copy of the foregoing document entitled:

**Notice of Intent to File Suit Under The California Environmental Quality Act Regarding Merge 56 – Project No. 360009 (SCH No. 2014071065) and Related Decisions**

on the following parties:

Myrtle Cole, Council President
Barbara Bry, Council President Pro Tem
City of San Diego City Council
City Administration Building
202 C St., 10th Floor
San Diego, CA 92101
myrtlecole@sandiego.gov
barbarabry@sandiego.gov

Elizabeth Maland, City Clerk
202 C St., Second Floor
San Diego, CA 92101
cityclerk@sandiego.gov

| | |
|---|---|
| ☒ | **BY MAIL. By placing the document listed above in a sealed envelope with postage thereon fully prepaid for First Class mail, in the United States mail at Oakland, California addressed as set forth above.** |
| ☒ | **BY EMAIL. By sending the documents as an electronic mail attachment in PDF format to the e-mail address above.** |
| ☐ | **BY FACSIMILE TRANSMISSION. By sending the documents via facsimile transmission to the fax telephone number identified above.** |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed July 11, 2018 at Oakland, California.

Toyer Grear

# Exhibit G

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
STREET ADDRESS:    325 S Melrose DRIVE
MAILING ADDRESS:    325 S Melrose DRIVE
CITY AND ZIP CODE:    Vista, CA 92081-6695
BRANCH NAME:    North County
TELEPHONE NUMBER:    (760) 201-8028

PLAINTIFF(S) / PETITIONER(S):    LABORERS INTERNATIONAL UNION OF NORTH AMERICA LOCAL UNION 89

DEFENDANT(S) / RESPONDENT(S):    CITY OF SAN DIEGO et.al.

LABORERS INTERNATIONAL UNION OF NORTH AMERICA LOCAL UNION 89 VS CITY OF SAN DIEGO [IMAGED]

| **NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE on MANDATORY eFILE CASE** | **CASE NUMBER:** 37-2018-00035233-CU-WM-NC |
|---|---|

**CASE ASSIGNMENT**

Judge: Earl H. Maas, III                                  Department: N-28

**COMPLAINT/PETITION FILED:** 07/13/2018

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|

A case management statement must be completed by counsel for all parties or self-represented litigants and timely filed with the court at least 15 days prior to the initial case management conference. (San Diego Local Rules, Division II, CRC Rule 3.725).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of ADR* options.

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT), THE ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION FORM (SDSC FORM #CIV-730), A STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) (SDSC FORM #CIV-359), AND OTHER DOCUMENTS AS SET OUT IN SDSC LOCAL RULE 2.1.5.

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

TIME STANDARDS: The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil cases consist of all civil cases except: small claims proceedings, civil petitions, unlawful detainer proceedings, probate, guardianship, conservatorship, juvenile, parking citation appeals, and family law proceedings.

COMPLAINTS: Complaints and all other documents listed in SDSC Local Rule 2.1.5 must be served on all named defendants.

DEFENDANT'S APPEARANCE: Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than 15 day extension which must be in writing and filed with the Court.) (SDSC Local Rule 2.1.6)

JURY FEES: In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

MANDATORY eFILE: Case assigned to mandatory eFile program per CRC 3.400-3.403 and SDSC Rule 2.4.11. All documents must be eFiled at www.onelegal.com. Refer to General Order in re procedures regarding electronically imaged court records, electronic filing, and access to electronic court records in civil and probate cases or guidelines and procedures.

COURT REPORTERS: Court reporters are not provided by the Court in Civil cases. See policy regarding normal availability and unavailability of official court reporters at www.sdcourt.ca.gov.

*ALTERNATIVE DISPUTE RESOLUTION (ADR): THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO TRIAL, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. PARTIES MAY FILE THE ATTACHED STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (SDSC FORM #CIV-359).

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Richard Drury (SBN 163559) / Rebecca L. Davis (SBN 271662)
Lozeau Drury LLP
410 12th Street, Ste. 250
Oakland, CA 94607

TELEPHONE NO.: 510-836-4200   FAX NO.: 510-836-4205
ATTORNEY FOR (Name): Laborers Int'l Union of North America, Local 89

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  San Diego
STREET ADDRESS: 325 South Melrose Dr.
MAILING ADDRESS:
CITY AND ZIP CODE: Vista, 92081
BRANCH NAME: North County Regional Center

FOR COURT USE ONLY

**F I L E D**
Clerk of the Superior Court
JUL 1 3 2018

COPY

CASE NAME:
Laborers Int'l Union of N. America, Local 89 v. City of San Diego et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder | | 37-2018-00035233-CU-WM-NC |
| | | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: |
| | | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[✓] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is  [✓] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [ ] monetary  b. [✓] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action (specify): 1
5. This case [ ] is  [✓] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: July 13, 2018
Rebecca L. Davis
_____
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

1 | RICHARD DRURY (SBN 163559)
REBECA L. DAVIS (SBN 271662)
2 | LOZEAU|DRURY LLP
410 12th Street, Suite 250
3 | Oakland, CA 94607
Telephone: (510) 836-4200
4 | E-mail: richard@lozeaudrury.com
rebecca@lozeaudrury.com
5 |

6 | Attorneys for Petitioner
Laborers International Union of North America, Local Union 89
7 |

F I L E D
Clerk of the Superior Court

JUL 1 3 2018

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF SAN DIEGO

10 | LABORERS INTERNATIONAL UNION OF
NORTH AMERICA, LOCAL UNION 89,
11 |

12 | Petitioner,

13 | vs.

14 | CITY OF SAN DIEGO; and CITY COUNCIL
OF THE CITY OF SAN DIEGO,
15 |

16 | Respondents.

17 | GARY LEVITT, and SEA BREEZE 56 LLC,

18 | Real Party in Interest.

19 |

Case No.   **37-2018-00035233-CU-WM-NC**

**PETITIONER'S NOTICE OF INTENT TO PREPARE ADMINISTRATIVE RECORD**

[California Environmental Quality Act ("CEQA"), Pub. Res. Code §21000, *et seq.*; C.C.P. §§1094.5, 1085]

20 | Pursuant to Public Resources Code §21167.6(b)(2), Petitioner Laborers International
21 | Union of North America, Local Union 89 ("Petitioner") hereby notifies all parties that Petitioner
22 | elects to prepare the administrative record relating to the above-captioned action challenging the
23 | May 22, 2018 decisions of Respondent City Council of the City of San Diego to approve the
24 | mixed-use development Project known as Merge 56 ("Project"), including certifying the EIR and
25 | adopting a Statement of Overriding Considerations.  Respondents and Real Party in Interest are
26 | directed not to prepare the administrative record for this action and not to expend any resources to
27 | prepare the administrative record.

28 |

PETITIONER'S NOTICE OF INTENT TO PREPARE ADMINISTRATIVE RECORD

1    Dated: July 13, 2018                      LOZEAU | DRURY LLP

2

3

4                                             Rebecca L. Davis
                                              Attorneys for Petitioner and Plaintiff
5                                             Laborers International Union of North America,
                                              Local Union 89

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

F I L E D
Clerk of the Superior Court
JUL 13 2018

COPY

1  RICHARD DRURY (SBN 163559)
   REBECA L. DAVIS (SBN 271662)
2  LOZEAU|DRURY LLP
   410 12th Street, Suite 250
3  Oakland, CA 94607
   Telephone: (510) 836-4200
4  E-mail: richard@lozeaudrury.com
5        rebecca@lozeaudrury.com

6  Attorneys for Petitioner
   Laborers International Union of North America, Local Union 89
7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    COUNTY OF SAN DIEGO

10  LABORERS INTERNATIONAL UNION OF      Case No.  37-2018-00035233-CU-WM-NC
    NORTH AMERICA, LOCAL UNION 89,
11                                       VERIFIED PETITION FOR WRIT OF
                                         MANDATE
12        Petitioner,

13     vs.                               [California Environmental Quality Act
                                         ("CEQA"), Pub. Res. Code §21000, et seq.;
14  CITY OF SAN DIEGO; and CITY COUNCIL  C.C.P. §§1094.5, 1085]
    OF THE CITY OF SAN DIEGO,
15
16        Respondents.

17  GARY LEVITT, and SEA BREEZE 56 LLC,

18        Real Parties in Interest.

19

20        Petitioner Laborers International Union of North America, Local Union 89 ("Petitioner"

21  or "Local 89") petitions this Court on its own behalf, on behalf of its members, on behalf of the

22  general public, and in the public interest pursuant to Code of Civil Procedure §1094.5 and Public

23  Resources Code §21168, or, in the alternative, pursuant to Code of Civil Procedure §1085 and

24  Public Resources Code §21168.5, for a writ of mandate, directed to Respondents  City of San

25  Diego and the City Council of the City of San Diego ("Respondents"), and Real Parties in

26  Interest Gary Levitt and Sea Breeze 56 LLC ("Real Parties").  By this verified petition

27  ("Petition"), Local 89 alleges as follows:

28

_____
                      VERIFIED PETITION FOR WRIT OF MANDATE

**INTRODUCTION**

1.      This action challenges Respondents' approval of a large project seeking to use approximately 73-acres in the largely undeveloped north-central portion of the City of San Diego for a mix of uses including residential, commercial, office, and hotel, as well as public roads for access to and within the Project site (the "Project"). The Project is proposed to be located immediately adjacent to the biologically diverse and protected Del Mar Mesa Preserve, as well as a U.S. Fish & Wildlife National Wildlife Refuge located within the Preserve. The Project will have significant impacts on the biological resources within and surrounding the Preserve, as well as air quality, traffic, and health risk impacts. The City's analysis of the Project's environmental impacts fails to comply with CEQA's strict standards.

2.      Respondents approved the Project even though the Environmental Impact Report ("EIR") and Statement of Overriding Considerations (which is necessary because Respondents concede there will be significant environmental effects that will not be fully mitigated) violate the California Environmental Quality Act ("CEQA"), Public Resources Code ("PRC") §21000, *et seq.*, including the CEQA Guidelines, 14 California Code of Regulations ("CCR") §15000, *et seq.*

3.      The EIR does not comply with CEQA, including by incorrectly analyzing greenhouse gases, biological impacts, and traffic impacts. Nor did the EIR properly analyze various mitigation measures, conduct a proper cumulative impacts analysis, or properly provide information about health risks. The EIR also adopted mitigation measures that do not comply with CEQA, and Respondents' failed to respond to public comments in a manner consistent with CEQA.

4.      Respondents also violated CEQA by adopting inadequate findings in adopting the Statement of Overriding Considerations.

5.      Respondents abused their discretion in approving the project without complying with CEQA. Accordingly, Respondents' certification of the EIR, adoption of the Statement of Overriding Considerations, and approval of the Project should be set aside.

VERIFIED PETITION FOR WRIT OF MANDATE

**PARTIES**

6.      Petitioner Laborers International Union of North America, Local Union 89, is a labor organization representing thousands of employees who are residents of the County of San Diego.  Local 89's purposes include advocating on behalf of its members to ensure safe workplace environments; working to protect recreational opportunities for its members to improve their quality of life when off the job; advocating to assure its members access to safe, healthful, productive, and aesthetically and culturally pleasing surroundings on and off the job; promoting environmentally sustainable businesses and development projects on behalf of its members, including providing comments raising environmental concerns and benefits on proposed development projects; advocating for changes to proposed development projects that will help to achieve a balance between employment, the human population, and resource use to permit high standards of living and a wide sharing of life's amenities by its members as well as the general public; advocating for steps to preserve important historic, cultural, and natural aspects of our national heritage, and to maintain, wherever possible, an environment that supports diversity and variety of individual choice; advocating on behalf of its members for programs, policies, and development projects that promote not only good jobs but also a healthy natural environment and working environment, including advocating for changes to proposed projects and policies that, if adopted, would reduce air, soil, and water pollution, minimize harm to wildlife, conserve wild places, reduce traffic congestion, reduce global warming impacts, and assure compliance with applicable land use ordinances; and working to attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable or unintended consequences.

7.      Local 89 and its members in the City of San Diego have several distinct legally cognizable interests in the Project.  Local 89 members live, work, and recreate in the City of San Diego. Local 89 members may also be exposed to construction and operational hazards from air pollution emissions that have not been adequately analyzed or mitigated.  The interests of Local

1  89 and its members are unique and will be directly impacted by the Project.  Petitioner brings this
2  action on behalf of itself, its members, and the public interest.

3       8.       Local 89 and its members have a direct and beneficial interest in Respondents'
4  compliance with laws bearing upon approval of the Project.  These interests will be directly and
5  adversely affected by the Project, which violates the law as set forth in this Petition and would
6  cause substantial harm to the natural environment and the quality of life in the surrounding
7  community.  The maintenance and prosecution of this action will confer a substantial benefit on
8  the public by protecting the public from the environmental and other harms alleged below.  Local
9  89 and its members submitted written and oral comments to the City of San Diego Planning
10  Commission objecting to and commenting on the Project and the EIR.

11      9.       Respondent City of San Diego ("City") is a municipal corporation in whose
12  jurisdiction the Project will be located, with its headquarters in San Diego, California.  The City
13  is the "lead agency" for the Project for purposes of Public Resources Code §21067, and has
14  principal responsibility for conducting environmental review for the Project and taking other
15  actions necessary to comply with CEQA.

16      10.      Respondent City Council of the City of San Diego  ("City Council") serves as the
17  legislative body of the City of San Diego for the planning and provision of services related to
18  public needs and the requirements of state laws.  As the elected representatives of the people of
19  the City of San Diego, the members of the City Council establish overall City priorities and set
20  policy.  Respondent City Council is the governing body of the City, and is ultimately responsible
21  for reviewing and approving or denying the Project.  The City Council voted on May 22, 2018, to
22  approve the Project, including to certify the EIR and adopt a Statement of Overriding
23  Considerations.

24      11.      Real Parties in Interest Gary Levitt and Sea Breeze 56, LLC are the Project
25  applicants and recipients of the approvals granted as part of the Project.

