ALEXANDER OKULIAR (*Pro Hac Vice*)
AOkuliar@mofo.com
DAVID J. SHAW (*Pro Hac Vice*)
DShaw@mofo.com
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC  20037
Telephone:  202.887.1500
Facsimile:   202.887.0763

RACHEL FELDMAN (CA SBN 329275)
RFeldman@mofo.com
TIMOTHY A. TROST (CA SBN 340843)
TTrost@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, California  90017-3543
Telephone:  213.892.5200
Facsimile:   213.892.5454

SEAN P. GATES (CA SBN 186247)
SGates@charislex.com
CHARIS LEX P.C.
301 N. Lake Ave., Suite 1100
Pasadena, California  91101
Telephone:  626.508.1717
Facsimile:   626.508.1730

Attorneys for Plaintiff
THE ICON AT PANORAMA, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ICON AT PANORAMA, LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>SOUTHWEST REGIONAL COUNCIL OF CARPENTERS, et al.,<br><br>                    Defendants. | Case No. 2:19-CV-00181-CBM-MRW<br><br>Judge:  Hon. Consuelo B. Marshall<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION TO STRIKE DEFENDANTS' REBUTTAL OPINIONS**<br><br>Date:       May 21, 2024<br>Time:      10:00 a.m.<br>Dept.:      8D |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

**PLEASE TAKE NOTICE** that on May 21, 2024, at 10:00 a.m., or as soon thereafter as the matter can be heard, before the Honorable Consuelo B. Marshall in Courtroom 8D of the United States District Court, Central District, located at 350 W. 1st Street, Los Angeles, California 90012, Plaintiff, The Icon at Panorama, LLC ("Icon"), by and through its counsel of record, will and hereby moves pursuant to L.R. 7 to strike the purported expert testimony of Dr. Laton, Mr. Selmi, Mr. Gebhart, Mr. Miller, and Mr. Kheyfets.

In accordance with Local Rule 7, Icon met and conferred with Defendants regarding the substance of this motion on April 8, 2024.

This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities, the Declaration of David Shaw and all exhibits thereto, all pleadings and other motions to file in this matter, and, any arguments of counsel that may be presented at the hearing on this matter.

Dated:  April 23, 2024            MORRISON & FOERSTER LLP

By: */s/ David J. Shaw*
        David J. Shaw

        *Attorneys for Plaintiff*
        THE ICON PANORAMA, LLC

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................ 1

II.     LEGAL STANDARD ................................................................................ 1

III.    ARGUMENT ............................................................................................. 3

    A.  The Testimony of Defendants' Purported CEQA Experts Dr. Laton, Mr. Miller, Mr. Gebhart, Mr. Selmi, and Should be Excluded ........................................................................................... 3

        1.  Dr. Laton's Opinions Should be Excluded as Irrelevant and Unreliable ............................................................. 5

        2.  Mr. Miller's Opinions Should be Excluded As Unreliable and Irrelevant ................................................... 8

        3.  Mr. Gebhart's Opinions Should Be Excluded as Unreliable and Irrelevant ................................................ 11

        4.  Mr. Selmi's Opinions Should Be Excluded as Unreliable, Irrelevant, or as Impermissible Legal Testimony .................... 14

    B.  Mr. Kheyfets' Testimony Should Be Excluded Because He Lacks Relevant Expertise and Offers Unreliable Testimony ............. 18

IV.     CONCLUSION ......................................................................................... 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
  738 F.3d 960 (9th Cir. 2013) ................................................................... 3

*Allied Tube & Conduit Corp. v. Indian Head*,
  486 U.S. 492 (1988) ............................................................................... 4

*Burkhart v. Washington Metro. Area Transit Auth.*,
  112 F.3d 1207 (D.C. Cir. 1997) ............................................................ 16

*Cabrera v. Cordis Corp.*,
  134 F.3d 1418 (9th Cir. 1998) ................................................................ 3

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
  404 U.S. 508 (1972) ............................................................................... 4

*In re Canvas Specialty, Inc.*,
  261 B.R. 12 (Bankr. C.D. Cal. 2001) ...................................................... 3

*City of Columbia v. Omni Outdoor Advert., Inc.*,
  499 U.S. 365 (1991) ............................................................................... 4

*Cooper v. Brown*,
  510 F.3d 870 (9th Cir. 2007) .................................................................. 2

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ...................................................................... 1, 2, 3

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) (*Daubert II*) ....................................... 2, 3

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ............................................................................... 2

*Mukhtar v. Cal. State Univ., Hayward*,
  299 F.3d 1053 (9th Cir. 2002), *amended by* 319 F.3d 1073 (9th Cir.
  2003), *overruled, in part, on other grounds by United States v.
  Bacon*, 979 F.3d 766 (9th Cir. 2020) (en banc) .................................... 2

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
  523 F.3d 1051 (9th Cir. 2008) ........................................................ 16, 17

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994) ................................................................. 2, 3

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir. 2010), *as amended* (Apr. 27, 2010) ................................. 3

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus.*,
  508 U.S. 49 (1993) ..................................................................................... 4

*PSM Holding Corp. v. Nat'l Farm Fin. Corp.*,
  No. CV0508891MMMFMOX, 2013 WL 12080306 (C.D. Cal. Oct.
  8, 2013), *aff'd in part*, 884 F.3d 812 (9th Cir. 2018) ........................................ 2

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) ..................................................... 16

*Shahid v. City of Detroit*,
  889 F.2d 1543 (6th Cir. 1989) ................................................................. 17

*Specht v. Jensen*,
  853 F.2d 805 (10th Cir. 1988) ................................................................. 17

*U.S. v. Hermanek*,
  289 F.3d 1076 (9th Cir. 2002) ................................................................... 3

## I.    INTRODUCTION

This case involves allegations that Defendants weaponized the CEQA process by filing meritless petitions to gain leverage in labor negotiations with developers in Los Angeles.  For the Icon Project, this anticompetitive conduct effectively killed the project for years, causing millions of dollars in harm.