26  **JURISDICTION AND VENUE AND CERTIFICATE OF COUNSEL AS TO PROPER**
       **COURT BRANCH**
27

28      12.      Pursuant to either California Code of Civil Procedure ("CCP") §1094.5 and Public

4

1  Resources Code §21168 or California Code of Civil Procedure §1085 and Public Resources Code
2  §21168.5, this Court has jurisdiction to issue a writ of mandate to set aside Respondents'
3  decisions to certify the EIR, adopt the Statement of Overriding Considerations, and approve the
4  Project. The Court may issue declaratory relief pursuant to Code of Civil Procedure §1060.

5     13.    Venue is proper in this Court under California Code of Civil Procedure §§394
6  (actions against a city, county, or local agency) and 395 (actions generally) because Respondents
7  include a city and local agency based in the County of San Diego and because the cause of action
8  alleged in this Petition arose in the County of San Diego and the Project will occur within the
9  County of San Diego.

10    14.    This Petition is timely filed within all applicable statutes of limitations. This
11  action is timely under CEQA because it is filed within 30 days of the filing of the Notice of
12  Determination for the Project with the County Clerk on June 15, 2018. PRC §21167.

13    15.    Petitioner performed all conditions precedent to filing this Petition by serving
14  prior notice of the action. PRC §21167.5. A copy of the written notice and proof of service is
15  attached as Exhibit A.

16    16.    Petitioner elects to prepare the record of proceedings in this matter, and is filing its
17  notice of intent to prepare the record of proceedings with this Petition. PRC §21167.6. A copy
18  of Petitioner's Notice of Intent to Prepare Record is attached as Exhibit B.

19    17.    Petitioner will provide notice of this action to the California Attorney General by
20  serving a copy of this Petition along with a notice of its filing. PRC §21167.7; CCP §388.

21    18.    Unless this Court grants the requested writ of mandate, Petitioner has no plain,
22  speedy, or adequate remedy in the course of ordinary law to require Respondents to set aside their
23  certification of the EIR, adoption of the Statement of Overriding Considerations, and approval of
24  the Project. In the absence of such remedies, Respondents' decisions will remain in effect in
25  violation of state law.

26                          **CEQA LEGAL BACKGROUND**

27    19.    "The 'foremost principle' in interpreting CEQA is that the Legislature intended
28  the act to be read so as to afford the fullest possible protection to the environment within the

1  reasonable scope of the statutory language." *Communities for a Better Environment v. Calif.*
2  *Resources Agency* (2002) 103 Cal.App.4th 98, 109.

3      20.     CEQA has two primary purposes. First, CEQA is designed to inform decision
4  makers and the public about the potential, significant environmental effects of a project. 14 Cal.
5  Code Regs. § 15002(a)(1). "Its purpose is to inform the public and its responsible officials of the
6  environmental consequences of their decisions before they are made. Thus, the EIR
7  [environmental impact report] 'protects not only the environment but also informed self-
8  government.'" *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564. The
9  EIR has been described as "an environmental 'alarm bell' whose purpose it is to alert the public
10  and its responsible officials to environmental changes before they have reached ecological points
11  of no return." *Berkeley Keep Jets Over the Bay v. Bd. of Port Comm'rs.* (2001) 91 Cal.App.4th
12  1344, 1354 ("*Berkeley Jets*"); *County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795, 810.

13      21.     Second, CEQA requires public agencies to avoid or reduce environmental damage
14  when "feasible" by requiring "environmentally superior" alternatives and all feasible mitigation
15  measures.  14 Cal. Code Regs. § 15002(a)(2) and (3); *See also Berkeley Jets*, 91 Cal.App.4th
16  1344, 1354; *Citizens of Goleta Valley*, 52 Cal.3d at 564. The EIR serves to provide agencies and
17  the public with information about the environmental impacts of a proposed project and to
18  "identify ways that environmental damage can be avoided or significantly reduced." 14 Cal. Code
19  Regs. §15002(a)(2). If the project will have a significant effect on the environment, the agency
20  may approve the project only if it finds that it has "eliminated or substantially lessened all
21  significant effects on the environment where feasible" and that any unavoidable significant
22  effects on the environment are "acceptable due to overriding concerns." Pub.Res.Code § 21081;
23  14 Cal. Code Regs. §15002§ 15092(b)(2)(A) & (B).

24      22.     CEQA disallows deferring the formulation of mitigation measures to post-
25  approval studies. 14 CCR § 15126.4(a)(1)(B); *Sundstrom v. County of Mendocino* (1988) 202
26  Cal.App.3d 296, 308-309.  An agency may only defer the formulation of mitigation measures
27  when it possesses "'meaningful information' reasonably justifying an expectation of

28

1  compliance." *Sundstrom* at 308; *see also Sacramento Old City Association v. City Council of*

2  *Sacramento* (1991) 229 Cal.App.3d 1011, 1028-29.

3      23.    Deferral of mitigation is also impermissible if it removes the CEQA decision-

4  making body from its decision-making role. *Sundstrom v County of Mendocino* (1988) 202

5  Cal.App.3d 296, 306-308.  In addition, a lead agency is precluded from making the required

6  CEQA findings unless the record shows that all uncertainties regarding the mitigation of impacts

7  have been resolved; an agency may not rely on mitigation measures of uncertain efficacy or

8  feasibility. *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 727

9      24.    An EIR is required to discuss the cumulative impacts of a project "when the

10  project's incremental effect is cumulatively considerable." 14 Cal. Code Regs. § 15130(a).

11  "'Cumulative impacts' refer to two or more individual effects which, when considered together,

12  are considerable or which compound or increase other environmental impacts." 14 Cal. Code

13  Regs. § 15355. "The individual effects may be changes resulting from a single project...", such

14  as the Ordinance. *Id.*, § 15355(a). If the individual effects of the Ordinance will "compound or

15  increase other environmental effects," then the project has a cumulative impact. "Other

16  environmental impacts" are not limited only to impacts from other "projects" as that term is

17  defined by CEQA. Additionally, cumulative impacts can result from many different related

18  projects:

19          The cumulative impact from several projects is the change in the environment
            which results from the incremental impact of the project when added to other
20          closely related past, present, and reasonably foreseeable probable future projects.
            Cumulative impacts can result from individually minor but collectively significant
21          projects taking place over a period of time.

22
23  14 Cal. Code Regs. § 15355(b). An EIR's cumulative impacts discussion "should be guided by

24  the standards of practicality and reasonableness." 14 Cal. Code Regs. § 15130(b); *Rialto Citizens*

25  *for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 928-29.

26      25.    A cumulative impact analysis, like the rest of the EIR, must provide specificity,

27  and must be more than a conclusion "devoid of any reasoned analysis." *Whitman v. Board of*

28  *Supervisors* (1979) 88 Cal.App.3d 397, 411. "[I]t is vitally important that an EIR avoid

7

1  minimizing the cumulative impacts.  Rather, it must reflect a conscientious effort to provide

2  public agencies and the general public with adequate and relevant detailed information about

3  them. (CEQA, § 21061.)" *San Franciscans for Reasonable Growth v. City and County of San*

4  *Francisco* (1984) 151 Cal.App.3d 61, 79.

5       26.    An FEIR's responses to comments must be detailed and must provide a reasoned,

6  good faith analysis.  14 CCR §15088(c ).  Failure to provide a substantive response to a comment

7  render the EIR legally inadequate.  *Rural Land Owners Assoc. v. City Council* (1983) 143

8  Cal.App.3d 1013, 1020.

9       27.    If a project will have a significant effect on the environment, the agency may

10  approve the project only if it has "[e]liminated or substantially lessened all significant effects on

11  the environment where feasible" and finds that any unavoidable significant effects on the

12  environment are "acceptable due to overriding concerns." 14 CCR §15092(b)(2).  When an

13  agency approves a project with significant environmental effects that will not be fully mitigated,

14  it must adopt a "statement of overriding considerations" finding that, because of the project's

15  overriding benefits, it is approving the project despite its environmental harm. 14 CCR §15043;

16  PRC §21081(b). A statement of overriding considerations expresses the "larger, more general

17  reasons for approving the project, such as the need to create new jobs, provide housing, generate

18  taxes and the like." *Concerned Citizens of South Central LA v. Los Angeles Unif. Sch. Dist.*

19  (1994) 24 Cal.App.4th 826, 847.  A statement of overriding considerations must be supported by

20  substantial evidence in the record.  14 CCR §15093(b).

21       28.    Key among the findings that the lead agency must make is: "Specific economic,

22  legal, social, technological, or other considerations, including the provision of employment

23  opportunities for highly trained workers, make infeasible the mitigation measures or alternatives

24  identified in the environmental impact report" and that those "benefits of the project outweigh the

25  significant effects on the environment." PRC §21081(a)(3), (b). Where the agency fails to

26  impose all feasible mitigation measures, the statement of overriding considerations is invalid.

27  *City of Marina v. Board of Trustees of the California State University* (2006) 39 Cal.4th 341,

28  368-69.

1        29.    Courts review an EIR using an "abuse of discretion" standard, but "the reviewing

2    court is not to 'uncritically rely on every study or analysis presented by a project proponent in

3    support of its position. A clearly inadequate or unsupported study is entitled to no judicial

4    deference.'" *Berkeley Keep Jets Over the Bay Committee v. Bd. of Port Comrs*. (2001) 91

5    Cal.App.4th 1344, 1355 (quoting *Laurel Heights*, 47 Cal.3d at 409 n.12). There is a prejudicial

6    abuse of discretion "if the failure to include relevant information precludes informed

7    decisionmaking and informed public participation, thereby thwarting the statutory goals of the

8    EIR process." *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 712

9    (citing *Laurel Heights*, 47 Cal.3d at 403-05).

10   **STATEMENT OF FACTS**

11       30.    The Project is comprised of two components, a mixed-use development and public

12   roadway improvements. The mixed-use development would consist of a mixed-use center

13   containing commercial, office, hotel and residential uses on 41.34 acres of the Project site. The

14   project would allow for construction of 525,000 square feet of commercial, office,

15   theater/cinema, and hotel uses, and 242 residences (both multi-family and single-family). The

16   Project would include construction of associated site improvements such as water, sewer,

17   electrical, internal private streets, storm drains/detection basins, hardscapes, site walls, and

18   landscaping.

19       31.    The Project also includes up to 31 acres of public road improvements including

20   circulation roads within the Project site, and completion of undeveloped segments of Camino Del

21   Sur and Carmel Mountain Road.

22       32.    The Project implicates approximately 72.34 acres in the largely undeveloped

23   north-central portion of the City of San Diego. The Project site is one of the last available

24   undeveloped pieces of land in the Del Mar Mesa area, as a result of the numerous development

25   projects that have been built over the last 20 years.

26       33.    The proposed Project site is located immediately adjacent to a United States Fish

27   & Wildlife National Wildlife Refuge ("Refuge"), which is located within the larger Del Mar

28   Mesa Preserve ("Preserve"). The Del Mar Mesa Preserve is unique in San Diego and is a

9

1   biologically highly diverse area.  As a result of development, the park land, which is part of the

2   Multiple Species Conservation Program ("MSCP") and the Multi-Habitat Planning Area

3   ("MPHA"), is the last big stand of old growth chaparral left in costal southern California.  It also

4   contains the largest cluster vernal pools left on San Diego lands, as well as dozens of sensitive

5   and listed plant and animal species.

6       34.     The Planning Commission recommended approval of the Project, and the City

7   Council approved the Project.  In so doing, the City Council certified the EIR and adopted the

8   Statement of Overriding Considerations.

9       35.     LIUNA's comments raised several issues with the EIR and the Statement of

10   Overriding Considerations.

11                          **VIOLATIONS OF THE CEQA**

12      36.     Petitioner challenges Respondents' approval of the Project and certification of the

13   EIR on multiples grounds.  The City abused its discretion and failed to act in the manner required

14   by law in approving Project and certifying the EIR because, among other things according to

15   proof following preparation of the record:

16                                 **Health Risks**

17      37.     The EIR's conclusion that the Project will not have a significant impact on human

18   health as a result of the Project's construction and operational emissions is not supported by

19   substantial evidence.  The City was required to conduct a health risk assessment to determine the

20   Project's potential impact on the health of nearby sensitive receptors.  The EIR does not include a

21   quantified health risk assessment or any other analysis of the Project's potential health risks as

22   required by CEQA.  Without this information, the EIR fails as an informational document.

23      38.     The EIR fails to disclose the serious cancer risks to nearby residential

24   communities and an elementary school created by diesel engine exhaust emitted during the

25   construction phase of the Project.  The environmental consulting firm Soil, Water, Air Protection

26   Enterprise ("SWAPE") did conduct a quantified health risk assessment to determine the increased

27   cancer risk that will result from the construction and operation of the Project.  SWAPE

28   determined that the excess cancer risks in children and infants at a sensitive receptor located

1   approximately 50 meters away would be 43 in one million.  The excess cancer risk over the

2   course of a residential lifetime of 30 years is approximately 94 in one million.  Both of these far

3   exceed the CEQA threshold of significance of 10 excess cancer cases per one million people.

4   The EIR does not disclose this significant health risk impact.  Nor does the EIR consider

5   construction emission mitigation measures such as limiting construction equipment idling and

6   using electric and hybrid construction equipment.

7        39.    The City violated CEQA by adopting a statement of overriding consideration

8   without imposing all feasible mitigation measures to reduce the Project's significant health risk

9   impacts.

10                          **Greenhouse Gas Emissions**

11        40.    The EIR is inadequate because it fails to demonstrate the Project's consistency

12   with Executive Order B-30-15, which requires statewide emissions reductions in greenhouse

13   gases to 40% below 1990 levels by 2030.

14        41.    The EIR's conclusion that the Project will not have a significant greenhouse gas

15   impact is not supported by substantial evidence.  The EIR bases its conclusion that the Project

16   will not have a significant greenhouse gas impact on the Project's compliance with the City of

17   San Diego's Climate Action Plan ("CAP").  The EIR contains a CAP Consistency Checklist that

18   was prepared for the Project.  The Checklist purports to identify which requirements of the CAP

19   the Project will comply with.  The CAP Consistency Checklist, however, is not in and of itself,

20   "binding and enforceable."  As a result, CEQA requires each of the requirements specified in the

21   CAP that apply to the Project be incorporated as enforceable mitigation measures.  14 CCR

22   15183.5(b)(2).  Yet none of the CAP Consistency Checklist requirements are included as

23   mitigation measures or as mandatory conditions of Project approval.  By failing to include the

24   CAP requirements as enforceable mitigation measures, there is no evidence that the Project will

25   comply, and therefore no evidence that the Project's greenhouse gas emissions will be

26   insignificant.