This motion concerns five purported experts that Defendants intend to offer. Four of the five claim to be experts on CEQA-related issues and offer various justifications for Defendants' sham petitions.  But these experts—Dr. Laton and Messrs.  Miller, Gebhart, Selmi—lack the necessary qualifications to opine on CEQA, offer irrelevant testimony, failed to offer opinions that are the product of reliable principles or methods or are the result of any experiments, and/or offer impermissible testimony regarding legal conclusions.  The fifth purported expert, Mr. Kheyfets, offers opinions that "rebut" Icon's damages expert, but he lacks the necessary qualifications and his opinions are inadmissible because they are irrelevant, unsound, and not the product of any reproducible method or analysis.

Because these purported expert witnesses are not, in fact, experts, offer irrelevant testimony, and fail to offer opinions that meet the standards of reliability required by Federal Rule of Evidence 702 or *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), this Court should exercise its gatekeeping function and exclude their testimony.

## II.    LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence ("Rule 702") provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and

1

methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702, which reflects the U.S. Supreme Court decisions in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony … is not only <u>relevant</u>, but <u>reliable</u>.'" *Kumho*, 526 U.S. at 147 (emphasis added) (quoting *Daubert*, 509 U.S. at 589).  The purpose of this "gatekeeping" function is to protect juries from being exposed to misleading or unreliable scientific testimony.  *Daubert*, 509 U.S. at 592-93, 597; *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063-64 (9th Cir. 2002) ("the aura of authority experts often exude, . . . can lead juries to give more weight to their testimony."), *amended by* 319 F.3d 1073 (9th Cir. 2003), *overruled, in part, on other grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020) (*en banc*).

"[R]elevance," which is the "first prong of *Daubert*, . . . means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (citing *Daubert*, 509 U.S. at 591-92).  The test for relevance under Rule 702 is "higher than bare relevance."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995) ("*Daubert II*") (explaining that Rule 702's "relevance" requirement is not "merely a reiteration of the general relevancy requirement of Rule 402.").

That means the proposed expert's "training, experience, or specialized knowledge" must be "sufficiently related to the subject matter about which he seeks to offer an opinion."  *PSM Holding Corp. v. Nat'l Farm Fin. Corp.*, No. CV0508891MMMFMOX, 2013 WL 12080306, at *9 (C.D. Cal. Oct. 8, 2013), *aff'd in part*, 884 F.3d 812 (9th Cir. 2018).  "It is not enough that the proposed

2

expert have expertise in an area of knowledge.  The expertise must be relevant to the determination of the facts in issue." *In re Canvas Specialty, Inc.*, 261 B.R. 12, 19 (Bankr. C.D. Cal. 2001).  Because expert testimony can be "both powerful and quite misleading because of the difficulty in evaluating it," *Daubert*, 509 U.S. at 595, trial courts must exclude proffered expert testimony "unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Daubert II*, 43 F.3d at 1321 n.17.

The second prong of the *Daubert* inquiry — the reliability requirement — focuses on the expert's "principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594-95.  Before admitting proffered expert testimony, "the court must assure that the [expert's] methods are adequately explained." *U.S. v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) (citing *Daubert II*, 43 F.3d at 1319). "[*A*]*ny* step that renders the analysis unreliable . . . *renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology*." *In re Paoli*, 35 F.3d at 745 (emphasis in original); *see also Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1422-23 (9th Cir. 1998) (experts were properly excluded when their opinions represented unsupported and untested conclusions).

### III.   ARGUMENT

#### A.   The Testimony of Defendants' Purported CEQA Experts Dr. Laton, Mr. Miller, Mr. Gebhart, Mr. Selmi, and Should be Excluded

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.  And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).  "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Primiano v. Cook*,

598 F.3d 558, 564 (9th Cir. 2010) (citations omitted), *as amended* (Apr. 27, 2010).

In the context of "sham petitioning," the relevant factual question is whether the petitioning is a genuine attempt to achieve an outcome from a governmental decisionmaker:

> The "sham" exception to *Noerr* encompasses situations in which persons use the governmental process—as opposed to the *outcome* of that process—as an anticompetitive weapon . . . . A "sham" situation involves a defendant whose activities are "not genuinely aimed at procuring favorable government action" at all . . . not one "who 'genuinely seeks to achieve his governmental result, but does so through improper means[.]'"

*City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (emphasis in original) (citations omitted); *see also Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 500 n.4 (1988) ("[I]n whatever forum, private action that is not genuinely aimed at procuring favorable government action is a mere sham that cannot be deemed a valid effort to influence government action.").

Given the many "forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes," *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972), the "objective criteria" to identify sham petitioning depends on the circumstances and conduct at issue, *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 59 (1993). For instance, in a case involving a single lawsuit premised on a single copyright claim, the Court held that "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* at 60. But in the context of multiple claims, a pattern of filing claims without regard to merit "may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused." *Cal. Motor Transp.*, 404 U.S. at 513. Thus, to be relevant to this matter, Defendants' purported CEQA experts opining on the "reasonableness," "appropriateness," or "legitimacy" of Defendants' petitioning must address objective indicia that show Defendants' CEQA comments were

genuine petitioning. None are able to offer relevant testimony on this point.

### 1. Dr. Laton's Opinions Should be Excluded as Irrelevant and Unreliable

Dr. Laton, Defendants' purported geophysical and subsurface studies expert, offers post hoc rationalizations for some of Defendants' petitions by drawing on new information not included in those petitions and, in fact, not known to Defendants at the time. (*Compare* ECF No. 396-13 ¶¶ 31-36, 41, 51 *with* ECF No. 381-7 at 101, 102.) This exercise is purely academic and unconnected to the relevant inquiry, which is whether Defendants petitions exhibit objective indicia of genuine petitioning. For this reason, Dr. Laton's opinions are irrelevant to the key questions that the jury must determine.