27                              **Traffic Impacts**

28        42.    Traffic engineer Daniel Smith, P.E., commented on traffic issues surrounding the

11

1 | Project, and found the EIR deficient.

2 | 43. First, Table 8-1 of Appendix B of the EIR contains the EIR's trip generation
3 | analysis for the Project. It describes the Project in very vague terms, including 9,000 square feet
4 | of "Retail – Unnamed," a 120-room hotel with no description of whether it will include a
5 | restaurant, conference, function or banquet facilities will be included, 10,564 square feet of
6 | "Market Hall," and 39,262 square feet of "Other Retail." The EIR fails to describe the Project in
7 | a manner sufficient to allow for an accurate assessment of the Project's traffic impacts, as well as
8 | air quality impacts that are based on the traffic analysis. The lack of information about what the
9 | Project will actually entail prevents an accurate assessment of the Project's traffic impacts.
10 | Without this information, the EIR fails as an informational document.

11 | 44. Second, the EIR's calculation sheets and data sheets included in the traffic impact
12 | analysis are significantly different from the narrative descriptions, tables and figures contained in
13 | the EIR itself that are supposed to be analyzing the data. For example, under existing conditions
14 | the EIR states that intersection 21 is at a level of service E. According to the EIR, 13% of Project
15 | generated trips will go through this intersection, amounting to 155 added trips in the AM peak
16 | period. Yet the "Existing + Project" scenarios in the EIR shows that there will be 96 fewer trips
17 | passing through this intersection. Traffic engineer Dan Smith, Jr. concluded that "[w]hen the
18 | actual calculation sheets and base data sheets are significantly discrepant from the narrative
19 | description and tables and figures embedded therein, the validity of the entire analysis is
20 | undermined." Without consistent information and data, the EIR fails as an informational
21 | document, and the traffic analysis is not supported by substantial evidence.

**Biological Resources**

22 | 45. Wildlife ecologist Dr. Shawn Smallwood commented on the biological resources
23 | assessment conducted by Alden Environmental, Inc. ("Alden") and the EIR, concluding that the
24 | biological analysis is incomplete, inadequate, and not supported by substantial evidence.

25 | 46. First, the survey effort for all special-status animal species other than fairy shrimp
26 | consisted of one or more biologists spending less than eight hours total on site, conducting
27 | surveys for Coastal California Gnatcatcher on three dates in the winter. This is insufficient.
28

1   There were no species-specific surveys conducted for any other special-status species. Had the

2   surveyors spent more time and surveyed the area during different seasons, they likely would have

3   found additional protected species. Moreover, while 54 animal species were observed on site

4   during the eight hours of gnatcatcher surveys, this amount of time "is grossly inadequate for

5   assessing potential impacts to 52 special-status species" and determining the baseline conditions

6   at the Project site according to Dr. Smallwood.

7        47.     Second, Dr. Smallwood found that the EIR "dismisses the occurrence potential of

8   some special-status species by mischaracterizing their habitat needs." For example, the

9   occurrence potential of burrowing owl was determined by the EIR to be low because the species

10  "would have been observed if present." Alden never conducted a species-specific survey,

11  however. Instead, one or more biologists spent less than eight hours on site searching for Coastal

12  California Gnatcatcher on three dates. Based on observations during the Coastal California

13  Gnatcatcher survey, the EIR dismisses the occurrence potential of burrowing owls. Dr.

14  Smallwood explains that burrowing owls are often difficult to detect, especially during winter

15  months, which is when the surveys were performed for Coastal California Gnatcatcher. This does

16  not meet the standards listed in the burrowing owl survey guidelines prescribed by the California

17  Department of Fish and Wildlife.

18        48.     Similarly, the occurrence potential of Loggerhead shrike was determined to be low

19  because the species "would have been observed if present." This determination was also made on

20  the basis of observations made during the surveys for Coastal California Gantcather. Dr.

21  Smallwood explained that "[l]ike other special status species, loggerhead shrikes are not easy to

22  detect. One cannot expect to detect this species after a few winter visits searching for Coastal

23  California Gnatcatcher."

24        49.     Third, in addition to mischaracterizing the potential for certain species, the FEIR

25  also fails to adequately address impacts on certain species that were observed on site because

26  their special-status was not acknowledged, and therefore an impact analysis was not conducted.

27  Specifically, Dr. Smallwood points out that Alden does not take into account potential impacts on

28  species protected by California Department of Fish and Wildlife Code 3503.5 (Birds of prey),

13

1  including the red-tailed hawk, red-shouldered hawk, and American kestrel. In addition, although
2  the savannah sparrow was seen on site, Alden did not analyze potential impacts to the species
3  despite it being a California Bird Species of Special Concern with Priority 2.

4      50. Fourth, Dr. Smallwood found that the EIR did not assess 35 special-status species
5  of wildlife for impacts and mitigation. Most of these species are not covered under the Multiple
6  Species Conservation Plan. For example, the EIR failed to properly recognize the presence,
7  assess impacts, and propose mitigation measures for Least Bell's vireo, peregrine falcon, and the
8  southwestern willow flycatcher, all of which are listed as endangered under either the federal or
9  California endangered species act, or both. In addition, without justification, the EIR completely
10 failed to analyze any potential impacts on bats, pocket mice, and the American badger, which Dr.
11 Smallwood is certain occur on site.

12     51. Fifth, the EIR failed to analyze the impacts of the Project's added road traffic on
13 special-status species of wildlife. The EIR should have assessed wildlife mortality caused by
14 increased traffic and provided mitigation measures.

15     52. Sixth, the EIR's cumulative biological impact analysis is based on the flawed
16 premise that a project cannot have a cumulative impact as long as it, and the other cumulative
17 projects, comply with applicable laws and regulations. The EIR concludes that the Project may
18 have significant cumulative biological impacts, but then without evidence dismisses these
19 impacts "[d]ue to each project's need to comply with City regulations pertaining to impacts to
20 biological resources." There is no evidence, however, that compliance with City regulations will
21 reduce the Project's impacts on biological resources to a less than significant level. In contrast,
22 Dr. Smallwood concludes that the level of habitat fragmentation that has occurred and will
23 continue to occur is "nothing short of catastrophic" for the 52-species of wildlife. Accordingly,
24 the EIR's cumulative biological impact analysis is inadequate and not supported by substantial
25 evidence.

26     53. Seventh, the EIR creates a false standard for assessing impacts on wildlife
27 movement. The EIR focused on whether the project would affect any documented wildlife
28

1  movement corridors, but the CEQA threshold of significance is much broader, addressing
2  impacts on wildlife movement regardless of whether the movement is channeled by a corridor.

3      54.    In addition, the EIR fails to provide substantial evidence that a wildlife tunnel or
4  undercrossing is infeasible. The Project will separate habitat areas and restrict or prevent
5  movement of animals and plants.  Deer Creek and Pensaquits Creek need to be accessible from
6  the upper reaches for water and cover.  Del Mesa Preserve will not continue functioning as it does
7  without a good connection to these resources.

8      55.    Eighth, the EIR fails to assess window collision impacts on wildlife.  The potential
9  windows that will be part of the Project could contribute to increased rates of bird collisions with
10 windows.  Dr. Smallwood recommended several mitigation measures to reduce potential impacts,
11 which the City rejected.

12     56.    Ninth, Mitigation Measure BIO-3 ("MM BIO-3") violates CEQA because there is
13 no evidence that it is feasible.  Mitigation Measure BIO-3 requires that, prior to the issuance of
14 the first construction and/or grading permit, mitigation for direct impacts to 61.2 acres of
15 sensitive upland vegetation communities and Nuttall's scrub oak shall be accomplished through
16 preservation of a minimum of 51.8 acres of suitable habitat/mitigation credit.  MM BIO-3 states
17 that "[f]inal mitigation compliance may be a combination of these three options; ***would be***
18 ***dependent upon credit/land availability***; and would be subject to City and wildlife agency
19 approval prior to issuance of the first grading permit." (emph. added.)  There is no evidence that
20 sufficient land and/or mitigation credits are available to fully satisfy this mitigation measure, and
21 therefore there is no evidence of the measure's feasibility.

22     57.    Tenth, Mitigation Measure BIO-4 violates CEQA because it constitutes
23 improperly deferred mitigation.  Mitigation measures BIO-4 defers the preparation of a
24 mitigation plan until after completion of CEQA review, without imposing any substantive
25 standards, without providing for any public review, and subject to approval by the U.S. Fish &
26 Wildlife Service.  It is improper for a mitigation plan to be created at some later time, after the
27 CEQA process is complete, with formulation and approval of the mitigation measure being
28 conducted by an agency other than the lead agency.

58.     Eleventh, the EIR fails to mitigate direct and indirect impacts to the Del Mar Mesa Preserve and the National Wildlife Refuge including, but not limited to, trespass by humans and domestic animals, lighting, noise, and invasive species.  Moreover, the EIR fails to provide substantial evidence as to why additional mitigation measures suggested by commenters are infeasible.

59.     Twelfth, the EIR's analysis and mitigation of impacts from invasive species is inadequate.  The only mitigation measure proposed to address invasive species impacts on the Preserve is to not plant invasive species on the Project site.  But 20 invasive non-native species are already present on the Project site, four of which are highly invasive.  The presence of these invasive species at the Project site was not disclosed or analyzed, and the EIR does not include mitigation measures that would prevent the invasive species from invading the Preserve.  Moreover, fill from the Project site is planned to be used to fill Deer Creek, and there is no mitigation that would prevent invasive species from being spread through this process.

**Hydrology and Water Quality**

60.     The EIR fails to analyze cumulative hydrology impacts.  Specifically, the EIR analyzes only the runoff from the project site, not the cumulative upstream runoff from Torrey Highlands and other upland properties that will be added to the Project runoff.

61.     The EIR fails to disclose and mitigate significant impacts resulting from fill in Deer Creek Canyon and part of Darkwood Canyon.

**Environmentally Superior Alternative and Statement of Overriding Considerations**

62.     The EIR found that an alternative labeled "Reduced Project Alternative" is the environmentally superior alternative.  The Reduced Project Alternative would involve reducing the intensity of the mixed-use development such that project traffic is reduced by 70 percent.  This would be accomplished in a number of ways, including reducing the amount of commercial, office, and/or residential development constructed on site.  This alternative would reduce traffic impacts, and produce substantially less greenhouse gas emissions from mobile sources.  The City, however, rejected the alternative for the Project without a proper showing that it would be infeasible.

63.     The City concedes that the Project will cause significant environmental effects that will not be fully mitigated and therefore adopted a Statement of Overriding Considerations.  The findings in the Statement of Overriding Considerations are inadequate, particularly in making a finding of infeasibility due to considerations under Public Resources Code §21081(a)(3), but not making specific findings, supported by substantial evidence, concerning "the provision of employment opportunities for highly trained workers" created by the Project.  PRC §21081(a)(3).

64.     Despite comments raising the above issues, including expert evidence, the City Council voted to approve the Project.

## FIRST CAUSE OF ACTION

### (Pub. Res. Code §§ 21168, 21168.5 - Failure to Comply with CEQA By Petitioner Against All Respondents and Real Parties in Interest)

65.     Petitioner realleges and incorporates by reference the paragraphs set forth above.

66.     CEQA requires the lead agency for a project to prepare an EIR that complies with the requirements of the statute.

67.     Respondents violated CEQA by certifying an EIR for the Project that is inadequate and fails to comply with CEQA.

68.     The analysis in the EIR failed to comply with CEQA including by: (a) failing to perform a health risk assessment; (b) not considering the excess cancer risk created by the Project; (c) not considering consistency with Executive Order B-30-15; (d) providing an overly vague description of the Project preventing an accurate determination of traffic impacts; (e) failing to disclose the full extent of traffic created by the Project; (f) improperly surveying for bird and mammal species; (g) not conducting species-specific surveys; (h) not acknowledging the special-status of certain species; (i) not surveying for bats, pocket mice, and American badger; (j) improperly examining burrowing owls by (1) concluding that there were no occurrences of burrowing owls in the Project area and (2) using a wholly insufficient survey; (k) not assessing 35 special-status species of wildlife for impacts, including 28 not covered under the MSCP; (l) not assessing the impacts of the Project's added road traffic on special-status species of wildlife; (m) dismissing the potential for cumulative impacts on biological resources; (n) not assessing the

17

1   impact on wildlife movement in the region in which the Project is situated; and (o) not

2   considering window collision impacts on wildlife.

3       69.    Based on the above failures of analysis, the EIR also did not conduct a proper

4   inquiry into mitigation measures, including for construction emissions, greenhouse gas emissions,

5   traffic, and wildlife.

6       70.    The EIR did not conduct a proper cumulative impacts analysis, including for the

7   Project's potential impact to biological resources on or near the Project site.

8       71.    The EIR is inadequate as an informational document because the Project

9   description neither provides a health risk assessment nor an adequate description of the mixed-

10   use development.

11       72.    Respondents further violated CEQA by (a) abusing their discretion in failing to

12   select the environmentally superior Reduced Project Alternative and (b) adopting findings that

13   are inadequate as a matter of law in that they are not supported by substantial evidence in the

14   record, particularly by (1) rejecting the Reduced Project Alternative and (2) adopting the

15   Statement of Overriding Considerations without specific findings concerning the Project's

16   employment opportunities for highly trained workers.

17       73.    The Final EIR violated CEQA by failing to adequately respond to comments on

18   the Draft EIR.

19       74.    As a result of the foregoing defects, Respondents' certification of the EIR,

20   adoption of the Statement of Overriding Considerations, and approval of the Project should be set

21   aside.