Additionally, Dr. Laton's opinions are unreliable because—as he admitted—they are based on misstatements of the administrative record and are irrelevant after-the-fact justifications of Defendants' comments based on evidence that Defendants were unaware of. (Shaw Decl. Ex. 1 at 179:1-21 (admitting that SWAPE's characterization of the Phase II report was incorrect); *id.* at 104:6-21 (discussing a 2014 Phase I report that SWAPE did not reference); *id.* at 131:3-23 (discussing the results of the twining report, which SWAPE did not reference); *id.* at 117:2-9 (admitting he fundamentally mischaracterized the record and "screwed up."); ECF No. 381-7 at 101 (SWAPE's comment letter, only referencing the 2015 Phase I report and none of the previous reports); *id.* at 102 (incorrectly stating that the 2015 Phase I report found environmental issues).)

**Relevance:** First, Dr. Laton's opinions are irrelevant because they are after-the-fact justifications for Defendants' comments based on evidence that Defendants did not use to support their frivolous comments, including evidence that was not in the record at all. (Shaw Decl. Ex. 1 at 179:1-21 (admitting that SWAPE's characterization of the Phase II report was incorrect; *id.* at 104:6-21 (discussing a 2014 Phase I report that SWAPE did not reference); *id.* at 130:20-25 (admitting that

the Phase II reports were referenced in the EIR); *id.* at 91:2-8 (admitting that there were reports Dr. Laton relied on that "were never in the record"); ECF No. 381-7 at 101-102 (SWAPE's letter, only referencing the 2014 Phase II report and 2015 Phase I report and none of the previous reports).)  Moreover, there is no record evidence that Defendants were even aware of many of the studies that Dr. Laton relies on in his report.  (Shaw Decl. Ex. 1 at 91:2-8 (admitting that there were reports Dr. Laton relied on that "were never in that record"); ECF No. 381-7 at 101-102 (only referencing the 2014 Phase II report and 2015 Phase I report and none of the previous reports).)

In particular, Dr. Laton's opinions rely on a summary of over five subsurface investigations at the Icon site, *which were not included in Defendants' submissions*. (ECF No. 396-13 at 26-29.)  These include Phase I type investigations, which are "book reports" that study the available history of the site and attempt to determine if environmental conditions might exist on the project site, and Phase II type investigations, which are follow-up reports to Phase I investigations and involve sampling the soil and subsurface to test if the possible hazardous environmental conditions exist or not.  (Shaw Decl. Ex. 1 at 94:17-95:12.)  Dr. Laton dedicates pages of analysis to these prior investigations and concludes that:

> Based on my extensive discussion above relating to the site history and prior investigations, it is my opinion that the Unions' comments on this issue - as analyzed by SWAPE - were reasonable, accurate, and specific to the issues implicated at the ICON Site.

(ECF No. 396-13 ¶ 51)

But the site history and prior investigations were not part of Defendants' comments.  Defendants only reference two reports and they fundamentally misrepresent the conclusions.  (*Compare* Shaw Decl. Ex. 1 at 107:4-6 (admitting that the 2015 report found no RECs) *with* ECF No. 381-7 ¶¶ 101-102 (erroneously concluding that the 2015 Phase I report found RECs).)  *Defendants never referenced any of the other reports to which Dr. Laton relies*, and there is no

1    evidence that Defendants knew about those reports at the time, or that the

2    Defendants relied on any of those materials when filing their comment letters or

3    bringing their appeals and lawsuit.  (ECF No. 381-7 ¶¶ 101-1022 (only referencing

4    the 2014 Phase II report and 2015 Phase I report and none of the previous reports).)

5         At issue in this case is whether there are objective indicia that *Defendants'*

6    *comments* and the evidence described *in their comments* were genuine petitioning

7    This assessment can only be made based on the evidence that Defendants put

8    forth—not after-the-fact rationalizations by a hired professional expert.

9         Similarly, Dr. Laton bases significant portions of his report on the

10   inadequacy of the testing sites that the environmental consultants chose. (ECF No.

11   396-13 ¶¶ 45-49; *id.* ¶¶ 60-67.)  But—as Dr. Laton admits—Defendants never

12   complained about the sites of the soil tests (or even admitted that such testing was

13   performed) in their comments submitted during the CEQ review.  (Shaw Decl. Ex.

14   1 at 161:16-25 (admitting that SWAPE's complaints about testing may have been

15   made in a "generic way."); *id.* at 161:8-12 (admitting that SWAPE didn't make any

16   comments about testing sites); *id.* at 160:22-25 (Q: "Where…do[es] SWAPE

17   complain about the area where the tests were taken? A: I don't believe they did. I

18   have.").)

19        The merits of Defendants' comments must be judged on the evidence in the

20   administrative record and the arguments that Defendants *actually* made.  In

21   particular, the factfinder must determine whether objective criteria show that

22   Defendants' CEQA comments were genuine, rather than sham, petitioning. The

23   arguments that one of Defendants' *antitrust litigation* experts *years later* wishes

24   Defendants' *CEQA petitioning* experts had made is entirely irrelevant.  Evidence

25   that Defendants did not even know about—let alone present in their comments—is

26   not relevant.  Because there is no record evidence that Defendants relied on any of

27   the myriad of reports that form the basis of Dr. Laton's opinions, Dr. Laton's

28   opinions are irrelevant, and Dr. Laton should not be able to present them to a jury.