22                             **PRAYER FOR RELIEF**

23       WHEREFORE, Petitioner demands the issuance of a peremptory writ of mandate

24   pursuant to Pub. Res. Code § 21168.9 and entry of judgment as follows:

25       1.    For a stay pending trial of Respondents' decisions approving the Project.

26       2.    For a peremptory writ of mandate ordering:

27           a.    Respondents to vacate and set aside their certification of the EIR for the

28                Project, adoption of the Statement of Overriding Considerations, and

1             decisions approving the Project;

2          b.     Respondents and Real Party in Interest to suspend all activity under the

3             certification of the EIR and approval of the Project that could result in any

4             change or alternation to the physical environment until Respondents have

5             taken all actions necessary to bring the certification and Project approvals

6             into compliance with CEQA; and

7          c.     Respondents to prepare, circulate, and consider an EIR in compliance with

8             CEQA prior to any subsequent action to approve the Project.

9    3.     For the costs of suit.

10    4.     For an award of attorney fees pursuant to Code of Civil Procedure § 1021.5 and

11 any other applicable provisions of law or equity.

12     5.     For any other equitable or legal relief that the Court considers just and proper.

14 Dated: July 13, 2018

                                 LOZEAU|DRURY LLP

                                 By: _____

                                 Rebecca L. Davis
                                 Attorneys for Petitioner
                                 Laborers International Union of North America,
                                 Local Union 89

VERIFIED PETITION FOR WRIT OF MANDATE

## VERIFICATION

I, Rebecca Davis, am an attorney for Petitioner Laborers International Union of North America, Local Union 89 in this action. I am verifying this Petition pursuant to California Code of Civil Procedure section 446. Petitioner is located outside of the County of Alameda, where I have my office. I have read the foregoing Petition. I am informed and believe that the matters in it are true and on that ground allege that the matters stated in the Petition are true.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 13, 2018, at Oakland, California.

Rebecca L. Davis
Attorney for Petitioner

20

# EXHIBIT A



LOZEAU DRURY LLP   T 510.836.4200   410 12th Street, Suite 250   www.lozeaudrury.com
                   F 510.836.4205   Oakland, Ca 94607      rebecca@lozeaudrury.com

*By U.S. Mail & E-mail*

July 11, 2018

Myrtle Cole, Council President
Barbara Bry, Council President Pro Tem
City of San Diego City Council
City Administration Building
202 C St., 10th Floor
San Diego, CA 92101
myrtlecole@sandiego.gov
barbarabry@sandiego.gov

Elizabeth Maland, City Clerk
202 C St., Second Floor
San Diego, CA 92101
cityclerk@sandiego.gov

**Re:**   **Notice of Intent to File Suit Under The California Environmental Quality Act
Regarding Merge 56 – Project No. 360009 (SCH No. 2014071065) and Related
Decisions**

Dear President Col, President Pro Tem Bry, and Clerk Maland:

Please take notice, pursuant to Public Resources Code ("PRC") § 21167.5, that Petitioner
Laborers International Union of North America, Local Union 89 ("Petitioner") intends to file a
Verified Petition for Peremptory Writ of Mandate ("Petition") under the provisions of the
California Environmental Quality Act ("CEQA"), PRC § 21000 *et seq.,* against Respondents the
City of San Diego and the City Council of the City of San Diego ("City" or "Respondents"),
challenging the May 22, 2018 approval of the Merge 56 mixed-use project ("Project")  and
adoption of Resolution R-2018-540 certifying Environmental Impact Report No. 360009/SCH
No. 2014071065 and adopting Findings, a Statement of Overriding Considerations, and a
Mitigation, Monitoring, and Reporting Program for the Merge 56 Project, as well as other
approved resolutions related to the Merge 56 project (O-2018-115, R-2018-548, R-2018-546, R-
2018-541, R-2018-545, R-2018-544).

Among other issues, Petitioner will allege that the City failed to proceed in the manner
required by law and without substantial evidence by relying on an EIR that fails to properly

Re: Notice of Intent to File Suit
Under the California Environmental Quality Act
June 19, 2018
Page 2 of 3

disclose, analyze, and mitigate the Project's potential significant individual and cumulative biological impact, impacts on human health from diesel emissions, greenhouse gas impacts, and traffic impacts.  The petition being filed will seek the following relief:

1. For a stay pending trial of Respondents' decisions approving the Project.
2. For a peremptory writ of mandate ordering:
   a. Respondents to vacate and set aside their certification of the EIR for the Project, adoption of the Statement of Overriding Considerations, and decisions approving the Project;
   b. Respondents and Real Party in Interest to suspend all activity under the certification of the EIR and approval of the Project that could result in any change or alternation to the physical environment until Respondents have taken all actions necessary to bring the certification and Project approvals into compliance with CEQA; and
   c. Respondents to prepare, circulate, and consider an EIR in compliance with CEQA prior to any subsequent action to approve the Project.
3. For the costs of suit.
4. For an award of attorney fees pursuant to Code of Civil Procedure § 1021.5 and any other applicable provisions of law or equity.
5. For any other equitable or legal relief that the Court considers just and proper.

Petitioner urges Respondents to rescind the Notice of Determination and the approvals for the Project, to conduct the appropriate environmental review, and to prepare the appropriate CEQA document for the Project as required by law.

Sincerely,

Rebecca L. Davis
Lozeau Drury LLP
Attorneys for Petitioner Friends of the Eel River

Re: Notice of Intent to File Suit
Under the California Environmental Quality Act
July 11, 2018
Page 3 of 3

## PROOF OF SERVICE

I, Toyer Grear, declare as follows:

I am a resident of the State of California, and employed in Oakland, California. I am over the age of 18 years and am not a party to the above-entitled action. My business address is 410 12th Street, Suite 250, Oakland, California, 94607.

On July 11, 2018, I served a copy of the foregoing document entitled:

**Notice of Intent to File Suit Under The California Environmental Quality Act Regarding Merge 56 – Project No. 360009 (SCH No. 2014071065) and Related Decisions**

on the following parties:

Myrtle Cole, Council President
Barbara Bry, Council President Pro Tem
City of San Diego City Council
City Administration Building
202 C St., 10th Floor
San Diego, CA 92101
myrtlecole@sandiego.gov
barbarabry@sandiego.gov

Elizabeth Maland, City Clerk
202 C St., Second Floor
San Diego, CA 92101
cityclerk@sandiego.gov

| | |
|---|---|
| ☒ | **BY MAIL. By placing the document listed above in a sealed envelope with postage thereon fully prepaid for First Class mail, in the United States mail at Oakland, California addressed as set forth above.** |
| ☒ | **BY EMAIL. By sending the documents as an electronic mail attachment in PDF format to the e-mail address above.** |
| ☐ | **BY FACSIMILE TRANSMISSION. By sending the documents via facsimile transmission to the fax telephone number identified above.** |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed July 11, 2018 at Oakland, California.

Toyer Grear

# EXHIBIT B

1 | RICHARD DRURY (SBN 163559)
REBECA L. DAVIS (SBN 271662)
2 | LOZEAU|DRURY LLP
410 12th Street, Suite 250
3 | Oakland, CA 94607
Telephone: (510) 836-4200
4 | E-mail: richard@lozeaudrury.com
5 |       rebecca@lozeaudrury.com

6 | Attorneys for Petitioner
Laborers International Union of North America, Local Union 89
7 |

8 |         SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 |                   COUNTY OF SAN DIEGO

10 | LABORERS INTERNATIONAL UNION OF      | Case No.
NORTH AMERICA, LOCAL UNION 89,
11 |                                      | **PETITIONER'S NOTICE OF INTENT TO**
        Petitioner,                      | **PREPARE ADMINISTRATIVE RECORD**
12 |
13 |     vs.                             | [California Environmental Quality Act
                                          | ("CEQA"), Pub. Res. Code §21000, *et seq.*;
14 | CITY OF SAN DIEGO; and CITY COUNCIL  | C.C.P. §§1094.5, 1085]
OF THE CITY OF SAN DIEGO,
15 |
16 |     Respondents.

17 | GARY LEVITT, and SEA BREEZE 56 LLC,

18 |     Real Party in Interest.

19 |

20 |     Pursuant to Public Resources Code §21167.6(b)(2), Petitioner Laborers International

21 | Union of North America, Local Union 89 ("Petitioner") hereby notifies all parties that Petitioner

22 | elects to prepare the administrative record relating to the above-captioned action challenging the

23 | May 22, 2018 decisions of Respondent City Council of the City of San Diego to approve the

24 | mixed-use development Project known as Merge 56 ("Project"), including certifying the EIR and

25 | adopting a Statement of Overriding Considerations.  Respondents and Real Party in Interest are

26 | directed not to prepare the administrative record for this action and not to expend any resources to

27 | prepare the administrative record.

28 |

PETITIONER'S NOTICE OF INTENT TO PREPARE ADMINISTRATIVE RECORD

1    Dated: July 13, 2018            LOZEAU | DRURY LLP

2

3

                                     Rebecca L. Davis

4                                  Attorneys for Petitioner and Plaintiff Laborers International Union of North America,

5                                  Local Union 89

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  RICHARD DRURY (SBN 163559)
    REBECA L. DAVIS (SBN 271662)
2  LOZEAU|DRURY LLP
    410 12th Street, Suite 250
3  Oakland, CA 94607
    Telephone: (510) 836-4200
4  E-mail: richard@lozeaudrury.com
        rebecca@lozeaudrury.com
5

6  Attorneys for Petitioner
    Laborers International Union of North America, Local Union 89
7

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                    COUNTY OF SAN DIEGO

F I L E D
Clerk of the Superior Court
JUL 1 3 2018
COPY

| | |
|---|---|
| 11  LABORERS INTERNATIONAL UNION OF NORTH AMERICA, LOCAL UNION 89,<br><br>12        Petitioner,<br><br>13      vs.<br><br>14  CITY OF SAN DIEGO; and CITY COUNCIL OF THE CITY OF SAN DIEGO,<br><br>15        Respondents.<br><br>16  GARY LEVITT, and SEA BREEZE 56 LLC,<br><br>17        Real Parties in Interest.. | Case No. 37-2018-00035233-CU-WM-NC<br><br>NOTICE TO ATTORNEY GENERAL OF VERIFIED PETITION FOR WRIT OF MANDATE<br><br>[California Environmental Quality Act ("CEQA"), Pub. Res. Code §21000, *et seq.*; C.C.P. §§1094.5, 1085] |

To the Attorney General of the State of California:

    PLEASE TAKE NOTICE, pursuant to Public Resources Code §21167.7 and Code of Civil Procedure §388, that on June 20, 2018, Petitioner Laborers International Union of North America, Local Union 89 ("Petitioner" or "Local 89") filed a Verified Petition for Writ of Mandate ("Petition") against Respondents City of San Diego, and the City Council of the City of San Diego ("Respondents"), and Real Party in Interest Sea Breeze 56, LLC.

    The Petition alleges that Respondents approved a project seeking to use approximately 73 acres in the largely undeveloped north-central portion of the City of San Diego for a mix of uses

1  including residential, commercial, office, and hotel, as well as public roads for access to and

2  within the Project site, including certifying the Environmental Impact Report and adopting the

3  Statement of Overriding Considerations, in violation of the California Environmental Quality Act

4  ("CEQA"), Public Resources Code ("PRC") §21000, *et seq.* A copy of the Petition is attached to

5  this Notice.

6  Dated: July 13, 2018                                LOZEAU|DRURY LLP

7

8                                                                By: _____

9                                                                Rebecca L. Davis
                                                                 Attorneys for Petitioner
10                                                               Laborers International Union of North America,
                                                                 Local Union 89

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE TO ATTORNEY GENERAL

1  RICHARD DRURY (SBN 163559)
   REBECA L. DAVIS (SBN 271662)
2  LOZEAU|DRURY LLP
   410 12th Street, Suite 250
3  Oakland, CA 94607
   Telephone: (510) 836-4200
4  E-mail: richard@lozeaudrury.com
        rebecca@lozeaudrury.com
5
6  Attorneys for Petitioner
   Laborers International Union of North America, Local Union 89
7
8            SUPERIOR COURT OF THE STATE OF CALIFORNIA
9                      COUNTY OF SAN DIEGO

10 | LABORERS INTERNATIONAL UNION OF    | Case No.
   | NORTH AMERICA, LOCAL UNION 89,     |
11 |                                    | **VERIFIED PETITION FOR WRIT OF**
   |        Petitioner,                 | **MANDATE**
12 |                                    |
13 |    vs.                             | [California Environmental Quality Act
   |                                    | ("CEQA"), Pub. Res. Code §21000, *et seq.*;
14 | CITY OF SAN DIEGO; and CITY COUNCIL | C.C.P. §§1094.5, 1085]
   | OF THE CITY OF SAN DIEGO,          |
15 |                                    |
16 |        Respondents.                |
17 | GARY LEVITT, and SEA BREEZE 56 LLC, |
18 |        Real Parties in Interest.    |
19

20         Petitioner Laborers International Union of North America, Local Union 89 ("Petitioner"

21 or "Local 89") petitions this Court on its own behalf, on behalf of its members, on behalf of the

22 general public, and in the public interest pursuant to Code of Civil Procedure §1094.5 and Public

23 Resources Code §21168, or, in the alternative, pursuant to Code of Civil Procedure §1085 and

24 Public Resources Code §21168.5, for a writ of mandate, directed to Respondents  City of San

25 Diego and the City Council of the City of San Diego ("Respondents"), and Real Parties in

26 Interest Gary Levitt and Sea Breeze 56 LLC ("Real Parties").  By this verified petition

27 ("Petition"), Local 89 alleges as follows:

28

—————————————————————————————————
                  VERIFIED PETITION FOR WRIT OF MANDATE

**INTRODUCTION**

1.      This action challenges Respondents' approval of a large project seeking to use approximately 73-acres in the largely undeveloped north-central portion of the City of San Diego for a mix of uses including residential, commercial, office, and hotel, as well as public roads for access to and within the Project site (the "Project"). The Project is proposed to be located immediately adjacent to the biologically diverse and protected Del Mar Mesa Preserve, as well as a U.S. Fish & Wildlife National Wildlife Refuge located within the Preserve. The Project will have significant impacts on the biological resources within and surrounding the Preserve, as well as air quality, traffic, and health risk impacts. The City's analysis of the Project's environmental impacts fails to comply with CEQA's strict standards.