1    **Reliability.** Dr. Laton's opinions should also be excluded because he decided

2    that Defendants had done a good job on the basis of reports that Defendants did not

3    even know about—much less read, understood, and referenced in their comment

4    letters.  Further, although he never took a soil sample of the Icon project site or

5    performed any subsurface study of any kind, Dr. Laton opines that "the presence or

6    absence of up to seven underground storage tanks (USTs) is still unresolved,"

7    despite the opposite conclusion of every soil sample test performed on the Icon

8    project site, (*id.* ¶¶ 17, 41).

9    Finally, and relatedly, Dr. Laton's opinions should be excluded because he

10   fundamentally misrepresents the record.  At various points, and despite arguing that

11   the timing of the reports affected their legitimacy, Dr. Laton admitted he "screwed

12   up" the record—misstating the dates and timing of the three most recent reports in

13   the public Icon administrative record—and that he "got carried away," leading him

14   to misrepresent the results of some of the studies he relied on.  (Shaw Decl. Ex. 1 at

15   117:2-7 (admitting that he "screwed up" the record); *id.* at 124:5-18 (admitting that

16   he "got carried away" by falsely representing the recommendations made by the

17   environmental consultant).)  Dr. Laton's opinions are unreliable and his testimony

18   should be excluded.

19          **2.    Mr. Miller's Opinions Should be Excluded As
                    Unreliable and Irrelevant**

20

21   Mr. Miller, Defendants' purported traffic expert, lacks the relevant expertise

22   in the CEQA process and standards specific to the City of Los Angeles.  Indeed, he

23   concedes that he is not an expert in the CEQA evaluation of traffic in the City of

24   Los Angeles.  His opinions are also unreliable because he cannot substantiate

25   claims in his report.

26   **Lack of Relevant Expertise.** Mr. Miller lacks the relevant knowledge and

27   experience required to act as an expert in this matter.  Although the general

28   framework of the CEQA process is the same across California, the administration

1  and relevant technical CEQA thresholds vary from municipality to municipality.
2  (Shaw Decl. Ex. 2 at 113:15-114:24.)  As Mr. Miller expressly conceded, this
3  variance causes the CEQA process to be highly specific to the locality
4  administering CEQA. (*Id*. at 76:12-19; *see also id*. at 76:12–80:7.)

5       It is undisputed that the Icon project was subject to CEQA as administered by
6  the City of Los Angeles.  The City of Los Angeles uses specific requirements and
7  thresholds in determining if an environmental impact is significant and requires
8  mitigation under CEQA.  (*Id*. at 113:15-114:24.)

9       Relevant expert testimony, then, requires relevant expertise regarding the
10 CEQA process and the standards used by the City of Los Angeles.  Mr. Miller lacks
11 this expertise.  He admitted that he has done "probably close to zero" CEQA work
12 in the City of Los Angeles.  (*Id*. at 36:19–22 ("Q How much of your CEQA-related
13 experience relates to the City of Los Angeles? A Relatively little work in the City
14 of Los Angeles. Probably close to zero.").)  This means:

15       • He has never assisted a lead agency in reviewing CEQA comments in
16          the City of Los Angeles.  (*Id*. at 37:2–7 ("Q What about assisting–
17          assisting an agency in– in reviewing comments in Los Angeles?...
18          THE DEPONENT: Not for the City of Los Angeles, and I don't recall
19          doing it for the County of Los Angeles.").)
20       • He only once assisted a third-party in preparing comments on a CEQA
21          review in the City of Los Angeles.  (*Id*. at 37:9–24 (recalling only
22          working on one in the past 20–30 years).)

23       Not surprisingly, Mr. Miller is also not on the City of Los Angeles'
24 prequalified list of traffic experts for CEQA and has never sought to be on that list
25 because his work is outside the City of Los Angeles.  (*See id*. at 41:17–42:10.)

26       In fact, Mr. Miller straight-forwardly concedes that he is not an expert when
27 it comes to the CEQA evaluation of traffic impacts in the City of Los Angeles:

28       [Q]: [J]ust so I – we're crystal clear, **you're a non-City of L.A. traffic**

9

1    specialist; is that fair?

2    [A]: **That's right.**

3    (*Id*. at 43:3–5 (emphasis added).)

4    Simply put, Mr. Miller lacks the requisite knowledge to form a reliable basis

5    for his opinions on CEQA traffic analysis in the City of Los Angeles.

6    **Relevance:** Mr. Miller's lack of particularized knowledge regarding CEQA

7    in the City of Los Angeles also means that his opinions are irrelevant. Because

8    CEQA practice in Los Angeles is different than in other localities (*id.* at 113:15–

9    114:24), abstract testimony about abstruse technicalities divorced from expertise

10   about the Los Angeles CEQA process, like Mr. Miller's, is simply not relevant.

11   Mr. Miller admits that he is not an expert in Los Angeles traffic analyses, the exact

12   topic on which he opines. (*Id.* at 43:3-5.) Mr. Miller's testimony should be

13   excluded.

14   **Reliability:** In addition to his lack of relevant expertise, Mr. Miller's

15   opinions should be excluded because he simply cannot substantiate his opinions.

16   For instance, although he claims that repeating comments regarding traffic analyses

17   may change a decisionmaker's mind, Mr. Miller could not point to one actual

18   instance in which this has occurred. The only example he could point to is

19   California changing from a traffic code-based analysis to a vehicle-miles-traveled

20   analysis. (ECF No. 396-11 ¶ 70; Shaw Decl. Ex. 2 at 122:25-123:11.) But even

21   this assertion is speculation; Mr. Miller offered no evidence that the change was

22   caused by CEQA comments. (*Id.* at 41:23–24; *id.* at 107:9–108:6; *id.* at. 122:12–

23   130:10.)