2.      Respondents approved the Project even though the Environmental Impact Report ("EIR") and Statement of Overriding Considerations (which is necessary because Respondents concede there will be significant environmental effects that will not be fully mitigated) violate the California Environmental Quality Act ("CEQA"), Public Resources Code ("PRC") §21000, *et seq.*, including the CEQA Guidelines, 14 California Code of Regulations ("CCR") §15000, *et seq.*

3.      The EIR does not comply with CEQA, including by incorrectly analyzing greenhouse gases, biological impacts, and traffic impacts. Nor did the EIR properly analyze various mitigation measures, conduct a proper cumulative impacts analysis, or properly provide information about health risks. The EIR also adopted mitigation measures that do not comply with CEQA, and Respondents' failed to respond to public comments in a manner consistent with CEQA.

4.      Respondents also violated CEQA by adopting inadequate findings in adopting the Statement of Overriding Considerations.

5.      Respondents abused their discretion in approving the project without complying with CEQA. Accordingly, Respondents' certification of the EIR, adoption of the Statement of Overriding Considerations, and approval of the Project should be set aside.

VERIFIED PETITION FOR WRIT OF MANDATE

1

2

## PARTIES

3
     6.    Petitioner Laborers International Union of North America, Local Union 89, is a

4
labor organization representing thousands of employees who are residents of the County of San

5
Diego. Local 89's purposes include advocating on behalf of its members to ensure safe

6
workplace environments; working to protect recreational opportunities for its members to

7
improve their quality of life when off the job; advocating to assure its members access to safe,

8
healthful, productive, and aesthetically and culturally pleasing surroundings on and off the job;

9
promoting environmentally sustainable businesses and development projects on behalf of its

10
members, including providing comments raising environmental concerns and benefits on

11
proposed development projects; advocating for changes to proposed development projects that

12
will help to achieve a balance between employment, the human population, and resource use to

13
permit high standards of living and a wide sharing of life's amenities by its members as well as

14
the general public; advocating for steps to preserve important historic, cultural, and natural

15
aspects of our national heritage, and to maintain, wherever possible, an environment that supports

16
diversity and variety of individual choice; advocating on behalf of its members for programs,

17
policies, and development projects that promote not only good jobs but also a healthy natural

18
environment and working environment, including advocating for changes to proposed projects

19
and policies that, if adopted, would reduce air, soil, and water pollution, minimize harm to

20
wildlife, conserve wild places, reduce traffic congestion, reduce global warming impacts, and

21
assure compliance with applicable land use ordinances; and working to attain the widest range of

22
beneficial uses of the environment without degradation, risk to health or safety, or other

23
undesirable or unintended consequences.

24
     7.    Local 89 and its members in the City of San Diego have several distinct legally

25
cognizable interests in the Project. Local 89 members live, work, and recreate in the City of San

26
Diego. Local 89 members may also be exposed to construction and operational hazards from air

27
pollution emissions that have not been adequately analyzed or mitigated. The interests of Local

28

VERIFIED PETITION FOR WRIT OF MANDATE

1  89 and its members are unique and will be directly impacted by the Project.  Petitioner brings this

2  action on behalf of itself, its members, and the public interest.

3      8.      Local 89 and its members have a direct and beneficial interest in Respondents'

4  compliance with laws bearing upon approval of the Project.  These interests will be directly and

5  adversely affected by the Project, which violates the law as set forth in this Petition and would

6  cause substantial harm to the natural environment and the quality of life in the surrounding

7  community.  The maintenance and prosecution of this action will confer a substantial benefit on

8  the public by protecting the public from the environmental and other harms alleged below.  Local

9  89 and its members submitted written and oral comments to the City of San Diego Planning

10  Commission objecting to and commenting on the Project and the EIR.

11      9.      Respondent City of San Diego ("City") is a municipal corporation in whose

12  jurisdiction the Project will be located, with its headquarters in San Diego, California.  The City

13  is the "lead agency" for the Project for purposes of Public Resources Code §21067, and has

14  principal responsibility for conducting environmental review for the Project and taking other

15  actions necessary to comply with CEQA.

16      10.     Respondent City Council of the City of San Diego  ("City Council") serves as the

17  legislative body of the City of San Diego for the planning and provision of services related to

18  public needs and the requirements of state laws.  As the elected representatives of the people of

19  the City of San Diego, the members of the City Council establish overall City priorities and set

20  policy.  Respondent City Council is the governing body of the City, and is ultimately responsible

21  for reviewing and approving or denying the Project.  The City Council voted on May 22, 2018, to

22  approve the Project, including to certify the EIR and adopt a Statement of Overriding

23  Considerations.

24      11.     Real Parties in Interest Gary Levitt and Sea Breeze 56, LLC are the Project

25  applicants and recipients of the approvals granted as part of the Project.

26  **JURISDICTION AND VENUE AND CERTIFICATE OF COUNSEL AS TO PROPER COURT BRANCH**

27

28      12.     Pursuant to either California Code of Civil Procedure ("CCP") §1094.5 and Public

4

1  Resources Code §21168 or California Code of Civil Procedure §1085 and Public Resources Code

2  §21168.5, this Court has jurisdiction to issue a writ of mandate to set aside Respondents'

3  decisions to certify the EIR, adopt the Statement of Overriding Considerations, and approve the

4  Project. The Court may issue declaratory relief pursuant to Code of Civil Procedure §1060.

5       13.    Venue is proper in this Court under California Code of Civil Procedure §§394

6  (actions against a city, county, or local agency) and 395 (actions generally) because Respondents

7  include a city and local agency based in the County of San Diego and because the cause of action

8  alleged in this Petition arose in the County of San Diego and the Project will occur within the

9  County of San Diego.

10      14.    This Petition is timely filed within all applicable statutes of limitations. This

11 action is timely under CEQA because it is filed within 30 days of the filing of the Notice of

12 Determination for the Project with the County Clerk on June 15, 2018. PRC §21167.

13      15.    Petitioner performed all conditions precedent to filing this Petition by serving

14 prior notice of the action. PRC §21167.5. A copy of the written notice and proof of service is

15 attached as Exhibit A.

16      16.    Petitioner elects to prepare the record of proceedings in this matter, and is filing its

17 notice of intent to prepare the record of proceedings with this Petition. PRC §21167.6. A copy

18 of Petitioner's Notice of Intent to Prepare Record is attached as Exhibit B.

19      17.    Petitioner will provide notice of this action to the California Attorney General by

20 serving a copy of this Petition along with a notice of its filing. PRC §21167.7; CCP §388.

21      18.    Unless this Court grants the requested writ of mandate, Petitioner has no plain,

22 speedy, or adequate remedy in the course of ordinary law to require Respondents to set aside their

23 certification of the EIR, adoption of the Statement of Overriding Considerations, and approval of

24 the Project. In the absence of such remedies, Respondents' decisions will remain in effect in

25 violation of state law.

26                          **CEQA LEGAL BACKGROUND**

27      19.    "The 'foremost principle' in interpreting CEQA is that the Legislature intended

28 the act to be read so as to afford the fullest possible protection to the environment within the

1    reasonable scope of the statutory language." *Communities for a Better Environment v. Calif.*

2    *Resources Agency* (2002) 103 Cal.App.4th 98, 109.

3        20.    CEQA has two primary purposes. First, CEQA is designed to inform decision

4    makers and the public about the potential, significant environmental effects of a project. 14 Cal.

5    Code Regs. § 15002(a)(1). "Its purpose is to inform the public and its responsible officials of the

6    environmental consequences of their decisions before they are made. Thus, the EIR

7    [environmental impact report] 'protects not only the environment but also informed self-

8    government.'" *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564. The

9    EIR has been described as "an environmental 'alarm bell' whose purpose it is to alert the public

10    and its responsible officials to environmental changes before they have reached ecological points

11    of no return." *Berkeley Keep Jets Over the Bay v. Bd. of Port Comm'rs.* (2001) 91 Cal.App.4th

12    1344, 1354 ("*Berkeley Jets*"); *County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795, 810.

13        21.    Second, CEQA requires public agencies to avoid or reduce environmental damage

14    when "feasible" by requiring "environmentally superior" alternatives and all feasible mitigation

15    measures. 14 Cal. Code Regs. § 15002(a)(2) and (3); *See also Berkeley Jets*, 91 Cal.App.4th

16    1344, 1354; *Citizens of Goleta Valley*, 52 Cal.3d at 564. The EIR serves to provide agencies and

17    the public with information about the environmental impacts of a proposed project and to

18    "identify ways that environmental damage can be avoided or significantly reduced." 14 Cal. Code

19    Regs. §15002(a)(2). If the project will have a significant effect on the environment, the agency

20    may approve the project only if it finds that it has "eliminated or substantially lessened all

21    significant effects on the environment where feasible" and that any unavoidable significant

22    effects on the environment are "acceptable due to overriding concerns." Pub.Res.Code § 21081;

23    14 Cal. Code Regs. §15002§ 15092(b)(2)(A) & (B).

24        22.    CEQA disallows deferring the formulation of mitigation measures to post-

25    approval studies. 14 CCR § 15126.4(a)(1)(B); *Sundstrom v. County of Mendocino* (1988) 202

26    Cal.App.3d 296, 308-309. An agency may only defer the formulation of mitigation measures

27    when it possesses "'meaningful information' reasonably justifying an expectation of

28

VERIFIED PETITION FOR WRIT OF MANDATE

1  compliance." *Sundstrom* at 308; *see also Sacramento Old City Association v. City Council of*
2  *Sacramento* (1991) 229 Cal.App.3d 1011, 1028-29.

3      23.     Deferral of mitigation is also impermissible if it removes the CEQA decision-
4  making body from its decision-making role. *Sundstrom v County of Mendocino* (1988) 202
5  Cal.App.3d 296, 306-308.  In addition, a lead agency is precluded from making the required
6  CEQA findings unless the record shows that all uncertainties regarding the mitigation of impacts
7  have been resolved; an agency may not rely on mitigation measures of uncertain efficacy or
8  feasibility.  *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 727

9      24.     An EIR is required to discuss the cumulative impacts of a project "when the
10  project's incremental effect is cumulatively considerable." 14 Cal. Code Regs. § 15130(a).
11  "'Cumulative impacts' refer to two or more individual effects which, when considered together,
12  are considerable or which compound or increase other environmental impacts." 14 Cal. Code
13  Regs. § 15355. "The individual effects may be changes resulting from a single project...", such
14  as the Ordinance. *Id.*, § 15355(a). If the individual effects of the Ordinance will "compound or
15  increase other environmental effects," then the project has a cumulative impact. "Other
16  environmental impacts" are not limited only to impacts from other "projects" as that term is
17  defined by CEQA. Additionally, cumulative impacts can result from many different related
18  projects:

19      The cumulative impact from several projects is the change in the environment
20      which results from the incremental impact of the project when added to other
        closely related past, present, and reasonably foreseeable probable future projects.
21      Cumulative impacts can result from individually minor but collectively significant
        projects taking place over a period of time.
22

23  14 Cal. Code Regs. § 15355(b). An EIR's cumulative impacts discussion "should be guided by
24  the standards of practicality and reasonableness." 14 Cal. Code Regs. § 15130(b); *Rialto Citizens*
25  *for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 928-29.

26      25.     A cumulative impact analysis, like the rest of the EIR, must provide specificity,
27  and must be more than a conclusion "devoid of any reasoned analysis." *Whitman v. Board of*
28  *Supervisors* (1979) 88 Cal.App.3d 397, 411. "[I]t is vitally important that an EIR avoid

1  minimizing the cumulative impacts.  Rather, it must reflect a conscientious effort to provide

2  public agencies and the general public with adequate and relevant detailed information about

3  them. (CEQA, § 21061.)" *San Franciscans for Reasonable Growth v. City and County of San*

4  *Francisco* (1984) 151 Cal.App.3d 61, 79.

5       26.    An FEIR's responses to comments must be detailed and must provide a reasoned,

6  good faith analysis. 14 CCR §15088(c ).  Failure to provide a substantive response to a comment

7  render the EIR legally inadequate. *Rural Land Owners Assoc. v. City Council* (1983) 143

8  Cal.App.3d 1013, 1020.

9       27.    If a project will have a significant effect on the environment, the agency may

10  approve the project only if it has "[e]liminated or substantially lessened all significant effects on

11  the environment where feasible" and finds that any unavoidable significant effects on the

12  environment are "acceptable due to overriding concerns."  14 CCR §15092(b)(2).  When an

13  agency approves a project with significant environmental effects that will not be fully mitigated,

14  it must adopt a "statement of overriding considerations" finding that, because of the project's

15  overriding benefits, it is approving the project despite its environmental harm.  14 CCR §15043;

16  PRC §21081(b).  A statement of overriding considerations expresses the "larger, more general

17  reasons for approving the project, such as the need to create new jobs, provide housing, generate

18  taxes and the like." *Concerned Citizens of South Central LA v. Los Angeles Unif. Sch. Dist.*

19  (1994) 24 Cal.App.4th 826, 847.  A statement of overriding considerations must be supported by

20  substantial evidence in the record.  14 CCR §15093(b).

21       28.    Key among the findings that the lead agency must make is: "Specific economic,

22  legal, social, technological, or other considerations, including the provision of employment

23  opportunities for highly trained workers, make infeasible the mitigation measures or alternatives

24  identified in the environmental impact report" and that those "benefits of the project outweigh the

25  significant effects on the environment."  PRC §21081(a)(3), (b).  Where the agency fails to

26  impose all feasible mitigation measures, the statement of overriding considerations is invalid.

27  *City of Marina v. Board of Trustees of the California State University* (2006) 39 Cal.4th 341,

28  368-69.