24   Finally, Mr. Miller's opinions are not reliable because they are founded on a

25   key false assumption. Mr. Miller erroneously claims that the Icon project the City

26   ultimately approved "deleted" the commercial space rather than merely scaling it

27   back. (*Id.* at 41:23–24; *id.* at 107:9–108:6; *id.* at. 122:12–130:10; ECF No. 396-11

28   ¶ 66.) This is wrong. The final approved project contained commercial and

10

residential space.  (ECF No. 401-1 ¶ 55.)  Yet Mr. Miller doubled down on this erroneous claim testifying that the change in the project description fundamentally changed the analysis because a project without commercial space would not be eligible for mixed-use "trip discounts."  (Shaw Decl. Ex. 2 at 225:10-226:25; ECF No. 396-11 ¶¶ 66, 73, 95, 96.)  Mr. Miller's faulty assumption significantly undermines the reliability of his opinions because Mr. Miller's theory that the Icon project FEIR was inadequate hinges, in part, on these trip discounts, and because Mr. Miller seems to not even know the most basic facts about the final approved project on which he is ostensibly opining.  (Shaw Decl. Ex. 2 at 226:18-25.)  His opinions must be excluded.

### 3.    Mr. Gebhart's Opinions Should Be Excluded as Unreliable and Irrelevant

Mr. Gebhart, Defendants' purported air quality and greenhouse gas expert, lacks relevant expertise with CEQA itself.  Moreover, he has an idiosyncratic understanding of what constitutes an "appropriate" or "legitimate" CEQA comment that is completely divorced from the relevant question for assessing sham petitioning.  In addition, his opinions are unreliable because they lack any principles or methodology.

**Lack of Relevant Expertise:** Mr. Gebhart lacks the requisite expertise to opine as a CEQA expert. He has:

- never testified in California or regarding CEQA, (Shaw Decl. Ex. 3 at 12:5-8);
- only worked on two CEQA Projects in his entire career, both approximately 30 years ago, (*id.* at 30:23-31:1); and
- never managed a CEQA project (*id.* at 33:8-10).

Mr. Gebhart's qualifications simply do not include any specialized "knowledge, skill, experience, training, or education" in CEQA, CEQA comment letters, or the reasonableness of CEQA comment letters.  Mr. Gebhart was entirely

11

unfamiliar with the CEQA guidelines, which form the backbone of CEQA.  (*Id.* 105:8-21.)  In his own words, **he "wouldn't consider [himself] to be an expert [in CEQA] in the same way that other people are."**  (*Id*. at 35:6–9 (emphasis added).)

Further, like several of Defendant's other purported experts, Mr. Gebhart has no experience with the methods and procedures of CEQA as administered by the City of Los Angeles.  (*Id.* at 35:6-17.)  Mr. Gebhart has never performed a CEQA analysis in Los Angeles, and the only knowledge that Mr. Gebhart has about CEQA as it relates to Los Angeles is what he has learned through this litigation:

> Q: Would you consider yourself knowledgeable about the CEQA process in the City of Los Angeles?
>
> A: I would say that my knowledge on the specifics of the City of Los Angeles are what I've learned through this particular work.

(*Id.* at 35:13–17.)

What is more, Mr. Gebhart is entirely unfamiliar with the modeling software that the City of Los Angeles, and Defendants, used in their analyses, CalEEMod, which is fundamental to many of Defendants' comments.  In fact, Mr. Gebhart has *never once* run an analysis using the CalEEMod software.  (*Id*. at 68:2–6; 61:10–15.)  Mr. Gebhart's opinions go well beyond his expertise and his opinions should be excluded.

**Relevance:** Mr. Gebhart opines that Defendants' CEQA comments were "reasonable," "appropriate," or "legitimate."  (*See, e.g.*, ECF No. 396-12 ¶¶ 67, 76, 88.)  But this testimony lacks relevance, and would mislead the jury, because it is divorced from the relevant standard.  According to Mr. Gebhart, the hallmark of genuine petitioning is not any objective criteria but whether the petitioners "truly believed in what they were saying":

> BY MR. SHAW: **Q Let me give a concrete example. The comments said, "Since we live on a flat earth, I'm concerned about too much**

**building in Los Angeles. It's going to tip us." Would that -- would that be a legitimate and reasonable comment?**

A If the person believes that it's a flat earth and they are worried about the impact, I think that that would be a relatively simple comment to address. **But I think if the person submitting the comment truly believed what they were saying, then that's a legitimate comment.**

(Shaw Decl. Ex. 3 at 183:25–185:7 (emphasis added).)  Thus, according to Mr. Gebhart, the fact that lead agency rejected Defendants' comments—even calling them misleading, false, and seriously flawed—"has no bearing on whether the comments submitted by interested parties were appropriate." (*Id.* ¶ 111; *see also id.* ¶ 9.)  He elaborated:

Q So I understand your testimony that the City's resolution of Swape's and Lozeau Drury's comments don't have any bearing on whether they were appropriate or legitimate. Is that a fair summary?

A That's a fair summary, yes.

(Shaw Decl. Ex. 3 at 183:25–185:7.)

Whether a petitioner "truly believed what they are saying" is not relevant to whether the facts show objective indicia of genuineness.  Mr. Gebhart's testimony, then, is irrelevant to the inquiry at hand and will only serve to confuse the jury.  It should be excluded.