1      29.    Courts review an EIR using an "abuse of discretion" standard, but "the reviewing

2  court is not to 'uncritically rely on every study or analysis presented by a project proponent in

3  support of its position. A clearly inadequate or unsupported study is entitled to no judicial

4  deference.'" *Berkeley Keep Jets Over the Bay Committee v. Bd. of Port Comrs.* (2001) 91

5  Cal.App.4th 1344, 1355 (quoting *Laurel Heights*, 47 Cal.3d at 409 n.12). There is a prejudicial

6  abuse of discretion "if the failure to include relevant information precludes informed

7  decisionmaking and informed public participation, thereby thwarting the statutory goals of the

8  EIR process." *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 712

9  (citing *Laurel Heights*, 47 Cal.3d at 403-05).

10  **STATEMENT OF FACTS**

11      30.    The Project is comprised of two components, a mixed-use development and public

12  roadway improvements. The mixed-use development would consist of a mixed-use center

13  containing commercial, office, hotel and residential uses on 41.34 acres of the Project site. The

14  project would allow for construction of 525,000 square feet of commercial, office,

15  theater/cinema, and hotel uses, and 242 residences (both multi-family and single-family). The

16  Project would include construction of associated site improvements such as water, sewer,

17  electrical, internal private streets, storm drains/detection basins, hardscapes, site walls, and

18  landscaping.

19      31.    The Project also includes up to 31 acres of public road improvements including

20  circulation roads within the Project site, and completion of undeveloped segments of Camino Del

21  Sur and Carmel Mountain Road.

22      32.    The Project implicates approximately 72.34 acres in the largely undeveloped

23  north-central portion of the City of San Diego. The Project site is one of the last available

24  undeveloped pieces of land in the Del Mar Mesa area, as a result of the numerous development

25  projects that have been built over the last 20 years.

26      33.    The proposed Project site is located immediately adjacent to a United States Fish

27  & Wildlife National Wildlife Refuge ("Refuge"), which is located within the larger Del Mar

28  Mesa Preserve ("Preserve"). The Del Mar Mesa Preserve is unique in San Diego and is a

1    biologically highly diverse area. As a result of development, the park land, which is part of the

2    Multiple Species Conservation Program ("MSCP") and the Multi-Habitat Planning Area

3    ("MPHA"), is the last big stand of old growth chaparral left in costal southern California. It also

4    contains the largest cluster vernal pools left on San Diego lands, as well as dozens of sensitive

5    and listed plant and animal species.

6         34.    The Planning Commission recommended approval of the Project, and the City

7    Council approved the Project. In so doing, the City Council certified the EIR and adopted the

8    Statement of Overriding Considerations.

9         35.    LIUNA's comments raised several issues with the EIR and the Statement of

10    Overriding Considerations.

11                          **VIOLATIONS OF THE CEQA**

12         36.    Petitioner challenges Respondents' approval of the Project and certification of the

13    EIR on multiples grounds. The City abused its discretion and failed to act in the manner required

14    by law in approving Project and certifying the EIR because, among other things according to

15    proof following preparation of the record:

16                              **Health Risks**

17         37.    The EIR's conclusion that the Project will not have a significant impact on human

18    health as a result of the Project's construction and operational emissions is not supported by

19    substantial evidence. The City was required to conduct a health risk assessment to determine the

20    Project's potential impact on the health of nearby sensitive receptors. The EIR does not include a

21    quantified health risk assessment or any other analysis of the Project's potential health risks as

22    required by CEQA. Without this information, the EIR fails as an informational document.

23         38.    The EIR fails to disclose the serious cancer risks to nearby residential

24    communities and an elementary school created by diesel engine exhaust emitted during the

25    construction phase of the Project. The environmental consulting firm Soil, Water, Air Protection

26    Enterprise ("SWAPE") did conduct a quantified health risk assessment to determine the increased

27    cancer risk that will result from the construction and operation of the Project. SWAPE

28    determined that the excess cancer risks in children and infants at a sensitive receptor located

1   approximately 50 meters away would be 43 in one million.  The excess cancer risk over the
2   course of a residential lifetime of 30 years is approximately 94 in one million.  Both of these far
3   exceed the CEQA threshold of significance of 10 excess cancer cases per one million people.
4   The EIR does not disclose this significant health risk impact.  Nor does the EIR consider
5   construction emission mitigation measures such as limiting construction equipment idling and
6   using electric and hybrid construction equipment.

7        39.      The City violated CEQA by adopting a statement of overriding consideration
8   without imposing all feasible mitigation measures to reduce the Project's significant health risk
9   impacts.

10                              **Greenhouse Gas Emissions**

11       40.      The EIR is inadequate because it fails to demonstrate the Project's consistency
12  with Executive Order B-30-15, which requires statewide emissions reductions in greenhouse
13  gases to 40% below 1990 levels by 2030.

14       41.      The EIR's conclusion that the Project will not have a significant greenhouse gas
15  impact is not supported by substantial evidence.  The EIR bases its conclusion that the Project
16  will not have a significant greenhouse gas impact on the Project's compliance with the City of
17  San Diego's Climate Action Plan ("CAP").  The EIR contains a CAP Consistency Checklist that
18  was prepared for the Project.  The Checklist purports to identify which requirements of the CAP
19  the Project will comply with.  The CAP Consistency Checklist, however, is not in and of itself,
20  "binding and enforceable."  As a result, CEQA requires each of the requirements specified in the
21  CAP that apply to the Project be incorporated as enforceable mitigation measures.  14 CCR
22  15183.5(b)(2).  Yet none of the CAP Consistency Checklist requirements are included as
23  mitigation measures or as mandatory conditions of Project approval.  By failing to include the
24  CAP requirements as enforceable mitigation measures, there is no evidence that the Project will
25  comply, and therefore no evidence that the Project's greenhouse gas emissions will be
26  insignificant.

27                                   **Traffic Impacts**

28       42.      Traffic engineer Daniel Smith, P.E., commented on traffic issues surrounding the

11

1 │ Project, and found the EIR deficient.

2 │     43.    First, Table 8-1 of Appendix B of the EIR contains the EIR's trip generation
3 │ analysis for the Project. It describes the Project in very vague terms, including 9,000 square feet
4 │ of "Retail – Unnamed," a 120-room hotel with no description of whether it will include a
5 │ restaurant, conference, function or banquet facilities will be included, 10,564 square feet of
6 │ "Market Hall," and 39,262 square feet of "Other Retail." The EIR fails to describe the Project in
7 │ a manner sufficient to allow for an accurate assessment of the Project's traffic impacts, as well as
8 │ air quality impacts that are based on the traffic analysis. The lack of information about what the
9 │ Project will actually entail prevents an accurate assessment of the Project's traffic impacts.
10 │ Without this information, the EIR fails as an informational document.

11 │     44.    Second, the EIR's calculation sheets and data sheets included in the traffic impact
12 │ analysis are significantly different from the narrative descriptions, tables and figures contained in
13 │ the EIR itself that are supposed to be analyzing the data. For example, under existing conditions
14 │ the EIR states that intersection 21 is at a level of service E. According to the EIR, 13% of Project
15 │ generated trips will go through this intersection, amounting to 155 added trips in the AM peak
16 │ period. Yet the "Existing + Project" scenarios in the EIR shows that there will be 96 fewer trips
17 │ passing through this intersection. Traffic engineer Dan Smith, Jr. concluded that "[w]hen the
18 │ actual calculation sheets and base data sheets are significantly discrepant from the narrative
19 │ description and tables and figures embedded therein, the validity of the entire analysis is
20 │ undermined." Without consistent information and data, the EIR fails as an informational
21 │ document, and the traffic analysis is not supported by substantial evidence.

**Biological Resources**

22 │     45.    Wildlife ecologist Dr. Shawn Smallwood commented on the biological resources
23 │ assessment conducted by Alden Environmental, Inc. ("Alden") and the EIR, concluding that the
24 │ biological analysis is incomplete, inadequate, and not supported by substantial evidence.

25 │     46.    First, the survey effort for all special-status animal species other than fairy shrimp
26 │ consisted of one or more biologists spending less than eight hours total on site, conducting
27 │ surveys for Coastal California Gnatcatcher on three dates in the winter. This is insufficient.

1    There were no species-specific surveys conducted for any other special-status species. Had the

2    surveyors spent more time and surveyed the area during different seasons, they likely would have

3    found additional protected species. Moreover, while 54 animal species were observed on site

4    during the eight hours of gnatcatcher surveys, this amount of time "is grossly inadequate for

5    assessing potential impacts to 52 special-status species" and determining the baseline conditions

6    at the Project site according to Dr. Smallwood.

7        47.     Second, Dr. Smallwood found that the EIR "dismisses the occurrence potential of

8    some special-status species by mischaracterizing their habitat needs." For example, the

9    occurrence potential of burrowing owl was determined by the EIR to be low because the species

10    "would have been observed if present." Alden never conducted a species-specific survey,

11    however. Instead, one or more biologists spent less than eight hours on site searching for Coastal

12    California Gnatcather on three dates. Based on observations during the Coastal California

13    Gnatcather survey, the EIR dismisses the occurrence potential of burrowing owls. Dr.

14    Smallwood explains that burrowing owls are often difficult to detect, especially during winter

15    months, which is when the surveys were performed for Coastal California Gnatcather. This does

16    not meet the standards listed in the burrowing owl survey guidelines prescribed by the California

17    Department of Fish and Wildlife.

18        48.     Similarly, the occurrence potential of Loggerhead shrike was determined to be low

19    because the species "would have been observed if present." This determination was also made on

20    the basis of observations made during the surveys for Coastal California Gantcather. Dr.

21    Smallwood explained that "[l]ike other special status species, loggerhead shrikes are not easy to

22    detect. One cannot expect to detect this species after a few winter visits searching for Coastal

23    California Gnatcatcher."

24        49.     Third, in addition to mischaracterizing the potential for certain species, the FEIR

25    also fails to adequately address impacts on certain species that were observed on site because

26    their special-status was not acknowledged, and therefore an impact analysis was not conducted.

27    Specifically, Dr. Smallwood points out that Alden does not take into account potential impacts on

28    species protected by California Department of Fish and Wildlife Code 3503.5 (Birds of prey),

1  including the  red-tailed hawk, red-shouldered hawk, and American kestrel.  In addition, although
2  the savannah sparrow was seen on site, Alden did not analyze potential impacts to the species
3  despite it being a California Bird Species of Special Concern with Priority 2.

4      50.     Fourth, Dr. Smallwood found that the EIR did not assess 35 special-status species
5  of wildlife for impacts and mitigation.  Most of these species are not covered under the Multiple
6  Species Conservation Plan.  For example, the EIR failed to properly recognize the presence,
7  assess impacts, and propose mitigation measures for Least Bell's vireo, peregrine falcon, and the
8  southwestern willow flycatcher, all of which are listed as endangered under either the federal or
9  California endangered species act, or both.  In addition, without justification, the EIR completely
10 failed to analyze any potential impacts on bats, pocket mice, and the American badger, which Dr.
11 Smallwood is certain occur on site.

12     51.     Fifth, the EIR failed to analyze the impacts of the Project's added road traffic on
13 special-status species of wildlife.  The EIR should have assessed wildlife mortality caused by
14 increased traffic and provided mitigation measures.

15     52.     Sixth, the EIR's cumulative biological impact analysis is based on the flawed
16 premise that a project cannot have a cumulative impact as long as it, and the other cumulative
17 projects, comply with applicable laws and regulations.  The EIR concludes that the Project may
18 have significant cumulative biological impacts, but then without evidence dismisses these
19 impacts "[d]ue to each project's need to comply with City regulations pertaining to impacts to
20 biological resources."  There is no evidence, however, that compliance with City regulations will
21 reduce the Project's impacts on biological resources to a less than significant level.  In contrast,
22 Dr. Smallwood concludes that the level of habitat fragmentation that has occurred and will
23 continue to occur is "nothing short of catastrophic" for the 52-species of wildlife.   Accordingly,
24 the EIR's cumulative biological impact analysis is inadequate and not supported by substantial
25 evidence.

26     53.     Seventh, the EIR creates a false standard for assessing impacts on wildlife
27 movement.  The EIR focused on whether the project would affect any documented wildlife

28

1  movement corridors, but the CEQA threshold of significance is much broader, addressing
2  impacts on wildlife movement regardless of whether the movement is channeled by a corridor.

3      54.     In addition, the EIR fails to provide substantial evidence that a wildlife tunnel or
4  undercrossing is infeasible. The Project will separate habitat areas and restrict or prevent
5  movement of animals and plants. Deer Creek and Pensaquits Creek need to be accessible from
6  the upper reaches for water and cover. Del Mesa Preserve will not continue functioning as it does
7  without a good connection to these resources.

8      55.     Eighth, the EIR fails to assess window collision impacts on wildlife. The potential
9  windows that will be part of the Project could contribute to increased rates of bird collisions with
10  windows. Dr. Smallwood recommended several mitigation measures to reduce potential impacts,
11  which the City rejected.

12     56.     Ninth, Mitigation Measure BIO-3 ("MM BIO-3") violates CEQA because there is
13  no evidence that it is feasible. Mitigation Measure BIO-3 requires that, prior to the issuance of
14  the first construction and/or grading permit, mitigation for direct impacts to 61.2 acres of
15  sensitive upland vegetation communities and Nuttall's scrub oak shall be accomplished through
16  preservation of a minimum of 51.8 acres of suitable habitat/mitigation credit. MM BIO-3 states
17  that "[f]inal mitigation compliance may be a combination of these three options; **would be**
18  **dependent upon credit/land availability**; and would be subject to City and wildlife agency
19  approval prior to issuance of the first grading permit." (emph. added.) There is no evidence that
20  sufficient land and/or mitigation credits are available to fully satisfy this mitigation measure, and
21  therefore there is no evidence of the measure's feasibility.

22     57.     Tenth, Mitigation Measure BIO-4 violates CEQA because it constitutes
23  improperly deferred mitigation. Mitigation measures BIO-4 defers the preparation of a
24  mitigation plan until after completion of CEQA review, without imposing any substantive
25  standards, without providing for any public review, and subject to approval by the U.S. Fish &
26  Wildlife Service. It is improper for a mitigation plan to be created at some later time, after the
27  CEQA process is complete, with formulation and approval of the mitigation measure being
28  conducted by an agency other than the lead agency.