**Reliability.** Mr. Gebhart's opinions are also unreliable because he lacks any specialized CEQA knowledge.  Despite this, he claims that Defendants' "comments raised the type of significant environmental concerns that, in my opinion, lead agencies use to warrant a more detailed investigation and analysis of the issues raised," and Defendants' comments "utilized appropriate methodologies, were based on sound scientific analyses, and raised legitimate questions about the data, analytical methods, and conclusions reached in the ICON Project CEQA review." (ECF No. 396-12 ¶¶ 5, 7.)  But Mr. Gebhart lacks the relevant expertise to reliably

13

1   opine on "appropriate methodologies" that should be used in the context of a

2   CEQA analysis within the City of Los Angeles.

3   Finally, throughout his report and testimony, Mr. Gebhart claimed that

4   repeated comments can lead to changes in the methodology used by CEQA

5   agencies.  (*See, e.g.*, ECF No. 396-12 ¶ 91; Shaw Decl. Ex. 3 at 75:20-77:21.)  But

6   Mr. Gebhart could not know this because he has had no CEQA experience for over

7   twenty years.  When questioned about these supposed changes or the changes that

8   Defendants supposedly wished to see, Mr. Gebhart couldn't point to a single

9   change stemming from repeated comments in the City of Los Angeles, and the only

10   change he could point to was related to *traffic impacts* which Defendants' traffic

11   expert clarified stemmed from state-level action.  (*Id.* at 77:21-25 ("Q: Just to be

12   clear.  You can't point to a specific CEQA experience[?]…A: Right."); *id.* at 79:18-

13   21 ("Q: Is it your understanding that this was also driven by comments? A: I don't

14   necessarily have firsthand knowledge as to what caused the change."); *see* Shaw

15   Decl. at Ex. 2 at 107:9-108:6.)

16   Therefore, Mr. Gebhart's opinions lack any reliable basis and should be

17   excluded.

18   **4.    Mr. Selmi's Opinions Should Be Excluded as**
       **Unreliable, Irrelevant, or as Impermissible Legal**
19       **Testimony.**

20   Mr. Selmi is a lawyer.  His only relevant expertise is in the law, which is not

21   an appropriate basis for expert testimony.  Thus, he lacks the relevant expertise to

22   offer opinions on complex technical issues.  His legal testimony offers

23   inappropriate legal conclusions.  The jury should not look to Mr. Selmi for

24   instruction on the law; the jury should look to the Court and expertise it possesses

25   in order to understand the relevant law.

26   **Lack of Relevant Expertise:** Mr. Selmi is a lawyer and a law school

27   professor.  (ECF No. 396-10 ¶¶ 1-2.)  He has no formal scientific or technical

28   training and admitted has "no technical expertise."  (Shaw Decl. Ex. 4 at 50:14-21.)

14

1   Therefore, Mr. Selmi lacks any basis to form any opinions regarding technical

2   aspects of CEQA comment letters.  Nonetheless, Mr. Selmi's report and transcript

3   are littered with his technical analyses and conclusions regarding a variety of issues.

4       Fire Protection: Despite admitting that he has no expertise in fire protection

5   (*Id.* at 94:6-14 ("Am I expert [in fire protection]? No.")).  Mr. Selmi offers opinion

6   relating to Mr. Drury's—and the Union's technical experts—comments regarding

7   the adequacy of the Fire Department's analysis that fire protection impacts would

8   be at an "acceptable level."  Mr. Selmi, without any basis, posits that Mr. Drury's

9   comments were "reasonable."  (ECF No. 396-10 ¶¶ 40-44.)  Indeed, Mr. Selmi

10  admits that he didn't use any specialized training to form this opinion: "I don't call

11  myself an expert in that. I'm simply a person who read what they said."  (Shaw

12  Decl. Ex. 4 at 94:15-19.)

13      Sewer Capacity: Mr. Selmi also lacks any relevant expertise relating to sewer

14  capacity issues.  (Shaw Decl. Ex. 4 at 94:21-95:1 ("Similarly, you're not an expert

15  in sewer capacity, as to the technical side? A:…[N]o, I am not an expert in

16  sewage.")  Mr. Selmi again posits that "Mr. Drury's . . . analysis was needed."

17  (ECF No. 396-10 ¶ 46.)  But again, Mr. Selmi did not use any technical expertise—

18  which he admitted he does not have—to reach that opinion. Instead he "read the

19  information that was in the responses by the agencies" and came up with the

20  unfounded opinion that he thought would help his client.  (Shaw Decl. Ex. 4 at

21  95:22-23.)

22      School Services: In line with Mr. Selmi's other unfounded opinions, Mr.

23  Selmi admits that he lacks any reliable basis for offering opinions related to school

24  services.  (Shaw Decl. Ex. 4 at 95:13-16 ("I am not an expert in what formulae

25  schools use to determine whether they will need more classroom capacity.").)

26  Again, with no basis, Mr. Selmi claims that Mr. Drury's comments were

27  "reasonable."  (ECF No. 396-10 ¶ 48.)  As he did with the rest of his city services-

28  related opinions, Mr. Selmi just "read the FEIR" and "read [Drury's] response" and

15

1  came up with an unfounded opinion on which he is not qualified to opine.  (Shaw
2  Decl. Ex. 4. at 96:11-16.)

3      <u>Recognized Environmental Conditions/Subsurface Studies</u>: Mr. Selmi
4  claims, without any basis, that "th[e] record would justify Mr. Drury's comment[s]"
5  regarding recognized environmental conditions based on the outcomes of three, of
6  the almost ten, subsurface study investigations.  (ECF No. 396-10 ¶ 136.)  Mr.
7  Selmi insinuates that because a Phase II study was published three days prior to a
8  Phase I study, that the Phase I study necessarily indicates that the outcome of the
9  studies is inconclusive.  (ECF No. 396-10 ¶¶ 134-136.)  But this is simply not so.
10 Defendants' own purported geophysical study expert opined that it is common for
11 Phase I reports—which he described as "book reports"—to be published after Phase
12 II reports—which are sampling investigations that search for the dangerous
13 conditions the Phase I report may have identified.  (Shaw Decl. Ex. 1 at 94:17-
14 95:12.)  However, Mr. Selmi—who admittedly lacks any expertise in geophysical
15 studies—admits that "[he has] no knowledge" regarding the production and timing
16 of Phase I and Phase II reports.  (Shaw Decl. Ex. 4 at 142:2-8.)  Despite this lack of
17 knowledge, he opines that because the Phase I report was published after the Phase
18 II report, the record is "confusing and incomplete."  (ECF No 396-10 ¶ 137.)  Of
19 course, these reports would appear confusing to a non-expert like Mr. Selmi.  Like
20 all of his opinions, Mr. Selmi's statements regarding subsurface studies lack a
21 reliable basis—and even conflict with Defendants' own purported subsurface study
22 expert—and must be excluded.  Mr. Selmi lack's the expertise to offer testimony on
23 any technical topic.