58.   Eleventh, the EIR fails to mitigate direct and indirect impacts to the Del Mar Mesa Preserve and the National Wildlife Refuge including, but not limited to, trespass by humans and domestic animals, lighting, noise, and invasive species.  Moreover, the EIR fails to provide substantial evidence as to why additional mitigation measures suggested by commenters are infeasible.

59.   Twelfth, the EIR's analysis and mitigation of impacts from invasive species is inadequate.  The only mitigation measure proposed to address invasive species impacts on the Preserve is to not plant invasive species on the Project site.  But 20 invasive non-native species are already present on the Project site, four of which are highly invasive.  The presence of these invasive species at the Project site was not disclosed or analyzed, and the EIR does not include mitigation measures that would prevent the invasive species from invading the Preserve. Moreover, fill from the Project site is planned to be used to fill Deer Creek, and there is no mitigation that would prevent invasive species from being spread through this process.

### Hydrology and Water Quality

60.   The EIR fails to analyze cumulative hydrology impacts.  Specifically, the EIR analyzes only the runoff from the project site, not the cumulative upstream runoff from Torrey Highlands and other upland properties that will be added to the Project runoff.

61.   The EIR fails to disclose and mitigate significant impacts resulting from fill in Deer Creek Canyon and part of Darkwood Canyon.

**Environmentally Superior Alternative and Statement of Overriding Considerations**

62.   The EIR found that an alternative labeled "Reduced Project Alternative" is the environmentally superior alternative.  The Reduced Project Alternative would involve reducing the intensity of the mixed-use development such that project traffic is reduced by 70 percent. This would be accomplished in a number of ways, including reducing the amount of commercial, office, and/or residential development constructed on site.  This alternative would reduce traffic impacts, and produce substantially less greenhouse gas emissions from mobile sources.  The City, however, rejected the alternative for the Project without a proper showing that it would be infeasible.

16

1    63.    The City concedes that the Project will cause significant environmental effects that

2    will not be fully mitigated and therefore adopted a Statement of Overriding Considerations.  The

3    findings in the Statement of Overriding Considerations are inadequate, particularly in making a

4    finding of infeasibility due to considerations under Public Resources Code §21081(a)(3), but not

5    making specific findings, supported by substantial evidence, concerning "the provision of

6    employment opportunities for highly trained workers" created by the Project.  PRC §21081(a)(3).

7    64.    Despite comments raising the above issues, including expert evidence, the City

8    Council voted to approve the Project.

9                                    **FIRST CAUSE OF ACTION**

10   **(Pub. Res. Code §§ 21168, 21168.5 - Failure to Comply with CEQA
     By Petitioner Against All Respondents and Real Parties in Interest)**

11

12   65.    Petitioner realleges and incorporates by reference the paragraphs set forth above.

13   66.    CEQA requires the lead agency for a project to prepare an EIR that complies with

14   the requirements of the statute.

15   67.    Respondents violated CEQA by certifying an EIR for the Project that is inadequate

16   and fails to comply with CEQA.

17   68.    The analysis in the EIR failed to comply with CEQA including by: (a) failing to

18   perform a health risk assessment; (b) not considering the excess cancer risk created by the

19   Project; (c) not considering consistency with Executive Order B-30-15; (d) providing an overly

20   vague description of the Project preventing an accurate determination of traffic impacts; (e)

21   failing to disclose the full extent of traffic created by the Project; (f) improperly surveying for

22   bird and mammal species; (g) not conducting species-specific surveys; (h) not acknowledging the

23   special-status of certain species; (i) not surveying for bats, pocket mice, and American badger; (j)

24   improperly examining burrowing owls by (1) concluding that there were no occurrences of

25   burrowing owls in the Project area and (2) using a wholly insufficient survey; (k) not assessing 35

26   special-status species of wildlife for impacts, including 28 not covered under the MSCP; (l) not

27   assessing the impacts of the Project's added road traffic on special-status species of wildlife; (m)

28   dismissing the potential for cumulative impacts on biological resources; (n) not assessing the

                                              17

1  impact on wildlife movement in the region in which the Project is situated; and (o) not

2  considering window collision impacts on wildlife.

3      69.     Based on the above failures of analysis, the EIR also did not conduct a proper

4  inquiry into mitigation measures, including for construction emissions, greenhouse gas emissions,

5  traffic, and wildlife.

6      70.     The EIR did not conduct a proper cumulative impacts analysis, including for the

7  Project's potential impact to biological resources on or near the Project site.

8      71.     The EIR is inadequate as an informational document because the Project

9  description neither provides a health risk assessment nor an adequate description of the mixed-

10  use development.

11      72.     Respondents further violated CEQA by (a) abusing their discretion in failing to

12  select the environmentally superior Reduced Project Alternative and (b) adopting findings that

13  are inadequate as a matter of law in that they are not supported by substantial evidence in the

14  record, particularly by (1) rejecting the Reduced Project Alternative and (2) adopting the

15  Statement of Overriding Considerations without specific findings concerning the Project's

16  employment opportunities for highly trained workers.

17      73.     The Final EIR violated CEQA by failing to adequately respond to comments on

18  the Draft EIR.

19      74.     As a result of the foregoing defects, Respondents' certification of the EIR,

20  adoption of the Statement of Overriding Considerations, and approval of the Project should be set

21  aside.

22                          **PRAYER FOR RELIEF**

23      WHEREFORE, Petitioner demands the issuance of a peremptory writ of mandate

24  pursuant to Pub. Res. Code § 21168.9 and entry of judgment as follows:

25      1.     For a stay pending trial of Respondents' decisions approving the Project.

26      2.     For a peremptory writ of mandate ordering:

27          a.     Respondents to vacate and set aside their certification of the EIR for the

28             Project, adoption of the Statement of Overriding Considerations, and

                          18

1        decisions approving the Project;

2        b.    Respondents and Real Party in Interest to suspend all activity under the

3        certification of the EIR and approval of the Project that could result in any

4        change or alternation to the physical environment until Respondents have

5        taken all actions necessary to bring the certification and Project approvals

6        into compliance with CEQA; and

7        c.    Respondents to prepare, circulate, and consider an EIR in compliance with

8        CEQA prior to any subsequent action to approve the Project.

9    3.    For the costs of suit.

10    4.    For an award of attorney fees pursuant to Code of Civil Procedure § 1021.5 and

11  any other applicable provisions of law or equity.

12    5.    For any other equitable or legal relief that the Court considers just and proper.

13

14  Dated: July 13, 2018

                           LOZEAU|DRURY LLP

15

16

17                       By: _____

18                      Rebecca L. Davis

19                      Attorneys for Petitioner
                      Laborers International Union of North America,

20                      Local Union 89

21

22

23

24

25

26

27

28

VERIFIED PETITION FOR WRIT OF MANDATE

**VERIFICATION**

I, Rebecca Davis, am an attorney for Petitioner Laborers International Union of North America, Local Union 89 in this action. I am verifying this Petition pursuant to California Code of Civil Procedure section 446. Petitioner is located outside of the County of Alameda, where I have my office. I have read the foregoing Petition. I am informed and believe that the matters in it are true and on that ground allege that the matters stated in the Petition are true.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 13, 2018, at Oakland, California.

Rebecca L. Davis
Attorney for Petitioner

20

# EXHIBIT A



**LOZEAU DRURY**LLP    T 510.836.4200    410 12th Street, Suite 250    www.lozeaudrury.com
                       F 510.836.4205    Oakland, Ca 94607      rebecca@lozeaudrury.com

*By U.S. Mail & E-mail*

July 11, 2018

Myrtle Cole, Council President
Barbara Bry, Council President Pro Tem
City of San Diego City Council
City Administration Building
202 C St., 10th Floor
San Diego, CA 92101
myrtlecole@sandiego.gov
barbarabry@sandiego.gov

Elizabeth Maland, City Clerk
202 C St., Second Floor
San Diego, CA 92101
cityclerk@sandiego.gov

**Re:    Notice of Intent to File Suit Under The California Environmental Quality Act
         Regarding Merge 56 – Project No. 360009 (SCH No. 2014071065) and Related
         Decisions**

Dear President Col, President Pro Tem Bry, and Clerk Maland:

     Please take notice, pursuant to Public Resources Code ("PRC") § 21167.5, that Petitioner
Laborers International Union of North America, Local Union 89 ("Petitioner") intends to file a
Verified Petition for Peremptory Writ of Mandate ("Petition") under the provisions of the
California Environmental Quality Act ("CEQA"), PRC § 21000 *et seq.,* against Respondents the
City of San Diego and the City Council of the City of San Diego ("City" or "Respondents"),
challenging the May 22, 2018 approval of the Merge 56 mixed-use project ("Project")  and
adoption of Resolution R-2018-540 certifying Environmental Impact Report No. 360009/SCH
No. 2014071065 and adopting Findings, a Statement of Overriding Considerations, and a
Mitigation, Monitoring, and Reporting Program for the Merge 56 Project, as well as other
approved resolutions related to the Merge 56 project (O-2018-115, R-2018-548, R-2018-546, R-
2018-541, R-2018-545, R-2018-544).

     Among other issues, Petitioner will allege that the City failed to proceed in the manner
required by law and without substantial evidence by relying on an EIR that fails to properly

Re: Notice of Intent to File Suit
Under the California Environmental Quality Act
June 19, 2018
Page 2 of 3

disclose, analyze, and mitigate the Project's potential significant individual and cumulative biological impact, impacts on human health from diesel emissions, greenhouse gas impacts, and traffic impacts. The petition being filed will seek the following relief:

1.  For a stay pending trial of Respondents' decisions approving the Project.
2.  For a peremptory writ of mandate ordering:
    a.  Respondents to vacate and set aside their certification of the EIR for the Project, adoption of the Statement of Overriding Considerations, and decisions approving the Project;
    b.  Respondents and Real Party in Interest to suspend all activity under the certification of the EIR and approval of the Project that could result in any change or alternation to the physical environment until Respondents have taken all actions necessary to bring the certification and Project approvals into compliance with CEQA; and
    c.  Respondents to prepare, circulate, and consider an EIR in compliance with CEQA prior to any subsequent action to approve the Project.
3.  For the costs of suit.
4.  For an award of attorney fees pursuant to Code of Civil Procedure § 1021.5 and any other applicable provisions of law or equity.
5.  For any other equitable or legal relief that the Court considers just and proper.

Petitioner urges Respondents to rescind the Notice of Determination and the approvals for the Project, to conduct the appropriate environmental review, and to prepare the appropriate CEQA document for the Project as required by law.

Sincerely,

Rebecca L. Davis
Lozeau Drury LLP
Attorneys for Petitioner Friends of the Eel River

Re: Notice of Intent to File Suit
Under the California Environmental Quality Act
July 11, 2018
Page 3 of 3

## PROOF OF SERVICE

I, Toyer Grear, declare as follows:

I am a resident of the State of California, and employed in Oakland, California.  I am over the age of 18 years and am not a party to the above-entitled action.  My business address is 410 12th Street, Suite 250, Oakland, California, 94607.

On July 11, 2018, I served a copy of the foregoing document entitled:

**Notice of Intent to File Suit Under The California Environmental Quality Act Regarding Merge 56 – Project No. 360009 (SCH No. 2014071065) and Related Decisions**

on the following parties:

Myrtle Cole, Council President
Barbara Bry, Council President Pro Tem
City of San Diego City Council
City Administration Building
202 C St., 10th Floor
San Diego, CA 92101
myrtlecole@sandiego.gov
barbarabry@sandiego.gov

Elizabeth Maland, City Clerk
202 C St., Second Floor
San Diego, CA 92101
cityclerk@sandiego.gov

| | |
|---|---|
| ☒ | **BY MAIL. By placing the document listed above in a sealed envelope with postage thereon fully prepaid for First Class mail, in the United States mail at Oakland, California addressed as set forth above.** |
| ☒ | **BY EMAIL.  By sending the documents as an electronic mail attachment in PDF format to the e-mail address above.** |
| ☐ | **BY FACSIMILE TRANSMISSION.  By sending the documents via facsimile transmission to the fax telephone number identified above.** |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed July 11, 2018 at Oakland, California.

Toyer Grear

# EXHIBIT B

1 │ RICHARD DRURY (SBN 163559)
  │ REBECA L. DAVIS (SBN 271662)
2 │ LOZEAU|DRURY LLP
  │ 410 12th Street, Suite 250
3 │ Oakland, CA 94607
4 │ Telephone: (510) 836-4200
  │ E-mail: richard@lozeaudrury.com
5 │        rebecca@lozeaudrury.com
6 │ Attorneys for Petitioner
  │ Laborers International Union of North America, Local Union 89
7 │

8 │            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 │                       COUNTY OF SAN DIEGO

10 │ LABORERS INTERNATIONAL UNION OF        │ Case No.
   │ NORTH AMERICA, LOCAL UNION 89,         │
11 │                                        │ **PETITIONER'S NOTICE OF INTENT TO**
   │         Petitioner,                    │ **PREPARE ADMINISTRATIVE RECORD**
12 │                                        │
13 │         vs.                            │ [California Environmental Quality Act
   │                                        │ ("CEQA"), Pub. Res. Code §21000, *et seq.*;
14 │ CITY OF SAN DIEGO; and CITY COUNCIL    │ C.C.P. §§1094.5, 1085]
   │ OF THE CITY OF SAN DIEGO,              │
15 │                                        │
   │         Respondents.                   │
16 │                                        │
17 │ GARY LEVITT, and SEA BREEZE 56 LLC,    │
18 │         Real Party in Interest.        │

19 │

20 │         Pursuant to Public Resources Code §21167.6(b)(2), Petitioner Laborers International

21 │ Union of North America, Local Union 89 ("Petitioner") hereby notifies all parties that Petitioner

22 │ elects to prepare the administrative record relating to the above-captioned action challenging the

23 │ May 22, 2018 decisions of Respondent City Council of the City of San Diego to approve the

24 │ mixed-use development Project known as Merge 56 ("Project"), including certifying the EIR and

25 │ adopting a Statement of Overriding Considerations. Respondents and Real Party in Interest are

26 │ directed not to prepare the administrative record for this action and not to expend any resources to

27 │ prepare the administrative record.