24     **Improper Testimony on Legal Conclusions:** The rest of Mr. Selmi's
25 opinions are improper because they offer legal conclusions that invade the
26 provenance of the court.  *In re REMEC Inc. Sec. Litig*., 702 F. Supp. 2d 1202, 1254
27 (S.D. Cal. 2010).  Opinion testimony that appears to define the applicable legal
28 standard is inappropriate and properly excluded because "instructing the jury as to

16

the applicable law is the distinct and exclusive province of the court." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (citation omitted); *see also Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997); *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988); *Shahid v. City of Detroit*, 889 F.2d 1543, 1547 (6th Cir. 1989).

Mr. Selmi, a law professor and non-technical expert, intends to opine regarding the legal requirements of the "stable project description" including:

> The requirement of stability concerns whether the project sufficiently changed during the CEQA process that the changes deprived the public of the opportunity to comment on the final project approved by the public agency. It also concerns whether the public agency evaluated a set of underlying facts and circumstances that so differed from those of the approved project as to undermine the accuracy[.]

(ECF No. 396-10 ¶ 20.)  Mr. Selmi goes on to draw the legal conclusion that the issue "was an important, undecided legal point," and that:

> This history of the ICON litigation unquestionably shows that the "stable project" issue raised in this case was valid, uncertain, and difficult. Mr. Joseph's report, however, entirely ignores the substance of the issue. Instead, he just dismisses the entire litigation as "facially deficient." Thus, his opinion is both unsupported and wrong.

(*Id* ¶ 155.)  Mr. Selmi should not be allowed to suggest to the jury that the Icon project did not meet the stable project description requirement or that Mr. Drury's comments regarding the stable project description were meritorious.  (*Id.* (characterizing the "issue raised in [the Icon state court action] was valid, uncertain, and difficult.").)

And Mr. Selmi's legal conclusions don't stop there.  Mr. Selmi similarly goes on to draw legal conclusions regarding legal doctrine of "exhaustion of administrative remedies."  (*Id.* ¶¶ 90-96.)  Mr. Selmi—incorrectly—posits that:

> [I]f [Mr. Drury] wished to preserve his clients' ability to raise these issues in Superior Court, Mr. Drury was obligated to raise them at each level to exhaust his client's administrative remedies.

(*Id.* ¶ 95.)  This baldfaced legal conclusion posits that Mr. Drury—along with SEM

and SWAPE—not only could, but were required by law, to file repeatedly baseless CEQA comments in order to sue Icon.  Not only is this a misstatement of the law, it is exactly the type of legal conclusion that an expert cannot offer.  *Nationwide Transp. Fin.*, 523 F.3d at 1058–60, 1063 (affirming exclusion of expert testimony that misstated the law and offered an opinion on how that law applied to the facts of the case).

Finally, Mr. Selmi's experience in working at an Attorney General's office in the 1970s is entirely irrelevant to the decisions made by Attorneys General Bonta and Becerra.  (ECF No. 396-10 ¶ 151; *id.* ¶ 2 (Mr. Selmi worked for the Attorney General's office from 1976-1983).)  Mr. Selmi's statement that "I know that the Attorney General does not participate in CEQA litigation unless the legal issue presented is important or unsettled" is not only irrelevant and unfounded because Mr. Selmi did not work in either of Messrs. Bonta's or Becerra's offices.  (*Id* ¶ 151.)  It is also a conclusion regarding the intent of Messrs. Bonta and Becerra in preparing amici briefs in support of the Unions for which Mr. Selmi has no basis.

For those reasons, Mr. Selmi's opinions should be excluded.

## B.    Mr. Kheyfets' Testimony Should Be Excluded Because He Lacks Relevant Expertise and Offers Unreliable Testimony

Mr. Kheyfets offers opinions on "the damages analysis offered by Icon's expert, Mr. Paul Habibi" and discusses in depth both California real estate and CEQA petitioning.  (ECF No. 395-5.)  But he lacks the relevant expertise to opine on CEQA or real estate in California (much less Los Angeles).  His only formal training consists of a bachelor's degree and master's degree in economics.  He has no formal training in anything related to real estate, nor does he have any real-world experience with real estate in California, with CEQA, or with land use law.  Additionally, his opinions are unreliable because they are not the product of any reproducible method or analysis.  Indeed, Mr. Kheyfets inexplicably spends much of his report summarizing an ABA book on damages.

**Lack of Relevant Expertise:** Nothing in Mr. Kheyfets formal training or background qualifies him to opine on California real estate or the effect that Defendants' baseless CEQA petitioning activity has on it.  But these topics form the core part of his report. Mr. Kheyfets spends nearly half his report discussing real estate in Southern California, including opining on the differences between 2018 and 2023.  (ECF No. 395-5 ¶¶ 33–36.)  He also delves into whether certain assumptions about real estate are reasonable, (*see, e.g.*, *id.* ¶ 42), including opining on the effect COVID had on the market, (*id.* ¶ 43), "apartment rent assumptions" in 2018 versus 2023, (*id.* ¶¶ 46–48), retail rent assumptions in 2018 versus 2023, (*id.* ¶¶ 49–50), operating expense assumptions in 2018 versus 2023, (*id.* ¶¶ 51–53), construction costs in 2018 versus 2023, (*id.* ¶¶ 54–55).