28 │

─────────────────────────────────────────────────────────────
PETITIONER'S NOTICE OF INTENT TO PREPARE ADMINISTRATIVE RECORD

1    Dated: July 13, 2018                    LOZEAU | DRURY LLP

2

3

                                            Rebecca L. Davis
4                                           Attorneys for Petitioner and Plaintiff
                                            Laborers International Union of North America,
5                                           Local Union 89

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          2

1                                 **PROOF OF SERVICE**

2

        I, Toyer Grear, declare as follows:

3        I am a resident of the State of California, and employed in Oakland, California. I am over the

4 age of 18 years and am not a party to the above-entitled action. My business address is 410 12th

5 Street, Suite 250 Oakland, CA 94607. On July 13, 2018 I served a copy of the document(s)

6 entitled:

7      **NOTICE TO ATTORNEY GENERAL OF VERIFIED PETITION FOR WRIT OF**

                                       **MANDATE**

8

9     ☒    By causing the above-named document(s) to be enclosed in sealed envelope(s) with postage
           thereon fully prepaid and addressed as stated below, and to be deposited in the United States
10         Mail at Oakland, California.

11

12 Office of the Attorney General
    1515 Clay Street, Suite 2000
13 Oakland, CA 94612

14        I declare under penalty of perjury that the foregoing is true and correct, and that this

15 declaration was executed July 13, 2018.

16

17                                   Toyer Grear

18

19

20

21

22

23

24

25

26

27

28

                                       3



# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION

CASE NUMBER: 37-2018-00035233-CU-WM-NC     CASE TITLE: LABORERS INTERNATIONAL UNION OF NORTH AMER

**NOTICE:** All plaintiffs/cross-complainants in a general civil case are required to serve a copy of the following three forms on each defendant/cross-defendant, together with the complaint/cross-complaint:
(1) this Alternative Dispute Resolution (ADR) Information form (SDSC form #CIV-730),
(2) the Stipulation to Use Alternative Dispute Resolution (ADR) form (SDSC form #CIV-359), _and_
(3) the Notice of Case Assignment form (SDSC form #CIV-721).

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts, community organizations, and private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. The San Diego Superior Court expects that litigants will utilize some form of ADR as a mechanism for case settlement before trial, and it may be beneficial to do this early in the case.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. A form for agreeing to use ADR is attached (SDSC form #CIV-359).

## Potential Advantages and Disadvantages of ADR
ADR may have a variety of advantages or disadvantages over a trial, depending on the type of ADR process used and the particular case:

**Potential Advantages**
- Saves time
- Saves money
- Gives parties more control over the dispute resolution process and outcome
- Preserves or improves relationships

**Potential Disadvantages**
- May take more time and money if ADR does not resolve the dispute
- Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable

## Most Common Types of ADR
You can read more information about these ADR processes and watch videos that demonstrate them on the court's ADR webpage at http://www.sdcourt.ca.gov/adr.

**Mediation:** A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners, or when parties want to discuss non-legal concerns or creative resolutions that could not be ordered at a trial.

**Settlement Conference:** A judge or another neutral person called a "settlement officer" helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge or settlement officer does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Arbitration:** A neutral person called an "arbitrator" considers arguments and evidence presented by each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are usually relaxed. If the parties agree to binding arbitration, they waive their right to a trial and agree to accept the arbitrator's decision as final. With nonbinding arbitration, any party may reject the arbitrator's decision and request a trial. Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time, and expense of a trial.

**Other ADR Processes:** There are several other types of ADR which are not offered through the court but which may be obtained privately, including neutral evaluation, conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR processes. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute. Be sure to learn about the rules of any ADR program and the qualifications of any neutral you are considering, and about their fees.

## Local ADR Programs for Civil Cases

**Mediation:** The San Diego Superior Court maintains a Civil Mediation Panel of approved mediators who have met certain minimum qualifications and have agreed to charge $150 per hour for each of the first two (2) hours of mediation and their regular hourly rate thereafter in court-referred mediations.

<u>On-line mediator search and selection:</u> Go to the court's ADR webpage at www.sdcourt.ca.gov/adr and click on the "Mediator Search" to review individual mediator profiles containing detailed information about each mediator including their dispute resolution training, relevant experience, ADR specialty, education and employment history, mediation style, and fees and to submit an on-line Mediator Selection Form (SDSC form #CIV-005). The Civil Mediation Panel List, the Available Mediator List, Individual Mediator Profiles, and Mediator Selection Form (CIV-005) can also be printed from the court's ADR webpage and are available at the Mediation Program Office or Civil Business Office at each court location.

**Settlement Conference:** The judge may order your case to a mandatory settlement conference, or voluntary settlement conferences may be requested from the court if the parties certify that; (1) settlement negotiations between the parties have been pursued, demands and offers have been tendered in good faith, and resolution has failed; (2) a judicially supervised settlement conference presents a substantial opportunity for settlement; and (3) the case has developed to a point where all parties are legally and factually prepared to present the issues for settlement consideration and further discovery for settlement purposes is not required. Refer to SDSC Local Rule 2.2.1 for more information. To schedule a settlement conference, contact the department to which your case is assigned.

**Arbitration:** The San Diego Superior Court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. Refer to SDSC Local Rules Division II, Chapter III and Code Civ. Proc. § 1141.10 et seq or contact the Arbitration Program Office at (619) 450-7300 for more information.

<u>More information about court-connected ADR:</u> Visit the court's ADR webpage at www.sdcourt.ca.gov/adr or contact the court's Mediation/Arbitration Office at (619) 450-7300.

**Dispute Resolution Programs Act (DRPA) funded ADR Programs:** The following community dispute resolution programs are funded under DRPA (Bus. and Prof. Code §§ 465 et seq.):
- In Central, East, and South San Diego County, contact the National Conflict Resolution Center (NCRC) at www.ncrconline.com or (619) 238-2400.
- In North San Diego County, contact North County Lifeline, Inc. at www.nclifeline.org or (760) 726-4900.

**Private ADR:** To find a private ADR program or neutral, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

## Legal Representation and Advice

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial. ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process. If you do not already have an attorney, the California State Bar or your local County Bar Association can assist you in finding an attorney. Information about obtaining free and low cost legal assistance is also available on the California courts website at www.courtinfo.ca.gov/selfhelp/lowcost.

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS: 325 S. Melrose | |
| MAILING ADDRESS: 325 S. Melrose | |
| CITY, STATE, & ZIP CODE: Vista, CA 92081-6695 | |
| BRANCH NAME: North County | |

| PLAINTIFF(S): LABORERS INTERNATIONAL UNION OF NORTH AMERICA LOCAL UNION 89 |
|---|
| DEFENDANT(S): CITY OF SAN DIEGO et.al. |
| SHORT TITLE: LABORERS INTERNATIONAL UNION OF NORTH AMERICA LOCAL UNION 89 VS CITY OF SAN DIEGO [IMAGED] |

| STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: 37-2018-00035233-CU-WM-NC |
|---|---|

Judge: Earl H. Maas, III                                        Department: N-28

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution (ADR) process. Selection of any of these options will not delay any case management timelines.

☐ Mediation (court-connected)                    ☐ Non-binding private arbitration

☐ Mediation (private)                            ☐ Binding private arbitration

☐ Voluntary settlement conference (private)      ☐ Non-binding judicial arbitration (discovery until 15 days before trial)

☐ Neutral evaluation (private)                   ☐ Non-binding judicial arbitration (discovery until 30 days before trial)

☐ Other (specify e.g., private mini-trial, private judge, etc.): _____

_____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: *(Name)* _____

_____

_____

Alternate neutral (for court Civil Mediation Program and arbitration only): _____

Date: _____                            Date: _____

_____                    _____
Name of Plaintiff                                Name of Defendant

_____                    _____
Signature                                        Signature

_____                    _____
Name of Plaintiff's Attorney                     Name of Defendant's Attorney

_____                    _____
Signature                                        Signature

If there are more parties and/or attorneys, please attach additional completed and fully executed sheets.

It is the duty of the parties to notify the court of any settlement pursuant to Cal. Rules of Court, rule 3.1385. Upon notification of the settlement, the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court.

IT IS SO ORDERED.

Dated: 07/17/2018                                JUDGE OF THE SUPERIOR COURT

SDSC CIV-359 (Rev 12-10)        STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION        Page: 1

# Exhibit I



# **CONFIDENTIAL**
## **Attorney Client Privileged**
### **Merge56 meeting with LIUNA Local 89**

*LiUNA HQ, 4399 Santa Anita Ave El Monte, CA ,*                    *February 11, 2019*

LiUNA: Al Cvitan, Val Macedo, Jon Preciado, Ernie Ortonez (sp?)
Merge56: Gary Levitt, Darren Levitt, Ed Heatley

Meeting Started at 1:41pm

Pleasantries exchanged about the snow on mountains – Ernie talked about how there was a car crash across the street this morning, truck hit a fire hydrant and it flooded the street.

**Jon Preciado** – When we last met we gave you a proposal and we told you there are 2 issues: environmental & labor issues. We here for labor, although if we can settle the labor function and we can settle the environmental, it can be done on the same day. We were expecting a counter proposal from what we gave you at our last meeting but you have a counter proposal you want to discuss in person?

**Gary** – I'm worried, or trying to understand why Al, attorney, is here. And as I don't have an attorney  "I feel exposed."

**Al** – as Jon said this is nothing to do with the environmental suit, that is a different attorney.  I don't represent the Laborers on any environmental matter "Jon asked me to be here that is why I am here."

**Gary** – OK but on environmental, how do we get the it resolved? We can talk labor but you're the same guys suing the city and us. "How can we be sure or be comfortable it will be resolved easily without us complicating our lives with the city?"

**Al** – fair question. I suggest we concentrate on the labor issues. You'll have to deal with Richard Drury's office on the environmental, and bring them together at the same time. There can be two documents (one for labor, one for environmental) signed on the same day "if that makes you feel more comfortable."

**Gary** – I understand but what I have concerns about is regarding what changes would be required for the project on the environmental.

**Al** – On the environmental "I don't think there'd be significant changes", and again I don't do that type of law, but "normally what I have seen is we would ask for some type of additional mitigation, hopefully mitigation that does not add significant cost to you. If there is going to be

additional cost, we'd rather see it on the labor side where workers are making a little more money. But Richard (Drury) is very creative" to make a project more acceptable and environmentally safe project, and "not add a lot of cost to the developer." I don't think you need to be concerned if you negotiate something here, he'll ask you to change 50% of the project, "I can pretty much guarantee you that."

**Gary** – and time associated with these changes- from a permit perspective change and the process has a time impact? It took 5 years to get here.

**Al** – If we can agree on labor issues within a week, you could resolve things with Richard (Drury) by the end of the month. "Normally, they will do things like, and I am not familiar with this project's environmental issues, but I've seen they'll have the contractor has to use electric forklifts, rather than diesel. Or, depending on your soil, may be some additional requirement for water trucks to prevent dust into the environment. It's more things like that than we want you to cut the size of the project in half, I mean we want the project built, we want it built environmentally sound and on good labor terms."

**Val** – "That's right Al, one of the one's I've seen is they changed over diesel emission to propane on the conversion kits on the equipment which comes from different rental companies, which is an easy thing to get done, that I've seen."

**Gary** – OK, let's discuss the project a bit more on what I do know

------ 5 or 6 minutes --------

For the next 35 - 40 minutes, **Gary** explains no proposal was sent in advance because of the unique project complexities, especially the requirement that all the public roads get built first requiring the layout of $30M in up front costs, as well as the variety of specific and different building types. He explained how the unique deal with Brookfield where they pay up front on their purchase years before they close, by building and paying for the public roads, and why for that reason, Residential is completely off the table.

Gary then asks questions related to PLA specifics trying to understand how the PLA works and specifically how the union and nonunion subcontractors work together. Jon and Val emphasized that many jobs, and most private jobs in San Diego, are a mix of union and nonunion workers and that working together is not a concern. They all want the project to be built and to be paid for the work.

Gary explained the different components of the commercial project, the retail buildings complexity vs the big office buildings, 4 story hotel and the 1,500 to 1,800 car parking structure

We discussed different GCs who we are considering and have worked with in the past. They referenced they had relationships with JR Concrete for parking structures or Stater Bros for the



anchor grocery (both are Union committed). The office buildings, and hotel would be different GCs. Retail would be CMU block in back with steel/glass in front.

**Val** – was very excited to hear about 1,500 – 1,800 parking spaces. – "that's a big structure".
**Al** – A GC must use union subs for each labor specific component of each of these buildings.
**Jon** – "there will be a non-strike clause if we sign a PLA."
**Val** – "we're here to do business and we want you to be successful"

They asked for a break at 2:30pm – came back in 25 minutes later – with their PLA offer:

**Jon** – "We'll agree to getting rid of residential, all of it". But on the commercial, we want parking structures. On office – we want concrete, fireproofing, cleanup, landscape, asphalt, outdoor concrete (curb & gutter), block walls, pavers, aka "all concrete related labor". On retail - we want a shot at masonry CMU, we have a good local CMU sub "Ross Masonry".

**Gary** – can you get me the rates on specific labor for the office component for the different components?

**Val** – Al will send you rate structure. Al is a brother to us. He's one of us. He's like a principal, he's an "educated labor rep" and "he wrote the labor union playbook".

**Gary** – back to environmental. How do we know it will be easy? What is to stop other environmentalists from taking advantage of what you started?

**Al** – "you settle with us, it will be free and clear" on the environmental piece and no one else can file suit against you.

**Val** – "when you deal with Richard (Drury), it will be cordial on that side, I don't see it being difficult for you either. I'm very comfortable you'll be satisfied over there dealing with Richard."

Al agreed to send us an outline of the PLA containing what we discussed. We agreed to send them a copy of draft reimbursement agreement with City for the public streets.

We mentioned timing and agreed that we would not want to ask courts for any more time which could delay CEQA process so we have to act fast.


---- Meeting over @ 3:18pm -----