The truth is that Mr. Kheyfets has no relevant expertise in real estate.  He has no formal training in real estate.  (*See* ECF No. 395-5 at A-2.)  And he has no relevant real-world experience. He has never developed real estate—much less in Southern California.  (Shaw Decl. Ex. 5 at 27:6–11; *id.* at 27:12–24.)  Outside of owning a small, single condo unit in Washington, D.C., Mr. Kheyfets has no experience in real estate investing.  (*Id.* at 28:13–29:16.)  He admits he has never managed a real estate development project.  (*Id.* at. 102:7–10.)  He concedes that he has never managed a multi-family building.  (*Id.* at 139:1–7.)  And he confessed that he has never underwritten a real estate development.  (*Id.* at 139:9–13.)

Mr. Kheyfets also opines on the nature of CEQA petitioning, (ECF No. 395-5 ¶¶ 21–22), the likely effect of that petitioning in general, (*id.* ¶ 23), the effect of that petitioning specific to the Icon project, (*id.* ¶¶ 24–33).  But again, Mr. Kheyfets lacks relevant expertise.  He has no experience regarding CEQA, environmental reviews, or California land use law.  He admits that he has never done work related to CEQA.  (Shaw Decl. Ex. 5 at 21:14–22:2; *id.* at 84:10–17.)  He admits that he isn't an environmental expert.  (*Id.* at 22:11–14.)  He concedes that, outside of this matter, he has no familiarity with California land use law.  (*Id.* at 22:4–9.)  Indeed,

he has no professional experience in California.  He has never worked outside the East Coast.  (ECF No. 395-5 at A-2; Shaw Decl. Ex. 5 at 20:20–21:1.)  In fact, he has never even been to his firm's Los Angeles' office.  (Shaw Decl. Ex. 5 at 19:14–16.)

His testimony should be excluded on the basis of relevance.

**Reliability:** Mr. Kheyfets's opinions are also unreliable.  He performed no independent review.  For instance, despite opining on it, Kheyfets didn't analyze which entities filed CEQA lawsuits.  (*Id.* at 67:19–68:1; *id.* at 68:3–9.)  Nor did he investigate the credibility of the entity's whose work he cited.  (*Id.* at. 70:23–72:2.)

As noted above, Mr. Kheyfets discusses Southern California real estate in detail, but performed no models regarding it in 2018.  (*Id.* at 105:23–106:8.)  Indeed, he made no independent assessment of changes in the Southern California real estate market from 2018 to 2023:

> Q: And outside of demand for the Icon project specifically, do you have any sense of larger changes that transcend the Icon project in southern California for real estate development? . . .
>
> THE WITNESS: Other than what Mr. Habibi describes in his report, there was no need -- and nor was I asked -- to conduct an independent analysis of real estate markets separate and apart from Mr. Habibi's calculation.

(*Id.* at 109:21–110:5 (objection omitted); *see also id.* at 108:3-9.)  Indeed, Mr. Kheyfets admitted that all he did was review and comment on Mr. Habibi's analysis:

> Q Did you compare Icon's 2018 projections with projections in other development projects in Los Angeles?
>
> THE WITNESS: Projections of what?
>
> BY MR. SHAW: Q Other development projects in Los Angeles.
>
> THE WITNESS: But projections of which metrics?
>
> BY MR. SHAW: Q Did you do it on any metrics?

20

A I certainly looked at Mr. Habibi's -- what he called "independent studies." The groups of other buildings that he used in his assessment. I did look at that.

Q So other than looking at Mr. Habibi's assessment, did you do your own assessment?

A I wasn't asked to do work that's unrelated to Mr. Habibi's calculations.

(*Id.* at 120:16–121:10 (objections omitted); *see also* 117:19–118:15.)

Mr. Kheyfets admitted that he:

- conducted no affirmative analysis of residential rents (*id.* at. 139:14–21; 144:11–17);
- conducted no affirmative analysis of retail rents (*id.* at 146:8–12); and
- had no separate methodology of Habibi's discounted cash flow analysis (*id.* at 161:8–13).

Finally, Mr. Kheyfets admitted that he wasn't familiar with basic facts related to the case. For instance, he didn't know whether a developer can develop while the CEQA process for that development is ongoing. (*Id.* at 98:14–19.) Nor whether a developer can develop while CEQA litigation is pending. (*Id.* at 98:21–25; 104:8–15.) He couldn't even opine on whether Icon could develop during the lawsuit. (*Id.* at 100:10–15.)

Mr. Kheyfets opinions are unreliable and should be excluded.

## IV.   CONCLUSION

For the foregoing reasons, the Court should exclude the purported expert testimony of Dr. Laton and Messrs. Miller, Gebhart, Selmi, and Kheyfets.

Dated:  April 23, 2024

MORRISON & FOERSTER LLP

By: */s/ David J. Shaw*
David J. Shaw
*Attorneys for Plaintiff*
THE ICON PANORAMA, LLC

21

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Plaintiff, The Icon at Panorama, LLC, certifies that this brief contains 6800 words, which complies with the word limit of L.R. 11-6.1.

*/s/ David J. Shaw*
David J. Shaw

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO STRIKE DEFENDANTS' REBUTTAL OPINIONS

1

## **CERTIFICATE OF SERVICE**

2       I hereby certify that on April 23, 2024, the within document was filed with

3 the Clerk of the Court using CM/ECF, which will send notification of such filing to

4 the attorneys of record in the case.

5

6                                          */s/ David J. Shaw*

7                                          David J. Shaw

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO STRIKE DEFENDANTS' REBUTTAL OPINIONS